UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KRISTINA GARCIA,

     Plaintiff,

v.

BEAUMONT HEALTH and
RACHEL LUCA,

     Defendants.

Case No: 19-11673

District Judge Linda V. Parker

Magistrate Judge David R. Grand

/

| | |
|---|---|
| Lisa C. Ward (P38933) | KIENBAUM HARDY VIVIANO |
| Law Offices of Lisa C. Ward, PLLC | PELTON & FORREST, P.L.C. |
| Attorney for Plaintiff | By: Eric J. Pelton (P40635) |
| 4131 Okemos Road, Suite 12 |     Shannon V. Loverich (P53877) |
| Okemos, MI  48864 | Attorneys for Defendant Beaumont Health |
| 517-347-8102 | 280 N. Old Woodward Avenue, Suite 400 |
| lisacward@aol.com | Birmingham, Michigan 48009 |
| | (248) 645-0000 |
| | epelton@khvpf.com |
| | sloverich@khvpf.com |

/

**DEFENDANT BEAUMONT HEALTH'S
MOTION FOR SUMMARY JUDGMENT**

Defendant Beaumont Health ("Beaumont"), through its attorneys, Kienbaum Hardy Viviano Pelton & Forrest, P.L.C., requests that the Court enter summary judgment in its favor, pursuant to Federal Rule of Civil Procedure 56, and dismiss Plaintiff's complaint in its entirety with prejudice. Ford relies on its accompanying Statement of Material Facts, accompanying brief, and exhibits and declarations in support of its motion for summary judgment.

On October 12, 2020, Ford's counsel sought concurrence from Plaintiff's counsel, explaining the nature of the motion and its legal basis. Plaintiff's counsel did not concur, necessitating this motion.

KIENBAUM HARDY VIVIANO
PELTON & FORREST, P.L.C.

By: */s/ Shannon V. Loverich*
    Eric J. Pelton (P40635)
    Shannon V. Loverich (P53877)
Attorneys for Defendant Beaumont Health
280 N. Old Woodward Avenue, Suite 400
Birmingham, Michigan 48009
(248) 645-0000
epelton@khvpf.com
sloverich@khvpf.com

Dated:  October 13, 2020

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KRISTINA GARCIA,

     Plaintiff,

v.

BEAUMONT HEALTH and
RACHEL LUCA,

     Defendants.

Case No:  19-11673

District Judge Linda V. Parker

Magistrate Judge David R. Grand

_____/

Lisa C. Ward (P38933)
Law Offices of Lisa C. Ward, PLLC
Attorney for Plaintiff
4131 Okemos Road, Suite 12
Okemos, MI  48864
517-347-8102
lisacward@aol.com

KIENBAUM HARDY VIVIANO
PELTON & FORREST, P.L.C.
By: Eric J. Pelton (P40635)
     Shannon V. Loverich (P53877)
Attorneys for Defendant Beaumont Health
280 N. Old Woodward Avenue, Suite 400
Birmingham, Michigan 48009
(248) 645-0000
epelton@khvpf.com
sloverich@khvpf.com

_____/

**BRIEF IN SUPPORT OF DEFENDANT BEAUMONT HEALTH'S
MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

STATEMENT OF ISSUES PRESENTED.................................................. iii

CONTROLLING AUTHORITY........................................................... v

INDEX OF AUTHORITIES................................................................vi

I.    Introductory Statement ........................................................1

II.   Facts ................................................................................2

     A.    Garcia Works as a Respiratory Therapist on Midnight
            Shift. .....................................................................2

     B.    Garcia Had an Amicable Relationship with Rachel
            Luca, Who Had No History of Sexual
            Misconduct/Communications...............................................3

     C.    Garcia Reports Alleged "Sexual Assault" By Luca a
            Week after it Purportedly Occurred. .....................................4

     D.    Garcia Repeatedly States That She Does Not Want
            Garcia Disciplined and Wants the Matter to Be Handled
            by Ms. Carroll................................................................6

          1.    Ms. Carroll immediately investigates Garcia's
                  written complaint. .......................................................6

          2.    The Investigation Refuted Garcia's Complaint ........................7

     E.    Ms. Carroll Counseled Luca and No Other Sexual
            Comments or Conduct is Reported By Garcia.....................................9

     F.    Garcia Admitted Ms. Carroll's Response Was
            Satisfactory and Resolved Her Issue with Luca....................................9

     G.    Garcia Reports That Luca is "Retaliating" By Telling
            Coworkers Her Side of the Story. ........................................10

     H.    Garcia's "Retaliation" Complaint Is Investigated and
            Luca Is Disciplined...........................................................11

III.   Legal Argument ..............................................................13

A.     Summary Judgment Standard..............................................................13

B.     Garcia Cannot Establish Essential Elements of a Title
       VII Disparate Treatment Claim..........................................................13

       1.     Garcia Cannot Establish That She Incurred an
              Adverse Action. ........................................................................14

       2.     Garcia's Post-Litigation Dissatisfaction With
              Luca's Discipline Is Not an Adverse Action and
              No One Outside of the Protected Class Was
              Treated More Favorably. ..........................................................15

       3.     Beaumont has a legitimate business reason for
              Luca's level of discipline, which Garcia cannot
              establish is pretext for unlawful discrimination......................16

C.     Garcia Cannot Establish an Elliott-Larsen Hostile
       Environment Claim. ..........................................................................17

D.     Garcia Cannot Establish a Title VII or Elliott-Larsen
       Retaliation Claim as a Matter of Law ...............................................20

       1.     Plaintiff's Retaliation Claim Should Be Dismissed
              Because She Cannot Establish Adverse Action by
              Beaumont. .................................................................................21

       2.     There is No Actionable Retaliatory Harassment for
              Which Beaumont Can Be Liable. ..............................................22

              a.     Luca's Conduct Does Not Meet Threshold
                     for Actionable Retaliatory Harassment. ..........................22

              b.     Garcia Cannot Establish Beaumont
                     Condoned, Participated in or Encouraged
                     Luca's Alleged "Harassment."........................................24

## STATEMENT OF ISSUES PRESENTED

I.   Title VII Disparate Treatment

A.   A *prima facie* case of discrimination requires that the plaintiff suffer an adverse job action. An adverse job action is a significant change in the plaintiff's employment status such as termination, failure to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits that typically inflicts direct economic harm. Where Plaintiff's employment has continued without any involuntary change to this day and without any impact on her pay or benefits, has Plaintiff established a *prima facie* case of discrimination?

B.   To establish a *prima facie* case, a female/bisexual plaintiff claiming sex discrimination is required to establish she was treated more harshly than a similarly situated man/heterosexual for the same conduct. Plaintiff does not contend that she was treated more harshly than a man/heterosexual.  Instead, Plaintiff claims that her accused harasser would have been treated more harshly had the alleged harasser been a man; *i.e.* the accused harasser received more favorable treatment because she is a woman. Can Plaintiff establish <u>she</u> was treated more harshly than a man or heterosexual employee where the alleged disparate treatment concerns her alleged harasser and not Plaintiff?

C.   If a plaintiff establishes a *prima facie* case of sex discrimination, the employer has the opportunity to articulate a non-discriminatory reason for its action. Thereafter, the plaintiff has a burden of showing the asserted reason is not the actual reason, but was pretext for unlawful discrimination. Here, Beaumont did not terminate Plaintiff's alleged sexual harasser because the only witness to the incident of harassment stated that it did not occur. Has Beaumont stated a legitimate, non-discriminatory reason for its conduct, which Plaintiff cannot establish is pretext for unlawful discrimination?

II.  Elliott-Larsen Hostile Environment Sexual Harassment Claim

A.   In order to hold an employer liable for a claim of hostile work environment sexual harassment under Elliott-Larsen, Plaintiff must establish *respondeat superior* liability on the part of the employer by establishing the employer failed to take prompt and appropriate

remedial action. Here, Beaumont immediately investigated Plaintiff's claim, concluded her allegations were unsubstantiated because the only witness to the event denied it occurred, and Beaumont thereafter ensured Plaintiff was never again paired on any work assignment with her alleged harasser. Plaintiff admits no further alleged sexual harassment occurred after Beaumont's investigation and responsive actions. Has Plaintiff established fault on the part of Beaumont?

III.   Title VII and Elliott-Larsen Retaliation Claim

A.   A *prima facie* case of retaliation requires that the plaintiff suffer an adverse job action. An adverse job action is a significant change in the plaintiff's employment status such as termination, failure to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits that typically inflicts direct economic harm. Where Plaintiff's employment has continued without any involuntary change to this day and without any impact on her pay or benefits, has Plaintiff established a *prima facie* case of retaliation?

B.   A claim of retaliation based on retaliatory harassment requires a showing of severe or pervasive conduct, something more severe than name calling, disparaging remarks and false complaints. Here, Plaintiff claims that the person she accused of sexual assault told three co-workers that the alleged assault did not happen, a position supported by the only witness to the alleged event. Has Plaintiff met the necessary threshold for actionable retaliatory harassment?

C.   In order to hold an employer liable for a coworker's retaliatory harassment, the employer must have condoned, tolerated, or encouraged the coworker harassment, or made a decision not to take action to stop the alleged harassment. Here, Beaumont immediately investigated the alleged retaliatory conduct Plaintiff attributed to her coworker and disciplined the co-worker, where upon the conduct stopped and Plaintiff never again reported any further retaliation. Can Beaumont be held liable under these circumstances?

# CONTROLLING AUTHORITY

*Alexander v. Caresource*, 576 F.3d 551 (6th Cir. 2009)

*Bellamy v. Fritz*, 129 Fed. Appx. 245 (6th Cir. 2005)

*Blankenship v. Parke Care Centers, Inc.,* 123 F.3d 868 (6th Cir. 1997)

*Bowman v. Shawnee State Univ*, 220 F.3d 456 (6th Cir. 2000)

*Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998)

*Chambers v. Trettco Inc.*, 463 Mich. 297; 614 N.W.2d 910 (2000)

*Chambers v. Trettco, Inc. (On Remand),* 244 Mich. App. 614 (2001)

*Chen v. Dow Chemical Co.*, 580 F.3d 394 (6th Cir. 2009)

*Hawkins v. Anheuser-Busch, Inc.,* 517 F.3d 321 (6th Cir. 2008)

*Kocsis v. Multi-Care Management, Inc.*, 97 F.3d 876 (6th Cir. 1996)

*Meyer v. City of Ctr. Line*, 242 Mich. App. 560; 619 N.W.2d 182 (2000)

*Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584 (6th Cir. 2007)

*Mullins v. Goodyear Tire & Rubber Co.*, 291 F. App'x 744 (6th Cir. 2008)

*Pena v. Ingham County Road Commission,* 255 Mich. App. 299; 660 N.W.2d 351 (2003)

*Primes v. Reno,* 190 F.3d 765 (6th Cir.1999)

*Rymal v. Baergen*, 262 Mich. App. 274; 686 N.W.2d 241 (2004)

# INDEX OF AUTHORITIES

## Cases

*Alexander v. Caresource,*
   576 F.3d 551 (6th Cir. 2009) ...................................................................13

*Allen v. Michigan Dep't of Corrections,*
   165 F.3d 405 (6th Cir. 1999)...................................................................20

*Anderson v. Memphis City Schools Bd. of Ed.,*
   75 F.Supp.2d 786 (W.D. Tenn. 1999)......................................................19

*Baird v. Gotbaum,*
   662 F.3d 1246 (D.C. Cir. 2011) ..............................................................23

*Baird v. Snowbarger,*
   744 F. Supp. 2d 279 (D.D.C. 2010) ........................................................23

*Bellamy v. Fritz,*
   129 Fed. Appx. 245 (6th Cir. 2005) ........................................................18

*Blackie v. Maine,*
   75 F.3d 716 (1st Cir.1996) ......................................................................15

*Blankenship v. Parke Care Centers, Inc.,*
   123 F.3d 868 (6th Cir. 1997)...................................................................19

*Bowman v. Shawnee State Univ,*
   220 F.3d 456 (6th Cir. 2000) ..................................................................14

*Burlington Indus., Inc. v. Ellerth,*
   524 U.S. 742 (1998) ................................................................................14

*Chambers v. Trettco Inc.,*
   463 Mich. 297; 614 N.W.2d 910 (2000) .................................................17

*Chambers v. Trettco, Inc. (On Remand),*
   244 Mich. App. 614 (2001) .....................................................................19

*Chen v. Dow Chemical Co.,*
   580 F.3d 394 (6th Cir. 2009) ....................................................... 14, 16, 17

*Ferguson v. Associated Wholesale Grocers, Inc.*,
469 F.Supp.2d 961 (D. Kan. 2007) .......................................................24

*Ford v. Lowe's Home Centers, Inc*,
No. 07-13303, 2008 WL 5273607 (E.D. Mich. Oct. 31, 2008) ..........................19

*Gunnell v. Utah Valley State Coll.*,
152 F.3d 1253 (10th Cir. 1998)...........................................................25

*Hawkins v. Anheuser-Busch, Inc.*,
517 F.3d 321 (6th Cir. 2008) ....................................................... 21, 24

*Huston v Procter & Gamble Paper Products Corp*,
568 F3d 100 (3rd Cir. 2009).............................................................19

*Johnson v. City of Flint*,
2010 WL 1957208 (E.D. Mich. May 13, 2010)...................................23

*Knabe v. Boury Corp.*,
114 F.3d 407 (3rd Cir. 1997)............................................................18

*Kocsis v. Multi-Care Management, Inc.*,
97 F.3d 876 (6th Cir. 1996). ...........................................................22

*McQuail v. Tennessee Tech. Univ.*,
69 F. Supp. 3d 701 (M.D. Tenn. 2014) ..............................................23

*Metropolitan Life Ins. Co. v. Gibbs*,
89 F.Supp.2d 877 (E.D. Mich. 2000) .................................................13

Meyer *v. City of Ctr. Line*,
242 Mich. App. 560; 619 N.W.2d 182 (2000) ............................. 21, 24

*Michael v. Caterpillar Fin. Servs. Corp.*,
496 F.3d 584 (6th Cir 2007)........................................................ 20, 21

*Mullins v. Goodyear Tire & Rubber Co.*,
291 F. App'x 744 (6th Cir. 2008).....................................................19

*Owen v. Peake*,
2008 WL 4449011 (S.D. Ohio September 26, 2008).............................23

*Pena v. Ingham County Road Commission,*
  255 Mich. App. 299; 660 N.W.2d 351 (2003) .....................................................15

*Primes v. Reno,*
  190 F.3d 765 (6th Cir.1999) ..................................................................................16

*Rymal v. Baergen*,
  262 Mich. App. 274; 686 N.W.2d 241 (2004) ...................................................20

*Swanson v. Livingston Co.*,
  121 Fed. Appx. 80 (6th Cir. 2005) ......................................................................25

*Vredevelt v. GEO Group, Inc.,*
  145 Fed. App'x 122 (6th Cir. 2005) .....................................................................14

**Statutes**

MCL 37.2103(h) ........................................................................................................17

MCL 37.2202(1)(a) ...................................................................................................17

**Rules**

Federal Rule of Civil Procedure 56(c) .....................................................................13

# I.      Introductory Statement

Plaintiff Kristina Garcia, a bi-sexual woman and Respiratory Therapist at Beaumont Health's Royal Oak Hospital, brought this suit alleging sex and sexual orientation discrimination (under Title VII), sexual harassment (under Elliott-Larsen) and retaliation (under Title VII and Elliott-Larsen). Garcia's claims are based entirely on her coworker Rachel Luca's alleged sexual assault on July 29, 2018—conduct the only witness in the room denies occurred—and Luca's alleged "retaliation" thereafter. Garcia waited one full week to report Luca's alleged assault, and in that report repeatedly told management that she did not want Luca disciplined or fired and that she did not want Human Resources involved. Garcia's management promptly investigated and any harassment apparently stopped because Garcia made no more complaints of sexual harassment. The purported retaliation was Luca telling three coworkers her side of the story—*i.e.,* that Garcia's allegations were untrue.

Garcia's claims against Beaumont fail as a matter of law. She cannot establish a materially adverse action, a necessary element of her disparate treatment claim. Instead, her disparate treatment claim is based on an unrecognized and unsupported legal theory that *Luca* received preferential treatment with respect to discipline because of her gender. Garcia has no evidence to support her theory (indeed, the undisputed facts refute it), and Luca's level of discipline, of course, has nothing to do with Garcia. Garcia's hostile environment and retaliatory harassment claims fail

1

because Beaumont promptly responded and took remedial action even though the alleged assault was unsubstantiated. Beaumont's actions indisputably stopped all conduct of which Garcia complained. And Garcia never again interacted with Luca in the workplace. In other words, Beaumont did exactly what it was supposed to do under the law. This precludes Garcia's retaliatory harassment and sexual harassment claims. Summary judgment for Beaumont is warranted under well-established principals of Title VII and Elliott-Larsen employment law.

## II.    Facts

### A.    Garcia Works as a Respiratory Therapist on Midnight Shift.

Since April 2011, Garcia has been employed at Beaumont's Royal Oak Hospital as a Respiratory Therapist. (Ex. A, Plaintiff's Dep. 54-56.) She remains employed today. Respiratory Therapists are responsible for caring for patients with breathing or cardiopulmonary disorders. (Ex. B, Decl. of Antoinette Carroll ¶3.) They are generally assigned to work in pairs throughout the hospital's four towers. (*Id.*) They report to one of four supervisors who, in turn, report to the Respiratory Director, Jean Aphram. (Pl. Dep. 59-60.)

Garcia also worked as a Charge Therapist from approximately January 2017 until she voluntarily resigned from that role on February 28, 2019.  (Carroll Decl. ¶ 5 and Ex. 1 to Decl.) The Charge Therapist acts as a lead when a supervisor is not on site (e.g. midnights, weekends). (Pl. Dep. 79-80.) Charge Therapists respond to

staff needs and make or change work assignments for the Respiratory Therapists to meet work demands. They have the authority to handle specific issues that may arise during a shift, or to assign someone else. (*Id.* at 79-80.)

**B.    Garcia Had an Amicable Relationship with Rachel Luca, Who Had No History of Sexual Misconduct/Communications.**

Defendant Rachel Luca was Garcia's coworker. (Ex. C, Decl. of Michael Dixon ¶ 7.) She was employed as a Respiratory Therapist from June 2, 2015 until December 11, 2018. (*Id.*) Luca was hired after an extensive background check that confirmed she had no criminal history, positive references, and all required certifications. (*Id.*)  Prior to Garcia's complaint (*see,* Section C, below), neither management nor Human Resources received any complaints about Luca engaging in sexually inappropriate conduct or comments. (*Id.*; Carroll Decl. ¶ 7.)

For three years, Garcia and Luca had an amicable relationship. (Pl. Dep. 90.) They talked at work, occasionally took breaks together, and Garcia performed favors for Luca outside of work (*i.e.,* taking Luca's dogs to the vet). (Pl. Dep. 90-93, 152.) Garcia described the Respiratory department on midnights as a playful, joking atmosphere that she admittedly participated in and which did not offend her. (Pl. Dep. 136, 138-140.) Garcia and her coworkers "get along well," "joke with each other," and admittedly are "a little loose with our lips." (*Id.*) Garcia admits she contributed to foul language and inappropriate conversations. (*Id.*; Pl. Dep. 280.)

**C.**     **Garcia Reports Alleged "Sexual Assault" By Luca a Week after it Purportedly Occurred.**

On Monday, August 6, 2018, Garcia came to day-shift supervisor Antoinette Carroll to complain about Luca.[1] (Pl. Dep. 201, 206 and Ex. 5 to Dep.) Garcia came to Ms. Carroll (as opposed to her own supervisor) because she felt more comfortable talking to a woman, and she believes Ms. Carroll is the strongest manager on the team. (*Id.*)  Garcia told Ms. Carroll that a week earlier, on Sunday, July 29, 2018, Luca reached under Garcia's scrubs, into her bra, lifted her breast out of the bra cup, and pinched her nipple. (*Id.*) Garcia waited a week to report it because she was focused on her dog's surgery. (Pl. Dep. 201-202.) Garcia alleged that the incident occurred in a small storage room on the 3rd floor of the East Tower where Garcia, Luca, and coworker Colleen Kaye gathered to take their break. (Pl. Dep. 120, 152-185 and Ex. 5 and 8 to Dep.) When Garcia entered the room, Luca or Kaye asked Garcia why she was wearing a PPE gown over her scrubs. (*Id.*) Garcia commented that she was "freezing and you can see my nips through my bra." (*Id.*) The conversation then turned to the topic of bras and they discussed their preferred bra brand/type. (*Id.*) Luca and Kaye asked Garcia if she had a bra like theirs and pulled out their shoulder straps to show her. (*Id.*) Garcia said she did not and pulled out her

---

[1] Garcia surreptitiously recorded her conversation with Ms. Carroll, and a transcript prepared by her attorney's office is Ex. 7 to Garcia's deposition.

left bra strap with her right hand. (*Id.*) Garcia claims Luca got up from her chair, came over to Garcia and put her right-hand down Garcia's shirt, pinched Garcia's left nipple and lifted Garcia's breast out of its bra cup. (*Id.* & Ex. 8.)

Garcia claims she was "pissed off" and told Luca "now that's too fucking far." (Pl. Dep. 186-190.) Garcia did not stand up. Did not grab Luca's hand. Did not stop Luca in any manner. (*Id.*) She did not walk out of the room. (*Id.*) She did not call security or the police. And she did not notify any supervisors or the Charge therapist. (*Id.*) Instead, Garcia testified that she "just moved on" and "I didn't do anything about it." (Pl. Dep. 190.) And, the conversation continued for a while after the alleged assault before they all returned to their work assignments. (Pl. Dep. 188-89.)

Later in the shift, Garcia elected to reconvene with Luca and her coworkers in the storage/breakroom. (Pl. Dep. 194-201.) That time, Luca allegedly shared a conversation she had about how vaginas change after childbirth, and Luca commented that hers was still beautiful even after all of her kids. (*Id.*) Luca then allegedly insinuated that she was going to take down her scrubs to show them. (*Id.*) Garcia claims Kaye made a comment to Luca along the lines of "you're crazy, knock it off." (*Id.*) Then Luca purportedly started googling vaginal infections and pointed her phone toward Garcia, and asked "so this is what you like?" (*Id.*) Garcia responded, "if you look up infected dicks, you will find that as well." (*Id.*)

**D.    Garcia Repeatedly States That She Does Not Want Garcia Disciplined and Wants the Matter to Be Handled by Ms. Carroll.**

Ms. Carroll was shocked and concerned by Garcia's allegations. (Carroll Dep. 50 and Ex. 5 and 7 to Dep.) She listened and offered support to Garcia. (*Id.*) Ms. Carroll asked Garcia to prepare a written statement of her complaint. (*Id.*)  Two days later, Garcia submitted a statement addressing Luca's alleged assault. (Pl. Dep. 211-212 and Ex. 5 to Dep.) Throughout their initial conversation, Garcia *repeatedly* requested that Luca not be disciplined or terminated and that the matter be handled by Ms. Carroll, and not Human Resources. (Pl. Dep. Ex. 7, p. 6.) ("[I]f I go to HR, I feel like they'll take it out of my hands and say, oh, [you] have to do something.") Garcia went to Ms. Carroll because she did not want Luca to be fired. (Pl. Dep. 204-205, 209-210.) Garcia told Ms. Carroll, "I'm not afraid of her" and "I don't think she'll do it again or anything like that." (Pl. Dep. Ex. 7, p. 6.) Garcia understood that Ms. Carroll would investigate and that was fine with her. (Pl. Dep. 210.)

**1.    Ms. Carroll immediately investigates Garcia's written complaint.**

Ms. Carroll consulted Beaumont's sexual harassment policy, discussed Garcia's compliant with her manager, Mr. Aphram, and notified HR.[2] (Carroll Dep.

---

[2] Ms. Carroll reviewed one of two sexual harassment policies.  (Carroll Dep. 38-39 and Ex. 2 to (policy issued 8/6/2018) and Ex. 3 (policy issued 9/1/2016) to Dep.) Both policies prohibit unwelcome touching and provide information about reporting and responding to employee complaints. (*Id.*) The 2016 policy states that investigations will be performed by the Hospital. (*Id.*) The policy issued on August 6, 2018—the very same date of Garcia's complaint—states that investigations will

38-39, 66; Ex. E, Jean Aphram Deposition, pp. 31-33.) The decided course of action was to obtain Garcia's written complaint, and Ms. Carroll would investigate. (Aphram Dep. 33; Carroll Decl. ¶ 9.) On August 8, 2018, Garcia provided Ms. Carroll with her written statement. (Pl. Dep. 211 and Ex. 5 to Dep.) That statement addressed the alleged touching incident, and alleged (and previously unreported) comments Luca made many months earlier that led Garcia to believe that Luca may have a sexual interest in her. (*Id.*) Garcia's statement ended with a specific request: "I wanted this documented and I expressed to Net [Ms. Carroll] that I was not comfortable being alone with [Luca] so we would not be paired together in an ICU where we could possibly be alone in our supply room where we do a lot of our charting." (*Id.*)

## 2.    The Investigation Refuted Garcia's Complaint

On August 8, 2018, Ms. Carroll began investigating by interviewing Luca and Colleen Kaye. (Carroll Decl. ¶ 10.) Ms. Carroll arranged her interviews in a manner so that the two could not discuss the matter prior to individually speaking with her. (*Id.*) Kaye and Luca both denied that Luca had reached into Garcia's bra and grabbed

---

be performed by the Compliance Department and/or HR. (*Id.*) Investigations into employee complaints were (and continue to be) investigated in substantially the same manner under both policies.   (Dixon Decl. ¶ 5.) Management may, and frequently does, conduct all or some of the investigation with input from HR as needed. (*Id.*)

her breast. (Carroll Dep. 52-53 and Ex. 5 to Dep.) Both described having a discussion about bras. (*Id.*) Kaye explained that she was pregnant and was discussing a bra that was causing her problems. (*Id.*) Similarly, Luca stated that they were comparing bras, and discussing sports bras and breastfeeding. (*Id.*) Luca stated that she accidentally touched Garcia when Garcia showed her bra strap and Luca touched the fabric of the strap. (*Id.*) Luca and Kaye both denied that Luca had reached underneath Garcia's clothing and grabbed or touched Garcia's breast/nipple. (*Id.*)

Luca, however, told Ms. Carroll that it was Garcia who had made inappropriate and untrue comments that were making *her uncomfortable*. (Carroll Dep. 55 and Ex. 5 to Dep.) Luca said that Garcia had brought up her nipples in their conversation, and then later made comments in the staff room that Luca "grabbed her nipple because she was into girls."[3] (*Id.*) Dianna Grayson, another coworker, confirmed that she heard "someone" say "Rachel grabbed my nipple because she is into girls." (*Id.*) In her deposition, Garcia admitted that she made a comment in front of coworkers, including Luca and David Antior, supposedly in an attempt to get Luca to admit to the alleged touching in front of Mr. Antior. (Pl. Dep.123-126) Luca

---

[3] Luca later provided a written statement that provided other details. (Dixon Decl. ¶ 18 and Ex. 7 to Decl.) Luca said that after Garcia pulled her bra strap out of her scrubs, Luca commented that Garcia's chest tattoo was showing. (*Id.*) Garcia responded by saying that Luca just wanted to see what color her nipples were. (*Id.*) Luca denied that stating that she was not into women. Garcia then commented to Luca, "we all know that you're a trisexual, willing to try anything." (*Id.*)

did not admit it, and Mr. Antior did not comment. (*Id.*) Ms. Carroll was concerned about Garcia's alleged behavior as well, and told Luca to submit a written complaint. (Carroll Dep. 55.) Luca, however, did not pursue a complaint against Garcia. (*Id.*)

**E.     Ms. Carroll Counseled Luca and No Other Sexual Comments or Conduct is Reported By Garcia.**

On Monday, August 13, 2018, Ms. Carroll met with Garcia and Luca separately to discuss the outcome of her investigation. (Carroll Dep. 64-65 and Ex. 5 to Dep.; Carroll Decl. ¶ 13.) She told them that Garcia's assault allegation was not substantiated. (*Id.*) Ms. Carroll nevertheless documented her investigation and issued a warning to both. (*Id.*) Ms. Carroll told Luca and Garcia that there is to be no inappropriate conversations, touching, or behavior going forward, and they must be professional and focus on patient care. (*Id.*) Ms. Carroll also directed both to treat the investigation and its subject matter confidentially. (*Id.*)

**F.     Garcia Admitted Ms. Carroll's Response Was Satisfactory and Resolved Her Issue with Luca.**

After meeting with Ms. Carroll on August 8, 2018, Garcia felt the matter had been adequately resolved. (Pl. Dep. 267-68, 280-81.) Garcia admits that she did not have any interactions with Luca after the alleged July 29th incident, and that Luca did not engage in any alleged conduct or communications of a sexual nature again. (Pl. Dep. 260, 290.) And Garcia and Luca were never again paired together for any work assignments. (Pl. Dep. 260.)

**G.     Garcia Reports That Luca is "Retaliating" By Telling Coworkers Her Side of the Story.**

On Monday, August 27, 2018, Garcia complained to Ms. Carroll that Luca was "retaliating." (Pl. Dep. 238-39.) The alleged retaliation was that Luca was talking to coworkers about the alleged assault and telling her side of the story (*i.e.,* she did not sexually assault Garcia).   (Pl. Dep. 226.) To support her complaint, Garcia played a portion of a surreptitiously recorded conversation with coworker Phil Matthewson, in which Matthewson stated that Luca had talked to him about the matter.[4] (Pl. Dep. 238-39.)

Ms. Carroll's manager, Mr. Aphram, contacted HR and was told to interview Luca. (Aphram Dep. 55 and Ex. 6 to Dep.) On Friday, September 7, 2018, Mr. Aphram conducted a meeting with Luca.[5] (*Id.*; Ex. F, Aphram Declaration ¶ 3.) Luca denied talking about the incident or engaging in any improper conduct toward Garcia. (*Id.*) Mr. Aphram told her that Human Resources had been consulted and they were awaiting further direction as to next steps. (*Id.*)

---

[4] Garcia also told Matthewson about the incident because she thought it was important that he hear *her* side of the story. (Pl. Dep. 236-37.) Matthewson said he did not believe Luca, but Garcia was nevertheless upset that Luca was attacking her credibility. (Pl. Dep. 234-35.)

[5] Luca was not at work during week day business hours between August 27, 2018 and September 7, 2018. (Carroll Decl. ¶ 17.)

On Monday, September 10, 2018, Garcia emailed a complaint to Human Resources and upper management. (Pl. Dep. 265-66 and Ex. 15 to Dep.) This complaint revisited the alleged assault and added the alleged "retaliation" by Luca. (*Id.*) All recipients immediately responded, and HR representative Kevin Brancaleone asked Garcia to contact him. (Pl. Dep. 272-273.) Garcia declined. (*Id.*) She stated that she was on vacation and would contact him when she returned over two weeks later on September 27, 2018. (*Id.*) She then took FMLA leave from September 27, 2018 through September 30, 2018. (Pl. Dep. 274.) Thereafter, Garcia refused to discuss her complaint with HR or management unless her lawyer was present, which is not permitted by Beaumont policy. (Dixon Decl. ¶ 16.)

## H.   Garcia's "Retaliation" Complaint Is Investigated and Luca Is Disciplined.

Despite Garcia's failure to cooperate, Beaumont continued to look into Luca's alleged "retaliatory" conduct.[6] (Dixon Decl. ¶ 17.) The investigation revealed that Luca had violated Ms. Carroll's directive and had talked to three coworkers about

---

[6] During the investigation, HR also requested witness statements regarding Luca's alleged assault. HR wanted the investigation file to include written statements from the witnesses in addition to Ms. Carroll's written summaries of the witness interviews. (Dixon Decl. ¶18 and Ex. 6 to Decl.)

Garcia's assault allegations (Phil Matthewson, Angelita Serratos, Anthony Stout).[7]
(Dixon Decl. ¶ 21 and Ex. 7 to Decl.)

On October 9, 2018, management and HR prepared written discipline for
Luca. (Aphram Dep. 73-76 and Ex. 13 to Dep.; Dixon Decl. ¶ 22 and Ex. 8 to Decl.)
Luca's supervisor administered the discipline when Luca next returned to work. (*Id.*)
Luca cried and claimed that the discipline was unfair and that she was the one being
bullied by Garcia's false allegations of sexual assault. (*Id.*)

Garcia reported no other complaints about Luca. (Pl. Dep. 257, 260.) Beaumont
honored Garcia's request and never paired her to work with Luca on any assignment
after Garcia's initial August 6 complaint. (*Id.*)  Garcia admittedly had no further
interaction with Luca, as therapists are spread among approximately 30 floors
throughout the hospital's four towers. (*Id.*; Carroll Decl. ¶ 4.)  Garcia continued to
be assigned Charge Therapist duties, including two occasions when Luca was
working. (Pl. Dep. 260, 262-64.) As Charge, Garcia had authority over Luca and

---

[7] Garcia admits that she also talked to her coworkers about the alleged incident
before Luca ever did.  Garcia admitted talking to several coworkers about her
allegations, including Dianna Grayson, David Antior, Toni Rose Cudilla.  (Carroll
Dep. Ex. 5; Pl. Dep. 226-28, 126-27, 129). She also discussed it with Stacy Cary and
Phil Matthewson. (Pl. Dep. 126-27, 129, 222-228). Garcia asked Angelita Serratos
to write HR about the topic. (*Id.* at 252.) And she again brought it up with David
Antior by texting him and stating that Luca had been telling coworkers about what
Garcia termed "nipplegate" and claiming that Garcia was trying to get her fired. (Pl.
Dep. 241-44 and Ex. 11 to Dep.)

could assign her as she saw fit.  (Pl. Dep. 79-80.)  On one occasion, Garcia requested to be relieved of the Charge therapist duties, and that request was accommodated. (Pl. Dep. 262-64.) On the other occasion Garcia did not request to be relieved of the Charge responsibilities and worked the shift without any interaction with Luca. (*Id.*) Luca last worked at Beaumont on November 30, 2018, and her employment was terminated December 11, 2018 for failure to report to work. (Dixon Decl. ¶ 7.)

### III.    Legal Argument

#### A.    Summary Judgment Standard

A motion under Federal Rule of Civil Procedure 56(c) should be granted when the moving party demonstrates that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See also, Metropolitan Life Ins. Co. v. Gibbs,* 89 F.Supp.2d 877, 881 (E.D. Mich. 2000).

#### B.    Garcia Cannot Establish Essential Elements of a Title VII Disparate Treatment Claim.

To establish a viable disparate treatment claim due to sex or sexual orientation, Garcia must demonstrate a *prima facie* case by establishing: (1) she belongs to a protected class, (2) she suffered an adverse employment action, and (3) others, similarly situated and outside the protected class, were treated more favorably. *Alexander v. Caresource*, 576 F.3d 551, 559 (6th Cir. 2009).   Garcia cannot meet the second or third elements.  In the event that Garcia could establish a

*prima facie* case, Beaumont can rebut it by articulating a legitimate non-discriminatory reason for its action. Thereafter, Garcia has the burden of showing that Beaumont's asserted reason was not the actual reason for its actions, but in fact was pretext for gender or sexual orientation discrimination. *Chen v. Dow Chemical Co.*, 580 F.3d 394, 400 (6th Cir. 2009).

### 1.   Garcia Cannot Establish That She Incurred an Adverse Action.

Garcia cannot dispense with the necessity of showing that *she* incurred an adverse employment action, and that action was taken because of *her* sex or sexual orientation. An adverse action "constitutes a significant change in [the plaintiff's] employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits," and it typically "inflicts direct economic harm." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761-62 (1998); *see also*, *Bowman v. Shawnee State Univ*, 220 F.3d 456, 461–62 (6th Cir. 2000). The adverse employment action "'must have an objective basis for demonstrating that the change [in plaintiff's employment status] is adverse, rather than the mere subjective impressions of the plaintiff.'" *Vredevelt v. GEO Group, Inc.,* 145 Fed. App'x 122, 128 (6th Cir. 2005). "In determining the existence of an adverse employment action, courts must keep in mind the fact that '[w]ork places are rarely idyllic retreats, and the mere fact that an employee is displeased by an employer's act or omission does not elevate that act or omission to

the level of a materially adverse employment action.'" *Pena v. Ingham County Road Commission,* 255 Mich. App. 299, 312; 660 N.W.2d 351 (2003) (quoting *Blackie v. Maine,* 75 F.3d 716, 725 (1st Cir.1996)).

### 2. Garcia's Post-Litigation Dissatisfaction With Luca's Discipline Is Not an Adverse Action and No One Outside of the Protected Class Was Treated More Favorably.

Garcia admittedly suffered no materially adverse employment action, let alone adverse action because she is a woman or bi-sexual. (Pl Dep. 88, 287-293.) Garcia was not disciplined and remains employed to this day. (*Id.*) And she has no evidence that anyone outside of her protected class was treated more favorably with respect to a material employment action.

Instead, Garcia asserts a bizarre and unrecognized theory of Title VII disparate treatment discrimination: she claims that *Luca* would have been treated differently (*i.e.,* terminated) *had Luca been a man.* (*Id.*) In other words, Garcia contends that Luca received preferential treatment vis-à-vis other alleged harassers because she is a woman. Garcia has no evidence supporting her speculation. To the contrary, Beaumont does not terminate employees—regardless of sex or sexual orientation— where an investigation concludes that the accused's alleged misconduct is not substantiated. (Dixon Decl. ¶ 14.) Regardless, Garcia's novel theory has nothing to do with Garcia's sex or sexual orientation as opposed to that of the alleged harasser. This is not a legally cognizable—or even logical—disparate treatment

discrimination claim for Garcia. Garcia cannot manufacture an adverse action necessary to support a disparate treatment theory by claiming that she is now unhappy about the discipline that Luca received.[8] *Primes v. Reno,* 190 F.3d 765, 767 (6th Cir.1999) (the mere fact that an employee is unhappy about a workplace decision does not establish an adverse action). Moreover, Garcia has no evidence that a similarly situated man accused of an unsubstantiated incident of harassment was treated any differently by Beaumont. Disparate treatment is not an available theory under the facts of this case.

### 3. Beaumont has a legitimate business reason for Luca's level of discipline, which Garcia cannot establish is pretext for unlawful discrimination.

Even if the Court construed Luca's discipline to be an adverse action against Garcia (it isn't), Garcia cannot refute Beaumont's legitimate business reason for its actions let alone establish it is a ruse to mask unlawful sex or sexual orientation discrimination. *Chen v. Dow Chemical Co.*, 580 F.3d 394, 400 n. 4 (6th Cir. 2009) (in establishing pretext, "at bottom the question is always whether the employer

---

[8] Garcia admits that she was satisfied with Ms. Carroll's investigation and the resolution at the time it occurred.  (Pl. Dep. 210, 280-81) And she concedes that she repeatedly asked Ms. Carroll not to discipline or terminate Luca.  (Pl. Dep. 204-205, 209 and Ex. 7 to Dep.)  But now, she does not know if she agrees with how it was handled.  (Pl. Dep. 216-220.)  Garcia thinks Ms. Carroll should have accepted her version as the truth, despite the statements to the contrary from Luca and Ms. Kaye, the only witness in the room.  (*Id.*)  Garcia admits, however, that Beaumont should consider all statements and evidence when making a business decision about the outcome of an investigation.  (Pl. Dep. 287-88.)

made up its stated reason to conceal intentional discrimination"). Beaumont did not terminate Luca because Garcia's allegations were not substantiated. (Dixon Decl. ¶ 12.) While Garcia may disagree with Beaumont's conclusion and the discipline administered to Luca, her disagreement does not magically taint Beaumont's decision-making with discriminatory bias. It is the quintessential argument over the employer's business judgment, which the courts have repeatedly held does not establish pretext. *See, e.g., Chen*, 580 F.3d at 401(the soundness of an employer's business judgment cannot be used as a means of showing pretext).

**C.   Garcia Cannot Establish an Elliott-Larsen Hostile Environment Claim.**

To establish a *prima facie* case of hostile work environment sexual harassment under Elliott-Larsen, Garcia must establish (1) she was subjected to unwelcome sexually harassing behavior, (2) the harassment was based on sex, (3) the harassing behavior was sufficiently severe or pervasive to affect the terms, conditions, or privileges of plaintiff's employment, and (4) respondeat superior. MCL 37.2103(h); 37.2202(1)(a); *Chambers v. Trettco Inc.*, 463 Mich. 297; 614 N.W.2d 910 (2000). Under Michigan law, it is Garcia's burden to prove "fault" by Beaumont as an element of her hostile work environment claim. That is, Garcia must show that Beaumont breached its duty to take prompt and appropriate remedial action after receiving notice of the alleged sexual harassment. *Chambers*, 463 Mich. at 312-313. She cannot do so here.

Even assuming, *arguendo*, that Luca's alleged conduct toward Garcia actually occurred and was inherently sexual (as opposed to horseplay by Luca, a heterosexual woman), Garcia cannot meet the fifth element of her *prima facie* burden. Garcia is unable to establish *respondeat superior* because Beaumont's prompt response and remedial efforts stopped the alleged harassment. It is undisputed that Ms. Carroll promptly investigated Garcia's complaint and counseled and warned Luca even though Garcia's complaint was denied by Luca and contradicted by the only witness in the room. (Carroll Decl. ¶¶ 13-14.) Ms. Carroll directed Garcia to report any further alleged incidents, and there were none. (*Id.*; Pl. Dep. 260, 290.) Per Garcia's request, management never paired Garcia and Luca on assignment during the remaining time that Luca was employed. (*Id.*) And when Garcia later requested to be excused from her Charge Therapist duties on one occasion (when she would have authority over Luca), Beaumont accommodated that request too. (Pl. Dep. 262-64.)

The courts have consistently held that a plaintiff cannot establish respondeat superior liability under these circumstances. See *Bellamy v. Fritz*, 129 Fed. Appx. 245, 248-249 (6th Cir. 2005) (where employer counseled the accused in good faith and limited his future contact with the plaintiff, plaintiff could not demonstrate employer fault under Elliott-Larsen as a matter of law); *Knabe v. Boury Corp.*, 114 F.3d 407, 412-413 (3rd Cir. 1997) (employer's remedial action is adequate if it is reasonably calculated to—and does—stop the harassment); *Ford v. Lowe's Home*

*Centers, Inc*, No. 07-13303, 2008 WL 5273607, at *8 (E.D. Mich. Oct. 31, 2008) (counseling employee accused of making inappropriate comments and conduct, leading to end of comments, was adequate response); *Mullins v. Goodyear Tire & Rubber Co.*, 291 F. App'x 744, 749 (6th Cir. 2008) (same).

Although Garcia is now critical of Beaumont's investigation and personally thinks that Luca should have been terminated, this does not negate the fact that Beaumont took prompt remedial action and its response was effective in ceasing the alleged harassment. Garcia's criticisms of Beaumont's effective investigation cannot preclude summary judgment for Beaumont. *Chambers v. Trettco, Inc. (On Remand),* 244 Mich. App. 614, 624 (2001) (employer took prompt and appropriate remedial action when it investigated and assured plaintiff she would not have to report to alleged harasser); *Huston v Procter & Gamble Paper Products Corp*, 568 F3d 100, 110 (3rd Cir. 2009) ("A remedial action that effectively stops the harassment will be deemed adequate as a matter of law.") *Mullins v. Goodyear Tire & Rubber Co.,* 291 F. App'x 744 (6th Cir. 2008) ("The issue is not whether plaintiff finds the response by defendant satisfactory but whether defendant's response was appropriate"); *Blankenship v. Parke Care Centers, Inc.,* 123 F.3d 868, 874 (6th Cir. 1997) (holding that a plaintiff "may not dictate an employer's [remedial] action. . . ."); *Anderson v. Memphis City Schools Bd. of Ed.,* 75 F.Supp.2d 786, 796 (W.D. Tenn. 1999) ("a

plaintiff will not prevail simply because the remedy offered by defendant was not what plaintiff wanted").

What more could Beaumont do? Garcia and Luca had competing stories of what occurred. A "she said/she said" situation. But what is more, the only eyewitness to the alleged event denied it occurred. There being no evidence that Beaumont failed to take prompt remedial action upon receiving her single sexual harassment complaint, summary judgment is warranted.

**D. Garcia Cannot Establish a Title VII or Elliott-Larsen Retaliation Claim as a Matter of Law**

Under Elliott-Larsen or Title VII, Plaintiff must establish the following *prima facie* elements for a retaliation claim: (1) she engaged in protected activity; (2) the protected activity was known to defendant; (3) she suffered an adverse employment action; and (4) causation between the protected activity and adverse employment action. *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 595 (6th Cir. 2007); *Rymal v. Baergen*, 262 Mich. App. 274; 686 N.W.2d 241 (2004). To establish a causal connection, Plaintiff must demonstrate that the adverse action would not have occurred "but for" the protected activity. *Allen v. Michigan Dep't of Corrections*, 165 F.3d 405, 413 (6th Cir. 1999). If plaintiff establishes a *prima facie* case, the defendant must articulate a legitimate, non-retaliatory reason for the alleged adverse job action. *Michael*, 496 F.3d at 597. Once the defendant does so, the plaintiff may survive summary judgment only by presenting admissible evidence that creates a

genuine issue of material fact as to whether the articulated reasons were a pretext for retaliation. *Michael*, 496 F.3d at 597.

Coworker harassment, if sufficiently severe, can rise to the level of an adverse employment action in certain limited circumstances. An employer can be liable for the coworker's actions only if (1) the retaliatory conduct is sufficiently severe so as to dissuade a reasonable worker from making a charge of discrimination, (2) management has actual or constructive knowledge of the coworker's retaliatory behavior, and (3) management condones, tolerates, or encourages the acts of retaliation or responds to plaintiff's complaints so inadequately that the response manifests indifference or unreasonableness under the circumstances. *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 347 (6th Cir. 2008); *Meyer v. City of Ctr. Line*, 242 Mich. App. 560, 571; 619 N.W.2d 182, 189 (2000) (supervisor's decision not to take action to stop harassment by co-workers in retaliation for an employee's protected activity can constitute an adverse employment action only where the harassment is sufficiently severe).

### 1. Plaintiff's Retaliation Claim Should Be Dismissed Because She Cannot Establish Adverse Action by Beaumont.

Garcia admittedly has not experienced any adverse employment action by Beaumont. She does not claim that Beaumont's management or HR retaliated against her in any manner following her complaint about Luca. (Pl. Dep. 286-87, 293-294.) Consequently, she cannot establish a typical retaliation claim because she

experienced no adverse employment action. *Kocsis v. Multi-Care Management, Inc.*, 97 F.3d 876, 885 (6th Cir. 1996) (an adverse employment action is a "materially adverse change in the terms or conditions of … employment because of [the] employer's conduct").

## 2. There is No Actionable Retaliatory Harassment for Which Beaumont Can Be Liable.

Garcia also cannot establish a viable retaliatory harassment claim against Beaumont because the conduct that she accuses Luca of does not meet the threshold for actionable "harassment." Even if it did, Beaumont cannot be liable where it undisputedly disciplined Luca, after which the conduct never occurred again.

### a. Luca's Conduct Does Not Meet Threshold for Actionable Retaliatory Harassment.

Garcia's retaliation claim fails as a matter of law because Luca's alleged retaliation does not rise to the level of severe or pervasive conduct as required under retaliatory harassment law. Garcia claims that Luca told three coworkers her side of the story with respect to the alleged assault: that is, it did not happen—a position that was supported by the only witness. (Pl. Dep. 222-226, 240-241, 252-253, 256, 266-67, 283.) And Garcia, while pointing a finger at Luca, admittedly likewise talked with numerous coworkers about the alleged incident at the very same time.[9] (Pl. Dep. 126-127, 129, 226-229.) Garcia admits Luca's comments did not affect her

---

[9] One can hardly blame Luca for defending herself if the allegation were not true.

ability to perform her job. (Pl. Dep. 285-87.) And Garcia acknowledges that the coworkers Luca spoke with seemed to believe her over Luca. (Pl. Dep. 234-235.)

If the court were to deem this type of behavior as meeting the necessary threshold for severity, there would be no limit to the number of workplace disputes that would be actionable "harassment" under civil rights laws. Thus, courts have routinely held that this is precisely the type of conduct that does not reach the severity threshold for establishing a viable retaliatory harassment claim. See, e.g., *McQuail v. Tennessee Tech. Univ.*, 69 F. Supp. 3d 701, 714 (M.D. Tenn. 2014) (coworker's refusal to acknowledge plaintiff's accomplishments and humiliation of plaintiff in a speech not actionable retaliatory harassment); *Johnson v. City of Flint,* 2010 WL 1957208 at *10 (E.D. Mich. May 13, 2010) (coworkers blocking plaintiff from elevator door, belching in front of her . . . calling her a "lesbian bitch" and turning off her access card, although rude and distasteful, does not rise to the requisite level of severity); *Baird v. Snowbarger*, 744 F. Supp. 2d 279, 292 (D.D.C. 2010), *aff'd in part, vacated in part on other grounds sub nom, Baird v. Gotbaum*, 662 F.3d 1246 (D.C. Cir. 2011) (coworkers' disparaging emails and remarks calling plaintiff "psychotic" and experiencing "litigation-induced hallucinations" do not meet threshold of severity); *Owen v. Peake*, 2008 WL 4449011 at * 6 (S.D. Ohio September 26, 2008) (coworkers yelling at plaintiff, submitting false complaints about her to supervision, announcing her personal leave information to others, etc.,

was not sufficiently severe to establish actionable harassment)[10]. Garcia's complaints about Luca telling three coworkers that she did not assault Garcia does not meet the threshold of actionable retaliatory harassment as a matter of law.

> **b.**  **Garcia Cannot Establish Beaumont Condoned, Participated in or Encouraged Luca's Alleged "Harassment."**

Finally, Garcia's retaliatory harassment claim also fails because she cannot establish that Beaumont's management "condoned, tolerated, or encouraged" coworker harassment or made a "decision not to take action to stop [alleged] harassment by coworkers." *Hawkins, 517* F.3d at 347 (6th Cir. 2008); *Meyer v City of Ctr Line*, 619 N.W.2d at 189 (Mich. Ct. App. 2000). To the contrary, Mr. Aphram and Ms. Carroll immediately reported Ms. Garcia's complaint to Human Resources and interviewed Luca. (*See,* Sections G-H, *supra* at pp. 10-13). Human Resources obtained statements from witnesses, and management issued Luca written discipline. (Carroll Dep. 73-77, 83; Aphram Dep. 72-73; Dixon Decl. ¶ 15, 20 and Ex. 7 to Decl.) It is undisputed that this action stopped Luca's purported "retaliatory"

---

[10] In contrast, the courts that have found actionable retaliation involves conduct far more egregious than that alleged in this case. *See, e.g., Hawkins v. Anheuser-Busch, Inc.,* 517 F.3d 321, 348 (6th Cir. 2008) (coworker set fire to plaintiff's car and threatened to kill her; employer allegedly failed to investigate and chided her for attempting to make a report); *Ferguson v. Associated Wholesale Grocers, Inc.,* 469 F.Supp.2d 961, 970 (D. Kan. 2007) (coworkers slashed plaintiff's tires, made threatening phone calls, called her disparaging names and threw soda can at her).

conduct. (*Id.*; Pl. Dep. 257, 260.) Garcia never again reported any complaints about Luca. (*Id.*)

Beaumont cannot be held liable under these circumstances. *Gunnell v. Utah Valley State Coll.*, 152 F.3d 1253, 1265 (10th Cir. 1998) (employer can only be liable for co-workers' retaliatory harassment where its management personnel either (1) orchestrate the harassment or (2) know about the harassment and acquiesce in it in such a manner as to condone and encourage the co-workers' actions); *Swanson v. Livingston Co.*, 121 Fed. Appx. 80, 85 (6th Cir. 2005) (affirming summary judgment for employer where employer's response to plaintiff's complaint of coworker harassment resulted in reprimands and counseling to alleged perpetrators).

The material facts are not in dispute, and Defendant's motion for summary judgment should be granted.

Respectfully submitted,

KIENBAUM HARDY VIVIANO
 PELTON & FORREST, P.L.C.

By: */s/ Shannon V. Loverich*
    Eric J. Pelton (P40635)
    Shannon V. Loverich (P53877)
Attorneys for Defendant Beaumont Health
280 N. Old Woodward Avenue, Suite 400
Birmingham, Michigan 48009
(248) 645-0000
epelton@khvpf.com
sloverich@khvpf.com

Dated:  October 13, 2020
377389

-25-

## CERTIFICATE OF SERVICE

I hereby certify that on October 13, 2020, I electronically filed the foregoing document with the Clerk of the Court using the ECF system which will send notification of such filing to upon all ECF participants.

*/s/ Shannon V. Loverich*
280 N. Old Woodward Ave.,
Suite 400
Birmingham, Michigan 48009
(248) 645-0000
sloverich@khvpf.com
(P53877)

377389