**Ex. A**

## In the Matter Of:

## GARCIA vs BEAUMONT HEALTH, ET AL.

## KRISTINA GARCIA

February 04, 2020

*Prepared for you by*



**Bingham Farms/Southfield • Grand Rapids**

Ann Arbor • Detroit • Flint • Jackson • Lansing • Mt. Clemens • Saginaw • Troy

**GARCIA, KRISTINA**
02/04/2020                                                                 Pages 1–4

---

**Page 1**

```
1                  UNITED STATES DISTRICT COURT
2                  EASTERN DISTRICT OF MICHIGAN
3                       SOUTHERN DIVISION
4
5    KRISTINA GARCIA,
6             Plaintiff,
7         vs.                    Case No. 19-11673
8                          District Judge Linda V. Parker
9    BEAUMONT HEALTH and      Magistrate Judge David R. Grand
10   RACHEL LUCA,
11            Defendants.
12   _____/
13
14
15       The Videotaped Deposition of KRISTINA GARCIA,
16       Taken at 306 Townsend Street,
17       Lansing, Michigan,
18       Commencing at 8:53 a.m.,
19       Tuesday, February 4, 2020,
20       Before Cheri L. Poplin, CSR-5132, RPR, CRR.
21
22
23
24
25
```

**Page 2**

```
1    APPEARANCES:
2
3    LISA C. WARD
4    Law Offices of Lisa C. Ward, PLLC
5    4131 Okemos Road
6    Suite 12
7    Okemos, Michigan 48864
8    517.347.8102
9    lisacwardlaw@gmail.com
10       Appearing on behalf of the Plaintiff.
11
12   ERIC J. PELTON
13   Kienbaum, Hardy, Viviano, Pelton & Forrest, P.L.C.
14   280 North Old Woodward Avenue
15   Suite 400
16   Birmingham, Michigan 48009
17   248.645.0000
18   epelton@khvpf.com
19       Appearing on behalf of the Defendant.
20
21   ALSO PRESENT:
22   Antoinette Carroll
23   Rob Girkin - Video Technician
24
25
```

**Page 3**

```
1                      TABLE OF CONTENTS
2
3    WITNESS                                             PAGE
4    KRISTINA GARCIA
5
6    EXAMINATION BY MR. PELTON                            6
7
8                          EXHIBITS
9    (Exhibits attached to transcript.)
10   MARKED         DESCRIPTION                          PAGE
11   EXHIBIT 1    Resume of Kristina Garcia              16
12   EXHIBIT 2    Online Job Application                 24
13   EXHIBIT 3    W-2 forms                              48
14   EXHIBIT 4    Calendar July 2018 to December 2018    98
15   EXHIBIT 5    Statement of Ms. Garcia                98
16   EXHIBIT 6    Plaintiff's Fifth Supplemental
17                Response to Defendant Beaumont
                  Health's First Request for
                  Production of Documents               104
18
     EXHIBIT 7    Transcript of Conversation with Net   121
19
     EXHIBIT 8    Diagram                               161
20
     EXHIBIT 9    Text messages between Ms. Garcia and
21                Lolly                                  168
22   EXHIBIT 10   Transcript of Conversation with
                  Phil M.                                222
23
     EXHIBIT 11   Text messages between Ms. Garcia and
24                David                                  241
25   EXHIBIT 12   Text messages between Ms. Garcia and
```

**Page 4**

```
1    EXHIBIT 13   Text messages between Ms. Garcia and
                  Angelita                               252
2
     EXHIBIT 14   Transcript of Conversation with Jean   253
3
     EXHIBIT 15   Email 9/10/18 from Ms. Garcia to
4                 Mr. Brancaleone                        264
5    EXHIBIT 16   Email string 9/10/18 between
                  Ms. Garcia to Mr. Brancaleone          272
6
     EXHIBIT 17   Letter 9/25/18 from Ms. Ward to
7                 Ms. Zinn                               278
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

GARCIA, KRISTINA
02/04/2020                                                                    Pages 5–8

Page 5

1    Lansing, Michigan
2    Tuesday, February 4, 2020
3    8:53 a.m.
4
5              VIDEO TECHNICIAN:  We are now on the
6    record.  This is the video recorded deposition of
7    Kristina Garcia being taken on Tuesday, February 4th,
8    2020.  The time is 8:53 a.m.  We are here in the
9    matter of Kristina Garcia versus Beaumont Health, et
10   al.  This is Case Number 19-11673 being held in the
11   United States District Court, Eastern District of
12   Michigan, Southern Division.  Will the court reporter
13   swear in the witness and the attorneys identify
14   themselves for the record, please.
15              KRISTINA GARCIA,
16   was thereupon called as a witness herein, and after
17   having first been duly sworn to testify to the truth,
18   the whole truth and nothing but the truth, was
19   examined and testified as follows:
20              MS. WARD:  Do you want to go first on
21   identification?
22              MR. PELTON:  Eric Pelton on behalf of the
23   defendant.
24              MS. WARD:  Lisa, middle initial C, Ward on
25   behalf of the plaintiff.

Page 6

1              EXAMINATION
2    BY MR. PELTON:
3    Q.   Good morning, Ms. Garcia.
4    A.   Good morning.
5    Q.   We met off the record, but, again, my name is Eric
6         Pelton, and you understand that I represent Beaumont
7         in this lawsuit you've brought against them?
8    A.   Yes.
9    Q.   You understand that this is our opportunity to ask you
10        questions about the factual basis for the claims
11        you've brought against my client?
12   A.   Yes.
13   Q.   And you understand you've been sworn to tell the truth
14        today?
15   A.   Yes.
16   Q.   Have you had a deposition taken in the past?
17   A.   No.
18   Q.   It's the first time?
19   A.   Yes.
20   Q.   I'll be asking you a series of questions regarding the
21        factual basis of your claims.
22   A.   Okay.
23   Q.   If at any time you didn't understand one of my
24        questions, let me know and I'll be glad to rephrase it
25        for you.

Page 7

1    A.   Okay.
2    Q.   If you don't understand something I've said, just let
3         me know and, again, I'll be happy to rephrase that for
4         you.
5    A.   Okay.
6    Q.   Is that fair?
7    A.   Yes.
8    Q.   Okay.  If you don't hear me or you just space out for
9         a minute, because it might be a long day, again, just
10        ask and we'll reread the question.
11   A.   Okay.
12   Q.   All right?  Otherwise it's going to come out in a
13        transcript and on this video and it'll assume that you
14        understood my question.  Do you understand that?
15   A.   Yes.
16   Q.   All right.  As your counsel suggested before we got
17        started, there may be times at which we need a break,
18        which is fine.  We can break whenever necessary.  So
19        just let me know if you want to take a break and we'll
20        find a convenient time to do that.
21   A.   Okay.
22   Q.   All right?  You -- when were you born, Ms. Garcia?
23   A.   January 17th, 1982.
24   Q.   Where were you born?
25   A.   Pomona Valley, California.

Page 8

1    Q.   Sorry?
2    A.   Pomona Valley, California.
3    Q.   Okay.  Where is that?  Northern?  Southern?
4    A.   Southern California.  I believe it's Los Angeles
5         County.
6    Q.   I see.  When did you come to Michigan?
7    A.   It was either 1993 or 1994.
8    Q.   So you were eleven, 12 years old?
9    A.   I believe I was eleven.
10   Q.   Have you been living in Michigan since that time?
11   A.   Yes.
12   Q.   Where do you currently reside?
13   A.   City?  The city?
14   Q.   Address.
15   A.   28327 Waverly Street in Roseville, Michigan, 48066.
16   Q.   How long have you been at that address?
17   A.   Since 2012.
18   Q.   Is that a single family home?
19   A.   Yes.
20   Q.   Do you own the home?
21   A.   Yes.
22   Q.   And did you purchase it in 2012?
23   A.   Yes.
24   Q.   With a mortgage?
25   A.   Yes.

Page 9

1  Q.  Do you still have a mortgage on the home?
2  A.  Yes.
3  Q.  What's the amount of mortgage that you still owe?
4         MS. WARD:  I'm going to object on the basis
5     of relevance.  But go ahead.
6  A.  Just under 14.
7  BY MR. PELTON:
8  Q.  Roughly.
9  A.  Just under 14,000.
10 Q.  Okay.  What's the value of the home?
11        MS. WARD:  Object.  Foundation.
12 BY MR. PELTON:
13 Q.  Roughly.  Any idea?
14 A.  Somewhere between 70 and 80,000, to my knowledge.
15 Q.  Who lives at that home with you?
16 A.  Just myself.
17 Q.  Okay.  Have you had any tenants over the years or
18    anything like that?
19 A.  No.
20 Q.  Okay.  And are you married at the present time?
21 A.  No.
22 Q.  Have you ever been married?
23 A.  No.  Not legally.
24 Q.  Okay.  You've had partnerships but not legally
25    married?  Is that what you're suggesting?

Page 10

1  A.  Correct.
2  Q.  I see.  Do you have a partner or significant other at
3     the present time?
4  A.  No.
5  Q.  Any children?
6  A.  No.
7  Q.  Do you have any sort of criminal history, any arrests
8     or felony or misdemeanor type convictions?
9         MS. WARD:  I'm going to object on the basis
10    that I'm aware of a juvenile proceeding that's been
11    sealed and I'm instructing her not to answer as to
12    that.  Anything else as an adult she can answer.
13 BY MR. PELTON:
14 Q.  To your knowledge.
15        MS. WARD:  Do you understand -- just a
16    second.  Do you understand the instruction?
17        THE WITNESS:  Yes.
18        MS. WARD:  Okay.  Go ahead.
19 BY MR. PELTON:
20 Q.  That was a -- like a Holmes Youthful Offender type
21    situation?
22        MS. WARD:  I'm not sure that it was under
23    that statute, but it has been sealed and it -- I'm --
24    if you need it, we'll have to go to the judge.
25        MR. PELTON:  I doubt I do.

Page 11

1         MS. WARD:  I'm not trying to be
2     threatening.  I'm just saying I'm going to instruct
3     her --
4         MR. PELTON:  Yeah.
5     -- with regard to anything when
6  you were a juvenile you don't answer.  With regard to
7  adulthood, which is 18, answer the question, please.
8         MR. PELTON:  And that's fine.  And I just
9     want to probe around it so I understand what it is and
10    then we'll move on.
11 BY MR. PELTON:
12 Q.  But how old were you at the time?
13        MS. WARD:  You can answer that question
14    only.
15 A.  Eleven.
16 BY MR. PELTON:
17 Q.  Okay.  Where did it occur?
18 A.  Eleven or 12.
19 Q.  Okay.
20 A.  I'm not sure.
21 Q.  Where did the incident occur?
22        MS. WARD:  You can answer that.
23 A.  City?  You want the city?
24 BY MR. PELTON:
25 Q.  Sure.  City and state.

Page 12

1  A.  Warren, Michigan.
2  Q.  Since you've been an adult, have you had any sort of
3     criminal issues?
4  A.  No criminal issues.  I've had speeding tickets or like
5     traffic offenses I should say, not --
6  Q.  Sure.
7  A.  Some of have been speeding.  Another was like --
8  Q.  All right.
9  A.  -- a stop sign.  Other than that, I did have a PPO
10    placed against a former partner.
11 Q.  You had it placed against the partner?
12        MS. WARD:  Right.  But that's civil, not
13    criminal.
14 BY MR. PELTON:
15 Q.  Right.
16 A.  Oh, I apologize.
17 Q.  That's okay.
18 A.  No criminal.
19 Q.  Okay.  And just -- just traffic tickets and such?
20 A.  Correct.
21 Q.  All right.  And this PPO you had entered against your
22    partner?
23 A.  Yes.
24 Q.  Okay.  And when was that?
25 A.  I don't recall the year.

GARCIA, KRISTINA
02/04/2020

Pages 13–16

Page 13

1   Q.   Roughly how many years ago?

2   A.   Over ten.  Well over ten.

3   Q.   Okay.  Who was the partner?

4   A.   A former partner?  Like do you want a name?

5   Q.   The name of the person.  Yeah.

6   A.   Her name was Teesha (ph).

7   Q.   Last name?

8   A.   Richardson.

9   Q.   Okay.  I assume she's no longer a partner?

10   A.   Correct.

11   Q.   When did that break off?

12   A.   The relationship ended approximately 2006.

13   Q.   Where was the PPO entered?

14   A.   County?

15   Q.   Yes.

16   A.   Macomb County.

17   Q.   Are you -- how is your health at present?

18             MS. WARD:  I'm going to object on the

19   ground of vagueness, but . . .

20   BY MR. PELTON:

21   Q.   Feeling pretty good?

22   A.   Right now, yeah.  I'm feeling good.

23   Q.   Okay.  Good.  Are you taking any medications at the

24   present time that would affect your ability to testify

25   truthfully today?

Page 14

1   A.   No.

2   Q.   What medications are you taking at the present time?

3   A.   Currently I am on Celexa.  I am on Xanax.  I am on

4   Singulair.  I am on albuterol.  I am on Wilexa (ph).

5   Q.   I'm sorry.  Which?

6   A.   Wilexa (ph) I believe it's called.  It's an inhaler

7   for asthma.

8   Q.   Okay.

9   A.   And just ibuprofen over-the-counter.  Oh, and

10   Cabergoline.

11   Q.   I'm sorry?

12   A.   Cabergoline, C-A-B-E-R-G-O-L-I-N-E.

13   Q.   How much Celexa do you -- or what's the dosage of

14   Celexa?

15   A.   I honestly don't recall.

16   Q.   Okay.  And how long have you been taking the Celexa?

17   A.   Since September 2018.

18   Q.   Had you taken it in the past prior to since September

19   of '18?

20   A.   No.

21   Q.   And when did you begin on the Xanax?

22   A.   I was prescribed it in September of 2018 as well.

23   Q.   You're taking both?

24   A.   The Xanax is PRN, so as needed.

25   Q.   Okay.  Had you taken Xanax in the past?

Page 15

1   A.   Yes.

2   Q.   And when -- what periods of time had you taken Xanax

3   in the past?

4   A.   I know I started taking it around 2011, 2012.  That

5   was also PRN, as needed.

6   Q.   Who prescribed it?

7   A.   Initially or in September of 2018?

8   Q.   In '11 or '12.

9   A.   My primary care physician, Dr. Clara Kamath.

10   Q.   Any other -- and are these taken for -- for what

11   purpose are you taking Celexa and Xanax?

12   A.   Celexa is for -- it's an antidepressant.  It's also

13   for antianxiety.  And then the Xanax is for

14   antianxiety.  Do you want me to tell you about the

15   remaining prescriptions?

16   Q.   Yeah.  So Singulair?

17   A.   Singulair is for allergies.  Albuterol is for asthma.

18   The Wixela is for asthma, and the Cabergoline is for a

19   pituitary tumor that I have.

20   Q.   Have you at some point taken Lexapro?

21   A.   That may have been one of the medications I have taken

22   before.

23   Q.   That was for antianxiety?

24   A.   I don't recall if that's anxiety or depression.

25   Q.   Are there other periods of time that you took

Page 16

1   antianxiety or antidepressants other than in 2011 and

2   2012 and since September 2018?

3   A.   Since September of 2018 I've been on the Celexa every

4   single day.  No other antidepressants.  Just that one.

5   There has been two other occasions where I had taken

6   an antianxiety/antidepressant medication.  One was in

7   2006, and I don't recall the date of the other one.

8   Q.   Who prescribed the medications in '06?

9   A.   My primary care physician, Dr. Clara Kamath.

10   Q.   Other than the Equal Employment Opportunity Commission

11   charge that you filed as part of this case against

12   Beaumont, are there any other times you've filed any

13   EEOC charge or any other sort of administrative

14   complaint against an employer?

15   A.   Administrative -- okay.  First, for the EEOC, no.

16   This is my only complaint that I filed against any

17   employer for EEOC.  As far as administrative, could

18   you clarify?

19   Q.   Sure.  Any other government agencies that you have

20   filed a complaint with concerning your employer?

21   A.   I don't believe so.

22   Q.   Have you ever been involved in a lawsuit prior to this

23   one?

24   A.   No.

25             (Marked EXHIBIT 1 at 9:07 a.m.)

GARCIA, KRISTINA
02/04/2020

Pages 17–20

Page 17

```
1              MS. WARD:  And this is Number 1?
2    BY MR. PELTON:
3    Q.  This will be Exhibit 1.  I wanted to review your
4        background and I thought it might be useful to have
5        this in front of you.  Can you identify Exhibit 1?
6    A.  My resume.  I'm assuming the resume that I applied to
7        Beaumont with.
8    Q.  I did find it in the Beaumont records.  Can you
9        identify the approximate date on which this would have
10       been prepared?
11   A.  Early 2011.
12   Q.  Did you prepare this as part of your application
13       process to Beaumont?
14   A.  I prepared this as part of my application process post
15       graduating from respiratory therapy.
16   Q.  So you were applying at different -- different places
17       at the same time?
18   A.  I was preparing to apply at different places, yes.
19   Q.  This provides your education background.  Where did
20       you gradu -- it doesn't have high school on here.
21       Where did you graduate high school?
22   A.  My high school diploma is from Lincoln High School,
23       Lincoln Senior High School in Warren, Michigan.
24   Q.  Okay.  What year did you graduate there?
25   A.  I believe it was 2002.
```

Page 18

```
1    Q.  This indicates that you received an Associate's of
2        General Studies from Macomb Community College in
3        December 2007.  Is that accurate?
4    A.  Correct.
5    Q.  What did you do between 2002 and 2007, if anything,
6        related to your education?
7    A.  Between 2002 and 2007 I took a certified nurse aid
8        course.  I also took a pharmacy tech course.  Like
9        they were both -- I suppose you would consider them a
10       trade.  It wasn't like one course.
11   Q.  Were you pursuing some sort of degree or certification
12       through those programs?
13   A.  Certifications, yes.
14   Q.  Did you become certified as a nurse aid?
15   A.  Yes.
16   Q.  When did that occur?
17   A.  I believe it was on the other page of this.  I don't
18       recall the date.
19   Q.  Is there a second page to this?
20   A.  There may.  I know it was in my file.  I specifically
21       remember going over HR with it.  I didn't use that as
22       part of like anything respiratory.  It was just
23       history.
24   Q.  All right.  So under "Highlights" I see State
25       Certified Nursing Assistant.
```

Page 19

```
1    A.  Yes.
2    Q.  So that refers to the certification you received?
3    A.  Correct.
4    Q.  Do you know what year you received that?
5    A.  I do not.
6    Q.  Where did you get your training for that
7        certification?
8    A.  It was at the Kramer Community Center.
9    Q.  Cranbrook?
10   A.  Kramer.
11   Q.  Kramer?
12   A.  It's K-R-A-M-E-R Community Center.
13   Q.  Where is that located?
14   A.  It's either Warren or Center Line, Michigan.  I'm not
15       sure.
16   Q.  All right.  And that occurred prior to receiving your
17       associate's from Macomb Community?
18   A.  Correct.
19   Q.  Did you work as a certified nursing assistant?
20   A.  I don't believe I actually worked as a certified
21       nursing assistant.  Many of the jobs that I -- I
22       worked kind of using that were considered direct care
23       jobs.  Basically they didn't want to pay you to be a
24       nursing assistant.  They wanted to pay you for direct
25       care.
```

Page 20

```
1    Q.  Sure.
2    A.  I don't know if that makes sense to you.
3    Q.  It does.  So on this resume under "Professional
4        Experience" you list two different times at which you
5        were working as a certified nursing assistant.  Do you
6        see those?
7    A.  Yes.
8    Q.  So the first one listed is in North Oak -- at the
9        North Oakland Residential Services in Utica looks like
10       for a period of approximately five months in 2006?
11   A.  Yes.
12   Q.  But your testimony is you didn't really work as a
13       certified nursing assistant?
14   A.  I did the job of a certified nursing assistant.  I
15       don't recall what they considered my title.
16   Q.  Who was your supervisor in that job?  Do you recall?
17   A.  No.
18   Q.  The second is in 2007.  Well, let me ask you why did
19       you leave the North Oakland Residential Services job?
20   A.  I don't recall.  I believe it was temporary.  I don't
21       recall really.
22   Q.  Well, if you look at the document, it says you went
23       and did it looks like an internship of some sort in
24       Norfolk, Virginia?
25   A.  I did.
```

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone:  888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

**GARCIA, KRISTINA**
02/04/2020                                                        Pages 21–24

Page 21

1   Q.   Did you leave for that job or were you asked to leave
2        North Oakland or do you remember how your employment
3        there ended?
4   A.   Leave the job for the internship?
5   Q.   The question is why you left the North Oakland
6        Residential Services job.
7   A.   I don't remember.
8   Q.   All right.  The -- you then went to the Kalb
9        Community -- Kalb Adult Foster Care Home in Shelby in
10       June 2007; right?
11  A.   Yes.
12  Q.   And it looks like you worked there for a period of six
13       or seven months?
14  A.   Yes.
15  Q.   And this also -- you indicate you worked as a
16       certified nursing assistant?
17  A.   Yes.
18  Q.   Is it your testimony that's not accurate because you
19       didn't really have that position with Kalb?
20  A.   I don't recall what they considered my position.  Each
21       of these places had my certified nursing assistant
22       license on file.
23  Q.   Well, but your earlier testimony was that you didn't
24       think you were actually given the title certified
25       nursing assistant.

Page 22

1   A.   I don't recall if I was -- what title I was given.  I
2        know it was -- direct care is what certified nursing
3        assistants provide, and I was hired because of my
4        education as a certified nursing assistant.
5   Q.   Do you recall the name of your supervisor at Kalb?
6   A.   I do not.
7   Q.   Did you work full time in those two jobs?
8   A.   I believe so, but I honestly don't remember.
9   Q.   What is M.O.R.C. entry level care giver?
10  A.   Macomb Oakland Regional Center.
11  Q.   What is it?
12  A.   It was a training program that anyone working doing
13       nursing assistant direct care had to obtain.
14  Q.   When did you do that training?
15  A.   I don't recall the date.
16  Q.   Do you still have a state certification as a nursing
17       assistant?
18  A.   No.  It expired a long time ago.
19  Q.   What is C.R.I.S.P. that's listed here under
20       "Highlights"?
21  A.   I don't recall.
22  Q.   Where did you get that training?
23  A.   I don't recall.
24  Q.   And then you have a Cultural Competency certificate.
25       Where did you get that?

Page 23

1   A.   From Macomb Community College.
2   Q.   You then have an Associate's of Arts listed in
3        December 2008.  Is that a second associate's degree?
4   A.   Yes.
5   Q.   Was there any specialized training or area of study
6        for that particular degree?
7   A.   For the Associate of Arts, I completed the
8        requirements for the Associate of Arts, which were
9        different than the general studies.
10  Q.   Right.  But was there a particular focus, either
11       professional or academic?
12  A.   No.
13  Q.   It's just a second type of degree?
14  A.   Yes.
15  Q.   And you got a third -- or it looks like you're working
16       on a third associate's at the time of this resume in
17       2011 in respiratory therapy?
18  A.   Correct.
19  Q.   Did you receive that degree?
20  A.   I did.
21  Q.   When did you receive that degree?
22  A.   2011.
23  Q.   May?  June?
24  A.   May or June.  I don't recall.
25  Q.   What attracted you to respiratory therapy?

Page 24

1   A.   I had been diagnosed with asthma in my early 20s, and
2        I didn't really receive a lot of education on what
3        asthma was or how to recognize it or how to treat it
4        and it sparked my interest.
5             MR. PELTON:  Let's mark this as Exhibit 2.
6             (Marked EXHIBIT 2 at 9:16 a.m.)
7   BY MR. PELTON:
8   Q.   Exhibit 2 appears to be your online job application
9        with Beaumont.  Would you agree with that?
10  A.   Yes.
11  Q.   Okay.  Do you recall submitting this for employment at
12       Beaumont?
13  A.   Not particularly.
14  Q.   Okay.  Do you recall filling out an application at the
15       time?
16  A.   Not particularly, but . . .
17  Q.   All right.  Let's take a look at it.  So it has some
18       personal information to start.  It has an email
19       address at umd.umich.  What is that email address?
20  A.   That was University of Michigan-Dearborn campus.
21  Q.   What affiliation did you have with that campus?
22  A.   I was a student.
23  Q.   What kind of classes did you take at U of M-Dearborn?
24  A.   I was pursuing a bachelor's.
25  Q.   Did you receive that degree?

GARCIA, KRISTINA
02/04/2020

Pages 25–28

Page 25

1  A.  I did, but not from the Dearborn campus.
2  Q.  I see.  What years did you attend U of M-Dearborn?
3  A.  I honestly don't recall.
4  Q.  Well, was it before or after receiving your
5      respiratory therapy degree?
6  A.  After.
7  Q.  Okay.  But apparently you at least registered there at
8      the time of April of 2011 when this resume -- or this
9      application is dated?
10 A.  Yes.
11 Q.  Had you started classes when you applied to Beaumont,
12     if you recall?
13 A.  I don't recall.
14 Q.  Do you recall --
15 A.  But --
16 Q.  I'm sorry.  Go ahead.
17 A.  If I had the email address, I had to have been a
18     student to have it.
19 Q.  Right.  Do you recall how long you took classes at
20     Dearborn?
21 A.  I don't.
22 Q.  Do you recall how many classes you took at Dearborn?
23 A.  I do not.
24 Q.  You transferred at some point to finish up your
25     bachelor's?

Page 26

1  A.  Yes.
2  Q.  Where did you transfer?
3  A.  I don't recall -- let me think.  I don't believe I
4      went anywhere other than U of M-Flint.
5  Q.  Do you have a bachelor's degree?
6  A.  Yes, I do.
7  Q.  And it was received from U of M-Flint?
8  A.  Yes.
9  Q.  What year?
10 A.  I don't recall.
11 Q.  What's your degree in?
12 A.  I have -- I don't remember now.  Bachelor's of Applied
13     Science in health care management I believe it was
14     called.  It's a Bachelor's of Applied Science.  I
15     remember that.
16 Q.  And it's in the health care field?
17 A.  Yes.
18 Q.  Have you pursued any other education beyond what we've
19     just discussed?
20 A.  Yes.
21 Q.  What else?
22 A.  I'm currently a student at Kent State University
23     completing my master's in public health.
24 Q.  Kent State?
25 A.  Yes.

Page 27

1  Q.  In Ohio?
2  A.  Yes.
3  Q.  How far along the degree track are you?
4  A.  I have completed all of my required courses and I just
5      need to complete my practicum.
6  Q.  What is the practicum?
7  A.  300 hours.  Basically a thesis.
8  Q.  Were these online courses that you took at Kent State?
9  A.  Yes.
10 Q.  Did you travel to Kent State or anywhere else to take
11     classes in a classroom for this degree or has it been
12     all online?
13 A.  All online.
14 Q.  When did you complete your coursework?
15 A.  I don't recall what month.
16 Q.  What are you hoping to do with this master's degree?
17 A.  I would like to teach online classes and/or possibly
18     go into management.
19 Q.  What kind of management?
20 A.  For respiratory therapy.
21 Q.  Have you applied for any management positions?
22 A.  I applied for a supervisor position with Beaumont.
23 Q.  When was that?
24 A.  January of I believe it was 2017.
25 Q.  What happened with that application?

Page 28

1  A.  I did not receive the position.
2  Q.  I take it that decision isn't part of this lawsuit?
3          MS. WARD:  Objection.  Vagueness, but . . .
4  A.  I don't know if it's considered part of the lawsuit.
5      I believe I was discriminated against for the
6      position.
7  BY MR. PELTON:
8  Q.  I see.  Are you claiming that in this lawsuit?
9  A.  I don't believe so.
10 Q.  All right.  Who made the decision for that position,
11     to fill that position?  Who was the decision-making
12     manager?
13 A.  I believe it to be Jean Aphram.
14 Q.  Okay.  Do you recall who the successful candidate was?
15 A.  Yes.
16          Coffee time.
17          MR. PELTON:  Take a quick break.  I don't
18     think we need to go off the record, though.
19          MS. WARD:  Can we go off the record for a
20     minute and get --
21          MR. PELTON:  Oh, sure.  All right.  We'll
22     go off the record.
23          VIDEO TECHNICIAN:  Going off the record at
24     9:22 a.m.
25          (Recess taken at 9:22 a.m.)

GARCIA, KRISTINA
02/04/2020                                                                Pages 29–32

---

Page 29

1                    (Back on the record at 9:23 a.m.)
2              VIDEO TECHNICIAN:  We are back on the
3      record at 9:23 a.m.
4  BY MR. PELTON:
5      Q.  All right.  So the question pending before our little
6          coffee break was who had received the supervisory
7          position you had applied for.
8              MS. WARD:  I'm sorry?  I didn't hear that.
9  BY MR. PELTON:
10     Q.  Who had received the supervisory position that you
11         applied for?
12     A.  Allen Frankhouse.
13     Q.  A-L-A-N?
14     A.  I think it's A-L-L-E-N.
15     Q.  Was anyone other than Mr. Aphram involved in the
16         decision to fill that position?
17             MS. WARD:  Foundation.  I'm going to object
18         on foundation.  But go ahead.
19     A.  I believe the remaining supervisors or his -- Jean's
20         supervisors had input.
21  BY MR. PELTON:
22     Q.  Do you know who those were?
23             MS. WARD:  Same objection.  Go ahead.
24     A.  Ms. Antoinette Carroll, Steven Hamick, and Jim
25         Burgess, James Burgess.

---

Page 30

1  BY MR. PELTON:
2      Q.  You said you believed that the decision was somehow
3          discriminatory?
4      A.  Yes.
5      Q.  On what basis?
6      A.  I'm assuming my sexual orientation.
7      Q.  Why are you assuming that?
8      A.  Because that seems to be the rolling theme.
9      Q.  Did Mr. Aphram say something negative about your
10         sexual orientation?
11     A.  Not to me, no.
12     Q.  Did Ms. Carroll?
13     A.  Not to me, no.
14     Q.  Mr. Hammond?
15     A.  Hamick?  No.  Not to me, no.
16     Q.  Hamick.  Mr. Burgess?
17     A.  Not to me, no.
18     Q.  Have they said it to others that you're aware of?
19     A.  Not that I'm aware of.
20     Q.  Okay.  So you're not aware of them ever saying
21         anything negative about your sexual orientation?
22     A.  Correct.
23     Q.  Do you know what Mr. Frankhouse's sexual orientation
24         is?
25     A.  Yes.

---

Page 31

1      Q.  What is it?
2      A.  He is heterosexual.
3      Q.  Is there any particular reason that you believe the
4          fact Mr. Frankhouse is heterosexual and you're
5          apparently something different had to do with this
6          decision?
7      A.  I'm sorry.  Say the question one more time.
8      Q.  Yeah.  It wasn't very well stated, was it?  What is
9          your sexual orientation?
10     A.  I'm bisexual.
11     Q.  All right.  What leads you to conclude or assume that
12         you're -- the fact you're bisexual or the fact
13         Mr. Frankhouse is heterosexual had anything to do with
14         the decision to fill this supervisory position?
15     A.  I believe I was the most qualified candidate and I did
16         not receive the position.
17     Q.  So on that basis you assume it may have had something
18         to do with your sexual orientation?
19     A.  Not completely on that.  That is -- I mean . . .
20     Q.  Well, what else led you to make this assumption?
21             MS. WARD:  Could you let her -- go ahead.
22     A.  Because the sexual orientation seems to be a theme
23         with why I'm not receiving fair treatment.
24  BY MR. PELTON:
25     Q.  What do you mean by that?

---

Page 32

1      A.  Could you be more specific?  Like what do I mean?
2      Q.  Well, I'm asking you to be more specific.  You said it
3          seems to be a theme with how you're being --
4      A.  Correct.  I feel --
5      Q.  -- that you're not receiving fair treatment because of
6          it.
7      A.  I feel I'm being treated different than others.  What
8          I find to be the difference between me and others is
9          my sexual orientation and the fact that I'm very open
10         with it.
11     Q.  And what leads you to conclude that?
12     A.  Because that's the only difference I see.
13     Q.  Okay.  So you can't think of other reasons that might
14         explain the difference in treatment?
15             MS. WARD:  I'm going to object on the
16         mischaracterization of what she said, but go ahead.
17             MR. PELTON:  Well, I'm asking her.
18  BY MR. PELTON:
19     Q.  Can you think of other reasons for the difference in
20         treatment?
21     A.  No.  That's the only difference I see.
22     Q.  All right.  Has anyone in -- we talked about Aphram,
23         Carroll, Hamick, and Burgess.  Has anyone else in your
24         line of management said anything negative about your
25         sexual orientation?

---

GARCIA, KRISTINA
02/04/2020

Page 33

1   A.   No.
2                    MS. WARD:  Objection.  You've got to let me
3        make my objection.  On the basis of vagueness.  But go
4        ahead if you can answer.
5   A.   Not that I recall.
6   BY MR. PELTON:
7   Q.   You understood my question?
8   A.   Say it -- repeat it, please.
9   Q.   Has anyone -- you talked about Carroll, Hamick,
10       Burgess, and Aphram and that they hadn't said anything
11       negative about your sexual orientation that you're
12       aware of.
13  A.   No.  Not to me, no.
14  Q.   Or -- and you haven't heard it from anyone else?
15  A.   No.
16  Q.   Correct?
17  A.   Correct.
18  Q.   Anyone else in your line of -- has anyone in your line
19       of management said anything that you're aware of
20       that's negative about your sexual orientation?
21  A.   I don't believe so.
22  Q.   When you talked about difference in treatment, you
23       mentioned the selection for the supervisory position
24       you applied for in 2017; right?
25  A.   Yes.

Page 34

1   Q.   What other treatment or different treatment are you
2        referring to?
3                    MS. WARD:  Objection.  Vagueness.
4   A.   Different treatment.  I've worked very hard to obtain
5        different credentials to move up the ladder in my
6        department to become a leader, to create value for
7        myself within my department, and I don't feel that
8        they were -- those credentials or those -- pursuing my
9        education were ever taken into consideration, valued,
10       utilized, acknowledged.
11  BY MR. PELTON:
12  Q.   What acknowledgment or consideration were you
13       expecting?
14  A.   To utilize my skills.  As far as acknowledgment, other
15       therapists have received acknowledgment, whether it be
16       in email form or in -- during our huddle, which is
17       when staff all speak before our shift starts or ends,
18       and people will be recognized for their
19       accomplishments, and I never have.
20  Q.   What accomplishments were you expecting recognition
21       for?
22                   MS. WARD:  Objection.  Asked and answered.
23       But go ahead.
24  A.   I went on a medical mission trip to Haiti and that
25       wasn't acknowledged, but other therapists that have

Page 35

1        done work-related extras, so to say, have been
2        acknowledged.
3   BY MR. PELTON:
4   Q.   How were they acknowledged?
5   A.   Like giving kudos or giving recognition through email
6        or through at the huddle praises.
7   Q.   And you don't believe you received that related to
8        your mission trip to Haiti?
9   A.   Related to my mission trip to Haiti, no, I did not.
10       Related to any of my extra credentials that I have
11       went above and beyond to obtain electively.  None of
12       them were required for my position, but I did it as --
13       to create value for the organization and no, they were
14       never acknowledged to -- to my -- to my understanding,
15       to my -- I've never seen it acknowledged.
16  Q.   Other than some acknowledgment in team huddles or an
17       email, was there any other sort of acknowledgment you
18       would be expecting?
19  A.   One -- initially before I went to Haiti I was trying
20       to go to Africa to do a medical mission trip, and I
21       asked a year in advance for the time off.  How our
22       schedule goes is if you request more than two weeks
23       off at a time, you need special approval.  Not only
24       did I give a year in advance notice of my intent, I
25       had the hours saved for my vacation, and I scheduled

Page 36

1        it during more of a down time in the -- the acuity of
2        what we see, because we have kind of ups and downs of
3        when patient care seems to go up and seems to go down.
4        I had asked for that time off and was denied.
5   Q.   A year in advance?
6   A.   Yes.
7   Q.   What year was that?
8   A.   I don't recall.  I believe it was either 2015 or maybe
9        2016.
10  Q.   That you made the request or that you planned to go?
11  A.   Actually it might have been 2014, 2015.  It was when
12       Mike Wagner was still our director.
13  Q.   So you asked to go in 2014 to go in 2015?
14  A.   I asked a year prior, because I asked in January and I
15       was planning on going the following January.  I don't
16       quite recall the year.
17  Q.   Who were you going with?  What group?
18  A.   There was an organization I had found online.  I don't
19       recall the name of the organization because I never
20       went.
21  Q.   Who sponsored the mission trip to Haiti?
22  A.   Who sponsored -- like who paid for me to go?
23  Q.   Who did you go with?
24  A.   I went with -- I can't remember the name right now.
25  Q.   I mean, was it some sort of health association or a

GARCIA, KRISTINA
02/04/2020                                                                                                    Pages 37–40

1     church group or what was the -- who organized it?
2  A.  It was a -- it was a religious organization.
3  Q.  Okay.  So you were denied time off to go to Africa.
4  A.  Correct.
5  Q.  How long were you expecting to be away or -- let me
6     rephrase that.  How much time were you requesting off
7     to go to Africa?
8  A.  Four weeks.
9  Q.  Did Mr. Wagner give a reason why he couldn't approve
10    that?
11  A.  He said if I wanted the time off they would consider
12    it if I would agree to working overtime before and
13    after.  Otherwise they could not grant my request.
14  Q.  How much overtime?
15  A.  He did not specify.
16  Q.  That wasn't something you were in a position to do?
17  A.  No.
18  Q.  Were there other ways in which you felt you were
19    treated differently because of your sexual
20    orientation?
21  A.  Not at this time.  I can't recall any.
22  Q.  Did you ever get a sense from say Ms. Carroll that she
23    didn't like you personally?
24  A.  Occasionally.
25  Q.  What gave rise to that?

1  A.  Just the way people treat you gives you an indication
2    of if they like you or not.
3  Q.  Do you recall any specific incidences?
4  A.  Not at this time I don't recall anything.
5  Q.  All right.  How about Mr. Hamick?
6  A.  Is there anything that happened to make me think he
7    did not like me?
8  Q.  Right.
9  A.  No.
10  Q.  How about Mr. Burgess?
11  A.  No.
12  Q.  And how about Mr. Aphram?
13  A.  The -- when I applied for the supervisor position,
14    yes.
15  Q.  So the fact you didn't get the job led you to conclude
16    he didn't like you personally?
17  A.  The fact that I asked how I could have created more
18    value for myself and basically, you know, what
19    prevented me from getting the position, and he told me
20    that I didn't have charge therapy experience, which
21    after becoming a charge therapist I realized there's
22    no real training for that.  There's no further
23    education for that other than where to locate things.
24    So that made me believe that was not truthful.
25  Q.  Did -- did Mr. Frankhouse have, to your knowledge, did

1    he have charge therapy experience at the time he
2    applied for the job?
3  A.  He did.
4  Q.  Do you know how long he'd been employed at the time he
5    applied for the job?
6  A.  Not specifically.  It was less than the time I had
7    been employed for the job -- or employed at Beaumont.
8  Q.  Do you know anything else about his employment
9    background prior to coming to Beaumont?
10  A.  Prior to coming to Beaumont?
11  Q.  Um-hmm.
12  A.  No.
13  Q.  Do you know if there were any other candidates for the
14    position?
15  A.  Yes.
16  Q.  How many?
17  A.  One.
18  Q.  Who was that?
19  A.  Ms. Stacy Cary.
20  Q.  Could you spell her last name?
21  A.  C-A-R-Y.
22  Q.  What's her sexual orientation, if you know?
23  A.  She's heterosexual.
24  Q.  Do you know why she wasn't selected?
25  A.  She was selected.

1  Q.  So there were two positions open?
2  A.  No.  She declined the position.
3  Q.  So she was the first choice and then Mr. Frankhouse?
4  A.  Yes.
5  Q.  I see.  Do you know why she declined the position?
6  A.  To my understanding, it wasn't the right time for her.
7  Q.  That's what she advised you?
8  A.  Yes.
9  Q.  Have you applied for any other positions while
10    employed at Beaumont?
11  A.  Yes.
12  Q.  What positions?
13  A.  At Beaumont or --
14  Q.  At Beaumont.
15  A.  At Beaumont, no.
16  Q.  Okay.  You've applied for other positions outside of
17    Beaumont?
18  A.  Yes.
19  Q.  Since being employed at Beaumont?
20  A.  Yes.
21  Q.  When were those applications?
22  A.  I don't recall.
23  Q.  Have you applied for any in say the last two years
24    outside of Beaumont?
25  A.  I don't recall the date of what I applied for.  I was

GARCIA, KRISTINA
02/04/2020                                                                    Pages 41–44

Page 41

1       an expert witness for a court case.  It perhaps was
2       before the two-year mark.  It might have been just
3       around the two-year mark.
4    Q.  What kind of court case were you an expert witness in?
5    A.  It was for a medical malpractice suit.
6    Q.  Do you know who the parties were?
7    A.  I don't have them memorized, no.
8    Q.  Were you retained by one side or the other to testify?
9    A.  I was retained by the hospital system.
10   Q.  Was it Beaumont?
11   A.  No.
12   Q.  Another -- what -- who was the hospital system?
13   A.  St. John.
14   Q.  In Detroit?
15   A.  I don't know where they're based out of.
16   Q.  Where was the lawsuit pending?
17   A.  I don't recall if it was Macomb or Oakland County.  I
18       think it was Oakland.
19   Q.  Do you recall the lawyers involved?
20   A.  I remember they were based out of Birmingham, I
21       believe, but, no, I don't -- oh, it was Plunkett &
22       Cooney.
23   Q.  Do you remember the particular lawyer at Plunkett
24       Cooney that you dealt with?
25   A.  I don't remember.  I have her name somewhere or his --

Page 42

1       I think it was a female.
2    Q.  Did you testify in that matter?
3    A.  No.  I quit the case.
4    Q.  What does that have to do with applying for jobs
5       outside of Beaumont?
6    A.  You asked where I applied.
7    Q.  And that was -- so you're -- you're identifying that
8       as a -- as a job or position outside of Beaumont?
9    A.  Yes.
10   Q.  I see.  Any others?
11   A.  In the past two years, I believe I retained my current
12       position at my second job prior to two years ago.
13   Q.  And what is your second job?
14   A.  Where is it at or -- it is in respiratory therapy.
15   Q.  Where?
16   A.  The Lakeland Center.
17   Q.  Where is that?
18   A.  In Southfield.
19   Q.  Where?  Where in Southfield?
20   A.  I don't recall the address.
21   Q.  Do you still work there?
22   A.  Yes.
23   Q.  Cross streets?
24   A.  I take 696 to Telegraph, get off, and it's right
25       around the corner.

Page 43

1    Q.  It's on Telegraph Road?
2    A.  No.  It's on a smaller road.  I can look up the
3       address.
4    Q.  That's fine.  Maybe on a break.  Who owns the Lake --
5       Lakeland?
6    A.  The Lakeland Center.
7    Q.  Lakeland Center.
8    A.  I --
9            MS. WARD:  I'm going to object on the
10       grounds of foundation.  But go ahead.
11   A.  I don't recall the owner's name.  It switched owners.
12       But my supervisor is Ron Gansler.
13   BY MR. PELTON:
14   Q.  Ron?
15   A.  Ronald Gansler, G-A-N-S-L-E-R.
16   Q.  When you get a paycheck from them, what is the company
17       on the paycheck?
18   A.  I don't recall.  It's automatic -- it's direct
19       deposit.
20   Q.  Okay.
21   A.  I believe it's The Lakeland Center.
22   Q.  In your tax returns that you provided as part of this
23       case there is an Advanced Healthcare Hospital.  Is
24       that related to The Lakeland Center?
25   A.  Could you tell me the address?

Page 44

1    Q.  It's been blocked out.  I will show you a page from
2       your production.  This is from Plaintiff's Second
3       Supplemental Responses to Defendant, Beaumont Health's
4       First Request for Production of Documents.  It's in
5       2016 returns and it is a W-2.  I'll hand that to you.
6            MS. WARD:  Do you have a copy for me, sir?
7            MR. PELTON:  I don't.
8            MS. WARD:  Let me see.  Can I read it with
9       her?
10           MR. PELTON:  Please.
11   A.  I don't believe that is Lakeland.  I think that is the
12       job prior to Lakeland, but I'm not a hundred percent
13       correct.
14   BY MR. PELTON:
15   Q.  All right.
16   A.  I mean, I'm not a hundred percent certain.  Sorry.
17   Q.  Thank you.  In 20 -- so that was the 2016 and you had
18       compensation of $11,533.43; correct?
19   A.  According to the tax return, yes.
20   Q.  Yeah.  Okay.  And that would be accurate; right?
21   A.  If it's in my taxes it should be, yes.
22   Q.  Okay.  And then 2017, again, there's an Advanced
23       Healthcare Hospital with wages of $3,205.35, and
24       there's a Lakeland Services, Inc., for $1,115.28, and
25       I'll show you those just to verify the amounts.

Page 45

1          MS. WARD:  Let me share them.  Unless you
2     have copies.
3          MR. PELTON:  I don't.  I didn't --
4          MS. WARD:  That's all right.  That's all
5     right.  I just want to . . .  Okay.
6  A.  I believe the Advanced Healthcare Hospital was my job
7      prior, and I believe the Lakeland Services, Inc., is
8      my current second job.
9  BY MR. PELTON:
10 Q.  That would make sense.
11 A.  Yeah.
12 Q.  Yeah.  Based on these records.  So for what period of
13     time did you work for Advanced Healthcare Hospital?
14 A.  I don't recall the dates off the top of my head.
15 Q.  Okay.  We know you were there in 2016 --
16 A.  Okay.
17 Q.  -- from the tax return.
18 A.  According to the tax return, yes.
19 Q.  And there's a W-2 in 2017 for quite a bit less, so it
20     might make sense -- well, instead of guessing, let me
21     just ask you.  Did you leave the Advanced Healthcare
22     position to go to Lakeland Services?
23 A.  I did not.
24          MS. WARD:  Somebody's trying to get in.
25     Didn't you hear it, too, sir?

Page 46

1          VIDEO TECHNICIAN:  I think it was the
2     reception.
3          MS. WARD:  Okay.  Sorry.  Go ahead.  Sorry
4     to interrupt.  I just didn't know who was there.
5          MR. PELTON:  That's all right.
6  BY MR. PELTON:
7  Q.  The question was did you leave Advanced Healthcare
8      when you started at Lakeland?
9  A.  I did not.
10 Q.  Okay.  Was there a break in time?
11 A.  Between the two positions, yes.
12 Q.  But it would be fair to say that you left Advanced in
13     2017?
14 A.  I believe so.
15 Q.  Where is that located?
16 A.  It was at that time located in Pontiac on North Perry
17     Street inside -- it's inside the hospital that's
18     there.  I can't --
19 Q.  The old Pontiac General?  It's now something --
20     Doctors Hospital or something?
21 A.  I don't remember the name of the hospital, but the --
22     the employer -- my employer rented a floor in the
23     hospital.
24 Q.  Yeah.  I know -- I know where you mean.  Who was your
25     supervisor there?

Page 47

1  A.  Initially her name was Jennifer.  I can't remember her
2      last name.  Then we went through a few supervisors.
3      My last supervisor was Stacy Sloan, S-L-O-A-N.
4  Q.  Why did you leave Advanced?
5  A.  I had requested two days off to focus on the court
6      case that I had been hired for and my requests were
7      denied, so I called in and I was terminated because I
8      called in.
9  Q.  This was the Plunkett Cooney matter?
10 A.  Correct.
11 Q.  I see.  How often did you work at Advanced Healthcare
12     during the time you were there on average?
13 A.  For quite a while I was every other weekend, so two to
14     three days every two weeks.
15 Q.  Was Beaumont aware of this employment?
16 A.  I'm unsure.  They do have -- Beaumont does have a -- I
17     don't recall what it's called, but something online
18     where you can fill out like other experience you've
19     had to show your experience that you have, and I -- I
20     do believe that was one of the jobs listed.
21 Q.  So this is some sort of online portal at the
22     hospital -- or at Beaumont?
23 A.  Yes.
24 Q.  You don't recall what it's called?
25 A.  No.  I believe you have a copy of it in my file,

Page 48

1      though.
2  Q.  Is it part of the HR system there?
3  A.  I don't know who oversees that component of online.
4  Q.  In 2018 your W-2 from Lakeland shows $6,501.15; is
5      that correct?  I'm showing you from the production.
6  A.  Correct.  Yeah.
7          MS. WARD:  Can you move it over here so I
8      can just make a note of it?
9          THE WITNESS:  Oh, I apologize.
10         MS. WARD:  That's okay.  Okay.  Thanks.
11 A.  Did you want these back?
12 BY MR. PELTON:
13 Q.  You can leave them there for now.
14 A.  Okay.
15 Q.  Thank you.  We'll try and keep them in order because
16     we may refer back to some as we go.
17 A.  Okay.
18         MR. PELTON:  Let's go ahead and mark the
19     collection of W-2s we just looked at from plaintiff's
20     production as Exhibit 3, so there will be no mistaking
21     what we just reviewed.
22         (Marked EXHIBIT 3 at 9:50 a.m.)
23         MS. WARD:  I know -- you don't have a copy
24     for me of that you said?
25         MR. PELTON:  You'll get one with the

GARCIA, KRISTINA
02/04/2020                                                          Pages 49—52

1    transcript.  You have them.  I mean, they're what
2    you've produced.
3                MS. WARD:  Can I at least take a minute to
4    find what you're looking at?
5                MR. PELTON:  Sure.
6                MS. WARD:  I don't have them here.  I do
7    not.  That's -- I didn't bring all the --
8                MR. PELTON:  That's okay.  Take --
9                MS. WARD:  Can I review them?
10               MR. PELTON:  Take a moment to review them.
11               MS. WARD:  That would be great.
12               MR. PELTON:  They're just the W-2s.  That's
13   all.
14               MS. WARD:  No.  I believe you.  I just want
15   to --
16               MR. PELTON:  Okay.
17               MS. WARD:  Yeah.  If I can have a second.
18               MR. PELTON:  I'm done with them, so I
19   probably won't be coming back to it.  But take your
20   time.
21               MS. WARD:  Okay.  Just taking some notes
22   and I'll be right with you.  Seven pages?  Okay.
23   Thank you.  That's all I needed.
24   BY MR. PELTON:
25   Q.   Why don't you clip them together again, Ms. Garcia,

1    and just --
2                MS. WARD:  Sorry.
3    BY MR. PELTON:
4    Q.   -- keep them with the others.
5                MR. PELTON:  That's okay.
6    A.   Keep them here?
7    BY MR. PELTON:
8    Q.   Yep.  And you can move them to the side if they're in
9    your way, but . . .
10   A.   Okay.
11   Q.   Okay.  What kind of work did you do at Advanced
12   Healthcare?
13   A.   Respiratory therapy.
14   Q.   Similar to what you were doing at Beaumont?
15   A.   Similar.
16   Q.   What kind of work were you doing at Lakeland Center?
17   A.   Respiratory therapy.
18   Q.   Similar to what you do at Beaumont?
19   A.   Similar.
20   Q.   Are there differences?
21   A.   Yes.
22   Q.   What kind?
23   A.   Those two places are both acute care and rehab, so
24       they don't have a Level 1 trauma center.  They don't
25       have an intensive care unit.  They don't have

1    pediatric.
2    Q.   Are you still employed at Lakeland Center?
3    A.   Yes.
4    Q.   Do you have -- have you had any other jobs while
5    working at Beaumont since you were hired in 2011?
6    A.   I was hired in 2011, yes.
7    Q.   Have you had any other employment since working at
8    Beaumont?
9    A.   Just those three that I recall.
10   Q.   How much were you paid for the expert witness work?
11   A.   I don't recall.
12   Q.   And you don't recall the year?
13   A.   It begun the same month I was -- the same month I left
14       or was terminated from -- it was called Pioneer
15       Specialty Hospital, which I'm assuming is the
16       Advanced, what -- whatever it said.  Advanced Health
17       or -- Advanced Healthcare Hospital.
18   Q.   How did you bill for your time?  Were you -- did you
19       set up a business through which to run that
20       compensation or they just sent you a check for the
21       expert work?
22   A.   I --
23               MS. WARD:  I'm going to object because
24       you've asked her like three questions there.  Can we
25       break it up?

1    BY MR. PELTON:
2    Q.   Do you understand my question?
3    A.   No.
4    Q.   Okay.  What was the form of your compensation as an
5        expert witness?
6    A.   The form?
7    Q.   Um-hmm.
8    A.   Payment.
9    Q.   By check?
10   A.   Yes.
11   Q.   From the law firm?
12   A.   Yes.
13   Q.   To you personally or to a business?
14   A.   To me.
15   Q.   How was it reported in your income taxes?
16   A.   I don't recall.
17   Q.   All right.  Well, did you receive a 1099 -- IRS Form
18       1099 for that work?
19   A.   I don't believe so.
20   Q.   Did you receive a W-2 for that work?
21   A.   I don't believe so.
22   Q.   Did you report the income to the government?
23   A.   I don't recall.
24   Q.   Do you still have records of that compensation as an
25       expert witness?

GARCIA, KRISTINA
02/04/2020                                                          Pages 53–56

Page 53

1   A.   I'm sure I do.
2   Q.   Why did you quit the case?
3                MS. WARD:  I'm going to place an objection.
4        If, in fact, anything you're about to say is subject
5        to any kind of confidentiality agreement, you can't
6        answer.  I don't know the answer to the question, but
7        I just want you to know.  As long as that's -- as long
8        as you've not signed something about non-disclosure,
9        go ahead.
10  A.   I don't recall if I've signed anything for
11       non-disclosure.
12  BY MR. PELTON:
13  Q.   All right.  Well, I don't want to put you in a tough
14       spot, so we'll follow up on this later if necessary.
15  A.   Okay.
16  Q.   All right?
17  A.   Okay.
18  Q.   Okay.  Thank you.  Do you recall what roughly your
19       earnings were from that case?
20  A.   From what I recall, I believe I only received one
21       paycheck and it was for $750 if I remember correctly.
22  Q.   What position were you applying for at Beaumont in
23       April 2011?
24  A.   Oh.  Respiratory therapy.  As a respiratory therapist.
25  Q.   How did the position come to your attention?

Page 54

1   A.   I was completing one of my clinical rotations at
2        Beaumont, and Steven Hamick, one of the -- he was the
3        educator at the time, he is now currently a
4        supervisor, informed me of the position.  I may have
5        asked him about the position.  I'm not sure who
6        brought it up.
7   Q.   The clinical rotations were part of your education
8        at --
9   A.   Yes.
10  Q.   -- at Macomb Community?
11  A.   Yes.
12  Q.   How long was the rotation at Beaumont?
13  A.   I don't remember how long our rotations were.
14  Q.   You were hired for that job?
15  A.   Yes.
16  Q.   Who did you report to initially?
17  A.   As my current supervisor upon hiring?
18  Q.   Yes.
19  A.   I don't recall.
20  Q.   What were you hired to do?
21  A.   Be a respiratory therapist.
22  Q.   Any particular area of the hospital?
23  A.   We have core areas that we get placed into, and
24       initially you get placed into -- I'm not sure what you
25       would call it.  It's just our MPCU group where you do

Page 55

1        floor therapy and you can cover the progressive units.
2   A.   I have several I guess job descriptions.  One is for
3        therapist responsibilities on the general floors.
4   A.   Okay.  So it would be considered general floors.
5   Q.   One is charge therapist.
6   A.   Okay.
7   Q.   One is emergency center.
8   A.   Yes.
9   Q.   One is adult critical care units.
10  A.   Okay.
11  Q.   Are there others?
12  A.   Pediatrics.
13  Q.   Any others?
14  A.   Not that I can think of.
15  Q.   So you started out general floor?
16  A.   Correct.
17  Q.   What does it mean when you're general floor?  You
18       don't have an assigned area or what -- what's the --
19       let me rephrase that.  What's the assignment when
20       you're general floor?
21  A.   There's lots of different general floors, so you can
22       be assigned to any of them, including the progressive
23       units.
24  Q.   What's mean by -- what do you mean by progressive
25       units?

Page 56

1   A.   Our progressive units are basically a unit that's in
2        between a general floor and an intensive care unit, so
3        they need a little bit more attention and supervision
4        than a general floor but not quite enough to require
5        an intensive care unit bed.
6   Q.   How long did you stay in the general floor unit or
7        group?
8   A.   I believe it was four years.
9   Q.   You were hired in May 2011?
10  A.   Yes.
11  Q.   So sometime in 2015 you started working some other
12       units?  And units might not be the right description,
13       but . . .
14  A.   I don't recall when I was placed in the EC box, so
15       that would be working primarily in the emergency
16       center.  I don't recall when I was placed in that box.
17       I do recall the four years because I had expressed
18       interest in getting into our intensive care units and
19       gaining experience in there, and it took quite a while
20       for me to be able to get into the units, which I
21       believe was four years.
22  Q.   Is intensive care part of the adult critical care?
23  A.   It would be adult critical care, yes.
24  Q.   Okay.  Did you eventually move into that area?
25  A.   Eventually, yes.

GARCIA, KRISTINA
02/04/2020

Page 57

1   Q.   When was that?
2   A.   I don't recall.
3   Q.   So you were floor -- general floor for four years
4        roughly and then you said in the EC, meaning the
5        emergency center box?
6   A.   Yes.  I did transfer to that as my primary.  I don't
7        recall when.  It was -- it was before the four years
8        if I remember correctly.
9   Q.   And you might still do some floor duties in addition
10       to emergency center depending on the needs?
11  A.   Oh, yes.
12  Q.   I see.  And then did there come a time where you were
13       primarily adult critical care?
14  A.   Yes.
15  Q.   When -- and do you recall when that was?
16  A.   I -- no.  After about four years is when I finally
17       became like -- received training to go into the ICUs.
18       I don't recall what date.  I did place a request to
19       switch my primary location to ICU to be -- to get more
20       experience so I wasn't there just occasionally.
21  Q.   When did you do that?
22  A.   I don't recall the date.
23  Q.   And then once you requested it, did you move -- begin
24       your training in that area?
25  A.   Eventually.

Page 58

1   Q.   Who did the training?
2   A.   We get -- various other staff member, coworkers are
3        scheduled with you to train you and oversee.
4   Q.   Who was supervisor at the time you started training in
5        adult critical care?
6   A.   I don't recall.  More than likely it was
7        Ms. Antoinette Carroll.
8   Q.   Were you working particular shifts at that time?
9   A.   I've always been on the midnight shift.
10  Q.   What are the hours for midnight shift?
11  A.   6:45 p.m. till 7:15 a.m.
12  Q.   And at the time you started in adult critical care,
13       who did Ms. Carroll or your supervisor at that time
14       report to?
15            MS. WARD:  Objection.  Foundation.  But go
16       ahead.
17  A.   Who did I report to?
18  BY MR. PELTON:
19  Q.   No.  Who did your supervisor report to?
20  A.   Oh.  I don't recall if it was Mike Wagner or Jean
21       Aphram.  I don't recall.
22  Q.   Did Mr. Aphram -- I'm sorry.
23  A.   Oh.  It must have been Mike Wagner.
24  Q.   Did Mr. Aphram replace Mr. Wagner?
25  A.   Correct.

Page 59

1   Q.   You don't recall the timing?
2   A.   No.
3   Q.   What position did Mr. Wagner and then Mr. Aphram hold?
4        Do you know the title?
5   A.   Mike Wagner was our director of respiratory care.
6        When he retired, Jean Aphram was currently a
7        respiratory care supervisor and then he went in to
8        replace him as the director of respiratory care.
9   Q.   So the director has a number of supervisors reporting
10       to him or her?
11  A.   Correct.
12  Q.   Does each of the areas we've been talking about have a
13       supervisor?  In other words, is it broken down by
14       general, emergency, pediatrics, et cetera?
15  A.   I don't know how they separate that.  I know generally
16       emergency kind of deals with Steven Hamick, but I
17       don't believe -- I don't believe any of them only see
18       an area.  It's -- they have certain staff members that
19       are considered like -- that is their supervisor even
20       though they're all our supervisor, you know.
21       They're --
22  Q.   How many supervisors are there that report to the
23       director?
24            MS. WARD:  I'm going to object on the basis
25       of foundation.  But go ahead if you know.

Page 60

1   BY MR. PELTON:
2   Q.   If you know.
3   A.   My understanding that report to the supervisor -- or
4        the director of respiratory care would be Antoinette
5        Carroll, James Burgess, Steven Hamick, and Allen
6        Frankhouse.
7   Q.   During the time you've been there have there always
8        been four supervisors, to your knowledge?
9   A.   When I started we had Pat Glass, Jean Aphram,
10       Antoinette Carroll.  I think it was just those three
11       if I remember correctly.  And Steven Hamick was our
12       educator.
13  Q.   When did Ms. Carroll become a supervisor, if you know?
14  A.   Well before I started.
15  Q.   I see.  Who -- which of these supervisors have you
16       reported to?
17  A.   All of them at one point or another.
18  Q.   Okay.  And at any given point in time do you only
19       report to one of them?
20  A.   Report in what way?
21  Q.   They would be the supervisor I presume on your shift
22       that you had some reporting relationship to who might
23       evaluate you, things like that.
24            MS. WARD:  Wait till he finishes the
25       question.  Go ahead.

GARCIA, KRISTINA
02/04/2020                                                                    Pages 61–64

Page 61

1  A.   Sorry.  Ms. Antoinette Carroll was the midnight
2       supervisor when I started up until -- I don't recall
3       the date that she went to days.  And then Allen
4       Frankhouse took over for the midnight shift
5       supervisor.
6  BY MR. PELTON:
7  Q.   Was that at the point he was promoted?
8  A.   Yes.
9  Q.   The position you had applied for?
10 A.   Correct.
11 Q.   All right.  How did you get along with Mr. Frankhouse?
12 A.   I really didn't have much interaction with him because
13      he was on days and I was on nights.
14 Q.   Since he became midnight supervisor how have you
15      gotten along with him?
16 A.   No -- no issues.
17 Q.   No issues?  No concerns?
18 A.   No.
19 Q.   While Ms. Carroll was on midnights, how did you get
20      along with her?
21 A.   Okay.
22 Q.   Did you have any particular issues with her while she
23      was your supervisor on midnights?
24 A.   Not that I recall.  If we could go back to
25      Mr. Frankhouse as far as issues, there was a comment

Page 62

1       that he made to me that I felt was slightly I suppose
2       degrading.  Other than that, I don't recall -- I don't
3       recall any others.
4  Q.   Was that when Mr. Frankhouse was a supervisor that he
5       made this comment?
6  A.   Yes.
7  Q.   What was the comment?
8  A.   After I had came back from my FMLA leave I was in the
9       emergency center, and Mr. Frankhouse had came down
10      just to check on us, and he had mentioned that Steven
11      Hamick, the other supervisor, was I guess upset and
12      flustered, didn't know what to do because we had BLS,
13      which is a certification that we all have to obtain,
14      and I am a BLS provider, so I renew certification for
15      that, and I was scheduled to -- I believe it was
16      during my FMLA.  It was during a time I wasn't there.
17      And he had said Mr. Hamick was flustered that all
18      these people in our department needed to renew their
19      certifications and I wasn't there for it, and he
20      said -- let me think of how he said it.  He said he
21      didn't like that Mr. Hamick was upset and flustered
22      about how to get these people certified, and he asked
23      me how I obtained my certification to be an instructor
24      so he could take it so they no longer had to rely on
25      me.

Page 63

1  Q.   When was your FML leave?
2  A.   In September of 2018.  I don't recall the specific
3       dates by memory.
4  Q.   What was the -- what is BLS certification?
5  A.   Basic life skills, so it's CPR and first aid.
6  Q.   So some respiratory therapists in the group were due
7       for BLS certification training?
8  A.   Renewal.
9  Q.   Renewal training?
10 A.   Yes.
11 Q.   All right.  How long a process is that?
12 A.   It's a one-day couple-hour process, but you have to be
13      obviously an instructor to recertify them.
14 Q.   You were the only instructor in the group?
15 A.   Myself and Steve Hamick.
16 Q.   I see.  Mr. Frankhouse said Mr. Hamick was flustered
17      that these people needed certification?
18 A.   Yeah.  I don't remember the exact term he used, but he
19      said basically Mr. Hamick was upset that the renewal
20      needed to take place by a certain date so there was no
21      lapse in their certification, and I could not do my
22      classes that I had scheduled because I was off.
23 Q.   Okay.  These were classes that had been scheduled
24      prior to your leave?
25 A.   Yeah.  They must have been.

Page 64

1  Q.   Did Mr. Hamick then conduct the classes since he was
2       also trained to be a trainer?
3  A.   I don't recall if he took over some of my classes.  I
4       still did classes, to the best of my recollection.  I
5       think we just moved the dates.
6  Q.   All right.  So he's relating to you Mr. Hamick's
7       frustration or flustering or being upset I guess,
8       what, that he had to conduct the classes?
9  A.   No.  It was more along the lines of how are we going
10      to get all these people recertified without another
11      instructor because one instructor can only do so
12      many -- they can only have so many students per class.
13 Q.   All right.
14 A.   And we do them when staff is currently working.
15 Q.   So if one instructor happens to be gone, now we're in
16      the lurch because we don't have another one?
17 A.   Correct.
18 Q.   And then who said what about getting themselves
19      trained?  Was that --
20 A.   Mr. Frankhouse asked me how I became an instructor
21      because he expressed that he wanted to become an
22      instructor so they didn't have to rely on me anymore.
23 Q.   And that's how he said it?
24 A.   I'm not quoting, but yes.
25 Q.   Well, what do you remember him saying, best you can

Page 65

1    recall?
2  A.  I remember him stating that Mr. Hamick was upset, and
3      I didn't get that he was upset with me, it was just
4      the situation, and Allen said he wanted to obtain the
5      instructor credentials so they didn't have to rely on
6      me.
7  Q.  Right.  You don't disagree it would be a good idea to
8      have more than one instructor; right?
9  A.  There's only other -- there's only ever been one
10     instructor other than Steve Hamick, to the best of my
11     knowledge, and that instructor had let his credentials
12     lapse, so they've only ever had two instructors, to
13     the best of my knowledge.
14 Q.  You don't disagree it would be good to have another
15     instructor available?
16 A.  I have no opinion on that.
17 Q.  I mean, it would be a good idea, wouldn't it, in case
18     someone's --
19         MS. WARD:  Objection.  Asked and answered.
20         MR. PELTON:  All right.  I'm testing that.
21 BY MR. PELTON:
22 Q.  It would be a good idea, wouldn't it, in the event
23     something occurred again like occurred with you that
24     you weren't available to do the testing?
25         MS. WARD:  Same -- just a minute.  Same

Page 66

1      objection.  If you have developed an opinion, go
2      ahead.
3  A.  I have no opinion on that.
4  BY MR. PELTON:
5  Q.  Doesn't matter to you?  So it doesn't matter to you
6      that --
7  A.  You can get more people done.
8  Q.  All right.  And they might be left in the lurch if
9      someone's not there to conduct the training?
10 A.  Apparently they were.  So . . .
11 Q.  All right.  So what is it that you thought was --
12 A.  Insulting or . . .?
13 Q.  Yeah.  I can't remember the exact word you used, but
14     insulting --
15 A.  Yeah.
16 Q.  -- by Mr. Frankhouse's comment?
17         MS. WARD:  You have to wait till he's
18     finished before you answer.
19 A.  I'm sorry.  I'm sorry.
20 BY MR. PELTON:
21 Q.  We're doing all right.  Don't worry.
22 A.  The way he said it, his body language, his tone, that
23     they didn't want to rely on me.
24 Q.  Okay.  So you took it as an insult?
25 A.  It didn't seem nice.

Page 67

1  Q.  Did you challenge him on that?
2         MS. WARD:  Can we take a break --
3         MR. PELTON:  In a moment.
4         MS. WARD:  I'm sorry.  Yeah.
5  BY MR. PELTON:
6  Q.  Did you challenge him on that?
7  A.  What do you mean challenge?
8  Q.  Say there was a pretty rude comment or challenge him at
9      all or push back at all on what he had said.
10 A.  I don't believe so.
11 Q.  Okay.  All right.
12         MR. PELTON:  We'll take a break.
13         MS. WARD:  Yeah.  Just a bathroom break
14     would be nice.
15         MR. PELTON:  Sure.  That's -- that's fine.
16     We'll take a break.
17         MS. WARD:  It's been about an hour and a
18     half give or take.
19         VIDEO TECHNICIAN:  Going off the record at
20     10:14 a.m.
21         (Recess taken at 10:14 a.m.)
22         (Back on the record at 10:23 a.m.)
23         VIDEO TECHNICIAN:  We are back on the
24     record at 10:23 a.m.
25 BY MR. PELTON:

Page 68

1  Q.  At the time of this September 2018 comment by
2      Mr. Frankhouse we were discussing prior to the break,
3      were there any other BLS certifiers or trainers like
4      you?
5  A.  We had one other staff that was trained for -- as an
6      instructor.  They were trained as an instructor.
7  Q.  Who was that?
8  A.  Scotty.  I don't recall his last name at the moment.
9  Q.  Which shift?
10 A.  Midnight.  That was the only one I was aware of.
11 Q.  Did he conduct the training, then, in your absence?
12 A.  No.  His certification as an instructor had lapsed by
13     that time.
14 Q.  Oh, I see.
15 A.  He was prior to.
16 Q.  I see.  I'm sorry.  Were there any others that were
17     active that you were aware of at that time as
18     trainers?
19 A.  Only -- only Steve Hamick from what I was aware of.
20 Q.  Okay.  So if there were others, you weren't aware of
21     it?
22 A.  Correct.
23 Q.  Did you end up doing the training after you got back?
24 A.  I did do instructor training, yes.
25 Q.  And did any training go on in your absence?

GARCIA, KRISTINA
02/04/2020

Pages 69–72

Page 69

1    MS. WARD:  Objection.  Foundation.
2  BY MR. PELTON:
3  Q.  If you know.
4  A.  I'm unaware.  I probably knew at that time.  I don't
5      recall now.
6  Q.  Any other supervisors that you had any particular
7      issues with or incidences with that are of concern to
8      you?
9    MS. WARD:  Objection for vagueness.  But go
10     ahead.
11 A.  Could you elaborate on concern with?
12 BY MR. PELTON:
13 Q.  Yeah.  We've been talking about how you got along with
14     your supervision.  You mentioned this particular issue
15     with Mr. Frankhouse that was of concern to you, and
16     I'm asking if there were any other issues or
17     incidences with your supervision that you thought was
18     particularly unfair or not well handled or was a rude
19     or insensitive statement.
20 A.  During which time frame?
21 Q.  During the time you were employed at Beaumont.
22 A.  When I was -- when I received a written, I don't know
23     if you would call it warning or reprimanda -- I was
24     reprimanded for calling in.  I felt that was unfair.
25 Q.  When was that?

Page 70

1  A.  I don't recall the date.  It's on file.
2  Q.  A written warning or written reprimand of some sort's
3      in your file?
4  A.  Yes.
5  Q.  Do you recall what year?
6  A.  No.
7  Q.  Do you recall your supervisor?
8  A.  The supervisor that gave me the reprimand -- or that
9      reprimanded me was Pat Glass.
10 Q.  Do you know what years he was your supervisor or she?
11 A.  She was a day shift supervisor, but all our
12     supervisors are -- are supervisors.  She was there
13     when I started.  I don't recall when she retired.
14 Q.  So it sounds like this goes back some years?
15 A.  I mean, I felt it was unfair.  I don't believe it was
16     due to my sexual orientation.
17 Q.  Well, I didn't ask that.  But I'm --
18 A.  Okay.
19 Q.  -- trying to focus on when it occurred.  Sounds like
20     it was several years ago?
21 A.  Yes.
22 Q.  All right.  Any other incidences or concerns that you
23     had with your supervision?
24 A.  Statements or comments made by Mr. Steve Hamick that I
25     felt were inappropriate.

Page 71

1  Q.  What were those?
2  A.  Comments about what kind of porn he likes.
3  Q.  When did he make those comments?
4  A.  When I was doing my clinical rotation.
5  Q.  When was that?
6  A.  Prior to May 2011.
7  Q.  Did he make any comments of that nature after you
8      became a full-time employee?
9  A.  No.
10 Q.  Who -- who was present when he made the comment?
11 A.  Just him and myself.
12 Q.  What did he say?
13 A.  He commented on my tattoos and made a comment that --
14     he asked me if I knew why men didn't like tattoos on
15     women, and I responded something along the lines of I
16     think men think they look masculine, and he said no,
17     it's because in porn and when having sex they get
18     distorted when you have the women in different
19     positions.
20 Q.  Was this a onetime comment he made?
21 A.  Yes.
22 Q.  Okay.  Do you recall anything further from the
23     conversation after he made that comment?
24 A.  No.
25 Q.  What was his position at the time?

Page 72

1  A.  Educator.
2  Q.  Did you report this to anyone?
3  A.  No.
4  Q.  Either at Beaumont or back at the school?
5  A.  No.
6  Q.  Were you offended?
7  A.  Yes.
8  Q.  Did you tell Mr. Hamick you were offended?
9  A.  No.
10 Q.  You just kind of walked away?
11 A.  I just said oh.  I didn't expect that to come out of
12     his mouth and move on.
13 Q.  So you just kind of said oh and then walked away and
14     that was the end of it?
15 A.  No.  Didn't walk away.  We were in his office.  The
16     subject I believe got changed after that.
17 Q.  I see.  So that was the end of it?
18 A.  Um-hmm.
19 Q.  Yes?
20 A.  Yes.
21 Q.  And you chose not to report it to anyone?
22 A.  Correct.
23 Q.  He's not made any statements of that nature to you
24     since that time?
25 A.  Correct.

GARCIA, KRISTINA
02/04/2020

Page 73

1  Q.  Any other concerns about your supervision?
2  A.  Concerns about the way everything was handled about
3      the sexual assault, yes.
4  Q.  Right.  We'll get into that.
5  A.  Okay.
6  Q.  And we'll spend a lot of the --
7  A.  So --
8  Q.  -- day on that.  But other than those issues which
9      we'll get into, in terms of how they handled things or
10     handled you or said things to you.
11 A.  Those are the two that stand out in my head.
12 Q.  The two being Mr. Hamick's comment when you were a --
13     prior to your employment?
14 A.  Yes.
15 Q.  And Mr. Frankhouse's comment about covering the BLS
16     certification training?
17 A.  Yes.
18 Q.  All right.  We were discussing prior to the break the
19     various types of respiratory therapist positions.  You
20     said you had started as general floor, worked in the
21     EC, and then eventually became trained to work in the
22     adult critical care area?
23 A.  Yes.
24 Q.  Have you -- has that remained your primary area since
25     then?

Page 74

1  A.  No.  I went back to EC, emergency.
2  Q.  Do you know when?
3  A.  No, I do not.
4  Q.  Where are you today?
5  A.  I believe I'm in the E -- yes.  I'm in the EC primary
6      box.
7  Q.  How long have you been working in the EC primarily?
8  A.  I -- I don't know.  Years.
9  Q.  What was -- I'm sorry?
10 A.  Years.
11 Q.  Okay.  And do you work in these other areas from time
12     to time as needed?
13 A.  Yes.
14 Q.  All right.
15 A.  Since I'm trained in all the areas except NIPI, I
16     rotate where needed.
17 Q.  So in a typical month say in 2018, 2019, or the last
18     couple years, in other words, in a typical month how
19     many shifts do you work?
20 A.  12.  At least 12.  Three per week.
21 Q.  Are there particular days of the week that you work
22     most often?
23 A.  Most often I am Friday, Saturday, Sunday.
24 Q.  You work this night shift for 12 hours on each of
25     those?

Page 75

1  A.  Yes.
2  Q.  So you work 36 hours per week usually?
3  A.  Yes.
4  Q.  Do you pick up overtime on occasion?
5  A.  Yes.
6  Q.  How often?
7  A.  Some -- sometimes it'll be a lot.  Sometimes -- some
8      months maybe none at all.
9  Q.  Where -- and where -- what days do you work at your
10     other job?
11 A.  I don't have set days.
12 Q.  I see.  What's your schedule with them?  They just --
13     as needed or they call you or how does that come
14     about?
15 A.  I'm contingent.
16 Q.  So they just call you up and say can you work tonight
17     or this week?
18 A.  Some days they will say, yes, they'll call me and say
19     can you work or they will have open shifts that they
20     know aren't covered in advance and they'll ask if any
21     contingents want to pick up any of those days.
22 Q.  Are there other days you could work at Beaumont?
23 A.  What do you mean?
24 Q.  Yeah.  You said you work on Friday, Saturday, Sunday.
25     If you wanted to pick up another day during the week,

Page 76

1      could you ask?
2  A.  As overtime?
3  Q.  Yeah.
4  A.  If the need -- if there's a need.
5  Q.  All right.  How often would you be able to do that?
6  A.  Depends on the season.  If it's the busy season,
7      probably most days.  As of right now we're very busy
8      and there's a lot of days they're looking for
9      overtime.
10     I mean, I'm assuming that you would prefer to work
11     that overtime at Beaumont than to pick up a shift as a
12     contingent at this other company.
13 A.  Why?
14     Because you're paid overtime.  So I assume it's a
15     higher rate of pay.
16 A.  After taxes, not necessarily.
17 Q.  Well, you get time and a half -- well, what's your pay
18     level at Beaumont?
19 A.  I don't recall off the top of my head.
20 Q.  All right.  You understand you get time and a half pay
21     after 40 hours?
22 A.  Correct.
23 Q.  What's your pay level at Lakeland?
24 A.  I don't recall.
25 Q.  Is it as high as Beaumont?

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson
U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids
Phone:  888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

GARCIA, KRISTINA
02/04/2020

Page 77

1  A.  It's higher than Beaumont.
2  Q.  It's higher than Beaumont?
3  A.  Yes.
4  Q.  Is it higher than time and a half at Beaumont?
5  A.  I don't recall what my time and a half rate would be
6      off the top of my head.  What I have noticed and why I
7      think there's a difference is because when I pick up
8      an overtime day at Beaumont, the first four hours are
9      under a 40-hour work week.
10 Q.  Sure.
11 A.  So it's straight pay.  And eight hours would be
12     overtime pay.  So if I work a higher rate at my other
13     job for the entire 12 hours, and occasionally we are
14     given bonuses for picking up a shift, I noticed even
15     without a bonus I would take home approximately $300
16     for a day at my second job.  I would take home
17     approximately 250 per day at Beaumont.  So, I mean, it
18     gives me different experience as well --
19 Q.  Sure.
20 A.  -- and different scenery and different -- just
21     different things.
22 Q.  Right.  And my assumption was not correct in terms of
23     your pay?
24 A.  I mean, I didn't -- I would have to actually go
25     through it because --

Page 78

1  Q.  Okay.
2  A.  -- there's different rates for midnight.  I forget
3      what they're called.  For working midnights you get an
4      extra whatever amount at both jobs.  It appears to me
5      that I tend to bring home more at my other job.
6  Q.  In the typical month where you're working three
7      12-hour shifts each week for a total of roughly 12
8      shifts, if you don't pick up any others, how many of
9      those on average would be in the emergency center?
10 A.  It would vary month to month and week to week.
11 Q.  In say 2019 rough percentage of time you would spend
12     in the emergency center?
13 A.  I couldn't tell you.
14 Q.  You can't say.
15 A.  No.  It's all on record.  Like they could pull up and
16     tell you how many days.  They keep track of, you know,
17     who's in what location.  I couldn't tell you.
18 Q.  After the emergency center what unit do you work in
19     most often over the last couple years?
20 A.  ICU.
21 Q.  Any others that you work in?
22 A.  I can be put on the general floors.  Sometimes I work
23     there.  The progressive units.  And occasionally I
24     will work pediatrics.
25 Q.  The other area mentioned was -- or job description is

Page 79

1      for charge therapist?
2  A.  Yes.
3  Q.  What does the charge therapist do?
4  A.  They are basically the acting supervisor, the acting
5      go to person in charge of seeing every -- the workflow
6      and the staff when there is not or sometimes when
7      there is a supervisor on duty.  Generally with
8      midnights there is a charge therapist when like on a
9      weekend or a holiday that a supervisor isn't there.
10 Q.  What types of things does the charge therapist do when
11     the supervisor isn't there on midnights?
12 A.  The charge therapist would take count, so they kind of
13     take a census of number of treatments, ventilators,
14     whatever's going on on the floors.  They have like a
15     count system for that.  They would write out the split
16     of who was -- what staff member was to work where.
17     They clean equipment.  They respond to codes.  They
18     respond to staff needs.  If staff has any problems,
19     they call the charge therapist.  Charge therapist will
20     also go to cath lab or IR to transport or set up
21     ventilators, respond to complaints, serve as recovery
22     with patients or other staff.  And that's some of
23     their duties.
24 Q.  When -- when the therapists arrive for the start of
25     their shift, are they -- do they know where they're

Page 80

1      going to be working or is that assign -- they find out
2      the assignment when they get there?
3  A.  They find out the assignment when they get there.
4  Q.  And as charge therapist you would fill out that
5      assignment if there's not a supervisor there or has
6      the supervisor kind of left the assignments for you?
7  A.  We would fill out where we want staff to be assigned
8      if it's not already filled out.  Sometimes the
9      supervisors will pre fill out the split, and in that
10     case I generally would not change it.  So sometimes
11     it's already filled out for us; sometimes it's left
12     for us to fill out.
13 Q.  And if somebody's absent or sick or something, you
14     might have to make some adjustments to the schedule?
15 A.  Correct.
16 Q.  Then -- and then as the charge therapist, you have the
17     ability to move people around during a shift?  If
18     something's going on in a particular unit, you could
19     send someone over there to assist?
20 A.  Yes.  We can -- we are in charge of making changes as
21     we see fit for workload and patient acuity.
22 Q.  You've worked as a charge therapist?
23 A.  Yes.
24 Q.  Is there extra pay associated with that -- a shift in
25     which you're assigned the charge therapist duties?

GARCIA, KRISTINA
02/04/2020

Pages 81–84

Page 81

1  A.  Yes.
2  Q.  How much is that?
3  A.  I believe it was $1.50 or it might have been $1.25.  I
4      think it was $1.50.
5  Q.  When did you first work as a charge therapist?
6  A.  I don't recall the month I started training for charge
7      therapist.  But if I remember correctly, in January
8      after I was declined the supervisor position I offered
9      to go into charge therapist.  I volunteered to train
10     for charge therapist.
11 Q.  And you were accepted to do that?
12 A.  Yes.
13 Q.  Would you say that's an acknowledgment of your work
14     ethic and skill level?
15 A.  Perhaps.
16 Q.  Okay.  Do you know who decided to approve you as a
17     person to train for charge therapist?
18 A.  I do not know who makes that decision.
19 Q.  All right.  And then how long was the training?
20 A.  It wasn't like a solid you train for this amount of
21     time.  It's -- it was a day here, a day there.
22 Q.  Kind of learn as you go when you can?
23 A.  A lot of learn as you go.  There was some days that
24     you were scheduled with another -- they would -- they
25     would have someone else that also did charge therapist

Page 82

1      on staff as your resource.  There were I believe a
2      couple days that Allen, Mr. Frankhouse considered
3      training days where maybe I wouldn't have an
4      assignment with charge duty and those were considered
5      my training days.
6  Q.  Did you enjoy the charge therapist duties?
7  A.  I did.
8  Q.  How often would you be assigned to be a charge
9      therapist?
10 A.  It depended.  It would fluctuate month to month.
11 Q.  Like between zero and ten or one and two or what's
12     the -- generally what's the number of times you might
13     out of 12 shifts be a charge therapist?
14 A.  Less than ten.  I don't -- it would -- it would vary
15     so much.  I don't know.
16 Q.  Okay.  And, again, we -- I'm sure we have records that
17     would tell us.
18 A.  Yes.
19 Q.  I take it, then, given all these different positions,
20     floor, emergency, adult intensive care, pediatric,
21     that there would be different locations in the
22     hospital where you'd be assigned?
23 A.  Yes.
24 Q.  All right.  And then you might be in the emergency
25     center if you're emergency center; right?  That's

Page 83

1      obvious.
2  A.  Yes.
3  Q.  Okay.  If you're adult critical care, where are those
4      units in the hospital?
5  A.  The East Tower.
6  Q.  Only in the East Tower?
7  A.  Yes.
8  Q.  And the general floors could be where?
9  A.  North Tower, Center Tower, South Tower.
10 Q.  Where is pediatric?
11 A.  South Tower.
12 Q.  Any other areas you would work as a charge therapist
13     in the hospital?
14 A.  Wait.  As charge therapist --
15 Q.  I didn't mean that.  As a therapist -- respiratory
16     therapist you could work in the emergency center, East
17     Tower, North Tower, Central Tower, and South Tower?
18 A.  Yes.  There's multiple components to each of those
19     towers.  Like it's not one person per tower.
20 Q.  Right.
21 A.  Okay.
22 Q.  So what do you mean multiple components?
23 A.  For example, North Tower, there's five different
24     floors.  You might have three therapists.  You might
25     have six therapists assigned to different floors.

Page 84

1  Q.  Are you normally paired with someone in particular --
2  A.  No.
3  Q.  -- on each shift?
4  A.  Like normally paired with the same person?
5  Q.  No.  Do you get paired with someone on a shift?
6  A.  It depends on the unit.  It depends on the assignment,
7      the area.
8  Q.  All right.  And how many floors -- so there -- you
9      said there might be three to six therapists to cover
10     five floors in the North Tower?
11 A.  Sure.  Yes.
12 Q.  On a midnight?
13 A.  There could be, yes.  Depending on the workload.
14 Q.  All right.  How many would be working in the emergency
15     center typically?
16 A.  In the emergency center we have one primary therapist
17     and then we will have one secondary therapist that may
18     or may not have a floor assignment, and sometimes we
19     will have a third -- third therapist as like backup.
20 Q.  And in the Central Tower and the South Tower did they
21     also have multiple floors?
22 A.  Yes.
23 Q.  How many floors in the Central?
24 A.  Seven.
25 Q.  What's the range of therapists that might be assigned?

GARCIA, KRISTINA
02/04/2020

Pages 85–88

Page 85

1   A.   Sometimes a therapist will have multiple floors.
2        Sometimes there will be two or even maybe three
3        therapists for the progressive unit.
4   Q.   How many in the South Tower typically?
5   A.   Not including NIPI, there could be three.
6   Q.   Where would the -- is there a particular place that
7        the respiratory therapists are housed or would have a
8        central reporting place?
9   A.   We have a respiratory therapy department in Center
10       Tower.
11  Q.   Is that where you would work out of if you were the
12       charge therapist?
13  A.   Yes.
14  Q.   When you report -- say you're assigned to the
15       emergency center and you report for your shift at 6:45
16       did you say?
17  A.   Yes.
18  Q.   6:45.  Where would you go?  Is there a place to clock
19       in, hang your coat, or do you go right to the
20       emergency center?  What's -- what's the usual
21       beginning of your shift?  What's that look like?
22  A.   Beginning of your shift, depending on where on campus
23       you park, there's multiple time clocks to punch in,
24       and then everyone goes to the respiratory therapy
25       department to find out where you're assigned for the

Page 86

1        night and for our huddle that happens.
2   Q.   So you go to your department, find out where you're
3        assigned, and then there's a huddle of everyone or
4        what -- what --
5   A.   Most staff will attend the huddle if they can.  The EC
6        therapists cannot leave EC, the primary, so they
7        generally do not attend the huddle.  In the ICU,
8        depending on what's going on, the therapists may or
9        may not attend the huddle.
10  Q.   What's the huddle?  What happens in a huddle?
11  A.   In the huddle the supervisor will make any
12       announcements that they need to make, any updates on
13       anything going on that pertains to staff, anything
14       they need to announce to everyone.
15  Q.   So you come in, you go to the department, find out
16       you're at the EC, and you're going to head right on
17       down since you don't have to attend the huddle?
18  A.   No.  Not necessarily.  The huddle will take place
19       before anyone can find out what their work assignment
20       is for the day.
21  Q.   Oh, I'm sorry.  I thought you said that the EC
22       therapists typically didn't attend the huddle.
23  A.   The one on shift.  For example, if I'm coming on
24       shift, the day shift therapist would not -- the day
25       shift therapist assigned to the emergency room would

Page 87

1        not be in attendance for the huddle, but if I'm going
2        to the emergency center, I would be there for the
3        huddle.  I most likely wouldn't know I'm scheduled for
4        the emergency room until after the huddle.
5   Q.   Since being employed at Beaumont in 2011, have you
6        received any other reprimand or discipline of any sort
7        other than the one from Ms. Glass for calling in?
8   A.   I've received a written warning or I'm not sure if
9        it's considered a warning or a -- it's for attendance
10       for our points system.
11  Q.   When was that?
12  A.   I know I received one in January of this year.
13  Q.   Last month, 2020?
14  A.   Yes.  And I believe I received one prior to that.  I
15       don't recall when.  When you get to three points, they
16       basically give you -- they give you a paper that shows
17       your dates and just makes you aware that you're at a
18       certain number of points.
19  Q.   So sort of a warning that you're getting into a
20       position where your attendance isn't what it should
21       be?
22  A.   Yes.
23  Q.   Any dispute about the points that you received?
24  A.   In the recent ones, no, I don't believe so.
25  Q.   And there was a prior one?  You just don't recall one?

Page 88

1   A.   The prior one being with Pat Glass.
2   Q.   I see.  All right.  So twice you've received these
3        attendance warnings for the points system?
4   A.   I believe it was twice recently since we switched to
5        the points system and prior to that with the write-up
6        with Pat Glass.  I don't recall any in between.
7   Q.   All right.  No dispute about the points you received
8        since they've had the points system?
9   A.   I don't believe so.
10  Q.   And the Ms. Glass, you said it was for calling in.
11       What does that mean?
12  A.   It was -- the write-up that I received with Pat Glass
13       was for calling in and not giving a two hours' notice,
14       so it wasn't considered a proper call-in.
15  Q.   Okay.  Have you received any other, other than this
16       attendance issues, have you received any other
17       discipline while working at Beaumont?
18  A.   Not that I recall.
19  Q.   All right.  You've never been demoted?
20  A.   Demoted?  No.
21  Q.   Never been discharged of course; right?  You still
22       work there?
23  A.   Correct.
24  Q.   And you did receive -- well, would you consider
25       becoming a charge therapist a promotion?

GARCIA, KRISTINA
02/04/2020                                                              Pages 89–92

Page 89

1   A.   I wouldn't consider it a promotion, no.
2   Q.   Okay.  But it is a lead position with higher pay?
3   A.   Yes.
4   Q.   So there's some positive recognition to that?
5            MS. WARD:  Objection.  You're
6        mischaracterizing what she said.
7   BY MR. PELTON:
8   Q.   Would you agree?
9            MS. WARD:  Go ahead.
10  A.   I don't believe there's positive recognition just
11       being a charge therapist.
12  BY MR. PELTON:
13  Q.   You don't?
14  A.   I think you earn that.  Once you're in the position
15       you earn it.
16  Q.   What -- what, then, justifies the extra $1.25 or
17       $1.50?
18  A.   I don't know who made that rule up.
19  Q.   I mean, you're taking a lead type position on a shift;
20       right?
21  A.   Yes.
22  Q.   Okay.  When was -- do you remember when Rachel Luca
23       was hired at Beaumont?
24  A.   No, I do not.
25  Q.   Do you know for how many years you worked with her?

Page 90

1   A.   Not exactly.  A couple years.
2   Q.   She left in November 2018; is that correct?
3            MS. WARD:  Objection.  Foundation.  If you
4        know.
5   A.   I don't recall the month.  I believe it was November
6        or December possibly.
7   BY MR. PELTON:
8   Q.   How did you get along with Ms. Luca?
9   A.   At which time?
10  Q.   Let's say in the initial years after her hire.
11  A.   I didn't have much conversation or communication with
12       her initially.  We had a friend in common.  Later, I'd
13       say probably at least a year or so into her employment
14       we started to talk more.  We were I wouldn't say
15       friends.  We were very civil at work.  We got along.
16  Q.   Who is the friend in common?
17  A.   Yvonne.
18  Q.   Last name?
19  A.   Current last name is Tamou.
20  Q.   Can you spell it?
21  A.   T-A-M-O-U.
22  Q.   What was her name prior?
23  A.   Kassab.
24  Q.   Spell it.
25  A.   K-A-S-S-A-B.

Page 91

1   Q.   And when you say it's a friend in common, did you both
2        know her outside of Beaumont?
3   A.   She was a coworker of both of ours.
4   Q.   Did you know her outside of Beaumont?
5   A.   Yvonne?
6   Q.   Yes.
7   A.   Yes.  I mean, I met her as a coworker.
8   Q.   I see.
9   A.   But we've -- we're friends outside of work.
10  Q.   You do things socially with her?
11  A.   Occasionally.
12  Q.   I see.  And you're aware apparently that Ms. Luca
13       socialized with Yvonne as well?
14  A.   Yes.
15  Q.   Outside of work?
16  A.   Yes.  There were times out of work.
17  Q.   All right.  And did you and Ms. Luca ever socialize
18       outside of work?
19  A.   No.
20  Q.   Okay.  But the three of you were kind of friends
21       within work?  Is that a fair characterization?
22  A.   Yes.  As far as socializing with Ms. Luca, I only had
23       contact with her one time outside of work.  Actually
24       she wasn't even there, but I had went to her house.
25  Q.   I see.  When was that?

Page 92

1   A.   I don't recall the date.
2   Q.   Why were you going to her house?
3   A.   She -- I do a lot with animal rescue and animal
4        welfare, and she had recently obtained two dogs that
5        she wanted to get spayed and neutered.  One was a
6        female.  One was a male.  But she didn't seem to have
7        time to do it, and I knew of a place that they work
8        with low income people and they provide services, like
9        cheap services for -- to help animals and to help
10       people with low income, and I picked up her dogs and
11       took them to the place to be spayed and neutered, and
12       I can't recall if I picked them up and transported
13       them back or she might have picked them up, but I know
14       I picked them up and dropped them off initially.
15  Q.   So you were doing her a favor?
16  A.   Doing the dogs a favor, yes.  But yes, her a favor.
17  Q.   Yeah.  And yeah.  It wasn't a social thing?  It was
18       just --
19  A.   She wasn't even home.  I believe she was at work at
20       Beaumont when that happened.
21  Q.   All right.  And so you were -- initially you didn't
22       communicate a lot.  After a year or so you were --
23       sounds like you got along and interacted with her from
24       time to time as you might work together in the
25       hospital?

GARCIA, KRISTINA
02/04/2020

Page 93

1  A.  Yes.
2  Q.  How often were you scheduled to work with her in that
3      time period?
4  A.  I don't recall.
5  Q.  Would you take breaks together?
6  A.  Occasionally.
7  Q.  Where would you take your breaks?
8  A.  Depends where we would be stationed at.
9  Q.  All right.  So if you're in the emergency center where
10     would you normally break?
11 A.  You could break in the emergency center.  You could
12     break in the respiratory therapy department.  You
13     could break wherever you wanted.  It's your free time.
14     You could go to the cafeteria.  You can go anywhere.
15 Q.  Where did you normally break?
16 A.  During like --
17 Q.  When working in the emergency center where do you
18     normally break?
19 A.  Normally I would go to the department.
20 Q.  In the Central Tower you said?
21 A.  Yes.
22 Q.  All right.  And if you're in the adult critical care
23     unit, where would you normally break?  Somewhere in
24     the East Tower?  Or I guess you could go anywhere.
25 A.  You could go anywhere.  It depends.  Sometimes I would

Page 94

1      go to the respiratory therapy department.  We -- in
2      each ICU we have a respiratory therapy room, kind of
3      like your little home base for the unit.  You could
4      stay there and take your break.  You're not supposed
5      to eat there.  So if you want to eat, you generally
6      will go back -- go to the cafeteria or go to the
7      department, but you could break in your room.
8  Q.  How long was your break, lunch break or meal break,
9      during your 12-hour shift?
10 A.  We get 30 minutes for lunch and two 15-minute breaks
11     that most of us will put all together and use an hour
12     instead of splitting it up.
13 Q.  So you're scheduled to be there 12 and a half hours.
14     I take it the 30 minutes is not paid?
15 A.  Correct.  That's my understanding.
16 Q.  And the two 15 minutes are?
17 A.  That's my understanding.
18 Q.  But supervision allows you to put the breaks together
19     and just take a longer hourlong break?
20 A.  Generally they don't mind if -- like if your workload
21     permits it.
22 Q.  Sure.  Patient demands have to come first I take it?
23 A.  Absolutely.
24 Q.  Yeah.  Do you usually plan your breaks to meet up with
25     a friend or one of your coworkers that you enjoy

Page 95

1      spending time with?
2  A.  Not usually.  You -- occasionally.  But it all depends
3      on your workload, and it changes day from day, so many
4      times you don't know when you're going to be able to
5      take your break.  You don't want to take it when
6      obviously things are going on.
7  Q.  Do you have some folks that -- coworkers at Beaumont
8      that you were close to on a personal level?
9  A.  Currently?
10 Q.  Let's say back in 2018, '19.
11 A.  I don't believe at that time I was very close with
12     anyone.
13 Q.  How about Yvonne?
14 A.  I believe Yvonne was already gone.
15 Q.  I see.  How -- was there anyone in that time frame
16     that you enjoyed taking a break with where you might
17     try to coordinate your break?
18 A.  Yeah.  Several people.
19 Q.  So you might text them during the shift and say, hey,
20     I'm hoping to break at 1:00 in the morning, you know,
21     can we meet up or something like that?
22 A.  Usually it wouldn't be a text message.  I would call
23     their work phone from my work phone if I really wanted
24     to try and arrange like a lunch date, but generally
25     it's whoever you're talking to and seeing what they're

Page 96

1      up to and if they say, oh -- sometimes people will
2      say, oh, I'm gonna go on break in a few minutes and
3      then you'll say, you know what, nothing's really going
4      on in my unit, maybe I'll go as well.
5  Q.  Sure.  And then if you're in a particular unit, do you
6      have to coordinate among the therapists in that unit?
7      I assume you can't all go on break at the same time.
8  A.  You could.
9  Q.  Depends how busy you are?
10 A.  Yeah.  It depends on your workload in the unit.  If I
11     feel I have an unstable patient or the workload is
12     high or there's something that I know is going to go
13     on, I may coordinate with someone else in my tower to
14     have coverage.  Sometimes the split will indicate who
15     is to cover you.  If you were in a unit that they see
16     is more acute or you have a high workload, sometimes
17     you self-cover.
18 Q.  But generally it sounds like you had a fair bit of
19     discretion as to when to take your break based on
20     patient demands?
21 A.  Yes.
22 Q.  And where to take it?
23 A.  Yes.
24 Q.  Okay.  Was there any -- is -- back in 2018, '19 was
25     there any particular place you usually took your

GARCIA, KRISTINA
02/04/2020

Page 97

1     breaks?
2 A.  Not that I recall, no.
3 Q.  Different place every day?
4 A.  Yeah.
5 Q.  You didn't have a pattern?
6 A.  No.
7 Q.  Did you ever have any -- so you said that, go back to
8     Ms. Luca, that you initially didn't have a lot of
9     communication and then after a year or so you had more
10     interactions and seemed to be civil and get along; is
11     that correct?
12 A.  Yes.
13 Q.  Did that change at some point in time?
14 A.  It changed after she sexually assaulted me.
15 Q.  Okay.  And that was in end of July 2018?
16 A.  That sounds correct.
17 Q.  All right.  That incident I think was reported to be
18     July 29.  Now, do you know if that would be the --
19     your shift always goes over two different dates?
20 A.  Correct.
21 Q.  So there would be July 28-29, or July 29-30.  Do you
22     know when it would have been?
23 A.  I know I -- I stated the -- the dates in -- in -- in
24     something I had written down.
25 Q.  Sure.

Page 98

1 A.  I don't recall off the top of my head.
2 Q.  You wrote a statement to whom it may concern that says
3     on the night of Sunday, July 28th.
4 A.  And I believe something else I had wrote indicated the
5     29th, so if that's the case, then it was probably the
6     night of the 28th into the morning of the 29th, and I
7     believe it was Sunday into Monday if I remember
8     correctly.
9 Q.  Yeah.  I've got a calendar.  So I'm going to go ahead
10     and mark that as Exhibit 4.
11         (Marked EXHIBIT 4 at 11:07 a.m.)
12         MS. WARD:  This is Number 4?
13         MR. PELTON:  Yep.
14 BY MR. PELTON:
15 Q.  All right.  So this says that Saturday was July 28th
16     and Sunday was July 29th.  Your statement had said on
17     the night of Sunday, July 28th.
18 A.  It said Sunday, July 28th?
19 Q.  That's what it says.  Why don't I give you a copy so
20     you can look at it as well.  Make this Exhibit 5.
21     Hand that to your counsel.
22         (Marked EXHIBIT 5 at 11:08 a.m.)
23 BY MR. PELTON:
24 Q.  That's your statement; correct?
25 A.  Correct.

Page 99

1 Q.  And you gave this statement to Net Carroll on
2     August 8th?  Does that sound correct?
3 A.  That sounds correct.
4 Q.  And it says, "On the night of Sunday, July 28th," so
5     do we assume, then, that the shift started on
6     Saturday, July 28th and carried over to Sunday,
7     July 29?  Does that sound right?
8 A.  I believe I worked this entire weekend, but I don't --
9     I don't know why I have Sunday the 28th.  I know it
10     gets confusing because we start on one day and end on
11     another, but . . .
12 Q.  Right.  That's my point.
13 A.  I'm not sure what to say about that.
14 Q.  All right.  And that's okay.
15 A.  Okay.
16 Q.  So we're talking about the time that you had said you
17     had a civil and got along okay with Ms. Luca after
18     that first year or so.  And then between then and up
19     to the time of the incident on July 28th we'll call it
20     how were you getting along?  Was your relationship the
21     same?  Had it deteriorated at all?  Any conflicts or
22     disagreement with her?
23         MS. WARD:  There's about three questions in
24     there.  Can you break that up?
25 BY MR. PELTON:

Page 100

1 Q.  Do you understand my question?
2 A.  Your question is did anything change in our
3     relationship as friends or coworkers or acquaintances?
4 Q.  Right.
5 A.  I would say several months prior to the sexual assault
6     she was being weird.  She would make strange comments
7     that she didn't make prior.  Like initially when we
8     were friends and getting along, I suppose we were just
9     getting to know each other.  We were fine with one
10     another.  And eventually it turned into something
11     strange where she would make weird comments about me
12     and her and us as a couple and just weird things.
13 Q.  When did that start?
14 A.  I don't recall a specific date of when it started, but
15     I would say several months prior to the sexual
16     assault.
17 Q.  You reported there was a point in time where you kind
18     of confronted her about that; right?
19 A.  Yes.
20 Q.  And that it stopped then for a period of six or eight
21     months leading up to this incident on July 28th; is
22     that correct?
23         MS. WARD:  I'm going to object because I
24     think your statement is a little bit inaccurate.  I
25     think it's six to seven months.

GARCIA, KRISTINA
02/04/2020                                                                                                    Pages 101–104

Page 101

```
1              MR. PELTON:  Well, I'm asking her if it's
2     correct.  She can correct me if I'm wrong.
3  A.  I'm sorry.  Repeat the question, please.
4  BY MR. PELTON:
5  Q.  You reported there was a point in time where you
6     confronted her about this weirdness, as you've
7     described it, and that it stopped; is that right?
8  A.  The weirdness stopped?
9  Q.  Yeah.
10 A.  I believe she avoided me for a little bit, but I
11    wouldn't say it completely stopped.
12 Q.  Let's look at the bottom of Exhibit 5.  Last
13    paragraph.  You say, "I have had situations with
14    Rachel in the past where she had continuously made
15    comments about 'wanting her' and her both asking me
16    and telling me that she 'knew' that 'I found her
17    attractive'.  It have never said I found her
18    attractive.' I assume you meant I have never said I
19    found her attractive.  ". . . and never responded to
20    her questioning if I found her attractive because I
21    brushed it off as her being silly."
22              That's what you wrote; correct?
23 A.  Correct.
24 Q.  All right.  And that's the weirdness you were just
25    testifying about?
```

Page 102

```
1  A.  Yes.
2  Q.  All right.  "It had become so repetitive however, that
3     a few months back," then you put in a parenthetical
4     that says "(maybe 6 to 7 months ago) that I wanted to
5     clear the air and had said to Rachel, 'You know I'm
6     not interested in you right?'  I said this because I
7     wanted to clear the air in case she really believed
8     that I was interested in her."  Is that right?
9  A.  Yes.
10 Q.  That's what you wrote?
11 A.  Yes.
12 Q.  All right.  "She had responded 'I'm not interested in
13    you either' and stormed away appearing either upset or
14    insulted."  Right?
15 A.  Yes.
16 Q.  "After that I acted normal toward her and she did the
17    same."  Is that an accurate statement?
18 A.  Acted normal, yes.  As far as we didn't hold that
19    against one another.  There was no anger involved.
20 Q.  And that -- there wasn't any more issues, then, until
21    this incident on July 28th; is that correct?
22 A.  I would have to refer to a timeline of events to give
23    you a solid answer on that.
24 Q.  All right.  And what would you need to refer to?
25 A.  I would have to consult my attorney.
```

Page 103

```
1  Q.  Well --
2              MS. WARD:  She's talking -- can I help?
3     She's talking about the document we sent you yesterday
4     by email and mail out to you.
5              MR. PELTON:  All right.
6  BY MR. PELTON:
7  Q.  You cannot talk to your attorney at this point to help
8     answer a question because I'm trying to test your
9     memory and not your lawyer's.  Do you understand that?
10 A.  Yes.
11 Q.  Okay.  It sounds like what's being referenced is a
12    timeline that you've prepared?
13 A.  A timeline that I kept of events that I found out of
14    the ordinary.
15 Q.  All right.  And you believe that might assist you in
16    remembering events in order to answer the question I
17    asked?
18 A.  Yes.
19 Q.  Did you do anything to prepare for your testimony
20    today?
21 A.  No.
22 Q.  Did you review any documents to prepare for your
23    testimony today?
24 A.  I constantly review all the paperwork associated with
25    this.
```

Page 104

```
1  Q.  All right.  And in order to prepare for today, did you
2     look over paperwork?
3  A.  I re -- I reviewed a couple things.
4  Q.  What did you review?
5  A.  I -- whatever I had in my binder I just kind of
6     skimmed through.
7  Q.  All right.  You've kept a binder of -- of documents
8     related to the issues here?
9  A.  Of a copy of all of my documents.
10             (Marked EXHIBIT 6 at 11:16 a.m.)
11 BY MR. PELTON:
12 Q.  Exhibit 6 is a Fifth Supplemental Response to
13    Beaumont's First Request for Production of Documents.
14    It was served on us via email yesterday afternoon.
15    And attached which we've control labeled Plaintiff 829
16    to 831 is a time -- what's called a "Timeline of
17    events."  Is this the document you were just referring
18    to?
19 A.  Yes.
20 Q.  When did you create this document?
21 A.  I don't recall the date I -- I begun the document.
22 Q.  You're suggesting it's a document you've maintained
23    over a -- and added to over a course of time?
24 A.  Correct.
25 Q.  When was the last time you put an entry into the
```

GARCIA, KRISTINA
02/04/2020                                                                    Pages 105–108

1    document?
2  A.  I don't know off the top of my head.
3  Q.  Well, the last date in here is 12-12 of '19, so I
4      guess sometime since then you've added to it; is that
5      correct?
6  A.  You're saying sometime after 12-12-19?
7  Q.  Yeah.  At least 12-12-19 or later you would have put
8      in that entry?
9  A.  At least 12-12-19, yes.  There have been times where I
10     have went back and put in information on the date --
11     I've like put in an entry with a date that maybe I
12     didn't find out information till later.  Does that
13     make -- am I saying that correctly?  Do you
14     understand?
15 Q.  Yes.
16 A.  Okay.
17 Q.  Safe to assume you didn't put anything in ahead of
18     time?
19 A.  Oh, not ahead of time, no.
20 Q.  Okay.
21 A.  But if I found information out later, I would go back
22     and put the date.
23 Q.  Correct.  So, and you don't recall when you started
24     this document?
25 A.  I do not.

1  Q.  Do you know how many entries you entered the first
2      time you sat down to prepare this document?
3  A.  I do not recall.
4  Q.  Was it after Ms. Luca's employment with Beaumont had
5      ended that you started this timeline of events?
6          MS. WARD:  I'm going to object on the basis
7      of asked and answered.  But . . .
8  A.  I don't -- I don't recall.
9  BY MR. PELTON:
10 Q.  Where do you keep this document?
11 A.  It's now with my attorney.
12 Q.  Do you still have it on your computer or your laptop
13     or your phone or . . .?  Where was this housed when
14     you created it?
15 A.  I created it on my phone.
16 Q.  What application were you using to create it?
17 A.  I don't recall the name of the application.
18 Q.  Can you check?
19 A.  I do not have my phone with me.
20 Q.  All right.  Do you -- you still have this on your
21     phone?
22 A.  I still have this on my phone, yes.
23 Q.  Other than adding to it as you went, have you gone
24     back and edited anything?
25 A.  Repeat the question.

1  Q.  Other than adding to the document as you go --
2  A.  Yes.
3  Q.  -- chronologically, have you gone back in time and
4      edited any of the documents, any of the entries?
5  A.  I may have.
6  Q.  You don't recall doing that?
7  A.  I recall going back and placing dates of things that
8      have happened.  Like I said, when I found out the
9      information, I would go back and put the date, for
10     example, finding out Ms. Luca was in jail and finding
11     out the date that she was supposedly -- she entered
12     jail.  I went back and I put the date she entered jail
13     and that information.
14 Q.  Once the information was on, I'm going to say the
15     document but was in your phone, did you go back, then,
16     and edit that information?  In other words, take a
17     look at let's just say the fourth entry is 8-27-18.
18     Do you see that entry?
19 A.  Yes.
20 Q.  And it starts with a parenthetical.  "(During shift
21     Sunday night" -- oh, I picked the right one.  It says,
22     "(During shift Sunday night/Monday morning
23     Mr. Matthewson told me"; right?
24 A.  Oh, I'm sorry.  Wait.
25 Q.  And it goes on from there.  Are you with me?  It's the

1      fourth entry in your timeline.
2  A.  Okay.
3  Q.  You got there?  Are you there?
4  A.  Yes.  Yes.
5  Q.  All right.  Once you wrote that, whenever it was
6      written, did you ever go back and change any of it?
7  A.  If I ever went back and changed anything, it was
8      because more information was provided.
9  Q.  So you would add information?
10 A.  If new information came to light.
11 Q.  But would you edit the information already there?
12         MS. WARD:  Objection.  Now asked and
13     answered.  But go ahead if you can --
14         MR. PELTON:  She hasn't answered it yet.
15         MS. WARD:  Same objection.  Go ahead.
16 A.  I don't -- I don't recall ever changing information.
17 BY MR. PELTON:
18 Q.  Okay.  What prompted you to begin preparing this
19     timeline?
20 A.  Weird stuff happening.  I don't recall when I started
21     it.
22 Q.  Do you recall a specific incident that caused you to
23     say I better start creating a timeline of events?
24 A.  Being sexually assaulted and then seeing that nothing
25     seemed to be happening about it was a red flag for me

GARCIA, KRISTINA
02/04/2020

Pages 109–112

Page 109

1  that I need to remember things going on.
2  Q.  How would you determine what you were going to enter
3      into your timeline?
4  A.  I would determine what I was going to enter into my
5      timeline based on if I found it either important,
6      strange, out of the ordinary, something that I
7      needed -- I felt I needed to remember.
8  Q.  So one of your criteria would be I better write this
9      down because I need to remember this?
10 A.  Yes.
11 Q.  And the types of things you needed to remember you
12     thought were strange or out of the ordinary things or
13     something that struck you as being important?
14 A.  Yes.
15 Q.  Important to what?
16 A.  To me.
17 Q.  Did you share this timeline of events with anyone?
18         MS. WARD:  I'm going to object on the -- to
19     the extent that anything that she did with this that
20     involved me is protected by attorney-client privilege.
21     If there's anyone else other than me you want to ask
22     her about, you can go ahead.
23 BY MR. PELTON:
24 Q.  The question is did you share the timeline of events
25     with anyone?  I'm certain you gave it to your lawyer

Page 110

1      because she sent it to me yesterday.  I'm not getting
2      into conversations you had with her.  My question
3      simply is did you share this timeline of events with
4      anyone?
5  A.  No.
6  Q.  Other than your lawyer.
7  A.  No.  No one other.
8  Q.  Okay.  Has anyone had input into this timeline of
9      events other than you?
10         MS. WARD:  I'm going to make the same
11     objection.  To the extent that anything on here
12     involves anything to do with our relationship and our
13     communication I'm going to instruct you not to answer,
14     but anything other than that, go ahead.
15 A.  No one has had any input in my timeline other than
16     if like a conversation took place I entered my
17     interpretation, my experience with that.
18 BY MR. PELTON:
19 Q.  Has anyone entered information into this timeline
20     other than you?
21 A.  No.
22 Q.  After the 8-15 entry, there's -- it's not quite in
23     chronological, you've got 7-29, 8-6, 8-8, 8-27, 9-2,
24     and then it goes back to 8-15.  Do you see that?
25 A.  Yes.

Page 111

1  Q.  Do you know why that's out of order?
2  A.  I did not know -- I did not know on August 15th that
3      Ms. Luca was arrested or what for, but when I found
4      out, that's one of the things I went back in and put
5      in there.
6  Q.  Right.  So why didn't you put it back between the 8-8
7      and the 8-27 entry?
8  A.  I may have just put it in there so I remembered like
9      at the time I was finding out the information and
10     perhaps didn't put it in chronological order.  That
11     may have been why I starred it, so I would do that at
12     a later time and then maybe never did.  I'm not sure.
13 Q.  You know how to cut and paste on this application?
14 A.  Yes.
15 Q.  You just didn't move it later?
16 A.  Apparently not.
17 Q.  All right.  Is it fair to assume you learned the
18     information sometime prior to the 9-10 entry?
19 A.  I don't recall when it became available.
20 Q.  Okay.  Now, there's an item right below that that is
21     blacked out, and I don't want to get into any
22     privileged information, but I'd like to know the
23     subject matter of what's been blocked out.
24         MS. WARD:  I'm going to instruct you not to
25     answer because it is privileged.

Page 112

1         MR. PELTON:  Well, I'm not asking for the
2  specific text of what's there.  I'd like to know the
3  subject matter so I can determine whether it's
4  privileged or not.
5         MS. WARD:  It has to do with our
6  relationship.  That's why it's blacked out.  I'm
7  instructing her not to answer any more than that.
8         MR. PELTON:  Well, having to do with your
9  relationship doesn't necessarily make it privileged.
10 It would need to be a communication --
11         MS. WARD:  It's a communication between her
12 and I.
13         MR. PELTON:  All right.  So --
14         MS. WARD:  And I'm instructing her not to
15 answer on that basis.
16         MR. PELTON:  Because it's a communication
17 between the two of you?
18         MS. WARD:  Yes.
19         MR. PELTON:  All right.
20         MS. WARD:  Covered by privilege.
21         MR. PELTON:  All right.  And you're not
22 able to tell me the -- or you're not willing to allow
23 her to tell me the subject matter of the privilege?
24         MS. WARD:  Not at this time, no.
25         MR. PELTON:  All right.

GARCIA, KRISTINA
02/04/2020

Pages 113—116

Page 113

1    MS. WARD:  You're instructed not to answer.
2  Do you understand?
3    **THE WITNESS:  Yes.**
4    MR. PELTON:  Is there -- are you able to
5  reveal to me the date of the entry?
6    MS. WARD:  No.  Not at this time.
7    MR. PELTON:  Meaning you may waive the
8  privilege at some point?
9    MS. WARD:  No.  No.  I mean that if you
10 need it, we need to go to the judge, and if there's --
11   MR. PELTON:  I see.
12   MS. WARD:  -- an in camera review and she
13 feels that I have to cough it up, but at this point
14 I'm maintaining privilege.
15   MR. PELTON:  Gotcha.
16   MS. WARD:  Obviously if I get a court
17 order, we'll deal with that.
18   MR. PELTON:  Yeah.  And I may or may not
19 seek one.  I'm just trying to --
20   MS. WARD:  Yeah.
21   MR. PELTON:  In order to pursue that, I
22 kind of need to know a little bit about it to help
23 make a determination if it's privileged.
24   MS. WARD:  It's an attorney-client
25 privileged communication.

Page 114

1    MR. PELTON:  All right.
2  BY MR. PELTON:
3  Q.   The first entry is 7-29-18.  It says, "Incident where
4       Miss Luca put her hand down my shirt," and then
5       there's a parenthesis, "(Sunday night/Monday
6       morning)"; correct?
7  A.   **Yes.**
8  Q.   All right.  And that would seem to be inconsistent
9       with the idea it was July 28th; right?
10   MS. WARD:  I'm going to object to your
11 characterization.  But go ahead if you can.
12 BY MR. PELTON:
13 Q.   Well, all right.  I don't want to characterize
14      anything.  Can you tell me what day of the week
15      July 28th is based on the calendar I've presented to
16      you?
17 A.   **It would be a Saturday.**
18 Q.   All right.  And what day of the week is a Sunday?
19   MS. WARD:  Objection for vagueness.  You
20 mean that particular week?
21   MR. PELTON:  Yes.  Of course.
22 BY MR. PELTON:
23 Q.   It's July 29th; correct?
24 A.   **Sunday is July 29th.  Correct.**
25 Q.   All right.  So this says Sunday night/Monday morning,

Page 115

1      which would mean the shift that started on the 29th
2      and ended on the 30th?
3  A.  **Right.  Correct.**
4  Q.  All right.  Your statement, which is Exhibit 5,
5      suggests the night of Sunday, July 28th, --
6  A.  **That's what it states.**
7  Q.  -- and I want you to help me reconcile that.  Which is
8      it do you think?
9  A.  **I believe it was Sunday night into Monday morning,**
10     **which would be the 29th.**
11 Q.  So the 29th/30th?
12 A.  **Correct.**
13 Q.  What time of night or day or I guess morning was it?
14 A.  **It was after midnight.  It was -- so technically it**
15     **would be the 30th.**
16 Q.  The event itself occurred after midnight, so it would
17     be on July 30?
18 A.  **Correct.**
19 Q.  A Monday.  Did you start this timeline, if you know,
20     after creating Exhibit 5 which you gave to Ms. Carroll
21     on August 8th?
22 A.  **I don't recall if I created my timeline before or**
23     **after.**
24 Q.  Did you consult anything in creating your timeline?
25    MS. WARD:  Other than -- I'm going to

Page 116

1      object to one narrow aspect.
2    MR. PELTON:  Of course.
3  BY MR. PELTON:
4  Q.  Don't reveal any confiden --
5    MS. WARD:  Right.  Other than any dialogue
6  we might have had, if any, that's privileged.  You can
7  answer as opposed to anyone else, other than my people
8  in my office.
9  BY MR. PELTON:
10 Q.  Well, in preparing this timeline did you consult with
11     someone in your attorney's office?
12   MS. WARD:  I'm going to object.
13   MR. PELTON:  I don't want to get into the
14 communication.  I just want to know if you consulted.
15 A.  **I don't recall when I started the timeline.**
16 BY MR. PELTON:
17 Q.  Did you -- yeah.  But it's been going on for close to
18     18 months or it covers a period of about 18 months;
19     right?
20 A.  **Correct.**
21 Q.  Right.  And did you obtain input from your counsel in
22     terms of putting things into this outline?
23   MS. WARD:  I'm going to object on the basis
24 of attorney-client privilege and instruct you not to
25 answer.  I'm not acknowledging it did or didn't occur

GARCIA, KRISTINA
02/04/2020

Page 117

1   that way, but she does not have to talk to you about
2   any input that may or may not have occurred.
3           MR. PELTON:  Well, she doesn't have to tell
4   me about the communications.  I think I'm entitled to
5   know whether attorney input made it into this
6   document.
7           MS. WARD:  That's objectable --
8   objectionable under attorney work product, if any, and
9   attorney-client, and I'm instructing her not to
10  answer.
11         MR. PELTON:  Okay.
12         MS. WARD:  If you want to go to the judge,
13  then go to the judge.
14        MR. PELTON:  Look, I'm not making any
15  threats right now.  Calm down.  It's okay.
16        MS. WARD:  Okay.  I'm just saying I'm
17  entitled to protect those privileges.
18        MR. PELTON:  Of course.  And I want you to.
19        MS. WARD:  And I need her, a lay --
20        MR. PELTON:  And please respect that I'm
21  not trying to pierce them at this point.  All right?
22        MS. WARD:  Time-out.
23        MR. PELTON:  Okay.
24        MS. WARD:  I need a layperson --
25        MR. PELTON:  I understand.

Page 118

1        MS. WARD:  -- who's under a lot of nervous
2  energy today, because it's hard, to understand the
3  directions.
4        MR. PELTON:  I appreciate that.
5        MS. WARD:  And that's why I keep bringing
6  it up just to help her because she may not have all
7  the intricacies of that privilege that you and I do.
8        MR. PELTON:  And I'm fine with that.
9        MS. WARD:  Good.  So --
10        MR. PELTON:  Just relax.
11        MS. WARD:  Well --
12        MR. PELTON:  It's okay, Ms. Ward.  All
13  right.  So --
14        MS. WARD:  Just let me finish.  So don't
15  talk about anything we may or may not have talked
16  about.  That includes my legal assistants, the
17  associate in my office.  Other than that, you can
18  answer the question.
19  BY MR. PELTON:
20  Q.   All right.  Aside from that, did you consult with
21      anything in preparing this document?  In other words,
22      did you go back and look at your statement?  Did you
23      look at documents?  Did you look at calendars?  Did
24      you do things -- refer to things in preparing your
25      timeline of events notes?

Page 119

1  A.   For example, I consulted public record to find out
2      about Ms. Luca's arrest.
3  Q.   Okay.  And there's a couple of those in here; right?
4  A.   Correct.
5  Q.   All right.  Were there other documents and things that
6      you consulted?
7  A.   Not that I recall.
8  Q.   Okay.  So if something would happen, you'd write it
9      down or a series of things might happen and you'd
10     decide I better go back and write that down and you
11     would do it from memory; is that correct?
12  A.   Correct.  I may have consulted like my pay stub or my
13     FMLA paperwork to put that in.
14  Q.   Okay.  Anything else?
15  A.   Not that I recall at this moment.
16  Q.   So we were talking about your working relationship
17     with Ms. Luca, and there was the -- sounds like a lot
18     of silliness, I guess, as you put it, going off --
19     going -- going around with her that you put a stop to
20     six or seven months prior to July 29th; is that right?
21  A.   I hoped to put a stop to it by confronting her.
22  Q.   Right.  And the question I'd asked you when you wanted
23     to turn to your notes that we have now marked as
24     Exhibit 6 was did anything else go on, any more of the
25     silliness or things that offended you between --

Page 120

1      during this six or seven-month period?
2  A.   During the six to seven months between the assault
3     and -- and the time I had confronted her --
4  Q.   No.  That's not my question.
5  A.   I'm sorry.
6  Q.   As I understand it, the alleged assault occurred now
7     we said on early Monday morning hours July 30th;
8     correct?
9  A.   Yes.
10  Q.   All right.  Was there more than one assault?
11  A.   No.
12  Q.   All right.  So my question was you had confronted her
13     six or seven months prior; correct?
14  A.   Correct.
15  Q.   All right.  And after confronting her, I got the
16     impression from this document and from other things
17     you've produced that it stopped until this assault
18     occurred six or seven months later; is that correct?
19  A.   I don't recall the specific dates of say the hand
20     holding incident or anything like that.  Like weird
21     things that had happened.  A lot of it I tried to blow
22     off.  So I did not keep record of the dates that
23     things happened, so I don't know what happened
24     between -- between when I confronted her and the
25     assault.

GARCIA, KRISTINA
02/04/2020

Pages 121–124

Page 121

1          MR. PELTON:  This will be Exhibit 7.
2          (Marked EXHIBIT 7 at 11:37 a.m.)
3    BY MR. PELTON:
4    Q.   Do you recognize Exhibit 7?
5    A.   Yes.
6    Q.   What is it?
7    A.   This is a transcript of an audio recording.
8    Q.   Who made the recording?
9    A.   I made the recording.
10   Q.   And this is a conversation -- recording -- it's a
11        transcript of a recording of a conversation you had
12        with Ms. Carroll?
13   A.   Correct.
14   Q.   What's the date of the recording?
15   A.   August 6, 2018.
16   Q.   All right.  And you're referring to something in -- to
17        refresh your recollection in making that answer?
18   A.   Correct.
19   Q.   What are you looking at?
20   A.   My timeline of events.
21   Q.   All right.  Exhibit 6.  And there's an 8-6 entry
22        "Initial complaint informing Mrs. Carroll about the
23        incident"; right?
24   A.   Correct.
25   Q.   So that August 6th entry on your timeline is this

Page 122

1         conversation here that's been marked as Exhibit 7?
2    A.   Correct.
3    Q.   And this is the first time you informed anyone of what
4         occurred with Ms. Luca on the early morning hours of
5         July 30th; is that correct?
6    A.   This was my initial complaint.  Correct.
7    Q.   It's the first time you informed anyone of what
8         happened; is that correct?
9    A.   Anyone as in?
10   Q.   Anyone.
11   A.   This is -- I'm not sure.  Can you rephrase your
12        question?
13   Q.   The incident with Ms. Luca that you're alleging
14        assault occurred on -- in the early morning hours of
15        July 30th; correct?
16   A.   Yes.
17   Q.   All right.  On August 6th you're telling Net Carroll
18        about it; correct?
19   A.   Yes.
20   Q.   Did you tell anyone about it between the event and
21        talking to Ms. Carroll on August 6th?
22   A.   I don't recall.  This was my first complaint to
23        management regarding the --
24   Q.   I understand that.  My question's broader than that.
25   A.   Okay.

Page 123

1    Q.   Any coworkers, family members, anyone else that you
2         recall informing as between the event and August 6th?
3    A.   I'm sure I spoke with friends outside of work
4         regarding it.  I --
5    Q.   Who would that be?
6    A.   My best friend.
7    Q.   Who's that?
8    A.   Her name is Jaumannet.
9    Q.   Sorry?
10   A.   Jaumannet.
11   Q.   Last name?
12   A.   Ruff.
13   Q.   Where does she live?
14   A.   Nevada.
15   Q.   Did you tell her by phone?
16   A.   Yes.
17   Q.   Anyone else you think you told between the event on
18        July 30th and speaking to Ms. Carroll on August 6th?
19   A.   There was a comment I had made in an attempt to get
20        Ms. Luca to admit to what she had done.  I believe it
21        was the same morning of the incident.
22   Q.   And what comment was made to who?
23   A.   There were a couple staff members in the department,
24        including Ms. Luca.  The staff member I recall
25        specifically was David Antior, A-N-T-I-O-R, and I

Page 124

1         don't recall the exact verbiage, but I made a comment
2         about Ms. Luca grabbing my nipple to get her to
3         respond and admit to what she had done in front of
4         somebody else.
5    Q.   David Antior was present?
6    A.   During my comment, yes.
7    Q.   Yes.  And you said others, other staff members?
8    A.   There were.
9    Q.   Who else?
10   A.   I don't recall who else.
11   Q.   What was Antior's position at the time?
12   A.   Respiratory therapist.
13   Q.   Did he make a comment in response to your statement?
14   A.   He did not.
15   Q.   And you don't recall your exact words but it had
16        something to do with Ms. Luca grabbing your nipple?
17   A.   Correct.
18   Q.   Would you agree that's a rather shocking statement to
19        make?
20   A.   A rather shocking statement to make -- it wasn't -- it
21        was what happened.
22   Q.   Understand.  But if Mr. Antior knows nothing about it
23        and he's standing there and you suddenly say, gee,
24        Ms. Luca grabbed my nipple, wouldn't you agree that's
25        kind of a shocking statement?

Page 125

1  A.   I suppose if you're shocked by that.
2  Q.   Okay.  Maybe Mr. Antior isn't.  We shouldn't guess.
3       And your recollection is he didn't comment?
4  A.   Correct.
5  Q.   But he was within ear-shot?
6  A.   Correct.
7  Q.   Was he part of a conversation?
8  A.   I don't think there was -- I don't recall the
9       conversation.  I know my intent on my comment
10      specifically because I saw David and he's trustworthy
11      and he -- he's very non-biased and he's not in a
12      clique, so to say, I said it in front of him
13      specifically because I wanted her to admit it in front
14      of somebody else.
15 Q.   What did she say?
16 A.   I don't recall what she said.
17 Q.   Did you say it like in a really serious manner or in a
18      joking manner?  In trying to get her to go along,
19      how -- how would you have presented that piece of
20      information?
21 A.   I'm sure I sounded slightly angry.  She did not
22      confirm it in front of him.
23 Q.   Did she deny it in front of him, if you recall?
24 A.   No.  No.
25 Q.   And I'm sorry.  You said you didn't recall who else

Page 126

1       was present?
2  A.   I do not.
3  Q.   But there were others there?
4  A.   There were others.
5  Q.   Do you know if Diana was there?
6  A.   I do not.
7  Q.   Do you know where you were at the time you made the
8       comment?
9  A.   Yes.
10 Q.   Where?
11 A.   In the middle of the respiratory care department.
12 Q.   And I'm sorry.  Was this the same night it occurred?
13 A.   I believe it was the same night.
14 Q.   Or morning, I guess.
15 A.   Or --
16 Q.   The same shift.
17 A.   I believe it was the same day.
18 Q.   All right.  Did you ever speak to Mr. Antior about it
19      again?
20 A.   I did.
21 Q.   When?
22 A.   I don't recall.
23 Q.   So you spoke to Ms. Ruff, your friend in Nevada.  You
24      mentioned it in front of Antior and other staff
25      members the same shift it had occurred you think.  Any

Page 127

1       other times you spoke to someone about the incident
2       prior to speaking with Ms. Carroll on August 6th?
3  A.   I did speak with Ms. Cary.
4  Q.   Who's that?
5  A.   A coworker.
6  Q.   Ms. Cary, C-A-R-R-I-E?
7  A.   C-A-R-Y.
8  Q.   First name?
9  A.   Stacy.
10 Q.   When did you speak to Ms. Stacy -- Ms. Cary?
11 A.   Probably that morning after work.
12 Q.   She's a respiratory therapist?
13 A.   Yes.
14 Q.   Where was she assigned that night?
15 A.   She was not at work that night.
16 Q.   Did you call her?
17 A.   I probably called her after work.  I generally do.
18 Q.   What shift does she work?
19 A.   Midnight shift.
20 Q.   So you'd get home early in the morning and call her?
21 A.   I generally will call her on my way home.
22 Q.   Why?
23 A.   Because we're both up at that time because we're weird
24      midnight people.
25 Q.   She's a pretty good friend, then, I take it?

Page 128

1  A.   Now she is, yes.
2  Q.   Well, was she at the time?
3  A.   We were getting to know each other at that time.
4  Q.   Well, if you're calling her frequently on your way
5       home, it's someone you're friendly with it sounds
6       like?
7  A.   Yes.  We're friendly.
8  Q.   All right.  And you told her on your way home you
9       think?
10 A.   I told her more of what had happened.  I did text her
11      during shift of different things that were happening
12      throughout the night for me to elaborate on later.
13 Q.   So you sent her more than one text?
14 A.   That night or about the subject?
15 Q.   You said you texted her during the shift of different
16      things that were happening throughout the night.
17 A.   Correct.
18 Q.   So it sounds like it was more than one text throughout
19      the night.
20 A.   Correct.
21 Q.   All right.  And then you called her on your way home
22      and filled in the details?
23 A.   I believe I called her on the way home.  I know I
24      spoke with her after.
25 Q.   Did you tell her exactly what you recalled happening

GARCIA, KRISTINA
02/04/2020

Pages 129–132

Page 129

1    in the room where this alleged assault occurred?
2  A. I believe I did.
3  Q. What was her reaction?
4  A. She couldn't believe Rachel actually did that.
5  Q. Okay. Did she say anything else?
6  A. I don't recall the --
7  Q. Did you discuss with her whether to take it to
8     management?
9  A. I probably did.
10 Q. You don't recall?
11 A. I probably did.
12 Q. Okay. Do you recall what she advised, if anything?
13 A. I remember her saying how I may get in trouble for
14    tugging on my bra strap to show like the other girls
15    did. I don't recall if she told me yes, go for it or
16    no, don't. I -- I don't remember off the top of my
17    head. I believe I discussed with Ms. Carroll actually
18    that some people had known because of my comment by
19    David and that I spoke with Stacy about it.
20 Q. Did you continue to have -- did you continue to have
21    dialogue with Ms. Cary after that first night?
22 A. I'm sure I did.
23 Q. About the incident.
24 A. I'm sure I did.
25 Q. All right. And on more than the one occasion prior to

Page 130

1     meeting with Ms. Carroll?
2  A. Probably.
3  Q. She was kind of a confidante at that point for you?
4  A. Yeah. We -- I trusted her with things.
5  Q. All right. Do you know if she spoke to others about
6     the situation?
7  A. About the details of the situation?
8  Q. Or generally about the situation.
9  A. I know other people have spoke with her about the
10    incident.
11 Q. During this time period prior to going to Ms. Carroll,
12    do you know if Ms. Cary spoke to others about what you
13    said had occurred?
14 A. Not -- not that I can recall off the top of my head,
15    no.
16 Q. Or that you're aware of?
17 A. Or that I'm aware of, yes.
18 Q. Okay. So Exhibit 7 is this -- this recorded
19    conversation, and I want to have you go to Page 2 of
20    it, and there's an entry at 2:15 of the recording.
21    All right?
22 A. Um-hmm. Yes.
23 Q. And that would be the time of the recording, not the
24    time of day that you were having this conversation;
25    right?

Page 131

1  A. The minute mark into the recording, yeah.
2  Q. And you describe some of what we were talking about
3     earlier with your issues with Ms. Luca and -- and then
4     you conclude by saying, ". . . so we really haven't
5     had any issues since then."
6        And Ms. Carroll says, "Okay, and that was
7     six to eight months ago."
8        And you said, "Yeah, between six and eight
9     months ago that both of these things have happened."
10       And feel free to take a moment to review
11    the rest of the recording if you like, but the
12    question I've been asking is whether anything else
13    inappropriate happened with Ms. Luca during that six
14    to seven or six to eight-month period.
15 A. Since I had said "So we really haven't had any issues
16    since then," issues I guess would be anything that I
17    found major.
18 Q. Okay. Was there anything minor that you're recalling
19    as you sit here today?
20 A. Not that I recall offhand, no.
21 Q. So this incident on July -- morning of July 30th was
22    kind of out of the blue, not --
23 A. Being sexually assaulted? Yes. That was out of the
24    blue.
25 Q. Right. And the conversation you were having leading

Page 132

1     up to that would be more regular conversation that you
2     didn't find offensive?
3  A. Yes.
4  Q. Okay.
5        MS. WARD: Can we -- can we go off the
6     record for a minute?
7        MR. PELTON: Sure.
8        VIDEO TECHNICIAN: Going off the record at
9     11:52 a.m.
10       (Recess taken at 11:52 a.m.)
11       (Back on the record at 12:06 p.m.)
12       VIDEO TECHNICIAN: We are back on the
13    record at 12:06 p.m.
14 BY MR. PELTON:
15 Q. We had been discussing some of the interactions that
16    you and Ms. Luca had in the period of time six to
17    seven months prior to the July 30th incident; right?
18 A. Okay.
19 Q. And I'd like you to describe in more detail if you can
20    what all occurred between you and Ms. Luca that you
21    thought might be inappropriate as it relates to your
22    sexual preference, as it relates to -- let's start
23    there. With regard to your sexual preference.
24    Anything she said or did that you thought was
25    inappropriate in that time period prior to the six to

GARCIA, KRISTINA
02/04/2020                                                                    Pages 133–136

Page 133

1    eight months before the July 30 incident?
2  A.  As far as making comments about me wanting her when I
3       had never said anything of the sort, her attempting to
4       hold my hand.  She's made comments about my sexuality.
5       I don't recall verbatim what she would or has said,
6       but she seemed to be interested in the fact that I was
7       openly bisexual.  She has asked me before if I thought
8       she was bisexual.  She has asked me about how many
9       women I've dated.  Well, I guess how many women I
10      dated, I don't find that inappropriate.  But we
11      weren't close friends, so it is a little strange to
12      ask someone that when you're not -- I think it's
13      strange when you're not close with them.
14  Q.  Did you get the impression that -- it sounds like some
15      of this was playful and maybe crossed some lines, but
16      did you get the impression that she actually was
17      interested in learning kind of more about this
18      bisexual thing, I mean, from some of her inquiry --
19  A.  I think --
20  Q.  -- on a more serious discussion?
21  A.  I think a lot of how she portrayed her trying to hold
22      my hand or trying to ask questions, she would always
23      giggle or make it like there was a funny or silly
24      aspect to it, but there was clearly some serious
25      undertone.  And as far as inquiring -- inquiring about

Page 134

1       bisexual, it was very directed to me.  It wasn't
2       necessarily general questions.
3  Q.  Did you -- did you think she had any sexual interest
4       in you?
5             MS. WARD:  I'm going to object on the basis
6       of asked and answered.  But go ahead.
7  A.  I think -- re -- or not rephrase, but repeat the
8       question, please.
9  BY MR. PELTON:
10  Q.  Yeah.  Did you -- based on these things you've been
11      telling me, did you ever form an impression that maybe
12      she actually had a sexual interest in you?
13  A.  They became so repeated at one point that I questioned
14      if she did have an interest, if she was taking
15      something out of context that -- maybe, you know,
16      comments or conversation.  That is when I confronted
17      her to clear the air because I wanted her to
18      understand I was not interested in her.  I think
19      generally when someone shuts down like comments or
20      attempts to hold someone's hand that would be enough
21      information for them to stop what they're doing if
22      they did have an interest because it's not being given
23      back.
24  Q.  All right.  And -- and it sounds like it did, then,
25      for a period of six or eight months; right?

Page 135

1  A.  There was nothing major for me to apparently write
2       down.
3  Q.  All right.  And you're not remembering anything
4       specific that was more minor?
5  A.  No.  Not at this time.  I don't remember anything.
6  Q.  And some of this sounds more playful?
7  A.  She would always put a playful spin on whatever she
8       was doing.
9  Q.  I get the impression she's a pretty colorful person,
10      if you will, that she's a bit of a --
11  A.  She's interesting.
12  Q.  -- crack-up, pushes the envelope, kind of a different
13      kind of person?
14  A.  She's interesting.
15  Q.  All right.  I mean, I think -- I think Matthewson,
16      according to another recording, had called her nuts or
17      fucking nuts?
18  A.  There was a running theme throughout the department
19      and she was referred to as crazy Rachel.
20  Q.  Okay.  So your sense was most of the department that
21      paid any attention to her had formed that kind of an
22      opinion?
23  A.  That was the common running theme of how we referred
24      to her was crazy Rachel.
25  Q.  Crazy Rachel.  Did you refer to that too -- refer to

Page 136

1       her as that as well?
2  A.  Yes.
3  Q.  Okay.  Did people take her seriously at all?
4  A.  I don't know how other people interpret her.  Calling
5       her by crazy Rachel was not behind her back.
6  Q.  Understand.  In the conversation with Ms. Carroll
7       that's been transcribed you say -- look at the 5 -- or
8       excuse me, the 53-second mark on Page 1.
9  A.  Yes.
10  Q.  You say, ". . . you know how we all talk at night,
11      we're a very playful bunch."  What are you referring
12      to?
13  A.  We talk about things that probably would not be
14      considered appropriate in -- by patient care areas
15      let's say.
16  Q.  Like what?
17  A.  Personal -- just we talk about our lives.
18  Q.  Well, you say you're a very playful bunch.  What are
19      you referring to?
20  A.  We all get along well.  We can joke with each other.
21  Q.  All right.  You said, "I've never let it get to
22      me . . ."  Let what get to you?
23  A.  Anything anyone has ever said in the department.
24  Q.  Can you be any more specific as to what you're talking
25      about when you say we talk at night, we're a playful

GARCIA, KRISTINA
02/04/2020                                                                Pages 137–140

Page 137

1    bunch?
2  A. There was nothing specific about that statement.
3  Q. Okay. Let's go to the 2:15 entry. Two minutes, 15
4     second entry on Page 2.
5  A. Yes.
6  Q. You say, "I think she just wants someone to want her
7     or to love her, you know. So, I blew that off. No
8     big deal. Things were awkward for a little bit. I
9     would say not a my side, I don't think."
10         So you're saying you weren't overly
11    offended by these various comments and conversations
12    about sexuality and hand holding and such that she had
13    been joking with you about?
14         MS. WARD: I'm going to object on the basis
15    the document speaks for itself. But go ahead.
16  A. I'm a very hard person to offend, and I was trying to
17    take that as not -- I'm trying to think how to say
18    this like. I was trying to blow it off and just pay
19    it no attention so it would pass and trying not to
20    think this is all about me.
21  BY MR. PELTON:
22  Q. Right. It's just crazy Rachel?
23  A. Just crazy Rachel.
24  Q. Okay. And you never complained about it?
25  A. I did not complain about the incidents to management.

Page 138

1  Q. Right. Go to 5:51, the five minute 51 second mark on
2     Page 3. And in this -- you're speaking here at this
3     point in the recording. About five lines down it
4     picks up. It says Net says, "Yeah, exactly." And
5     then you say, "I mean, like I said, I know on nights
6     were a little loose with our lips." What are you
7     referring to?
8  A. The fact that we have conversations that are not
9     necessarily considered appropriate within our
10    department.
11  Q. Meaning foul language, sexual connotations, things
12    like that?
13  A. Those are some, yes.
14  Q. All right. Do you recall anything specific?
15  A. I wasn't referring to anything specific.
16  Q. Okay. Do you recall anything specific sitting here
17    today?
18  A. As far as things that have been said inappropriately
19    in the department?
20  Q. Yes.
21  A. Lots of things have been said. There's nothing that's
22    come to mind specifically. Like I said, it's not
23    something that -- foul language or speaking of
24    inappropriate things doesn't generally offend me,
25    so . . .

Page 139

1  Q. All right. But you're not recalling any specific
2     incidences?
3  A. That I was referring to here, no.
4  Q. Well, or that you can recall now.
5  A. People talk about their sex lives. People talk about,
6     you know, their families dying. People talk about
7     lots of different things that you wouldn't talk about
8     out by patients' families, opinions.
9  Q. Let's turn to the 13-minute 49-second mark on Page 8.
10  A. What minute mark did you say?
11  Q. 13 minutes and 49 seconds.
12  A. Okay.
13  Q. About third line down in that entry you're speaking
14    and it says, "I think we do a lot of things on nights
15    that I'm sure are inappropriate." Net says yes. And
16    you say, "And I participate in it with foul language
17    worst than that. You know, I'm not saying I did
18    everything right. But, I'm saying, she touched me."
19         Again, what are you -- do you have any
20    specific recollection of what you're referring to
21    about these inappropriate things at night, foul
22    language and worse than that?
23  A. As far as worse than that, I do believe that is an
24    error on what they heard versus what I said. I would
25    have to listen to the audio. But I do contribute to

Page 140

1     foul language in the department. I am -- I'm not
2     unknown to swear, which obviously is something I would
3     not do in patient care areas or in certain places.
4     When I'm saying I did not -- wait, I am not -- I'm not
5     saying I did everything right, I believe I was
6     referring to tugging on my bra strap because Stacy,
7     Ms. Cary, had said you probably shouldn't have done
8     that. All three of us had done that.
9  Q. But back to this reference to -- several references
10    we've been looking at about foul language and whatever
11    goes on at nights with loose lips. You're saying your
12    participation might have been some foul language?
13  A. Sure.
14  Q. Did you discuss your personal life with others?
15  A. Not in detail.
16  Q. Did you discuss your partnerships over the years with
17    others?
18         MS. WARD: I'm going to object on the
19    grounds of vagueness. But go ahead.
20  A. Not in any detail from what I can recall.
21  BY MR. PELTON:
22  Q. You recall others sharing things about their sex life
23    I think you said?
24  A. Yes.
25  Q. Okay. You never did that you're saying?

GARCIA, KRISTINA
02/04/2020                                                                    Pages 141–144

Page 141

1   A.   Not that I recall.
2   Q.   And worse than that on this recording you think is a
3        transcription error?
4   A.   I do believe so.
5   Q.   All right.  Were you familiar with the -- with
6        Beaumont's policies and procedures for making a
7        complaint about inappropriate conduct in the
8        workplace?
9   A.   I would have to refer to the policy.
10  Q.   You were familiar with it at this time we've been
11       talking about?
12  A.   I assume they have a policy in place.
13  Q.   Were you familiar with it?  Had you read it?  Had you
14       reviewed it?
15  A.   No.  I'm not familiar with it.
16  Q.   In going to Net, did you talk -- did you review the
17       policy?
18  A.   No.
19  Q.   You knew you had access to the policies?
20  A.   I had access to the policies, yes.
21  Q.   There's a online system that you can access human
22       resource policies?
23  A.   Correct.
24  Q.   You didn't do that in assessing what to do about the
25       alleged assault?

Page 142

1   A.   No.
2   Q.   You still have the audio of this conversation with
3        Net, Exhibit 7?
4   A.   I've provided that to my attorney.
5   Q.   Do you still have it on your phone?
6   A.   I'm not sure if it's on my phone.  I've went --
7   Q.   I shouldn't have assumed that.  How did you record the
8        conversation?
9   A.   On my phone, yes.
10  Q.   How did you do that?
11  A.   What do you mean?
12  Q.   How do you record on your phone?
13  A.   Through an app.
14  Q.   Do you know the name of the app?
15  A.   No, I do not.
16  Q.   Is it one that came with the phone or one that you
17       downloaded?
18  A.   I don't recall.
19  Q.   What kind of phone did you have at this time in August
20       of 2018?
21  A.   I don't recall.
22  Q.   Do you still have that phone?
23  A.   No.
24  Q.   What did you do with it?
25  A.   I've probably went through three phones since this

Page 143

1        time.
2   Q.   Who's your carrier?
3   A.   AT&T.
4   Q.   Was it at that time in 2018?
5   A.   Possibly.
6   Q.   Do you have the same phone number?
7   A.   Yes.
8   Q.   What is your phone number?
9   A.   (586) 943-1518.
10  Q.   That's with AT&T?
11  A.   Yes.
12  Q.   What type of phone do you have now?
13  A.   Now I have an iPhone.
14  Q.   You did not have an iPhone back in 2018, August 2018?
15  A.   I may have.
16  Q.   All right.  Do you recall -- can you visualize what
17       you did going into that meeting with Net to turn on a
18       recorder?
19  A.   I opened the app and pressed a button to record.
20  Q.   All right.  You don't recall the name of the app?
21  A.   No, I don't.
22  Q.   You don't recall if it's an app that came with the
23       phone or one you downloaded?
24  A.   I don't.  No, I don't.
25  Q.   Did you discuss with anyone, such as Stacy, that you

Page 144

1        might record this conversation?
2   A.   I don't recall.
3   Q.   Did you receive advice or comments from anyone on how
4        to record a conversation?
5   A.   Comments?  You said did I receive advice or comments?
6   Q.   Yeah.  On how to do it.
7   A.   Ms. Luca recorded lots of things at work and that's
8        kind of where I picked it up from.
9   Q.   Did she teach you how to record a conversation?
10  A.   She did not teach me how to record a conversation, but
11       I was aware that she recorded lots of things, audio,
12       video, and, you know, recording like this, audio, and
13       that's kind of where I got the idea from.
14  Q.   Yeah.  I'm not asking where you got the idea.  I'm
15       more interested in how you figured out how to do that.
16       I wouldn't know how to record a conversation, but
17       that's me.  Is this something you do regularly, you
18       knew how to do it already, or did you seek advice to
19       say, gee, I'm going to record this conversation with
20       Net, I better figure out how to do that going into the
21       room?
22  A.   I did not seek advice from anyone to learn how to
23       record anything.  I figured it out myself because I
24       knew I needed to do something to protect myself, so I
25       looked into it.

GARCIA, KRISTINA
02/04/2020

Pages 145–148

Page 145

1  Q.  What's happened to the recording?
2  A.  It's on the app.
3  Q.  Yeah.  But the app's -- do you still have it on an app
4      on your current phone?
5  A.  I have an app on my current phone.
6  Q.  With this recording on it, Exhibit 7?
7  A.  It may be accessible through the -- the app.
8  Q.  So, in other words, when you changed phones it went
9      with the phone or it went -- through the app stays
10     with the phone?
11 A.  It may have.  I went through three phones and one -- I
12     know I had a couple iPhones and at one point I had
13     went to an Android.  I don't know if it was compatible
14     with an Android, so I don't know.  I would have to
15     look for it.
16 Q.  So you went from an iPhone to an Android and back to
17     an iPhone?
18 A.  Yeah.
19 Q.  And you're not recalling if you had an iPhone at the
20     time in August 2018?
21 A.  I believe it was, but I couldn't tell you for certain.
22 Q.  All right.  Who transcribed the audio?
23 A.  I would have to consult my attorney about who
24     transcribed it.
25 Q.  Okay.  Well, that's okay.  I think it's okay for you

Page 146

1      to say someone in her office, but I don't -- well, let
2      me -- let me --
3  A.  I don't recall if it was --
4  Q.  -- let me -- let me approach it this way.  You didn't
5      transcribe it?
6  A.  No.
7  Q.  Have you verified the accuracy of the transcription?
8  A.  I went through two of the three and listened and read
9      along and had noted some minor errors.
10 Q.  Which two of the three did you review?
11 A.  Jean's and Net's.
12 Q.  Okay.  You did not review Philip is it Matthewson?
13 A.  No.
14 Q.  And when you noted -- how did you note the minor
15     errors?  Did you write something down?
16     MS. WARD:  To the extent there's anything
17     involving communication with me, that's privileged.
18     You can answer with anything else.
19     MR. PELTON:  Let me do this because I --
20     look, I just want to make sure we all have the same
21     accurate transcription.  Maybe what I could do would
22     be to send a offer or a request for admission on it or
23     something.  I want you and I to be on the same page
24     that we're working from the same accurate
25     transcription.  So you tell me what's best.  I can

Page 147

1      keep questioning her or we can -- maybe our offices
2      can work together to do that.
3      MS. WARD:  I don't -- I don't know what you
4      want.  I'm not opposed to considering or having a
5      dialogue with you.
6      MR. PELTON:  I want an accurate
7      transcription --
8      MS. WARD:  Well, I get that.
9      MR. PELTON:  -- because she just testified
10     it wasn't accurate.  So there --
11     MS. WARD:  There may be a way --
12     MR. PELTON:  Any minor discrepancies.
13     MS. WARD:  Yeah.  There may be a way for us
14     to take the transcription we have, figure out what's
15     inaccurate and send you a supplement.
16     MR. PELTON:  All right.  Or I probably
17     would like a copy of the audio, so --
18     MS. WARD:  And I'm not sure what we're
19     going to say about that, but I'm going to look into
20     it.
21     MR. PELTON:  All right.  Well, I don't want
22     to dwell on it this witness today.  So you and I
23     will work it out.
24     MS. WARD:  Yeah.  That's what I'm saying.
25     I'm happy to work with you to the extent I can.  What

Page 148

1      I'm not willing to do is stipulate on the record right
2      now at this moment you can have X or Y.  I want to
3      look into it.
4  BY MR. PELTON:
5  Q.  Do you recall anything specific in Exhibit 7 that was
6      inaccurate?
7  A.  I -- I don't recall.  I would have to go through it
8      again.
9  Q.  Have you looked to see if the errors were corrected?
10 A.  How would they be corrected unless someone consulted
11     me about it?
12 Q.  Well, that's how.
13 A.  So with the audio transcription I never touched it.
14 Q.  Have you recorded any other -- you mentioned three
15     conversations.  There was Ms. -- conversation with
16     Ms. Carroll, conversation with Mr. -- is it
17     Matthewson?
18 A.  Yes.  Mr. Matthewson.
19 Q.  And with Mr. Aphram.  Did you record any other
20     conversations with anyone working for Beaumont?
21 A.  No.
22 Q.  No other conversations?
23 A.  No.
24 Q.  How did you choose these three particular
25     conversations to record?

GARCIA, KRISTINA
02/04/2020

Pages 149–152

Page 149

1  A.  How did I choose them?  Well, this was my initial
2      complaint.  I wanted somehow to be able to prove that
3      I made a complaint.  The conversation with Mr. Aphram,
4      I recorded that because that was regarding -- it was
5      like supposed to be a follow-up of what had happened
6      in the investigation, and they would not allow my
7      attorney present, so I wanted to safeguard myself and
8      record what was happening.  And with Mr. Matthewson, I
9      did anticipate that he would not want to become
10     involved, so I needed to protect myself with the
11     information and not do -- not -- not -- to be able to
12     provide the information without badgering him or
13     anything about coming forward with what he knew.
14  Q.  Did you seek permission from any of these three
15      individuals to record the conversation?
16  A.  No.
17  Q.  To your knowledge, were any of the three aware that
18      you were recording the conversation?
19          MS. WARD:  I'm going to object on the basis
20      of foundation.  Go ahead.
21  A.  No.
22  BY MR. PELTON:
23  Q.  You didn't advise any of them you were recording the
24      conversation?
25  A.  No, I did not.

Page 150

1  Q.  It was your --
2  A.  They did not ask.
3  Q.  It was your intent to surreptitiously record the
4      conversation; right?
5          MS. WARD:  I'm going to object to your
6      characterization.  But go ahead.
7  A.  I'm not sure of the definition of that word.
8  BY MR. PELTON:
9  Q.  Surreptitiously?
10  A.  Correct.
11  Q.  Okay.
12  A.  I don't know the definition.
13  Q.  Let me rephrase it.  You didn't want them to know you
14      were recording the conversation; is that correct?
15  A.  I would not have been opposed to them knowing I was
16      recording the conversation.
17  Q.  But you didn't tell them?
18  A.  Correct.
19  Q.  And, to your knowledge, they didn't know?
20  A.  Correct.
21  Q.  All right.  Did you ever disclose to any of the three
22      that you had recorded a conversation with them?
23  A.  No.
24          MS. WARD:  Are you done with this line of
25      questioning?  It's 12:32.  I don't want to break up

Page 151

1      your stride here.
2          MR. PELTON:  No.  We can break.  That's
3      fine.  We'll come back.  Let's go about an hour.
4          MS. WARD:  Yeah.
5          MR. PELTON:  All right.
6          MS. WARD:  That gives us a little time to
7      get some fresh air too.
8          MR. PELTON:  Very good.
9          VIDEO TECHNICIAN:  Off the record at
10      12:31 p.m.
11          (Recess taken at 12:31 p.m.)
12          (Back on the record at 1:17 p.m.)
13          VIDEO TECHNICIAN:  We are back on the
14      record at 1:17 p.m.
15  BY MR. PELTON:
16  Q.  Good afternoon, Ms. Garcia.  We're back on the record.
17      You understand you're still under oath?
18  A.  Yes.
19  Q.  In the -- in the -- say the months leading up to the
20      incident on July 30th how often would you work with
21      Ms. Luca?
22  A.  Work with in terms of being paired --
23  Q.  Being paired, if you will, you know, in the same work
24      area.
25  A.  I don't recall how many times, but probably maybe a

Page 152

1      handful or less.
2  Q.  Okay.  Wasn't often?
3  A.  Wasn't often, no.
4  Q.  Where did she normally work?
5  A.  I believe she -- I can't remember if she was general
6      floors or ICU primary.  At one point I believe she
7      changed from general floors to ICU.
8  Q.  And you were in the EC?
9  A.  I was either in ICU or EC.  I'm not sure.
10  Q.  Okay.  Did you -- did you often have breaks with her?
11  A.  Oftentimes.  During breaks she would be either in the
12      department or perhaps nearby.
13  Q.  You didn't coordinate breaks with her very often?
14  A.  I had never coordinated a break with her.
15  Q.  Never coordinated a break with her?
16  A.  No.
17  Q.  Okay.  How about Colleen?
18  A.  I've never coordinated a break with her.
19  Q.  What is Colleen's last name?
20  A.  Kaye.
21  Q.  K-A-Y-E?
22  A.  Yes.
23  Q.  You found yourself breaking with them on early morning
24      hours of July 30th; is that right?
25  A.  Yes.

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson
U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids
Phone:  888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

GARCIA, KRISTINA
02/04/2020

Pages 153–156

Page 153

1   Q.   How did you end up getting together with them for this
2        break?
3   A.   I don't honestly recall.  I went to the 3 East
4        respiratory room to break, and I believe Colleen was
5        scheduled to that unit that night.
6   Q.   Where were you working that night?
7   A.   I don't recall.
8   Q.   Does 9 North sound accurate?
9   A.   I don't recall.
10  Q.   What would you be doing in 9 North when you worked
11       there?
12  A.   General floors.
13  Q.   General floors.  Why did you go to the 3 East
14       respiratory room for your break that day or evening?
15  A.   I -- I don't recall why.
16  Q.   Colleen was working in that unit that evening?
17  A.   To the best of my memory she was.
18  Q.   Where was Ms. Luca working?
19  A.   I don't know.
20  Q.   Was this an hourlong break you were taking?
21  A.   No.  It was -- it was just a break.
22  Q.   Not a meal break?
23  A.   I wasn't eating.
24  Q.   You said sometimes you combined your breaks.  This
25       wasn't one of those times?

Page 154

1   A.   No.
2   Q.   This was a short 15-minute break or thereabouts?
3   A.   I don't recall how long I was in the room.
4   Q.   Who arrived first?
5   A.   I don't recall.
6   Q.   You don't recall if you walked in and the two of them
7        were already there or if you were there and they
8        walked in or anything like that?
9   A.   I believe they were both in the room, but I can't say
10       for certain.  I think both or I think all three of us
11       at one point one might be gone, the other might be
12       gone, the other one might come back in.  We were just
13       using the 3 East respiratory room as just little down
14       time break room.
15  Q.   Do you know how long you took for break that evening?
16  A.   No.
17  Q.   What is the 3 East respiratory room?
18  A.   What do you mean what is it?
19  Q.   What is it?  What's it used for?
20  A.   Kind of like the base room for that unit.  It has
21       respiratory supplies in it.  It has respiratory
22       equipment in it.  It has the Bernoulli which we watch
23       ventilators on.  It has a computer for charting.
24       Multiple computers for charting.
25  Q.   So it would be used by those in the 3 -- working on

Page 155

1        3 East or all of the East Tower or who uses it?
2   A.   Generally it's for the 3 East unit.  In one of the
3        other units we no longer have a respiratory room, so
4        sometimes we'll go from that unit down there to have
5        an area to sit and chart or grab -- like take a break
6        or grab a supply -- supplies that we need or . . .
7   Q.   So it sounds like a work room/supply room?
8   A.   It's a respiratory work room/supply room, yes.
9   Q.   And there's rooms like it on other floors?
10  A.   Yes.
11  Q.   How large is the room?
12  A.   The 3 East room is I believe the largest respiratory
13       room that's dedicated to us aside from our actual
14       department.
15  Q.   Who else was in and out while you were breaking?
16  A.   Ms. Kaye, Ms. Luca, myself.  That morning Tonirose
17       Cudilla.
18  Q.   T-O-N-I?
19  A.   T-O-N-I-R-O-S-E.  All one --
20  Q.   All one word?
21  A.   Yeah.  I believe so.
22  Q.   What's the last name?
23  A.   Cudilla, C-U-D-I-L-L-A I believe.
24  Q.   Was she sitting with you, the three of you, or was
25       just kind of in and out working?

Page 156

1   A.   I believe she only came in once but it was after the
2        incident.
3   Q.   All right.  How long into the -- how long had the
4        three of you -- well, the three of you were sitting
5        together, right, in this room?
6   A.   We were sitting in the same room, yes.
7   Q.   How long had you been sitting together when the
8        incident happened?
9   A.   I don't recall.
10  Q.   And how big is the room?
11  A.   I don't know.  Maybe a fourth of this room or a third
12       of this room.  It's a fairly decent size room.
13  Q.   Is it crowded given that you have all this equipment
14       and supplies in there?
15  A.   Depends of your idea of crowded.  It's the biggest
16       respiratory room we have outside of the department, so
17       it's the most spacious to us.
18  Q.   But it can get more crowded in other rooms, huh?
19  A.   Well, we have a lot of equipment in there.
20  Q.   When you were sitting, were you sitting in a group
21       like a circle or how were you arranged chair-wise?
22  A.   Kind of a triangle of sort.
23  Q.   How many chairs are in there?
24  A.   I don't know.
25  Q.   Okay.

GARCIA, KRISTINA
02/04/2020                                                                    Pages 157–160

Page 157

1   A.   We were -- we each had a chair.
2   Q.   Okay.  I don't know how your drawing skills are, but
3        I'm going to ask you to see if you can sketch the room
4        best you can.  Just --
5   A.   The room with us in it or just the room in general?
6   Q.   Yeah.  Start is it square, rectangular?
7   A.   Yeah.  It's square.
8   Q.   Okay.  And then show maybe where the entrance to the
9        room is.
10  A.   So the entrance is here.
11  Q.   Okay.  And you're labeling that?
12  A.   Entrance.  Yep.
13  Q.   All right.  And then once you come in, where were the
14       chairs situated that the three of you were in?
15  A.   So this is like a counter.
16  Q.   Okay.
17  A.   I was sitting approximately here.
18  Q.   Want to put your name by that?
19  A.   Sure.  Colleen was like here.  And Rachel was like
20       here.
21  Q.   Where is other equipment or the computers or
22       workstations in the room?
23  A.   So here is bins with equipment.
24  Q.   Those are the X marks?
25  A.   Yeah.  Well, it -- actually it's supplies I would say.

Page 158

1   Q.   Okay.
2   A.   This is an O2 tank storage.  There's usually in this
3        area here like a vent, high flow nitric, different
4        equipment, so . . .  You want me to just put --
5   Q.   Just put equipment or something.
6   A.   Sometimes it spans a little more out.  Do you want --
7   Q.   Was there any other equipment in there that you recall
8        or workstations?
9   A.   I mean, each of us had a computer.
10  Q.   Where you're sitting?
11  A.   Yes.
12  Q.   I see.  Were they backed up to -- I guess the one you
13       said is a counter.  Are the others backed up to a desk
14       or a workstation?  What's that look like?
15  A.   The computers are on wheels, so they're -- it's on a
16       station.  It's -- it's on its own cart.
17  Q.   But there's chairs there in case someone wants to come
18       in and work at the station?
19  A.   It's not really a station.  It's just -- if you want
20       to push a computer in there or sometimes there's
21       multiple computers in there that you can utilize.
22  Q.   Or you can take into a patient's room on the wheels?
23  A.   Yes.
24  Q.   I see.  But the chairs that happened to be in there,
25       are they so people can sit there and work or to break

Page 159

1        or why are the chairs in there?
2   A.   To break.  To chart.  Because that's your room, so if
3        you're -- if you have down time and you're either
4        charting or making notes in your report or sitting
5        there waiting for something to happen, this is where
6        you would sit for that unit specifically.
7   Q.   Are the chairs on wheels?
8   A.   I think one is.
9   Q.   Who had the wheeled chair?
10  A.   I don't know.
11  Q.   Did you?
12  A.   I don't know.
13  Q.   Do they rock back and forth or are they stationary?
14  A.   I don't know, to be honest.  I don't recall.
15  Q.   You know how some chairs you can lean back and it
16       flexes back.
17  A.   I think the wheeled one may, but a lot of ours are
18       broke as well, so it doesn't mean that they'll do it.
19  Q.   You just don't recall from that evening?
20  A.   No.  I know there are -- there's at least one of the
21       wheeled chairs in there and there's usually some
22       fold-up chairs.
23  Q.   Did the chairs you -- did the chair you were sitting
24       in have arms in it?
25  A.   I don't recall.

Page 160

1   Q.   All right.  May I see the piece of paper?  I'll take
2        my pen too.  Thank you.
3              MS. WARD:  Counsel, are you done with your
4        questions?  Because I was going to ask either to get a
5        copy of that or make it an exhibit.
6              MR. PELTON:  We're going to make it an
7        exhibit, yeah, --
8              MS. WARD:  Okay.
9              MR. PELTON:  -- in a moment.
10             MS. WARD:  That's fine.
11  BY MR. PELTON:
12  Q.   So you -- you and -- how far apart are you and Colleen
13       sitting, roughly, on the diagram?  In between you and
14       me or between you and Ms. Carroll, you and the court
15       reporter?
16  A.   Probably -- probably between you and me.
17  Q.   So about five, six feet?
18  A.   About that probably.
19  Q.   How far apart are you and Rachel?  Looks like a little
20       further.
21  A.   A little bit further.
22  Q.   Okay.  And between Rachel and Colleen, a little
23       closer?
24  A.   They were a little closer.
25             MR. PELTON:  Let's go ahead and then mark

GARCIA, KRISTINA
02/04/2020                                                                          Pages 161–164

Page 161

1        it.  I think it'll be Exhibit 8.
2             (Marked EXHIBIT 8 at 1:30 p.m.)
3    BY MR. PELTON:
4    Q.   What were you all talking about prior to the touching
5         incident, the three of you?
6    A.   I was wearing a PPE gown, which it's a yellow gown
7         that we use for contact isolation when we enter in a
8         patient's room.  It looks similar to like a patient
9         gown where it's all open on one side and then you can
10        put your arms into it.  I was wearing that, but I was
11        wearing it the opposite way that I would if I was
12        using it as PPE.  Normally you would go into the coat
13        where the opening is in the back.  I turned it around
14        and was kind of using it as a coat because I had
15        forgot my hoodie at home.
16   Q.   What's the material made of?
17   A.   I don't know.
18   Q.   I mean, is it just thin cotton like a patient gown you
19        were saying or is it something thicker than that?
20   A.   It looks like a patient gown in the -- in the terms of
21        it's completely open on one side, but no, the material
22        is -- it's not a material things would soak into.
23        It's a -- it's a very thin material and it's kind
24        of -- I don't want to say waterproof.  It might be
25        waterproof or water-resistant.

Page 162

1    Q.   How does it fasten?
2    A.   You tie it in the back, and I don't recall if that was
3         one of the gowns that ties in the back on the lower
4         back or it might have snaps.
5    Q.   So it's open on the front but then you can tie it
6         around your back in the back?
7    A.   It's open on the back --
8    Q.   It's open on the back?
9    A.   -- when you use it as intended, which is for PPE,
10        personal protective equipment.  So if I were to put it
11        on, it -- my arms go through it.  The opening is in
12        the back and you either fasten -- tie it or clip it
13        behind your neck and tie it or clip it behind your
14        back.
15   Q.   Does it have sleeves?
16   A.   Yes.
17   Q.   How long are the sleeves?
18   A.   Long.  Full length.
19   Q.   Full length sleeves?
20   A.   Yes.
21   Q.   What did you have on underneath the coat?
22   A.   My scrubs.
23   Q.   What kind of scrubs do you wear?  Well, let me be more
24        specific.  What kind of scrubs were you wearing that
25        night?

Page 163

1    A.   Blue scrubs.  Just a T-shirt type scrub where the arm
2         sleeves can come to here and a V neck.
3    Q.   So the sleeves come halfway to your elbow?
4    A.   They come about to my elbow because I --
5    Q.   About to your elbow?
6    A.   Yes.
7    Q.   It's a blue?
8    A.   At that time it was blue.
9    Q.   Do you own that or do you just get them at the
10        hospital and they clean them and all that?
11   A.   No.  We purchase them.  They're ours.
12   Q.   You purchase them and take them home and wash them and
13        bring them back.  Okay.
14   A.   Yes.
15   Q.   Is this the kind of scrub you almost always wore or
16        did you have different kinds of scrubs?
17   A.   I had different kinds of scrubs, different styles.
18   Q.   This -- does this have a brand name?
19   A.   They all have brand names, but I don't recall which
20        one I was wearing.
21   Q.   You said it had a V neck.
22   A.   Generally I get the V necks.
23   Q.   Do you sometimes get more of a crew neck?
24   A.   Rarely.  I try not to.  I'm more comfortable in the V
25        neck, traditional.

Page 164

1    Q.   Why is that?
2    A.   They're traditional.  I think they look better
3         and . . .
4    Q.   How far down does the V of the V neck go?
5    A.   Depends on the person I suppose.
6    Q.   On you.
7    A.   To here.
8    Q.   All right.  And how -- how large of a scrub were you
9         wearing?  What size?
10   A.   I don't recall.  It could have been a 2X.  It could
11        have been -- could have been a 3X.  I'm generally a
12        2X.
13   Q.   How tight or loose fitting is it?
14   A.   In between tight and loose.  It's not overly baggy.
15        It's not overly form fitting.  I generally go for
16        something more just comfortable that you can move
17        around in.
18   Q.   And then how -- what's the collar on the -- the PPE
19        coat or gown?
20   A.   When wearing it appropriately, it covers up to your --
21        probably the bottom of your neck here.
22   Q.   Because it's protective?
23   A.   Correct.
24   Q.   And then it ties right behind there on your neck; is
25        that correct?

GARCIA, KRISTINA
02/04/2020

Pages 165–168

Page 165

1  A.  Ties or clips.
2  Q.  Okay. Were you tied or clipped that night?
3  A.  No. I was wearing it backwards. I was wearing it
4      like a coat.
5  Q.  So the open part would be in the front?
6  A.  Correct. I was wearing it like a coat. That's not
7      how it's intended to wear when you're in a patient
8      room.
9  Q.  Were your arms through the sleeves?
10 A.  Yes.
11 Q.  Did you have it tied at the front or clipped?
12 A.  No.
13 Q.  At all or you just had it like an open coat?
14 A.  I just had it like a coat like this.
15 Q.  Like your sweater is on?
16 A.  Yes.
17 Q.  I see. And then I take it you had on -- your pants
18     were also scrubs?
19 A.  Yes.
20 Q.  All right. What was the topic of conversation?
21             MS. WARD: I'm going to object. Is there a
22     reference of when we're talking about?
23 BY MR. PELTON:
24 Q.  In -- in this -- in this room. The three of you
25     gathered. What did you talk about?

Page 166

1  A.  There was lots of things talked about that night. Are
2      you referring specifically to right before she
3      assaulted me?
4  Q.  No. I -- no. The three of you sat down at some point
5      together, and I'm wondering what's the first thing you
6      talked about that you can recall?
7  A.  I don't recall what the first thing is. I know -- and
8      I don't remember in which order. Ms. Luca was talking
9      about her ex-husband, and she was complaining or
10     venting about her ex-husband having a relationship
11     with George Zimmerman's ex-wife or somebody related to
12     George Zimmerman. She was talking about a date that
13     she had went on. We had multiple subjects and
14     conversations going on.
15 Q.  George Zimmerman is the Trayvon Martin shooter?
16 A.  Correct.
17 Q.  Who was acquitted in self-defense I guess?
18 A.  He's that fellow. I don't know --
19 Q.  Somewhere in Florida I think was it?
20 A.  Yes.
21 Q.  Okay. And she was talking about her ex-husband having
22     a relationship with George Zimmerman's ex-wife or
23     girlfriend or . . .?
24 A.  Ex-wife or girlfriend or somebody -- somebody in
25     relation to George Zimmerman.

Page 167

1  Q.  That's kind of interesting.
2  A.  She thought it was.
3  Q.  You didn't think it was interesting?
4  A.  Not particularly.
5  Q.  Did you know who George Zimmerman was at the time?
6  A.  I knew of him from like media, yeah. News reports.
7  Q.  What else did she have to say about that, if you
8      recall?
9  A.  She was just upset about it, and she had made comments
10     that -- something along the lines of she was talking
11     to George Zimmerman now and it apparently was like in
12     retaliation for her ex-husband talking with the
13     ex-girlfriend, ex-fiance, ex-wife or whatever of
14     George Zimmerman, so there was this weird -- I don't
15     know.
16 Q.  Sounds exciting.
17 A.  If that's what you're into.
18 Q.  Well, it's not everyday conversation. But did you
19     believe what she was saying?
20 A.  I didn't believe or not believe. I just -- okay. You
21     never know -- I never know what is truth coming out of
22     her mouth, so I didn't really have an interest in it,
23     so I didn't think one way or the other.
24 Q.  Just chalk it up to crazy Rachel?
25 A.  Crazy Rachel.

Page 168

1  Q.  Do you recall any other topics of conversation that
2      evening prior to the incident beginning?
3  A.  I recall a conversation she was talking about somebody
4      she had been on a date with and she said like they had
5      made a move on her as if they wanted to go further
6      physically, and she was telling us, me and Colleen,
7      she was telling me and Colleen that she told him, oh,
8      no, I've been raped, don't do that to me and started
9      crying to get him to not pursue advancing -- advancing
10     physically with her.
11 Q.  What she was relating was -- was she told him this and
12     like faked crying in order to get him to stop?
13 A.  According to her, yes.
14 Q.  Okay. Do you recall anything else of your
15     conversation that evening -- or, excuse me, morning?
16 A.  Prior to the incident? I know I had text messaged
17     Stacy random not really phrases but words or topics to
18     talk with her later about things. So we could -- we
19     can look at that text message if there was others.
20 Q.  During the conversation you were texting her?
21 A.  Yes.
22 Q.  I see. This is a text you've produced in this
23     litigation?
24 A.  Yes.
25             (Marked EXHIBIT 9 at 1:42 p.m.)

GARCIA, KRISTINA
02/04/2020

Pages 169–172

Page 169

1   BY MR. PELTON:
2   Q.   Is this the text message you're referring to?
3   A.   Yes.
4   Q.   Now, this is a text with a Lolly, L-O-L-L-Y.  Who is
5        that?
6   A.   Lolly is my nickname or was my nickname for Stacy
7        Cary.
8   Q.   Did others call her that?
9   A.   No.
10  Q.   How did you come up with that one?
11  A.   Stacy is very happy-go-lucky, and I call her -- she's
12       very lolly.  She's not ditzy because it's not a
13       negative term.  She's just la la la.  She's happy
14       and . . .
15  Q.   So she shows in your phone as Lolly?
16  A.   At that time she did.
17  Q.   All right.  So that's why it comes up Lolly?
18  A.   Correct.
19  Q.   And I see it's AT&T.  Looks like there's an image
20       there above the name.  What is that image?
21  A.   I can't decipher the image from this printout.
22  Q.   You don't have your phone you said?
23  A.   I no longer have this phone.
24  Q.   Well, do you still have this text message?
25  A.   No, I do not have this text message.  To the best of

Page 170

1        my knowledge, I don't.
2   Q.   Is this the best image of it you're aware of?
3   A.   Probably the original image is the best, and this
4        looks like a -- I'm sure there's all copies.
5   Q.   Probably been copied a number of times.  Can you read
6        the time at the top?
7   A.   At the very top?
8   Q.   Yeah.
9   A.   No.  It's cut off.
10  Q.   Then there's a date July 29, 2018, 1:22.  So that
11       would be the time of this first text?
12  A.   That would be the time of the text "Reminders for me
13       to tell you about later."
14  Q.   All right.  And that's what you were suggesting, that
15       you were just texting her during the conversation of
16       things to talk about?
17  A.   Right.  Things to remind myself what to talk about,
18       what -- what to tell her.
19  Q.   Sure.  Because they were interesting?
20  A.   For the day they were I guess.
21  Q.   Right.  Okay.  Then she says, Lolly -- I guess that's
22       Stacy Cary you said?
23  A.   Yes.
24  Q.   Says, "What kind of reminders now I'm not going to be
25       able to sleep."  And then you text back, "Phil's peak

Page 171

1        flow comment."  What is that?
2   A.   That was another topic that we had discussed that
3        night or that Rachel had brought up.
4   Q.   About Phil?
5   A.   About Phil Matthewson.
6   Q.   What was it she brought up?
7   A.   For some reason she wanted to get him on audio
8        recording admitting to or talking about a comment he
9        made about a peak flow.
10  Q.   What is a peak flow?
11  A.   A peak flow is a hand-held device we use to have
12       asthmatics -- it's a breathing test.  You blow into it
13       and it gives you a specific number, and based on
14       the -- the height -- I'm trying to think what it is.
15       The height and the -- I can't remember right now, but
16       it's --
17  Q.   So what's the comment that's being referenced?
18  A.   He made a sexual comment about using a peak flow
19       meter.
20  Q.   And she wanted to record it?
21  A.   She wanted to record it.
22  Q.   Did she say why she wanted to record it?
23  A.   She did not indicate why she wanted to record it.
24  Q.   Did she indicate she found it funny?
25  A.   She found it amusing I suppose.

Page 172

1   Q.   What was the reference?
2   A.   He -- I don't recall.  He said something -- because
3        the peak flow meter you blow into it, so respiratory
4        therapists tend to think it's funny to say blow, and
5        he made a comment about -- I don't recall how it went.
6        She told us what he had said, and then she called him
7        on her work phone on his work phone and was trying to
8        get him to restate the story.
9   Q.   While the three of you were sitting there?
10  A.   Yes.
11  Q.   Was she successful in getting him to retell the story
12       or the joke?
13  A.   No.  He -- when he realized that she wasn't calling
14       for a work purpose, he said, "I'm really busy and I
15       have to go."  And that was the end of it.
16  Q.   Did you find the comment amusing?
17  A.   I've heard it 101 times.
18  Q.   It's rather sophomoric and old?
19  A.   It's just -- yeah.  I mean, maybe the first time I
20       heard it it's like okay, that's silly, but . . .  She
21       wasn't --
22  Q.   Stupid.  Yeah.  Immature.
23  A.   I don't -- I didn't get the impression she was doing
24       it for Colleen or myself.  It was brought up -- she
25       brought it up, I don't know for what reason, and she

GARCIA, KRISTINA
02/04/2020                                                                Pages 173—176

Page 173

1    decided to try and get him recorded saying it.
2  Q.  Stacy Cory [sic] then says, "Call me"?
3  A.  Correct.
4  Q.  I don't see a time associated with any of the rest of
5    the text.  Do you know why that is?
6  A.  I don't know exactly how it works, but one text will
7    have a date and a time and subsequent texts will not
8    necessarily date and time stamp it for what seems to
9    be a certain amount of time.  I don't know if it's two
10   hours, five hours or what.  But after a certain amount
11   of time goes by, you will sometimes notice like
12   another time stamp.  I don't know.  You'd have to
13   ask --
14 Q.  Well, I have a Verizon, and if I -- if I scroll it
15   over, it'll show the time of the -- each text.  Does
16   AT&T work the same?
17             MS. WARD:  I'm going to object on the basis
18   of foundation.  But go ahead if you know.
19 A.  When you scroll the screen over, it will show a time,
20   but . . .
21 BY MR. PELTON:
22 Q.  You didn't capture that?
23 A.  No.  Because -- I'm trying to remember.  I don't
24   remember what buttons you have to hit for whatever
25   phone this was.  I don't know if it was possible for

Page 174

1    me to hold it and like screen -- like screen shot it.
2  Q.  Is that what this is, a screen shot that you took?
3  A.  This was a screen shot.
4  Q.  And then you were able to print it out somehow?
5  A.  I didn't print it I don't believe.  I think I put it
6    in a file and emailed it.
7  Q.  You emailed the screen shot?
8  A.  Correct.
9  Q.  Do you still have that email?
10 A.  Do I have the email?
11 Q.  Um-hmm.
12 A.  That I sent it to my attorney?
13 Q.  Um-hmm.
14 A.  She has the email.
15 Q.  Okay.
16             MS. WARD:  Obviously we're not going to
17   talk about what the email says.  Right?  You got that?
18             MR. PELTON:  Of course.
19             MS. WARD:  Attorney-client.  I'm just
20   saying it for her.
21 BY MR. PELTON:
22 Q.  Then you write "Claiming rape."
23 A.  Correct.
24 Q.  She writes "Ok."  You write "George Zimmerman."  And
25   then you say, "I cant right now."  I assume meaning

Page 175

1    call her?
2  A.  Correct.
3  Q.  Why couldn't you?
4  A.  I'm at work.
5  Q.  Well, you're on break.  You're texting.
6  A.  I'm not going to discuss these matters right in front
7    of Rachel and Colleen and chat about them.
8  Q.  Well, you could go to another room I suppose.
9             MS. WARD:  Objection.  Is there a question
10   pending?
11             MR. PELTON:  Yeah.  That's a question.
12 A.  I generally don't make personal calls while at work
13   even on break.
14 BY MR. PELTON:
15 Q.  But you do text?
16 A.  Occasionally.
17 Q.  Then you write "Nipple."
18 A.  Correct.
19 Q.  Then there seems to be an overlap of the same text;
20   right?
21 A.  Correct.
22 Q.  She says, "aureola."  And then you send her a thumbs
23   up?
24 A.  Correct.
25 Q.  What's the thumbs up mean?

Page 176

1  A.  She's on the right track.
2  Q.  And then she says, "so why are you texting me the word
3    nipple I mean it's kind of a fair question."  And then
4    you say, "She pulled my tit out of my bra to see my
5    nipple."
6  A.  Correct.
7  Q.  When did you text -- from nipple down when did you
8    text that?
9  A.  What time?
10 Q.  Yes.
11 A.  I don't know what time.
12 Q.  How long after 1:22 a.m.?
13 A.  These text messages were not one right after another
14   like -- when she said "call me" and then I put
15   "claiming rape," I don't know -- 30 seconds might have
16   passed, ten minutes might have passed.  I don't
17   recall.
18 Q.  All right.  Well, you said "George Zimmerman" and then
19   you said "I can't right now" responding to the call
20   me.
21 A.  Correct.  But that doesn't necessarily mean it was
22   minutes later.  It may have been.  I don't recall.
23 Q.  Did you finish this exchange while you were still in
24   the room, if you recall?
25 A.  I don't recall.

GARCIA, KRISTINA
02/04/2020                                                                    Pages 177–180

Page 177

1  Q.  And I apologize if I asked this, but do you still have
2      these texts on your phone?
3              MS. WARD:  Objection.  Asked and answered.
4      But go ahead.
5              MR. PELTON:  That's really not a proper
6      objection.
7  BY MR. PELTON:
8  Q.  But go ahead.
9  A.  **I don't recall if I have the screen shots of these.**
10 Q.  All right.  But do you have the original texts so we
11     could scroll over and find out the time of day?
12 A.  **I don't believe so, because this was a different**
13     **phone.**
14 Q.  So this helps refresh your recollection of a
15     discussion about Phil's peak flow comment.  You had
16     already discussed the rape issue with the date in
17     order to get him to slow down, and then you mentioned
18     the George Zimmerman earlier as well; right?
19 A.  **Correct.**
20 Q.  And do you recall anything else before we get to the
21     subject matter of the alleged assault?
22 A.  **Prior to the assault I don't -- at this time I don't**
23     **recall any other topics.**
24 Q.  How long were the three of you in the room together?
25 A.  **I don't know.**

Page 178

1  Q.  Like ten minutes?  Five minutes?  Half hour?  Any
2      recollections at all?
3  A.  **We were kind of in and out of the room I'd say for the**
4      **majority of the morning.  I don't -- I don't know how**
5      **to answer that.**
6  Q.  Well, you weren't working in 3 East.
7  A.  **Okay.  Correct.**
8  Q.  So why would you be in and out of the room?
9  A.  **Because we were kind of using that as a home base.**
10     **Ms. Luca didn't work 3 East either.**
11 Q.  Right.  But if I -- according to my records, you were
12     in 9 North, so --
13 A.  **Okay.**
14 Q.  -- that's a hike to get over to 3 East, isn't it?
15 A.  **I mean, it's a different tower.**
16 Q.  Right.
17 A.  **Okay.**
18 Q.  So you go down an elevator, walk over to another
19     elevator bank, and go back up; right?
20 A.  **No.  Go down an elevator and over, over to the next**
21     **tower.**
22 Q.  And then back up?
23 A.  **Why back up?**
24 Q.  That's what I'm asking you.
25 A.  **I don't understand.**

Page 179

1  Q.  So you can go down North to 3 and then walk from
2      3 North to 3 East without having to go to the ground
3      floor?
4  A.  **To be honest, I don't recall if you can actually get**
5      **through to North Tower from 3.  I don't know.  I don't**
6      **know what route I took.**
7  Q.  How long would it take you to get from 9 North to
8      3 East utility room?
9  A.  **Minutes.**
10 Q.  How many minutes?
11 A.  **I don't know.  I've never timed it.**
12 Q.  But you think you were in and out of the room several
13     times that morning?
14 A.  **Yes.**
15 Q.  So were these conversations here as it relates to
16     Phil's peak flow, claiming rape, George Zimmerman, and
17     the nipple all at different times?
18 A.  **I believe they were all at the same time, but I don't**
19     **honestly -- I don't recall.**
20 Q.  You said to Net that you "made a comment, might be
21     inappropriate, but we, you know how we talk on nights,
22     we're a little loose."  And you said, "Well, I said,
23     I'm like, 'it's cold, I'm freezing.  You can see my
24     nips through my bra,' you know . . ."  Is that -- do
25     you recall saying that to Rachel and Colleen?

Page 180

1  A.  **Yes.**
2  Q.  Why were you bringing that topic up with them?
3  A.  **I don't know who, but somebody had asked why I would**
4      **be wearing a PPE gown.**
5  Q.  You didn't state that in your conversation with Net,
6      did you?
7  A.  **According to the transcript, no.**
8  Q.  You say, ". . . you know, and I was like, and I got a
9      good girl."  What is a good girl?
10 A.  **I'm sorry.  Where?**
11 Q.  Yeah.  I'm on the three -- Page 2.  It's the
12     three-minute 22 mark.  The conversation picks up a few
13     lines down.  You said, "Some things are a little bit
14     of a blur . . .  We were sitting together . . .  I
15     always have a hoodie.  I'm . . . cold.  So I have one
16     of those" --
17 A.  **Yes.**
18 Q.  -- "one of the yellow gowns . . ."  All right?  And
19     then we talked about the comment about your nips
20     showing through your bra, and it goes on to say,
21     ". . . you know, I was like, and I got a good girl."
22     Do you see that?  Ninth line down.  Fourth line up
23     from the bottom.
24 A.  **I believe that is a transcription error.**
25 Q.  Oh, okay.

GARCIA, KRISTINA
02/04/2020                                                                Pages 181–184

Page 181

1   A.   But can I point out I did mention to Ms. Carroll I was
2        wearing the PPE gown.  That is what I was referring to
3        as yellow gowns.
4   Q.   Right.  I got that.
5   A.   Oh, okay.
6   Q.   So what -- you're saying good girl is -- is a mistype?
7   A.   Yes.
8   Q.   Any idea what that's supposed to say?
9   A.   I would need to listen to the audio, but I believe it
10       was referring to the fact that I had a good bra.
11  Q.   Ah.
12  A.   I might --
13  Q.   Do you recall telling them that?
14  A.   I said something along the lines of I -- I don't know
15       if I said I had a good bra or a good one referring to
16       a bra.
17  Q.   In your August 8th statement, which is Exhibit --
18       excuse me, Exhibit 5, you say you have a really good
19       insulated bra, so you were surprised.
20  A.   Yes.
21  Q.   Meaning you were surprised that your nipples were
22       showing through the bra?
23  A.   Correct.
24  Q.   Okay.  What -- what kind of bra were you wearing that
25       night?

Page 182

1   A.   A Lane Bryant bra.
2   Q.   I'm sorry?
3   A.   A Lane Bryant bra.
4   Q.   Is there a particular style?  And I apologize for
5        getting personal, but I think this is important.  Is
6        there a particular brand -- well, the brand is Lane
7        Bryant; right?
8   A.   The store is Lane Bryant.
9   Q.   What's the brand?
10  A.   I don't know.
11  Q.   Do you know what style it was if there's a way to
12       describe that?
13  A.   I don't -- I believe it's called a Balconette.
14  Q.   Can you spell it?
15  A.   B-A-L-C-O-N-E-T-T-E.  That's generally the bra I
16       prefer.
17  Q.   This is the kind you would normally where when
18       working?
19  A.   Yes.
20  Q.   How -- how is it cut?  Is it low cut, high cut?
21  A.   It's considered a full coverage, but it doesn't cover
22       the cleavage part.  You could -- if I was not wearing
23       a shirt, you could see the mid portion here.
24  Q.   And you're saying that the scrub you had on with the V
25       neck would be just above that, above the bra, or does

Page 183

1        it show the bra?
2   A.   No.  It doesn't show the bra.
3   Q.   Now, you say you then pulled your strap to show them
4        the regular bra that you had on?
5   A.   When they -- when I said I had a good bra, Colleen and
6        Rachel said, "Do you have one of these?"  And they
7        each tugged their strap to show the strap.  And I
8        said, "No.  I have this."  And I did this, just like
9        they did.
10  Q.   All right.  And then there was some discussion about
11       their sports or combo bra?
12  A.   They were both bragging about how they loved their
13       bra, it was some type of a sports bra, regular bra
14       combo.  I don't recall what else they said.
15  Q.   All right.  What was said next or what happened next?
16  A.   While I did this and had my -- my bra strap out,
17       Ms. Luca had came from where she was next to me and
18       put her hand down my shirt.
19  Q.   You were showing a moment ago that you pulled the left
20       bra strap out with your right hand?
21  A.   Yes.
22  Q.   That's what happened that night?
23  A.   Yes.
24  Q.   And you're saying while you were doing that Ms. Luca
25       had gotten up and walked around to where?

Page 184

1   A.   She got up from where she was sitting and she came
2        next to me and stuck --
3   Q.   Right next to you or behind you or where was she
4        standing?
5   A.   Kind of here.
6   Q.   Okay.  And then she stuck her hand down your shirt?
7   A.   Yes.
8   Q.   Which hand?
9   A.   I believe her right hand.
10  Q.   Then what happened?
11  A.   She pinched my nipple and lifted up.
12  Q.   So she got inside your -- not only inside your shirt
13       but inside your bra?
14  A.   Correct.
15  Q.   How does that happen?
16            MS. WARD:  Objection.  Vagueness.
17  A.   How does it happen?
18  BY MR. PELTON:
19  Q.   Is it loose?  Do you have a loose fitting bra?
20  A.   I mean, there's no strap or anything here protecting.
21       It's --
22  Q.   So just slide -- her hand just slid in?
23  A.   She put her hand down my shirt.
24  Q.   Did you react?
25  A.   Yes.  I was shocked, and I think I like -- because I

GARCIA, KRISTINA
02/04/2020

<div style="columns:2">

Page 185

1  was like this and did not even notice her going from
2  where she was to next to me until she had her hand
3  down my shirt.
4  Q.  When you pulled your bra strap out, did she go over
5      your hand or under it?
6  A.  I don't recall.
7  Q.  Did she -- you say she -- so she reached in and you
8      said she pinched your nipple?
9  A.  She pinched my nipple and lifted up.
10 Q.  And so she lifted your breast out of the bra cup?
11 A.  Yes.
12 Q.  That's your testimony?
13 A.  Yes.
14 Q.  What did you do?
15 A.  I instantly became pissed off.  I -- I got like rigid
16     and I stood up and -- or I don't know if I stood or --
17     I was in the chair, but I know I like -- I went from
18     this to like -- like that, like got rigid, and I said,
19     "Now, that was too fucking far."
20 Q.  Did you grab her hand?
21 A.  No.
22 Q.  Did you get up and confront her?
23 A.  She was right there.
24 Q.  Did you get up and confront her?
25 A.  I don't recall if I -- this was standing or sitting.

Page 186

1      I believe I was sitting.
2  Q.  So you just sat there?
3  A.  I don't recall --
4  Q.  So --
5  A.  -- if I stood or not.
6  Q.  I apologize.
7          MS. WARD:  Let her finish her answer.
8  BY MR. PELTON:
9  Q.  Yep.  And you said, "That's too fucking far?"
10 A.  Yes.
11 Q.  Then what was said?
12 A.  I don't recall in exactly what order, but I remember
13     her saying, "Oh, I'm sorry.  Did I offend you?"
14         And I said, "You didn't offend me.  You
15     pissed me off," or something along those lines.  And I
16     said something along the lines of "What did you do
17     that?"  Like what -- why -- like what just -- kind of
18     like trying to figure out what happened.  Like why did
19     you just do that?  Where did that come from?
20         And she was -- she was just acting strange,
21     and I think -- I think I shouted out -- not shouted,
22     but I said a couple things in a row, like, "What are
23     you doing?  Why would you do that?  Like were you
24     trying to see my nipple?  What -- what would kind
25     of -- why would you want to lift my breast up?"

Page 187

1          And she had made a comment trying to turn
2      it into a joke saying, "Oh, I just wanted to see" --
3      what did she say?  I think I asked her if she wanted
4      to see my nipple, was that what she was going for, and
5      she goes, "Well, you have nice nipples, he he,"
6      like to try and smooth it over.  It was -- yeah.
7      Yeah.
8  Q.  Did you indicate to Ms. Carroll that she had said --
9      or giggled, he he he, I just -- you have nice nipples?
10 A.  I don't recall.
11         MS. WARD:  Can she review that whole thing
12     for a minute?
13         MR. PELTON:  Sure.
14         MS. WARD:  Because . . .
15 A.  Okay.  What was your question?  I'm sorry.
16 BY MR. PELTON:
17 Q.  Did you relate to Ms. Carroll that she had giggled and
18     said "You have nice nipples"?
19 A.  According to the transcript, I did not.
20 Q.  What happened next?  You said that there's this
21     conversation about her wanting to see -- or
22     questioning whether she wanted to see your nipples.
23     She said, "You have nice nipples" and tried to smooth
24     it over.  What -- what do you recall being said next?
25 A.  I don't recall.  I was furious.

Page 188

1  Q.  Did you smack her?
2  A.  No.
3  Q.  Did you grab her hand?
4  A.  No.  I did not touch her.
5  Q.  Did you walk out?
6  A.  No.
7  Q.  Did you call security?
8  A.  No.
9  Q.  Did you tell anyone?
10 A.  Tell anyone at what point?
11 Q.  Right then.
12 A.  No.
13 Q.  Did you walk out of there and say what happened?
14 A.  No.
15 Q.  Did you go to supervision?
16 A.  There was no supervisors at the time of the incident.
17     We had a charge therapist.
18 Q.  Do you have a night phone you can call someone if
19     there's an incident?
20 A.  We all have phones.
21 Q.  You could call someone if there's an incident?
22 A.  Correct.
23 Q.  You didn't do that?
24 A.  I did not.
25 Q.  And you don't recall anything else being said?

</div>

Page 189

1  A.  I mean, this is over a year later.  I don't recall.
2  Q.  I understand.  You've taken a lot of notes and created
3      a timeline, so you've had a lot that you've reviewed,
4      right, to prepare for today?
5  A.  Okay.
6  Q.  Right?
7  A.  That's why I wrote stuff down because I knew in two
8      years, five years I'm not going to remember.
9  Q.  Sure.  So in preparing for the deposition and thinking
10     this through, you still can't recall what more was
11     said in -- at this time between the three of you?
12 A.  No.
13 Q.  Do you recall Ms. Kaye saying anything?
14 A.  I know she called Rachel, "Oh, you're crazy." I don't
15     recall if it was right at that moment.  That could
16     have been later.  I probably mentioned in here.
17 Q.  How much longer did the three of you stay in the room
18     and chat?
19 A.  I don't recall.
20 Q.  You didn't just walk right out?
21 A.  I did not.
22 Q.  Did you mention anything to Ms. Kaye later on, like
23     can you believe what just happened or, you know,
24     anything like that?
25 A.  No.  I don't believe so.

Page 190

1  Q.  You said to her, at least according to what you told
2      Ms. Carroll, you said to Ms. Luca, "You didn't offend
3      me?  You just pissed me off."  Right?
4  A.  Correct.
5  Q.  What did you mean by that statement?
6  A.  Offend is a term that I don't use often, and I think
7      it's beyond offensive to put your hand under someone
8      else's clothing.  She went beyond offending me.  She
9      pissed me off by touching me.
10 Q.  Okay.  What did you do about it?
11         MS. WARD:  I'm going to object on the basis
12     of vagueness.  But go ahead.
13 A.  What do you mean exactly what did I do about it?  What
14     did I do to --
15 BY MR. PELTON:
16 Q.  You were offended and pissed off or beyond offended
17     and pissed off.  What did you do about it?
18 A.  At that moment?
19 Q.  Yes.
20 A.  We just moved on.
21 Q.  And then in the hours that followed between then and
22     the rest of the shift did you do anything about it?
23 A.  No.  I didn't do anything about it.  I -- I did vent
24     to Tonirose about what happened.  I do recall that.
25 Q.  That evening or that -- excuse me, that morning?

Page 191

1  A.  Morning.  Yes.
2  Q.  Same shift?
3  A.  Same shift.
4  Q.  All right.  What did you tell Tonirose?
5  A.  I don't recall exactly.
6  Q.  But you told her that Ms. Luca had touched you
7      inappropriately?
8  A.  I did.
9  Q.  What did Ms. Cudilla say?
10 A.  I don't recall.
11 Q.  Did you tell anyone else between the time it occurred
12     and the end of the shift?
13 A.  Not that I recall.
14 Q.  Do you recall when you left your shift?
15 A.  Approximately 7:15 is when we clock out.  I don't
16     recall what time I punched out that day.
17 Q.  You also texted Ms. Cory -- Cary -- Sherry Cary?
18 A.  Stacy Cary.
19 Q.  Sorry.  Stacy Cary?
20 A.  Yes.
21 Q.  Right.  And that was Exhibit 9, the texts between the
22     two of you.  Was that while you were on your shift
23     still?
24 A.  Okay.  Which page are you referring to?
25 Q.  It's Exhibit 9, second page.  It says, "Why are you

Page 192

1      texting me the word nipple I mean it's kind of a fair
2      question."  And you respond, "She pulled her tit out of
3      my bra to see my nipple."
4  A.  Correct.  That --
5  Q.  And you said you didn't recall if it was still in the
6      room, and now I'm asking you if it was during the rest
7      of your shift.
8  A.  I'm sure it was.
9  Q.  All right.  And then you called her on the way home?
10 A.  I probably did.
11 Q.  Did you tell her what happened?
12 A.  I did.
13 Q.  Now, I noticed here in the text you don't say she
14     pinched your nipple.  You say she pulled your breast
15     out of your bra to see your nipple.
16 A.  I didn't elaborate on how she pulled my breast out of
17     my bra.
18 Q.  But you stated the purpose of her doing that was to
19     see your nipple?
20 A.  I questioned if that was why she did what she did.
21 Q.  You state -- made a statement to Ms. Cary that that's
22     why she did what she did; right?
23         MS. WARD:  I'm going to object to your
24     characterization of the text.
25         MR. PELTON:  Even if she agrees with me?

Page 193

1    It's just a question.
2         MS. WARD:  Well, you're mischaracterizing
3    what she said.  Go ahead.
4         MR. PELTON:  I'm not.  She can tell me if
5    I'm mischaracterizing, not you.
6         MS. WARD:  For the record, same objection.
7    Go ahead.
8         MR. PELTON:  It's an improper objection.
9  BY MR. PELTON:
10  Q.  Go ahead.
11  A.  I texted small amount of words or phrases to elaborate
12      on later.
13  Q.  You agree what you told her in your text was that
14      Ms. Luca pulled your breast out of your bra to see
15      your nipple; right?
16  A.  That is what I texted.
17  Q.  And you did not text her that she had pinched your
18      nipple; correct?
19  A.  Not -- no.  I did not.
20  Q.  Do you recall if you told Ms. Tonirose Cudilla that
21      she had pinched your nipple or simply instead pulled
22      your breast out of your bra to see your nipple?
23  A.  I don't recall which phrase I used.
24         MS. WARD:  Is this an appropriate time to
25      take a bathroom break?  It's been about an hour and a

Page 194

1    half.
2         MR. PELTON:  Sure.  If we need to.
3         MS. WARD:  Or maybe less than that.
4         MR. PELTON:  It doesn't matter how long
5    it's been.  If we need a break, by all means let's
6    take a break.
7         MS. WARD:  Well, we've had lunch and got
8    some coffee.  Is that all right?
9         MR. PELTON:  I understand.  Please.
10        MS. WARD:  I don't want to break up your
11   flow.
12        MR. PELTON:  No, no.  You're fine.  Let's
13   take a break.
14        VIDEO TECHNICIAN:  Off the record at
15   2:14 p.m.
16       (Recess taken at 2:14 p.m.)
17       (Back on the record at 2:20 p.m.)
18        VIDEO TECHNICIAN:  We are back on the
19   record at 2:20 p.m.
20  BY MR. PELTON:
21  Q.  Your -- the transcript of your conversation with
22      Ms. Carroll also references a discussion about vaginas
23      that same night?
24  A.  Correct.
25  Q.  Or morning.  When did that occur in relation to the

Page 195

1    alleged touching?
2  A.  After the incident.
3  Q.  How far after?
4  A.  I don't recall.
5  Q.  Were you still in the room?
6  A.  We were in the room.  I don't recall.  There might
7      have been time -- a time where one or all of us were
8      out of the room and we kind of reconvened.  I don't
9      recall.
10  Q.  Did you go back to your work assignment?
11  A.  I may have.
12  Q.  Are you able to estimate how much later it was that
13      there was this conversation about vaginas?
14  A.  No.
15  Q.  What do you recall being discussed?
16  A.  With the conversation about beautiful vaginas?
17  Q.  Yes.
18  A.  I don't know.  I don't recall how it started.  But
19      Rachel begun Googling nasty terms for infected vaginas
20      and would take her phone and point it toward me with
21      the screen showing toward me and say, "So this is what
22      you like?  This is what you're into?"
23  Q.  Who else was present?
24  A.  Ms. Colleen Kaye was present and Ms. Tonirose Cudilla
25      was present for that conversation.

Page 196

1  Q.  What about an Elaine?
2  A.  Who?
3  Q.  Elaine?
4  A.  Oh.  She was not present.  Ms. Luca had -- somewhere
5      in the beginning of the conversation Ms. Luca had
6      mentioned Elaine and I guess a conversation that had
7      taken place between those two about how vaginas change
8      after you give birth, and Rachel -- or Ms. Luca was I
9      guess bragging saying that even after all her kids
10     hers was -- her vagina was still beautiful, it did not
11     change after she gave birth to all her kids.
12  Q.  You're saying that Rachel Luca was relating a prior
13      conversation she'd had with Elaine about vaginas after
14      childbirth?
15  A.  She was talking about, yes, a conversation she had
16      with Elaine about that topic.
17  Q.  And that she had told Elaine that even after five kids
18      hers was beautiful?
19  A.  I believe she was telling us that.  I don't know if
20      that's what she said to Elaine.
21  Q.  I see.  So the conversation started, best you recall,
22      with her relating this conversation with Elaine?
23  A.  The best I recall, it was her talking about the
24      conversation with Elaine and then it turned into her
25      Googling vaginas and then was directed toward me.

GARCIA, KRISTINA
02/04/2020                                                                      Pages 197–200

1   Q.   Why were you still talking to her at this point?
2   A.   I don't know.  I wasn't actually talking to her.  She
3        was talking to everybody else.
4   Q.   But why not leave?  I mean, you know, sounds like a
5        crazy Rachel where she's about to launch into another
6        thing about sexual body parts.  Why not leave?
7   A.   I was, in my mind, standing my ground and not going to
8        allow Ms. Luca to, I don't know, chase me away or make
9        me feel I'm unwanted there or -- I don't know how to
10       explain it.  I was just kind of standing my ground.
11  Q.   What did you say to her about the pictures?
12  A.   When she started directing that conversation toward me
13       and was pointing pictures in my direction and asking
14       me, you know, "Is this what you like?  Is this what
15       you're into?" I recall saying something along the
16       lines of, "Are you serious right now?  You're asking
17       me this question?"  And I know I had made a statement
18       or a comment or whatever you call it and I had told
19       her, "If you look up infected dicks, you will find
20       that as well.  So what are you really asking me right
21       now?"
22  Q.   What did she say?
23  A.   I don't recall.
24  Q.   What did Ms. Cudilla say?
25  A.   Tonirose did not say much in the conversation that I

1        can recall.
2   Q.   How about Ms. Kaye?  Do you recall her saying
3        anything?
4   A.   Ms. Kaye had made comments saying, "Oh, Rachel,"
5        like -- kind of like "Knock it off.  What are you
6        doing?  What are you talking about right now?"
7   Q.   Did anyone encourage her, I mean, like egg her on, if
8        you will?
9   A.   I don't believe either of those two said anything to
10       continue the conversation --
11  Q.   Right.
12  A.   -- or make it go further.
13  Q.   Sounds like in the case of Ms. Kaye she was trying to
14       slow her down?
15  A.   Ms. Kaye kind of didn't add input to it from what I
16       remember.
17  Q.   Well, you said she made a comment to the effect of
18       like knock it off?
19  A.   Well, like what are we talking about right now?  Like
20       where is this going kind of?
21  Q.   No place good it sounds like.  Right?
22  A.   I wouldn't say so.
23  Q.   Okay.  Anyone else part of that conversation or
24       witness it that you know of?
25  A.   Witnessed it, no.  I don't recall what, if anything,

1        either of those two said during the conversation.
2   Q.   You also said that she at that point of saying that
3        even after five kids her vag is beautiful that she
4        started to take her pants down?
5   A.   Ms. Luca did insinuate she was going to show us to --
6        I -- I guess prove to us that she was, in fact, still
7        beautiful.
8   Q.   Did you walk away at that point?
9   A.   At that point right when she was like grabbing her
10       waistband, I know I turned my head, I turned, and I
11       don't recall what I said.  I think I stated in here
12       something like what are you doing or I don't know.
13       Like I made a comment.  I know Colleen said something
14       along the lines of "Rachel, you're crazy.  What are
15       you doing?  Like knock it off."  I -- Tonirose said
16       like, "Oh, my God, Rachel," like . . .  And then it
17       was very -- like within I'd say a minute after that
18       Tonirose and I both got up and walked out.
19  Q.   You were still in that 3 East room?
20  A.   That was in the 3 East room.  Correct.
21  Q.   What did you -- so she didn't pull her pants down, and
22       then what was discussed for the remaining minute or so
23       that you were still there?
24  A.   I don't know if Ms. Luca pulled her pants down.  I
25       turned my head.  When I was turning my head, it looked

1        as if the other two in attendance were doing the same,
2        and then I believe it was less than a minute, like I
3        stood up, Tonirose stood up, I don't know who stood up
4        first, and then we just, all right, bye.
5   Q.   Were you still pissed?
6   A.   Was I still pissed about being grabbed?
7   Q.   Yeah.
8   A.   Yeah.  I'm still pissed today.
9   Q.   How long were you in the room together in total do you
10       think that morning?
11  A.   I have no idea.
12  Q.   So at this point the people that know about the
13       incident you're describing are Luca, Kaye, Cudilla
14       because you told her --
15  A.   Correct.
16  Q.   -- and your friend Stacy?  And I apologize.  What's
17       Stacy's last name?
18  A.   Cary.
19  Q.   Stacy Cary because you texted and then followed up
20       with a phone call?
21  A.   Correct.
22  Q.   Anyone else aware at this point of the incident?
23  A.   Not to my knowledge that -- nobody else from my end
24       that I can recall.
25  Q.   Do you know if Ms. Cudilla told anyone else?

GARCIA, KRISTINA
02/04/2020                                                                    Pages 201–204

Page 201

1   A.   I do not know.
2   Q.   Do you know if Ms. Kaye told anyone else?
3   A.   I do not know.
4   Q.   And you would agree it's a pretty extraordinary
5        incident in the workplace; right?
6   A.   Yeah.  It's not common I hope.
7   Q.   One would hope.  I think we established earlier that
8        the discussion you had with Ms. Carroll here in
9        Exhibit 7, the transcript, occurred on August 6th?
10  A.   Okay.  Yes.
11  Q.   So it was a week afterward, after the incident?
12  A.   Yes.
13  Q.   Why did you choose to report it to her at that time?
14  A.   I had time to process what happened, and I thought
15       about I guess my options and what -- what I wanted to
16       happen like as a consequence of this, and I thought
17       about who to go to.  Most importantly, I would say my
18       delay in going to my supervisor was I believe I was
19       off all week, because our supervisors work Monday
20       through Friday, and I generally work Friday, Saturday,
21       Sunday, and my dog is the very most important thing in
22       my life and she was having surgery for cancer.  She
23       was having a mass removed.  And I can't remember if it
24       was that Monday morning or Tuesday that she was having
25       surgery, but my focus was on her.

Page 202

1   Q.   Sure.  Did you have any other interactions with
2        Ms. Luca -- excuse me.  Did you have any interactions
3        with Ms. Luca between -- let me rephrase that.
4             Did you have any interactions with Ms. Luca
5        between the end of your shift on July 30th and Monday,
6        August 6th when you spoke to Ms. Carroll?
7   A.   I do not believe so.
8   Q.   Did you work together during that time frame?
9   A.   I don't recall what the next days that I worked was.
10       I believe it was Friday, Saturday, Sunday, but I could
11       be incorrect.
12  Q.   You don't have a specific memory of working with
13       Ms. Luca during that week?
14  A.   I do not.
15  Q.   You have no specific memory of running into her during
16       that week even if you were in different locations?
17  A.   I don't recall off the top of my head, no.
18  Q.   You never stopped to call her or sought her out to
19       confront her about what had happened?
20  A.   I did not.
21  Q.   You said, then, during this week period sounds, like
22       some other things were going on in your life, but you
23       said you were assessing your options.  What options
24       did you consider?
25  A.   I considered going to HR.  I considered going to one

Page 203

1        of my supervisors.  I considered which supervisor to
2        go to.
3   Q.   Any other options come to mind?
4   A.   No.
5   Q.   Did you consider going to security?
6   A.   No, I did not.
7   Q.   Did you consider going to the police department?
8   A.   No.  I didn't think that was an option.
9   Q.   Why?
10  A.   Because when things happen on our campus, it's taken
11       care of on our campus.  For instance, if I call 911 on
12       my phone, they're going to -- it's going to go to our
13       security.  So you don't call the police.  You call our
14       security.
15  Q.   But during the week you could have gone down to the
16       police station and filed a complaint?
17  A.   I didn't consider that as an option.
18  Q.   It didn't occur to you you could do that because
19       security on campus normally handles it?  Is that what
20       you're saying?
21  A.   I -- if I was going to go to like law enforcement, I
22       assumed it would need to be our security.
23  Q.   And that's something you didn't consider doing?
24  A.   No, I didn't.
25  Q.   Why not?

Page 204

1   A.   I didn't see a purpose.
2   Q.   You ended up going to supervision rather than HR?
3   A.   I did.
4   Q.   Why?
5   A.   I did not want to be the cause of Ms. Luca losing her
6        job.  I -- that was not my intention with reporting
7        the incident.  And I thought if I went to HR they may
8        fire her.  I would assume they would fire somebody for
9        doing something like that.  And I kind of wanted to be
10       nice and get her to face consequences without them
11       being severe I suppose you could say.
12  Q.   Any other reason you didn't go to HR?
13  A.   No.
14  Q.   All right.  You just didn't want her fired and you
15       thought that might happen?
16  A.   My goal was not to get her fired.  My goal was to get
17       her to stop, and I figured going to my supervisor was
18       probably the -- the first step in like the chain of
19       command.
20  Q.   Why didn't you want her to get fired, Ms. Luca?
21  A.   I -- I don't want to see anyone go through unnecessary
22       hardships.  When Ms. Luca and I were civil to each
23       other and spoke about personal things, families, what
24       have you, I kind of know her situation.  She plays up
25       her situation to make sure everyone's aware of her

GARCIA, KRISTINA
02/04/2020

Pages 205–208

1    family situation, which does tend to make people feel
2    bad for her.  And I never wanted to get her fired.  I
3    wanted her to face consequences.
4  Q.  Did you feel bad for her?
5  A.  In what sense?
6  Q.  The sense you were just describing.
7  A.  There was a time I felt bad for her in her personal
8    situation, her personal life.
9  Q.  Sounds like some of it might have been of her own
10    making?
11  A.  Definitely.
12  Q.  Poor choices?
13  A.  Some things.
14  Q.  Think she made a poor choice in touching you as you've
15    alleged?
16  A.  I think she made a very poor choice in touching me.
17  Q.  Did you have any further discussion with Ms. Kaye
18    about this incident?
19  A.  I do not believe Ms. Kaye and I have ever spoke of
20    this incident.
21  Q.  So in the two years or whatever it is since it's
22    occurred, year and a half, you've had no discussion
23    with Ms. Kaye about the incident?
24  A.  No.
25  Q.  Did you have any further discussion with Ms. Cudilla

1    after the morning of the incident?
2  A.  Not that I recall.
3  Q.  Have you spoken to her about your lawsuit?
4  A.  Who?
5  Q.  Ms. Cudilla.
6  A.  No.
7  Q.  What did you ask -- well, you said you -- also part of
8    your options you considered was which supervisor to go
9    to.  How did you end up deciding to go to Ms. Carroll?
10  A.  The remaining supervisors were men, and I felt more
11    comfortable going to Ms. Carroll as a woman.  I
12    certainly did not want to approach Steve Hamick
13    considering previous comments he's made.  And
14    Ms. Carroll for the most part I feel runs our
15    department, and even though all our supervisors are
16    equal, I feel she's the strength of the leadership
17    team.
18  Q.  And you would agree you had a good relationship with
19    her up to that time?
20  A.  It was fine.
21  Q.  So you chose her to go to; right?  And you would catch
22    her then when she came in so that -- your shift ends
23    early morning hours and hers starts early morning
24    hours?
25  A.  Correct.  Once she went to day shift, yes.

1  Q.  So it would have been early morning hours on this
2    August 6th that you met with her?
3  A.  I believe it was at the end of my shift and the
4    beginning of hers.
5  Q.  In going to Ms. Carroll what did you want to see
6    happen?
7  A.  I didn't have any goal in mind.  I wanted Ms. Luca to
8    stop.  I did not want it to -- I didn't want anything
9    like her grabbing me to happen again.  And since it
10    had escalated to that point where prior to that it was
11    just comments, once that line was crossed, I mean, I
12    didn't want it to go any further or continue in the
13    manner it was.
14  Q.  Do you recall telling her you didn't want to be paired
15    with her again?
16  A.  I did mention it in that initial conversation that I
17    didn't want to be alone with her at all.
18  Q.  Do you recall telling her you didn't want to be paired
19    with her again?
20  A.  I know I did.  If it was -- I'd have to refer to the
21    transcript to see if I had said it on this specific
22    date.
23  Q.  Why don't you turn to Exhibit 5, which is your
24    August 8th statement.
25  A.  Okay.

1  Q.  Turn to the second page of that statement.  And you
2    state, "I wanted this documented and I expressed to
3    Net that I was not comfortable being alone with her,"
4    meaning Ms. Luca; right?  Not Ms. Carroll.
5  A.  Correct.
6  Q.  Okay.  ". . . so we would not be paired together in an
7    ICU where we could possibly be alone in our supply
8    room where we do a lot of our charting"; right?
9  A.  Correct.
10  Q.  So that was part of your purpose in reporting this to
11    Ms. Carroll?
12  A.  Correct.
13  Q.  So you wanted it to stop.  You didn't want to be
14    paired with her again.  Do you recall anything else
15    you might have requested of Ms. Carroll?
16  A.  At that time?
17  Q.  Yes.
18  A.  We could refer to the transcript if I did request
19    anything else.
20  Q.  You're not recalling it if -- independent of the
21    transcript?
22  A.  Not at this moment.
23  Q.  All right.  And you did request that it not go to HR;
24    right?
25  A.  I don't recall how I phrased it, but I did express to

GARCIA, KRISTINA
02/04/2020

Pages 209–212

Page 209

1     Ms. Carroll that I didn't go to HR, that I went to her
2     because I was not trying to get Ms. Luca fired.
3  Q.  Do you also recall telling her, this is 9:51 of the
4     transcript on Page 5, "I'm not even trying to get her
5     in trouble"; right?
6  A.  I did.
7  Q.  All right.  So you're not trying to get her fired.
8     You're not trying to get her in trouble.  You wanted
9     it documented in some way; right?
10  A.  I said that.
11  Q.  Next page.  You -- top.  You said you're not afraid of
12     her; right?
13  A.  I said that.
14  Q.  And you said further down at 10:43 you just wanted
15     Ms. Carroll to know so if there were any further
16     incidents that happened; right?
17  A.  I'm not sure exactly what you're looking at, but yes,
18     I did say that.  Oh.  10:43.  Yes.
19  Q.  Then down at 11:30 on the same page you say, ". . . if
20     I go to HR, I feel like they'll take it out of my
21     hands and say, Oh, have to do something"; right?
22  A.  I did.
23  Q.  So you're suggesting to her you didn't want it to go
24     to HR?  Do you agree with that?
25  A.  I did, yes.

Page 210

1  Q.  On Page 8 at 13:31 you say, "I thank God, she did that
2     in front of Colleen"; right?
3  A.  Yes.
4  Q.  And that's because there was a witness; correct?
5  A.  Correct.
6  Q.  You understood, then, that Ms. Carroll was going to
7     investigate?
8  A.  Yes.
9  Q.  And she told you -- she told you that she would be as
10     discreet as possible; right?
11  A.  I'm sure she did.
12  Q.  And that was okay with you?
13  A.  That she investigated?  Yes.
14  Q.  And that she would be discreet about it?
15  A.  I would assume she would, yes.
16  Q.  Well, that's what you wanted; right?
17  A.  Yes.  It's no one's business really.
18  Q.  Did you tell her that you had spoken to Ms. Cary about
19     the incident?
20  A.  I believe I did.
21  Q.  Is that somewhere in the transcript, if you recall?
22  A.  It must be.  Oh.  Yes.  Page 8.  13:49 I mentioned
23     Stacy.
24  Q.  All right.  Do you know what Ms. Carroll did to
25     investigate?

Page 211

1  A.  When I turned in my written statement to her, she did
2     inform me that she had spoke to others.
3  Q.  You turned it in on August 8th?
4  A.  That sounds correct.
5  Q.  And that's Exhibit 5; right?
6  A.  Yes.
7  Q.  She requested that you provide her with a written
8     statement; is that right?
9  A.  That's correct.
10  Q.  Who wrote this document?
11  A.  Exhibit 5?
12  Q.  Yes.
13  A.  I did.
14  Q.  Is there a reason you did not include in this written
15     statement the incident with the discussion around the
16     vagina?
17  A.  I wasn't indicated to include that.
18  Q.  You what?
19  A.  I was not -- it wasn't indicated to me to include
20     that.  I was writing up the statement regarding the
21     incident with the nipple.
22  Q.  Well, did Ms. Carroll put some limitation on what you
23     would provide to her?
24  A.  No.  She did not put limitation.  They were two
25     separate incidents in my mind.

Page 212

1  Q.  So did you complain to her about the vagina incident?
2  A.  I believe I did.
3  Q.  You brought it to her attention.  Were you complaining
4     about it?
5  A.  If I brought it to her attention during the complaint
6     I was.
7  Q.  Then why not include it in your written statement?
8         MS. WARD:  Objection.  Asked and answered.
9     Go ahead.
10  A.  Because I felt it was a separate incident and I
11     don't -- I was asked to write a statement and I
12     believed it to be over the nipple incident.
13  BY MR. PELTON:
14  Q.  Did she tell you that specifically?
15  A.  I don't recall what she said specifically.  We could
16     refer to the transcript.
17  Q.  Please do.
18  A.  Okay.  In the --
19  Q.  Did she tell you specifically to write about the
20     nipple incident and not the vagina incident?
21  A.  Not that I see.
22  Q.  Okay.  By the way, was the entire conversation with
23     Ms. Carroll recorded?
24  A.  This is the entire conversation.
25  Q.  There was nothing that transpired after the end of the

GARCIA, KRISTINA
02/04/2020

Pages 213-216

Page 213

1    conversation at 23:33 on Page 14?
2 A.  No.  Because you can see where it says, "You can shut
3    the door."  And I said, "Leave it shut?"  And she
4    said, "Yes."  And I exited the room.
5 Q.  Did you have any further conversation with her before
6    turning in the statement?
7 A.  With Ms. Carroll?
8 Q.  Uh-huh.
9 A.  I can refer to my timeline.
10 Q.  Sure.  It's Exhibit 6.
11 A.  So between 8-6, August 6th, 2018, and my initial
12    complaint my next contact with Ms. Carroll that I
13    recall was August 8th, 2018, when I turned in the
14    written statement.
15 Q.  Do you know when you wrote this entry?
16 A.  Which entry?
17 Q.  The 8-8-18 entry.
18 A.  I do not.
19 Q.  Do you recall a specific conversation when you handed
20    her your statement?
21 A.  I do.
22 Q.  What do you recall?
23 A.  That is when Ms. Carroll informed me that she had
24    spoke to some people and she said she still had to
25    speak to, I don't recall if she said one or more

Page 214

1    people, regarding it.  That's all I recall.
2 Q.  All right.  Do you recall her telling you that none of
3    you had the same story about the incident?
4 A.  I recall her saying that.  I'm not sure if it was that
5    day.
6 Q.  Well, I'm just reading from your notes.
7 A.  Oh, yes.
8 Q.  Right?  I don't know what was said.
9 A.  Yes.
10 Q.  But it says no one's stories were the same.  In other
11    words, Ms. Kaye, Ms. Luca, and your story weren't the
12    same.  Is that what you meant to say here?
13 A.  Correct.
14 Q.  And that she told Luca not to talk about the incident
15    to anyone?
16 A.  She did.
17 Q.  And that she threatened to go to HR with it if -- if
18    Luca did?
19 A.  Correct.
20 Q.  And then it says there's a few more people she had to
21    talk to.  Did she say who?
22 A.  No.  She did not indicate.
23 Q.  Do you know who all she spoke to during her
24    investigation?
25 A.  There were rumors that went around the office as far

Page 215

1    as who she spoke to, but I don't know hundred percent
2    certain she -- I never asked Ms. Carroll and
3    Ms. Carroll never indicated to me everybody that she
4    spoke with.
5 Q.  All right.  Then she met with you again a few days
6    later to close out the investigation.  Do you recall
7    that?
8 A.  I don't recall.
9 Q.  All right.  You didn't note it if she did?
10 A.  We never had a discussion closing.  I don't know what
11    you mean by closing.
12 Q.  Well, telling you the results of her investigation.
13 A.  The only thing she said about her investigation that I
14    recall was her saying we didn't have the same stories.
15    She said -- she indicated that it was not to be
16    further talked about, and she indicated that, I don't
17    remember if she was referring to Ms. Luca or Ms. Luca
18    and Ms. Kaye, that no one should make me feel bad
19    about coming into the office and making the complaint.
20 Q.  Ms. Carroll told you that?
21 A.  Correct.
22 Q.  Do you know what she said specifically to Ms. Luca?
23 A.  No, I do not.
24 Q.  And at that point did you figure this was the end of
25    it?

Page 216

1 A.  I hoped it was the end of it.
2 Q.  And it had been handled how you had wanted it handled?
3 A.  I did not know if it had been handled the way I wanted
4    it to be handled.
5 Q.  Well, as far as you know she didn't go to HR with it;
6    right?
7 A.  I was more concerned over Rachel stopping.
8 Q.  As far as you know she spoke to Rachel about it?
9 A.  From my understanding she did.
10 Q.  Did you understand she had told her to knock it off,
11    there would be no -- no more conduct like this going
12    forward?
13 A.  That was my impression.
14 Q.  Is there anything more you would have had Ms. Carroll
15    do at this point?
16 A.  For Ms. Luca to understand the severity of it and for
17    there to be repercussions after thinking about it, I
18    would have appreciated her penalizing her in some way,
19    whether it was suspending her for a day or whatever
20    she felt fit, but it would have -- I think it would
21    have benefitted the entire situation for there --
22    there to be like an actual consequence.  I -- that's
23    not for me to determine.
24 Q.  Given that the only witness to the incident -- well,
25    let me -- are you aware of what Ms. Kaye told

GARCIA, KRISTINA
02/04/2020                                                                         Pages 217—220

Page 217

1   Ms. Carroll about the alleged incident?
2   A.   Now I am.
3   Q.   And if Ms. Kaye denied that a inappropriate touching
4        occurred, it leaves Ms. Carroll in a position where
5        you're saying one thing and two people are saying
6        something different; right?
7   A.   Ms. Kaye said something different than what happened,
8        yes.
9   Q.   So on what basis would Ms. Carroll be able to
10       discipline Ms. Luca?
11            MS. WARD:  I'm going to object if you're
12       asking for some kind of legal conclusion.  But you can
13       give your opinion.
14            MR. PELTON:  I'm not.  I'm following up on
15       her statement that Ms. Luca maybe could have been
16       disciplined.
17  A.   In Ms. Luca's statement, according to the EEOC files,
18       she -- she made different comments than what Ms. Kaye
19       did, so I think basing it on everything together, she
20       could have -- Ms. Carroll could have disciplined her
21       versus what I'm understanding you're saying is
22       basing -- you're expecting her to base it off of what
23       Ms. Kaye said alone, which did not corroborate our
24       stories.
25  BY MR. PELTON:

Page 218

1   Q.   I'm not saying anything.  I'm asking a question.  You
2        made a statement that you thought maybe Ms. Luca could
3        have been disciplined in some manner.
4   A.   I thought that would be better for the situation, yes.
5   Q.   And my question is if Ms. Luca and Ms. Kaye are
6        denying that a touching occurred, on what basis is
7        Ms. Carroll supposed to discipline Ms. Luca?
8            MS. WARD:  I'm going to object on the basis
9        of assuming facts not in evidence.  But go ahead.
10  A.   You're stating that Ms. Luca denied it.  However, in
11       her statement to the EEOC she did not deny that she
12       touched me.  We have different stories as to how I was
13       touched.
14  BY MR. PELTON:
15  Q.   What did she tell the EEOC?
16  A.   It's in her statement.
17  Q.   What did she tell the EEOC?
18  A.   She said something along the lines of touching my --
19       well, she made the statement, it wasn't to the EEOC,
20       she made the statement for Ms. Carroll about what her
21       impression of that night was.  Beaumont gave that
22       document, that email, whatever it was to the EEOC, and
23       in that document she said something along the lines of
24       admitting to touching my bra.
25  Q.   So she should be suspended or disciplined in some

Page 219

1        manner for touching your bra?
2            MS. WARD:  Objection.  You're
3        mischaracterizing what she said.  But go ahead.
4   BY MR. PELTON:
5   Q.   Is that what you're suggesting?
6   A.   I'm suggesting that I made a complaint and I expected
7        it to be taken seriously and I expected it to -- I
8        expected my words to be -- I don't know the term for
9        it.  I've never complained about anybody else.
10  Q.   So your words are gospel truth?  She's just supposed
11       to believe you?
12            MS. WARD:  I'm going to object to you
13       badgering the witness at this point.  She's given you
14       her answer.  Please move on.
15  BY MR. PELTON:
16  Q.   Did you expect her to take your words as gospel truth
17       despite what else she might have been told?
18  A.   I expected my words to be truth -- considered truth,
19       yes.
20  Q.   And that's the basis on which you believe Ms. Carroll
21       should have disciplined Ms. Luca?
22  A.   It's not out of character for Ms. Luca to do strange
23       things, so I did not feel that this was anything to
24       question on her character.  Therefore, I thought it
25       would be considered truth.  Understandably she has to

Page 220

1        look into it, but I do believe there was enough
2        provided to her that I would expect something to
3        happen.
4   Q.   Had she fully believed Ms. Luca and Ms. Kaye, I
5        suppose she could have disciplined you for lying to
6        her?  Did that ever occur to you?
7   A.   How?  I don't understand.
8   Q.   You've got two people saying you weren't touched.
9        You're saying you were touched.  She could have
10       concluded I suppose that you were the one lying.
11  A.   We have one person saying she touched me in a
12       different way than what I am saying she touched me.
13       Touched your bra.
14  A.   And we have another person saying there was no
15       touching at all.
16  Q.   Right.
17  A.   Like Ms. Carroll had stated, she -- according to her,
18       she got three different stories.
19  Q.   So it didn't occur to you that she could have
20       determined that you were the one lying?
21  A.   It did not occur to me because I am not lying.
22  Q.   All right.  After you met with her on -- well, let me
23       ask you when you met with Ms. Carroll on August 8th,
24       why didn't you record the conversation?
25  A.   I didn't anticipate having a conversation.  I was

GARCIA, KRISTINA
02/04/2020
Pages 221–224

Page 221

1  going to Beaumont for a class. I believe it was a
2  class. I was going to Beaumont for something. And I
3  was just turning in my statement.
4  Q.  So you didn't anticipate you would have any
5  conversation whatsoever?
6  A.  I did not even know if Ms. Carroll was necessarily in
7  the office when I was coming in. Sometimes she has
8  other things to do.
9  Q.  Do you recall meeting with Ms. Carroll on August 13th
10  to discuss her investigation?
11  A.  I do not.
12  Q.  And you didn't record any such conversation; correct?
13  A.  Not according to my timeline, no. I had three
14  conversations recorded.
15  Q.  Do you recall any other conversations with Ms. Carroll
16  about the August 29th -- excuse me, the July 30th
17  incident?
18  A.  I did speak with Ms. Carroll after my conversation
19  with Mr. Matthewson.
20  Q.  Okay. Any other conversation with Ms. Carroll that
21  you recall between August 8th and meeting with her
22  about Mr. Matthewson?
23  A.  Not that I recall.
24  Q.  Okay. You spoke to Mr. Matthewson according to your
25  recording on August 27th? Does that sound correct?

Page 222

1  A.  I don't recall the date off the top of my head. Oh.
2  August 27th according to my timeline.
3  (Marked EXHIBIT 10 at 3:03 p.m.)
4  BY MR. PELTON:
5  Q.  Do you recognize Exhibit 10?
6  A.  Yes.
7  Q.  This is your recording of a conversation with Phil
8  Matthewson?
9  A.  This is the transcript of the recording, yes.
10  Q.  This is on August 27 according to your timeline?
11  A.  Correct.
12  Q.  What prompted this recording?
13  A.  I had heard that Ms. Luca -- it got back to me that
14  Ms. Luca had said something to Phil Matthewson and
15  Mr. Matthewson had told other people that Ms. Luca had
16  talked to him about the incident, so I confronted him
17  with what -- to find out what she had said.
18  Q.  And you chose to record him?
19  A.  I did.
20  Q.  Because you knew he didn't really want to be involved?
21  A.  I assumed he wouldn't want to be involved.
22  Q.  He told you that once you'd recorded it, right, during
23  the recording?
24  A.  He expressed to me that he didn't want to be the only
25  one to go into the office and talk about it.

Page 223

1  Q.  What did Mr. Matthewson say to you that prompted this
2  conversation that you recorded?
3  A.  He didn't say anything to me regarding this. He had
4  told other people that Ms. Luca had told him about the
5  incident. That got back to me, and that's what
6  prompted me to have a conversation with him.
7  Q.  So you approached him, started the recording, and this
8  is what we have here?
9  A.  I asked him to meet me somewhere and I initiated the
10  recording of our conversation.
11  Q.  Where did you meet?
12  A.  In a -- I don't know what you call it. Like a break
13  room, a family -- it's not a respiratory specific
14  room. It's just a break room. Anyone could go in
15  there. Family.
16  Q.  Where?
17  A.  I don't recall what floor or exactly where.
18  Q.  Where were you working that day?
19  A.  I don't recall.
20  Q.  Where was he working that day?
21  A.  At this time I don't recall.
22  Q.  What time of day did you meet with him?
23  A.  I do not recall. It was during our shift.
24  Q.  Who had come to you to alert you that Mr. Matthewson
25  had said Luca had spoken to him about the incident?

Page 224

1  A.  If I remember correctly, it was Ms. Cary.
2  Q.  And had you continued to dialogue with Ms. Cary during
3  that time?
4  A.  During what time?
5  Q.  Between August 8th and August 27th.
6  A.  Yes. We talked frequently.
7  Q.  About the incident?
8  A.  I don't recall when we've spoken about the incident.
9  Q.  Did she relate to you what Mr. Matthewson had said to
10  her?
11  A.  She told me some things that Phil had -- or
12  Mr. Matthewson had said to her. I don't recall off
13  the top of my head exactly what, but it was Ms. Luca
14  speaking about the incident.
15  Q.  Do you know if Ms. Stacy had been out, Ms. Stacy --
16  I'm sorry. What --
17  A.  Cary.
18  Q.  Cary. Stacy Cary had been out talking to others about
19  it?
20  A.  I don't know if she was talking to anyone about it or
21  if they were going to her.
22  Q.  All right. And so you wanted to confirm with Phil
23  what Ms. Luca had or hadn't said to him about the
24  incident?
25  A.  Correct. Because the only information I had was like

GARCIA, KRISTINA
02/04/2020                                                                    Pages 225–228

Page 225

1       third party information.
2   Q.  He says at 54 seconds that "She just decided to vent
3       to me right in the beginning of the shift.  She just
4       brought up something about with the bra."  Right?
5   A.  Yes.
6   Q.  He doesn't say anything about nipples or pulling your
7       breast out of the bra at this point; right?
8   A.  He said in the last sentence, "She said she didn't
9       pull your boob out."
10  Q.  Ah.  I see.  Did he say to you what prompted her to
11      speak to him about it?
12  A.  At 1:34 he said, "She just it started out with her
13      talking talking about her daughter how she like went
14      to jail."  And then it continues on.  He -- according
15      to Mr. Matthewson, it was unprovoked.  She offered the
16      information.
17  Q.  Then she says a couple of times to him that -- well,
18      you say to him at 2:32 at the bottom of the page she's
19      not supposed to be talking about it; right?
20  A.  Correct.  I said that.
21  Q.  You said, "Like she's calling me a liar to people.
22      And you know, she's not supposed to talk about it.
23      And if she's telling you that I'm a liar, she's
24      telling you about the story.  Who else is she
25      telling?"  Right?

Page 226

1   A.  Correct.
2   Q.  All right.  So you're trying to confirm that she's out
3       talking about it?
4   A.  Correct.
5   Q.  So then you're going to report her to HR at that
6       point; correct?
7   A.  I'm not going to report her to HR necessarily.  At
8       this point I'm trying to confirm that she is, in fact,
9       retaliating against me.
10  Q.  What do you mean retaliating?
11  A.  She's calling me a liar.
12  Q.  Okay.
13  A.  She's slandering my name.  She's attempting to
14      assassinate my character.  She's attacking me on a
15      work level and my credibility within my workplace.
16  Q.  Now, she could say the same about you; correct?
17          MS. WARD:  I'm going to object to that.
18      Lack of foundation.
19  A.  She could say whatever she wants.
20  BY MR. PELTON:
21  Q.  Right.  And, in fact, you were out telling people up
22      to this point in time; right?
23  A.  I had confided in people that I thought were friends
24      outside of work.
25  Q.  Well, you told people in work too.  Stacy, Ms. Rose,

Page 227

1       Tonirose Cudilla; right?
2   A.  I did.
3   Q.  You spoke it out loud in the presence of Diane
4           MS. WARD:  I'm going to object.
5   BY MR. PELTON:
6   Q.  Right?
7           MS. WARD:  That lacks -- you're
8       mischaracterizing her prior testimony.
9   BY MR. PELTON:
10  Q.  Did you say it out loud in the presence of Diane?
11  A.  I don't recall Diane -- Diana.
12  Q.  Diana.
13  A.  I don't recall her ever being part of a conversation.
14  Q.  Okay.  Do you know if she overheard you at some point
15      talking about it?
16          MS. WARD:  Same -- asked and answered.  But
17      go ahead.
18  BY MR. PELTON:
19  Q.  If you know.
20  A.  According to the EEOC file, Ms. Luca believes Diana
21      was in the room when I made the comment for David to
22      hear trying to get her to admit in front of other
23      people what she did.
24  Q.  And what had you told David?
25  A.  What had I told David?

Page 228

1   Q.  Yeah.
2   A.  I had spoke in front of David that -- it was not
3       directed at David.  It was for David to hear.
4   Q.  That Ms. Luca had supposedly grabbed your breast?
5   A.  My nipple.
6   Q.  Your nipple.
7   A.  Yes.
8   Q.  Right.  So, again, my point is you're out telling
9       people what you claim Ms. Luca had done to you.
10  A.  I was telling people that I considered my friends my
11      experience.
12  Q.  And Ms. Luca apparently is doing the same?
13          MS. WARD:  Objection.  Mischaracterizing --
14  BY MR. PELTON:
15  Q.  Right?
16          MS. WARD:  -- her statement.  Go ahead.
17  A.  Ms. Luca was calling me a liar.
18  BY MR. PELTON:
19  Q.  Right.
20  A.  And discussing the incident.
21  Q.  Okay.  Now, if somebody falsely accused you of
22      grabbing someone's nipple, you'd be upset, wouldn't
23      you?
24  A.  Yes.
25  Q.  You might want to tell someone to defend your honor;

GARCIA, KRISTINA
02/04/2020

Pages 229–232

Page 229

1   right?
2   A.   I think I would move forward and ignore the entire
3        situation.
4   Q.   On Page 2 you state that certain people won't even be
5        alone in the room with you.  Who are you talking
6        about?  3:02.
7   A.   There was a number of people that I found odd would
8        leave the room after all this had happened, and it was
9        leading me to believe that Ms. Luca was talking about
10       the situation.
11  Q.   Who?
12  A.   Tamara, a coworker of ours.  Tamara was one.  Jessica,
13       a coworker of ours, was one.  Matt was -- is a
14       coworker of ours, was another one.  There were
15       multiple nurses in 4 East, which is an ICU unit that
16       we work in, that would leave the room if I was in a
17       patient room with them alone that I found very odd.
18       They would stop that they were doing and walk out.  I
19       never inquired as to why.
20  Q.   Of any of them?
21  A.   I don't believe I asked any of them.
22  Q.   What's Tamara's last name?
23  A.   It starts with an S.
24  Q.   Jessica?
25  A.   Laga.

Page 230

1   Q.   Spell it.
2   A.   L-A-G-A.
3   Q.   Matt?
4   A.   Jones.
5   Q.   Are they all therapists?
6   A.   Those all are, yes.
7   Q.   Who are the nurses in 4 East?
8   A.   I don't know the names.  They -- nurses change often.
9   Q.   Do you know if Ms. Luca had spoken to any of them
10       about the incident?
11  A.   I never asked them.
12  Q.   Do you know if Ms. Cary had spoken to any of them
13       about the incident?
14  A.   I never asked her.
15  Q.   Do you know what kind of relationship any of these
16       people had with Ms. Luca?
17            MS. WARD:  Objection.  Foundation.  But go
18       ahead.
19  A.   Ms. Cary was a friend of Ms. Luca's at one point.  I
20       don't recall --
21  BY MR. PELTON:
22  Q.   I'm talking about -- I'm sorry.  I'm talking about
23       Tamara, Jessica, Matt, and the nurses in 4 East.
24            MS. WARD:  Can you let her finish the
25       answer before you jump in?

Page 231

1   A.   Tamara was a good friend of Ms. Luca's to my
2        understanding, as was both Ms. Laga and Mr. Jones.
3   BY MR. PELTON:
4   Q.   How did you come to that understanding?
5   A.   Conversations that have taken place at work where it
6        was mentioned that Ms. Luca and all those three have
7        corresponded outside of work.  It was mentioned before
8        that Mr. Jones had loaned Ms. Luca substantial amount
9        of money.  It was spoken about that Tamara and Rachel,
10       I believe, were talking about either going or they did
11       go to her cottage.  So they were all friends outside
12       of work.
13  Q.   Did you hear this from any of them or from others?
14  A.   They -- it was conversations they would have in the
15       department that I would overhear.
16  Q.   Do you recall where you were working when Tamara left
17       the room?
18  A.   One of the incidents where Tamara left the area I was
19       in when it was just her and I was the respiratory
20       department.
21  Q.   Where did she go?
22  A.   Outside the respiratory department.  She left.
23  Q.   Do you know why?
24  A.   I do not know why.
25  Q.   Okay.  Did that -- did you have any trouble getting

Page 232

1        done what you had to get done?
2   A.   I was in the respiratory department.  I don't know
3        what I was doing.
4   Q.   But you don't recall it causing you a problem that she
5        had left the unit?
6   A.   No.  I found it strange.  It wasn't the unit.  It was
7        the respiratory department.
8   Q.   Department.  And how about Jessica Laga?  Where were
9        you working when she left the area or the room?
10  A.   I remember one specific incident where it was in the
11       respiratory department.
12  Q.   Do you remember any other instances?
13  A.   I believe there may have been an incident in the ICU.
14       I don't recall.
15  Q.   And did their -- did Jessica's leaving the area cause
16       you any problems getting done what you had to get
17       done?
18  A.   As far as me being stressed at work over why
19       everyone's suddenly avoiding me, I mean, that's a
20       problem, but . . .
21  Q.   Right.  But you were still able to tend to your
22       patients and get your work done?
23  A.   Yes.
24  Q.   How about Matt Jones?  Where did he leave?
25  A.   The department as well.

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone:  888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

GARCIA, KRISTINA
02/04/2020

Pages 233–236

Page 233

1   Q.   And did that cause you any issues in terms of
2        performing your duties?
3   A.   Aside from stress.
4   Q.   Okay.  And did you speak to any of the three of them
5        as to what was going on?
6   A.   I never questioned them.
7   Q.   How about the nurses in 4 East?  Did you ever question
8        any of them as to what was going on?
9   A.   The ones that had left the room when we were working
10       on patients together, no, I did -- I never questioned.
11              MS. WARD:  Can we take a break between --
12              MR. PELTON:  Yeah.  Give me minute or two?
13              MS. WARD:  Okay.  If it is a minute or two.
14       I've also been in depositions where one more question
15       takes an hour and a half.
16              MR. PELTON:  I didn't say one.  Let's take
17       a break and we'll pick up.  That's fine.
18              MS. WARD:  Okay.  Sorry.  I just --
19              MR. PELTON:  That's all right.
20              VIDEO TECHNICIAN:  Off the record at
21       3:17 p.m.
22              (Recess taken at 3:17 p.m.)
23              (Back on the record at 3:22 p.m.)
24              VIDEO TECHNICIAN:  We are back on the
25       record at 3:22 p.m.

Page 234

1   BY MR. PELTON:
2   Q.   Turn to Page 3 of the exhibit.  It's the 5:37 mark.
3   A.   Yes.
4   Q.   You say, "I don't know if a hundred percent on
5        purpose, or if she just doesn't care that it gets back
6        to me.  I don't know.  This is the first time I've
7        heard her say anything."  You're saying it's the first
8        you're aware she's talking to others about the
9        incident?
10  A.   That's what I said.
11  Q.   Okay.  And that is when Ms. Cary told you that Phil
12       had mentioned Luca had spoken to him?
13  A.   I believe that's what I'm referring to, yes.
14  Q.   Apparently Phil didn't believe her; right?
15              MS. WARD:  Can you be -- objection.
16       Vagueness.  Believe her as to what?
17  BY MR. PELTON:
18  Q.   Do you understand the question?
19  A.   Believe her as in Ms. Luca?
20  Q.   Yes.
21  A.   It didn't appear that he believed what she was saying
22       to him.
23  Q.   Right.  I mean, throughout the transcript he calls
24       her -- says she lies, she lies about stupid shit,
25       she's a liar, she's crazy, she's F'ing crazy; right?

Page 235

1   A.   Yes.
2   Q.   All right.  So she didn't seem to have much
3        credibility in his eyes?
4   A.   Correct.
5   Q.   Crazy Rachel?
6   A.   That's what it appears.
7   Q.   All right.  You say in here Page 8 on the 16:06 mark,
8        you say, "I don't know.  I think she has prescriptions
9        for that.  But I know she sells them, deals them, and
10       gives them out."  What are you referring to?
11       Ms. Luca?
12  A.   Correct.
13  Q.   What are you referencing?
14  A.   Her prescriptions.
15  Q.   Her own prescriptions?
16  A.   Her personal prescriptions.
17  Q.   So she gets personal prescriptions and then sells
18       them?
19  A.   To my knowledge, yes.
20  Q.   What's your knowledge based on?
21  A.   Based on conversations Ms. Luca has had in front of
22       me.  Based on what numerous other coworkers have said.
23  Q.   What has Luca told you about it?
24  A.   She hasn't discussed it with me specifically.  I have
25       overheard her speaking about her prescriptions.

Page 236

1   Q.   What have you heard her say?
2   A.   Mentioning selling them to other people, giving them
3        to other people.
4   Q.   Did she say who she gave them to or sold them to?
5   A.   I have names, but I don't recall if that was something
6        she had stated or if that was something I heard
7        through the grapevine.
8   Q.   Did she -- do you recall when it was you overheard her
9        saying this?
10  A.   Different occasions.
11  Q.   You've heard from other people that she's selling
12       prescription meds?
13  A.   Correct.
14  Q.   Have you had any information that she was stealing
15       them from Beaumont?
16  A.   No.
17  Q.   Did you report to anyone that she was selling
18       prescription medications?
19  A.   I had no evidence.
20  Q.   Did you report to anyone?
21  A.   That I overheard conversations of her selling them?
22       No.
23  Q.   Go to Page 9 at 18:40.  Now, here you start to tell
24       Mr. Matthewson some of the incidences between you and
25       Rachel; right?

GARCIA, KRISTINA
02/04/2020                                                                    Pages 237–240

Page 237

1   A.   Yes.
2   Q.   Like the hand holding?
3   A.   Yes.
4   Q.   And on the next page you tell him specifically about
5        the incident on July 30th?
6   A.   What minute mark are you looking at?
7   Q.   20:12.
8   A.   I clarified what happened for him, yes.
9   Q.   Is there a reason you're telling him the detail of
10       what occurred between the two of you?
11  A.   Yes.  Because Ms. Luca told him about the situation
12       and I was clarifying what had happened.
13  Q.   Why?
14  A.   Because he got her side, so I told him my experience.
15  Q.   Even though you'd been asked not to talk about it?
16  A.   Yes.
17  Q.   You spent a half hour with Mr. Matthewson almost?
18       28 minutes?
19  A.   Yes.
20  Q.   On work time?
21  A.   Yes.
22  Q.   And was he on work time?
23  A.   Yes.
24  Q.   What did you do with this information from
25       Mr. Matthewson?

Page 238

1   A.   I approached Ms. Carroll with it.
2   Q.   Did you record that conversation?
3   A.   No, I did not.
4   Q.   Why not?
5   A.   Because I was playing her the audio of this
6        conversation.
7   Q.   Did you play the entire audio or portions of it?
8   A.   I played a clip of it.
9   Q.   What did you tell her first to introduce the topic?
10  A.   I don't recall.  I --
11  Q.   You met with her that same day?
12  A.   Pardon?
13  Q.   You met with her the same day?
14  A.   I met with her to discuss what I found out through
15       Mr. Matthewson.
16  Q.   On the same day?
17  A.   Oh.  Correct.  Yes.
18  Q.   Yeah.  Do you know what clip you played for her?
19  A.   I do not recall.  It was -- I don't even remember how
20       many seconds.  I played a little bit for her.
21  Q.   What did she say?
22  A.   I don't recall.
23  Q.   What did you tell her in -- in the meeting?
24  A.   I said that I was very upset that she was calling me a
25       liar and slandering my name and my character and

Page 239

1        telling about -- telling people about it unprovoked.
2   Q.   Did you reveal to Ms. Carroll that you had also been
3        speaking about it to others?
4   A.   Ms. Carroll knew I had spoke about it with Stacy.  I
5        can't recall if it was mentioned about Tonirose, but
6        Ms. Carroll knows that I had mentioned it like say in
7        front of David to get her to admit what she had done.
8   Q.   What did she say in this meeting?
9   A.   I told her that since it was escalating I wanted HR to
10       become involved, and she said she would get HR
11       involved, and then later that morning when Jean had
12       came in --
13  Q.   Aphram?
14  A.   Jean Aphram, yes.  Then we both -- or we all three
15       momentarily were in the office, in the supervisor's
16       office, and both Jean and Net assured me that HR would
17       be -- become involved now.
18  Q.   Did you record that conversation?
19  A.   I did not.
20  Q.   Did they then involve HR?
21  A.   Not to my knowledge.
22  Q.   All right.  What's the next you heard about it, the
23       situation with Rachel, about which you were now
24       complaining?
25  A.   I would have to refer to my timeline.  So you're

Page 240

1        saying the next thing that I heard from the
2        supervisors?
3   Q.   Yes.
4   A.   The next time I heard from one of my supervisors in
5        respiratory I believe was an email from Jean Aphram on
6        9-11 after I had contacted Jose and Kevin by email.
7   Q.   Do you know what effort, if any, Mr. Aphram and
8        Ms. Carroll made to speak with Ms. Luca?
9   A.   After her initial conversation with her?  I do not
10       know what they have done.
11  Q.   After you complained on August 27th.
12  A.   I don't know what they have discussed with her or
13       when.
14  Q.   You have an entry on 9-2 in your timeline, Exhibit 6,
15       that Ms. Luca came to 4 East where you were scheduled
16       three times.  Did you see her in 4 East?
17  A.   I did.
18  Q.   You say "Told Tony," and that's Anthony Stout?
19  A.   Correct.
20  Q.   ". . . that 'Stacy and I concocted a story to get her
21       fired' and that I lied about the whole thing."  Where
22       did you learn that?
23  A.   Three different places.  The first is I overheard her
24       speaking with Tony as I was walking by to a patient's
25       room.  The second is when Tony had talked to Ms. Cary

Page 241

1   saying what Ms. Luca had said.  And then later Tony
2   had also told me about Rachel saying that.
3   Q.  This is all on September 2nd?
4   A.  All throughout -- well, the second -- okay.  Like we
5       said before, the -- our nights are one day and then it
6       ends another.  I believe I usually will put the date
7       as the date that we started work, so technically it
8       could have been the 3rd, but it was throughout that
9       shift that -- that I heard -- I overheard Rachel and
10      that Tony had told me later that morning.  I don't
11      recall if it was the same exact night.  I don't think
12      it was the same night.  But Ms. Cary had told me that
13      Tony had mentioned that to her as well.  I believe
14      that was a different day.
15  Q.  So when you put down 9-2, that would have been a shift
16      starting on 9-2 and ending on 9-3?
17  A.  I believe that, yes.
18              (Marked EXHIBIT 11 at 3:34 p.m.)
19  BY MR. PELTON:
20  Q.  Who's David?
21  A.  Our coworker David Antior.
22  Q.  This is September 6th at 1:59 a.m.?
23  A.  That was the -- when the initial text went out, yes.
24  Q.  And you're asking him if he's up?
25  A.  Correct.

Page 242

1   Q.  And you ask him, "The last night we worked
2       together...did anyone come ask if you needed help?  Or
3       did you get help from anyone?"  Why are you making
4       that inquiry of him?
5   A.  Because I wanted to clarify that Ms. Luca did not come
6       to the 4 East unit where both David and I were paired
7       and working.  She did not come by to offer help.
8       Therefore, she really didn't have any reason to be in
9       the unit speaking with Tony.
10  Q.  All right.  And he says she didn't come to the unit
11      that he saw; is that right?
12  A.  He said he didn't see her.
13  Q.  And then he asks if she says she did, in other words,
14      come to the unit?
15  A.  I think he did.  I don't know what you're looking at
16      specifically.
17  Q.  Well, you say, "Now more specifically did Rachel
18      ever," in caps, "COME TO THE UNIT asking if you needed
19      help?"  He says, "No.  Did she say she did?"  Right?
20  A.  Correct.
21  Q.  All right.  You say, "No.  Not yet."  What does that
22      mean?
23  A.  That means I hadn't heard of her saying why she was in
24      the unit to anybody yet.
25  Q.  And he's saying he didn't see her in the unit; right?

Page 243

1   A.  Correct.  He said he didn't -- he doesn't recall even
2       seeing her that night.
3   Q.  All right.  And you say, ". . . she came to our unit
4       three times that night.  She proceeded to tell some of
5       the nursing staff about nipplegate and how I'm trying
6       to get her fired.  When I say something about this I
7       know she is going to try and cover up by saying she
8       was helping us.  So I wanted to make sure that was
9       bullshit because I know thats gonna be her excuse for
10      coming to the unit."
11  A.  Yes.
12  Q.  Now, why are you -- why are you making this inquiry of
13      David?
14  A.  Because I'm confirming with David that she did not
15      come to offer help to either him or myself.
16  Q.  Why?
17  A.  Because that would be the only reason why she should
18      be in that unit at that time.
19  Q.  Why do you care?  Why are you trying to make this case
20      here with David?
21  A.  Because this was the time I overheard her speaking
22      with Tony saying that Stacy and I concocted a story to
23      get her fired, and I believe this is the same night
24      that Tony was referring to when he spoke with Stacy
25      saying the same exact thing.

Page 244

1   Q.  When did -- when was this term "nipplegate" or this
2       moniker "nipplegate" coined?
3   A.  I don't recall.
4   Q.  Is this something you made up?
5              MS. WARD:  Objection.  Asked and answered.
6              Go ahead.
7   A.  I don't recall who made it up.
8   BY MR. PELTON:
9   Q.  But it's something you colloquially used to refer to
10      the incident?
11  A.  It is now known as nipplegate, yes.
12  Q.  And you yourself are using that term?
13  A.  Yes.
14  Q.  Okay.  You say it's funny not funny, meaning it's kind
15      of a funny term but it's not a funny incident?
16  A.  Exactly.
17  Q.  Turn back to Exhibit 9.  And we've covered the first
18      two pages, which were your July 29th texts with Lolly,
19      known as Stacy?
20  A.  Yes.  Stacy Cary.  Yes.
21  Q.  And this is a text from September 6th at 1:35 a.m.;
22      right?
23  A.  Correct.
24  Q.  You say -- is this you starting this?  "Yeah, I keep
25      going back to sleep"?

GARCIA, KRISTINA
02/04/2020

Page 245

1  A.  Yes.
2  Q.  What are you responding to?
3  A.  Obviously an earlier text message.
4  Q.  Do you still have that earlier text message?
5  A.  I don't believe so.
6  Q.  How did you decide what to screen shot for purposes of
7      saving evidence?
8          MS. WARD:  With the exception of anything I
9      might have told her.  That's attorney-client
10     privilege.  Can you answer the question?
11 A.  I screen shotted information that had to do with the
12     subject.
13 BY MR. PELTON:
14 Q.  Well, my point is you have a -- looks like a lot of
15     texting you do with Stacy Cary, and I have a couple of
16     selections here and one that seems to pick up
17     midstream, and so my question was how you decided what
18     to screen shot.
19         MS. WARD:  Objection.  Asked and answered.
20     But go ahead.
21 A.  Text messages don't necessarily start and stop based
22     on a topic or a conversation.  They just continuously
23     add to it.
24 BY MR. PELTON:
25 Q.  Have you saved other texts that haven't been provided

Page 246

1      to us between you and Ms. Cary?
2  A.  I don't believe so.
3  Q.  All right.  And then she responds rather bluntly about
4      Ms. Luca I'm assuming complaining to Tony on Sunday
5      night about how you came up with this story to try to
6      get her fired; right?
7  A.  That is what Tony had told Ms. Cary, yes.
8  Q.  All right.  And when -- when -- and I apologize, but
9      when your friend Ms. Cary uses the term "bitch cunt,"
10     she's referring to Ms. Luca; is that correct?
11 A.  In this instance, yes, she is.
12 Q.  All right.  And is this then what -- who is Tony?
13 A.  Tony is Mr. Anthony stout.
14 Q.  Ah.  All right.  And then you text back, "I wish you
15     would have recorded him saying that.  That was the
16     night I told you she came over there when I was
17     working the unit."
18         Now, looking at the calendar we marked
19     earlier, what date is Sunday night?
20 A.  Which Sunday night?
21 Q.  I'm asking you.
22 A.  I'm sorry.  What is it that you're asking me?
23 Q.  Yeah.  You have a September 6th -- first of all, what
24     date is September -- what day of the week is
25     September 6th?

Page 247

1          MS. WARD:  2018?  Yes?
2          MR. PELTON:  Yes.  Of course.
3  A.  On here it's listed as a Thursday.
4  BY MR. PELTON:
5  Q.  All right.  And so what would the prior Sunday be?
6  A.  The 2nd.
7  Q.  All right.  Given the context of this text, Exhibit 9,
8      on September 6th, is that the Sunday night that
9      Ms. Cary is referring to, September 2nd?
10 A.  Yes.
11 Q.  So the story you're getting from Ms. Cary is that
12     Ms. Luca is complaining to Tony Stout; right?
13 A.  Yes.
14 Q.  About you trying to get her fired by coming up with a
15     story; is that right?
16 A.  That is the comment she is referring to.
17 Q.  And you say, "That's the night she came over there
18     when I was working in the unit."
19 A.  Yes.
20 Q.  What unit?
21 A.  4 East.
22 Q.  And then you say, "OMFG This is total harassment and
23     slander"; right?
24 A.  Yes.
25 Q.  But this isn't the first you're hearing of it; right?

Page 248

1      Because you'd complained back on August 27?
2  A.  With Ms. -- Mr. Matthewson.
3  Q.  Yeah.  I mean --
4  A.  This is --
5  Q.  -- you're sounding surprised?  Would that be a fair
6      characterization?
7          MS. WARD:  Can you let her finish her other
8      answer?  Because you asked a question and then cut her
9      off.
10 A.  I believe this was the first time that I heard her
11     saying that Stacy and I made up a story to get her
12     fired.  I don't recall if she had said that to
13     Mr. Matthewson.  I'd have to refer to our
14     conversation.  I don't believe I was acting shocked
15     that she had said that, per se, but more, oh, my God,
16     we're continuing this and she's bringing nurses into
17     this.
18 BY MR. PELTON:
19 Q.  Mr. Stout's a nurse?
20 A.  Correct.
21 Q.  Gotcha.  On the next page she gets into a little more
22     detail stating, "And then he," I guess meaning
23     Mr. Stout, "told me she came into his patients room
24     bitching and he stopped I said bitching about what and
25     he said that you and kryssie concocted a story to try

GARCIA, KRISTINA
02/04/2020                                                                                    Pages 249–252

Page 249

1    and get her fired."
2 A. That -- yes.
3 Q. The he she's referring to is Mr. Stout?
4 A. Correct.
5 Q. Nurse Stout.  All right.  Now, do you know if
6    Mr. Stout ended up confirming this conversation that
7    Ms. Cary's relating to you?
8 A. He confirmed it to me and I overheard it.
9 Q. What do you mean you overheard it?
10 A. As I was walking to a patient's room, Ms. Luca was
11    standing at the desk where -- like the nurses' station
12    where Mr. Stout was sitting, and I overheard her
13    saying that to him, and I kept moving.  I didn't
14    acknowledge it at all.
15 Q. This is the three things you were referring to in your
16    chronology, right, your timeline?  This is the same
17    conversation you'd related to me you're saying?
18         MS. WARD:  I'm going to object on the
19    grounds of vagueness.
20 BY MR. PELTON:
21 Q. Do you understand my question?
22 A. I don't know how many times Ms. Luca has said this to
23    him, but I overheard her stating it to him.  He had
24    repeated it to Ms. Cary and he had later mentioned it
25    to me.

Page 250

1 Q. My point is this is the same conversation you
2    overheard?  Do I have that right?
3 A. I believe it to be.
4 Q. I gotcha.  All right.  And that's what you're
5    referencing in your timeline on September 2nd?
6 A. I'm -- you think I'm referencing my timeline to the
7    text message?  Because I was there.
8 Q. Right.  And -- and so you've referenced it in your
9    timeline on 9-2.  We now have a text from Lolly
10    confirming that same conversation.  Do I have that
11    right?
12 A. Yes.  Where I said, "Told Tony that Stacy and I" --
13    oh, wait.  I mean, we're referring to the same thing I
14    believe, yes.
15 Q. Okay.  That's -- that's all I'm trying to understand.
16    And while we're at it on this exhibit, let's jump
17    ahead to September 27th.  You say -- or she says, this
18    is again Ms. Cary writing to you now September 27th,
19    2018, at 19:09, so this would be 7:09 p.m.?
20 A. Correct.
21 Q. It says, "So jb just asked me to write up a statement
22    about anything I knew or may have heard about you and
23    Rachel."  Is that Jim Burgess?
24 A. Correct.
25 Q. Your testimony is these are the only texts you have

Page 251

1    regarding this situation with Ms. Luca touching you
2    between you and Ms. Cary?
3 A. I do believe so.
4 Q. These are the only ones you've saved?
5 A. I don't even know if I still have them, but these were
6    the ones that had to do with the -- the situation.
7         (Marked EXHIBIT 12 at 3:47 p.m.)
8 BY MR. PELTON:
9 Q. Exhibit 12 is a text, I guess again a screen saved
10    shot.  It has RG at the top.  Who is that?
11 A. Ron Gansler.
12 Q. Who is he?
13 A. He is my supervisor at my second job.
14 Q. All right.  And you're writing to him that you won't
15    be in?
16 A. Correct.
17 Q. What's that have to do with the issues in this case?
18 A. I was on FMLA during the time I was scheduled to work
19    at my second job.
20 Q. And which job was that?  Lakeside?
21 A. This is Lakeside.  I was on FMLA through Beaumont.
22    Of course.
23         MS. WARD:  Has this been marked as an
24    exhibit?
25         THE WITNESS:  Yes.  Right here.

Page 252

1         MS. WARD:  What number?
2         MR. PELTON:  It's 12.
3         MS. WARD:  Thank you.
4         (Marked EXHIBIT 13 at 3:49 p.m.)
5 BY MR. PELTON:
6 Q. Who's Angelita?
7 A. A coworker.
8 Q. And why are you writing to her on September 30th?
9 A. I wrote to her to ask her if she would contact HR with
10    what she knew.
11 Q. Why?
12 A. Because she had information that I thought would be
13    beneficial for them to know.
14 Q. Okay.  And you -- instead of telling HR you might want
15    to talk to Angelita, you're out telling Angelita, gee,
16    would you write up a statement; right?
17 A. I'm sorry?  Say that --
18 Q. Instead of letting HR handle this, you're out asking
19    for people to do statements; correct?
20 A. I asked Angelita if she would contact HR, who was
21    investigating the situation, with her -- with what she
22    knew.
23 Q. Why not tell HR that Angelita might have information?
24 A. I didn't -- either way.  What -- I don't see a
25    difference.

GARCIA, KRISTINA
02/04/2020

1  Q.  Well, why not let HR do their job by giving them your
2      statement, telling them who you think has information
3      that's relevant, and let them investigate?
4              MS. WARD:  Objection.  Asked and answered.
5      It's the third time now.
6  A.  I gave H -- I gave any information to Ms. Carroll
7      and/or I don't recall what I've given to HR, but I
8      just didn't see a difference in calling
9      Mr. Brancaleone and telling him to contact Angelita
10     versus asking her to just contact them.  I -- I didn't
11     see a difference.
12 BY MR. PELTON:
13 Q.  You state to her you're still not trying to get her
14     fired; right?  Page 2.
15 A.  I did say -- I did state that I'm not trying to get
16     Ms. Luca fired either because she had stated -- I
17     don't know where she --
18 Q.  Well, was that an accurate statement at this point?
19 A.  Yes.
20 Q.  It's still your desire that she not get fired?
21 A.  I didn't -- the goal was never to get her fired.
22 Q.  Okay.  Fair enough.
23              (Marked EXHIBIT 14 at 3:52 p.m.)
24 BY MR. PELTON:
25 Q.  Exhibit 14 is another audio conversation that's been

1      transcribed; right?
2  A.  Correct.
3  Q.  And this was with Jean -- or Jean Aphram?
4  A.  Jean Aphram, yes.
5  Q.  Why did you record this one?
6  A.  This was Jean updating me.  He had said HR wanted to
7      speak with me, but --
8              MS. WARD:  Again, any communication we had
9      is privileged.  You can talk about what you talked to
10     him about.  Go ahead.
11 BY MR. PELTON:
12 Q.  The question is why you recorded this one.
13 A.  To protect myself.
14 Q.  What do you mean?
15 A.  I didn't know what was going to be said.  My attorney
16     was not allowed to be with me.
17 Q.  Okay.  You had a lot of other conversations you didn't
18     record; right?
19 A.  With Jean?
20 Q.  No.  About these incidences with others.
21 A.  What do you mean exactly --
22 Q.  I mean --
23 A.  -- with others?
24 Q.  -- you had other conversations with management at
25     Beaumont that you didn't record; right?  Concerning

1      these issues.
2  A.  I believe there was only a couple I didn't record.
3      One being because I was playing a recording.  The
4      other one was more I didn't anticipate it.  That was
5      the one with Ms. Carroll and Jean saying that they
6      would get HR involved.  That was a very short
7      conversation that I -- I guess I didn't anticipate
8      happening at that moment.
9  Q.  So you had a sum total of only four conversations with
10     management or HR about these issues?
11 A.  I would have to refer to my timeline.  That sounds
12     about right.
13 Q.  Okay.  What brought about this conversation with
14     Mr. Aphram?
15 A.  He asked me to see him after my shift.  He had I
16     believe sent me an email.
17 Q.  Is this on the telephone?
18 A.  Pardon?  The -- this conversation?
19 Q.  Yes.
20 A.  No.  This was in his office.
21 Q.  Okay.  He's telling you that they went out and
22     investigated and you were right, what was being
23     happening, what was being said, and that they've
24     addressed it; right?
25 A.  That's what Jean said to me, yes.

1  Q.  And that's what he wanted to share with you in this
2      meeting apparently?
3  A.  And that HR wanted to I guess discuss it with me.
4  Q.  Okay.  And you weren't willing to do that without your
5      attorney present; is that correct?
6  A.  Correct.
7  Q.  Did you hear anything more from management about their
8      investigation after this conversation?
9  A.  I don't believe so.
10 Q.  Are you able to date this conversation?
11 A.  October 24th, 2018, according to my timeline.
12 Q.  Very good.
13 A.  Oh, and according to my timeline, it was a voicemail
14     he left me to come see him after my shift, not an
15     email.
16 Q.  Very good.  Did you note in your timeline each and
17     every instance you became aware of where Ms. Luca was
18     supposedly talking about the incident?
19 A.  I believe I wrote down most instances where I found
20     out she was discussing the incident.
21 Q.  After your meeting with Mr. Aphram on October 24th did
22     you have any other issues with Luca?
23 A.  According to my timeline, on October 27th she
24     attempted to talk to me, was not successful as I
25     walked away.

GARCIA, KRISTINA
02/04/2020                                                                                    Pages 257–260

Page 257

```
1   Q.   You said you ran into her at 6C med room; right?
2   A.   Correct.
3   Q.   Was that where she was working?
4   A.   I don't recall where she was working that day.
5   Q.   Is that where you were working?
6   A.   I don't believe so.  I had specified I went up there
7        to look for water bottles for Sue in peds.  That's why
8        I was --
9   Q.   Pediatrics?
10  A.   Yes.
11  Q.   Were you working in pediatrics that day, then?
12  A.   I was not.  Sue called the department and was looking
13       for water bottles.  We did not have any in the
14       department, and I recall going to the floors to try
15       and locate one or more for her.
16  Q.   All right.  So she said, "Hey, Kryssie," and you
17       didn't respond and left the room; right?
18  A.   I left immediately.
19  Q.   Okay.  All right.  Now, my question was whether you
20       had any other issues with her after you spoke to
21       Mr. Aphram on October 24th.
22  A.   I don't believe so.
23  Q.   Okay.  According to your timeline, on October 19th you
24       got a call from Angelita to say that Jim Burgess and
25       Allen -- I assume that's Frankhouse?
```

Page 258

```
1   A.   Correct.
2   Q.   Were speaking with Ms. Luca in the 4 East conference
3        room on the night of October 18th, 2018, and she was
4        crying?
5   A.   Correct.
6   Q.   What did you make of that?
7                  MS. WARD:  I'm going to object on the
8        grounds of vagueness.  But go ahead.
9   A.   I don't know what that was about.  It was information
10       that was provided to me.
11  BY MR. PELTON:
12  Q.   After August 27th, 2018, how many times did you
13       actually see Ms. Luca?
14  A.   I don't know.
15  Q.   Did you see her at all?  I guess you saw her the one
16       night or overheard her the one night.  I guess it was
17       September 2nd.  Did you see her on any other occasions
18       after that?
19                 MS. WARD:  Ever?
20                 MR. PELTON:  Yeah.
21  A.   Only at work.
22  BY MR. PELTON:
23  Q.   Yeah.  At work.  When?
24  A.   Whenever we would work together.  I mean, the same
25       shift.  I was scheduled as charge with her on shift.
```

Page 259

```
1   Q.   When?
2                  MS. WARD:  Could you let her finish her
3        answer before you cut in?
4   BY MR. PELTON:
5   Q.   When?
6   A.   I would have to refer to my timeline as to when.
7        October 13th, according to my timeline, was one of the
8        days I was charge therapist and Ms. Luca was on shift.
9        I had prior to that asked to be taken off that day as
10       well as asked to not be scheduled at all with -- as
11       charge therapist with Ms. Luca on shift.
12  Q.   You didn't see her that day; right?
13  A.   I mean, yes.  She was at work.
14  Q.   Well, why does that mean you saw her?
15  A.   Probably in the beginning of shift during the --
16       during the course of the shift I'm sure we crossed
17       paths.
18  Q.   Even if you're working in different towers?
19  A.   Absolutely.  We -- most people congregate in the
20       respiratory room before shift, after shift, --
21  Q.   Okay.
22  A.   -- sometimes during your breaks, throughout the night
23       as you're gathering supplies, any other down time you
24       have.
25  Q.   It's your testimony that every time you were scheduled
```

Page 260

```
1        on the same night as Ms. Luca you saw her?
2   A.   More than likely.
3   Q.   Is it your testimony you had any interaction with her?
4   A.   I did not have any interaction with her.
5   Q.   Did you have any interaction with her at all after
6        August 27th?
7                  MS. WARD:  Objection.  Asked and answered.
8        It's like the third time, but . . .
9                  MR. PELTON:  You're wrong and it's an
10       inappropriate objection.
11  BY MR. PELTON:
12  Q.   But go ahead and answer if you can.
13  A.   I don't believe I had any interaction with her after
14       October 27th.
15  Q.   Did you have any interaction with her after July 30th?
16  A.   No.  I don't believe so.
17  Q.   You were never paired with her again; right?
18  A.   I was scheduled as charge therapist with her on shift.
19  Q.   You were never paired with her again, were you?
20  A.   I don't believe so.
21  Q.   Now, what does being charge therapist have to do with
22       Ms. Luca?
23  A.   As charge therapist, Ms. Luca would report to me if
24       she had any issues, concerns.  I may have to assist
25       her in her assignment or a component of her
```

GARCIA, KRISTINA
02/04/2020

Pages 261–264

Page 261

1   assignment.
2   Q.   And as charge therapist you would have the option to
3        send somebody else to assist her if needed; right?
4   A.   **Not always.**
5   Q.   You testified earlier this morning as part of the
6        charge duties one of the things you were able to do
7        would be to assign someone to assist where there's
8        help needed?
9   A.   **Yes.  But if there was an incident going on that she**
10       **required a supervisor to come for patient recover --**
11       **or service recovery or if she had an issue with a**
12       **patient that she needed further assistance on, you**
13       **would go to the charge therapist for that.**
14  Q.   And if those things occurred, you could send someone
15       to assist her; right?
16  A.   **As charge therapist, that's my job.**
17  Q.   And you can --
18  A.   **Is to --**
19  Q.   -- and use your discretion to send someone to assist
20       her; right?
21            MS. WARD:  I'm going to object now.  It's
22       the fourth time you've asked --
23            MR. PELTON:  She hasn't answered the
24       question.
25            MS. WARD:  That's your opinion, but . . .

Page 262

1        Badgering the witness.
2   A.   **As far as service recovery, no, I cannot send somebody**
3        **else to do that.  That is the charge therapist's**
4        **responsibility.  If there is no one available to go to**
5        **say cath lab that is familiar with it, I wouldn't send**
6        **somebody that didn't know.  That is my job as charge**
7        **therapist.**
8   BY MR. PELTON:
9   Q.   And you're certain that would be the case?
10  A.   **That's what I would do as charge therapist would**
11       **handle the job.**
12  Q.   So you weren't scheduled as charge therapist with the
13       exception of October 13th, which was changed, and --
14  A.   **That's not correct.**
15  Q.   -- November 11th; correct?
16  A.   **No.**
17  Q.   Straighten me out.
18  A.   **October 13th I took it upon myself to get off that day**
19       **because I had asked on a couple different occasions**
20       **both Allen and Ms. Carroll to change that, and I had**
21       **personally asked Ms. Strzelecki, Karen Strzelecki, who**
22       **is another charge therapist, if she would take over my**
23       **day.**
24  Q.   And she did and it was changed?
25  A.   **I changed it.**

Page 263

1   Q.   You didn't work as charge therapist on October 13; is
2        that a correct --
3   A.   **On that night.**
4   Q.   Is that a correct statement?
5   A.   **Yes.**
6            MS. WARD:  Could you let her finish her
7        answer before you jump in?
8            MR. PELTON:  No.  She cut me off, but --
9            MS. WARD:  I don't think that's what
10       happened.  But go ahead.
11            MR. PELTON:  Well, it's a good thing we're
12       on the video.  Right?  In case that's so important.
13  BY MR. PELTON:
14  Q.   You didn't work as charge therapist on October 13; is
15       that a correct statement?
16  A.   **Yes.**
17  Q.   You were scheduled on November 11th as charge with
18       Ms. Luca on shift; correct?
19  A.   **Correct.**
20  Q.   Who scheduled that?
21  A.   **I don't know for certain, but generally Mr. Frankhouse**
22       **is -- it's my understanding that he comes up with the**
23       **charge schedule.**
24  Q.   Did you approach him about that?
25  A.   **I don't believe I did for that specific date.**

Page 264

1   Q.   You worked it?
2   A.   **I did.**
3   Q.   Did you run into Ms. Luca on that shift?
4   A.   **I believe this was the shift that I transported a vent**
5        **from EC to her unit, but she had someone else take --**
6        **take the patient from me.**
7   Q.   Okay.  So you didn't run into her?
8   A.   **I didn't have conversation with her to the best of my**
9        **recollection.**
10  Q.   And if you had, you'd have been professional about it;
11       right?
12  A.   **Absolutely.**
13  Q.   And then the last day she worked at Beaumont was
14       November 30th; right?
15  A.   **That was to the best of my knowledge, yes.**
16  Q.   After that she's gone?
17  A.   **I don't believe she worked after that.**
18  Q.   You've never seen her again; right?
19  A.   **I don't believe I have, no.**
20  Q.   And you were aware she was gone, right, at some point
21       in time?
22  A.   **At some point I did find out she was no longer**
23       **employed with Beaumont.  I don't recall what date.**
24            (Marked EXHIBIT 15 at 4:08 p.m.)
25  BY MR. PELTON:

GARCIA, KRISTINA
02/04/2020

Pages 265–268

Page 265

1  Q.  Do you recognize Exhibit 15?
2  A.  Yes.
3  Q.  What is it?
4  A.  It is the email that I sent to Kevin.
5  Q.  What prompted you to send this email to Kevin?
6  A.  Because -- I sent the email because after I had spoke
7      with Ms. Carroll and Mr. Aphram about getting HR
8      involved, I had not heard anything back.
9  Q.  This is Kevin Brancaleone?
10 A.  Yes.
11 Q.  He was in HR?
12 A.  Correct.
13 Q.  All right.  And this is a statement dated
14     September 10th; right?
15 A.  Yes.
16 Q.  And that's the date you sent it to him?
17 A.  Correct.
18 Q.  So your concern at this point is you had not heard
19     back from HR?
20 A.  I had not heard anything from HR, no.
21 Q.  Right.  And did you inquire of Ms. -- Mr. Aphram what
22     was going on?
23 A.  I don't recall.
24 Q.  Okay.  You state in the first sentence, "I am writing
25     to follow up with my sexual harassment complaint."

Page 266

1      What did you mean follow up?
2  A.  The last conversation I recall have -- having with
3      Ms. Carroll and Mr. Aphram that they would contact HR,
4      so I was writing to follow up with HR about the
5      incident.
6  Q.  Well, you -- the complaint in August was that she was
7      out talking about it; right?
8  A.  That she was retaliating regarding the sexual
9      harassment complaint.
10 Q.  Okay.  And so you say, "I am following up with my
11     sexual harassment complaint."  You don't say I'm
12     following up with my claim that she's retaliating
13     against me.
14 A.  Well, the retaliation was for the sexual harassment
15     complaint.
16 Q.  Okay.  And the retaliation you're referring to is her
17     talking to others at Beaumont about what had occurred
18     or what she claims did or didn't occur; is that
19     correct?
20 A.  My complaint is that she was calling me a liar and
21     slandering my character.
22 Q.  And by speaking to coworkers about her claim of what
23     had occurred in the incident you complained about;
24     right?
25 A.  Not just her giving her side of the situation but

Page 267

1      bluntly calling me a liar and saying --
2  Q.  As it -- I'm sorry.
3  A.  -- and saying I filed false claims of sexual
4      harassment.
5  Q.  Right.  As it related to that situation on July 30th?
6  A.  Yes.
7  Q.  All right.  She's not calling you a liar about
8      anything else?  That's -- that's the issue; right?
9  A.  That's the issue.
10 Q.  And then you try and recap for him what had occurred?
11 A.  Correct.
12 Q.  Who wrote this?
13 A.  I did.
14 Q.  Okay.  Five lines down on that second full paragraph
15     it starts -- toward the end it says, "Mrs. Carroll
16     updated me."  Do you see where I'm at?
17 A.  In the first par -- oh.
18 Q.  The first large paragraph there.  After the
19     introduction.  The fifth line down toward the end of
20     that picking up with a new sentence.  It says,
21     "Mrs. Carroll," then the next line "updated me."  Do
22     you see where I'm referring?
23 A.  Yes.
24 Q.  Okay.  So after August 8th you're saying Mrs. Carroll
25     updated me on the situation; correct?

Page 268

1  A.  On August 8th.
2  Q.  All right.  Let's back up.  "As requested, I turned in
3      a written statement on August 8th to Mrs. Carroll,
4      illustrating the event that had occurred and outlining
5      previous situations with Miss Luca that made me
6      uncomfortable"; right?
7  A.  Correct.
8  Q.  "Mrs. Carroll updated me on the situation," and you're
9      saying on August 8th?
10 A.  Correct.
11 Q.  ". . . stating that she had spoken with Miss Luca and
12     Mrs. Kaye (Mrs. Kaye is Miss Luca's close friend and a
13     witness to the incident) and that she informed
14     Miss Luca that she was not to talk about the incident
15     with anyone or else this would be turned over to Human
16     Resources for further review."  Right?
17 A.  Correct.
18 Q.  And you said you were accepting of this, meaning this
19     result; right?
20 A.  Yes.
21 Q.  Okay.  You say toward the end of this paragraph that,
22     three lines up, ". . . several coworkers I had not
23     previously ever had any problems with had begun
24     treating me poorly . . ."  What are you referring to?
25 A.  I was referring to people leaving the area or the

GARCIA, KRISTINA
02/04/2020

Pages 269–272

Page 269

1    respiratory room when it was just us alone.  I was
2    referring to people no longer having friendly
3    conversation with me.  I was referring to nursing
4    walking out of rooms.  I was referring to general
5    atmosphere and the way I felt I was being kind of
6    ostracized for a while afterwards.  People did not
7    initiate conversation with me as usual.  They didn't
8    include me in conversations as usual.
9  Q.  Who are you referring to?
10  A.  Mainly people within respiratory, but I named the
11     people that I recall walking out of the rooms.
12  Q.  Right.  We've talked about that and I don't
13     necessarily want to go over that.  I hear you also
14     saying that people were not having friendly
15     conversations with you.  Are you referring to anyone
16     beyond those same people?
17  A.  I don't recall.  It seemed that there was a number of
18     people that were different toward me, but I didn't
19     apparently write down any names.
20  Q.  Well, do you recall any names?
21  A.  I'm -- I'm not going to name anyone else that I'm not
22     a hundred percent sure.  And like I stated in here, I
23     didn't have hard proof, so if I had hard proof, that
24     was something I documented.
25  Q.  All right.  Do you know if Ms. Luca was feeling

Page 270

1     ostracized?
2  A.  No, I do not know.
3  Q.  In the last paragraph before your closing you state,
4     "I was assured that this situation would be handled
5     yet it persists without consequence."  Do you see
6     that?
7  A.  Yes.
8  Q.  You understood it needed to be investigated?
9  A.  I did.
10  Q.  And you say without consequence.  What you mean to say
11     is without any consequence you're aware of?
12  A.  Correct.
13  Q.  Okay.  Whether they had spoken to Ms. Luca by this
14     time or not you don't know?
15  A.  According to Ms. Carroll, she had already spoke with
16     her by this time.
17  Q.  And had anyone else spoken to her by this time?
18  A.  I do not know.
19  Q.  All right.  In the top paragraph on the second page
20     you're presenting to them some of the people you
21     believe Ms. Luca has spoken to; right?
22  A.  I believe I only mentioned Mr. Stout in the paragraph
23     you're referring to.
24  Q.  Yeah.  Well, in the prior paragraph, prior page you
25     refer to Mr. Matthewson?

Page 271

1  A.  Yes.
2  Q.  And on this page you refer to Mr. Antior, the nurse.
3     No.  He's -- he's a respiratory therapist; right?  And
4     you reference Tony Stout, the RN?
5  A.  With Mr. David Antior, I didn't say that she said
6     anything to him.  He was proof that she came into the
7     unit and didn't ask if either one of us needed any
8     help.
9  Q.  And then Mr. Stout, and you've talked about that?
10  A.  Correct.
11  Q.  Were you aware of any other evidence at this point of
12     her speaking to others when she shouldn't have been
13     about the situation?
14  A.  At this point on September 10th, referring to my
15     timeline, I don't believe I -- I believe those were
16     the only two or the only ones at that time.
17  Q.  And, again, your timeline would have an indication of
18     each person you became aware of that had spoken to
19     Ms. Luca about the in -- or that Ms. Luca had spoken
20     to about the incident; is that correct?
21  A.  I did my best to record everyone that I was -- I
22     became aware of.  I don't recall when I had
23     specifically started this timeline, but I recorded
24     everything that I remembered or thought was of
25     significance.

Page 272

1  Q.  Did you get a response to this email to
2     Mr. Brancaleone?
3  A.  He did respond.
4  Q.  And Mr. Rivera also responded?
5  A.  Correct.
6  Q.  Who's he?
7  A.  I don't recall his exact title, but I believe he was
8     vice president of safety.
9  Q.  And you were told that they were doing an
10     investigation?
11  A.  Jose had responded asking permission to look into the
12     matter.  I don't recall what Kevin had responded with.
13  Q.  All right.  Well, he -- he said he'd like to speak to
14     you; right?
15  A.  That sounds right.
16  Q.  And you told him you would be on vacation for a couple
17     of weeks?
18  A.  I believe I was already on vacation at the time I sent
19     the email on September 10th.
20  Q.  All right.  And you were on -- scheduled for vacation
21     through September 27th; is that correct?
22  A.  I don't have the dates with me, but that sounds --
23     let's see.  No.  I don't believe that date is correct.
24              (Marked EXHIBIT 16 at 4:21 p.m.)
25  BY MR. PELTON:

GARCIA, KRISTINA
02/04/2020

Page 273

1  Q.  The court reporter is handing you Exhibit 16.  This is
2      an email exchange between you and Mr. Brancaleone;
3      correct?
4  A.  Correct.
5  Q.  It starts with your email September 10th asking him to
6      review the attachment; right?
7  A.  Yes.
8  Q.  And oddly this shows as you to you, from Kristina
9      Garcia to Kristina Garcia, but Exhibit 15 shows Kevin
10     Brancaleone printing it out; right?
11 A.  Correct.  I believe I may have blind carbon copied
12     Kevin and Jose.  That's a possibility.
13 Q.  All right.  And do you know if anyone else was copied
14     on it or blind copied on it?
15 A.  I -- I don't believe so, but I don't recall.
16 Q.  All right.  And then Mr. Brancaleone at 8:30 in the
17     morning sends you an email asking you to call him;
18     correct?
19 A.  Correct.
20 Q.  And then you respond saying you'll be available on or
21     after September 27th because you're going to be on
22     vacation; right?
23 A.  That I will be available on or after September 27th,
24     yes.
25 Q.  So your return -- your return date was scheduled to be

Page 274

1      September 27th?
2  A.  I believe that was my next scheduled workday after my
3      vacation.
4  Q.  All right.  And then didn't you go on a leave, FMLA
5      leave or something at that point?
6  A.  I did.
7  Q.  When did that begin?
8  A.  According to my timeline, I have FMLA as
9      September 26th through October 3rd, 2018.
10 Q.  So your vacation that started sometime before
11     September 10th extended to the 26th and then you were
12     on leave to October 3rd?
13 A.  I believe my next scheduled workday was either the
14     26th or 27th.  I think I said I was available on or
15     after the 27th because I was scheduled to go to work
16     the night of the 26th.
17 Q.  Well, let me say it differently.  You didn't work
18     between November 10th and what date?
19         MS. WARD:  Objection.  You said
20     November 10th.
21 BY MR. PELTON:
22 Q.  September 10th.
23         MS. WARD:  Okay.  Sorry.
24 A.  I didn't work through -- from September 10th through
25     after my FMLA.

Page 275

1  BY MR. PELTON:
2  Q.  Yeah.  What date?
3  A.  I have showing on here that my FMLA ended 10-3 and I
4      was approved to return to work on 10-3.  I don't know
5      what my next scheduled day to work was.  It may have
6      been the 4th.
7  Q.  You met with Ms. Carroll on the 8th and she stated HR
8      was, what, still investigating or she hadn't heard
9      from them anyway; is that correct?
10 A.  No.  That's not correct.
11 Q.  What -- tell me about your 10-8 entry.
12 A.  Oh.  10-8.  I apologize.  I thought you said 8-8.  On
13     10-8.  On --
14 Q.  It starts out saying you needed clearance from
15     occupational health.  What does that mean?
16 A.  I did not know that upon returning from FMLA that I
17     had to be cleared through Beaumont's occupational
18     health.
19 Q.  All right.
20 A.  I had returned to work, and that morning I had spoke
21     with Ms. Carroll regarding the need to go through
22     occupational health to properly come back.
23 Q.  So it looks like, then, the next day you had an
24     appointment with occupational health for that purpose?
25 A.  I made an appointment that day after speaking with

Page 276

1      Ms. Carroll for the next day, yes, to get cleared to
2      come back to work.
3  Q.  And they cleared you on that date?
4  A.  Occupational health cleared me on that date, yes.
5  Q.  All right.  Further in your meeting on the 8th she
6      said that she hadn't heard back yet from HR; right?
7  A.  Yes.
8  Q.  Acknowledged that you didn't want to be a charge
9      therapist or partnered with Luca on the same shift?
10 A.  Correct.
11 Q.  All right.  And you mentioned the scheduling for the
12     13th?
13 A.  Yes.  I mentioned that Allen had not relieved me from
14     charge duties on the 13th.
15 Q.  Okay.  And then the next you spoke with management
16     about this was on October 24th with Mr. Aphram --
17 A.  About what specifically?
18 Q.  About your issue, your complaint.  Correct?
19 A.  Correct.
20 Q.  Remember we talked earlier that he had called and
21     wanted you to see him?
22 A.  Correct.
23 Q.  And you did on the 24th and we reviewed that
24     conversation?
25 A.  Correct.

GARCIA, KRISTINA
02/04/2020

Pages 277–280

Page 277

1  Q.  All right. Was there any other discussion after that
2      time with management or HR about your complaint?
3  A.  **Not that I recall.**
4  Q.  All right. So it was done, over as far as you
5      understood it?
6  A.  **It wasn't over. I didn't receive any further updates.**
7      **If they contacted my attorney, they contacted my**
8      **attorney. I don't recall them contacting me directly.**
9  Q.  He told you it had been addressed; is that correct?
10 A.  **Jean Aphram stated that it had been addressed, yes.**
11 Q.  Did you take that to mean it had been addressed with
12     Ms. Luca?
13 A.  **Yes.**
14 Q.  Particularly in light of your 10-19 entry; is that
15     fair?
16 A.  **In regard to 10-19? Oh. Like do I believe on 10-19**
17     **that was when they addressed it?**
18 Q.  Yes.
19 A.  **Looking back, I believe that's when they addressed it.**
20 Q.  Put two and two together, that would be what you
21     assumed?
22 A.  **It could have been.**
23 Q.  Sure. All right. And were you expecting to hear
24     something more at that point, then?
25 A.  **I had asked Mr. Aphram if I could find out how it was**

Page 278

1      **addressed.**
2  Q.  He said no, for privacy reasons; right?
3  A.  **I believe he said something along the lines of that or**
4      **he would refer to HR.**
5  Q.  And of course your attorney was involved at this
6      point; right?
7  A.  **I -- I don't recall the exact date I had first contact**
8      **with . . .**
9  Q.  Okay.
10              (Marked EXHIBIT 17 at 4:29 p.m.)
11 BY MR. PELTON:
12 Q.  Exhibit 17 is a letter from your attorney to a
13     Beaumont attorney dated September 25th, 2018. Do you
14     see that?
15 A.  **Yes.**
16 Q.  And attached to it is an affidavit --
17              MS. WARD: For purposes of the record, the
18     letter is actually from my legal assistant.
19              MR. PELTON: Okay.
20              MS. WARD: That's okay. I just want it to
21     be clear which letter we're talking about.
22              MR. PELTON: All right. So your legal
23     assistant sent the letter on your letterhead; right?
24 BY MR. PELTON:
25 Q.  So attached to it is an affidavit executed by you; is

Page 279

1      that right?
2  A.  **Yes.**
3  Q.  Okay. Did you draft the affidavit?
4  A.  **I drafted the information for the affidavit.**
5  Q.  Okay. You provided information for the affidavit?
6  A.  **Correct.**
7  Q.  Okay. It was drafted for you?
8  A.  **Correct.**
9  Q.  Did you make any changes before executing it?
10 A.  **I don't recall.**
11 Q.  All right. In Line 1 you state, "Ms. Luca has been
12     making sexually harassing comments that make me
13     uncomfortable for several months," and you give some
14     examples; right?
15 A.  **Correct.**
16 Q.  I think you testified earlier that you blew these off?
17 A.  **I did.**
18 Q.  They were playful and joking?
19 A.  **She attempted to pretend they were playful and joking**
20     **but I believe there was serious undertone to them.**
21 Q.  You told Net you blew it off, no big deal; right?
22 A.  **I did not make a big deal of them, no.**
23 Q.  Okay. And you told her you never let it get to you;
24     right?
25 A.  **I tried not to let her comments affect me.**

Page 280

1  Q.  And you told her you were all a little loose with your
2      lips; right?
3  A.  **Referring to conversations that happened within the**
4      **department, yeah.**
5  Q.  Right. In other words, you engaged in the banter as
6      well; right?
7  A.  **In what banter?**
8  Q.  What you testified to this morning, the back and forth
9      that went on on the night shifts.
10 A.  **I contributed to conversations and foul language. I**
11     **had never contributed to a conversation regarding me**
12     **wanting Ms. Luca or thinking she's attractive or**
13     **really responding to any of her strange comments.**
14 Q.  In Paragraph 2 you again -- you state that you thought
15     the matter had been resolved after you confronted her?
16 A.  **I hoped it would stop.**
17 Q.  Right. And it did for six to eight months; right?
18 A.  **There was nothing significant that I noted for myself**
19     **to recall.**
20 Q.  Or that you can recall sitting here today?
21 A.  **Correct.**
22 Q.  All right. Paragraph 7 you state that after meeting
23     with Ms. Carroll on August 8th you thought the matter
24     had been resolved; right?
25 A.  **After August 8th when I turned in my statement I was**

GARCIA, KRISTINA
02/04/2020

Pages 281–284

Page 281

1   hoping that Ms. Luca's comments and everything, yes,
2   would stop.
3   Q.   Right.  According to this, you understood Carroll had
4        interviewed you, Ms. Kaye, and Ms. Luca and you
5        believed the matter had been resolved?
6   A.   I had hoped it would stop after that, yes.
7   Q.   And all parties were told not to discuss the incident
8        or her report -- your report of the incident; right?
9   A.   Correct.
10  Q.   You say Carroll started treating you differently after
11       this.  In what way?
12  A.   On here I had stated after my meeting with Ms. Carroll
13       other staff members began treating me differently.
14  Q.   I see.  Not Ms. Carroll?
15  A.   No.  Ms. Carroll was on day shift.  I didn't have
16       much, if any, contact with her.
17  Q.   Did she ever mistreat you after August 8th?
18            MS. WARD:  Objection.  Could you clarify
19       who we're talking about now?
20            MR. PELTON:  Ms. Carroll.
21            MS. WARD:  Ms. Carroll.  Okay.  Go ahead.
22  A.   As far as mistreat --
23  BY MR. PELTON:
24  Q.   Did Ms. Carroll ever mistreat you after August 8th?
25  A.   I think our relationship had -- has changed.  I don't

Page 282

1        know what you mean by mistreat.
2   Q.   In the workplace.  Did she ever treat you poorly or
3        differently after August 8th than she did prior?
4   A.   I don't believe we have friendly conversation even in
5        passing the way we used to.
6   Q.   Okay.  When did that start?
7   A.   I don't know of a date, but after the incident,
8        after -- after my telling her of the incident.
9   Q.   Let me be more specific.  Between August 8th and the
10       filing of your EEOC charge, did Ms. Carroll treat you
11       any differently or more poorly than she had prior to
12       August 8th?
13            MS. WARD:  Objection.  Asked and answered.
14       But go ahead.
15  A.   I didn't have much interaction with Ms. Carroll since
16       she's on days, so other than kind of what seemed to be
17       avoiding -- maybe avoiding conversation or avoiding
18       looking at me or initiating any conversation.
19  BY MR. PELTON:
20  Q.   Did you initiate any conversation with her?
21  A.   If I did, I'm sure she responded.
22  Q.   Did you cut her off your Facebook?
23  A.   I think that was well before any of this.
24  Q.   I think the proper word is did you defriend her?
25  A.   I did at some point.  I don't recall at what point

Page 283

1        that was.
2   Q.   Sometime after August 8th, 2018?
3   A.   I couldn't -- I don't -- I believe it was before then,
4        but I honestly don't recall.
5   Q.   The September 14th reference in Paragraph 13.
6   A.   Yes.
7   Q.   Was that the incident where Mr. Stout was present?
8   A.   No.
9   Q.   This is a different incident?
10  A.   Yes.
11  Q.   What happened on that date?
12  A.   According to our coworker and mutual acquaintance,
13       friend, Angelita, she had informed me that on
14       September 14th Ms. Luca was yelling about the incident
15       near the department in the 4 Center unit hallway.
16  Q.   You weren't present; right?
17  A.   I was not.
18  Q.   Did anyone in management at Beaumont ever sexually
19       harass you?
20  A.   No one ever touched me.
21  Q.   Did they ever sexually harass you?
22  A.   If you consider what Steve Hamick's comment was sexual
23       harassment,
24  Q.   Okay.  Any other occasions?
25  A.   That wasn't -- that wasn't when I was employed at

Page 284

1        Beaumont.
2   Q.   Understand.
3   A.   No.  Not that I recall.
4   Q.   Did anyone in management at Beaumont retaliate against
5        you for having complained about Ms. Luca's alleged
6        behavior on July 30th?
7            MS. WARD:  I'm going to object on the basis
8        of foundation.  But if you know.
9   A.   Aside from, like I said, different -- just feeling a
10       different atmosphere when you're around them or when
11       I'm around them.
12  BY MR. PELTON:
13  Q.   Around who?
14  A.   My supervisors.
15  Q.   Which ones?
16  A.   Any of them.
17  Q.   And I don't think we've talked about that other than
18       Ms. Carroll.  What are you referring to that you feel
19       a little different atmosphere?
20  A.   It's just not the same atmosphere as it was before.
21       It's not kind of family like and chitchat and, you
22       know, friendly conversation.
23  Q.   Is it more professional?
24  A.   More absent.
25  Q.   Sorry?

GARCIA, KRISTINA
02/04/2020

Pages 285–288

Page 285

1   A.   More absent.
2   Q.   What do you mean absent?
3   A.   There's just a lack of conversation.
4   Q.   Okay.  Are you able to get your job done?
5   A.   Current day?
6   Q.   Sorry?
7   A.   Current day you're speaking of?
8   Q.   Since -- since all of these events we've been talking
9        about.  Yeah.
10  A.   I have continued working.
11  Q.   Right.  You've been able to perform your job duties
12       throughout this entire period of time we've talked
13       about up to the present day; right?
14            MS. WARD:  Other than the FMLA leave?
15            MR. PELTON:  Sorry?
16            MS. WARD:  You're asking her a very broad
17       question.  I'm trying to let you ask it, but you're
18       saying other than the FMLA leave?
19            MR. PELTON:  I don't know.  I'd like her to
20       answer the question and not you.
21            MS. WARD:  Well, I'm not trying to do that,
22       but the question's been pretty broad.
23            MR. PELTON:  I think that type of coaching
24       is completely inappropriate --
25            MS. WARD:  I object to your call --

Page 286

1            MR. PELTON:  -- and I will not stand for
2        it.
3            MS. WARD:  Well, you can do whatever you
4        need to do, but I object to your question
5        coaching.  You referenced no time period, and all I'm
6        trying to find out is whether or not you're talking
7        about from 2018 till today or some other time period.
8            MR. PELTON:  That's not all you're trying
9        to accomplish.
10           MS. WARD:  That's your opinion.  That's not
11       my opinion.  I've let you ask all kinds of questions.
12           MR. PELTON:  The record will be very clear.
13           MS. WARD:  I hope it will be.
14  BY MR. PELTON:
15  Q.   All right.  You've been able to perform your duties
16       throughout this entire time period we've been talking
17       about up to the present time; is that correct?
18  A.   I have performed my job satisfactorily.
19  Q.   You've performed it well?
20  A.   I hope so.
21  Q.   Has anyone ever indicated otherwise?
22  A.   I don't recall.
23  Q.   Is there any other manner in which you believe
24       management at Beaumont has retaliated against you for
25       having made the complaint against Ms. Luca?

Page 287

1   A.   Not that I can recall at this moment.
2   Q.   Well, today's a pretty important day because it's your
3        deposition, and I'm assuming you gave it a lot of
4        thought coming into today, so I'd like you to take
5        just a moment and tell me if there's anything else you
6        can recall that you believe is retaliatory by
7        management at Beaumont.
8   A.   I believe it wasn't -- my situation wasn't handled
9        appropriately.  I don't believe it was handled the way
10       it would have been had it been two different people,
11       specifically if it had been two people of different --
12       of, you know, opposite sexes.
13  Q.   What leads you to conclude that?
14  A.   There's a few things I suppose.  The fact that
15       Ms. Carroll had mentioned during our initial -- during
16       my initial complaint that if it had been a man, he
17       would have been -- I believe she said he would have
18       been walked out or he would have been fired or
19       something along that lines.  I can't fathom a large
20       company allowing something like that to happen and not
21       having a repercussion for it.  Something.
22  Q.   All right.  You would expect a large company to
23       consider all of the statements and evidence they were
24       able to obtain in an investigation in making a
25       decision?

Page 288

1   A.   Yes.
2   Q.   You'd agree that's fair?
3   A.   Yes.
4   Q.   All right.  When did Ms. Carroll state that if it were
5        a man they would have been walked out?
6   A.   I believe it was in my initial complaint that -- with
7        the transcript that we have.  It was in there.
8   Q.   So that's before she had a chance to speak to
9        Ms. Kaye; correct?
10  A.   Yes.  That was my initial complaint.
11  Q.   And you had said if it were a man you might have hit
12       him?
13  A.   Correct.
14  Q.   Okay.  So apparently you had some difference between
15       male and female in how you reacted?
16  A.   I think the difference in how I reacted was I wouldn't
17       have expected a female to reach down my shirt where
18       she claims not to be -- she claims to be heterosexual,
19       so I didn't expect that coming from her.
20  Q.   Well, we'd hope a man wouldn't do it either; right?
21  A.   I would hope a man wouldn't do it, but if a man that
22       was also heterosexual did that, I mean, that's --
23       that's what -- you know, that's what they're into, a
24       female.
25  Q.   Why else do you believe that you may have been -- your

GARCIA, KRISTINA
02/04/2020                                                                    Pages 289–292

Page 289

```
1        investigation may have been treated differently
2        because of your gender or sexual preferences?
3    A.  Because I don't think a man could have got away with
4        what Ms. Luca got away with without repercussions.
5    Q.  Why do you believe that?
6    A.  Because I don't believe it would have been tolerated.
7    Q.  Even if there are people denying it occurred,
8        witnesses to the incident that deny it occurred?
9               MS. WARD:  I'm going to object now.  You've
10       been over this ground probably four times.  It's asked
11       and answered.  I think she's given you her best
12       answer.
13   A.  Are you still waiting for a response?
14   BY MR. PELTON:
15   Q.  Yeah.  Um-hmm.
16   A.  I don't know what to say.  You hear news cases, you
17       hear things that happen, and it doesn't appear that
18       it's tolerated from a male.
19   Q.  Have you heard of any companies getting sued because
20       they just believed the female as opposed to a man?
21   A.  I don't follow news reports that much to know who's
22       getting sued.
23   Q.  So you think Ms. Carroll has a bias against you
24       because of your sexual preference?
25   A.  I do.
```

Page 290

```
1    Q.  She would actually discriminate against you because of
2        your sexual preference?
3    A.  I do.
4    Q.  And you believe she handled this somehow differently
5        when she investigated in August even though you said
6        she did what you had asked her to do; is that right?
7               MS. WARD:  I'm going to object about
8        mischaracterizing her prior testimony.  But go ahead.
9    A.  What did she do that I asked her to do?  Investigate
10       the matter?
11   BY MR. PELTON:
12   Q.  You wanted it to stop, you wanted it investigated, you
13       did not want HR to know about it; correct?
14   A.  I wanted it to stop, yes.  I wanted her to do
15       something about it to make it stop, yes.
16   Q.  And she did?
17   A.  No.
18   Q.  No?
19   A.  Did it stop?
20   Q.  Were you ever assaulted again by Ms. Luca?
21   A.  No.  Because -- no.
22   Q.  Okay.  Now, is there any other reason you think that
23       Ms. Carroll would discriminate against you because of
24       your sexual preferences?
25   A.  I don't think the situation would have been handled
```

Page 291

```
1        the same way if it were a man.  I don't know what to
2        tell you.
3    Q.  Okay.  Fair enough.  Any reasons beyond that is what
4        I'm asking?
5    A.  Because nothing happened.
6    Q.  Okay.
7               MS. WARD:  I'm going to stop right here and
8        tell you you've been going at this over seven hours,
9        including the lunch break.  We're getting close.  I
10       need to take a restroom break.  I'm willing to wait
11       until you get done with the questions you have left,
12       but I can't wait until 5:00.
13              MR. PELTON:  Well, let's take a quick break
14       and then I'll try and finish up for today and see
15       where we're at.  I'm about done with the primary
16       questioning.
17              MS. WARD:  Well, I can wait a couple
18       questions.
19              MR. PELTON:  There's an issue of damages,
20       but . . .
21              MS. WARD:  Well --
22              MR. PELTON:  You better go --
23              MS. WARD:  -- you get seven hours and we're
24       pretty close to the end of that.
25              MR. PELTON:  Go take your break.
```

Page 292

```
1               MS. WARD:  No.  That's all right.  I'll
2        wait.  Go ahead.
3               MR. PELTON:  Okay.
4               MS. WARD:  We started at 8:53, so . . .
5               MR. PELTON:  How long have we been on the
6        record?
7               VIDEO TECHNICIAN:  Six 33.
8               MS. WARD:  That's -- we need a break.
9    BY MR. PELTON:
10   Q.  Do you believe Ms. Carroll treated you differently
11       because you're a woman as opposed to your sexual
12       preferences?
13   A.  I'm not sure how to answer that.  I believe it was
14       over my sexual orientation.
15   Q.  You understand you've alleged in the lawsuit it was
16       because of your gender as well?
17   A.  Because it was two females, yes.
18   Q.  Okay.  Who else at Beaumont in management do you
19       believe discriminated against you because of your
20       sexual preferences?
21   A.  I feel that between Ms. Carroll and Ms. Aphram -- or
22       Mr. Aphram there's some discrimination on my
23       orientation.
24   Q.  We've talked about Ms. Carroll; right?  What about
25       Mr. Aphram?  What leads you to conclude he would
```

GARCIA, KRISTINA
02/04/2020

Pages 293–296

Page 293

1   discriminate against you or did discriminate against
2   you because of your sexual orientation?
3 A. Because it was not handled the way it would have been
4   handled had Ms. Luca been a man.
5 Q. Anything else?
6 A. I don't recall anything.
7 Q. How about human resources?  Anyone in human resources
8   you feel discriminated against you because of your
9   sexual orientation?
10 A. I can't say either way.
11 Q. And how about retaliation?  Do you believe Ms. Carroll
12   retaliated against you because you made a complaint?
13 A. I don't -- there's nothing that comes to mind that I
14   think she retaliated.
15 Q. I know Ms. Luca did you believe; right?
16 A. Correct.
17 Q. Okay.  And how about Mr. Aphram?  Do you think he
18   retaliated against you because you made a complaint
19   against Ms. Luca?
20 A. Nothing comes to mind.
21 Q. How about human resources?
22 A. I haven't had any contact with them.
23 Q. Is there any other person you believe discriminated
24   against you because of your sexual orientation?
25 A. That I'm aware of?

Page 294

1 Q. Yes.
2 A. I don't believe so.
3 Q. Is there any other person you believe sexually
4   harassed you other than Ms. Luca?
5 A. While I was employed at Beaumont?
6 Q. Yes.
7 A. I don't believe so, no.
8 Q. Do you believe anyone at Beaumont discriminated
9   against you because of your sex, your gender?
10        MS. WARD:  Objection.  Asked and answered.
11   But go ahead.
12 A. Yes.
13 BY MR. PELTON:
14 Q. Who?
15 A. Ms. Carroll and/or Mr. Aphram.
16 Q. All right.  And that's because you believe they might
17   have treated a man differently?
18 A. Absolutely.
19 Q. Than they treated Ms. Luca?
20 A. Absolutely.
21 Q. Any other reasons that come to mind as it relates to
22   your claim of sex discrimination?
23 A. Just the conversation with Net where it appeared that
24   she felt it would have been a harsher -- it would be
25   harsher looked at if a man had done the assault.

Page 295

1 Q. Sure.  Did you ever request anything specific of
2   Mr. Aphram as it relates to the issue you had with
3   Ms. Luca?
4 A. A follow-up.
5 Q. Yeah.  So in terms of the incident did you -- did you
6   ask him to do anything specific as it relates to the
7   incident on July 30?
8 A. No.  I don't believe I asked him anything specific to
9   do.
10 Q. All right.  And then as it --
11 A. Oh.
12 Q. Go ahead.
13 A. I'm sorry.  I had emailed the supervisors and
14   Mr. Aphram regarding my request not to be partnered or
15   assigned as charge therapist when Ms. Luca was also
16   working the same shift.
17 Q. That was after your complaint of retaliation on
18   August 28th; is that correct?
19 A. Referring to my timeline.  On October 5th, 2018,
20   according to my timeline, I had emailed Jean Aphram
21   and all the supervisors with that request.  That's the
22   only request I remember.
23 Q. And twice you showed up on the schedule as charge
24   nurse while Ms. Luca was working; is that correct?
25 A. Charge therapist?

Page 296

1 Q. Yes.  Sorry.
2 A. October 13th I was charge therapist -- I was scheduled
3   to be charge therapist.
4 Q. And November 11th; right?
5 A. And November 11th.  And I was also scheduled to be
6   charge therapist -- I was scheduled to be charge
7   therapist with Ms. Luca on shift on December 7th,
8   2018, December 8th, 2018, December 9th, 2018.  I
9   believe those were all the dates.
10 Q. She was gone by December; right?
11 A. Gone as far as she -- I had noted that she was crossed
12   off the schedule, but I was scheduled as charge
13   therapist with her on shift.
14 Q. She never worked again after end of November; right?
15   That's what your notes say; correct?
16 A. November 30th is -- I put down last day that Ms. Luca
17   worked.
18 Q. Is there anything you asked Mr. Aphram to do
19   specifically as it related to your August 27th
20   complaint of retaliation by Ms. Luca?
21 A. I don't recall specifying anything specific I wanted
22   done.
23 Q. And as far as you're aware you don't know of any
24   reasons someone in human resources would have a bias
25   against you because you're a female; is that correct?

GARCIA, KRISTINA
02/04/2020                                                                      Pages 297–300

Page 297

1   A.   I don't have contact with human resources.  I don't
2        know what they think.
3   Q.   In your interrogatory responses you have listed a
4        number of witnesses that may have relevant information
5        about your claims in this case.  You're familiar with
6        that?
7   A.   Yes.
8   Q.   Have you spoken to any of those witnesses specifically
9        about testifying in this case?
10            MS. WARD:  I'm going to object to anything
11       that may or may not involve any communications between
12       me and my client.  Other than that, with that
13       understanding, you can talk about any other time you
14       might have talked to them.
15  BY MR. PELTON:
16  Q.   To be clear, I didn't ask about that.  I asked about
17       conversations you had, not your attorney, with any of
18       the witnesses you've listed here about the claims in
19       your case.
20  A.   Have I asked them or had conversations with them about
21       testifying?
22  Q.   Yes.
23  A.   No.
24  Q.   Have you spoken to any of them about the fact you have
25       a lawsuit against the company?

Page 298

1   A.   I have received questions on if I did, because
2        attorneys had questioned some people at Beaumont and
3        became aware that I did have a lawsuit, so people have
4        questioned me on it.
5   Q.   Okay.  Have you approached any of these people about
6        your lawsuit?
7   A.   No.  I had mentioned prior to anything that I was
8        considering seeking an attorney.
9   Q.   Did you tell Ms. Cary you were going to file a
10       lawsuit?
11  A.   I don't recall if I had told her that.  I remember
12       saying that I was considering seeking legal counsel.
13  Q.   Who is Karen Strzelecki?
14  A.   A coworker, a respiratory therapist.
15  Q.   What are you aware of -- you say she witnessed
16       retaliation by Luca and your efforts to avoid working
17       with Ms. Luca.  What does she know about that?
18  A.   Ms. Strzelecki, I had went to her because she was one
19       of the other charge therapists and asked her to
20       cover the one charge date.  There was another
21       conversation with Ms. Strzelecki where she had
22       informed me of what she had heard from Ms. Luca about
23       the situation, and she had brought up the other
24       retaliatory efforts that she was aware Ms. Luca had
25       done to other people and was informing me about that.

Page 299

1   Q.   Did you bring those to the attention of management?
2   A.   Bring what to the attention?
3   Q.   The things Ms. Strzelecki told you.
4   A.   No.
5   Q.   When did she tell you about these other things that
6        Ms. Luca -- she had heard Ms. Luca had done to other
7        people?
8   A.   She was friends with Ms. Luca, and according to my
9        timeline, on December 21st, 2018, I was in the
10       department.  There was at least Karen and Betty in the
11       department, and that was when Ms. Strzelecki was
12       telling me about -- let's see.  I said -- oh.  She was
13       talking about an incident she had with Ms. Luca and
14       her emergency contacts with her -- one of her
15       children.  I think that's how Ms. Luca got brought up.
16       And she had told me that Ms. Luca had talked to her
17       about the situation and said that I blew up at her,
18       being Ms. Luca, that I blew up at her during the
19       situation and that I took it out of hand.
20  Q.   Who is Ms. Warnecke?
21  A.   That is who I'm referring to in December 21st, 2018,
22       entry where I say Betty.  That's Betty Warnecke.
23  Q.   I see.  Um-hmm.  And what specifically was the
24       incident she had with Luca and her emergency contacts?
25       I'm not following that.

Page 300

1   A.   That's Ms. Strzelecki.  Somewhere around this date, I
2        believe, apparently Ms. Luca had placed Ms. Strzelecki
3        on her emergency contact list for her daughter at
4        school, so Ms. Strzelecki had received a call from
5        Ms. Luca's daughter's school.
6   Q.   All right.  And Ms. Strzelecki was not aware of it?
7   A.   According to Ms. Strzelecki, she was not aware of it.
8   Q.   And she says Luca blew up at her or Luca says
9        Strzelecki blew up at her?
10  A.   No.  The I blew up at her was I, being me, and her,
11       being Ms. Luca, that was something else that was
12       talked about during that conversation where Ms. Luca
13       told Ms. Strzelecki that during the incident, the
14       nipple grabbing incident, she had told Ms. Strzelecki
15       I blew up at her for -- she didn't say she grabbed my
16       nipple.  I don't recall what she -- what version of
17       the story she told her, but she said I took -- I took
18       it way out of hand and I blew up on her.
19  Q.   I took it way out of hand and I blew up on her?
20  A.   That I took the situation out of hand and that I blew
21       up on Ms. Luca.
22  Q.   All right.  Well, your -- your interrogatory response
23       says Ms. Warnecke heard Luca admit to sexually
24       assaulting you.  What -- what did -- what did
25       Ms. Warnecke hear from Ms. Luca in the way of

GARCIA, KRISTINA
02/04/2020

Pages 301–304

Page 301

1    admission to sexually assaulting you?
2  A.  From what I recall, both Ms. Strzelecki and
3    Ms. Warnecke had said that she admitted touching me
4    but didn't grab my nipple.
5  Q.  Well, what did she admit to touching?
6  A.  I don't recall.  You would have to ask Ms. Strzelecki
7    and Ms. Warnecke what she said she touched, but she
8    admitted to touching me.
9  Q.  When was there a conversation with Ms. Luca?
10 A.  I don't know.
11 Q.  But you learned it in December?
12 A.  I learned it -- I learned of the conversation on
13    December 21st, yes.
14           MS. WARD:  How much -- sir, how long have
15    we been on the record?
16           VIDEO TECHNICIAN:  Six 50.
17           MS. WARD:  Six 50.  If you're going to go a
18    lot further, I will need to take a bathroom break.
19           MR. PELTON:  No.  I'll finish now and then
20    we need to get those medical records and then we'll
21    finish.
22           MS. WARD:  I'm not conceding that, but we
23    can see where we are.
24           MR. PELTON:  I understand.  But I'm not
25    conceding a seven-hour limit, but we'll -- we'll --

Page 302

1    we'll discuss it.  It's all cool.
2           MS. WARD:  I understand we might need to
3    talk to the judge, too, so . . .
4           MR. PELTON:  We might.  Hopefully not.
5           MS. WARD:  Yeah.  Hopefully not, but you
6    never know.  Are you done so I can go to the bathroom
7    or . . .?
8           MR. PELTON:  Okay.  We'll finish here.
9           MS. WARD:  I'm just -- it's --
10           MR. PELTON:  Yes.
11           MS. WARD:  -- 5:05.  I'm not trying to
12    break up your flow, but I'm --
13           MR. PELTON:  I'm done.  It's not a matter
14    of flow.  I'm trying to just review my notes and see
15    if I have any other questions today, but --
16           MS. WARD:  Okay.  I can wait.  I can wait.
17           MR. PELTON:  -- let's -- let's take a break
18    and --
19           MS. WARD:  No, no.  I can wait.
20           MR. PELTON:  -- we will come back.
21           MS. WARD:  No.  I don't want to do that.
22    Go ahead.
23           MR. PELTON:  No.  We're done.
24           MS. WARD:  You're done?
25           MR. PELTON:  I've got to get some medicals

Page 303

1    and we're going to have to finish her up anyway, so
2    we'll take it up next time.
3           MS. WARD:  Well, like I said, I think
4    you'll need to file a motion to expand the time and
5    we'll deal with it at that time, but we'll -- send me
6    an email and we'll talk about it.
7           MR. PELTON:  All right.  Thank you.
8    Thanks, Ms. Garcia.
9           THE WITNESS:  Thank you.
10           VIDEO TECHNICIAN:  Going off the record.
11    The time is 5:05 p.m.
12           (The deposition was concluded at 5:05 p.m.
13           Signature of the witness was not requested by
14           counsel for the respective parties hereto.)

Page 304

1              CERTIFICATE OF NOTARY
2    STATE OF MICHIGAN )
3                     ) SS
4    COUNTY OF WAYNE   )
5
6           I, Cheri L. Poplin, certify that this
7        deposition was taken before me on the date
8        hereinbefore set forth; that the foregoing questions
9        and answers were recorded by me stenographically and
10       reduced to computer transcription; that this is a
11       true, full and correct transcript of my stenographic
12       notes so taken; and that I am not related to, nor of
13       counsel to either party nor interested in the event of
14       this cause.
15
16
17
18
19
20
21
22       Cheri L. Poplin, CSR 5132, RPR, CRR
23       Notary Public,
24       Wayne County, Michigan
25    My Commission expires:  August 21, 2025

# KRISTINA GARCIA

21061 Helle, Warren, Michigan 48089

586.943.1518
KJGarcia@umd.umich.edu

## CAREER OBJECTIVE

Seeking a position as a Student Respiratory Therapist, where I can utilize my knowledge and enthusiasm for health care while providing excellent patient care and gaining field related work experience.

## EDUCATION

**Associate of Applied Science in Respiratory Therapy**
Macomb Community College, Clinton Township, Michigan

In Progress

**Associates of Arts**
Macomb Community College, Clinton Township, Michigan

December 2008
GPA: 3.55

**Associates of General Studies**
Macomb Community College, Clinton Township, Michigan

December 2007
GPA: 3.39

## HIGHLIGHTS

- State Certified Nursing Assistant
- M.O.R.C. Entry Level Care Giver
- C.R.I.S.P. Customer Service Trained
- Cultural Competency Professional Development Certificate
- Phi Theta Kappa National Honor Society

## PROFESSIONAL EXPERIENCE

**Event Coordinator, Student Life and Leadership**
Macomb Community College
Clinton Township, Michigan

August 2006 – Present

Provides assistance to Facility Manager in meeting and event planning and implementation. Assists with operational management of assigned facilities. Responsible for on-site supervision of events and part-time staff.

**Certified Nursing Assistant**
Kalb Adult Foster Care Home III
Shelby Township, Michigan

June 2007 – December 2007

Assisted with activities of daily living. Kept daily records of medical and mental health. Administered and documented daily medications

**International Grassroots Campaign Intern**
Foundation to Support Animal Protection
Norfolk, Virginia

May 2006 – August 2006

Promoted and educated the public on humane alternatives to domestic animal and wildlife issues. Staffed the after hours informational helpline. Helped plan, promote and execute public and corporate educational events nationwide.

**Certified Nursing Assistant**
North Oakland Residential Services
Utica, Michigan

January 2006 – May 2006

Administered and documented daily medications including tubule feedings and catheter care. Kept daily records of medical and mental health and provided transportation to and from leisure as well as medical appointments. Assisted with activities of daily living.

**Medical Coordinator**
Community Homes Inc.
Berkley, Michigan

August 2003 – November 2004

Ordered and monitored medications for 8 consumers. Trained all new hires on medication administration procedures. Administered and maintained proper documentation for all medications. Assisted consumers with activities of daily living.

**Night Manager**
Q.S.R. Inc.,
Warren, Michigan

March 2000 – March 2005

Managed a crew of 20 plus employees. Handled all incoming cash, and shipments. Recognized for bringing waste levels to an all time low.

Garcia
EXHIBIT 1
2/4/20
Rptr: Cheri Poplin

Beaumont/Garcia 000029



**Position Applied For**

Position: Respiratory Therapist - 36 Hours
Facility: *Main Hospital - Beaumont Hospitals, Royal Oak
Department: Respiratory Care - RO
Schedule: Full Time - Regular
Req Num: 14964

## Application for Employment

Beaumont Hospital is an equal opportunity employer and complies with all laws prohibiting discrimination on the basis of race, color, age, sex, national origin, religion, citizenship, handicap, height, weight and marital status.

**Instructions to Applicant**

1. You must fully and accurately complete the Application for Employment. Incomplete applications will not be considered. Beaumont Hospitals may use the information given in the application to investigate the applicant's previous employment and background.
2. The Application for Employment will be considered inactive after 90 days. If you wish to be considered after that time, you must complete a new Application for Employment.
3. If you are hired, proof of citizenship or immigration status will be required to verify your lawful right to work in the United States.

**\* Required Information**                                                          April 11, 2011

PERSONAL INFORMATION

Are you a current employee of Beaumont Hospitals?* (X)No

Title: Ms.

First Name:* Kristina   MI: J

Last Name:* Garcia

Address:* 21061 Helle

City:* Warren

County:* Macomb

State:* MI

Zip:* 48089

Country: US-United States

Home/Other Phone:* 586 - 943 - 1518

Work Phone: - -

Cell Phone: - -

Best way to contact: Home Phone

Best time to contact: Evenings

Email Address:* KJGarcia@umd.umich.edu

Garcia
EXHIBIT 2
2/4/20
Rptr: Cheri Poplin

EDUCATION
High School

Name of school: Lincoln High School    Years completed? 4

Street: 22900 Federal          Degree Type: HIGH SCHOOL

City: Warren                Did you graduate? Yes

Beaumont/Garcia 000015

State: MI                          Province:
Zip: 48089                         Postal Code:
Country: US-United States

**Associates**

Name of school: Macomb Community College        Major: General Studies
Street: 44575 Garfield                           Degree Type: ASSOCIATES
City: Clinton Township                           Did you graduate? Yes
State: MI                                         Date of Graduation or
                                                  Anticipated Date of Graduation:* 12 / 20 / 2007
Zip: 48038                                        Province:
Country: US-United States                         Postal Code:

**Undergraduate**

Name of school:                    Major:
Street:                            Degree Type:
City:                              Did you graduate?
State:                             Date of Graduation or
                                   Anticipated Date of Graduation:* / /
Zip:                               Province:
Country:                           Postal Code:

**Technical**

Name of school: Kramer Center                    Major: Nurse Assistant
Street: 8830 E. Ten Mile Road                    Degree Type: NO DEGREE
City: Centerline                                 Did you graduate? Yes
State: MI                                         Date of Graduation or
                                                  Anticipated Date of Graduation:* 08 / 01 / 2002
Zip: 48089                                        Province:
Country: US-United States                         Postal Code:

**Other**

Name of school: Macomb Community College         Major: Applied Science
Street: 44575 Garfield                           Degree Type: ASSOCIATES
City: Clinton Township                           Did you graduate? No
State: MI                                         Date of Graduation or
                                                  Anticipated Date of Graduation: 05 / 11 / 2011
Zip: 48038                                        Province:
Country: US-United States                         Postal Code:

**Other**

Name of school: Macomb Community College         Major: Arts
Street: 44575 Garfield                           Degree Type: ASSOCIATES
City: Clinton Township                           Did you graduate? Yes
State: MI                                         Date of Graduation or 12 / 20 / 2008
                                                  Anticipated Date of Graduation:
Zip: 48038                                        Province:

**Beaumont/Garcia 000016**

| | |
|---|---|
| Country: United States | Postal Code: |

**Other**

| | |
|---|---|
| Name of school: Macomb-Oakland Regional Center Inc. | Major: Caregiver |
| Street: 44575 Garfield | Degree Type: NO DEGREE |
| City: Clinton Township | Did you graduate? Yes |
| State: MI | Date of Graduation or Anticipated Date of Graduation: 05 / 01 / 2006 |
| Zip: 48038 | Province: |
| Country: United States | Postal Code: |

**LICENSES/CERTIFICATIONS**

| Type | State | Number | Date Issued | Expiration Date | Temp / Perm |
|---|---|---|---|---|---|
| Certified Nuse Assistant | MI | 230008258080403 | 08 2002 | 08 2006 | [X] / [ ] |

Have you ever had any disciplinary action taken against your professional license? No
If yes, please explain circumstances and outcome.

**WORK HISTORY**

Please provide the requested information about your past employers, beginning with your most recent employer. Make sure you include volunteer work or other job related training which provides information on skills/abilities you have developed. It is important to be accurate and complete since your pay rate may be related to your experience.

Are you currently employed?* Yes

**(Please indicate all Employment from the past 5 years, with a minimum of 3 previous employers)**

**1. Current/most recent employer:**

| | |
|---|---|
| Name of Company:* Student Life and Leadership Macomb Community College | Job Duties and Responsibilities:* Provides assistance to Facility Manager in meeting and event planning and implementation. Assists with operational management of assigned facilities. Responsible for on-site supervision of events and part-time staff. |
| Street: 44575 Garfield | |
| City: Clinton Township | |
| State: MI | |
| Zip: 48038 | |
| Employer's Phone: 586 - 286 - 2242 | Reason For Leaving:* Present Employer |
| Other Name(s) Used: | May we contact this employer for a reference? Yes |
| Job Title:* Event Coordinator | |
| Employed From:* 08 2006 | |
| Employed To: Present Present | |
| Supervisor's Name: Jenn McCabe | |

Beaumont/Garcia 000017

Supervisor's Phone: 586 - 286 - 2086

Employment Status: Part Time

**2.**

Name of Company: Kalb Adult Foster Care Home III

Street: 13599 Culver Drive

City: Shelby Township, Michigan

State: MI

Zip: 48315

Employer's Phone: - -

Other Name(s) Used:

Job Title: Certified Nursing Assistant

Employed From: 06 2007

Employed To: 12 2007

Supervisor's Name: Susan

Supervisor's Phone: - -

Employment Status:

Job Duties and Responsibilities:
Assisted with activities of daily living. Kept daily records of medical and mental health. Administered and documented daily medications

Reason For Leaving:
Closed Down

May we contact this employer for a reference?
Yes

**3.**

Name of Company: Foundation to Support Animal Protection

Street: 501 Front Street

City: Norfolk

State: VA

Zip: 23510

Employer's Phone: 757 - 622 - 7382

Other Name(s) Used:

Job Title: International Grassroots Campaign Intern

Employed From: 06 2006

Employed To: 08 2006

Supervisor's Name: Angela Conant

Supervisor's Phone: 757 - 622 - 7382

Employment Status: Full Time

Job Duties and Responsibilities:
Promoted and educated the public on humane alternatives to domestic animal and wildlife issues. Staffed the afterhours informational helpline. Helped plan, promote and execute public and corporate educational events nationwide.

Reason For Leaving:
Summer Internship

May we contact this employer for a reference?
Yes

Beaumont/Garcia 000018

## MILITARY SERVICE

Were/Are you a member of the U.S. Armed Forces?

Branch of Service:

Period of Active Duty:   From:

To:

Highest rank held:

Type of Separation/Discharge:

## RESUME

**Resume-** *For your convenience, you may copy your resume and cover letter here.*
To cut and paste your resume:

1. Highlight the text on the resume you want to copy.
2. Press 'Ctrl C' to copy (Hold down the Ctrl key and press C).
3. Place the cursor in the **RESUME** box below.
4. Press 'Ctrl V' to paste the information.

**Cover Letter**
21061 Helle
Warren, Michigan 48089
586.943.1518
KJGarcia@umd.umich.edu

April 11, 2011

Mike Wagner
William Beaumont Hospital
3601 W. Thirteen Mile Road
Royal Oak, Michigan 48073

Dear Mr. Wagner:

Please allow me to introduce myself. My name is Kristina Garcia. I am currently in my last semester of the Respiratory Therapy program at Macomb Community College. I am writing because I wanted to express my interest in working for and becoming part of the team at William Beaumont Hospital Royal Oak.

I completed my Neonatal rotation at Royal Oak Beaumont from January - April of this year. I am currently in my final ICU rotation here at Royal Oak Beaumont as well. I have thoroughly enjoyed my experience at Beaumont. I feel I would be a great addition to your staff since quality of patient care is a high priority of mine and from my experience at your hospital; it is a high priority of Beaumont as well. Please feel free to inquire with Steve Hamick with any questions as to my professionalism and performance during my clinical rotation. In addition, I conducted my floor therapy rotation at Harper University Hospital under Charles Dunlap BAS-RT, RRT-NPS. Should you wish to contact him regarding my performance, Charles can be reached at 313.745.1510 or via email at CDunlap@dmc.org

I welcome the opportunity to interview for a position, and hope you keep me in consideration should a position open.

Sincerely,

Kristina Garcia
Ph: 586.943.1518
Email: KJGarcia@umd.umich.edu

**Resume**
Kristina Garcia
586.943.1518

**Beaumont/Garcia 000019**

21061 Helle, Warren, Michigan 48089
KJGarcia@umd.umich.edu


Career Objective
Seeking a position as a Student Respiratory Therapist, where I can utilize my knowledge and enthusiasm for
health care while providing excellent patient care and gaining field related work experience.

Education
Associate of Applied Science in RespiratoryTherapy In Progress
Macomb Community College, Clinton Township, Michigan

Associates of Arts December 2008
Macomb Community College, Clinton Township, Michigan GPA: 3.55

Associates of General Studies December 2007
Macomb Community College, Clinton Township, Michigan GPA: 3.39
Highlights
? State Certified Nursing Assistant
? M.O.R.C. Entry Level Care Giver
? C.R.I.S.P. Customer Service Trained
? Cultural Competency Professional Development Certificate
? Phi Theta Kappa National Honor Society

Professional Experience
Event Coordinator, Student Life and Leadership Macomb Community College
Clinton Township, Michigan August 2006 - Present
Provides assistance to Facility Manager in meeting and event planning and implementation. Assists with
operational management of assigned facilities. Responsible for on-site supervision of events and part-time
staff.

Certified Nursing Assistant
Kalb Adult Foster Care Home III
June 2007 - December 2007
Shelby Township, Michigan
Assisted with activities of daily living. Kept daily records of medical and mental health. Administered and
documented daily medications


International Grassroots Campaign Intern Foundation to Support Animal Protection
May 2006 - August 2006
Norfolk, Virginia
Promoted and educated the public on humane alternatives to domestic animal and wildlife issues. Staffed the
afterhours informational helpline. Helped plan, promote and execute public and corporate educational events
nationwide.

Certified Nursing Assistant
North Oakland Residential Services
January 2006 - May 2006
Utica, Michigan
Administered and documented daily medications including tubule feedings and catheter care. Kept daily
records of medical and mental health and provided transportation to and from leisure as well as medical
appointments. Assisted with activities of daily living.


Medical Coordinator
Community Homes Inc.
August 2003 - November 2004
Berkley, Michigan
Ordered and monitored medications for 8 consumers. Trained all new hires on medication administration

Beaumont/Garcia 000020

procedures. Administered and maintained proper documentation for all medications. Assisted consumers with activities of daily living.

Night Manager
Q.S.R. Inc.,
March 2000 - March 2005
Warren, Michigan
Managed a crew of 20 plus employees. Handled all incoming cash, and shipments. Recognized for bringing waste levels to an all time low.

REFERENCES

Please give three professional references (DO NOT list relatives)

| Name | Phone Number | Email Address | Relationship |
|---|---|---|---|
| Diane Wisnewski | 586 - 873 - 1955 | WisnewskiD@macomb.edu | Former Supervisor |
| Rick Zahodnic | 586 - 286 - 2033 | ZahodnicR@macomb.edu | Professor |
| Mai Vang | 586 - 350 - 9966 | VangM@macomb.edu | Co-Worker |

ADDITIONAL INFORMATION

How did you find out about this position?* Employee Referral (Beaumont Employee)

If you selected other, please enter "Other" source:

If you were referred by a current employee, enter their

First Name: Steve

Last Name: Hamick

Department: Respiratory Therapy

If you have any relatives currently employed by Beaumont Hospitals, please provide their information below:

| First Name | Last Name | Relationship | Department |
|---|---|---|---|

Please answer all of the following questions.

* Yes     If you are under 18 years of age, can you provide required proof of your eligibility to work?

* Yes     Are you legally eligible for employment in the United States with any employer?

If yes, and you are not a U.S. Citizen, please provide the number of your Resident Alien or Work Authorization Card.
Form I-551: Form I-94: Class

* Yes     Beaumont Hospitals is a smoke-free employer. Will you be able to comply with this policy?

* No     Have you ever been employed by Beaumont Hospitals or any of its affiliates in any capacity?

If yes, hire date and department?
Hire Date: Department:

* No     Have you previously filed an application with Beaumont Hospitals or any of its affiliates?

If yes, please provide name of affiliate(s):

* Yes     Have you previously used other names for work or education records?

If yes, please provide: Kristina Baker

* No     Are you a recipient of a Beaumont Hospital scholarship or student loan?

* Yes     Are you able to perform the essential job functions of the position(s)?

If no, please explain.

Beaumont/Garcia 000021

* No     Have you ever been convicted of a crime (misdemeanor or felony) other than a minor traffic offense? Please be sure to include any major traffic offense such as DUI, OUI, etc.

           If yes, please explain.

           *(Beaumont Hospitals conducts criminal record checks. Failure to divulge complete information will disqualify you from employment. However, conviction will not necessarily disqualify an applicant from employment).*

* No     Are you charged with or have any pending unresolved criminal charges? (Are you charged with a crime that has not yet resulted in a plea of guilty, court trial, deferred adjudication or dropping of the charge? )

           If yes, explain fully.

* No     Have you ever been discharged or suspended from employment?

           If yes, please explain.

READ AND SIGN

## Read the following carefully before signing.

In submitting this application for employment, I understand that an investigation may be made whereby information is obtained regarding my character, previous employment, general reputation, education, educational background and/or criminal history. I agree the information I have provided is truthful and accurate. I understand that false information may be sufficient cause for termination.

**My typed name below shall have the same force and effect as my written signature.**

Candidate's/Applicant's Signature: Kristina Garcia

Date: April 11, 2011

Beaumont/Garcia 000022

# July 2018

Garcia
**EXHIBIT 4**
2/4/20
Rptr. Cheri Poplin

July 2018

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|--------|--------|---------|-----------|----------|--------|----------|
| Jul 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | 31 | Aug 1 | 2 | 3 | 4 |

August 2018

July 2018

Thomas Kienbaum

12/10/2019 9:27 AM

1

# August 2018

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|--------|--------|---------|-----------|----------|--------|----------|
| Jul 29 | 30 | 31 | Aug 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 | 31 | Sep 1 |

August 2018
Su Mo Tu We Th Fr Sa
      1 2 3 4
5 6 7 8 9 10 11
12 13 14 15 16 17 18
19 20 21 22 23 24 25
26 27 28 29 30 31

September 2018
Su Mo Tu We Th Fr Sa
                1
2 3 4 5 6 7 8
9 10 11 12 13 14 15
16 17 18 19 20 21 22
23 24 25 26 27 28 29
30

12/10/2019 9:30 AM

Thomas Kienbaum

1

# September 2018

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|--------|--------|---------|-----------|----------|--------|----------|
| Aug 26 | 27 | 28 | 29 | 30 | 31 | Sep 1 |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23 | 24 | 25 | 26 | 27 | 28 | 29 |
| 30 | Oct 1 | 2 | 3 | 4 | 5 | 6 |

September 2018

October 2018

# October 2018

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|--------|--------|---------|-----------|----------|--------|----------|
| Sep 30 | Oct 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | 31 | Nov 1 | 2 | 3 |

October 2018

| Su | Mo | Tu | We | Th | Fr | Sa |
|----|----|----|----|----|----|----|
|  | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | 31 |  |  |  |

November 2018

| Su | Mo | Tu | We | Th | Fr | Sa |
|----|----|----|----|----|----|----|
|  |  |  |  | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | 29 | 30 |  |

12/10/2019 9:27 AM

Thomas Kienbaum

1

# November 2018

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|--------|--------|---------|-----------|----------|--------|----------|
| Oct 28 | 29 | 30 | 31 | Nov 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | 29 | 30 | Dec 1 |

Thomas Kienbaum

12/10/2019 9:27 AM

1

# December 2018

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|---|---|---|---|---|---|---|
| Nov 25 | 26 | 27 | 28 | 29 | 30 | Dec 1 |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23 | 24 | 25 | 26 | 27 | 28 | 29 |
| 30 | 31 | Jan 1, 19 | 2 | 3 | 4 | 5 |

December 2018 — Su Mo Tu We Th Fr Sa: 2 3 4 5 6 7 8 / 9 10 11 12 13 14 15 / 16 17 18 19 20 21 22 / 23 24 25 26 27 28 29 / 30 31

January 2019 — Su Mo Tu We Th Fr Sa: 1 2 3 4 5 / 6 7 8 9 10 11 12 / 13 14 15 16 17 18 19 / 20 21 22 23 24 25 26 / 27 28 29 30 31

Thomas Kienbaum

12/10/2019 9:27 AM

1

**PRODUCED PURSUANT TO PROTECTIVE ORDER**

To Whom It May Concern,

On the night of Sunday, July 28ᵗʰ I was sitting on break with two of my coworkers, Colleen Kay and Rachel Luca. I had forgotten my work coat that night and made the comment that I was so cold you could see me (meaning my nipples) through my bra. I was embarrassed about it (going into patient rooms like that) and mentioned I had a really good, insulted bra on so I was surprised. Colleen and Rachel both asked what kind of bra I had and stated they were in love with their new bra's and asked if I had "one of these"... they both pulled their bra's shoulder strap slightly out of their shirt to show me and were talking about the type/brand of bra that it was and how they both just got them and were in love with them. I said "No, I have a regular bra but a good one" and I pulled on my strap just as they did, to show it was regular. While I did that Rachel had got up and came next to me, I didn't even notice she had moved from her chair when suddenly her hand was down my shirt, inside my bra cup and she pinched my nipple (bare skin) and pulled up on my (left) breast, removing it from the bra cup. Stunned, I stated "Now that was too f****** far!". She immediately said, "oh I'm sorry I didn't mean to offend you". I responded asking "What are you doing?! Why would you do that?!" She said "I just wanted to see your bra", I said something along the lines of that wasn't my bra that was my nipple and again asked why she would do that. She stated "Well you have nice nipples" and giggled. It had all happened so quickly and I was so shocked I really didn't know what else to do at that point. I was so upset I knew I needed to stop and diffuse (myself and my emotions) because nothing good was going to come of it. I don't know if Colleen or Rachel had changed the subject at that point, it was a bit of a blur because I was so enraged I was focused on handling myself appropriately. I managed to let things go at that time because as I stated, any escalation of conversation wouldn't have served any constructive purpose at that time.

I have had situations with Rachel in the past where she had continuously made comments about me "wanting her" and her both asking me and telling me that she "knew" that "I found her attractive". It have never said I found her attractive and never responded to her questioning if I found her attractive because I brushed it off as her being silly. It had become so repetitive however, that a few months back (maybe 6-7 months ago) that I wanted to clear the air and had said to Rachel, "You know I'm not interested in you right?". I said this because I wanted to clear

Garcia
EXHIBIT 5
2/4/20
Rptr: Cheri Poplin

**CONFIDENTIAL**

PRODUCED PURSUANT TO PROTECTIVE ORDER

the air in case she really believed that I was interested in her. She had responded "I'm not interested in you either" and stormed away appearing either upset or insulted. After that I acted normal toward her and she did the same. This incident however, was so upsetting and crossed the line that I felt I had to say something to our supervisor. I wanted this documented and I expressed to Net that I was not comfortable being alone with her so we would not be paired together in an ICU where we could possibly be alone in our supply room where we do a lot of our charting.

If there are any further questions, please feel free to contact me.

*Kristina Garcia*

Kristina Garcia

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**KRISTINA GARCIA,**

Plaintiff,

**Case No.: 19-cv-11673**

v.

Judge Linda V. Parker

**BEAUMONT HEALTH and
RACHEL LUCA,**

Magistrate Judge David R. Grand

Defendants.

| | |
|---|---|
| **Lisa C. Ward (P38933)** | **Eric Pelton (P40635)** |
| Attorney for Plaintiff | **Shannon V. Loverich (P53877)** |
| Law Office of Lisa C. Ward, PLLC | Attorneys for Defendants |
| 4131 Okemos Rd., Ste. 12 | Kienbaum Hardy Viviano |
| Okemos, MI 48864 | Pelton & Forest, PLC |
| (517) 347-8100 | 280 N. Old Woodward Ave., Ste. 400 |
| lisacwardlaw@gmail.com | Birmingham, MI 48009 |
| | (248) 645-0000 |
| | (248) 645-1385 |
| | epelton@khvpf.com |
| | sloverich@khpvf.com |

### PLAINTIFF'S FIFTH SUPPLEMENTAL RESPONSE
### TO DEFENDANT BEAUMONT HEALTH'S FIRST REQUEST
### FOR PRODUCTION OF DOCUMENTS

Plaintiff, Kristina Garcia, by her attorneys, hereby submits the following Fifth

Supplemental Responses to Defendant Beaumont Health's First Request for Production of

Documents.

Garcia
EXHIBIT 6
2/4/20
Rptr: Cheri Poplin

1

1. All documents in the possession or control of the Plaintiff that mention, discuss, refer or relate to Plaintiff's claims against Defendant Beaumont Health in this litigation or the events described in Plaintiff's Complaint.

**SUPPLEMENTAL RESPONSE: See Attachment 1**

2. All diaries, journals, calendars, logs, planners, day-timers or appointment books used by Plaintiff from January 2017 to the present.

**SUPPLEMENTAL RESPONSE: See Attachment 1**

Respectfully Submitted,

Dated: February 3, 2020

**Lisa C. Ward (P38933)**
Attorney for Plaintiff
Law Office Of Lisa C. Ward, PLLC
4131 Okemos Road, Suite. 12
Okemos, MI  48864
(517) 347-8100
lisacwardlaw@gmail.com

2

## CERTIFICATE OF SERVICE

I, Polina Hristova, hereby certify that on January 29, 2020, I served a copy of Plaintiff's

Fourth Supplemental Response to Defendant Beaumont Health's First Request for Production of

Documents on Defendant's attorney of record, Eric Pelton, via email and certified U.S. mail.

Dated: February 3, 2020

_____
Polina Hristova
*Legal Assistant*

# ATTACHMENT 1

Timeline of events:

7-29-18. Incident where Miss Luca put her hand down my shirt. (Sunday night/Monday morning) with Colleen present.
Also, Miss Luca initiated a conversation about her "beautiful vagina" with Colleen and ToniRose present.

8-6-18. Initial complaint informing Mrs. Carroll about the incident.

8-8-18. Turned in my written statement to Mrs. Carroll about the incident. Mrs. Carroll updated me stating she talked to Miss Luca and Colleen Kaye and that no ones stories were the same and that she told Miss Luca not to talk about the incident to anyone or it would be going to HR for further review. She also said there were a few more people she had to talk to.

8-27-18. (During shift Sunday night/Monday morning) Mr. Matthewson told me that Miss Luca told him (unsolicited) about the situation and that I was lying. (In the morning) I spoke with Mrs. Carroll insisting HR become involves because of my conversation with Mr. Matthewson and how Miss Luca was slandering my name calling me a liar and talking about the incident. Both Jean Aprham and Miss Carroll both assured me HR would be contacted and they would update me after they spoke with them.

9-2-18 Miss Luca came to 4East (where I was scheduled) 3 times. Told Tony that "Stacy and I concocted a story to get her fired" and that I lied about the whole thing. She was scheduled to float between 2&3 east. She never contact myself or David to see if we needed help. So she was not in the unit to help. She was in the unit to talk to nurses about the incident.

****8-15-19 Rachel was arrested for "B&E - Burglary - Forced Entry - Residence - Home Invasion, Damage to Property (other), Resisting Officer"

█████████████████████

9-10-18 Emailed Kevin Brancaleone in HR and Jose VP requesting follow up.
Both Kevin Brancaleone and Jose Rivera responded to my email stating they would look into things.
Jean emailed me regarding my complaint stating he would like to meet with me.

9-11-18 Jean sent me an email (obviously Kevin spoke to him) asking to meet with me upon return from My vacation.

9-23-18 Angelita called and told me that Miss Luca was "yelling" about the incident in 4C on 9-14-18 and also told her about the incident saying I was a liar during ACLS class on 9-17-18. Miss Luca also told Angelita on this day that Mrs. Carroll confronted her about her recordings of selling her Xanax when Miss Luca was on break from ACLS and had went to the department regarding a switch. Per Rhonda Salhaney, Mrs Carroll told Miss Luca to leave her phone and purse in the department and come into the office.

9-24-18 Made Dr appointment for depression. Dr. Kamath on vacation. Scheduled with Dr. Kurzawa.
Called EAP to initiate counseling.

9-25-18 written affidavit sent to HR

9-26-18 Appointment with Dr. Kurzawa. Begun antidepressants and anti anxiety meds.

9-26-18 thru 10-3-18
On FMLA

10-02-18
Called in at Lakeland because of FMLA

10-03-18 Follow up appointment with Dr. Kurzawa. Approved to return to work.

10-05-18
Emailed Jean Aprham and the supervisors asking not to be Charge therapist or partnered with Miss Luca on assignments.

10-08-19 Met with Mrs Carroll about needing clearance from occupational health. Mrs Carroll brought up that she hadnt yet heard back from HR and also acknowledged my email and said they would "pay attention" when scheduling Miss Luca and myself. I mentioned Allen had not yet removed me from Charge duties on Saturday the 13th.

10-09-18 Appointment with Occupational Health.
When the NP/PA asked if I knew why I was depressed I said "Yes, because I was sexually assaulted at work and no one is doing anything about it".
First counseling appointment.

10-13-18 I took it upon myself to ask Karen S. to take my charge day and she did. Removed myself from Charge duties and given a regular assignment because Miss Luca worked. This was after asking three times to be removed from Charge on this day.

PLAINTIFF (Supp5) 00829

10-15-18 Counseling appointment.

10-19-18 Angelita called me after work to tell me Jim Burgess and Allen were speaking with Miss Luca in the 4E conference room (night of 10-18-18) and she was crying. Miss Luca worked in 5E with Darlene that night. Angelita and Jessica May were in 4E.

10-22-18 Counseling appointment.

10-23-18 Jean left me a voicemail to come see him after my shift.

10-24-18 Spoke with Jean after my shift. Jean stated that HR wanted to talk to me and states that things had been "addressed".

10-27-18 Ran into Miss Luca on 6C med room while looking for water bottles for Sue in PEDS. She tried to talk to me stating "Hey, Kryssie?" I did not respond and left the med room immediately.

10-29-18 Counseling appointment.

11-7-18 Counseling appointment.

11-11-18 Scheduled to be Charge with miss Luca on shift despite my request not to be.

11-13-18 Counseling appointment.

11-14-18 6-week Follow up appointment with Dr. Kurzawa regarding medications.

11-20-18 Counseling appointment.

11-30-19 Last day that Rachel worked before jail drama

12-4-18 Counseling apmt and Psychiatrist apmt. Meds increased from 20mg to 30mg for anxiety. (Upcoming charge weekend with Rachel on staff)
** Rachel arrested? 12-4-18 is the date of her offense. Rachel called in as FMLA on the night of 12-4-18. Charged with two counts of: **750.81d Assaulting, battering, resisting, obstructing, opposing person performing duty; felony; penalty; other violations; consecutive terms; definitions.**

12-7-18 Scheduled as Charge with Rachel on shift. (Rachel was crossed off schedule.) Burgess came to get me in 6E because Allen wanted to talk. Allen told me that Rachel "shouldnt be in this weekend" but if she were to show up, not to give her an assignment, to have her call him.

12-8-18 Scheduled as Charge with Rachel on shift. (Rachel was crossed out on schedule.)

12-9-18 Scheduled as Charge with Rachel on shift. (Rachel was removed from schedule.)

12-9 found out Rachel had told Cheri about the incident. Found out Sue Buckner knew but thought it was about an inappropriate conversation.

12-11-18 Counseling appointment.
Per HRs statement to EEOC, this was the date Rachel was terminated.

12-13-18 Found out Rachel was arrested.

12-15-18 Found out from Shavonne that Karen "backed away" from Rachel because Rachel wouldn't stop talking to her about the situation between me and her (Rachel) and Karen said she was "messy" and didnt want to know anything because she didnt want any type of involvement.

12-18-18 Marcia told Stacy that her and Diana Grayson were talked to by Human Resources. Someone said Marcia had walked in during the incident.

12-21-18 Karen and Betty told me that Rachel told them "I blew up at her" because she was joking and touched my shirt by my bra strap and that it was a joke and I took it "way out of hand."
Also... Karen told me about the emergency contact incident where Brianna called Karen from school needing to be picked up and that Karen was on her emergency contacts, and she also said that the engineer that Rachel was "dating" had broke it off with her so she put all his personal information on craigslist and Karen was not happy about that. She said she is shady and she couldnt believe how dirty she was being and that she didnt want anything to do with her after that because she realized how dirty and shady she was by her retaliation just because he didnt want to date her anymore.

2-28-19 Put in my resignation for charge.

3-12-19 Rachel was released from jail.

3-16-19 I was charge and Burgess called me at the beginning of shift and stated that he didnt have any confirmation or reason to think this.... but he had a feeling that Rachel may come by the department over the weekend and told me if she were to come by to tell her nicely that she could not be in the department and she had to go or security will be called. And if she didnt promptly leave then to call security.

4-14-18 Last day as charge

PLAINTIFF (Supp5) 00830

5-21-19 Rachel was arrested again and charged with **"750.157c Recruiting, inducing, soliciting, or coercing minor to commit felony."**

10-10-19 Angelita was called in early to speak with someone. Beaumonts lawyer, Shannon, was here to question Angelita. Angelita called me from work to tell me. This conversation was recorded.

??? Found out by email they were havinf a new election for the scheduling committee. Never did that before. Only when Kim wanted to quit. Sue has been doing the schedule for 20 years. Kim for xx years. No vote for day shift scheduling.

12-12-19 Phil M said Rachel tried to sell him adderall. David said she tried to sell him weed.

PLAINTIFF (Supp5) 00831

## Conversation with Net

**Net 0:07**
Come in

**Kristina 0:08**
Hey. (Pause) How are you doing?

**Net 0:18**
I hate Mondays. Especially when I've been off on a Friday

**Kristina 0:21**
Oh, because you had a 4 day..3 day weekend?

**Net 0:21**
Well, yeah, it doesn't feel like that. It's like I'm like, oh my god.

**Kristina 0:30**
Okay, so I don't know where to start with this.

**Net 0:32**
Oh my god.

**Kristina 0:34**
So, I guess let's give it just a little bit backstory. Okay. Okay. So, Rachel, okay. She's made a lot of comments to me before, like me being interested in her and stuff like that. Just wait. Just wait.

**Net 0:50**
Are you serious? That girl is dreaming.

**Kristina 0:53**
And so, you know, you know how we all talk at night, we're a very playful bunch. I've never let it get to me or whatever. Well, I'd say like six to eight months ago, I think, me and her were and 4 east together in the little back room. And she kept making comments making comments about like, she thinks I want her and stuff like that. And she said it, so many times so close together. I'm like, maybe something I'm doing is misleading her. So I'm, I'm thinking to myself, let's just clear the air. Ao, I'm like, Rachel, you know, I'm not interested in you, right? Like, I thought that was a very nice way. And, she was like, oh, oh, oh and she like, got huffy, and puffy and I don't remember ever what she said, but she left the room. Like, immediately. I was like, Oh, I think someone got their feelings hurt.

**Net 1:47**
Yeah, I was just gonna say you offended her (laughs)

**Kristina 1:49**
And then she came back in about 15, 30 seconds later and was like, "I'm not interested in you either." And, like, shut the door. And I was like,

1 of 14

Garcia
EXHIBIT 7
2/4/20
Rptr: Cheri Poplin

PLAINTIFF 00137

**Net 1:57**
(Sighs) Oh, she's so immature.

**Kristina 1:58**
Okay, okay, someone their feelings hurt.

**Net 2:00**
Yeah

**Kristina 2:01**
And to be honest. Now, I've talked to Stacy about this, because I was like, I kind of want someone to know. But umm, like I told Stacy, I said, I think Rachel just wants someone to want her. (Net: That's all) So I don't think it's like, personal really.

**Net 2:13**
Right. Right.

**Kristina 2:15**
I think she just wants someone (Net: Right) to want her or to love her, (Net: Right) you know. So, I blew that off. No big deal. Things were awkward for a little bit. (Net: Okay) I would say not a my side, I don't think. (Net Right) But like Stacy even said, Oh, she's she's awkward around. you now.(Net: Yeah, well, yea) And let's just, you know, and she actually brought it up in front of other people like, Oh, yeah, because you think I wanted you or whatever. And I was like I didn't, or I don't remember, she said something about it. And I was like, I was just clearing the air to make sure there was no miscommunication or anything. (Net: Hmm mm) Well, a little bit after that. We were walking in the hallway, and our hands like, bumped because we're.  (Net: Yeah, yeah I know) And then she, like, went to go grab my hand. Like, jokingly she's, he he he, I was just like "girl, what you going?" (Net: laughs) And so she's like, "what, you don't want to hold my hand? You don't find me attractive?" like stuff like that. (Net: What is her problem?) I know! I'm like, Girl, I was like, Okay, so I'm just thinking to myself. Just let it roll. Like, don't don't bite on this. Don't make it a big thing, whatever. Okay, so we really haven't had any issues since then.

**Net  3:19**
Okay, and that was six to eight months ago.

**Kristina  3:22**
Yeah, between six and eight months ago that both of these things have happened. And, umm, then last Sunday, Colleen, and I and Rachel were sitting together. And, it, what was then? Now I'm not I'm probably not going to say this verbatim, because it's been a week now. And I'm kind of pissed. And some things are a little bit of a blur. But umm, we were sitting together. Oh, that's what it was! I had forgotten my hoodie. I always have a hoodie. I'm always cold. And so I have one of the yellow gowns, and I was wearing it because it was cold. And I made a comment, might be inappropriate, but we, you know how we talk on nights, we're a little loose. (Net: Yea, I know, I know, I know, (laughs)) Well, I said, I'm like, "it's so cold, I'm freezing. You can see my nips through my bra," you know, and I was like, and I got a good girl. And Colleen and Rachel were both like, do you have a bra like us? Like, they were like fascinated with their little, umm, I guess they have like a combo bra, uhh what do you call it? A sports bra bra combo or whatever? And they're like, "Do you have one? Like, this is like this." And I was like, "No, I have a regular

PLAINTIFF 00138

one." And I did this same exact thing they did. And Rachel, I'm not even joking Net, I'm laughing because I'm like, it's so I don't get pissed. Somehow she got, okay, so like, say Colleen was there. (Net: Uh huh) I'm here. (Net: Uh huh) Rachel was like, we're in a triangle, to I didn't even hear or see whatever her get up. I'm like this. (Net: Uh huh) She stuck her hand down my shirt, grabbed my nipple. (Net: No she didn't!) She pulled my breast up. And I go, "now that's too fucking far, right there!" (Net: Oh Hell Yeah) And she was like, "Oh, oh, are you offended? I'm sorry. I was just looking at your bra." And I go, "No, you grabbed my nipple. Like, what are you doing?" And she was like, I was just playing, I just want to see your bra." (Net: You don't play. You don't do that shit.) And I was like, "did you want to see the color of my nipple? Or Like what?" Like, what I like I don't, I cannot (Net: Understand why you would do something like that!) I was just like, what? Like Colleen is like, "Rachel, you so crazy I don't know what you're doing," you know? And I was just, she knew, she I was pissed. And she was like, "I'm so sorry. I'm so sorry. I didn't mean to offend you." I'm thinking I was thinking in my head. You didn't offend me? You just pissed me off.

**Net  5:38**
You don't do that! You just, You went over, she went over the line.

**Kristina  5:40**
If she was a dude Net, I would have (Net: You would've punched the shit out of her, I know!) without even thinking. (Net: I know, I know) I was I'm actually proud of myself that wasn't my reaction.

**Net  5:48**
I am too that you held it together? I think I would have just, reaction would have been like, pew!

**Kristina  5:51**
Exactly, but I swear to you Net, I didn't, I don't even know how she got from there to here with her hand down my fucking shirt within like point five of a second like. And then after that was a little bit of a blur. Because I was so pissed, but I was trying so hard girl to like (Net: (laughs) Well, you kept it in (laughs)) not do anything wrong. I was I was in complete shock thinking like, "why the hell did you think that was okay." (Net: Yeah, exactly) I mean, like I said, I know on nights were a little loose with our lips. (Net: Yeah, but we but yeah, you still) But, you touched me. (Net: Exactly) Like, you just touched me. Now, she brushed against me before and kind of did one of these. (Net: Yeah)  I was like ehh

**Net  6:27**
Yeah, you brushed it off and think, okay, it was an accident.

**Kristina  6:30**
You didn't you didn't even reach down my shirt, you touched my boobie, your grabbed my fucking nipple. You know what I'm saying? Like, I was so pissed, Net. So anyways, like, I it was a little, little bit of tension there, or whatever. And I think to kind of, maybe redeem herself. This is my opinion of it. To redeem herself. She was talking about vaginas. And she was like, I'm not gay. I could never I could never, and she's like, on her phone, Googling vaginas. And she was like, (Net: What the hell?) I was like, Why? I know. I know. You're probably wondering why the hell are you still in this room? (Net: I would've left!) I know. I know. I know. I don't know why I didn't know. But she like, points the phone to me. And she's like, (Paused to ask Net: You know, I'm bi, right?)

PLAINTIFF 00139

**Net  7:13**
Okay, I know.

Kristina  7:14
She she's like you like this? And I go, "Rachel, Google ugly dicks, you're going to find them too." I'm like, What are you asking me right now? Seriously, what are you asking me?

**Net 7:24**
But, it's none of her fucking business. And this isn't a place. We don't do that. She doesn't have that kind of relationship with you to have these kind of, you know what I'm saying?

**Kristina 7:29**
But she, she is she's loosened up with everybody.

**Net 7:31**
I know. But she got is she has to rein in. It's like Enough is enough. And your immaturity? You got kids. I feel sorry, your mom, she should know fucking better.

**Kristina  7:40**
Right? Well, I feel like she's doing this to me because I'm bi and I think she thinks like, she can get away with this or something like, I don't know. But I was just like, still again, just blowing her off. And I'm like, Oh, this is her redeeming herself saying I'm not gay. I didn't touch you.

**Net 7:55**
But, that's not even redeeming. That's her actually making more out of it than she needs to. (Kristina: Well, I think) She's bringing more attention to it. You know? (Kristina: And, it's insulting too) Well, that's what I'm saying? Yeah, that's what I'm saying. Yeah.

**Kristina 8:03**
But, you know, but I think that was in her mind.

**Net 8:05**
Yeah, that's how she thought. Yeah, you're probably right. But, she is immature, she probably thought that.

**Kristina  8:10**
She is immature. And that's why I was just like, kind of blowing it off. But, when she was doing that, she was like, Yeah, Elaine, she made a comment about her and Elaine talked before about how, like vagges change after you have a baby and whatever. And she was like, I've had five and mine is beautiful. And me and Colleen were like, okay, Rachel, like, whatever.

**Net 8:28**
And, y'all were only three in here?

**Kristina 8:32**
Uhh, Tony Rose might have been there for this part. Yeah. Tony Rose was there for this part. For this part. So the first time when she grabbed my tit, (Net: Yeah, it was just you three) it was just me and Colleen and her. And then the for this part, Tony Rose was in there because umm

4 of 14

PLAINTIFF 00140

she, so she was saying like, Oh, you know, my vag is beautiful look, even though I've had five kids. And we're like, okay, like, it wasn't okay, like we don't believe you, it was like, okay, like keep your mouth shut

**Net 8:54**
I know. Just like, okay, shut up.

**Kristina  8:57**
And she was like, You don't believe me? She goes to put down her pants. I'm not, Im not joking.

**Net  9:06**
My oh my god, I cannot believe, you can't make this shit up. This is just too. I'm like, oh my god, I can't believe this.

**Kristina 9:09**
I know. So when she did that, okay, this is the same day that she had just grabbed my boob. You know, this is just a little bit later.

**Net 9:14**
Right

**Kristina  9:15**
So yeah, she's like, you don't believe me? I'll show y'all and really she goes ti pull down her pants. And I'm like this. I'm like Rachel, and Colleens like oh my god. Rachel, what are you doing? And I don't know who looks 'cause I was like this. I don't know. I don't know if she pulled her pants down Net, I really honestly don't. Because I'm like this. I'm like, Rachel, are you serious right now? Like, Rachel, this is a little too far. Like, what are you doing right now? And then, so she might not have pulled her pants down. I don't know if she was bluffing. I don't know what. You can ask Tony Rose and Colleen if you feel the need. Now? I'm coming to you not 'cause I'm not trying to get her fired.

**Net  9:50**
Oh I know, I know, I know.

**Kristina 9:51**
I'm not even trying to get her in trouble. But she's kind of shady. I already know. She's kind of shady. And I just feel like

**Net 9:58**
You have to protect yourself.

**Kristina 9:59**
Yeah. So yeah, like, I want this documented in some way. (Net: Yeah.) So, if something happens, right? Because like I said Net, I'm really, if that was a man I would've hit him without thinking.

**Net 10:08**
Well, he would have been out of the job. He would have been gone. Because that's sexual harassment. And guess what? It's sexual harassment on her part, too.

PLAINTIFF 00141

**Kristina 10:14**
It is. (Net: It really is) But, like I said, I, like I'm not afraid of her.

**Net 10:19**
Oh, I know that. Oh, I know that. You know, I know that. No, no, I know. I know.

**Kristina 10:23**
If it were a man, I might have been a little bit intimidated based on their size (Net: I know.) But like, I'm just so glad I didn't haul off and hit her 'cause I know. (Net: Yeah) That doesn't, just because she did that doesn't make it right. But, I'm proud that I did not

**Net 10:35**
I'm very proud of you too that you held it together. Even though I think after that I would have got up. I would have said something, and I would have walked out. I would have just walked out. Umm. But

**Kristina 10:43**
So yeah, I just want you to know, so if any further incidents happen. Now. Like I said, she knows I was pissed. She saw my face immediately knows I was pissed. I don't think she'll do it again or anything like that. But, I didn't think she do it to begin with.

**Net 10:58**
Well, I'll see, that's my problem.

**Kristina 11:00**
So I don't know if you've had any issues with anyone else. So I'm like, you know, I hemmed and hawed about it for about a week. I mean, I was busy with my dog because my dog had cancer. (Net: Oh, I'm sorry) She had surgery. Oh, she's fine now. She had surgery. So that was my main focus, but then I was like, I was thinking, and now Stacy does know, okay, um, because I was talking to her and I'm like, What do you think?

**Net 11:21**
Yeah, trying to get her

**Kristina 11:22**
Because I'm like, I feel like, like I said, I, I wanted it documented. And I'm like, I didn't feel comfortable going to the guy supervisors.

**Net 11:29**
No, no, no, no

**Kristina 11:30**
And I'm like, if I go to HR, I feel like they'll take it out of my hands and say, Oh, have to do something.

**Net 11:35**
What they, what they, What they will do is, they'll send it to john and say it's a sexual harassment because that's exactly what it is sexual harassment. Yes, we've had issues with

PLAINTIFF 00142

Rachel Luca and I think this is the one that's just gone just because she's been talked to about number of things. But this is the first time she's ever. Well, I know she's done some

**Kristina  11:54**
I know her and Jessica play grab ass. They smack each other's butts you know whatever. Like I said, she's came up to me on holidays before and

**Net 12:04**
But physically go down your shirt and grab, (Kristina: Amen) I mean, that right there. I don't care. I think I lost my job. I think I would have punched her. I'm sorry. I think I would have. (Kristina: I'm telling you that if it were a man I wouldn't have thought about it) You did good. I know. I know. You would have Yeah. And you would have every right to do it.

**Kristina 12:19**
I think she shocked me so bad. That's I was just like,

**Net 12:22**
I can't believe this just happened, yeah.

**Kristina 12:26**
Oh, no, no. I was just like, No, she's so shady, that I have, all these little things that have happened.

**Net  12:32**
They add up to and then with her. She thinks she, the problem is she does these things and then she gets away with it. And she thinks it's okay. (Kristina: Yeah)  And that's the thing. And she doesn't. And you can tell her and she still doesn't realize the severity of what's going on.

**Kristina 12:52**
That's why I'm like, I've been thinking about this all week. Like, I'm not trying to get her fired. I'm really not. I'm not mad at her as a person. (Net: Oh, I know.) I think she doesn't know when to stop. (Net: She doesn't) You know what I'm saying?

**Net  13:03**
But, she's trying too hard to be liked and be part of the group that she's doing shit that she should not be doing.

**Kristina  13:09**
And I think because she's kind of known as crazy Rachel.

**Net 13:11**
Yeah, they think it's okay.

**Kristina 13:14**
She wants to meet that expectation.

**Net 13:15**
Right. Right. Right. That's right. And you can't

PLAINTIFF 00143

**Kristina 13:17**
It's almost like, you know, like, encouragement.

**Net 13:18**
Yeah, exactly.

**Kristina 13:21**
So, I don't know. What do you think? Like what? I mean?

**Net 13:25**
Me? I personally, I mean, I just can't get over that she did it.

**Kristina 13:31**
I thank God, she did that in front of Colleen.

**Net 13:34**
Well I am too.

**Kristina 13:36**
Even though they are friends. I thought like, I don't want to be alone with this girl, at all.

**Net 13:40**
No. I wouldn't either. Well, I wouldn't trust her. Because if she would've tried turn it back on you saying any? You know what I'm saying?

**Kristina 13:49**
Well, Stacy was like, well, you probably, you know, you shouldn't have like pulled out your bra like that. And I go, Okay, I think we do a lot to be honest. (Net: Right Right. There's a lot of things that we should do) I think we do a lot of things on nights that I'm sure are inappropriate. (Net: Yes.) And I participate in it with foul language worst than that. You know, I'm not saying I did everything right. But, I'm saying, she touched me.

**Net 14:09**
But, it didn't ask for that. It wasn't an invitation. That's the whole point.

**Kristina 14:12**
Yeah, don't? Yeah. So, honestly, if nothing, if she doesn't get in any trouble at all, I don't care about that. I don't care.

**Net 14:22**
Chrissy because now that I know, I have to respond. And me as a female, I'm upset for you that you should had to go through that and you shouldn't have. And I felt like she violated you. I don't care. You know what I'm saying? (Kristina: I feel like she disrespected me) That too! But it's a violation too. Anytime you touch someone else's body with no permission or consent, it's a violation, period. Any way you want to look at it. And that's sexual harassment, period. Anyway you look at it. Whether she think it was fun in that, shame on you. Why do you think it's fun to do that? Why do you think it's okay to do that?

**Kristina 14:57**

PLAINTIFF 00144

That was what I was thinking. (Net: That's the thing.) Me of all people. I don't think I come off as too

**Net 15:04**
I would be too scared to touch you Chrissy. I can't even believe she did that. That why

**Kristina 15:08**
Of all the people here. Like,

**Net 15:09**
Chrissy, I'm telling you, I'm not touching you just because I don't want you to punch me because I would be scared that you would knock the (laughs)

**Kristina 15:16**
I mean, I don't think I come off as too aggressive or anything.

**Net 15:19**
You're not aggressive, but you're one who don't mess. She don't mess with her. You know, that what I'm saying. You know.

**Kristina 15:26**
I had the wrong opinion of myself.

**Net 15:30**
No, I know. But, you're approachable. You're a good worker, but you're one who, don't fuck around with me, that's how I look at it. And I think that's a good thing because I think that's how people need to be. I come here to do my job and that's it. You know, I got friends, we can hang out, you know, this and that. But don't take it too far. She took it way too far. I have to look it up and see what, I'll look and see the different categories and see where it falls. And then I go from there. I will have to talk to Colleen. And then we'll go from there. And to be discreet as possible. So if I'm talking to you, I talked to Colleen and she'll be told and I let you know that whatever me and her talk about can't go outside out of this. And that if it does, and I know it's her and then I'm going to be action against her. So she knows.

**Kristina 16:16**
Well, just so you know, it was said later on. Like, I don't even remember how or what was said. Umm, but like David and some other people were in here, and umm it was said about, like grabbing my nipples. (Net: So, it's out there) So there is out there are other people that heard it. I don't, they don't know the story. I don't know if it was outside, whatever, you know, but there are some people that heard. So, but.

**Net 16:41**
Okay, I may need you to put this in writing. (Kristina: Okay) I'm gonna need something in writing. Okay, so whenever you get a chance.

**Kristina 16:48**
Okay. Okay. So how should I phrase or like, say it where, like I said, it's been a week now. I don't want to say like, just say it verbatim

PLAINTIFF 00145

**Net 16:55**
Well just say that it's been on my mind for the past week. This occurred on this day, and it was actually just the facts. What occurred? Okay.

**Kristina 17:06**
And then should I, I'm trying to say, like, I think I'll get everything in order. It's just been like I said, it's been a week, right. And I, I blurred after like

**Net 17:15**
I know, you're so you're so surprised too.

**Kristina 17:19**
And I was pissed. I went from zero to 10. And I was just trying to, like, don't be pissed, don't be pissed, you know. (laughs) But, okay. So then just like, type that up, and give that to you? Okay.

**Net 17:31**
I just can't believe something will have the nerve.

**Kristina 17:33**
No, I couldn't either. And I kind of felt like, maybe I'm,

**Net 17:37**
I don't think your

**Kristina 17:39**
picked because I'm bi like,

**Net 17:40**
Which, you shouldn't be. I mean, that's the thing. You're right. And you shouldn't be, but I don't know what she's thinking. You know, I'm saying? (Kristina: I don't either) But, it could be because that's how it but I don't understand that has nothing to do with anything. Has nothing to do with. Is, is she jealous?

**Kristina 17:46**
No, I mean, I don't know.

**Net 17:48**
Well, I'm thinking if she knows that you have friends, everyone likes ypu. And if she's not getting that attention, like you said, somewhat of an attention-seeker thing for her, you know, because, you know, she's the mom with the kids and she likes people to feel sorry for and she wants that attention. When she's not getting in then she goes out there trying to get they way that she can. It's just like a kid. Any kind of attention, whether it's bad or not. It's better than nothing. Because the attention and that's how she is that's what she reminds me of.

**Kristina 18:23**
Yeah. That's true. She's been trying to like date a lot right now. (Net: Well, see) And I'm like, okay, either maybe she wants to try something with the girls and she doesn't know how to do it.

**Net 18:32**

PLAINTIFF 00146

Well, I think that's what it is and she doesn't know what she's doing and she doesn't know how.

**Kristina 18:34**
Oh, he just wants attention. I don't know.

**Net: 18:35**
Yeah. It could be a little bit of both. But, that's still no.

**Kristina 18:37**
But at the end of the day like, if she's shady and tries to turn something around on me,

**Net 18:41**
Well, see. That's why I'm scared.

**Kristina 18:42**
It's gonna make sense, like the bisexual would hit on me. But, she's like straight with five kids, like I wouldn't do something like that. No! You either questioning or you're weird or something is going on? It's like, Don't drag me into it.

**Net 18:55**
I know. I know.

**Kristina 19:00**
I kind of I don't even know why I kind of feel bad saying anything because I like I didn't want her to get into trouble

**Net 19:06**
It's because you're a good person, and you don't want to lose her job. But, you got to think of the fact that it's going to be something else. And it's always attention with her. And she has that reputation of just doing something unorthodox, period. And it's not okay, and she needs to know it has to stop.

**Kristina 19:23**
I think it's because like you said with the little kid. (Net: Yeah.) You get attention (Net: Yeah.) for being a little crazy. (Net: Yeah.) And now it fed into it. Now, she's like, now I gotta be the crazy one. You know?

**Net 19:32**
That's what it is. I mean, I can't talk to you about different things I've talked to her about, but she knows that she's supposed to act the way a certain way when she's here. And she's still not doing it. And she does little things like she tries to. It's so funny. Because, you know, you can see people thinking they're working you, and you know what they're after? And you're like, looking at them, like, "Do you seriously think I'm falling for this kind of thing," you know, and that's how she is. She would come in and give me a sad story. And I'm thinking seriously, how old are you? You know, I'm a mother too. And it's like, I ain't falling for that. Or she forgets your on Facebook, silly. I can see some of the stuff you're doing. And you tell me stuff and I'm supposed to believe it. You know, and it's like, okay.

**Kristina 20:15**

11 of 14

PLAINTIFF 00147

That's why I say she's shady.

**Net 10:17**
What why I'm saying, you know? Yeah. Yeah.

**Kristina 20:18**
She's very shady. That's why when I was telling Stacy, about the first thing that happened when we were in the room, and she made a comment, I'm like, I kind of want someone to know, because we were alone. And I'm like, I don't really want to go and make a big deal out of this. But I just like, I don't trust her because she's shady. So that's why and then with this, I'm like, Oh, no, because now I was just thinking like, Okay, I have to say something because if me and her get stuck in a unit together, I don't want to be alone with her,

**Net 20:44**
Well, that's the thing, 'cause then we have to make sure that you both aren't in the same area together. So yeah. Oh, Chrissy,

**Kristina 20:53**
I'm sorry.

**Net 21:01**
It ain't you! It ain't you're fault. It's just people. People are just stupid. (Kristina: It's just drama though) It is. But, it's just stupid.

**Kristina 21:02**
That why I was just gonna let it go. I was just gonna brush it off and I'm like, you know what? You grabbed the nipple? You didn't just touch my boob.

**Net 21:06**
Yea, no, woman. You know, it's like, me and Lisa, when we're walking down stairs, you know, you swing your hands and you accidentally hit it tries to make a big thing. She'll be like, Oh, you hit my butt. I go, Lisa, seriously. I go, my hand was just moving. The other day. It's funny. Steve was walking with next to me. And I went like this. And didn't know he was behind me. And I hit him. And she goes, Oh, you hit him. And he's like, she hit my shoulder. It's like, stop trying to act like it's something that's happening that it's not. And I looked at him I go, don't walk close to me. (laughs) Like walk up there. You know, you were right there. (laughs) You know, but she's the same. She's funny like that, because she just does stuff and it's like Lisa, so now I try not to even. Because it's just that I just go Excuse me, I'm sorry. You know, when you walk. But, she always makes a big thing and I don't know if she just does it just to get on my nerves because she knows that I'm like (Kristina: Yeah) and I think that's why 'cause she does it with everything I do. Like if I'm, and she notices. I don't even notice it. So I think, you need to get a life seriously, woman, So it's just too funny. But Rachel, we'll deal with Rachel.

**Kristina 22:10**
Okay. I'll type that up. Okay, I'm off to the next few days. I'm back on Friday, but

**Net 22:14**
Okay, just leave it for me in a in an envelope with my name on it. Okay, umm sealed in the box in the mailbox and I get it then I won't get until Monday then.

PLAINTIFF 00148

**Kristina 22:24**
Is it okay if wait I till Friday?

**Net 22:26**
Yeah, well, I'm going to see

**Kristina 22:29**
Oh, you know what I'm up here on Wednesday for umm pls instructor renewal

**Net 22:30**
If you can bring it in and that'd be better. (Kristina: Okay) 'cause I'm not here tomorrow. I actually I just decided I'm gonna come tomorrow. Mark is gotta get testing done.

**Kristina 22:37**
You just now decided (laughs)

**Net 22:39**
I did. I did. When I'm sitting here, going you know, I'm not coming here tomorrow. He gotta get testing done. And I want to meet with his new counselor. So I figured while he's testing I can meet with her. I'm going to see if I can make an appointment. So okay, yeah.

**Kristina 22:49**
Okay, I'll drop it off. I think 9am to noon is my thing is my thing

**Net 22:53**
Okay, I'm here all day Wednesday. Actually, I have a conference call from 8 to 9:30 for that single instance thing. Did you go to that fair?

**Kristina 23:00**
I didn't because my dog, I like I didn't want to leave her alone.

**Net 23:05**
That's okay. Because the things I think they sent you an informational packet. (Kristina: Yea, I saw) Yeah, that's everything that was there. I went and it was just all they had to do is just go through those and that was it. (Kristina: Okay. Cool.) Yeah, Nothing. Nothing. You ain't missing nothing. Yeah, Jim Burgess came in early. I'm like Oh, they wasted your time, but.

**Kristina 23:21**
Oh, that's why I was like, oh, I was trying to get a sitter (Net: No, that's okay) and I'm like, my cousin already

**Net 23:27**
That's okay. But, I'm gonna go back. You can shut the door.

**Kristina 23:29**
Leave it shut?

**Net 23:32**

<center>13 of 14</center>

PLAINTIFF 00149

Yea, look, if I don''t then be sitting in here when I come back.

**Kristina 23:33**
Oh Lord.

**End of Conversation.**

PLAINTIFF 00150



Garcia
EXHIBIT 8
2/4/20
Rptr. Cheri Poplin



Garcia
EXHIBIT 9
2/4/20
Rptr: Cheri Poplin



Lolly

Claiming rape

Ok

George zimmerman

I cant right now

Nipple

aureola

so why are you texting me the word nipple i mean it's kind of a fair question

She pulled my tit out of my bra to see my nipple

PLAINTIFF 00132



Lolly

Sep 6, 2018, 01:35

Yeah. I keep going back to sleep

That bitch cunt was bitching to tony Sunday night about how you and I came up with a story to try to get her fired

I wish you would have recorded him saying that

That was the night I told you she came over there when I was working the unit

Omfg This is total harassment and slander

Was that what she was saying to him at like 6am when she was there? Or was that one of





Lolly >

Was that what she was saying to him at like 6am when she was there? Or was that one of the other two times she came during my shift

And then he told me she came into his patients room bitching and he stopped I said bitching about what and he said that you and kryssie concocted a story to try and get her fired

I said first of all I had nothing to do with any of this and second of all the story was not concocted

I fucking walked away

Ohhh. That is what he said to me but I didnt probe into it any further. He told me she came



Lolly >

Ohhh. That is what he said to me but I didnt probe into it any further. He told me she came into his pts room bitching to him. But i didnt ask what about

Oh yeah about us because she probably thought maybe the might know he story and she can get you into trouble or me for talking about it or 2get him to think badly of me and welcome the little victim being her with open as

Arms

I cant believe she came into the unit I was in to tell lies about me while Im fucking working there

I bet you only got added to the





I went home and took a nap
cause I gotta go to stupid work
tonight i want to call in so bad

Sep 27, 2018, 19:09

So jb just asked me to write up
a statement about anything i
knew or may have heard about
you and Rachel

Oh boy. That will be a long one
lol

Like 30 pages

Lol

Or maybe a whole novel

Gonna be a long night

Sorry doll

iMessage

PLAINTIFF 00136

<u>**Conversation with Phil M.**</u>

**Kristina  0:35**
I just wanted to check on you [unclear statement] worried about anyone. So, I heard (laugh) that Rachel had mentioned to you something that happened between me and her?

**Phil M.  0:47**
She did. Yea

**Kristina  0:49**
Why did she? Okay, what did she  say? She just brought it up out of the blue or what?

**Phil M.  0:54**
Yeah, it was completely out of the blue. She just decided to vent to me right in the beginning of the shift. She just brought up about something with the bra. And uhh she said, she was just like looking. I don't know, I wasn't paying much attention. But she said she got pulled in the office and all that crap about it. But she said she didn't do anything today. She said she didn't pull your boob out. (Laugh)

**Phil M.  1:25**
I don't believe her. I know she's fucking nuts.

**Kristina  1:28**
What was like, did she have a point in telling you? She was just like, Hey, did you hear blah, blah, blah?

**Phil M.  1:34**
She just it started out with her talking, talking about her daughter how like, she went to jail. I'm sure she's, you've heard about that. Umm, and then it literally, you know how like, when she's like, all fucked up on her Adderall or whatever the hell she's taking, she talks a mile minute. So literally in five minutes, she talks shit on everyone and everything. Like I heard so much shit from her, like, in this matter of five minutes I wasn't even saying a word. I literally was sitting there and she just kept going and going. She's doing it again. Well, she wasn't like talking crap to me yesterday, but but ummm she she just starts talking and then she doesn't know when to stop. And then she said, well, uh well I wasn't supposed to say anything like that, I wasn't supposed to say anything about that. I shouldn't have said anything.

**Kristina  2:24**
About what? About the me thing?

**Phil M.  2:25**
Yeah. She said she's not supposed to talk about it. You're not going to tell

**Kristina  2:32**
Well, that's why I wanted to talk to you because I had heard that she had said something to you. Because I heard that she had told you about the incident and said that I completely made it up. And, yes, I'm pissed. Because that's defamation of character. Like she's calling me a liar to people. And you know, she's not supposed to talk about it. And if she's telling you that I'm a liar, she's telling you about the story. Who else is she telling? You know? So?

1 of 14

Garcia
**EXHIBIT 10**
2/4/20
Rptr: Cheri Poplin

PLAINTIFF 00153

**Phil M. 3:01**
I'm sure I'm not the only one

**Kristina 3:02**
I'm sure you're not either. 'Cause I haven't mentioned it to anyone. No one's mentioned it to me. But people have been really weird around to me. Like certain people won't even be alone in the room with me now. And I'm like, I don't know what she's saying. I didn't know if it was coincidence. I don't know. Because I haven't asked them. But since I had heard that she had said that to you. I wanted to see if you would be mad if I approached networking.

**Phil M. 3:32**
Yea, I don't... because then that's gonna call me in.

**Kristina 3:35**
Yes. She probably asked you did Rachel say this or whatever. So

**Phil M. 3:37**
Yeah. But then I also wonder like, if she has some other people, how would you, uhh you know, she probably she would know I said it because it you just approached her this morning. And then all of a sudden she's getting pulled it off as like a week after she told me, not even

**Kristina 3:52**
Wait, it wasn't yesterday that she

**Phil M. 3:54**
No, it was yesterday. But I mean, like, I don't know whether next time she's working, because that's probably when that they will ask to see her. Or the next time she works. She's not gonna ever come in on her day off. Umm I'm sure it wouldn't be that hard to connect the dots. Because she knows she told me because then she was like, I'm not supposed to be talking about this.

**Kristina 4:13**
But she had no point in telling you this? She's just bleh bleh bleh bleh bleh

**Phil M. 4:15**
She was just going a mile a minute

**Kristina 4:18**
Because that's why I'm like, why is she even bringing it up to Phil. Like, what do you have to do about any of this? You know what I mean?

**Phil M. 4:23**
I don't know. Half the shit she tells me. I don't know why she's even telling me. I'm not even asking her questions. She's just talking. Like, today she was talking about how she was like date raped by her previous baby daddy. When she was under age, I don't know what the, I'm like breach of TMI. Too much information. She's like, Oh, oh, oh I'm sorry. I didn't think was that detail and I'm like, too much information, Rachel. I'm like, I don't want to know that. You don't have to, don't tell me these things. She's like oh, oh I'm sorry. I'm just I'm really sorry. I just I just haven't taken my adrenal yet and then I'll shut up. That chick, she's insane. She's fucking

PLAINTIFF 00154

insane. And I'm sure you already heard about her going to jail and shit. Like, why did she tell me that? I didn't have

**Kristina 5:14**
She told the whole department that yes

**Phil M 5:16**
I know (laughs)

**Kristina 5:16**
Yeah, I know. That's why I'm like,

**Phil M. 5:19**
Why is she telling me this?

**Kristina 5:19**
Yeah, that's what I'm wondering. Like, why is she bringing it up to you just to call me a liar? Because she said I was lying. Correct?

**Phil M. 5:24**
Mm hmm.

**Kristina 5:27**
Like and if she's saying this to you, who I believe she thinks that this will get back to me. I I

**Phil M 5:34**
You believe he's doing it on purpose? You think she's casting a line?

**Kristina 5:37**
I don't know if a hundred percent on purpose, or if she just doesn't care that it gets back to me. I don't know. This is the first time I've heard her say anything but like I said. There's numerous people that I have noticed will not be left in a room alone with me now. And I don't know if it's because she's saying something to them. I don't know what. It was like the weekend after that had been an issue. Like, Colleen avoided me like the plague, Jessica, Tamara, like multiple people. It was like Stacey even picked up on it. She was like, "Oh, there's tension in here. Like everyone is being weird as hell. Like, why is it seem like we're the outcast?" Because I was hanging out with Stacy. I'm like, well, you're you're being you know, you're you're defaulted into my group because you're by me so if I'm being shunned then I guess the rest of you are. But or ahh not that the rest of you, but like her, you know, because she's by me. But, I don't know. I'm just like it. Have you, you ever heard her say it by anyone else to anyone else? No, just you?

**Phil M 6:41**
No, it was just yesterday. Umm, I don't, maybe she's confiding me because she maybe she trusts me?

**Kristina 6:48**
But what's the point?

PLAINTIFF 00155

**Phil M.  6:50**
I don't know. I've never, I'm not even like, friends with her

**Kristina  6:54**
No, she just wants a word out there that I'm lying about this.

**Phil M.  6:59**
Yeah, could be. Ad she knows that. She was talking shit about Johnny. And she knows I'm friends with Johnny.

**Kristina  7:05**
Yeah, well, exactly. See, that's why I'm like, does she want us to get back to me, so I'm mad about it. And I say something to her. I like I don't know what her ultimate goal is. That's why

**Phil 7:17**
I don't think she's that smart

**Kristina  7:18**
She's that stupid. That's why she records everything too

**Phil M.  7:22**
Yea stupid. I never knew she did that shit. I'm sure she's recording me.

**Kristina  7:27**
Yea, she's recorded everyone. Pictures, videos. She's always doing it. Always.

**Phil M.  7:33**
That's fucked up. And then she always takes me in like, takes pictures on like of herself. No, I fuckin lock my phone now.

**Kristina  7:40**
She does that. So that's how she gets into people's phones. Because if she ever gets busted with someone's phone, she's like, it's just, I'm just leaving you cute little picture. No, you weren't. You were snooping.

**Phil M.  7:50**
Yeah. Yeah. So I mean, I locked my phone now. I mean, there's nothing like nothing that she can really see. Other than that, like, I'm texting Stacy. But

**Kristina  8:00**
I know, I was thinking, I don't know if she looked at our messages. But the last messages was, I was like, Don't call her back. She's being shady

**Phil M.  8:08**
Oh, no, I deleted that. I frequently deleted the last message between with you on there was with Johnny when he sent us that video. Okay, so

**Kristina  8:16**

PLAINTIFF 00156

I mean, not that I care if she seen it, but I'm like, Well, yeah, why? why she snooping in your phone?

**Phil M.  8:22**
She told me today. Oh, I didn't look through your phone. Don't think I looked through your phone.

**Kristina  8:26**
That right there tells you she (laughs) did

**Phil M.  8:28**
I know. And I'm like, I mean, I didn't say anything. But she's done this multiple times. Like, takee my phone take my phone. Because I don't know, I just leave my phone. I don't fucking lock it. Because there's nothing on there. I don't give a shit. But like, now, I should have been smarter knowing that she does that shit. And I should have locked it. It locks now. But yeah, but I don't really want to get pulled into that to be honest.

**Kristina 8:55**
I know. I know.

**Phil M.  8:56**
It could get her out of here, which needs to fucking go. She like I mean, why are they putting her in the unit? Why??

**Kristina  9:08**
Wasn't she in the box now?

**Phil M.  9:10**
Yea I don't know why. Net wouldn't put her in there for years I heard because she knew she was...she doesn't know shit. And she, Ahh (Sigh) II it's not that I feel like I should be in units. I just get pissed that she's in it because I know she doesn't belong there. She's making us look stupid. (Laughs) And the thing is with us, you know, we're so small. So only it only takes one person to make us look like a fucking idiot. And then they'll just think, Oh, it's just respiratory they're idiots.

**Kristina  9:42**
Those are the people that we need to put under our wing, so they learn. But, she makes it difficult when she wants to constantly have conflict with everybody.

**Phil M.  9:54**
Yeah. Yeah, she brought up that you were helping her with their ACLS. But now you won't talk to her.

**Kristina  9:58**
Oh, now I won't talk to her. That's funny. Well, one. No, I'm not seeking her out and talking to her. No, I don't want to be left alone in a room with her. But also, it's funny because she's the one that bluntly avoided me. Stacy and I were coming up the elevator, we had both gotten on at one, It opened up at two, it was her and Jessica coming into the elevator, just those two. Rachel looked in and saw me and Stacey was like, "Fuck that." And literally was like "fuck that" and turn

PLAINTIFF 00157

and walk away. And Jessica was like, oh, oh, oh, and then she finally like went after her. I'm like, Oh, okay.

**Phil M. 10:39**
Yeah, I don't know. I can't stand her.

**Kristina 10:41**
It's just pissing me off that she's gonna go and tell other people that I lied. Because I've been here for seven years have I lied on anyone. Do I even go in that often?

**Phil M. 10:51**
No, I know she fucking lies. So it's I didn't I didn't believe her for a minute. I know what she does.

**Kristina 10:57**
But the point is, is someone that doesn't, I don't know if she's saying this to nurses is she talking to other PA's, MP's, residents, I don't know who she's talking to. It doesn't matter who she's talking to. But for her to say I'm a liar. No, I'm not a liar. And if I was gonna lie. This is funny, because I've been thinking about, oh okay, if I'm gonna lie, wouldn't I have lied when it was me and her alone in a room and I would've accused her something, not in front of her best friend. Because Colleen was in the room.

**Phil M. 11:24**
Yeah. No, I know. It's insane. It's because she's a liar. She wants to cover make herself look good.

**Kristina 11:32**
She is a liar. She's saying I'm a liar. No, she is a liar.

**Phil M. 11:36**
She lies about stupid shit too. Like that, like when you try to call her and she doesn't answer her fucking phone. And she says, oh, sorry, the battery fell out. No, you're fucking ignoring the call. And I tested her on that one time. I paged (her) and said that Rachel called and I need call report. No phone call for an hour and a half. I call, J calls and he's like have you heard from Rachel and I'm like no, Rachel hasn't called me. So I'm like, let me do a test. I'm just gonna send my number. Like what nurses do. We'll see if she calls back. Sure enough, boom. She calls me right away. (Laughs) And I was like, hmmm, that's very interesting. That you now you return my call. She like ohh my battery was out. Total fucking shit, you still have a fucking pager. I paged you and called you. You can't deny that so.

**Kristina 12:25**
And I'm helping her with her ACL as What? What does she want me to do? Take the test for her, like, you know what I mean? Like I signed her up for it

**Phil M. 12:34**
The have like, I mean, it's an open book test. Except with the [Mega] code. She's gonna fuck up on the [Mega] code.

**Kristina 12:40**

PLAINTIFF 00158

It doesn't matter. We basically keep going until you get it right

**Phil M. 12:44**
Yeah, because I fucked up the first two me and me and my partner. You know, Quan on four center? That little Asian guy. He's a he's a four center nurse. He's here tonight. If you walk down there you may see him. Short Asian dude. Umm, him and I were partners and we fucked up, but. Yeah, no, I mean, I don't believe her for a fucking second.

**Kristina 13:06**
No, I know you don't. But well, I hope you don't

**Phil M. 13:09**
No, not at all.

**Kristina 13:11**
I don't know who else she's saying it to. And I don't appreciate like, her calling me a liar. Like, I'm really pissed off about it because what do we have in this job? Other than, like, what do you call it? Like, our being trustworthy, kind of, you know what I mean? Like, it's all about our knowledge and, and being trustworthy. Like if you're trying to like, that's like slandering my name. Like, you're creating an image of me that I'm a liar. And I don't know if people are believing it. Because like I said, it's really weird that suddenly, Jessica wouldn't be alone in the room with me, Tamara wouldn't be alone in a room with me, Colleen wouldn't be alone. Because Colleen and I were in four east together, she would not come in the back room. I either she didn't want to talk to me. She didn't want to be alone where we would talk, or she just didn't want to be by me. She avoided me the entire night. I'm like, Okay, so I'm the one. This is all getting pointed at me when you did this. This was your choice. You did this. And now I'm going to get the backlash from it. Like, she needs to shut it down. Because see, that was a thing. When I went to Ned, I told her that I just want her to stop. Like, I didn't go to HR. I didn't go straight to HR. I asked Ned. Like, can we address this, like I was debating on going to either Ned or HR. And I decided, let's go to Ned. I'm not trying to get her fired. I'm trying to get her to stop because there's been other issues, like little things that have built up between me and her and that. Oh, yeah, that was the other thing. And I had heard that she told you, I want her and I want Stacey? Like I have the hots for both?

**Phil M. 14:55**
And remembers this, keep in mind, this all took place in five minutes. That's how much shit she said about not just you, but like a lot of people.

**Kristina 15:04**
But well, I'm only concerned about what she said about me.

**Phil M. 15:06**
I know. I know. I know.

**Kristina 15:08**
But she said I want her? She thinks I want her. But I'm what I'm quote unquote, lying on her, but I want her?

**Phil M. 15:15**

PLAINTIFF 00159

She's not stable. She's not mentally stable.

**Kristina 15:18**
And I knew she I've heard from other people that she's been saying I want Stacy or me and Stacey got some undercover going on. She (sighs) speculate all you want. Like I can't even be friends with somebody apparently. Well, neither can Stacey apparently. But she ugh, oh my God

**Phil M. 15:32**
She's a retard. She's not mentally stable.

**Kristina 15:38**
I agree. There's something wrong with her.

**Phil M. 15:39**
I think it has a lot to

**Kristina 15:40**
But don't drag me into it. You know?

**Phil M. 12:42**
No, no, I know. I don't know why she's trying to please. I think her overusing her prescriptions. I mean, I don't know for a fact if she is but I'm am highly suspected that she is overusing her prescriptions. Whatever the fuck, she's taking. I know she takes adderral. I'm sure it's fucking with her brain. It can't be good for you. Adderral is basically, like meth anyway.

**Kristina 16:06**
I don't know. I think she has prescriptions for that. But I know she sells them, deals them, and gives them out.

**Phil M. 16:16**
Oh yea, she's selling them to people. I know she's _____

**Kristina 16:20**
Several, several people.

**Phil M. 16:23**
Yeah. Then she tried to pluck try to play and that's, you know, when I when you told me that she was recording and shit. I kind of thought back like a year and a half ago. Like whenever I first started here, she was asking me these dumb questions about like, we handle shit like that. And I know she fucking smokes weed and shit, and she was trying to play dumb with me. I'm thinking she was recording me. For whatever reason of me talking saying like yeah, you know, like yea I smoked weed before. Because she was asking these really like, almost like childish questions. And I'm like, You're fucking older than me. What do you like, why are you asking me about weed and shit? Like? No. And I think she was recording me.

**Kristina 17:01**
That I think she records everybody. And like any little ounce of anything she could try and quote unquote, get on somebody, she'll either take photos videos or or audio record, because she wants something on everybody. Because she knows she associated and all the other weird shit

PLAINTIFF 00160

that she's doing all the wrong shit she's doing and if she likes every were to go down like she's going she wants to take people down with her.

**Phil M. 17:25**
Yeah. Oh, yeah, I agree. That's what makes me nervous is like, what is she recording me doing? I don't I don't know what I mean. I mean, every time I've spoke like about drugs and shit there, I always told him like, no, that was back when I was younger. It's not illegal to do drugs when you were younger, but now we'll get busted for something I did when I was 20. Right?

**Kristina 17:55**
Yeah, right. You're an adult and you grew up.

**Phil M. 17:58**
Yea, I, I, yea, I (studdering) I don't know. I really don't want to get pulled into it.

**Kristina 18:00**
yea, I know. I don't blame you.

**Phil M. 18:03**
Cuz I yeah, that's what I was thinking. Like, if she tells her she's gonna pull it. That's gonna pull me and I'm gonna have to say yes she said that. Do you think do you think Net wants to her around here? Or do you think people like, like play the sympathy card with her? That, oh, she's a single mother has like five kids.

**Kristina 18:21**
I kind of feel like people play the sympathy card on her. That's why I did expect a little bit of backlash because I'm thinking, if she were to talk to people, they're all going to be like, Oh, poor single mother of five. And Christie's this

**Phil M. 18:32**
Maybe they're thinking you're trying to turn it like, they're like, oh, why would you want to get someone that is a single mother. Why would you want to get them fired? Maybe that's what they're thinking.

**Kristina 18:40**
But this is the thing, I went to Net and I said, I'm not trying to get her fired. I want I want it to stop. She's crossed the damn line now. Like the couple other little weird things that she's done with me, where she's she flat out told me before. I know you aren't me. Like she said multiple times. But like kind of, you know how she does stuff in a jokey manner. She's like, I know you want me. I know if I didn't have five kids, we would be perfect together because we love animals that we would have a big house of all these animals and I would just like blow her off and brush it off. Like, okay, you're being goofy. You're being crazy Rachel, you know, whatever. And then, like one time we were walking down the hall, and our hands like had hit. Like, we were walking in our hands it and then she reached out and tried to grab my hand. And I was like, kind of like, pull back and I'm like, What are you doing goofball? And she was just like, What? You don't want to hold my hand? I know you want me. I know you want me. One time we were in four east she kept saying it. And it was me and her and in the little respiratory room. And she kept saying it and like she said it like so many times that I was just like, Rachel, you know, I'm not interested in you, right? Like, I just felt like, we need to clear the air in case you're misinterpreting

PLAINTIFF 00161

something that I don't realize. Like, I'm like you, you know, I'm not interested in you. Right? And she was like, and she like oh oh, and she like storms out the room. Literally the door didn't even finish closing. She came back in and she was like, I'm not interested in you either. And like stormed out, and I was like, oh, someone got their feelings hurt. But I'm like, Okay, well, maybe everything will be clear now that she like I addressed her weirdness. Like, I'm not interested in you.

**Phil M. 20:09**
Yea, like quit fucking with me.

**Kristina 20:12**
Yeah. And then she continues to do it. And then when she put her hand in my shirt, and she grabbed my nipple, and pulled my boob. Yeah, no, there was absolutely no reason for that. But then you want to turn like, you know what if she was third, she was shut off. Like Net. NET told me that she told her, she better not talk about it. It does not need to be talked about. And for her to be talking about it now and not only talking about it, you want to make sure you put out there that you're saying I'm lying? Why would I lie and throw your best friend into the mix? Because I know damn Collen's gonna have her back over mine but Colleen was in the damn room.

**Phil M. 20:55**
I wonder, (studders) did Colleen admit to coming.

**Kristine 20:57**
All I know is I was told they each, everyone told me a different story.

**Phil M. 21:06**
So they say there's always three, three sides to every story.

**Kristina 21:09**
And I'll give you that. There are always three different perceptions, three different sides. But don't tell me you didn't do it. Look me in my eye and tell me you didn't do it.

**Phil M. 21:16**
No, you can't deny an action. You can't deny that.

**Kristina 21:21**
That's like, I'll give it. I'll give it to Colleen that Colleen was across from me, and there was a computer right here. And Colleen can't see what she's doing down my shirt. But I guarantee you Colleen can see her going down my shirt. Like because I was sitting down. And she came right here. And I was like this, because we were we were talking about bras and I was like this. And it was like no, I have a regular bra. And I did just like that, which they did the same thing. We just pulled her strap out. And she was like, boop and stuck her hand right now my fucking shirt. And I was like, now that is too fucking far. And she was like, oh, oh, I'm sorry. I'm sorry. I was just looking at your bra. I'm sorry. And I'm like, What? Like, why would you do that? Why, What were you doing? And she was like, oh, oh, no, I don't remember what I said after but I said

**Phil M. 22:05**
I ain't your family member. You can't be grabbing down

PLAINTIFF 00162

**Kristina  22:07**
It don't, family member not, you grabbing your family like they you creepy but I don't know I said something. I was like, like, what did you want to see my nipple or something like that? And she was like, Oh, well, you have nice nipples. Like, it? Am I supposed to be not mad now cause you complimented me like, what do you like? It blew my mind that I'm like, I don't even know what you thought you were doing. Like, if that would have been a man I would hauled off and hit him without thinking.

**Phil M.  22:35**
Oh, they would have been fired right on the spot.

**Kristina  22:37**
Right? they woulld've been walked out.

**Phil M.  22:35**
Net would have been like, "You're outta here!" You know, no questions asked. That's sexual harassment. And what she did to you was sexual harassment.

**Kristina  22:45**
Yeah, it was, Well, she she did grow man. (Phil M. That's groping, that's groping) She She said she told me Net that she touched my bra. But she did not go in my bra. Well, that's a lie.

**Phil M.  22:54**
Yeah, that's what she was saying to me. Something about the texture or something like that? I don't know. She was talking about the material that was made out of. I don't know. That's what she told me,

**Kristina  23:06**
She never touched my bra. She went inside it. But anyways, she should, if she was smart. She would shut up and move on. And she would be happy that all I did was talk to Net. Because I could have not even talked to Net. I could have not even talked to John. Yeah, and I could have marched my ass right to HR. The point was to get her to knock it off. And now I feel like she's just doing it more. Now, she's trying to turn people against me and say like, I'm a liar. And I'm pissed and pissed

**Phil M.  23:41**
I believe it. I mean, I'd be pissed, too. She'll, I think, I think she'll tell someone and then it's going to eventually come out again. And if that happens, then yeah, you can bring me up. Because then if there's other people who she told,

**Kristina  24:01**
I know she's told other people; I wouldn't, I don't

**Phil M.  24:04**
I just don't want to be the main focus 'cause he has my phone number. I don't want her fucking contacting me saying you did this and blah blah blah. And, you know, get, I don't want to get pulled into the drama that's what I'm trying to say.

11 of 14

PLAINTIFF 00163

**Kristina  24:17**
I believe she's already told people because like I said, people are being weird. But the people that she's told are kind of like, her friends. They're not like really my friends.

**Phil M.  24:26**
That's why I don't know why she fucking told me.

**Kristina  24:28**
That's why I'm like does she want it to get back to me?

**Phil M.  24:32**
I'm not her fucking friend. I mean, she's done shit to me and I could have got her in big fucking trouble for not only just going through my phone, but remember that time she gave me that laxative?

**Kristina  24:40**
Yeah, she slipped that in you're drink, or?

**Phil M.  24:42**
And didn't tell me! I was fine. It wasn't a big deal. But I could have easily gotten her

**Kristina  24:49**
You could've gotten really sick or something. Yeah,

**Phil M.  24:50**
Well, that's when Janine was here, and Janine was like fucking pissed. She was like "Rachel you cant be fucking around like that!"

**Kristina  24:57**
That's, that's the that's the thing.

**Phil M.  24:59**
And she got scared after that. Because she called like apologizing. Because she knew she fucked up.

**Kristina  25:05**
Well, I feel like right now she should have known she fucked up too. And she should shut up and move forward and do exactly what I'm doing. We don't have to talk. Just move forward and keep moving. Keep going. Yeah, just go one time. Why do you want to talk shit to people? Like, why do you want to bring this up to other people? Like, why? Why tell you? You didn't know about it? Why does she want to make sure everyone knows? Like

**Phil M.  25:29**
I don't know. It all started with, it, I don't know. She just said she wanted to, she needed to vent.

PLAINTIFF 00164

**Kristina 25:36**
She don't have a friend at home she can vent to that don't work here?


**Phil M. 25:41**
Apparently, not. She's doesn't have no one at home because her kids are now away from her. Because, you know, I think, she's probably fucking beats their kids. I'm sure she does.  She's fucking nuts.  She's insane. (Laughs) Like, she just goes a mile a minute, right? That's why I don't sit in the room in there more. Like, when I'm working, the past two nights, I've been sitting in the department because I don't want to fucking sit there because she just won't stop fucking talking…about shit. And I just like I don't want to fucking talk. Can you just please just leave me alone? Like, don't fuck, Can we just sit here? I like working with like, Diana, no one says a word. Everyone just chills. Nice and quiet. We just do our own thing. We don't get each other's fucking business. You know? That goes with like a lot of people up here. It's just her, she is all up in your fucking business. Like with AVG sheets yesterday. I'm trying, that, that.

**Kristina 26:33**
Oh, I know. You're doing it the right way. And she wants to act like you're doing it, you're being

**Phil M. 26:39**
She's like oh no, I can do it. I can do it. And she's like grabbing it, and I'm like, I'm like go to lunch. That's what I told her. And uhh, Bob, who's that registration dude? Yeah, he was there. And then one of the nurses are there like, watching this little performance she's putting on. And I'm like, go to lunch! And she's like oh, oh, you're being so cute about it. Oh oh. And, I'm like, I want to be like no, fuck off, like (laughs). No, I'm not trying to be cute. I'm trying to politely tell you to fuck off. Like, leave me alone. Like, I know how to do this like. I don't know. But yeah, I mean, I would just. I don't know. I almost regret telling Stacey to put me in four east (laughs). But my options are limited to four Center, which I fucking hate. Or six east and I fucking hate six east. I thought I could just suck it up on four east. But,

**Kristina 27:34**
You can just stay in the back room and just do your thing instead of going to the nurse's station.

**Phil M. 27:39**
I don't, yeah. I wonder if the nurses think she's fucking nuts. They have to. Some of them seem like they're like, they like her. I don't know if they're being fake.

**Kristina 27:53**
I don't either

**Phil 27:55**
Alright. I probably should get back. I gotta do my bed check. Sorry.

**Kristina 28:01**
You don't have to tell me sorry.

**Phil M. 28:04**
But if it does come up again…

PLAINTIFF 00165

**Kristina 28:05**
Yeah, if you hear her saying that everyone else please let me know.

**Phil M. 28:06**
Yeah

**End of Conversation.**

PLAINTIFF 00166



DA

David >

Sep 6, 2018, 01:59

You up?

Yeah. What's up

The last night we worked together... did anyone come ask if you needed help? Or did you get help from anyone??

I don't think so

Now more specifically did Rachel ever COME TO THE UNIT asking if you needed help?

No

Did she say she did?

No. Not yet. But she came to

Garcia
EXHIBIT 11
2/4/20
Rptr: Cheri Poplin

PLAINTIFF 00127



DA

David >

No. Not yet. But she came to our unit three times that night. She proceeded to tell some of the nursing staff about nipplegate and how "im trying to get her fired". When I say something about this I know she is going to try and cover up by saying she was helping us. So I wanted to make sure that was bullshit because I know thats gonna be her excuse for coming to the unit.

NIPPLEGATE

lololol

#FunnyNotFunny

Yeah, I don't think I even saw her that night



PLAINTIFF 00128



DA

David >

the nursing staff about nipplegate and how "im trying to get her fired". When I say something about this I know she is going to try and cover up by saying she was helping us. So I wanted to make sure that was bullshit because I know thats gonna be her excuse for coming to the unit

NIPPLEGATE

lolol

#FunnyNotFunny

Yeah, I don't think I even saw her that night

Okay. Just wanted to confirm that. Thanks

iMessage

PLAINTIFF 00129



RG

Ron >

Have a safe trip!

Thank you :)

Oct 1, 2018, 11:07

Hi Ron. I'm ill and will not be able to work tomorrow night. I wanted to tell you now to give you more time to find coverage. I can provide a doctors note if necessary as I have another appointment on Wednesday. Sorry :(

No problem, get better

Thank you

Oct 13, 2018, 18:01

Hi Kris , do you know anyone interested in full time nights

iMessage

Garcia
EXHIBIT 12
2/4/20
Rptr: Cheri Poplin

PLAINTIFF 00130



Sep 30, 2018, 19:02

Hey boo. So I know you offered but I also know no one really wants to get involved. But would you mind emailing HR about what Rachel said in 4C and during/ after ACLS. Its important that they hear she is continuing to talk about the situation and continuing to call me a liar. I can give you the specific persons email for HR if youre willing to do that.

Why what happened i thought this shit was getting settled

I don't mind emailing

I'm not here to get people fired or in trouble but the truth is the truth

Garcia
EXHIBIT 13
2/4/20
Rptr: Cheri Poplin



PLAINTIFF 00122



I'm not here to get people fired or in trouble but the truth is the truth

Is she still talking shit to people

Its still drawing on. They are still questioning people

I know. Im not *trying* to get her fired either. I just want them to stop her from doing all the shit she is doing to me

Okay I understand

I don't mind emailing

Thats all im asking. Just say what she said. If what she said is the truth it shouldnt matter ya know?

iMessage

PLAINTIFF 00123



**AT&T**   07:10   72%

**A**

Angelita >

Thats all im asking. Just say what she said. If what she said is the truth it shouldnt matter ya know?

I agree

They havent been identifying anyone they are talking to. Just so you know incase you are afraid of her retaliating.

Girl I am not afraid of that girl

The truth is the truth

Ill get his email and send it to you in a few

Thanks doll. Sorry to drag you into it

Girl it's all good

iMessage

PLAINTIFF 00124



PLAINTIFF 00125



She just blurred it out to me

And thats what they need to know

Kevins is the HR representative investigating this. His email is:

Are you at work

kevin.Brancaleone@beaumont.org

PLAINTIFF 00126



I wanted to change weekends but I said I work every weekend so I dont see how that would change anything

I hope so. If im lucky they will just keep putting me in EC so I dont have to socialize with anyone

I think that's what going to happen

That's their only option

That would be just fine with me

Oct 10, 2018, 12:36

Hey HR called me

They want to talk more about my email



PLAINTIFF 00121

**Conversation with Jean**

**Jean  0:21**
Hello? Hi Krissie

**Jean  0:23**
I just want to see how things are going

**Kristina  0:25**
Okay

**Jean  0:27**
Very good. Ahh, I just wanted to let you know that we did follow up with Kevin, ummm We wanted to see when you have time to either...he could either come up here we go down to his office and just kind of go over your concern that you had, and umm all I can share with you because of confidentiality is that, you know, we did go out and we did investigate, and you, you were right, what was being happening, what was being said, and we did address it. So I could share that much with you.

**Kristina  0:57**
Okay, at the meeting, will I find out how that was addressed? Or No?

**Jean  1:02**
Because of confidentiality, I mean, I'll let HR, I'll defer to them. Umm but usually we don't discuss that sort of, you know, what happened, you know, as far as how we how it was addressed, and I can just assure you that it was addressed. Umm, so, umm when's a good time? When do you have time? Umm I don't want to come in on your day off or anything like that. I mean,

**Kristina  1:23**
Oh, no, I don't mind coming on my day off. But I want my attorney with me.

**Jean  1:27**
Oh, absolutely. Sure no, no problem. I think when I called you yesterday and then I think umm she reached out to Kevin, but I think there was like uhhh, it was the wrong address. So he got it late.

**Kristina  1:38**
For what?

**Jean  1:40**
I don't know. There was a letter that was sent to Kevin, but I think to uhh

**Kristina  1:44**
Well, I know they tried to set up a, my attorney tried to set up a date and they actually declined to let her come. So I put in a umm what's that an affidavit in place of actually meeting with Kevin.

1 of 2

Garcia
EXHIBIT 14
2/4/20
Rptr: Cheri Poplin

PLAINTIFF 00151

**Jean 2:00**
Oh, okay,

**Kristina 2:01**
Because he wanted my like statement and they wouldn't allow her to come for the preliminary like statement. Umm so I'm hoping they'll allow her to come this time.

**Jean 2:10**
Okay

**Kristina 2:10**
Because I would like to meet and see

**Jean 2:11**
No problem, then what I'll do is I'll reach out to Kevin, I'll let him know that, you know, I met with you uhh briefly this morning and uhh we'll probably either I'll call you or he'll call you and you know we'll work out the uhh

**Kristina 2:21**
Okay. Well, I can have my attorney contact him just set up the date because whatever works for her.

**Jean 2:26**
Yeah, yea that's fine. Yeah. However, that works for that. Yeah, no problem. Okay. Thank you. Thank you for your patience. Okay.

**Kristina 2:30**
Okay, you're welcome

**End of Conversation.**

PLAINTIFF 00152

**Brancaleone, Kevin**

| | |
|---|---|
| **From:** | Garcia, Kristina |
| **Sent:** | Monday, September 10, 2018 2:43 AM |
| **To:** | Garcia, Kristina |
| **Subject:** | Sexual Harassment |
| **Attachments:** | Garcia - Sexual Harassment.docx |
| | |
| **Sensitivity:** | Private |

Please review attachment.

Thank you,

Kristina Garcia, BAS, RRT-ACCS, AE-C, FCCS

```
Garcia
EXHIBIT 15
2/4/20
Rptr: Cheri Poplin
```

1

Beaumont/Garcia 000306

September 10th, 2018

To whom it may concern,

I am writing to follow up with my sexual harassment complaint.

To reiterate the situation, on the morning of August 6th, 2018, I informed my immediate supervisor (Mrs. Antoinette Carroll) regarding the events that occurred on July 29th, 2018, resulting in Miss Luca putting her hand down my shirt, pinching my nipple and lifting my breast up out of my bra cup. As requested, I turned in a written statement on August 8th, 2018, to Mrs. Carroll, illustrating the event that had occurred and outlining previous situations with Miss Luca that made me uncomfortable. Mrs. Carroll updated me on the situation stating that she had spoken with Miss Luca and Mrs. Kaye (Mrs. Kaye is Miss Luca's close friend and a witness to the incident) and that she informed Miss. Luca that she was not to talk about the incident with anyone or else this would be turned over to Human Resources for further review. I was accepting of this as I simply wanted the harassment to stop and for everyone to move forward. Since then I have been treated differently by a number of staff (in particular, staff that are close friends with Miss Luca). Some staff members have withheld having friendly conversations with me; other staff members have left the immediate area when it is just them and I alone in the area/department, and another staff member chose to leave the ICU completely to do her charting during downtime rather than sit alone with me in the designated respiratory room as usually occurs. It became apparent to me that Miss. Luca had, in fact, been talking about the situation by the way the atmosphere had changed, especially since several co-workers I had not previously ever had any problems with had begun treating me poorly, although I did not have any hard proof of this. I let these initial things go, hoping that everything would run its course.

Moving forward, I have been approached by my co-workers informing me that Miss Luca continues to discuss the incident and asserts that I am lying about the situation. One such co-worker that she discussed the incident with was Phillip Mathewson. In the early morning hours of August 27th, 2018, I approached Mr. Matthewson to ask exactly what Miss Luca said. Mr. Matthewson confirmed that Miss Luca did, in fact, tell him the story and proclaimed that it was a lie. Mr. Matthewson expressed not wanting to get further involved in the situation. He told me he did not want to speak with management about it, albeit if other people were saying the same thing, he didn't mind being one of a number of people speaking with management, but that he did not want to be the only one speaking for fear of retaliation by Miss Luca. I had anticipated this response so in an effort to protect myself and my reputation I had recorded the conversation I had with Mr. Matthewson. Following the conversation with Mr. Matthewson, I updated Mrs. Carroll and requested that Human Resources be notified immediately as the situation was escalating. I expressed that Miss Luca was slandering my name in an attempt to ruin my reputation for speaking out against her in regards to being sexually harassed. I played Mrs. Carroll a portion of the audio where Mr. Matthewson confirmed that Miss Luca gave her unsolicited views and opinions to him regarding my sexual harassment claim and labeled me a lair. I was assured by both Jean Aphram, Director of Respiratory Care, and Mrs. Carroll that they would contact Human Resources that morning (August 27th, 2018) and updated me. Two weeks have passed and I have yet to hear anything back from my supervisors, our Director, or Human Resources.

Beaumont/Garcia 000299

2

Meanwhile, I continue to have my name slandered by Miss Luca. The most recent incident I am aware of was September 2nd, 2018. I was working in the 4 East ICU with David Antior, RRT. Miss Luca came into the unit a minimum of two times. She did not appear to have come to the unit for any constructive reason such as offering help, as neither Mr. Antior nor I were contacted by her. Instead, Miss Luca approached 4 East ICU nurse Anthony "Tony" Stout, RN, and begun discussing the incident. Mr. Stout states that Miss Luca approached him in his patient's room and specifically told him "Kryssie and Stacy concocted a story to get me fired" and proceeded to elaborate on how I made up the claim. Later that morning, I personally witnessed Miss Luca come to the unit and approach Mr. Stout while he was at the nursing desk and overheard her referencing the story again.

I am very upset that not only was I physically assaulted by Miss Luca, but that she proceeds to attack my character all without any repercussions. I know of nothing that has been done regarding my complaints. My co-workers have become unwillingly involved in this situation such as with Mrs. Stacy Cary, RRT, being named an accomplice to my alleged "lies" meanwhile others are unsolicitedly fed Miss Luca's version of the story accompanied by slander. Not only has Miss Luca involved those in our department but now other departments have become involved as well. She continues this despite management explicitly instructing her not to discuss the situation. This will undoubtedly affect my interprofessional relationships throughout the hospital as Miss Luca is branding me as a liar with the accusation of filing false claims of sexual harassment.

I was assured that this situation would be handled yet it persists without consequence. I have followed the chain of command in reporting this incident and handling it in a professional manner, nevertheless it continues to worsen. I would like to inquire as to what will be done to protect me from Miss Luca's retaliatory actions, relative to my coming forward and reporting sexual harassment. I am requesting a written update on my complaint in addition to the next steps Human Resources will take to ensure a safe work environment that is free from all forms of harassment.

Thank you in advance,

Kristina Garcia, BAS, RRT-ACCS, AE-C, FCCS

Beaumont/Garcia 000300

**Brancaleone, Kevin**

| | |
|---|---|
| **From:** | Garcia, Kristina |
| **Sent:** | Monday, September 10, 2018 7:47 PM |
| **To:** | Brancaleone, Kevin |
| **Subject:** | Re: Sexual Harassment |
| **Sensitivity:** | Private |

Thank you very much Mr. Brancaleone.

Kristina Garcia

**From:** Brancaleone, Kevin
**Sent:** Monday, September 10, 2018 12:27:54 PM
**To:** Garcia, Kristina
**Subject:** RE: Sexual Harassment

Thank you, Kristina.  In the meantime, I will work with Jean Aphram to make sure your concerns are being appropriately addressed.  I look forward to speaking with you, when you return.

Please enjoy and have a safe vacation!

Kevin

**From:** Garcia, Kristina
**Sent:** Monday, September 10, 2018 12:20 PM
**To:** Brancaleone, Kevin
**Subject:** Re: Sexual Harassment
**Sensitivity:** Private

Mr. Brancaleone,

I'd like to thank you for your prompt response.  I am currently on vacation, while this is obviously very important to me, I welcome discussing this further upon my return. I will be available on or after September 27th, 2018.

Thank you again,

Kristina Garcia

**From:** Brancaleone, Kevin
**Sent:** Monday, September 10, 2018 8:31:12 AM
**To:** Garcia, Kristina
**Subject:** RE: Sexual Harassment

Hello, Kristina:  Can you please give me a call in Human Resources at ▮▮▮▮▮▮ as soon as you are available to do so?  I will attempt to reach you this morning, as well.

Thank You,

1

Garcia
EXHIBIT 16
2/4/20
Rptr: Cheri Poplin

Beaumont/Garcia 000319

Kevin Brancaleone
Human Resources

**From:** Garcia, Kristina
**Sent:** Monday, September 10, 2018 2:43 AM
**To:** Garcia, Kristina
**Subject:** Sexual Harassment
**Sensitivity:** Private

Please review attachment.

Thank you,

Kristina Garcia, BAS, RRT-ACCS, AE-C, FCCS

2

Beaumont/Garcia 000320



**LAW OFFICES OF**
# LISA C. WARD
PLLC

4131 OKEMOS ROAD • SUITE 12
OKEMOS, MICHIGAN 48864
E-MAIL lisacwardlaw@gmail.com



LISA C. WARD
LICENSED IN MI & DC

TELEPHONE 517-347-8100

September 25, 2018

Jennifer Zinn
Beaumont Health
3601 W. 13 Mile Rd.
Royal Oak, MI 48073

   *Re: Rachel Luca*

Dear Ms. Zinn:

   Pursuant to our September 20, 2018 telephone conversation, enclosed, please find Kristina Garcia's notarized affidavit regarding the above-referenced matter. If you have any questions, please contact our office.

Sincerely,

Lindsay Weiss
*Legal Assistant*

1 of 1

Garcia
EXHIBIT 17
2/4/20
Rptr: Cheri Poplin

PLAINTIFF 00016

## AFFIDAVIT OF KRISTINA GARCIA

I, Kristina Garcia, am submitting this Affidavit in support of my sexual harassment and retaliation grievances against Rachel Luca.

1.     Ms. Luca has been making sexually harassing comments that make me uncomfortable for several months. She has said:
   (1) "I know you want me."
   (2) "Don't you think I'm attractive?"
   (3) "We would make the perfect couple."
In addition, on one occasion, she attempted to hold my hand.

2.     On or about January 2018, when she made several comments about how I "want her," I told her, "You know I'm not interested in you, right?" I hoped that clarifying this for her would make the harassment stop. She responded, "I'm not interested in you either," apparently insulted. After that, I believed that the matter had been resolved between us.

3.     On July 28, 2018, I was on break with two coworkers, Colleen Kay and Rachel Luca. I mentioned that I was so cold you could see me through my bra, and we began talking about our bras. This kind of talk was not atypical during night shift breaks.

4.     During the conversation, Ms. Luca put her hand down my shirt, pinched my nipple, and pulled my breast out of my bra cup. I felt stunned, uncomfortable, and upset. I asked, "What are you doing? Why would you do that?" She replied, "I just wanted to see your bra." I told her that she had grabbed my nipple, not my bra. Her response was, "Well, you have nice nipples." At that point, I was very angry and upset.

5.     Later that morning, July 28, 2018, Ms. Luca began talking about her "beautiful" vagina. She then started looking up pictures of vaginas on her phone and showing me those pictures, saying, "Do you like that? Is this what you like?"

PLAINTIFF 00017

6.      After these events, I did not feel safe around Ms. Luca. On August 6, 2018, I went to my supervisor, Antoinette Carroll, to report what had happened. During the August 6, 2018 meeting, I submitted my first written grievance regarding the sexual harassment incident.

7.      On August 8, 2018, Ms. Carroll interviewed Ms. Luca, Ms. Kay, and myself, and I believed that the matter had been resolved. All parties were told not to discuss the incident or my report of the incident. However, following the August 8, 2018 meeting with Ms. Carroll, other staff members began treating me differently.

8.      Staff members, including Ms. Kay, who witnessed the incident, stopped talking to me and would leave the room if I was there. Prior to Ms. Luca's sexual harassment of me, I had no issues with these coworkers.

9.      Subsequently, I learned that Ms. Luca was retaliating against me for reporting her to Ms. Carroll. On August 27, 2018, my coworker, Phillip Matthewson, told me that Ms. Luca told him that I had concocted a claim of sexual harassment in a conspiracy to get her fired. Ms. Luca's lies were retaliation for reporting the sexual harassment.

10.     I was very upset and uncomfortable, and I no longer feel safe at work. On August 27, 2018, I reported the retaliation to Ms. Carroll. I also requested that the sexual harassment and retaliation grievances be reported to Human Resources.

11.     On September 2, 2018, while I was working in the 4 East ICU, Ms. Luca came into the unit. Ms. Luca approached one of the resident nurses, Anthony Stout, and told him that I had concocted a story to get her fired. Ms. Luca's conduct had a direct impact on my ability to look after my patients because I must work closely with the resident nurses to coordinate their care.

12.     As of September 10, 2018, I still had not heard from Human Resources. On that same day, I submitted a second written grievance directly to Human Resources about the retaliation by Ms. Luca.

13.     As of the date of this affidavit, Ms. Luca continues to retaliate against me. On September 14, 2018, Ms. Luca began yelling that I was trying to get her fired and that I was a liar. On September 17, 2018, Ms. Luca told coworkers about my reporting her for sexual harassment, the investigation, and she again called me a liar.

PLAINTIFF 00018

14.    The sexual harassment and retaliation by Ms. Luca has made it impossible for me to perform my job. I am being harassed, and I no longer feel safe at work.

This information is true to the best of my knowledge, information and belief.

**FURTHER AFFIANT SAYETH NOT.**

Dated: 09-25-18                                            _Kristina Garcia_
                                                           **Kristina Garcia**

Subscribed and sworn before me
On September 25, 2018
_Michael K. Warren Jr._
Notary Public, Livingston County
Acting in Ingham County
My Commission expires 12/10/23

Michael K. Warren Jr.
Notary Public - Michigan
Livingston County
Acting in the County of Ingham
My Commission Expires December 10, 2023

Page 305

```
1              UNITED STATES DISTRICT COURT
2              EASTERN DISTRICT OF MICHIGAN
3                  SOUTHERN DIVISION
4
5   KRISTINA GARCIA,
6              Plaintiff,
7        vs.              Case No. 19-11673
8                         District Judge Linda Parker
9   BEAUMONT HEALTH and
10  RACHEL LUCA,
11             Defendants.
12                       /
13
14        The Video-Recorded Deposition of
15        KRISTINA GARCIA, Volume 2,
16        Taken Remotely from Oakland County, Michigan
17        Commencing at 10:01 a.m.,
18        Tuesday, September 22, 2019,
19        Before Linda S. Wilson, CSR-0973.
20
21
22
23
24
25
```

Page 306

```
1   APPEARANCES:
2
3   LISA C. WARD
4   Law Offices of Lisa C. Ward, PLLC
5   4131 Okemos Road
6   Suite 12
7   Okemos, Michigan 48864
8   (517) 347-8102
9   lisacward@aol.com
10       Appearing on behalf of the Plaintiff.
11
12  ERIC J. PELTON
13  Kienbaum, Hardy, Viviano, Pelton & Forrest, PLC
14  280 North Old Woodward Avenue
15  Suite 400
16  Birmingham, Michigan 48009
17  (248) 645-0000
18  epelton@khvpf.com
19       Appearing on behalf of the Defendant.
20
21  Also Present:  Travis Jewell - Video Technician.
22
23
24
25
```

Page 307

```
    WITNESS, DATE
1             INDEX TO EXAMINATIONS
2
3   Witness                              Page
4   KRISTINA GARCIA
5
6   EXAMINATION                          310
7   BY MR. PELTON:
8
9             INDEX TO EXHIBITS
10
11  Exhibit                              Page
12  (Exhibits attached to transcript.)
13
14  DEPOSITION EXHIBIT 18                318
15  DEPOSITION EXHIBIT 19                327
16  DEPOSITION EXHIBIT 20                330
17  DEPOSITION EXHIBIT 21                334
18
19
20
21
22
23
24
25
```

Page 308

```
1   Taken Remotely from Oakland County, Michigan
2   Tuesday, September 22, 2020
3   10:01 a.m.
4
5            VIDEO TECHNICIAN:  We are now on the
6   record.  Participants should be aware that this
7   proceeding is being recorded and as such all
8   conversations held will be recorded unless there is a
9   request and agreement to go off the record.  Private
10  conversations and/or attorney client interactions
11  should be held outside the presence of the remote
12  interface.
13           For the purpose of creating a witness-only
14  video recording the witness is being spotlighted on
15  all the video screens while in speaker view.  We ask
16  that the witness not remove the spotlight setting
17  during the deposition as it may cause other
18  participants to appear on the final video rather than
19  just the witness.
20           For anyone who doesn't want the witness'
21  video to take up a large part of your screen, you may
22  click the gallery view button in the upper right
23  conner of the Remote Depo interface.
24           This is the remote video-recorded
25  deposition of Kristina Garcia being taken on Tuesday,
```

VOL. II, KRISTINA GARCIA
09/22/2019

Pages 309–312

Page 309

1   September 22, 2020.  The time is now 14:01 UTC.  We
2   are here in the matter of Garcia versus Beaumont
3   Health, et al.
4           My name is Travis Jewell, remote video
5   technician, on behalf of the USLegal Support located
6   at 30800 Telegraph Road, Bingham Farms, Michigan.  I
7   am not related to any party in this action.  Nor am I
8   financially interested in the outcome.
9           At this time will the court reporter on
10  behalf of the USLegal Support please enter the
11  statement for remote proceedings into the record.
12          COURT REPORTER:  The attorneys
13  participating in this deposition acknowledge that I am
14  not physically present in the deposition room and that
15  I will be reporting this deposition remotely.  They
16  further acknowledge that, in lieu of an oath
17  administered in person, the witness will verbally
18  declare her testimony in this matter is under penalty
19  of perjury.  The parties and their Counsel consent to
20  this arrangement and waive any objections to this
21  manner of reporting.  Please indicate your agreement
22  by stating your name and your agreement on the record.
23          MS. WARD:  Lisa, middle initial C, last
24  name Ward, and I do agree to this arrangement.
25          MR. PELTON:  Eric Pelton on behalf of the

Page 310

1   Defendant, Beaumont Health.  Given that the Court
2   ordered that we do this remotely, we are in agreement
3   based on that.
4           THE WITNESS:  Do I agree as well?  Do I
5   have to say --
6           MS. WARD:  You can.
7           THE WITNESS:  Kristina Garcia, and yes, I
8   do agree.
9           KRISTINA GARCIA,
10  was thereupon called as a witness herein, and after
11  having first been duly sworn to testify to the truth,
12  the whole truth and nothing but the truth, was
13  examined and testified as follows:
14              EXAMINATION
15  BY MR. PELTON:
16  Q.  Good morning, Miss Garcia.  It's nice to see you
17      again.
18  A.  Good morning, Mr. Pelton.
19  Q.  So we are going to conclude your deposition today.
20      Same sort of ground rules as last time.  I have to
21      remind you to again ask that you let me know if you
22      don't understand one of my questions, and I will be
23      happy to rephrase that for you.
24          I want to confirm a few things with you.
25      It's my understanding that you are in Ms. Ward's

Page 311

1   office, just you and Ms. Ward?
2   A.  Correct.
3   Q.  And you are in a conference room there or her office?
4   A.  Office.
5   Q.  Okay.  And I want to confirm that no one else would be
6       communicating with you during the deposition either
7       via chat or e-mail or text?
8   A.  Correct.
9   Q.  Your phone is off?
10  A.  I don't have my phone.
11  Q.  Very good.  And you won't communicate with Ms. Ward
12      during the questioning.  Certainly if you want to take
13      a break, you will let me know that, and we will take
14      break, and then you are free to talk to your Counsel.
15      But during questioning, obviously, there should be no
16      communication between you and Ms. Ward.  Do you
17      understand that?
18  A.  Yes.
19  Q.  All right.  I want to get -- first get an update on
20      your job situation.  You are still working at
21      Beaumont?
22  A.  Yes.
23  Q.  As a therapist?
24  A.  Correct.
25  Q.  And do you still work three days per week generally?

Page 312

1   A.  Yes.  I'm full time.
2   Q.  Okay.  And so that hasn't changed.  You are still
3       three days a week, as when you were -- as when we last
4       met?
5   A.  Correct.
6   Q.  You work still the late shift?  I think it was like
7       6:45 p.m. to 7:15 a.m.?
8   A.  Yes.
9   Q.  All right.  Are you working any overtime?
10  A.  Yes.
11  Q.  How often?
12  A.  Lately it has been every week.
13  Q.  Okay.
14  A.  Generally every week.
15  Q.  Do you usually accept overtime when it's offered?
16  A.  Yes.
17  Q.  Okay.  And are you content with the hours you are
18      getting at Beaumont?
19  A.  Yes.
20  Q.  When you were a charge therapist, that was what, 2017
21      ant 2018 primarily?
22  A.  Yes.
23  Q.  Okay.  When you were working as a charge therapist,
24      would that be one of your three weekly shifts, or
25      would that usually be an additional shift?

**VOL. II, KRISTINA GARCIA**
09/22/2019                                                              Pages 313—316

Page 313

1   A.   It would be one of my three weekly shifts.  It could
2        be additional as well.  But it was generally my
3        scheduled days, my regularly scheduled days.
4   Q.   Very good.  And I'm curious, since you worked this
5        midnight shift and three times a week generally unless
6        you are working overtime, what do you usually do with
7        the rest of your week?  Do you have activities you
8        engage in during the day on days off or even on days
9        you are working?
10  A.   Yes.
11  Q.   What types of things do you like to do?
12  A.   I go to concerts.  I like to travel, but it's not --
13       it's usually like once a year.  I work my second job.
14       I have a dog that I'm invested in.
15  Q.   Are you involved in any organizations or volunteer
16       groups or social groups?
17  A.   I haven't been recently, but generally I would go and
18       see the homeless during the wintertime.  I usually do
19       things with animal welfare groups during the
20       summertime.
21  Q.   Sounds like some of those activities are kind of on
22       hold right now with the Covid issues?
23  A.   Well, it's been the Covid issues as well as just my
24       general self.  I have refrained from some things.
25  Q.   Why is that?

Page 314

1   A.   I haven't found pleasure in them.  I have been
2        stressed.  I have been depressed.
3   Q.   When did you last go to a concert?
4   A.   Last year some time.
5   Q.   2019?
6   A.   Yes.  Some time in 2019.
7   Q.   Do you remember what the concert was?
8   A.   I think the last concert I went to might have been
9        Queen.
10  Q.   Oh, fun.  Did you go with some friends?
11  A.   I did.  I went with one friend.
12  Q.   Have you done any virtual concerts --
13  A.   No.
14  Q.   -- since the pandemic started?
15  A.   No, I have not.
16  Q.   When were you last involved with assisting homeless
17       people?
18  A.   I believe the winter of 2017, maybe 2018, that winter.
19  Q.   Any particular -- I'm sorry.
20  A.   That winter.
21  Q.   '17 or '18?
22  A.   Yes.  The winter that went through, you know, the end
23       of '17, beginning of '18.
24  Q.   Is there a particular organization you are involved
25       with?

Page 315

1   A.   I usually go with a group of friends.  One of them
2        does have -- like she does have a nonprofit
3        organization.  I wouldn't necessarily say I went with
4        that organization.  We just -- we go ourselves.  A
5        group of us will coordinate who makes food, and we
6        usually each make like an individual dish, and we
7        would go out and serve Downtown just on the street.
8   Q.   That's great.  You have chosen not to do that the last
9        couple of winters?
10  A.   Correct.
11  Q.   Are you planning to get involved again this winter?
12  A.   Possibly.
13  Q.   Does that kind of depend on the pandemic situation?
14  A.   No.  I'm not necessarily concern about that because I
15       could wear a mask.  It's just if it's going to -- I
16       don't know how to say it.  Like if I feel up to it.
17  Q.   Sure.  As a therapist, respiratory therapist,
18       obviously you were in the heart of some of the Covid
19       treatment patient issues I would assume.
20  A.   Absolutely.
21  Q.   Were you given any instructions or guidelines or
22       recommendations on interacting with others since you
23       have been so exposed in the workplace to people with
24       Covid?
25  A.   Could you be like a little more specific?  Like I'm

Page 316

1        not sure what you mean.
2   Q.   Well, I'm not sure either.  Since you are interacting
3        with a lot of people who have Covid, I assume, right?
4   A.   Yes.
5   Q.   That you may have been given some guidelines, either
6        by the CDC, by Beaumont, interest groups, whatever it
7        is, as to, you know, any restrictions on your
8        activities or interactions with people.
9   A.   Well, I have taken the CDC recommendations of wearing
10       a mask when you go out, limiting -- you know, limiting
11       you going out for whatever is necessary.  I mean
12       obviously that was during the heart of the pandemic.
13       Where it has slowed down now, I feel more comfortable
14       going out, wearing a mask.
15            When everything was very new and kind of
16       like everything was blowing up basically, you know, I
17       really didn't have time to go out anyway.  I was
18       pulling a lot of overtime to help at the hospital.
19  Q.   Yes.  That was one of my questions.  Did your hours
20       increase quite a bit in February, March and April?
21  A.   Dramatically, yes.
22  Q.   We appreciate that.  You said you still have your
23       other job.  Is that the one at Lakeland?
24  A.   Correct.
25  Q.   Did your hours increase there as well?

**VOL. II, KRISTINA GARCIA**
09/22/2019
Pages 317–320

Page 317

1   A.   No.  I pulled overtime at Beaumont, and I don't even
2        believe I pulled any regular hours during that time
3        because I didn't feel that is where I was needed.
4        They weren't booming the way, you know, Beaumont was
5        booming.  I think there was a couple months there I
6        didn't take a day at all at my other job.
7   Q.   I apologize.  What did you say?
8   A.   I said I believe there was a couple months there that
9        I didn't have a single day at my second job because I
10       was at Beaumont so much.
11  Q.   Right.  Have you looked for any other jobs during --
12       well, since February when we were last together?
13  A.   Yes.
14  Q.   Where are you looking?
15  A.   I was looking at Macomb Community College.
16  Q.   To teach?
17  A.   Correct.
18  Q.   Would that be full-time faculty position or sort of an
19       adjunct?
20  A.   Adjunct.
21  Q.   What is the status of that?
22  A.   I did not receive the position.
23  Q.   What was the position?
24  A.   Adjunct faculty teaching respiratory therapy.
25  Q.   Are you still taking classes?

Page 318

1   A.   No.  I have completed my Master's classes.
2   Q.   Very good.  Congratulations.
3   A.   Thank you.
4   Q.   Have you filed your 2019 tax return?
5   A.   2019?  Yes.
6   Q.   Did you file it in April or more recently?
7   A.   I probably filed it within the first three months of
8        the year.
9   Q.   Oh, okay.  All right.  So we will need a copy of that.
10  A.   Okay.
11  Q.   If you want to get it to Miss Ward and she can
12       supplement the production?
13  A.   Okay.
14  Q.   All right.  All right.  We are going to try our first
15       exhibit, which will be Exhibit 18 so we can continue
16       the numbering from the prior deposition.  So I'm going
17       to try and pull up the share screen.  Bear with me.
18              INTRODUCED INTO THE RECORD:
19              DEPOSITION EXHIBIT 18
20              10:13 a.m.
21  BY MR. PELTON:
22  Q.   Are you able to see this?
23  A.   I don't see anything.
24  Q.   All right.
25              MS. WARD:  Neither do I.

Page 319

1              MR. PELTON:  All right.  I don't know where
2   it went.
3              MS. WARD:  My screen keeps popping in and
4   out, in and out, so I can't even read it.
5              MR. PELTON:  Yes.  I'm trying to find the
6   exhibit I want, and it is -- let me go back to the
7   UBS (sic) drive.  Okay.  Is that up?
8              THE WITNESS:  Pioneer Specialty Hospital?
9              MR. PELTON:  Yes.
10             THE WITNESS:  Yes.
11             MS. WARD:  Just a second because I am
12  having some trouble with it here.  Can you help me out
13  here a little bit?
14             THE WITNESS:  You shouldn't have to do
15  anything.
16             MS. WARD:  Wait a minute.  Okay.  I only
17  have the top half of it.
18             THE WITNESS:  Well, he can scroll.
19             MR. PELTON:  I'm going to have to scroll
20  it.
21             MS. WARD:  Can you scroll it so I can see
22  it?
23             MR. PELTON:  Sorry?
24             MS. WARD:  If you could -- okay.  I'm
25  reading it now.  I can only see a section at a time,

Page 320

1   so all I'm asking you, Eric is that --
2              MR. PELTON:  All right.  Allow me to
3   identify it, and then we can talk about how you want
4   to look at it.  You may want to pull it out of your
5   file drawer, but this is a record from Pioneer
6   Specialty Hospital.  It's control labeled
7   Beaumont/Garcia 544 through 552, which are records we
8   received from Pioneer Specialty Hospital.
9              MS. WARD:  Can you pause for a minute, and
10  I will see if I can get it?
11             MR. PELTON:  Sure.
12             MS. WARD:  Is there a way -- let me ask the
13  court reporter.  Is there a way for me to download
14  this whole thing on my computer?
15             VIDEO TECHNICIAN:  This is Travis, the
16  videographer.  Do you want to go off the video record
17  while we figure this out?
18             THE WITNESS:  Do you want to turn your
19  screen for me so I can see what you --
20             MS. WARD:  Do you have more than one page
21  with you?  Is your screen more than one page?
22             THE WITNESS:  Yes.
23             MS. WARD:  I'm fine.  I got it.
24  BY MR. PELTON:
25  Q.   Miss Garcia, do you recognize this letter that is

**VOL. II, KRISTINA GARCIA**
09/22/2019                                                                    Pages 321-324

Page 321

1    addressed to you dated 27th July 2017?
2    A.   Yes.
3    Q.   And this is from Anu Locricchio, the chief executive
4         officer, I guess Specialty -- Pioneer Specialty
5         Hospital?
6    A.   She was at the time, yes.
7    Q.   Okay.  And this is a letter terminating your
8         employment based on their determination that you had
9         numerous call-ins, correct?
10   A.   Correct.
11   Q.   Okay.  The next page is a text.  Do you recognize the
12        handwriting on the text?
13   A.   The handwriting?
14   Q.   Yes.
15   A.   That is a copy of a text message.
16   Q.   Yes.  Do you see the handwriting on it?  It says
17        Kristina Garcia.
18   A.   Yes.
19   Q.   Do you recognize the handwriting?
20   A.   No.
21   Q.   Its says, "Hey Stacy.  I'm not going to be able to
22        make it in tonight.  I can provide a doctor's note if
23        you need it.  Sorry."  Is this a text you sent to
24        Stacy?
25   A.   It appears to be, yes.

Page 322

1    Q.   Who is Stacy?
2    A.   Stacy was kind of the lead therapist.
3    Q.   She is who you reported to?
4    A.   Yes.
5    Q.   Okay.  The next, which is page -- control label 546 is
6         another text.  Why don't you take a moment to read
7         that?  Can you see that on your screen?
8    A.   Yes, I can.  Yes.  Okay.
9    Q.   Is that a text you sent to Stacy?
10   A.   Yes, it is.
11   Q.   All right.  Were these two texts related to the final
12        call-off that led to the termination decision?
13   A.   Yes.
14   Q.   All right.  And what were you responding to in this
15        text?
16   A.   Yes.  She didn't include her text, which I cannot
17        remember verbatim, but she had texted back saying if
18        you are calling in for -- something along the lines of
19        perhaps, you know, you shouldn't have two jobs if you
20        can't handle, you know, being at two jobs.  You know,
21        maybe you should consider just going down to one.  I
22        don't recall the whole entire text, but that was what
23        I was responding to, her saying like I shouldn't have
24        two jobs.
25   Q.   Right.  So you were a little annoyed by that it looks

Page 323

1    A.   like?
2    A.   I mean I didn't feel she had enough information to
3         make that assumption.
4    Q.   She knew about your job at Beaumont?
5    A.   I'm not sure if she knew it was Beaumont, but she knew
6         I had a full-time position.
7    Q.   Okay.  So that was just part of the deal as far as you
8         were concerned?
9    A.   I mean what do you mean part of the deal?
10   Q.   Well, they knew you would be taking shifts when you
11        could, and when you were available to do so, and you
12        were very much part time it sounds like from what you
13        described last time.
14   A.   I was contingent.
15   Q.   Contingent?
16   A.   Yes.
17   Q.   Yes.  Okay.  That is what I meant.
18   A.   Yes.
19   Q.   Okay.  We are back.  In 2019 you resigned your
20        position as charge therapist?
21   A.   Correct.
22   Q.   Why did you resign?
23   A.   I resigned generally because it was a lot of stress
24        having to deal with the charge position.  I was
25        concerned that Miss Luca was coming up for release

Page 324

1         from jail, and there was rumors going around, and I
2         kind of heard and thought she might be getting her job
3         back at Beaumont.
4              And since my request to not be charged with
5         her on the schedule were not honored before, I was
6         afraid that I was going to be put in that position
7         again if she resumed her employment at Beaumont, that
8         I would be her charge therapist again, and I wanted to
9         avoid that.
10   Q.   Okay.  Any other reasons?
11   A.   It was just -- it was stressful because of that.
12   Q.   Did you speak to anyone in management about your
13        concerns?
14   A.   About?
15   Q.   Let's break it down.  First concern was that Luca
16        would be released from jail.
17   A.   Correct.
18   Q.   Did you discuss that with anyone in management?
19   A.   No.
20   Q.   Did you discuss with them what you had haired about
21        Luca maybe getting her job back?
22   A.   No.
23   Q.   Who did you hear that from?
24   A.   I can't remember anyone specifically.  Well, yes, I
25        can actually.  Colleen I know was one of them that was

**VOL. II, KRISTINA GARCIA**
09/22/2019                                                              Pages 325–328

Page 325

1  saying that, but that was kind of running through the
2  department.  I don't remember everybody that brought
3  that up.
4  Q.  Do you remember anyone other than Colleen who raised
5      it?
6  A.  Not specifically, no.
7  Q.  Do you know the basis for Colleen saying that she
8      heard or that she knew or thought, or whatever it was,
9      that Luca might get her job back?
10 A.  Because she was getting out of jail.
11 Q.  So just speculative on her part as far as you knew?
12 A.  I suppose.  I mean Colleen is very good friends with
13     Miss Luca.  I have no idea if they had contact while
14     she was in prison or jail or wherever she was.  I kind
15     of assumed maybe she had some insider information
16     since she was friends with her, but I don't know of
17     anything specific.
18 Q.  Okay.  So it was just your assumption?
19 A.  Yes.
20 Q.  Then you mentioned that your schedule had not been
21     honored.  I believe we covered this, but there were
22     two instances when you worked as charge therapist
23     where Miss Luca was scheduled?
24 A.  I don't recall off the top of my head how many there
25     were, but I know I had to switch a day, one specific

Page 326

1  day, with Miss Strelecki (phonetic) so I would not be
2  charge therapist.  There were other days that we were
3  scheduled just prior to Miss Luca going to jail that I
4  would have been charge therapist with her on schedule
5  if, you know, she had not ended up in jail.
6  Q.  So this was on a written schedule?
7  A.  Yes.
8  Q.  So we would have to look at the written schedule to
9      see which days and how often?
10 A.  Yes.  I believe it's listed on my timeline.
11 Q.  Okay.  I think we covered it last time, so I don't
12     want to belabor it, but let's look at an e-mail.  I'm
13     going to share a screen again here hopefully.  All
14     right.  Are you able to see that now?
15 A.  Can you make it larger?
16 Q.  Yes.  How is that?
17 A.  Yes.
18 Q.  Okay.  This is an e-mail from you to Jean Aphram.  It
19     is control labeled Beaumont/Garcia 56.  And this is
20     the e-mail you sent on February 28th, 2019 resigning
21     your position as charge therapist, correct?
22 A.  Yes.  Correct.
23            MR. PELTON:  So this will be Exhibit 19.
24
25

Page 327

1            INTRODUCED INTO THE RECORD:
2            DEPOSITION EXHIBIT 19
3            10:27 a.m.
4  BY MR. PELTON:
5  Q.  Prior to sending this to Mr. Aphram did you speak with
6      him or Miss Carroll or Mr. Frankhouse or Mr. Hamick or
7      Mr. Burgess about your decision to step down?
8  A.  Not immediately prior to this, no.
9  Q.  You spoke to them some time after?
10 A.  No.  They never had a response.
11 Q.  Okay.  So you never spoke to them about your decision
12     to step down or the fact that you did step down?
13 A.  I spoke with them when I was having issues with Rachel
14     in terms of how that was impacting me as a charge
15     therapist, and this was the result of it.
16 Q.  That was around your scheduling?
17 A.  Around my scheduling with Miss Luca, yes, as a charge
18     therapist.
19 Q.  Okay.  She had been gone for three months at this
20     point?
21 A.  Yes.
22 Q.  And you were aware her employment had been terminated?
23 A.  I don't -- I mean I knew she was in jail, so she
24     wasn't working.
25 Q.  You weren't aware her employment had been terminated?

Page 328

1  A.  I don't believe so, no.
2  Q.  Okay.  You say at the last sentence, second to last
3      sentence, three lines up, it says, "Due to health
4      concerns."  Do you see that where I am referring?
5  A.  Yes.
6  Q.  "Due to health concerns I'm not longer able to fulfill
7      the current expectations and demands of charge
8      therapist."  What were the health concerns at this
9      point?
10 A.  My stress, my anxiety levels, my mental health.
11 Q.  And your concern was that if Luca was reinstated and
12     if you were scheduled on the same shift again, that
13     could exacerbate your concerns, your condition?
14 A.  That was the main component of it, yes.
15 Q.  Any other concern?
16 A.  I was concerned that if I was ever put in any type of
17     a similar situation, the scenario would repeat.
18 Q.  Okay.  You say the current -- you are no longer able
19     to fulfill the current expectations and demands of a
20     charge therapist.  What were the expectations and
21     demands that you couldn't fulfill?
22 A.  Apparently being forced to work as a charge therapist
23     with staff that is -- I don't know if underneath me is
24     the correct word, but staff that I have to oversee
25     that there might be a major issue with.

**VOL. II, KRISTINA GARCIA**
09/22/2019                                                    Pages 329–332

Page 329

1    Q.   That is Miss Luca?
2    A.   That was the current situation, yes.  But like I said,
3         if it happened again or any type of a major situation
4         happened with a staff member, I didn't have trust or
5         faith that I would kind of be listened to or looked
6         after or my concerns would be, you know, valid enough
7         to warrant them not putting me in a situation that
8         made me uncomfortable.
9    Q.   Sure.
10   A.   I mean --
11   Q.   Okay.  You say in the last sentence, "I look forward
12        to continuing to serve as a valuable resource for our
13        team while focusing my energy on professional growth
14        and providing excellent patient care."  That is what
15        you wrote?
16   A.   Yes.
17   Q.   And did you provide excellent patient care?
18   A.   Yes.  I hope so.  I believe so.
19   Q.   And you continue to do so?
20   A.   Absolutely.
21   Q.   Okay.  We are going to put up another exhibit, if you
22        will bear with me.  It keeps telling me I have
23        insufficient data when I open them.  All right.  Are
24        you able to see this document?
25   A.   Yes.

Page 330

1    Q.   Charge therapist, job description?
2    A.   Yes.
3    Q.   Okay.  This will be Exhibit 20.  It's control labeled
4         Beaumont/Garcia Number 77.
5                     INTRODUCED INTO THE RECORD:
6                     DEPOSITION EXHIBIT 20
7                     10:32 a.m.
8    BY MR. PELTON:
9    Q.   I would like you to take a moment to review it.  Then
10        I want to ask you if you believe it accurately
11        describes the responsibilities of the charge therapist
12        as you understood it.
13                  MS. WARD:  Eric?
14   BY MR. PELTON:
15   Q.   Take your time.  When you need me to scroll, I will.
16                  MS. WARD:  Eric?
17                  MR. PELTON:  Yes.
18                  MS. WARD:  Our copy doesn't -- it has a
19        February 19th date, but it doesn't have a year.  Is it
20        possible you could scroll it over just a little bit to
21        see the year?
22                  MR. PELTON:  It's February of 2019.
23                  MS. WARD:  Okay.  Thank you.  Just let him
24        know when you're ready to go ahead and scroll.
25   A.   Can you scroll up, please?

Page 331

1    BY MR. PELTON:
2    Q.   You bet.
3    A.   Can you scroll up again, please?  Okay.  Is that the
4         end of it?
5    Q.   It is.  Yes.  That is the bottom of the document.
6    A.   Okay.
7    Q.   We will go back to the top.  So the question was does
8         this accurately describe the responsibilities of the
9         charge therapist in February of 2019 as you understood
10        them?
11   A.   Yes.  Some of -- I mean this is some of the
12        responsibilities.  Some of these responsibilities more
13        so pertain to the day shift therapist, but yes.
14   Q.   Okay.  Which ones were more related to the day shift?
15   A.   We don't tend to focus that much on rotation
16        monitoring.
17   Q.   That is the second bullet under "prepares shift"?
18   A.   Yes.
19   Q.   Okay.
20   A.   We don't have senior therapists on night shift.  We no
21        longer -- I don't believe even at that time we no
22        longer do the pharmacy medication printouts.
23   Q.   That is the fifth and sixth bullet?
24   A.   One, two, three -- wait, one, two, three, four, five.
25        Yes, fifth and sixth.

Page 332

1    Q.   Okay.
2    A.   The third bullet point, throughout shift, night shift
3         doesn't do outpatient therapies ABGs.  That is a day
4         shift.  That happens on day shift.  Then the next
5         bullet point, we no longer go to RRTs unless it's
6         specific -- it's specifically paged out for
7         respiratory to attend.
8    Q.   What is RRTs?
9    A.   That is part the Rapid Response Team.  We used to
10        go to every rapid response that was called because we
11        were part of the team.  They ended up eliminating us,
12        and then they just call if it's respiratory specific.
13        Again, we don't have senior therapists on night shift.
14   Q.   Mm-hmm.
15   A.   I believe the rest is accurate.
16   Q.   All right.  You mentioned -- were there tasks or
17        duties you would add?
18   A.   Yes.  There is, you know, responding to anything in --
19        I can't remember if it said PACU, but we do PACU, IR,
20        cath lab.
21   Q.   PACU is in the --
22   A.   PACU.  We go to IR.  We go to cath lab.  We have to
23        do -- what is the term they use?  Service recovery
24        with -- like if a patient and/or a family member has
25        an issue, we have to go do service recovery.  That is

Page 333

1   kind of what comes to mind at this point.
2   Q.   Very good.  Thank you.
3   A.   You're welcome.
4   Q.   Have you had any discussion of resuming as a charge
5        therapist since you resigned in February 2019?
6   A.   No.
7   Q.   Have you thought about doing so?
8   A.   I momentarily thought about doing so when Covid hit
9        because I felt that my department needed some strong
10       leaders, and I consider myself a very strong leader.
11       However, after thought I was concerned that one, they
12       would expect me to do it after the initial crisis was
13       over, and also -- I kind of weighed my options and
14       thought maybe I was more needed in direct patient care
15       than actual leadership.
16   Q.   Mm-hmm.  The question is have you talked to management
17       about that possibility?
18   A.   No.
19   Q.   Are you planning to at some point?
20   A.   Probably not.
21   Q.   Would you like to get back to being a charge
22       therapist?
23   A.   I loved being a charge therapist, but my lack of trust
24       in management I don't believe will -- I don't believe
25       the situation will be different for me.

Page 334

1   Q.   You don't think it's worth a conversation with them?
2   A.   No, I don't.
3   Q.   It just did it again.  Okay.  This will be the next
4        exhibit.  What are we on?  20, 21, Linda?
5              COURT REPORTER:  I believe it's 21.
6              MR. PELTON:  Okay.  This will be Exhibit
7        21.
8              INTRODUCED INTO THE RECORD:
9              DEPOSITION EXHIBIT 21
10             10:40 a.m.
11   BY MR. PELTON:
12   Q.   This is entitled Affidavit of Plaintiff Kristina
13       Garcia in Support of Motion for Default Judgment.  It
14       has got an ECF Number of 54-1 on it filed July 30,
15       2020.  Page I.D. is 549.  It's three pages.  I want to
16       scroll this for a moment and ask if you recall this
17       Affidavit.
18   A.   Yes, I do.
19   Q.   This is your signature at the bottom of the Affidavit
20       that has been notarized?
21   A.   Correct.
22   Q.   You understood you were filing this under oath?
23   A.   Yes.
24   Q.   Signing it under oath.  You understood you were
25       signing this under oath?

Page 335

1   A.   Yes.
2   Q.   Who prepared the Affidavit?
3   A.   My legal counsel.
4   Q.   Did you review it before signing it?
5   A.   Yes.
6   Q.   Did you make any revisions?
7   A.   I don't believe so.
8   Q.   How much time did you spend reviewing it?
9   A.   I don't recall.
10   Q.   The first paragraph says that you have a total of
11       $1,051.28 in medical expenses, September 2018 to July
12       13th of 2020.  To what do you attribute that $1,051.28
13       in medical expenses?
14   A.   Co-pays for my counseling, co-pays for my prescription
15       medications.
16   Q.   How do you come up with a $10,000 for ten years?
17   A.   Calculating future medication costs and counseling
18       fees.
19   Q.   I guess we can all do the math.  I guess let me be
20       more precise.  How do you come up with ten years of
21       such expenses?
22   A.   Elaborate.  What do you mean how do I come up with it?
23   Q.   You say you are going to estimate you need, I guess,
24       the counseling and medication for ten years, right?
25   A.   Yes.

Page 336

1   Q.   So how did you arrive at ten years as opposed to one
2        or five or 30?
3   A.   Well, I haven't been able to even begin healing yet
4        because it continues to go on.
5   Q.   The lawsuit?
6   A.   The entire procedure, yes.
7   Q.   Okay.  Have you talked to your therapist or
8        psychiatrist or personal care doctor about the length
9        of time it might take you to heal, as you put it?
10   A.   Yes.
11   Q.   And which one did you speak to about how long it might
12       take you to heal?
13   A.   Both my counselor and the primary care physician that
14       is overseeing my depression and anxiety meds.
15   Q.   What did they say to you?
16   A.   They said that they anticipate that it's going to be
17       kind of a reoccurring topic and issue that will take
18       me some time to officially deal with and feel that I
19       have overcome.
20   Q.   Did either of them indicate whether once the
21       litigation was over, you might heal more quickly and
22       get this behind you?
23   A.   Not necessarily the term more quickly, but that is
24       when we all kind of anticipate I will be able to start
25       to work on healing, coping with it, moving forward,

**VOL. II, KRISTINA GARCIA**
09/22/2019                                                    Pages 337–340

---

Page 337

1    putting things behind me.
2    Q.   All right.  And we all hope, I think, hope that that
3         will be way less than ten years.
4    A.   I would love it.
5    Q.   You are a wonderful person, Miss Garcia, but I hope we
6         are not talking in ten years about the litigation,
7         right?
8    A.   I hope so as well.
9    Q.   All right.  Did either the counselor or PCP indicate a
10        length of time, or was it just kind of open ended?
11   A.   I mean there was -- it was spoken of time, but nothing
12        was solidified.  Nothing -- they didn't tell me, you
13        know, in X amount of time you will be over this.  It
14        was just, you know, this is kind of what we are
15        looking at.  Everyone is different.  It is difficult
16        to say.
17   Q.   Sure.  It's not an exact science.  We all hope you are
18        feeling better, but in terms of the ten years and the
19        math that you applied the ten years, did you consider
20        whether your counseling might become less frequent?
21   A.   If it was recommended by my counselor.
22   Q.   Right.  But did you include that in your math for the
23        $10,000, or did you just figure continue at the same
24        rate?
25   A.   Continue at the same rate.

---

Page 338

1    Q.   Okay.  Number two says you have incurred $25,349.52 in
2         legal expenses.
3    A.   Correct.
4    Q.   Have you paid that?
5    A.   Yes.
6    Q.   All right.  Is your arrangement with your Counsel
7         contingency or hourly or some other basis?
8              MS. WARD:  I'm going to object on the basis
9         of attorney-client privilege.  For the record, I
10        believe the term is legal expenses, and I think you
11        can ask her what that represents, but I do not believe
12        that our arrangement -- I believe our arrangement is
13        privileged, exactly what the arrangement is.  You can
14        ask her all about what the $25,000 were spent on, but
15        not about my arrangement with Ms. Garcia.
16             MR. PELTON:  Well, I'm assuming that if you
17        get a favorable outcome, you will be seeking attorney
18        fees in this matter, or are you waiving that?
19             MS. WARD:  I'm not prepared to make a
20        statement about what I will or won't do when and if we
21        get a favorable outcome at this time.
22             MR. PELTON:  Are you instructing your
23        client not to answer that question?
24             MS. WARD:  I don't know -- are you asking
25        her whether I will seek attorney fees?

---

Page 339

1              MR. PELTON:  No.  I was -- the question
2    posed to her was whether -- excuse me.  The question
3    posed to her was the basis for the $25,349.52 and
4    whether her arrangement was on an hourly basis, a
5    contingency basis or some other basis.
6              MS. WARD:  You can ask her what kind of
7    expenses she has incurred thus far to come up with the
8    $25,000.  I have not prohibited that.  But anything
9    about whether we are going to seek attorney fees, what
10   kind of arrangement we have is privileged.
11             MR. PELTON:  All right.  Linda, can you
12   read back the question to which she is objecting?  I
13   want to make sure she is going to stand on her
14   objection.
15             MS. WARD:  You don't have to read it back.
16   I'm going to stand on the statement I made, Eric.  We
17   don't want to waste time on this.
18             MR. PELTON:  I am entitled to a clear
19   record.  You are posing an attorney-client privilege
20   objection to something I think I'm entitled to.  I
21   think it will put into issue whether you are entitled
22   to recover attorney fees if you're going to continue
23   with this objection.  I want to be real sure that you
24   are instructing your client not to answer the question
25   about the basis for attorneys fees in this case.

---

Page 340

1              MS. WARD:  She is not claiming $25,000 in
2    attorney fees.  She is claiming it in legal expenses.
3    The Affidavit speaks for itself.  It has nothing to do
4    with our attorney-client relationship.  If you want to
5    ask her what those legal expenses are, I'm not
6    objecting to that.  But how we set up our contract
7    isn't at issue in this Affidavit.
8              MR. PELTON:  That doesn't matter.  I think
9    it is an issue in this case if you are going to seek
10   fees.
11   BY MR. PELTON:
12   Q.   I'm going to ask again, Miss Garcia, what the basis is
13        for your attorneys fees with Ms. Ward, whether it's
14        contingency or hourly or some other basis?
15             MS. WARD:  I'm going to object and instruct
16        her not to answer on the basis of that narrow
17        question.  You can ask her anything you want about
18        what the $25,000 represents.
19             MR. PELTON:  I will get there.  Believe me.
20   BY MR. PELTON:
21   Q.   Miss Garcia, in paragraph two you reference legal
22        expenses of $25,349.52.  What do those represent?
23   A.   It represents bills I have received regarding anything
24        legal going on from the depositions, from filing fees,
25        from legal assistant fees, from anything having to do

---

Page 341

1      with pursuing this case.
2   Q.   And you have paid that amount?
3   A.   Can I -- pardon?
4   Q.   Have you paid that amount?
5   A.   Yes.
6   Q.   You have the invoices for that?
7   A.   Yes.
8   Q.   Okay.  And they represent legal assistant fees?
9   A.   Yes.
10  Q.   Costs for deposition transcripts?
11  A.   The transcripts, the videography, yes.
12  Q.   Anything else you can recall?
13  A.   Filing fees.
14  Q.   Anything else you can recall?
15  A.   That's all that comes to mind at this moment.
16  Q.   Does it include any of Ms. Ward's fees, attorneys
17       fees, or time?
18              MS. WARD:  I'm going to object and instruct
19       her not to answer.
20  BY MR. PELTON:
21  Q.   In paragraph three you state you lost $1,676.76 in
22       wages for the time you were on Family Medical Leave
23       Act.
24  A.   Correct.
25  Q.   Was that in I guess it would have been late September,

Page 342

1       maybe carried into October of 2018?
2   A.   I believe, yes.  That was the dates, yes.
3   Q.   How did you calculate that amount, or did you?
4   A.   Yes, it was calculated based off of my wages.
5   Q.   Well, but how many days did you assume you worked that
6        week in order to calculate it?
7   A.   Well, I calculated off the days that I was scheduled.
8   Q.   How many days was that?
9   A.   It was three days at Beaumont and one day at my second
10       job at Lakeland.
11  Q.   So 36 hours at Beaumont?
12  A.   Correct.
13  Q.   And how many at Lakeland?
14  A.   12.
15  Q.   In paragraph 4 you indicate an estimate of emotional
16       damages of $300,000.  Do you see that?
17              MS. WARD:  Can you scroll down, because I
18       don't see it?
19              MR. PELTON:  I apologize.
20  BY MR. PELTON:
21  Q.   So on my screen I'm scrolling down to paragraph 4.
22       The last sentence says you estimate the total value of
23       emotional damages is $300,000.
24  A.   Yes.
25  Q.   How did you arrive at that figure?

Page 343

1   A.   I considered all the emotional stress I have dealt
2        with, that I continue to deal with, everything I have
3        been through due to this case and continue to,
4        everything I am dealing with at my job.  Yes.
5   Q.   Well, what are you dealing with at your job?
6   A.   Well, I continue to feel unprotected and unsafe at my
7        job.  I constantly worry that if there were any major
8        issues, if I would be listened to, protected.  I
9        continue to have issues because of this at my job.
10  Q.   And you attribute all of that to what occurred in
11       August and September and October of 2018?
12  A.   Absolutely.
13  Q.   Anything else?
14  A.   What I have been through.  My emotional distress.
15  Q.   Hold on.  Right.  But let me go back.  You said that
16       you didn't feel supported, or I guess you said you
17       felt unsupported and unsafe.  And my question is that
18       that arose out of the events that is the subject of
19       this litigation, in other words, August, September,
20       October of 2018, right?
21  A.   Correct.
22  Q.   I'm asking now is there anything else contributing to
23       that feeling of being unsupported and unsafe other
24       than those events?
25  A.   The continuation that I do not feel that my management

Page 344

1        will take me seriously, will protect me, will
2        efficiently, you know, respond to any possible
3        complaints or issues that I may encounter.
4   Q.   Right.  But what is causing you to feel that way?
5        Anything beyond the issues that are the subject of the
6        litigation from 2018 time period?
7              MS. WARD:  I'm going to object on the
8        grounds of vagueness, but go ahead.
9   BY MR. PELTON:
10  Q.   Do you understand my question, Miss Garcia?
11  A.   I think so.  It was due to the way I was treated and
12       the way I feel that my case was not taken seriously
13       based off of my sexual orientation, based off of my
14       gender, and that continues to concern me and make me
15       worry that this will happen again.  I don't believe
16       that my management has my best interest at heart.  I
17       don't believe -- I don't believe I'm safe there at
18       work.  I think if another hostile environment were to
19       come up, this would repeat.
20  Q.   All right.  So and I get all that, and I appreciate
21       that.  The question is -- let me state it differently.
22       Have there been any events in 2019 or 2020 that
23       contribute to creating that feeling within you that
24       you feel unsafe or unsupported?
25              MS. WARD:  I'm going object again on

**VOL. II, KRISTINA GARCIA**
09/22/2019                                                          Pages 345–348

Page 345

1    vagueness, but go ahead.
2    BY MR. PELTON:
3    Q.   You can answer the question.
4    A.   I would have to look at my timeline of events, but I
5         do believe -- like, for instance, after Miss Luca had
6         went to jail, I was approached by Mr. Burgess, which
7         is one of my supervisors, about how I should act and
8         what I should say because I was a charge therapist,
9         and he was concerned that Miss Luca may come into the
10        building and either attempt to -- I don't remember if
11        he said work or just come get her stuff or why he
12        thought she would come into the building, but that was
13        something I was expected deal with that made me very
14        uncomfortable.
15   Q.   What advice did he give you, Mr. Burgess?
16   A.   He had said he -- I believe he said something along
17        the lines of he had no specific reason to think that
18        she may come into the department, but he had the
19        feeling she might, and if she were, then I was to
20        do -- I was to call security if she wouldn't leave.
21             I would have to review my timeline for
22        exact.  I mean it has been two years now, but --
23   Q.   Did you feel that was pretty good advice?
24   A.   I felt that was something I should not have to deal
25        with.  That was not my position to have to deal with.

Page 346

1    Q.   What did you expect management to do?
2    A.   That is for them to determine, but I didn't feel that
3         it was appropriate, especially considering the
4         situation I have with Miss Luca, to ask me to get
5         involved in other matters like that.
6    Q.   You didn't feel it was appropriate for him to provide
7         that kind of warning?
8    A.   He could warn me that he feels for whatever reason she
9         may enter the building, but I don't want to be
10        involved in anything with her.  That is why I asked
11        not to be paired with her, not to be charge therapist.
12        If he thought she was going to come in the building,
13        perhaps he should have made a different therapist
14        charge so she could handle that.  I didn't think it
15        was appropriate at all to put me in the situation.
16   Q.   Do you know what other measures they may have taken to
17        contain that type of problem?
18   A.   Not that I'm aware of, no.
19   Q.   Did you ask him?
20   A.   No.  I didn't expect him to say what he said.  He had
21        called me, and it was just a very -- I think he had
22        called me.  Maybe it was right before he left.  I
23        don't remember exact details, but I just remember the
24        conversation was brief.
25   Q.   All right.  Anything else, other events, that

Page 347

1    contributed to your concern of feeling unsupported or
2    unsafe?
3    A.   Since?
4    Q.   Yes.
5    A.   Nothing that comes to mind at the moment.  Again, if I
6         reviewed my timeline, something else might be
7         triggered, you know, to my mind.
8    Q.   Sure.  So if we go to -- when did your timeline end?
9    A.   I don't recall off the top of my head.
10   Q.   Is it the one we looked at in the last deposition?
11   A.   Yes.
12   Q.   Maybe we didn't mark it last time, but it's a document
13        that you produced in the litigation?
14   A.   Yes.
15   Q.   When was the last time you updated it?
16   A.   I don't recall.
17   Q.   Okay.  Had you updated it since filing the lawsuit?
18   A.   I don't recall honestly.
19   Q.   And aside from what you might have written there, you
20        don't recall any other events in 2019 or 2020 that
21        leads to your continued concern of feeling unsupported
22        and unsafe?
23   A.   I recall a conversation with Mr. Frankhouse where he
24        questioned me on my BLS instructor recertification,
25        and he made a comment that he didn't like that

Page 348

1    Mr. Hamick or other supervisor was relying on me
2    for -- like to be a BLS instructor because right
3    around that time I was off -- I don't recall if it
4    was -- I was sick or -- I don't think it was the FMLA.
5    Maybe it was the FMLA leave, but I was off, and we
6    were supposed to begin BLS recertification for staff,
7    and he made the comment, he asked me how I got my
8    certification because he didn't like that Mr. Hamick
9    had to rely on me, and he basically wanted to prevent
10   that.  It didn't come off very nice.
11   Q.   When was that?
12   A.   I don't recall the date.  It's on my timeline.
13   Q.   Well, your FMLA leave was September 2018.  I think you
14        testified last time it was shortly after that.
15   A.   That sounds right because we generally do BLS
16        recertifications in October and March.
17   Q.   Okay.  Again, any other events in 2019 or '20 that
18        have contributed to your feeling that you feel
19        unsupported or unsafe or that your management won't
20        protect you?
21   A.   I'm not sure if this is one of the things like you
22        would -- you're necessarily like trying to get at, but
23        I did just have a recent incident where I had an issue
24        with a nurse touching the machine that I run, and I
25        went to a senior therapist about what had happened,

**VOL. II, KRISTINA GARCIA**
09/22/2019

Pages 349–352

Page 349

1  and it was overheard by one of my supervisors, and he
2  requested that I do a PSQI, which is a form that we
3  use to report issues that we see, and I was very
4  concerned about writing that report because I did not
5  want retaliation against me from the nurse, because I
6  didn't believe that they would protect me if there was
7  any retaliation because the pattern is proved they
8  wouldn't?
9  Q.  When was this event?
10 A.  That was just within the last two weeks.
11 Q.  Did you fill out the PQSI (sic)?
12 A.  I did not.
13 Q.  What was the issue, a nurse had done what, touched the
14    machine or something?
15 A.  A nurse had adjusted settings on the ventilator, which
16    the nurses are not supposed to adjust any settings
17    other than the FiO2 on the ventilator.  This nurse had
18    chosen to adjust the peak on the ventilator.  So I was
19    discussing it with the senior therapist that oversees
20    that unit and asked him if he would address this with
21    the management that the -- the nursing management for
22    that unit.
23 Q.  Did you say the nurse adjusted the machine?
24 A.  Correct.
25 Q.  Did that endanger the patient?

Page 350

1  A.  In this specific incident I ended up coming in
2    immediately after and making adjustments myself, but
3    yes, that is a very dangerous situation to have a
4    nurse that is not trained on the machine and does not
5    understand what really it is that she is doing.  That
6    is why we are the only ones that are supposed to be
7    adjusting anything other than the oxygen.
8  Q.  It was a significant safety issue?
9  A.  In my eyes, yes.
10 Q.  But you don't feel that you can fill out an PQSI (sic)
11    on this incident?
12 A.  It's a PSQI.  No, I did not feel safe doing so.
13 Q.  Don't you feel you have an obligation to do so?
14 A.  I feel I have an obligation to address the issue, and
15    I absolutely did with my senior therapist.
16 Q.  What is the name of the nurse?
17 A.  Martha.  Last name started with an R, but I don't
18    recall how to spell it.
19 Q.  Who is the senior therapist?
20 A.  The senior therapist that I spoke with was Tom
21    Gilbert.
22 Q.  Have you spoken to anyone else about it?
23 A.  Steve Hamick overheard the conversation I had with Tom
24    Gilbert.
25 Q.  Okay.  Has Steve talked to you any further about it?

Page 351

1  A.  I don't believe I have seen or had any conversations
2    with Mr. Hamick since that incident.
3  Q.  Is he the one that asked you to fill out the PSQI?
4  A.  He suggested that I fill out the PSQI, yes.
5  Q.  All right.
6  A.  I expressed to him that I did not feel safe doing so
7    because the unit that that happened in was the same
8    unit that Miss Luca went to and was speaking with
9    multiple nurses in there regarding calling me a liar
10    and saying that I file false claims and sexual
11    harassment and that I was trying to get her fired.  So
12    this was kind of already a difficult unit for me to be
13    in because of everything that has happened regarding
14    that.
15 Q.  What is the name of the unit?
16 A.  The unit is 4 East.  I had expressed to Mr. Hamick
17    that I was concerned about retaliation.
18 Q.  Have you ever requested not to be assigned 4 East?
19 A.  No.
20 Q.  Any other issues or incidences that contribute to your
21    continued feeling that you are unsupported by
22    management or that you are unsafe?
23 A.  I think the fact that I do feel a little ostracized in
24    terms of I don't -- it's not a friendly vibe.  I feel
25    like supervisors avoid me.  It doesn't feel like a

Page 352

1  friendly, happy environment.
2  Q.  Anymore specific examples of that vibe or what is
3    contributing to that vibe?
4  A.  Not that I recall at this moment.
5  Q.  So back to the issue of $300,000 and how you came up
6    with that particular dollar amount, is there any other
7    basis for 300 as opposed to 200 or 100 or 500?
8  A.  It's based off of how I emotionally have felt, how it
9    continues to play on, how I haven't began the healing
10    process yet in my eyes.  I'm not sure how else to
11    answer that for you.
12 Q.  All right.  Have you had any other -- you would
13    attribute this $300,000, this is your emotional damage
14    is related to claims in the lawsuit --
15 A.  Yes.
16 Q.  -- against Beaumont health and Luca?
17 A.  Yes.
18 Q.  In terms of your medical situation, you had your --
19    your attorney sent a letter to Beaumont dated
20    September 14, 2018.  Do you recall that letter?
21 A.  I don't know specifically what you are speaking of.
22 Q.  All right.  Are you able to see this document?
23 A.  I don't see anything at the moment.
24 Q.  Okay.  It's asking for a plug-in for some reason.  All
25    right.  Let's move past that.

**VOL. II, KRISTINA GARCIA**
09/22/2019

Pages 353–356

Page 353

```
1        So there was a letter dated September 14th,
2   2018 addressed to Kevin Brockleoni (phonetic) from
3   your attorney advising Mr. Brockleoni that you had
4   been -- that Miss Ward had been retained by you for
5   representation in this matter.  "It's my understanding
6   that HR intends to interview Miss Garcia regarding her
7   complaint.  Miss Garcia and I can be available on
8   September 26th, 2018 for this meeting.  If you have
9   any questions, please contact our office."  Does that
10  refresh your memory of what the letter says?
11       MS. WARD:  Objection, Eric.  I think if you
12  are going to talk about a document, rather than read
13  it into the record, we are entitled to take a look at
14  it.
15  BY MR. PELTON:
16  Q.  I will take an answer.  Do you recall the letter?
17  A.  I recall a letter, yes.
18  Q.  All right.  This is -- what was your purpose in having
19  your attorney send this letter?
20       MS. WARD:  I'm going to object on the basis
21  of anything that she or I discussed prior to the
22  letter going out on the basis of attorney-client
23  privilege.
24  BY MR. PELTON:
25  Q.  Yes.  I don't want to know what your attorney may have
```

Page 354

```
1   advised or what discussions you had with her.  The
2   question is why you would have an attorney send a
3   letter concerning this matter.
4        MS. WARD:  I'm going to place another
5   objection.  The letter was from me.  I don't know what
6   you are trying to get at here, but you need to
7   rephrase.
8   BY MR. PELTON:
9   Q.  I will take an answer.
10       MS. WARD:  I don't know how she would know
11  what was in my head when I drafted the letter.
12       MR. PELTON:  I will rephrase it.
13  BY MR. PELTON:
14  Q.  What was your purpose in seeing an attorney concerning
15  this internal HR matter?
16       MS. WARD:  I'm going to object on the basis
17  of her seeking advice.  Again, anything that goes into
18  anything that we discussed is privileged.  Other than
19  that, go ahead.
20  BY MR. PELTON:
21  Q.  I will take an answer.
22  A.  Okay.  I'm sorry.  Say the question one more time now.
23  Q.  What was your purpose in seeing an attorney
24  concerning this internal HR matter at Beaumont?
25       MS. WARD:  Kristina, do you understand not
```

Page 355

```
1   to discuss anything that I or you discussed?
2        THE WITNESS:  Yes.
3        MS. WARD:  Okay.  Go ahead.
4   A.  I was already feeling from what was going on that I
5   was not -- my best interest was not being had.  I was
6   not being taken seriously, and that it was not being
7   pursued appropriately.
8   BY MR. PELTON:
9   Q.  Do you recall sending an e-mail and attached letter to
10  several people in HR on September 10th right as you
11  were going on vacation?
12  A.  Yes.
13  Q.  And was that sent by you before or after you had
14  sought advice from Ms. Ward?
15       MS. WARD:  Objection.  That goes into how
16  we came together.  Discussions we had, all of that I
17  believe is covered by the privilege.
18  BY MR. PELTON:
19  Q.  I don't want to know what advice you were given or
20  sought.  Let me rephrase the question.  When did you
21  first seek advice from Ms. Ward?
22  A.  I don't recall the date.
23  Q.  Was it before or after sending the September 10th
24  letter?
25  A.  I do not recall.
```

Page 356

```
1   Q.  Was it before or after complaining to Mr. Aphram that
2   last week of August about Ms. Luca talking?
3   A.  I don't recall.
4   Q.  Was it before or after your alleged assault?
5   A.  After.
6   Q.  Okay.  And you can't benchmark your first seeking
7   advice from her with any other event?
8        MS. WARD:  Objection, asked and answered.
9   Go ahead.
10  A.  I don't recall a date.  I honestly don't recall the
11  month right now.  I mean this was two years ago.
12  BY MR. PELTON:
13  Q.  What is your current diagnosis, as you understand it,
14  related to your emotional damages claim, this
15  $300,000?
16       MS. WARD:  Objection on the grounds of
17  vagueness.  Do you understand the question?
18  BY MR. PELTON:
19  Q.  You are claiming in this lawsuit $300,000 in emotional
20  distress damages, right?
21  A.  Yes.
22  Q.  And the question is what is your current diagnosis as
23  it relates to that emotional state that you are in?
24  A.  Trauma, depression, anxiety.
25  Q.  Anything else that you are aware of?
```

**VOL. II, KRISTINA GARCIA**
09/22/2019                                                                                          Pages 357—360

Page 357

1   A.   I don't particularly know what it has been categorized
2        by, you know, but my primary care physician has put
3        down depression, anxiety.  A counselor I know has
4        spoke of trauma.
5   Q.   What are the symptoms of your issues?
6                  MS. WARD:  Objection, vagueness.  But go
7        ahead.
8   A.   My symptoms include panic attacks, excessive worrying,
9        sometimes anger, sometimes sadness.  I'm constantly
10       worrying about things.  I mean I'm not sure -- I'm not
11       sure how else to answer that.
12  BY MR. PELTON:
13  Q.   Well, you have stated that you are feeling some
14       emotional distress --
15  A.   Yes.
16  Q.   -- from a variety of things.  You're focused a lot of
17       on the 2018 timeframe of course.  That is what the
18       lawsuit is about.
19  A.   Yes.
20  Q.   So since those events that you are alleging has caused
21       you this emotional distress in the form of depression,
22       anxiety, those types of diagnoses, what I'm asking is
23       the symptoms, how you are feeling.  You mentioned you
24       feel panic attacks, excessive worry, some anger,
25       sadness.  Other ways you would describe what you are

Page 358

1        feeling or experiencing either mentally or physically?
2   A.   I mean with anxiety I feel palpitations, shortness of
3        breath.  I feel like I'm in a hostile work
4        environment, which makes me feel, you know, fear.  I
5        don't think there has been a day that I went to work
6        where I wasn't either, you know, anxious or depressed
7        or scared.  I don't go to work anymore and feel like
8        I'm just at work.
9   Q.   Why not change jobs?
10  A.   I like my job.
11  Q.   So on balance you would prefer to go to work, even
12       though you are having those feelings, at Beaumont?
13  A.   I work because everyone needs to work for a living.  I
14       know this is something I have to push through.  This
15       is why I'm seeking counseling, and this is why I have
16       elected to take medications that have been recommended
17       by my primary care physician to deal with and overcome
18       this.
19  Q.   There are other hospitals in the area you could work
20       at, right?
21  A.   Yes.
22  Q.   They all have charge -- they all have respiratory
23       therapists?
24  A.   To my knowledge, yes.
25  Q.   Okay.  And you haven't sought any such jobs, Henry

Page 359

1        Ford?
2   A.   Not at other hospitals, but Beaumont is a large
3        hospital.  It is one of only I think one or two others
4        that have the level one trauma center.  I very much
5        enjoy the experience that I get at Beaumont.  I have
6        established friendships and reestablished friendships
7        and have been working on friendships, you know, since
8        this has happened with my coworkers.
9                  I feel like me having to leave is kind of a
10       punishment.  Like I said, I enjoy the experience.  I
11       have always loved my job and what I do and this
12       company that I had worked for prior to this.
13  Q.   Have you spoken to your therapist about maybe looking
14       for work at a different hospital?
15  A.   I'm sure that has come up.
16  Q.   Has it?
17  A.   I'm sure it has.  I don't recall any specific
18       conversations, but --
19  Q.   Has your therapist advised that might be a healthy
20       thing for you to do?
21  A.   No.  I believe it was talked about as an option, but
22       it was never advice to get out.  It was more so we
23       have focused on like me coping with and dealing with
24       this.
25  Q.   It's nothing you have pursued?

Page 360

1   A.   I'm sorry?
2   Q.   It's nothing you have pursued?
3   A.   No, I have not put any applications into any other
4        hospitals.
5   Q.   All right.  How often are these panic attacks that you
6        are referencing?
7   A.   I couldn't give you a timeline.  I had a little bit of
8        a panic attack when Mr. Hamick had overheard me
9        speaking with Mr. Gilbert because I didn't want to go
10       to the supervisors with my issue.  I went to
11       Mr. Gilbert because I was more comfortable with him
12       than the supervisors.  I --
13  Q.   I'm sorry.  The question was how often do you feel
14       these panic attacks?
15                 MS. WARD:  Eric, can you let her finish her
16       answer?
17                 MR. PELTON:  Not if it's not responsive and
18       you are going to hold me to 90 minutes.
19  A.   It's when they are triggered.
20  BY MR. PELTON:
21  Q.   How often?
22  A.   Frequently.  Frequently.
23  Q.   Okay.  What types of things trigger them?
24  A.   Having to deal with the issues with the supervisors.
25  Q.   Is that it?  Those are your only triggers?

**VOL. II, KRISTINA GARCIA**
09/22/2019

Pages 361–364

Page 361

1   A.   No.  That is the main one.
2   Q.   Now, this isn't the first time you have had -- in your
3        life that you have had this diagnosis?
4   A.   It's been mentioned before about anxiety and
5        depression.
6   Q.   Well, you have treated for anxiety and depression
7        before, right?
8   A.   Yes.
9   Q.   2012 to 2014 you treated at Gloria Counseling, right?
10  A.   I don't recall the dates.  I don't believe it was that
11       long.  I did go a couple of times.
12  Q.   All right.  And you had some life stressors at that
13       time that caused you to seek treatment?
14  A.   Yes.
15  Q.   All right.  And it was the same diagnosis then as it
16       is now?
17  A.   Yes.
18  Q.   You took similar prescriptions then as you do now?
19  A.   I took prescriptions, yes.
20  Q.   Similar to what you are -- you are taking Celexa now?
21  A.   Yes.
22  Q.   Anything else?
23  A.   Xanax.
24  Q.   Are you actively taking Xanax?
25  A.   Yes.

Page 362

1   Q.   How long have you been taking Xanax?
2   A.   I take Xanax whenever I have an issue with anxiety or
3        panic attacks.  So frequently, but not daily.
4   Q.   Well, you were prescribed 12 pills back on September
5        26, 2018.  Have you had that refilled?
6   A.   I don't recall.
7   Q.   You don't recall at all in the last two years whether
8        you have had that prescription refilled?
9   A.   No, I couldn't give you a number of how many times I
10       have.
11  Q.   All right.  Any other medications you have taken to
12       control your emotional state?
13  A.   The Celexa.  From my understanding the Celexa it was
14       titrated at one point because it deals with both -- it
15       treats both depression and anxiety.
16  Q.   All right.  You had had a history of some issues from
17       childhood as well as in your teen years?
18            MS. WARD:  Objection for vagueness.  Go
19       ahead.
20  A.   Issues in terms of what?
21  BY MR. PELTON:
22  Q.   Emotional issues.
23  A.   Depression and anxiety.
24  Q.   Yes.  All right.  So it's sort have been a lifelong
25       problem, right?

Page 363

1   A.   It has come up occasionally here and there throughout
2        my life.
3   Q.   All right.  According to at least one record, it
4        resulted in your you doing some cutting as a teen and
5        into your early 20s.  Is that accurate?
6   A.   I did self mutilate as a teenager.
7   Q.   Since 2018, aside from the issues in the lawsuit, have
8        you had other stressors in your life that may be
9        contributing to your emotional state?
10  A.   Nothing like I dealt with -- like normal stressors,
11       school, you know.
12  Q.   Do you remember telling your PCP in November 2018 that
13       you felt overwhelmed by school and work and your
14       contract job?
15  A.   Overworked?
16  Q.   Overwhelmed by school, work and your contract job?
17  A.   I mean I'm constantly overwhelmed by all three.
18       Handling all three is a lot.
19  Q.   It is.  How about the issues around the pandemic, has
20       that created any additional stress or fear or sadness
21       in terms of your emotional state?
22  A.   Sadness, yes.  It was very sad to see as many people
23       as I did die.
24  Q.   Did you report to your therapist that you were having
25       some difficulty working with the Covid patients?

Page 364

1   A.   I wouldn't say difficulty working with them, but I do
2        remember one specific conversation in the middle of
3        Covid happening where I expressed my sadness of how it
4        felt troubling that no matter what we did at work, it
5        still felt like we were losing people.
6   Q.   Yes.  That is tough.
7   A.   Yes, it's very.
8   Q.   And you would agree that it certainly contributed to
9        your emotional state?
10  A.   No, I wouldn't agree with that.  I think I talked
11       about it.  I expressed my feelings.  We deal with
12       trauma every day.  I have to see gruesome things every
13       day.  I dealt with that for ten years.  That is
14       something I think I have already figured out how to
15       cope with.
16  Q.   Did you report to your therapist that it was causing
17       nightmares and difficulty sleeping?
18  A.   I had one nightmare, yes, and I expressed that
19       nightmare to her.
20  Q.   Have you talked with anyone, any of your coworkers at
21       Beaumont or anyone at Beaumont, concerning your
22       lawsuit?
23            MS. WARD:  Objection for vagueness, but go
24       ahead.
25  A.   I have not discussed any type of details or anything

**VOL. II, KRISTINA GARCIA**
09/22/2019                                                        Pages 365–368

Page 365

1    with anyone I work with.
2    BY MR. PELTON:
3    Q.   Have you talked with anyone you have worked with about
4         being a witness in your case?
5    A.   No.
6    Q.   Have you asked them to speak to your attorney?
7              MS. WARD:  I'm going to --
8    A.   No.
9              MS. WARD:  Go ahead.
10   A.   No.
11   BY MR. PELTON:
12   Q.   You have not?
13   A.   I don't recall doing that at all, never.
14   Q.   Have you tried to obtain a written statement from any
15        of them?
16   A.   No.
17   Q.   Have you recorded anymore conversations with any of
18        them?
19   A.   No.
20   Q.   You have listed Colleen Kay as a witness in this case.
21        Have you talked to her about testifying?
22   A.   No.
23   Q.   What she would say?
24   A.   No.
25   Q.   How about Stacy Carey, have you spoken to her about

Page 366

1         your lawsuit?
2    A.   She is aware that I had sought legal counsel.  I have
3         not discussed any type of details or requested she be
4         a witness or anything like that.
5    Q.   Have you obtained a written statement from her?
6    A.   No.
7    Q.   Have you asked her to speak to your attorney?
8    A.   No.
9    Q.   How about Karen Strelecki?
10   A.   No.
11   Q.   David Amphere (phonetic)?
12             MS. WARD:  Are you asking as to all three
13        of those questions for those names, because I'm not
14        clear?
15   BY MR. PELTON:
16   Q.   Do you understand my question, Miss Garcia?
17   A.   You are asking have I spoke with these specific people
18        about getting a written statement or speaking to my
19        attorney about my lawsuit.  No.
20   Q.   All right.  And you would say that of anyone on your
21        witness list related to -- or who works at Beaumont?
22             MS. WARD:  Objection, vagueness.  Do you
23        understand?
24             THE WITNESS:  Yes.
25   A.   I don't recall everyone on my witness list, but I do

Page 367

1    not recall approaching anyone for any written
2    statement or asking them to speak to my attorney.
3    BY MR. PELTON:
4    Q.   Okay.  All right.  Well, thank you, Miss Garcia.  I
5         appreciate your appearing now for a second time.  That
6         concludes my questioning.
7    A.   Thank you, Mr. Pelton.
8              VIDEO TECHNICIAN:  Anything else before we
9    go off the video record?
10             MS. WARD:  No.
11             VIDEO TECHNICIAN:  Going off the video
12   record.  The time is now 15:28 UTC.
13             (The deposition was concluded at 11:28 a.m.
14        Signature of the witness was not requested by
15        counsel for the respective parties hereto.)
16
17
18
19
20
21
22
23
24
25

Page 368

1                    CERTIFICATE OF NOTARY
2    STATE OF MICHIGAN )
3                      ) SS
4    COUNTY OF OAKLAND )
5
6         I, Linda S. Wilson, certify that this
7    deposition was taken before me on the date
8    hereinbefore set forth; that the foregoing questions
9    and answers were recorded by me stenographically and
10   reduced to computer transcription; that this is a
11   true, full and correct transcript of my stenographic
12   notes so taken; and that I am not related to, nor of
13   counsel to, either party nor interested in the event
14   of this cause.
15
16
17
18
19
20
21             *Linda S. Wilson*
22             LINDA S. WILSON, CSR-0973
23             Notary Public,
24             Oakland County, Michigan.
25   My Commission expires:  2/24/2026.



**Pioneer Specialty Hospital**
Specialized Acute Care

Pioneer Specialty Hospital
50 North Perry Street
6th Floor
Pontiac, MI 48342
Phone 248 338 5511
Fax 248 338 5429

27th July 2017

Dear Kristina Garcia,

As an at will employee you are aware that your employment as a Respiratory Therapist at Pioneer Specialty Hospital may be terminated for any reason, or for no reason. At this time, it is our determination that due to numerous call in's (01/10/2017, 01/31/2017, 07/16/2017 and 07/26/2017), you are being released immediately from your Respiratory Therapist duties at Pioneer Specialty Hospital.

Time worked for this pay period will be paid out on August 15th 2017 and a check will be placed in the mail. Please notify us of any changed in your contact information in writing at:

Pioneer Specialty Hospital
50 North Perry Street
6th Floor
Pontiac, MI 48342
Phone 248 338 5511
Fax 248 338 5429

You will receive your final check and W-2 information at your current mailing address.

I would like to thank you for your efforts at Pioneer Specialty Hospital, I regret the necessity of this action, and extend my best wishes for success in your future endeavors.

Sincerely,

Anu Locricchio
Chief Executive Officer

**EXHIBIT   18**
Witness: GARCIA
Date: 09.22.20
Stenographer: L. WILSON

Kristina Garcia.

text_0.txt
Hey Stacy. Im not going to be able to make it in tonight. I can provide a doctors
note if needed. Sorry. 

Page 1

Beaumont/Garcia  000545

text_0.txt

To clarify, this is only my second call in, in six months. I had a call in on January 10th when I needed a root canal but that was more than 6 months ago. I dont even have four call-ins total if you counted back from when I started working at Pioneer in May of 2015. This has nothing to do with having two jobs. Please dont assume you know me or my life better than I know myself and what I can handle. I understand that you may be upset because you have to find coverage for my shift. But that is your positions responsibility. Im sure you can understand that having an illness is not something one can always predict or prevent. If this requires a doctors note please let me know and I can provide it.

Beaumont/Garcia  000546

text_0 (1).txt

This is what Kristina Garcia sent me. Anu told me to send to you. Let me know if I
need something else.

Page 1

Beaumont/Garcia  000547

Performance Evaluation Record

Employee Name: Kristina Garcia          Date of Hire: 5-8-15          Job Position: Respiratory Therapist

Department: Pioneer Respiratory          Shift: Midnights          Evaluation Period: _____

Reason for Evaluation: [ ] 90 Day     [ ] Job Change     [ ] Performance Improvement/Decline     [ ] Annual     [ ] Other _____

## Part II – General Observations

| Personal Appearance: | Dressing Habits: | [ ] Exceptional | [ ] Satisfactory | [ ] Needs Improvement | [ ] Other _____ |
| | Hygiene: | [ ] Exceptional | [ ] Satisfactory | [ ] Needs Improvement | |
| | Grooming: | [ ] Exceptional | [ ] Satisfactory | [ ] Needs Improvement | |

Attendance:     [ ] On Time     [ ] Reports in Late     [X] Repeated Absenteeism     [ ] Other _____

Dependability:     [ ] Very Dependable     [ ] Satisfactory     [X] Needs Improvement     [ ] Other _____

Part III – Performance Plan: (List the goals and objectives the employee is expected to attain by the next evaluation period.)

Part IV – Supervisor's Comments Relative to Employee's Strong Points:

Part V – Supervisor's Comments Relative to Employee's Weak Points:

Repetavive call ins
Jan-10th        July 16th
Jan 31st        July-26th

Part VI – Employee's Comments:

## Part VII - Acknowledgements

Date: _____          Employee's Signature: _____

Date: 7-26-17          Supervisor's Signature: Stacy Sloan

*File the original signed and dated copy of this evaluation in the employee's personnel record.*

Beaumont/Garcia   000548

Kristinia Garcia called in on January 31st for midnight shift 7P-7A at 10:45AM. She followed Pioneers call in procedure.


Stacey Sloan LRRT

1

Beaumont/Garcia  000549

1-10-2017

Kristinia Garcia called in at 11:16AM for the night shift 7P-7A 1-10-2017.
Kristina followed Pioneer Specialty Hospitals call in Policy.


Stacey Sloan LRRT

1

Beaumont/Garcia  000550

Kristina Garcia called in at 3:00pm stating she could not work tonight July 26th 7p-7:30A. It was explained to her about our policy, 3call in's is grounds for termination. This call in makes for 4 call in this year as a contingent employee.

Stacey Sloan LRRT

Beaumont/Garcia  000551

July 7-16-17 Kristinia  Garcia called in for midnight shift July16th 7P-7A.

Stacey Sloan LRRT

Beaumont/Garcia  000552

**Aphram, Jean**

| | |
|---|---|
| **From:** | Garcia, Kristina |
| **Sent:** | Thursday, February 28, 2019 12:35 AM |
| **To:** | Aphram, Jean |
| **Cc:** | Carroll, Net; Hamick, Steven; Frankhouse, Allen J; Burgess, James |
| **Subject:** | Charge Therapist |

**Importance:** High

Effective Immediately.

It is with great sorrow that I am stepping down from the role as one of our departments Charge Therapists. Over the last two years I have thoroughly enjoyed assisting our team through leadership, education and assistance as a Charge Therapist. Acting as Charge I have been able to combine and utilize my education and enthusiasm for professional leadership, the science of respiratory care as well as direct patient care. As health care providers we recognize the importance of being an active participant in our own health care plans. Due to health concerns I am no longer able to fulfill the current expectations and demands of Charge Therapist. I look forward to continuing to serve as a valuable resource for our team whilst focusing my energy on professional growth and providing excellent patient care.

Kristina Garcia

EXHIBIT 19
Witness: GARCIA
Date: 09.22.20
Stenographer L WILSON

1

Beaumont/Garcia 000056

# Beaumont

| | | No. | Page |
|---|---|---|---|
| **CHARGE THERAPIST** | | **132** | 1 of 1 |
| Prepared By | Prior Issue Date | Issue Date | |
| **Department of Respiratory Care – Royal Oak** | **FEB 16** | **FEB 19** | |

**GENERAL:**

Interested therapists are encouraged to become charge therapists. Charge therapists are the point person for the therapists during shift operations.

**RESPONSIBILITIES:**

**Prepares Shift:**

- Prepare assignments and shift plan.
- Utilize "rotation monitor" to ensure all therapists are assigned and rotated thru work areas.
- Fills in all assignments making needed moves to compensate for call ins & workload volumes.
- Utilizes shift counts to project staffing effectiveness.
- Works cooperatively with Senior Therapists & NeoPeds charge to ensure balanced coverage in all areas & utilize information from previous charge therapist.
- Collelate pharmacy medications per unit report at beginning of each shift.
- Fill in assignments for next day with therapists that will be back to ensure continuity of care.

**Throughout Shift:**

- Monitors and adjust workloads to ensure continuing balanced coverage.
- Monitors and addresses adequate availability of equipment, supplies and meds for shift and utilize resources for assistance, communicate to .coming shift.
- Outpatients: Delivers and documents therapy for scheduled Pentamadine, ABGs, Sputum Inductions.
- Covers Pre-ops, PACUs, CPRs, Anesthesia STATs, RRTs, transports; takes assignments as needed and responds to any unusual requests or needs in conjunction with Supervisor and/or Senior Therapists.
- Delegates job duties as needed to ensure balanced utilization of shift resources; promotes teamwork to coordinate breaks/lunches during acceptable time periods to ensure adequate, safe coverage.
- Keeps supervisor up to date and communicates any problems, concerns or unusual events (i.e.: employee illness or work related injury, requests to leave early beyond ½ hour, requests to leave campus or attend to personal business during shift).
- Accept staff call ins and logs onto the exception log; communicates to supervisor appropriate information (Emergency Personal, Bereavement, Unexcused Absence call-ins must be handled by supervisor).
- Collects estimated procedure count for next shift.
- Identifies oncoming shift staffing needs by utilizing shift counts; communicates with supervisor and/or follows established action plan to recruit additional staffing.

**EXHIBIT 20**
Witness: GARCIA
Date: 09.22.20
Stenographer: L. WILSON

## RESPIRATORY CARE MANUAL

Disclaimer: user must ensure that any printed copies of this policy/procedure is current with the Respiratory Care Policy & Procedure Manual.

Beaumont/Garcia 000077

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KRISTINA GARCIA,

        Plaintiff,

v.

                                CASE NO.: 2:19-cv-11673

                                District Judge Linda V. Parker

Beaumont Health and RACHEL LUCA,        Magistrate Judge David Grand

        Defendant.

---

**Lisa C. Ward (P38933)**
Attorney for Plaintiff
Law Office of Lisa C. Ward, PLLC
4131 Okemos Rd., Ste. 12
Okemos, MI 48864
(517) 347-8100
lisacwardlaw@gmail.com

**Eric J. Pelton (P40635)**
**Shannon V. Loverich (P53877)**
Attorneys for Def. Beaumont Health
Kienbaum Hardy Viviano
    Pelton & Forest, PLC
280 N. Old Woodward Ave., Suite 400
Birmingham, MI 48009
(248) 645-0000
epelton@khvpf.com
sloverich@khvpf.com

---

<u>**AFFIDAVIT OF PLAINTIFF KRISTINA GARCIA IN SUPPORT OF MOTION FOR DEFAULT JUDGMENT**</u>

    I, Kristina Garcia, am the Plaintiff in the above-referenced matter and I have personal knowledge regarding the following information. During the course of this litigation, I have incurred the following expenses:

**EXHIBIT 21**
Witness: GARCIA
Date: 09.22.20
Stenographer: L. WILSON

1. From September 2018 to July 13, 2020, I have spent a total of $1,051.28 in medical expenses. I estimate that I will need an additional $10,000 for ten years of future expenses.

2. From September 12, 2018 to July 13, 2020, I have incurred a total of $25,349.52 in legal expenses to litigate this matter, and my legal expenses continue to increase.

3. While on leave from work, under the Family and Medical Leave Act, I have lost a total of $1,676.76 in wages.

4. Because of Defendant Luca's actions, I am humiliated and my reputation and esteem in the community have suffered. Additionally, I now struggle with depression, for which I take medication, previously saw a psychiatrist, and am currently seeking mental health counseling from my primary care physician. Further, Defendant Luca has made it impossible for me to perform my job and sufficiently look after my patients, and I no longer feel safe at work. I estimate that the total value of my emotional damages is $300,000.00.

5. In total, I have incurred expenses in the amount of $338,077.56 as a result of Defendant Luca's unlawful sexual assault that I experienced.

This information is true to the best of my knowledge, information, and belief.

FURTHER AFFIANT SAYETH NOT.

Dated: _7-29-2020_

_Kristina Garcia_

Kristina Garcia

Subscribed and sworn before me
On _7-29-2020_
_Eli Boike_
Notary Public, _Macomb_ County
Acting in _Macomb_ County
My Commission expires _12/26/2024_

ELI BOIKE
Notary Public State of Michigan
County of Macomb
My Commission Expires: December 26, 2024
Acting in the County of _Macomb_