UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION

KRISTINA GARCIA,

        Plaintiff,

v                                                    File No. 19-CV-11673

                                   HON. LINDA V. PARKER

BEAUMONT HEALTH and
RACHEL LUCA,                                  MAGISTRATE DAVID R. GRAND

        Defendants.

                            /

VIDEO DEPOSITION OF ANTOINETTE CARROLL

    Taken by the Plaintiff on the 21st day of February, 2020, at

    280 North Old Woodward Avenue, Birmingham, Michigan, at

    9:00 a.m.

APPEARANCES:

For the Plaintiff:          MS. LISA C. WARD (P38933)
                            Law Offices of Lisa C. Ward PLLC
                            4131 Okemos Road, Suite 12
                            Okemos, Michigan 48864
                            (517) 347-8100

For the Defendants          MR. ERIC J. PELTON (P40635)
Beaumont Health             Kienbaum Hardy Viviano Pelton &
and Luca:                   Forest PLC
                            280 North Old Woodward Avenue, Suite 400
                            Birmingham, Michigan 48009
                            (248) 645-0000


NetworkReporting
STATEWIDE COURT REPORTERS
800-632-2720

**Page 2**

```
 1   For the Defendant     MS. JENNIFER A. ZINN (P41469)
     Beaumont:             Beaumont Health
 2                         26901 Beaumont Boulevard 6D
                           Southfield, Michigan 48033
 3                         (947) 522-3035
 4   Also Present:         Chip Staley, Video Operator
                           Kristina Garcia
 5
     RECORDED BY:          Amanda Flesher, CER 9491
 6                         Certified Electronic Recorder
                           Network Reporting Corporation
 7                         Firm Registration Number 8151
                           1-800-632-2720
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1   Plaintiff's Exhibit 18 marked . . . . . . . . . . . .  93
        (E-mail)
 2   Plaintiff's Exhibit 19 marked . . . . . . . . . . . .  94
        (E-mail)
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1            TABLE OF CONTENTS
 2                                         PAGE
 3   Direct Examination by Ms. Ward . . . . . . . . . . . .  6
 4
 5
 6            EXHIBIT INDEX
 7                                         PAGE
 8
 9   Plaintiff's Exhibit 1 marked . . . . . . . . . . . .  33
        (Personal data changes)
     Plaintiff's Exhibit 2 marked . . . . . . . . . . . .  36
10      (Harassment policy 8/6/18)
     Plaintiff's Exhibit 3 marked . . . . . . . . . . . .  39
11      (Harassment policy 9/1/16)
     Plaintiff's Exhibit 4 marked . . . . . . . . . . . .  46
12      (Statement)
     Plaintiff's Exhibit 5 marked . . . . . . . . . . . .  52
13      (Notes)
     Plaintiff's Exhibit 6 marked . . . . . . . . . . . .  60
14      (Statement)
     Plaintiff's Exhibit 7 marked . . . . . . . . . . . .  62
15      (Report)
     Plaintiff's Exhibit 8 marked . . . . . . . . . . . .  67
16      (Statement)
     Plaintiff's Exhibit 9 marked . . . . . . . . . . . .  67
17      (Statement)
     Plaintiff's Exhibit 10 marked . . . . . . . . . . .  69
18      (Notes)
     Plaintiff's Exhibit 11 marked . . . . . . . . . . .  70
19      (Statement)
     Plaintiff's Exhibit 12 marked . . . . . . . . . . .  73
20      (Report)
     Plaintiff's Exhibit 13 marked . . . . . . . . . . .  78
21      (KG Harassment Investigation)
     Plaintiff's Exhibit 14 marked . . . . . . . . . . .  80
22      (Statement)
     Plaintiff's Exhibit 15 marked . . . . . . . . . . .  85
23      (Two documents)
     Plaintiff's Exhibit 16 marked . . . . . . . . . . .  86
24      (Notes)
     Plaintiff's Exhibit 17 marked . . . . . . . . . . .  88
25      (E-mails)
```

**Page 5**

```
 1   Birmingham, Michigan
 2   Friday, February 21, 2020 - 9:11 a.m.
 3        VIDEO OPERATOR:  We're going on the record at
 4   9:11 a.m. on Friday, February 21st, 2020.  This is volume 1
 5   of disk 1 of the video deposition of Antoinette Carroll
 6   taken by the Plaintiff in the matter of Kristina Garcia
 7   versus Beaumont Health and Rachel Luca, filed in the United
 8   States District Court for the Eastern District of Michigan
 9   Southern Division, case number 19-CV-11673.  This deposition
10   is being held at 280 North Old Woodward Avenue, Birmingham,
11   Michigan.  My name is Chip Staley and I am the videographer.
12   Counsel will now state their appearance and affiliation for
13   the record.
14        MS. WARD:  Lisa Ward and I'm counsel for the
15   Plaintiff.
16        MR. PELTON:  Eric Pelton on behalf of the
17   Defendant.
18        VIDEO OPERATOR:  The court reporter will now swear
19   in the witness.
20        REPORTER:  Would you raise your right hand for me,
21   please?  Do you solemnly swear or affirm that the testimony
22   you're about to give will be the whole truth?
23        MS. CARROLL:  Yes.
24        REPORTER:  Thank you.
25        MS. WARD:  Okay.  First thing I'm going to do is
```



GARCIA v. BEAUMONT HEALTH, ET AL                          DEPOSITION OF ANTOINETTE CARROLL

1  hand you a copy of the protective order that was entered in
2  this case.  I'm not sure if any of it's applicable to you,
3  but to the extent that it is, you can just have a
4  complimentary copy.
5          (Counsel hands document to court reporter)
6              ANTOINETTE CARROLL
7       having been called by the Plaintiff and sworn:
8              DIRECT EXAMINATION
9  BY MS. WARD:
10 Q  Good morning, Ms. Carroll.
11 A  **Good morning.**
12 Q  I'm here to take your deposition and it's going to be used
13    for all purposes that are permissible under the Federal
14    Court Rules.  I'm going to ask you a series of questions.  I
15    will need you to do two things for me.  Number one, because
16    we're both videoing it and audioing it, I need you to
17    annunciate an answer, not just shake your head.
18 A  **Yes, ma'am.**
19 Q  Number two, if you don't understand a question, you should
20    ask me to clarify it or repeat it because if you provide an
21    answer, I will assume that that's your best answer to the
22    question asked.
23 A  **Okay.**
24 Q  Do you have any questions at this time?
25 A  **None at this time.**

Page 6

1  Q  Now, have you ever testified before?
2  A  **No.**
3  Q  Have you ever been involved in any kind of court proceeding?
4  A  **Jury duty.**
5  Q  Jury duty.  Have you ever been a witness in a court
6     proceeding?
7  A  **No.**
8  Q  Have you ever been a party to any kind of civil or criminal
9     court proceeding?
10 A  **No.**
11 Q  So jury duty was your only experience?
12 A  **Yes.**
13 Q  Okay.  Have you ever provided expert reports on anything?
14 A  **No.**
15 Q  Okay.  First, we're going to ask some routine questions.
16    Your full legal name?
17 A  **Antoinette Carroll.**
18 Q  Have you ever been known by any other names?
19 A  **Net.**
20 Q  Net?
21 A  **Just Net.**
22 Q  Carroll?
23 A  **Net; Net Carroll, yes.**
24 Q  Any other last names?
25 A  **No.**

Page 7

1  Q  And your marital status?
2  A  **Single.**
3  Q  Have you always been single?
4  A  **Yes.**
5  Q  Okay.  I'm going to ask do you have any kids?
6  A  **Three.**
7  Q  Okay.  Can you give me their approximate ages and names?
8  A  **Let's see.  Michael Mills, he's 31.  Marissa Mills, she is**
9     **26, and Marcus Mills is 15.**
10 Q  Okay.  And can you give me your address?
11 A  **13361 Kenwood Street, Oak Park, Michigan 48237.**
12 Q  All right.
13        MR. PELTON:  And I would just note that if there's
14    need to subpoena this witness, we will accept it on her
15    behalf.
16        MS. WARD:  Understood.
17        MR. PELTON:  All right.
18 Q  Let's talk a little bit about your educational background.
19 A  **Okay.**
20 Q  Let's start with high school.  I assume you graduated from
21    high school?
22 A  **Yes, I did.**
23 Q  Can you tell me where and when?
24 A  **Mumford High School, 1986.**
25 Q  Say it again?

Page 8

1  A  **Mumford High School, 19- --**
2  Q  Mumford?
3  A  **Yeah, Mumford.**
4  Q  1996?
5  A  **'86.**
6  Q  1986?
7  A  **Yes.**
8  Q  And after high school did you obtain any other education?
9  A  **Oakland Community College, associates degree in applied**
10    **science.**
11 Q  Applied science?
12 A  **Uh-huh (affirmative).**
13 Q  And when was that?
14 A  **Offhand I could not tell you the year.**
15 Q  Can you tell me the decade?
16 A  **Let's see.  I can't tell you for sure what date it -- what**
17    **year it was.  It had to be in the 90's.**
18 Q  In the 90's?  Okay.
19 A  **Yes.**
20 Q  And after that did you go to any further education?
21 A  **No, I did not.**
22 Q  Do you have any particular certificates?
23 A  **What kind of certificate are you referring to?**
24 Q  Well, some people have, you know, a certificate in life
25    saving or a certificate in something special.

Page 9

3 (Pages 6 to 9)



GARCIA v. BEAUMONT HEALTH, ET AL                    DEPOSITION OF ANTOINETTE CARROLL

1  A   Oh, yes; yes.  I have certificates in BLS, a certificate for
2      management.  That's it.
3  Q   What's "BLS"?
4  A   Basic life support.
5  Q   And what is that?
6  A   Basic life support is we all -- as a respiratory therapist
7      we deal with saving lives, and if a patient comes in and
8      they are in cardiac or respiratory arrest, then we can step
9      in.
10 Q   Okay.  And it -- the certificate in management, can you tell
11     me what that's about?
12 A   It's just that I had to attend a lot of management classes
13     and then you get a certificate to show that you completed
14     all the classes.
15 Q   And who put on those management classes?
16 A   Beaumont Education.
17 Q   Okay.  And you got graded in that?
18 A   They don't grade you.  You either pass or fail.
19 Q   Okay.  And you passed?
20 A   I passed, yes.
21 Q   Okay.  Did you get any other special type of training to be
22     involved in the respiratory therapy work?
23 A   Besides just going to school.
24 Q   So the associates in applied science --
25 A   Yes.

Page 10

1  Q   -- provided you with the background and then the BLS was in
2      addition to that?
3  A   That's something we do every two years.
4  Q   Okay.  Any other specialized certificates, training,
5      degrees?
6  A   Not that I can recall at this time.
7  Q   Can you tell me when you completed the Beaumont Management
8      course?
9  A   I -- not at this time.  I can't recall it.
10 Q   Can you tell me the decade?
11 A   That I can't either.  It's a long -- ongoing.
12 Q   Okay; okay.  Since your applied science degree --
13 A   Uh-huh; yes.
14 Q   -- can you tell me any employment that you've had?
15 A   Outside of Beaumont Hospital?
16 Q   Well, let's start from right after you got your associates.
17 A   I went right to Sinai-Grace and from there I went to
18     Beaumont Hospital.
19 Q   How long were you at Sinai-Grace?
20 A   I was there a year.
21 Q   Okay.  And what did you do there?
22 A   Respiratory therapist on afternoon shift.
23 Q   And would that have been in the 90's as well?
24 A   Yes.
25 Q   Did you leave voluntarily or involuntarily?

Page 11

1  A   Voluntary.
2  Q   Okay.  And why did you leave?
3  A   I had another job at Beaumont Hospital.
4  Q   Okay.  And when did you start at Beaumont Hospital?
5  A   1994.
6  Q   Okay.  And did you look at anything to prepare for your
7      deposition today?
8  A   When you say "look at anything" --
9  Q   Did you review any documents to prepare?
10 A   Oh, just my notes.
11 Q   What kind of notes?
12 A   Just my notes that I had when Krissy came to me.  That's
13     all.  What I documented after my conversation.
14 Q   Okay.  Do you have them with you?
15 A   No, I do not.
16     MS. WARD:  Do you know whether these have been
17     turned over in Discovery?
18     MR. PELTON:  They've been produced.
19     MS. WARD:  Okay.
20 Q   Okay.  So let's start with your education -- I mean, your
21     employment at Beaumont.
22 A   Uh-huh (affirmative).
23 Q   What was the first position you had?
24 A   Staff therapist.
25 Q   Staff therapist?

Page 12

1  A   Yes.
2  Q   And what did that job entail?
3  A   Direct patient care, maintaining/delivering equipment.
4  Q   I'm sorry.  You have to speak up a little.
5  A   Maintaining and delivering respiratory equipment.
6  Q   Okay.
7  A   Respiratory procedures, breathing treatments.
8  Q   And who was your supervisor?
9  A   It was Joy McAlpine.
10 Q   Okay.  And how long were you in that position?
11 A   Six years.
12 Q   So you did that for six years?
13 A   Uh-huh; yes.
14 Q   And then did there come a time when you took a different
15     position?
16 A   Yes.
17 Q   Okay.  Can you explain?  Was it a promotion, demotion,
18     lateral?
19 A   Promotion.
20 Q   Promotion.  And what were you promoted to?
21 A   Supervisor.
22 Q   And was there a supervisory assignment to a particular unit
23     or floor, or what kind of supervisor?
24 A   Supervisor of respiratory care.
25 Q   Okay.  And how long were you in that position?

Page 13

4 (Pages 10 to 13)



GARCIA v. BEAUMONT HEALTH, ET AL                    DEPOSITION OF ANTOINETTE CARROLL

| | |
|---|---|
| 1  A  Presently in that position. | 1  A  No. |
| 2  Q  So from the 90's? | 2  Q  Okay.  How many non-respiratory care assistants would you |
| 3  A  From -- oh, sorry.  I took that position in 2000. | 3     say you supervise?  So you said about 50 total.  How many of |
| 4  Q  In 2000? | 4     those are full-time employees? |
| 5  A  Yes. | 5  A  I don't have that information. |
| 6  Q  Okay.  So after the staff therapist, you were promoted to a | 6  Q  Can you give me an approximation? |
| 7     supervisor of respiratory care? | 7  A  No. |
| 8  A  Yes. | 8  Q  Is it half? |
| 9  Q  And that's where you remain today? | 9  A  Can you state that question again? |
| 10  A  Yes. | 10     MR. PELTON:  I'll object.  You haven't established |
| 11  Q  Can you explain the job duties of that position? | 11     a foundation that she has that knowledge. |
| 12  A  As a supervisor I oversee therapists, making sure that we | 12     MS. WARD:  Well, she told me she supervised about |
| 13     have enough staff to cover our patient care needs, making | 13     50 individuals per shift and then she told me that some of |
| 14     sure that staff has the resources available to them to | 14     them are respiratory therapists and then some are |
| 15     deliver to the patients to administer breathing treatments, | 15     respiratory care assistants. |
| 16     breathing apparatuses. | 16  Q  I'm trying to find out how many are respiratory therapists, |
| 17     MS. WARD:  You okay? | 17     approximately? |
| 18     REPORTER:  Yeah. | 18  A  Probably 45. |
| 19     MS. WARD:  Okay. | 19  Q  45? |
| 20  Q  How many staff do you supervise, approximately? | 20  A  Uh-huh (affirmative). |
| 21  A  Are you saying for the whole department or just a shift? | 21  Q  And is there a particular shift that you work when you do |
| 22  Q  You said that you supervise staff -- | 22     this supervision? |
| 23  A  Staff. | 23  A  Yes, day shift. |
| 24  Q  -- and I was trying to find out who all is included in that | 24  Q  Day shift.  So how do you supervise the night -- I mean, I'm |
| 25     by way of a number. | 25     assuming -- let me start -- let me strike that.  Let me go |
| Page 14 | Page 16 |

| | |
|---|---|
| 1  A  I couldn't tell you offhand what the total number of | 1     back.  When does the day shift start? |
| 2     therapists are. | 2  A  6:45 a.m. |
| 3  Q  You cannot or you can? | 3  Q  And how long does it run? |
| 4  A  I can't. | 4  A  7:15 p.m. |
| 5  Q  Okay.  But when you said you supervise, do you know about | 5  Q  And is there three shifts or two? |
| 6     how many people you supervise? | 6  A  Two. |
| 7  A  Approximately 50 staff. | 7  Q  So the night shift runs from? |
| 8  Q  50 staff.  Is that per shift or is that broken up into three | 8  A  6:45 p.m. to 7:15 a.m. |
| 9     shifts? | 9  Q  And it runs to 7:15 a.m.? |
| 10  A  That is per shift. | 10  A  Yes. |
| 11  Q  And are all of those staff members respiratory therapists? | 11  Q  A bit of overlap? |
| 12  A  Respiratory therapists and respiratory care assistants. | 12  A  Yes. |
| 13  Q  What's a "respiratory care assistant"? | 13  Q  Okay.  And what I'm trying to find out is you run the day |
| 14  A  It is a person who is going to respiratory care school and | 14     shift, so -- |
| 15     they come in and they do things like oxygen, things to help | 15  A  Yes. |
| 16     them be prepared for when they graduate and to become a | 16  Q  -- how do you come to supervise what happens on the night |
| 17     respiratory therapist. | 17     shift?  How does that work? |
| 18  Q  Are they paid for this position or is it an -- free? | 18  A  I don't necessarily supervise what happens on night shift. |
| 19  A  They are paid. | 19     I am a day shift supervisor. |
| 20  Q  Okay.  Do they work full time in this position or is it part | 20  Q  Okay; okay.  So is there a supervisor for the night shift? |
| 21     time with school? | 21  A  Yes. |
| 22  A  Contingent. | 22  Q  Who's the night shift supervisor? |
| 23  Q  Tell me what that means. | 23  A  Allen Frankhouse. |
| 24  A  Whenever they have time available from school. | 24  Q  Allen Frankhouse.  And are you and he co-workers or is he |
| 25  Q  Okay.  So it's not necessarily 40 hours a week? | 25     higher or lower on the chain of command? |
| Page 15 | Page 17 |

5 (Pages 14 to 17)



GARCIA v. BEAUMONT HEALTH, ET AL                    DEPOSITION OF ANTOINETTE CARROLL

| | | |
|---|---|---|
| 1 | A | Co-workers. |
| 2 | Q | Okay.  And he's the night shift supervisor? |
| 3 | A | Yes. |
| 4 | Q | Okay.  With regard to the day shift, how did you come to get |
| 5 | | involved in the incident that gave rise to this complaint? |
| 6 | A | Krissy came to me. |
| 7 | Q | Okay.  And that's what started your involvement? |
| 8 | A | Yes. |
| 9 | Q | So you don't normally supervise Krissy? |
| 10 | A | No; no.  Not when I -- not since I've been on day shift. |
| 11 | Q | And for the record, Krissy is Ms. Garcia? |
| 12 | A | Yes. |
| 13 | Q | Okay.  Very good.  All right.  Prior to -- let me ask you a |
| 14 | | question.  Since you've been a supervisor, other than the |
| 15 | | management and BLS did you receive any training to conduct |
| 16 | | investigations into -- |
| 17 | A | It's part of the supervisor skills training. |
| 18 | Q | So part of the management training was -- |
| 19 | A | Yes. |
| 20 | Q | -- to conduct investigations into what? |
| 21 | A | Any allegation that comes to me I have to investigate. |
| 22 | Q | Okay.  And what kind of training did you receive?  How long |
| 23 | | did it last? |
| 24 | A | Supervisory skills training is a four-day training. |
| 25 | Q | Okay.  And of the four days can you tell me was a whole day |

Page 18

| | | |
|---|---|---|
| 1 | | devoted to investigations?  A half day? |
| 2 | A | I can't recall because I had this training awhile back. |
| 3 | Q | Would that have been the training that you had that you |
| 4 | | mentioned as management training? |
| 5 | A | Yes. |
| 6 | Q | And that would have been around 2000? |
| 7 | A | Yes. |
| 8 | Q | Do you remember if -- what the training consisted of at all? |
| 9 | A | I can only recall some of it. |
| 10 | Q | Okay.  What do you remember? |
| 11 | A | We talked about crucial conversations, having conversations |
| 12 | | with staff. |
| 13 | Q | Okay.  Slow down.  We're going to do it one at a time. |
| 14 | | Crucial conversations? |
| 15 | A | Yes. |
| 16 | Q | Can you tell me in the context of the training what a |
| 17 | | crucial conversation is? |
| 18 | A | You are given different scenarios and you are in a group |
| 19 | | with other management and an instructor who tells you the |
| 20 | | best way to get -- have these crucial conversations with |
| 21 | | staff. |
| 22 | Q | Okay.  All right.  Any other aspects of the training you can |
| 23 | | recall today? |
| 24 | A | They talked about listening. |
| 25 | Q | Okay.  What did they say about listening? |

Page 19

| | | |
|---|---|---|
| 1 | A | Listen to your staff. |
| 2 | Q | Anything else? |
| 3 | A | I can't recall. |
| 4 | Q | Did you receive any kind of training about specifically |
| 5 | | investigations in sexual harassment? |
| 6 | A | I can't recall if they did touch upon that. |
| 7 | Q | How about training about investigations into allegations of |
| 8 | | discrimination? |
| 9 | A | I can't recall that either. |
| 10 | Q | How about investigative instruction in retaliation? |
| 11 | A | I can't recall that. |
| 12 | Q | Okay.  So other than that training in 2000, do you remember |
| 13 | | any other training you've had along the lines of |
| 14 | | investigations of sexual harassment, sex -- discrimination, |
| 15 | | or retaliation? |
| 16 | A | Say that again.  Repeat that again. |
| 17 | Q | Other than the training in 2000, have you had any other |
| 18 | | training in investigating sexual harassment, discrimination, |
| 19 | | or retaliation? |
| 20 | A | I can't recall. |
| 21 | Q | Okay.  Have you had an opportunity to investigate other |
| 22 | | employee complaints, generally? |
| 23 | A | Yes. |
| 24 | Q | And can you tell me is this something you do on a daily |
| 25 | | basis?  Weekly?  What are we talking about, the volume? |

Page 20

| | | |
|---|---|---|
| 1 | A | It's whenever it comes to my attention. |
| 2 | Q | So let's say in the last five years, about how many employee |
| 3 | | complaints do you think you've investigated? |
| 4 | A | You said the last five years? |
| 5 | Q | Yup. |
| 6 | A | Employee complaints? |
| 7 | Q | About anything. |
| 8 | A | That's very vague when you say "anything." |
| 9 | Q | Well, you said you were responsible for some investigations. |
| 10 | A | Uh-huh (affirmative). |
| 11 | Q | And I'm trying to find out the nature.  Before we get to |
| 12 | | that, I want to know the overall number. |
| 13 | A | Employees complain -- I can't give you a ballpark.  I can |
| 14 | | only -- I really can't tell you how many.  It's whenever it |
| 15 | | comes to my attention.  I don't count how many people come |
| 16 | | in with complaints. |
| 17 | Q | Well, let's start with is this something that happens every |
| 18 | | day? |
| 19 | A | No. |
| 20 | Q | Does it happen weekly? |
| 21 | A | I would hope not, no. |
| 22 | Q | Okay.  I don't want you to hope.  I want you to tell me what |
| 23 | | you remember. |
| 24 | A | No. |
| 25 | Q | Okay.  So it's something -- maybe if it's not weekly, |

Page 21

6 (Pages 18 to 21)



GARCIA v. BEAUMONT HEALTH, ET AL                         DEPOSITION OF ANTOINETTE CARROLL

| | |
|---|---|
| 1 | maybe is it more or less than ten a year? |
| 2 | A   Probably. |
| 3 | Q   Probably?  You're saying -- |
| 4 | A   (Nodding head in affirmative) |
| 5 | Q   -- you're nodding.  Probably what? |
| 6 | A   Probably -- I want to say it's less than ten a year. |
| 7 | Q   Okay.  In the last five years? |
| 8 | A   Yes. |
| 9 | Q   Okay.  And of those complaints, how many in the -- and I'm |
| 10 | talking five years, less than ten a year. |
| 11 | A   Okay. |
| 12 | Q   How many of those involved retaliation? |
| 13 | A   None. |
| 14 | Q   None other than Ms. Garcia's? |
| 15 | A   No. |
| 16 | Q   Okay.  How about discrimination?  How many of those involved |
| 17 | discrimination? |
| 18 | A   None. |
| 19 | Q   Other than Ms. Garcia's? |
| 20 | A   Yes. |
| 21 | Q   And how about retaliation? |
| 22 |         MR. PELTON:  I think you already asked that. |
| 23 | A   You did ask that. |
| 24 | Q   I started -- oh, I'm sorry.  My mistake.  You're right.  How |
| 25 | about sexual harassment? |

Page  22

| | |
|---|---|
| 1 | A   None, except for Garcia. |
| 2 | Q   Okay.  So in the last five years, she's the only one you've |
| 3 | investigated? |
| 4 | A   For the offenses that you stated. |
| 5 | Q   Say it again. |
| 6 | A   For the offenses that you just stated. |
| 7 | Q   Yes. |
| 8 | A   Yes. |
| 9 | Q   Okay.  What were the complaints that you investigated?  Can |
| 10 | you give me a ballpark? |
| 11 | A   Someone not getting along with a patient, a family member or |
| 12 | staff person being very loud, or someone not liking their |
| 13 | assignment, someone not liking their schedule. |
| 14 | Q   Have you ever investigated any prior complaints involving |
| 15 | Ms. Luca? |
| 16 | A   Yes. |
| 17 | Q   Okay.  Can you tell me what those were? |
| 18 | A   It was just her always just talking, being very social. |
| 19 | Q   Okay.  And who brought that complaint, if you remember? |
| 20 | A   I can't remember a name.  It was probably a staff member. |
| 21 | Q   Was it someone on the night shift? |
| 22 | A   The only time I had to deal with it was when I was on night |
| 23 | shift.  So as the day shift supervisor, I didn't hear any |
| 24 | complaints about Ms. Luca. |
| 25 | Q   So it was when you were on the night shift? |

Page  23

| | |
|---|---|
| 1 | A   Yes. |
| 2 | Q   Do you know when that was? |
| 3 | A   Maybe four years ago. |
| 4 | Q   What kind of investigation did you do for that? |
| 5 | A   I listened to the complaint from the employee, called Rachel |
| 6 | in -- Ms. Luca in and asked her to give me her side of the |
| 7 | story.  And then after listening to her and going back and |
| 8 | talking to the other employee, we found out that she was |
| 9 | just being very personal, talking about all her personal |
| 10 | affairs, and staff was tired of hearing it. |
| 11 | Q   Okay.  So what did you do about that? |
| 12 | A   Had a conversation with Ms. Luca to let her know that she |
| 13 | was not to be bringing up her personal life when she was at |
| 14 | work.  She was there to take care of the patients. |
| 15 | Q   Okay.  Now, I know during part of this investigation of Ms. |
| 16 | Garcia's complaints you heard a tape with Phil -- with an |
| 17 | employee named Phil Matthewson? |
| 18 | A   Yes. |
| 19 | Q   And he, in that tape, describes a lot of stuff that's pretty |
| 20 | personal that she brought up.  Do you remember that? |
| 21 | A   I didn't -- I did not hear the whole tape. |
| 22 | Q   Okay. |
| 23 | A   Ms. Garcia played a little for me.  All I heard was Ms. Luca |
| 24 | saying she shouldn't be talking about this. |
| 25 | Q   Ms. Luca saying to? |

Page  24

| | |
|---|---|
| 1 | A   Phil. |
| 2 | Q   That she shouldn't be talking about, that's the only part |
| 3 | you heard? |
| 4 | A   Yes, that's all I heard. |
| 5 | Q   Okay.  Since the four years ago, have you had any other |
| 6 | complaints about Ms. Luca from staff other than Ms. Garcia? |
| 7 | A   Yes, with her talking, her mouth. |
| 8 | Q   So other than that one? |
| 9 | A   No. |
| 10 | Q   So just one complaint about her talking too much? |
| 11 | A   I wouldn't say one complaint.  It's the same complaint. |
| 12 | Q   Oh, the same complaint? |
| 13 | A   Uh-huh (affirmative).  Just talking. |
| 14 | Q   So how many times have there been complaints in the last |
| 15 | five years about her talking too much about her life? |
| 16 | A   I couldn't tell you.  I can't recall how many. |
| 17 | Q   More than five? |
| 18 | A   No; no, not more than five. |
| 19 | Q   More than two? |
| 20 | A   Maybe. |
| 21 | Q   So somewhere between three and five? |
| 22 | A   I would say three -- probably three or four. |
| 23 | Q   And as a result of this did you take any disciplinary steps |
| 24 | against her? |
| 25 | A   No.  We advised her to get -- go to an employee assistance |

Page  25

7 (Pages 22 to 25)



1   program if she needed to talk about her personal life.
2   Q   Did that work?
3   A   I don't know if she took me up on that.
4   Q   Well, okay.  So let me get this straight.  Someone comes in
5       and they say, "She's doing this -- talking about her life
6       too much"?
7   A   Uh-huh; uh-huh (affirmative).
8   Q   And you brought her in?
9   A   Uh-huh (affirmative).
10  Q   And you heard her story?
11  A   Uh-huh (affirmative).  Which she said she was not.
12  Q   She denied it?
13  A   Yes.
14  Q   Okay.  And you told her at that point to stop doing it?
15  A   That she would have to stop talking about your personal
16      life.
17  Q   Okay.  Well, then somebody else comes in later?
18  A   Uh-huh (affirmative).
19  Q   Saying she's still doing it?
20  A   So then you told her -- I sat her in and told her that if it
21      keeps -- if it keeps up, we'll do a counseling, but she had
22      to stop talking about her personal life.
23  Q   But then two more -- one or two more employees come in and
24      complain that she's still doing it?
25  A   We can't -- HR -- we cannot get rid of a person just because

Page  26

1       they're talking.
2   Q   Did you believe her story that she was -- that -- when she
3       denied she was doing it?
4   A   I can't prejudge anyone.  I have to listen to both sides.
5   Q   But you did.
6   A   I did and I couldn't tell if she was telling the truth or
7       telling not the truth.
8   Q   Did you think it was suspicious that up to four people were
9       complaining about the same thing and she kept denying it?
10          MR. PELTON:  Object to the form of the question.
11      It lacks foundation.
12  Q   Go ahead.
13  A   Repeat that question.
14  Q   Did you think it was suspicious that she kept denying she
15      was doing it, but yet you had four employees saying she was?
16          MR. PELTON:  Same objection.
17          MS. WARD:  Uh-huh (affirmative).
18  Q   Go ahead.
19          MR. PELTON:  You can answer.
20  A   Yes.
21  Q   You thought it was suspicious?
22  A   Well, I just thought she wasn't listening, not suspicious.
23      There's nothing suspicious about someone talking.
24  Q   No, I didn't ask that.  I asked when she said she wasn't
25      doing it -- she denied, you said?

Page  27

1   A   Uh-huh (affirmative).
2   Q   Did you think it was suspicious that she kept denying it and
3       you had up to four employees complaining about it?
4   A   Yes.
5   Q   Did you find her to be truthful?
6   A   In some of the cases, yes.
7   Q   But not in others?
8   A   Not in others, no.
9   Q   Was that troubling for you that she had lied about it?
10  A   That she kept talking?
11  Q   No, that she had lied about talking because she kept denying
12      it.
13          MR. PELTON:  Object to the form.
14  Q   Go ahead.
15  A   For someone -- someone -- she -- someone came in to say that
16      she was talking about her personal life.  I told her to stop
17      talking about her personal life and she said that, "I wasn't
18      talking about my personal life."  And then you said -- how
19      many people?
20  A   Well, you said between three and four employees.
21  A   Just talking about her life.
22  Q   I understood that.
23  A   Yes.
24  Q   That wasn't my question.
25  A   Okay.

Page  28

1           MS. WARD:  Can you read back the question --
2           THE WITNESS:  Please.
3           MS. WARD:  -- that I asked?  Sorry.
4           REPORTER:  I'm not getting any sound out of it.
5           VIDEO OPERATOR:  I'm sorry?
6           REPORTER:  I'm not getting any sound out of it.
7           VIDEO OPERATOR:  Does it use batteries?
8           REPORTER:  No.
9           MS. WARD:  Maybe I can reconstruct it at this
10      time.
11          REPORTER:  Yeah.  It just plugs in and it's not
12      working.  I believe the last question you asked is, "Does it
13      keep -- does it trouble you that she lied about it?"
14          MR. PELTON:  Same objection.
15          MS. WARD:  Okay.
16  A   Yes.
17  Q   It did?
18  A   Uh-huh (affirmative).
19  Q   Okay.  I thought you told me that at one point you said if
20      she kept it up, you were going to counsel her?
21  A   Yes.
22  Q   What's that?
23  A   It's a verbal counseling where I tell her that it needs to
24      stop.
25  Q   Okay.  And did you, in fact, counsel?

Page  29

8  (Pages  26 to 29)



GARCIA v. BEAUMONT HEALTH, ET AL                        DEPOSITION OF ANTOINETTE CARROLL

1   A   Yes.  That was her verbal counseling.
2   Q   And when she kept doing it did you progress up the chain of
3       discipline?
4   A   No.
5   Q   Can you tell me why not?
6   A   Because when I talked to her that was, like, the fourth time
7       and she hadn't -- no one else came back in and complained
8       about her after I talked to her the fourth time.
9   Q   Okay.  So after the first time?
10  A   The first time I didn't find anything to stand out.  She
11      denied it and then the person who came back and
12      complained -- the person who complained about her said it
13      was just her talking personal, so there was no need to
14      escalate it.  I just had a conversation with her to let her
15      know the staff was uncomfortable with her talking about her
16      personal life.
17  Q   So she denied it.  You -- you believed -- you must have
18      believed the person who said she was doing it because then
19      you talked to her about not talking about --
20  A   Any allegation I have to talk to the person, whether I
21      believe it or not.  I have to investigate and find out if
22      it's happening.
23  Q   Okay.  Did you believe her denial at that time?
24  A   Yes, the first time.
25  Q   Okay.  How about the second time?

                        Page 30

1   A   The second time, no.
2   Q   You didn't believe her?
3   A   Unh-unh (negative).
4   Q   Okay.  How about the third time?
5   A   The third time?  I can't recall.
6   Q   When did you refer to the counseling?  Would that have been
7       the second time or third time?
8   A   Unh-unh (negative).  Fourth time is when I did a verbal
9       counseling.
10  Q   Okay.  So the second time you don't know whether you
11      believed her or not?
12  A   Right.
13  Q   But you know what you did as a result of the allegation?
14  A   I didn't get any more complaints about her for awhile.
15  Q   Okay.  I'm asking you a different question.  I wasn't asking
16      you -- did you take any action after the second time?
17  A   Just to talk to her.
18  Q   Another verbal?
19  A   Each time she was talked to, yes.
20  Q   Okay.  And then you said there was a third time?
21  A   Uh-huh (affirmative).
22  Q   And during the third time did you take any action?
23  A   Just to talk to her.
24  Q   Did you believe her the third time when she said, "I wasn't
25      doing it"?

                        Page 31

1   A   I don't recall.
2   Q   But the fourth time is when she got the verbal and you
3       referred her to the EAP?
4   A   EAP.
5   Q   Okay.  Are you aware of whether Ms. Luca's had any prior
6       discipline during her employment with Beaumont Health?
7   A   Discipline, like, what in particular?
8   Q   Well, I'm asking you are you aware of any other discipline,
9       other than what you've done, with regard to Ms. Luca when --
10      during her employment at Beaumont Health?
11  A   Yes; yes.
12  Q   You are?
13  A   Yes.
14  Q   Okay.  Has there been prior discipline?
15  A   For attendance.
16  Q   And how many times has she been disciplined for --
17  A   I can't recall that.
18  Q   Has it been more than one?
19  A   I can't recall that.  I don't remember.
20  Q   Okay.  Any other prior discipline of Ms. Luca?
21  A   Just for attendance.
22  Q   And those are the only complaints you got from employees
23      other than Ms. Garcia?
24  A   Yes.
25  Q   Are you aware of whether or not Ms. Luca has a criminal

                        Page 32

1       history?
2   A   Yes.
3   Q   And what are you aware of?
4   A   I only know that she was arrested.
5   Q   Do you know when?
6   A   I can't recall when.
7   Q   Was it within the last five years?
8   A   Yes.
9   Q   Was it last year?
10  A   I don't know if it was last year or not.
11  Q   Was it possibly within the last three years?
12  A   Yes.
13  Q   And do you know what she was arrested for?
14  A   No, I don't.
15  Q   Okay.  I know before employees come to work at Beaumont
16      there's a criminal background check?
17  A   Oh, I don't know anything about that.
18  Q   You don't do -- you're not involved in that at all?
19  A   I don't know anything about that, no; no.
20  Q   Okay.  Fair enough.  I'm going to hand you what's been
21      marked as --
22          MS. WARD:  Can you mark this as Exhibit 1?
23          (Plaintiff's Exhibit 1 marked)
24          MS. WARD:  And there's a copy for you, Mr. Pelton.
25          MR. PELTON:  Thank you.

                        Page 33

                                                   9 (Pages 30 to 33)



GARCIA v. BEAUMONT HEALTH, ET AL                    DEPOSITION OF ANTOINETTE CARROLL

1   Q   There should be an extra copy there.  Can I have the other
2       one?
3   A   You need the one with the sticker?
4   Q   The sticker's for you.  The copy's for Mr. Pelton and a copy
5       for me.
6           MS. WARD:  I'm going to write at the top really
7       small "Exhibit 1."
8   Q   I'll give you a moment to look at it.
9           (Witness reviews document)
10  Q   Have you had a chance to review the document?
11  A   Excuse me.  Yes.
12  Q   It's -- up at the top it says, "Beaumont Personal Data
13      Changes."  Do you see that?
14  A   Yes.
15  Q   Do you recognize what this is?
16  A   I think so.
17  Q   Okay.  What do you think it is?
18  A   I think it's where Ms. Garcia can go in and update her
19      personal information regarding certificates and --
20  Q   Okay; okay.  And after the -- do you see where it says "add
21      license certification"?
22  A   Wait a minute, no.
23  Q   Halfway down the box.  Actually, it's at the --
24  A   Oh, I see it, uh-huh (affirmative).
25  Q   Okay.  And then after that there's a third box that says

Page 34

1       "work history"?
2   A   Yes.
3   Q   So would that also be true that she's updating her work
4       history here?
5   A   It has it that she has a work history on here.
6   Q   Okay.  Do you see where it says "The Lakeland Center"?
7   A   Yes.
8   Q   And "Plunkett Cooney PC"?
9   A   Yes.
10  Q   Is this -- are you familiar with how this goes?  What this
11      is for?
12  A   No.
13  Q   You've never done this before?
14  A   Not this.
15  Q   Okay.  So you're not familiar with how this works at
16      Beaumont Health?  You've never gone into the computer and
17      gone on a sheet like -- you know, gone through a process
18      like this where you update your licensure or work history?
19  A   Not my work history; licensure.
20  Q   Okay.  I see some licensures listed there.
21  A   Uh-huh (affirmative).
22  Q   Have you utilized this particular online source to update
23      your licensure?
24  A   Yes.
25  Q   When you were doing that did you notice if you could also

Page 35

1       update your work history?
2   A   No, I did not.
3   Q   Okay.  All right.
4   A   Yeah, this is the first --
5   Q   All right.  Thank you very much.  That's all I have for that
6       particular one.  So who at Beaumont might know how this
7       process works, if you know?
8   A   Human Resources.
9   Q   Okay.  And is there someone in Human Resources that's sort
10      of more involved in IT than others?
11  A   Beaumont has an IT Department and a Human Resource
12      Department.
13  Q   Okay; okay.  And do you know who runs that?
14  A   No, I don't know who runs it.
15  Q   Okay.
16          MS. WARD:  I'm going to mark this as Exhibit 2.
17          (Plaintiff's Exhibit 2 marked)
18          MS. WARD:  Copy for you.
19          (Counsel hands document to counsel)
20  Q   You have a chance to look it over?
21  A   No.  I just got it.
22  Q   No, I'm saying, can you take a moment to look it over?
23  A   Oh, yeah.  Okay.
24          MS. WARD:  I'm going to get some coffee for a
25      second here, be right back, while she's looking it over.

Page 36

1       Thank you.  Thanks for the coffee Mr. Pelton.
2           MR. PELTON:  Of course.
3           MS. WARD:  I'll let you do it.
4   Q   Have you had a chance to look it over?
5   A   Yeah; yes.
6   Q   Can you tell me what this is?
7   A   It is a policy -- harassment policy.
8   Q   Of?
9   A   Beaumont.
10  Q   Beaumont Health?
11  A   Yup.
12  Q   Have you read this before?
13  A   I may have, but I don't recall.  They've changed policies
14      over the last three years.
15  Q   Okay.  If you look at the top -- first sheet, top -- I'll
16      call it the "northeast corner."
17  A   Uh-huh (affirmative).
18  Q   It says "effective date"?
19  A   Uh-huh (affirmative).
20  Q   Can you tell me what that effective date is?
21  A   August 6th, 2018.
22  Q   Okay.  When this was put out in August 6th, 2018, did you
23      know whether or not you received a copy of it?
24  A   I may not have.
25  Q   You may not have?

Page 37

10  (Pages 34 to 37)



GARCIA v. BEAUMONT HEALTH, ET AL                    DEPOSITION OF ANTOINETTE CARROLL

| | |
|---|---|
| 1 | **A No.** |
| 2 | Q How does Beaumont Health let people know about their |
| 3 | policies, if you know? |
| 4 | **A They used to send an e-mail, but they don't anymore.** |
| 5 | Q Do you know when they stopped sending e-mails? |
| 6 | **A No, I don't.** |
| 7 | Q Would it have been possibly in 2018? |
| 8 | **A It probably stopped way before then.** |
| 9 | Q Okay. So they have this policy they put out in August of |
| 10 | 2018? |
| 11 | **A Uh-huh (affirmative).** |
| 12 | Q Do you have any idea how they would come to talk to |
| 13 | supervisors about it? |
| 14 | **A No.** |
| 15 | Q So nobody alerted you you needed to read this or -- |
| 16 | **A (Shaking head negatively)** |
| 17 | Q Okay. Did you consult this before you conducted your |
| 18 | investigation of Ms. Garcia's -- |
| 19 | **A I did look at a --** |
| 20 | Q -- let me just finish the whole question. |
| 21 | **A Okay.** |
| 22 | Q Because it's hard for the court reporter to take it down. |
| 23 | **A Okay.** |
| 24 | Q Did you consult Ms. Garcia -- I mean, did you consult this |
| 25 | policy before you did the investigation of Ms. Garcia's |

Page 38

| | |
|---|---|
| 1 | complaints? |
| 2 | **A I recall looking at a policy.** |
| 3 | Q But you don't recall if it was the harassment policy? |
| 4 | **A I don't recall if it was this one dated August 6th, 2018.** |
| 5 | Q But it might have been another one? |
| 6 | **A Yes.** |
| 7 | Q And that policy -- let me ask you this. Just a second. I'm |
| 8 | going to have to get something. Just a minute. |
| 9 | MS. WARD: Sorry about this. I'll put it right |
| 10 | here. I'll put it back on. Thanks. |
| 11 | Q I'm going to hand you -- |
| 12 | MS. WARD: Can we make this -- this is Exhibit -- |
| 13 | can we make this Exhibit 3? |
| 14 | (Plaintiff's Exhibit 3 marked) |
| 15 | MS. WARD: And sorry, I only have one copy of it. |
| 16 | Q I want you to have a chance to look at that. |
| 17 | **A Okay.** |
| 18 | Q Do you recognize that? |
| 19 | **A Yes.** |
| 20 | Q Okay. How do you recognize it? |
| 21 | **A I think this may have been the one I looked at.** |
| 22 | Q Can you hand it back to me for a second? |
| 23 | **A Uh-huh (affirmative).** |
| 24 | **(Witness hands document to counsel)** |
| 25 | Q This document, Exhibit 3, purports to be the Beaumont Health |

Page 39

| | |
|---|---|
| 1 | System Sexual Harassment Policy and it's -- appears to have |
| 2 | a date of 9/1/16. Would you agree with that? |
| 3 | **A Yes.** |
| 4 | Q And can you tell me in looking at that policy -- can I take |
| 5 | a look at it again? I'm sorry we only have one copy. All |
| 6 | right. I want you to read the second sentence of the |
| 7 | policy, if you can. Sorry. |
| 8 | **A "All employees including supervisors and managers will be** |
| 9 | **subject to discipline up to and including discharge for any** |
| 10 | **act of sexual harassment which in the judgement of the** |
| 11 | **hospital they have committed."** |
| 12 | Q Okay. And I want to ask you how do they define "sexual |
| 13 | harassment" in that policy? |
| 14 | **A You want me to read the whole thing?** |
| 15 | Q Well, how about if you read the first sentence? |
| 16 | **A "Unwelcome sexual advances, requests for sexual** |
| 17 | **favors, and other verbal or physical conduct of a** |
| 18 | **sexual nature constitutes sexual harassment. When** |
| 19 | **submission to the conducts made either explicit or** |
| 20 | **implicit condition of employment. Submission to a** |
| 21 | **rejection letter conducts used as the basis for** |
| 22 | **employment decision affecting a harassed employee. The** |
| 23 | **harassment substantially interferes with the employee's** |
| 24 | **work performance or creates an intimidating, hostile,** |
| 25 | **or offensive work environment."** |

Page 40

| | |
|---|---|
| 1 | Q Thank you. And can I ask you what -- can I look at it one |
| 2 | more time? I know. It's my only one. Sorry about this. |
| 3 | (Witness hands document to counsel) |
| 4 | Q Okay. That's number 3. And you think this (indicating) is |
| 5 | the one you looked at? |
| 6 | **A Yes.** |
| 7 | Q Okay. I want to go back to Exhibit Number 2 that you have |
| 8 | in front of you, and I want you to look at the second |
| 9 | sentence of the definition section. And it starts at the |
| 10 | bottom of page 1 and moves over into the top of page 2. |
| 11 | **A You want me to just look at it, you said?** |
| 12 | Q Yup; yup. |
| 13 | **A Okay.** |
| 14 | Q Okay. And would you agree with me that the 2018 policy |
| 15 | appears to define a protective characteristic to include |
| 16 | sexual orientation and gender? |
| 17 | **A Yes.** |
| 18 | Q Okay. Can you look at page 3 of the new policy -- the 2018 |
| 19 | policy where it says "Standards"? |
| 20 | **A Uh-huh (affirmative).** |
| 21 | Q Can you read the first sentence of the second paragraph in |
| 22 | the record? |
| 23 | **A Say that again?** |
| 24 | Q The first sentence of the second paragraph, can you read |
| 25 | that in the record? |

Page 41

11 (Pages 38 to 41)



GARCIA v. BEAUMONT HEALTH, ET AL                    DEPOSITION OF ANTOINETTE CARROLL

**Page 42**

1 **A   Oh.  "Beaumont Health prohibits any form of discipline,**
2 **reprisal, intimidation, or retaliation for good faith**
3 **reporting incidents of harassment, pursuing any harassment**
4 **claim, or cooperating in related investigations."**
5 Q   And down to the section "VII: Process"?
6 **A   Uh-huh (affirmative).  "All complaints of harassment --**
7          MS. ZINN:  I'm sorry to interrupt.  Eric?  Hi.
8          (Ms. Zinn enters the deposition)
9          MR. PELTON:  Hey, how you doing, Jen?
10         MS. ZINN:  I'm Jennifer Zinn.  I'm the Beaumont
11 attorney.
12         MR. PELTON:  You're here.  Come on in.
13         MS. WARD:  Okay.
14         MS. ZINN:  I'm -- I apologize to interrupt.
15         MR. PELTON:  That's okay.  We're just reading
16 policies.
17         MS. ZINN:  Okay.
18         MS. WARD:  Okay.
19 Q   See where it says "process"?
20 **A   Okay.**
21         MS. WARD:  I'm Lisa Ward, by the way.
22         MS. ZINN:  Pardon?
23         MS. WARD:  Jennifer Zinn, I'm Lisa Ward.
24         MS. ZINN:  Nice to meet you.
25         MS. WARD:  I don't know -- this is my client --

**Page 43**

1          MR. PELTON:  Ms. Garcia.
2          MS. ZINN:  We haven't met.
3          MS. WARD:  -- Kristina Garcia.
4          MS. ZINN:  Nice meeting you.
5          MS. GARCIA:  Nice to meet you.
6 Q   Where it says "process," can you read the first sentence
7 into the record?
8 **A   "All complaints of harassment and retaliation will be**
9 **investigated promptly, thoroughly, and fairly."**
10 Q   Okay.  Now, at the time that Ms. Garcia came to you to
11 report the sexual harassment complaint of --
12 **A   Yes.**
13 Q   -- by Ms. Luca --
14 **A   Yes.**
15 Q   -- did you consult the 2018 policy prior to conducting your
16 investigation?
17 **A   I do not recall if this (indicating) was the one that was in**
18 **the computer.**
19 Q   Okay.  So you don't know which policy you consulted by
20 looking --
21 **A   Exactly.**
22 Q   So it might have been the 218 (sic)?
23 **A   I don't recall.**
24 Q   Okay.  All right.  Thank you.  Let's take a look here.  Do
25 you know if Beaumont Health had any policies that put forth

**Page 44**

1 a method for conducting an investigation into an employee
2 complaint?
3 **A   I don't know.**
4 Q   So they may -- there might be a written policy on that?
5 **A   I don't know.**
6 Q   Okay.  But you didn't consult any such policy before you did
7 your investigation?
8 **A   I just looked at a policy, but I don't recall which one it**
9 **was.**
10 Q   Okay.  Do you know what a "CAR" means in that policy in 218
11 (sic)?
12 **A   218?**
13 Q   Yeah.  If you look at the 218 policy there's a reference to
14 a -- it's at the bottom of "Process," bottom of page 3?
15 **A   Yes, I see it.  What was the question?**
16 Q   Do you know what "CAR" refers to?
17 **A   Not in reference to this policy.**
18 Q   Well, can you read the first sentence of the second
19 paragraph at the bottom of page 3, under "Process"?
20 **A   The first sentence?**
21 Q   Second paragraph.
22 **A   "Once a complaint is received an investigation will be**
23 **conducted by the Compliance, Audit, Accreditation and Risk**
24 **Department and/or Human Resources."**
25 Q   So you don't know what the Compliance, Audit, and

**Page 45**

1 Accreditation and Risk Department is?
2 **A   No, I do not.**
3 Q   Are you part of Human Resources?
4 **A   No, I am not part of Human Resources.**
5 Q   Okay.  Can you read the second sentence of that into the
6 record?
7 **A        "To ensure a thorough and fair investigation, the**
8 **investigators may conduct interviews with the**
9 **complainant -- complainant, subjects of the complaint,**
10 **and any witness to the incident, review related**
11 **documents including witness statements, company**
12 **e-mails, and other internal communications, and secure**
13 **other company assets such as computers and surveillance**
14 **videos."**
15 Q   Okay.  Did you look at any related documents, other than
16 witness statements, for your investigation of the Garcia
17 complaint?
18 **A   No.**
19 Q   No?  Okay.  Did you look at company e-mails as part of your
20 investigation into the Garcia complaint?
21 **A   No.**
22 Q   Okay.  Did you look at any other internal communications
23 when you looked at -- when you investigated the Garcia
24 complaint?
25         MR. PELTON:  Written communications?

12 (Pages 42 to 45)



GARCIA v. BEAUMONT HEALTH, ET AL                    DEPOSITION OF ANTOINETTE CARROLL

| | |
|---|---|
| 1 | MS. WARD:  It just says "internal communications." |
| 2 | I'm trying to ask her if she looked at anything that would |
| 3 | fall under that category. |
| 4 | **A  I don't know what falls under that category.** |
| 5 | Q  Did you look at any other internal written communications? |
| 6 | **A  Communications between who?** |
| 7 | Q  I'm just looking at the language they use in the policy; |
| 8 | "internal communications."  Did you look at anything |
| 9 | other -- |
| 10 | **A  I don't understand the question and I don't understand that.** |
| 11 | Q  Okay.  Did you look at any computers as part -- |
| 12 | **A  No.** |
| 13 | Q  -- let me finish the question -- as part of your |
| 14 | investigation into the Garcia complaint? |
| 15 | **A  No.** |
| 16 | Q  Did you look at any surveillance videos as part of your |
| 17 | investigation into Ms. Garcia's complaint? |
| 18 | **A  No.** |
| 19 | Q  Okay. |
| 20 | MS. WARD:  I'm going to have you mark -- I think |
| 21 | we're up to Number 4.  Here we go. |
| 22 | (Plaintiff's Exhibit 4 marked) |
| 23 | MS. WARD:  And one for Mr. Pelton. |
| 24 | MR. PELTON:  Thank you. |
| 25 | MS. WARD:  You're welcome. |

Page  46

| | |
|---|---|
| 1 | (Witness reviews document) |
| 2 | Q  Have you had a chance to review the document? |
| 3 | **A  Yes.** |
| 4 | Q  Do you recognize it? |
| 5 | **A  Yes.** |
| 6 | Q  What is it? |
| 7 | **A  It is Krissy's -- Kristy Garcia's statement on what** |
| 8 | **happened.** |
| 9 | Q  Do you remember when she gave it to you, approximately? |
| 10 | **A  I want to say she gave it to me during the week after she** |
| 11 | **told me, a couple days afterwards.** |
| 12 | Q  Does September 6th, 2018, sound right? |
| 13 | **A  Not September; August 6th.** |
| 14 | Q  August 6th?  Does that sound like the date she might have |
| 15 | given it to you or was it later than that? |
| 16 | **A  Later than that.** |
| 17 | Q  Was it in that week that includes -- |
| 18 | **A  Yes.** |
| 19 | Q  -- August 6th? |
| 20 | **A  It was in that week.** |
| 21 | Q  Okay.  Does this document -- well, let me ask you this: |
| 22 | Why -- why did she provide this document to you? |
| 23 | **A  We had a conversation and it was said that she needed to put** |
| 24 | **something in writing on what happened.** |
| 25 | Q  Okay.  And who asked her to do that? |

Page  47

| | |
|---|---|
| 1 | **A  I think I brought it up.** |
| 2 | Q  So you asked her to put something in writing? |
| 3 | **A  I needed something in writing.** |
| 4 | Q  Does this document reflect the conversation that you had, or |
| 5 | was there new information in here that didn't come up during |
| 6 | your conversation? |
| 7 | **A  I don't recall.  This is -- this is the conversation we had.** |
| 8 | Q  So she talked to you about Rachel putting her hand down her |
| 9 | shirt, inside her bra cup, and pinching her nipple? |
| 10 | **A  Yes.** |
| 11 | Q  And pulling out her left breast?  Do you recall that in the |
| 12 | conversation? |
| 13 | **A  I don't recall that part.  I recall her being touched.** |
| 14 | Q  Okay.  Well, let's break it up. |
| 15 | **A  Uh-huh (affirmative).** |
| 16 | Q  Do you recall her talking about how Rachel had gotten up and |
| 17 | come over and sat next to her -- or was next to her?  My |
| 18 | mistake. |
| 19 | **A  I can't recall the whole conversation, seeing how it was in** |
| 20 | **August of 2018.  I can only speak on what I'm reading.** |
| 21 | Q  Well, at the time she turned it in, did you think it was |
| 22 | accurate of what she had told you? |
| 23 | **A  Uh-huh; yes.** |
| 24 | Q  Okay.  Do you see where she says, "She moved her chair and |
| 25 | suddenly her hand was down my shirt, inside my bra cup, and |

Page  48

| | |
|---|---|
| 1 | she pinched my nipple"? |
| 2 | **A  Where's that?  I'm sorry.** |
| 3 | Q  I'm going to count them. |
| 4 | **A  You read faster than me.  I see it.** |
| 5 | Q  It starts at line ten, about. |
| 6 | **A  I see it.  Uh-huh (affirmative).** |
| 7 | Q  Okay.  Do you recall her telling you that? |
| 8 | **A  Yes.** |
| 9 | Q  Do you recall her telling you that she pulled up Ms. |
| 10 | Garcia's left breast, removing it from the bra cup? |
| 11 | **A  I can't recall the whole conversation.  I can only recall** |
| 12 | **that she said she touched her breast.** |
| 13 | Q  Did -- do you recall if she told you she touched her breast |
| 14 | under her clothes or over her clothes? |
| 15 | **A  Under her clothes, I think.** |
| 16 | Q  Okay.  And you don't recall her saying that she -- that Ms. |
| 17 | Luca pinched her nipple? |
| 18 | **A  No, I cannot recall that.** |
| 19 | Q  But you're not calling her a liar if she -- |
| 20 | **A  No.** |
| 21 | Q  Okay.  If she's -- |
| 22 | MR. PELTON:  She said she can't recall it. |
| 23 | **A  I can't recall it.** |
| 24 | Q  Right.  Okay; okay.  Do you recall her expressing during |
| 25 | that conversation that she was not comfortable being alone |

Page  49

13  (Pages  46 to 49)



GARCIA v. BEAUMONT HEALTH, ET AL                    DEPOSITION OF ANTOINETTE CARROLL

| | |
|---|---|
| 1    with Ms. Luca?  I'm looking at the bottom of page -- or the | 1  Q   Had Ms. Garcia lied to you before this? |
| 2    bottom of the first -- the last paragraph. | 2  A   No. |
| 3  A  Okay. | 3  Q   So you had no experience of her being dishonest with you? |
| 4  Q  It starts on page 1 and goes to page 2. | 4  A   No, I have not. |
| 5  A  Yes. | 5  Q   Okay.  All right. |
| 6  Q  Okay.  Did she ask not to be paired together in an ICU | 6        MR. PELTON:  When you have a convenient time -- |
| 7     "where we could possibly be alone in our supply room"? | 7        MS. WARD:  Pardon me? |
| 8  A  Yes; yes. | 8        MR. PELTON:  -- I could use a comfort break when |
| 9  Q  Okay.  You recall both of those things? | 9     you have a convenient time. |
| 10  A  Yes. | 10       MS. WARD:  This would be it. |
| 11  Q  Okay.  When she came to you did you have an occasion to | 11       MR. PELTON:  All right. |
| 12     observe her appearance, her demeanor? | 12       VIDEO OPERATOR:  We are going off the record at |
| 13  A  Whose appearance? | 13    10:11. |
| 14  Q  Ms. Garcia's. | 14       (Off the record) |
| 15  A  Yes. | 15       VIDEO OPERATOR:  We are going back on the record |
| 16  Q  When she was talking to you did you have any impression of | 16    at 10:25. |
| 17     whether or not she was telling you the truth? | 17       (Plaintiff's Exhibit 5 marked) |
| 18  A  I just knew it was a serious allegation.  It needed to be | 18  Q   Okay.  I'm going to hand you what I think is Exhibit 5. |
| 19     taken seriously. | 19       MS. WARD:  A copy for you, Mr. Pelton. |
| 20  Q  Okay.  Well, I understand that.  But I'm asking did you have | 20  A   Thank you. |
| 21     any occasion to -- when you looked at her did she seem like | 21  Q   Give you an opportunity to look it over. |
| 22     she was telling you the truth? | 22  A   Okay. |
| 23  A  She seemed very upset. | 23  Q   All righty.  I want to ask you do you recognize this? |
| 24  Q  She seemed very upset? | 24  A   Yes. |
| 25  A  Uh-huh (affirmative). | 25  Q   And what is it? |
| Page 50 | Page 52 |

| | |
|---|---|
| 1  Q  Was she crying? | 1  A   It is my typed-up version of what happened when Krissy |
| 2  A  I don't recall. | 2      Garcia came in and talked to me, and when I talked to |
| 3  Q  Was -- well, how would you describe her demeanor when she | 3      Colleen and Rachel, and Dianna. |
| 4     was talking to you? | 4  Q   Okay.  So these are a typed-up version of your |
| 5  A  Upset, angry. | 5      investigation? |
| 6  Q  Upset and angry? | 6  A   Yeah. |
| 7  A  Uh-huh (affirmative). | 7  Q   Okay.  You've had a chance to review what Colleen said? |
| 8  Q  How was that expressed to you? | 8  A   Yes. |
| 9  A  Her saying she had to talk about it and she thought about it | 9  Q   I want you to go to the third sentence and read that into |
| 10    because it had been a week since it happened. | 10     the record. |
| 11  Q  Yes. | 11  A   "Colleen doesn't recall anything coming up regarding a |
| 12  A  Yes. | 12     nipple and she states, 'I didn't see Rachel touch or grab |
| 13  Q  And you thought she was upset and angry? | 13     Krissy's breast.'" |
| 14  A  Yes. | 14  Q   Okay.  And then I want you to look at the second sentence of |
| 15  Q  Did she seem genuine to you? | 15     Rachel's statement. |
| 16  A  Yes. | 16  A   "I accidently touched Krissy.  I did not grab her.  Krissy |
| 17  Q  Had she lied to you before, that you know?  Ms. Garcia? | 17     has been making comments about me trying" -- |
| 18  A  Yes. | 18  Q   Okay.  Just the two sentences.  I'm sorry.  My mistake. |
| 19  Q  Really?  When did she lie? | 19  A   Oh, okay. |
| 20  A  No.  I thought you said "like."  You said "lie?" | 20  Q   All right.  There was an inconsistency between Colleen and |
| 21       MR. PELTON:  You said "like." | 21     Rachel in that Colleen said she didn't see anything and |
| 22  A  I thought you said "like." | 22     Rachel said she touched Krissy.  Did you go back to Colleen |
| 23       MR. PELTON:  I thought you said "like." | 23     and ask her about that? |
| 24  Q  "Lied." | 24  A   Yes.  She said she didn't see anything. |
| 25  A  Oh, repeat the question. | 25  Q   Okay.  When she said "I actually (sic) touched Krissy's |
| Page 51 | Page 53 |



GARCIA v. BEAUMONT HEALTH, ET AL                    DEPOSITION OF ANTOINETTE CARROLL

| | |
|---|---|
| 1 | breast," -- and I'm talking about Rachel now -- did you |
| 2 | follow up with any questions about where?  How? |
| 3 | MR. PELTON:  Objection; misstates what the |
| 4 | document says. |
| 5 | MS. WARD:  I'm looking at what Rachel says and I'm |
| 6 | looking at the second sentence.  "I accidently touched |
| 7 | Krissy." |
| 8 | MR. PELTON:  Right.  It doesn't say she touched |
| 9 | her breast. |
| 10 | MS. WARD:  Fair enough. |
| 11 | **A    Right.** |
| 12 | MR. PELTON:  So you're misreading the document. |
| 13 | MS. WARD:  Okay.  I'll fix it.  I stand corrected. |
| 14 | Q    Can you just tell me did you ask her any follow-up on what |
| 15 | she touched?  Where she touched? |
| 16 | **A    I can't recall.** |
| 17 | Q    Is that something you might have done? |
| 18 | **A    Probably, yes.** |
| 19 | Q    Would it have made a difference to you if she touched her |
| 20 | back versus her breast? |
| 21 | **A    No.  She touched her and she didn't -- she shouldn't have** |
| 22 | **touched her.** |
| 23 | Q    Okay; okay.  When she -- I want you to read further about |
| 24 | what Rachel states.  And I'm looking at now -- seventh |
| 25 | sentence in Rachel's -- under "Rachel states:", can you read |

Page 54

| | |
|---|---|
| 1 | that in the record? |
| 2 | **A    You said seven?** |
| 3 | Q    Uh-huh (affirmative). |
| 4 | **A    Can you tell me where you want me to start?** |
| 5 | Q    "Krissy was making comments about." |
| 6 | **A    Okay.  "Krissy was making comments about me grabbing her** |
| 7 | **nipple in the staff room, saying things like, 'Rachel** |
| 8 | **grabbed my nipple because she's into girls.'  Dianna Grayson** |
| 9 | **and Marcia Davis were walking by when this was said."** |
| 10 | Q    Okay.  And I want to ask you did you -- were you concerned |
| 11 | at all about Rachel's comments about Krissy's behavior? |
| 12 | **A    Repeat your question, please.** |
| 13 | Q    Were you concerned -- I'm looking at what was said and I'm |
| 14 | asking you if you were concerned at all about Rachel's |
| 15 | allegations of Krissy's behavior? |
| 16 | **A    Yes.** |
| 17 | Q    Okay.  Did you express to Rachel she could file a statement |
| 18 | if she was interested in pursuing something against Krissy? |
| 19 | **A    I told Rachel she needed to do the exact same thing Krissy** |
| 20 | **did.** |
| 21 | Q    Which was? |
| 22 | **A    She needed to put something in writing.** |
| 23 | Q    Did she? |
| 24 | **A    No; no.** |
| 25 | Q    Do you know why? |

Page 55

| | |
|---|---|
| 1 | **A    No, I don't.** |
| 2 | Q    Did you ask her? |
| 3 | **A    She said she didn't want to put anything in writing.** |
| 4 | Q    Did you find that odd? |
| 5 | **A    No.** |
| 6 | Q    Because? |
| 7 | **A    I figured she would put it in writing.** |
| 8 | Q    But when she didn't, did you go back to her and say, "You |
| 9 | said you were" -- I believe she says in here she's |
| 10 | uncomfortable with her comments; right? |
| 11 | **A    I did go back and tell her to put it in writing.** |
| 12 | Q    Okay.  And when she didn't, did you go back and say, "Why |
| 13 | didn't you put it in writing?" |
| 14 | **A    Yes, and she said she didn't want to.** |
| 15 | Q    And you let it go? |
| 16 | **A    I can't force her to put something in writing.** |
| 17 | Q    Okay.  All right.  I want to look down to the last -- the |
| 18 | underlined portion of your report. |
| 19 | **A    Uh-huh (affirmative).** |
| 20 | Q    Can you read that into the record? |
| 21 | **A    "Per my investigation there is no one to** |
| 22 | **corroborate what happened.  Spoke to the persons'** |
| 23 | **name(s) I was given to substantiate what happened and** |
| 24 | **no one wants to be a part of this.  Both party's** |
| 25 | **account of what happen do not match up without any** |

Page 56

| | |
|---|---|
| 1 | **witnesses willing to corroborate what happened.  It is** |
| 2 | **a case of he said/she said, thus" --** |
| 3 | Q    That's good; that's good.  And my question to you is |
| 4 | were you concerned that "no one wants to be a part of this"? |
| 5 | You said you spoke to -- you said you "spoke to the persons' |
| 6 | name(s)" -- the "S" is in parenthesis -- "I was given to |
| 7 | substantiate what happened and no one wants to be a part of |
| 8 | this."  Do you see that sentence? |
| 9 | **A    Yes.** |
| 10 | Q    Did it concern you that none of -- no one wanted to be a |
| 11 | part of this investigation? |
| 12 | **A    No.** |
| 13 | Q    It didn't concern you? |
| 14 | **A    When you say -- when you say "no one wants to be a part of** |
| 15 | **the" --** |
| 16 | Q    You said it in the -- it's the second -- |
| 17 | MR. PELTON:  Well, let her explain. |
| 18 | MS. WARD:  Okay. |
| 19 | **A    "No one wants to be a part of this."  When I asked them** |
| 20 | **questions, they said they didn't want to be involved.** |
| 21 | Q    Did that concern you? |
| 22 | **A    Yes.** |
| 23 | Q    What did you do about that? |
| 24 | **A    I can't force people to put things in writing.  I went to HR** |
| 25 | **and let them know I spoke to those persons and they didn't** |

Page 57

15 (Pages 54 to 57)


NetworkReporting
STATEWIDE COURT REPORTERS
800-632-2720

GARCIA v. BEAUMONT HEALTH, ET AL                    DEPOSITION OF ANTOINETTE CARROLL

| | |
|---|---|
| 1 | want to say anything.  It was left in HR's hand. |
| 2 | Q   Did they tell you why they didn't want to be involved? |
| 3 | A   **Nope.** |
| 4 | Q   Did you ask them? |
| 5 | A   **Yes.** |
| 6 | Q   What did they say in response? |
| 7 | A   **"I don't want to be involved."** |
| 8 | Q   That's all they said? |
| 9 | A   **That's all they said.** |
| 10 | Q   Okay.  Given that you had some doubts about Ms. Luca's |
| 11 | credibility in the past when she denied talking about |
| 12 | personal stuff at the office, did this play into your |
| 13 | evaluation of her credibility at this -- at this point? |
| 14 | A   **This is a whole different allegation.  Nothing this serious** |
| 15 | **had came up before.** |
| 16 | Q   I understand that.  But given that you had some doubts about |
| 17 | her credibility, I'm just wondering if there was anything |
| 18 | about this -- her denial of having grabbed her breast -- |
| 19 | that you doubted her credibility at this point?  This is |
| 20 | September 8th -- or August 8th.  I stand corrected. |
| 21 | A   **I couldn't go based on her saying "no" and Krissy saying** |
| 22 | **"yes."** |
| 23 | Q   I understand that you couldn't go.  I'm just asking if you |
| 24 | had doubts about her credibility at that point? |
| 25 | A   **No.** |

<div align="center">Page 58</div>

| | |
|---|---|
| 1 | (Plaintiff's Exhibit 6 marked) |
| 2 | Q   Okay.  I'm going to give you what's been marked as -- I |
| 3 | think we're up to Exhibit 6. |
| 4 | MS. WARD:  Yes? |
| 5 | REPORTER:  (Nodding head in affirmative) |
| 6 | Q   Okay.  Have you had a chance to look this over? |
| 7 | A   **Yes.** |
| 8 | Q   Do you recognize it? |
| 9 | A   **No.** |
| 10 | Q   You've never seen this before? |
| 11 | A   **I've never seen this before.** |
| 12 | Q   Okay.  So the statement that you took from Dianna that was |
| 13 | mentioned in -- when you spoke to Dianna Grayson, this |
| 14 | wasn't that statement? |
| 15 | A   **No, it was not.** |
| 16 | Q   When you spoke to Grayson what did she tell you? |
| 17 | A   **She told me she overheard a conversation, but she didn't** |
| 18 | **recall who said it or who was around at the time.** |
| 19 | Q   Okay.  You state in your report -- now I'm looking at under |
| 20 | "Dianna states." |
| 21 | A   **Uh-huh (affirmative).** |
| 22 | Q   The last sentence in the first paragraph, can you read that |
| 23 | in the record? |
| 24 | A   **"She was very hesitant speaking on the issue."** |
| 25 | Q   Did you ask her why? |

<div align="center">Page 60</div>

| | |
|---|---|
| 1 | Q   You didn't doubt Luca's credibility. |
| 2 | A   **I can't doubt.  I take every allegation seriously and I** |
| 3 | **can't prejudge.  You're asking me if I prejudged her and** |
| 4 | **thought that she was -- no.** |
| 5 | Q   No, I'm not saying prejudge.  I'm saying the day that you |
| 6 | got her statement. |
| 7 | A   **I didn't know if it was true or not true.  Honestly, that's** |
| 8 | **all I can say.** |
| 9 | Q   But you had already had issues with her honesty in the past? |
| 10 | A   **About her talking to others about her personal life.** |
| 11 | Q   And that didn't weigh into anything about her denying this? |
| 12 | A   **No.** |
| 13 | Q   Okay.  Sorry.  Can you tell me why you put these notes in |
| 14 | writing? |
| 15 | A   **Whenever someone comes to you with an allegation, you have** |
| 16 | **to print out everything.  And because I investigated, I** |
| 17 | **wanted to make sure I had it in writing so I can remember** |
| 18 | **that I did speak to those individuals that were named.** |
| 19 | Q   Okay.  Did you interview Marcia Davis? |
| 20 | A   **Marcia was on vacation.** |
| 21 | Q   So the answer to that question is? |
| 22 | A   **No.** |
| 23 | Q   And you did speak to Dianna Grayson? |
| 24 | A   **Yes, I did.** |
| 25 | Q   Okay. |

<div align="center">Page 59</div>

| | |
|---|---|
| 1 | A   **Yes.** |
| 2 | Q   What did she say? |
| 3 | A   **"I don't want to get involved."** |
| 4 | Q   Did you find that troubling? |
| 5 | A   **Troubling how?** |
| 6 | Q   I'm asking you if you found it troubling in any way? |
| 7 | A   **That she didn't want to get involved?** |
| 8 | Q   Yup. |
| 9 | A   **I thought she should know who she heard, but she said she** |
| 10 | **didn't.** |
| 11 | Q   Did you believe her? |
| 12 | A   **Yes.** |
| 13 | Q   Okay.  Did you ever get back with Marcia Davis? |
| 14 | A   **No.** |
| 15 | Q   Okay.  Did you ever get a statement from Marcia Davis? |
| 16 | A   **No.** |
| 17 | Q   When she got back from vacation, can you tell me why you |
| 18 | didn't talk to her? |
| 19 | A   **We had already talked to Colleen, Rachel, and Dianna and** |
| 20 | **Krissy, and Rachel and Colleen were the ones that were in** |
| 21 | **the room when it happened.** |
| 22 | Q   Okay.  So you didn't talk to Marcia Davis because you |
| 23 | thought her input would be irrelevant? |
| 24 | A   **No.  We were done with the investigation when Marcia came** |
| 25 | **back from her vacation.** |

<div align="center">Page 61</div>

<div align="right">16 (Pages 58 to 61)</div>



GARCIA v. BEAUMONT HEALTH, ET AL                    DEPOSITION OF ANTOINETTE CARROLL

1  Q   Was there some rule that said that you had to be done within
2      a certain amount of time?
3  A   No.
4  Q   Is there something that prohibits you from following up with
5      her?
6  A   No.  She wasn't there.
7  Q   No, I understand that.  But she came back from vacation, I
8      assume, at some point?
9  A   Yeah.  I'm sure she did.
10 Q   And you didn't follow up with her?
11 A   No.
12 Q   Okay.
13         (Plaintiff's Exhibit 7 marked)
14 Q   I'm going to give you what's been marked as Exhibit 7.
15         (Witness reviews exhibit)
16 Q   Have you had a chance to look it over?
17 A   Yes.
18 Q   Can you tell me what that document is?
19 A   This was after I talked to Rachel.
20 Q   Okay.  So when would that have been prepared?
21 A   Probably the same date that's up at the top.
22 Q   Did you -- when you talked to Rachel was anyone else in the
23     room?
24 A   No.
25 Q   Okay.  Well, the first thing you say in here is, "Rachel

Page  62

1  Q   states."  Can I ask you how did it come about that she
2      started talking to you?
3  A   I asked her what happened.
4  Q   Again, or is this the same conversation that was referenced
5      in your chronology?
6  A   Yes.
7  Q   Okay; okay.  So you asked her what happened and was this --
8      this paragraph an accurate depiction of what you remember
9      she told you?
10 A   From what I can recall.
11 Q   Okay.  Can you go to the second paragraph and read that in
12     the record?
13 A        "Rachel appeared upset that I was bringing this to
14         her attention and repeated she had nothing to add to
15         the above statement.  Rachel is not putting anything in
16         writing at this time.  She kept repeating she couldn't
17         believe this is happening."
18 Q   Okay.  When she made the statement to you, did you have an
19     opportunity to observe her demeanor?
20 A   Yes.
21 Q   What -- what did she look like that day?
22 A   She was upset that I was bringing it up.
23 Q   Okay.  But can you describe how she manifested that?
24 A   I can't just -- not -- I can't recall.
25 Q   Facial -- facial items?  Body language?  Anything?

Page  63

1  A   Just by her saying that she just couldn't believe this was
2      happening.
3  Q   Was she crying?
4  A   No, I don't recall.
5  Q   You don't recall if she was crying, or, no, she wasn't
6      crying?
7  A   I don't recall if she was crying.
8  Q   Okay.  Was she shouting?
9  A   I don't recall if she was shouting.
10 Q   Was she loud?
11 A   No.
12 Q   Okay.  Can you go down to the part that starts "on Monday"?
13 A   Uh-huh (affirmative).  You want me to read it?
14 Q   Yup.
15 A   Okay.  "On Monday, August 13th, 2018, I spoke with Rachel
16     Luca regarding an investigation into the allegation that was
17     made against her and told her my findings."
18 Q   Okay.  And then I want to go after that -- there's a big
19     paragraph --
20 A   Okay.
21 Q   -- and then I want to go to the last paragraph.  Can you
22     read that?
23 A   The last or the second -- the next one?
24 Q   No, the last paragraph.
25 A        "Rachel was reminded to be professional while at

Page  64

1      work and to remember we are here for our patients.
2      Patient care comes first.  If there is any continued
3      inappropriate behavior it needs to be and will be
4      reported."
5  Q   Okay.  Why did you give her that reminder?
6  A   An allegation was brought to my attention and it needed --
7      she needed to be reminded why we're here and it is
8      considered inappropriate behavior.
9  Q   Okay.  So you kind of believed the allegation?
10 A   Yes.
11 Q   You did?  You believed --
12 A   I took it seriously.
13 Q   Okay.  So you believed that --
14 A   I took it seriously.
15 Q   You believed Krissy's story somewhat?
16 A   I took it seriously.
17 Q   Okay.  Did you ever consider maybe writing her up for
18     inappropriate touching when you did your investigation?
19 A   No.  We called HR and we were told to investigate.
20 Q   Okay.
21 A   And I would take my lead from HR.
22 Q   Did HR tell you not to issue a written warning?
23 A   I do not recall.
24 Q   They might have?
25 A   I don't recall.

Page  65

17 (Pages 62 to 65)



GARCIA v. BEAUMONT HEALTH, ET AL                    DEPOSITION OF ANTOINETTE CARROLL

1  Q  Okay.  What's the next step in progressive discipline after
2     a written warning?
3  A  If the person does the same behavior, then it goes up to HR.
4  Q  Okay.  And there was nothing about this situation that made
5     you want to refer to HR for discipline at that time?
6  A  We -- I already referred to HR.  HR knew about this on the
7     day that Krissy came to me.
8  Q  Okay.  All right.  Did Rachel ever give you one of her Xanax
9     pills while you worked at Beaumont Health?
10 A  No.
11 Q  So you've never got --
12 A  I have --
13 Q  -- just a second -- you've never gotten any prescription
14    pills from Rachel Luca while you were employed at Beaumont
15    Health?
16 A  I don't think prescription, no.
17 Q  What kind of pills did you take from --
18 A  Motrin.
19 Q  She -- you took some Motrin from her?
20 A  Yes.
21 Q  Okay.  Do you remember when that happened?
22 A  No; unh-unh.  I can't recall when that happened.
23 Q  Did you ever hear allegations that Rachel Luca was selling
24    some of her prescription drugs at Beaumont Health?
25 A  I didn't hear any of that.

Page 66

1  Q  Okay.  No one ever brought that to your attention?
2  A  That she was selling drugs?  No; unh-unh.
3  Q  Okay; okay.  All righty.
4       MS. WARD:  Can you mark that?  I think we're up to
5     Exhibit 8.
6       (Plaintiff's Exhibit 8 marked)
7  Q  Do you recognize that document?
8  A  No, I do not.
9  Q  Have you ever seen it before?
10 A  No, I have not.
11 Q  Okay.
12      MS. WARD:  Exhibit 9.
13      (Plaintiff's Exhibit 9 marked)
14 Q  Have you ever seen that document before, Exhibit 9?
15 A  No, I -- no, I have not.
16 Q  Okay.  I'm going to go back to Exhibit 8 and 9, if you could
17    put them in front of you.  I believe -- you have to help me
18    here.  I have to look at the numbers.  Exhibit 9 purports to
19    be a statement from Rachel Luca to Jean -- is it Aphram?
20 A  Yes.  John Aphram.
21 Q  John?  Okay.  And Exhibit 8 appears to be a statement from
22    Colleen Kaye to John Aphram; yes?
23 A  Yes.
24 Q  Okay.  Can you tell me, if you know, why John Aphram was
25    collecting these statements on or about September 22nd and

Page 67

1     24th, 218?
2  A  I don't want to speculate.
3  Q  Do you know?
4  A  I think he was still invest- -- they had to investigate
5     because Krissy came to us and told us that Rachel was still
6     talking about the incident.
7  Q  Okay.  But if you look over the statements, it looks like
8     part of the statement is about what actually happened that
9     day, as opposed to her talking about what happened?
10 A  Right.
11 Q  Would you agree?
12 A  I don't --
13      MR. PELTON:  I'm going to object.  She said she's
14    not familiar with the documents.
15 A  I'm not familiar with these.
16 Q  So were you a part of the follow-up investigation that was
17    conducted on or around September 22nd, September 24th, 218?
18 A  No.
19 Q  Were you in any meetings where that investigation was
20    discussed?
21 A  I don't recall.
22 Q  Okay.  Did you ever go to John Aphram and ask him anything
23    about his investigation into --
24 A  No.
25 Q  Okay.

Page 68

1       MS. WARD:  Is this number 9?
2       MR. PELTON:  10.
3       REPORTER:  10.
4       (Plaintiff's Exhibit 10 marked)
5  Q  Can you look at that?
6       (Witness reviews exhibit)
7  Q  Have you had a chance to look that over?
8  A  Yes.
9  Q  Have you ever seen that document before?
10 A  No, I have not.
11 Q  Did you ever speak to Phil Matthewson about anything
12    involving Krissy and Rachel?
13 A  No.
14 Q  So at no time did you interview him about any allegations
15    that Krissy may have brought to your attention?
16 A  No.  I don't recall.
17 Q  Do you know why Phil Matthewson submitted this statement on
18    9/13/18?
19 A  No, I don't.
20 Q  Did he bring any allegations to your attention regarding Ms.
21    Luca?
22 A  Not that I recall.
23 Q  Do you recall at all listening to a conversation that was
24    recorded between Ms. Garcia and Mr. Matthewson?
25 A  Yes.

Page 69

18 (Pages 66 to 69)



GARCIA v. BEAUMONT HEALTH, ET AL                    DEPOSITION OF ANTOINETTE CARROLL

| | |
|---|---|
| 1 Q   And can you tell me why that conversation was brought to | 1 Q   What made you think that? |
| 2     your attention, to the best of your memory? | 2 A   **Because she wasn't here during the week.** |
| 3 A   **Krissy wanted me to know that Rachel was still talking about** | 3 Q   Okay.  Did that concern you? |
| 4     **it after being told not to.** | 4 A   **Yes.** |
| 5 Q   Okay.  And as a result of that, did you investigate those | 5 Q   Why? |
| 6     allegations? | 6 A   **Because she wasn't there during the week so someone can talk** |
| 7 A   **I went to my director, John Aphram, and told him.** | 7     **to her.** |
| 8 Q   And you -- at that point did you have any further | 8 Q   Okay.  Did you do any follow-up on her calling in FMLA |
| 9     involvement in that investigation? | 9     during the week? |
| 10 A   **Not that I recall.** | 10 A   **You'll have to explain "follow-up."** |
| 11 Q   Did you make a statement about that investigation? | 11 Q   Well, did you do anything other than make this note? |
| 12 A   **I told John.** | 12 A   **I don't understand the question.** |
| 13 Q   But did you write anything down? | 13 Q   Well, it would appear -- and I'm just asking you -- that |
| 14 A   **I don't recall; I don't recall.** | 14     she's using the FMLA leave to keep from seeing a supervisor. |
| 15     **(Witness hands document to counsel)** | 15 A   **Okay.** |
| 16 Q   Okay. | 16 Q   Did that concern you? |
| 17     MS. WARD:  That's for the court reporter.  Sorry. | 17 A   **Yes.** |
| 18     (Plaintiff's Exhibit 11 marked) | 18 Q   What did you do based on your concerns, if anything? |
| 19 Q   Prior to August 8th, 2018, did Ms. Luca ever come to you to | 19 A   **Go to my director and let him know that I can't get in touch** |
| 20     complain about Ms. Garcia's behavior? | 20     **with Rachel Luca.** |
| 21 A   **You said prior to 8/8/18?** | 21 Q   Did you think her use of the FMLA leave was dishonest? |
| 22 Q   Yeah. | 22 A   **I can't say.  HR tells us not to ask a person why they use** |
| 23 A   **No.** | 23     **FMLA, so it's -- I can't ask a person why they're using it.** |
| 24 Q   Okay.  Do you recognize the document I've put in front of | 24 Q   Well, I'm not asking you if you could ask her.  I'm asking |
| 25     you? | 25     you if you felt something, which is that her use of the FMLA |
| Page 70 | Page 72 |

| | |
|---|---|
| 1 A   **Yes.** | 1     was dishonest given that you say she used it during the week |
| 2 Q   What is it? | 2     to keep from seeing the supervisor? |
| 3 A   **It is a note that I jotted down dates and to remember what** | 3 A   **She used FMLA all the time.** |
| 4     **was going on.** | 4 Q   Did you think she was truthful about her FMLA usage? |
| 5 Q   Okay.  And why did you prepare this document? | 5 A   **I can't -- I can't say if she was or not.** |
| 6 A   **Because I was going to make sure I typed it up so I could** | 6 Q   Okay; okay. |
| 7     **understand the chain of the dates that was involved.** | 7     (Plaintiff's Exhibit 12 marked) |
| 8 Q   All right.  I want to draw your attention to the last | 8 Q   Have you had a chance to look over Exhibit 12? |
| 9     sentence on 8/27/18 starting with "Rachel Luca." | 9 A   **Yes.** |
| 10 A   **"Rachel Luca scheduled to work 8/31.  Rachel Luca called in** | 10 Q   In the first paragraph I want you to read the second |
| 11     **FMLA that night, then it was the weekend.  No supervisors on** | 11     sentence -- starting with the second sentence, can you read |
| 12     **the weekend."** | 12     the next two sentences?  It starts with "Yet." |
| 13 Q   Okay.  Why did you make a note about that? | 13 A   **"Yet last night, August 27th, it was brought to** |
| 14 A   **I don't recall.** | 14     **our -- to her attention that Rachel Luca was now going** |
| 15 Q   Were you concerned that Ms. Luca would be working on the | 15     **to staff and accusing Krissy of lying on her to get her** |
| 16     weekend with no supervision? | 16     **in trouble and informing staff she, Rachel Luca, was** |
| 17 A   **No.** | 17     **called into the office."** |
| 18 Q   Okay.  I want you to look at the last sentence and read that | 18 Q   Can you read the next sentence? |
| 19     in the record. | 19 A   **Uh-huh (affirmative).** |
| 20 A   **"Rachel Luca calling in FMLA throughout the week to keep** | 20     **"As well as making statements that Krissy wanted** |
| 21     **from seeing a supervisor, only working weekends with no** | 21     **her and was making sexual advances towards her.  A** |
| 22     **supervisor."** | 22     **conversation was taped between Krissy and one of the** |
| 23 Q   So you thought she was calling in to keep from seeing a | 23     **staff person, Phil Matthewson, regarding a conversation** |
| 24     supervisor? | 24     **shared between Rachel Luca and Phil with Rachel making** |
| 25 A   **Yes.** | 25     **the accusations."** |
| Page 71 | Page 73 |

19 (Pages 70 to 73)



GARCIA v. BEAUMONT HEALTH, ET AL                    DEPOSITION OF ANTOINETTE CARROLL

1  Q   Okay.  Now, at that time, August 27th, 218, you were aware
2      that Krissy had recorded the conversation with Phil;
3      correct?
4  A   Yes.
5  Q   And you said she played a portion of it to you?
6  A   Yes.
7  Q   Okay.  Can you read the next sentence?
8  A   "Phil told Krissy he did not want to be involved, but he
9      felt Krissy needed to know what was going on."
10 Q   Okay.  As a result of that report, did you then interview
11     Phil about what happened?
12 A   No.  I went to my director.
13 Q   Okay.  Let's go down to the third bullet point.
14 A   Uh-huh (affirmative).
15 Q   Can you read that?
16 A       "I explained to Krissy I was sorry this was
17     happening and Rachel was told not to repeat any of the
18     conversation I had with her on the issue.  I explained
19     to Krissy that I would talk to John, our director, to
20     see what our recourse would be when he checked in with
21     HR.  I told Krissy that John and I would probably have
22     a sit-down to discuss the situation.  I felt at this
23     point bringing a director in may stress the importance
24     and seriousness of the matter."
25 Q   Okay.  You can stop there.  Now, you said you felt that

Page 74

1                  MR. PELTON:  Including the parenthetical?
2                  MS. WARD:  I'm looking at the third bullet point
3      down, the last two sentences.
4                  MR. PELTON:  Including the parenthetical as a
5      sentence?  Is that where you want her to start?
6                  MS. WARD:  No.  Right here (indicating).
7  A   At "Krissy"?
8  Q   "Krissy stated."
9  A   "Krissy stated she understood.  Krissy said she didn't want
10     to get Rachel into any trouble or to have her lose her job,
11     but this behavior had to stop."
12 Q   Okay.  Did you believe Krissy when she came to you with this
13     complaint?
14 A   Yes.
15 Q   You found her to be trustworthy?
16 A   Yes.
17 Q   Okay.  Can you read the next -- let's see -- fifth bullet
18     point?  Start with "Spoke to."
19 A       "Spoke to the afternoon supervisor, Jim Burgess,
20     regarding speaking with Rachel on her next scheduled
21     night to work.  Friday, August 31st, Rachel called in
22     FMLA and has herself scheduled during the weekend when
23     the supervisors are off."
24 Q   Stop right there.  I want to ask you a couple of questions.
25 A   Uh-huh (affirmative).

Page 76

1      bringing the director in may "stress the importance."
2      Stress the importance with whom?
3  A   I felt that if John talked to Rachel she will understand
4      that this was a serious matter and why I was going up to HR.
5  Q   Did it concern you at all that she hadn't taken your
6      instructions and implemented them?
7                  MR. PELTON:  Object to the form; lacks foundation.
8  A   Yes.
9  Q   Okay.  Why?
10 A   Because I told her cease and decease (sic).
11 Q   And she didn't do that?
12 A   No, she did not.
13 Q   Did that make you mad?
14 A   No, just upset that she didn't listen and that this was
15     serious.
16 Q   Okay; okay.  Can you read the next sentence -- next --
17     actually, to the end of the paragraph?
18 A       "Told Krissy I would let her know what the next
19     step is.  Krissy stated she may take it to HR herself.
20     I told her we were talking and requesting guidance from
21     HR on how to handle the situation.  Follow-up from HR,
22     called Rachel Luca and interview her regarding
23     Krissy's statements."
24 Q   Okay.  I wanted to go up, third bullet point, the very last
25     two sentences.  Can you read those in the record?

Page 75

1  Q   When you put that in, you assumed she was calling in FMLA to
2      avoid interacting with the supervisors; is that a fair --
3  A   I was just saying that she was calling in.  I don't know if
4      she knew that we wanted to speak to her.
5  Q   Well, okay.  But the parenthetical -- "(when the supervisors
6      are off,)" why did you add that?
7  A   Because she was coming in on the weekends and we weren't
8      there.  We were on call, but not physically there at the
9      hospital.
10 Q   Did that concern you?
11 A   I just thought no one would be able to talk to her.
12 Q   You weren't concerned that she was avoiding you?
13 A   I was concerned that she knew no one would be there to talk
14     to her.
15 Q   She knew it?  Okay.  If she knew it, did it concern you that
16     she was trying to avoid this conversation with you or any
17     supervisor?
18 A   I couldn't tell you how she felt either way.
19 Q   I'm asking if it concerned you?
20 A   I felt that she worked on the weekends because she knew no
21     one was there to talk to her.
22 Q   Okay.  Can you read the last bullet point?
23 A   "Our director, John Aphram, has reached out to Rachel by
24     phone and has left messages to no avail."
25 Q   Okay.  Do you know if they ever did talk to her?

Page 77



GARCIA v. BEAUMONT HEALTH, ET AL          DEPOSITION OF ANTOINETTE CARROLL

| | |
|---|---|
| 1   **A**   I don't know. | 1   **A**   I don't know what this is. This is -- |
| 2   **Q**   Were you in -- part of any conversation with Rachel, | 2   **Q**   Okay. You've never seen it before? |
| 3   subsequent to August 27th, relating to the Garcia | 3   **A**   I've never seen this before. |
| 4   allegations? | 4   **Q**   And you weren't involved in any way in this investigation? |
| 5   **A**   I don't recall. | 5   **A**   Not with this, no. |
| 6   **Q**   I'm going to hand you what's been -- what I think is going | 6   **Q**   Okay. Thanks. |
| 7   to be Exhibit 13? | 7        MR. PELTON: "This"; meaning, the exhibit? |
| 8   **A**   Yes. | 8        THE WITNESS: This exhibit. |
| 9        **(Plaintiff's Exhibit 13 marked)** | 9        MS. WARD: Yes. |
| 10        MR. PELTON: Do you want her to try and read all | 10        THE WITNESS: Yeah. |
| 11   that handwriting? | 11        MS. WARD: Exhibit 13. |
| 12        THE WITNESS: I can't read -- I can't read this. | 12        THE WITNESS: Correct, 13, yeah. |
| 13        MS. WARD: Well, -- | 13        MS. WARD: This might be quicker than I thought. |
| 14        MR. PELTON: Do you want her to read all the | 14        MR. PELTON: All right. |
| 15   handwriting on that or -- | 15        MS. WARD: All right. |
| 16        MS. WARD: -- eventually someone needs to because | 16        (Plaintiff's Exhibit 14 marked) |
| 17   I couldn't read it either. | 17   **Q**   I'm going to hand you -- wait a minute. Let's do it this |
| 18        THE WITNESS: I can't either. | 18   way. Just a second. |
| 19        MR. PELTON: Well, it's difficult. It's not hers, | 19        MR. PELTON: Do you want her to read that |
| 20   so I just -- so I wondered. | 20   whole thing, or just enough to identify it? |
| 21        MS. WARD: No, but let's just let her look at it | 21        MS. WARD: Well, I'm going to ask her some |
| 22   first -- | 22   questions once she's had a chance to read it. I just want |
| 23        MR. PELTON: Other than sitting here. | 23   to give her an opportunity to look it over before I start. |
| 24        MS. WARD: -- and we'll see whether or not -- | 24        (Witness reviews document) |
| 25        MR. PELTON: Okay. | 25   **A**   Okay. |
| <div align="center">Page 78</div> | <div align="center">Page 80</div> |
| 1        MS. WARD: We might have to get a translator for | 1   **Q**   Do you see down at the bottom of the first page, starting |
| 2   the handwriting. | 2   with "Following the conversation with Ms. (sic) Matthewson"? |
| 3        MR. PELTON: -- have a chance to ask Mr. | 3   Can you read that sentence into the record? It's a little |
| 4   Brancaleone about it. | 4   more than halfway down that paragraph. |
| 5   **A**   Yeah, I don't know. I've got glasses and I can't see this. | 5   **A**   **"Following a conversation with Mr. Matthewson, I** |
| 6        **(Witness reviews exhibit)** | 6   **updated Ms. Carroll requesting that Human Resources be** |
| 7   **Q**   Have you had a chance to look that over? | 7   **notified immediately as the situation was escalating.** |
| 8   **A**   I tried. | 8   **I expressed that Ms. Luca was slandering my name in an** |
| 9   **Q**   Exhibit 3 -- 13? | 9   **attempt to ruin my reputation for speaking out against** |
| 10   **A**   Uh-huh; yes. | 10   **her in regards to being sexually harassed. I played** |
| 11   **Q**   First of all, did you have any involvement at all in the "KG | 11   **Ms. Carroll a portion of the audio where Mr. Matthewson** |
| 12   Harassment Investigation"? See it, that's what it's labeled | 12   **confirmed that Ms. Luca gave her unsolicited views and** |
| 13   at the top? | 13   **opinions to him regarding my sexual harassment claim** |
| 14   **A**   If you're talking about this particular form, no, I did not | 14   **and labeled me a liar -- layer."** |
| 15   **have anything to do with this form.** | 15   **Q**   Okay. We'll stop right there for a minute. |
| 16   **Q**   Okay. Did you have any input in any of the questions they | 16        MR. PELTON: Layer? |
| 17   were going to ask? | 17   **Q**   Do you recall that conversation with Ms. Garcia that she |
| 18   **A**   No, I did not. | 18   refers to here where she's talking about the audio of Mr. |
| 19   **Q**   Did anyone come to you and ask you for a statement? | 19   Matthewson? |
| 20   **A**   Not in -- regarding this, no. | 20   **A**   Yes. |
| 21   **Q**   Okay. What did you understand this to be about? As you | 21   **Q**   Okay. Who was in the room for that conversation, if you |
| 22   were -- | 22   recall? |
| 23   **A**   I don't know what this is about. | 23   **A**   Me and Krissy. Are you talking about for telling me this? |
| 24        MR. PELTON: "This," you're referring to the | 24   **Q**   Pardon me? |
| 25   exhibit? Let's -- | 25   **A**   Are you talking about her telling me about this?** |
| <div align="center">Page 79</div> | <div align="center">Page 81</div> |

<div align="right">21 (Pages 78 to 81)</div>



GARCIA v. BEAUMONT HEALTH, ET AL                    DEPOSITION OF ANTOINETTE CARROLL

1    Q    Yes.
2    A    It was just me and Krissy.
3    Q    So John Aphram wasn't in the room at that time?
4    A    He was not there when she played the tape, no.
5    Q    Okay.  Do you see where the next sentence -- can you read
6         that in the record?
7    A         "I was assured by both John of Respiratory Care
8         and Ms. Carroll they would contact Human Resources" --
9         sorry -- "Human Resources that morning, August 27th,
10        and update me.  Two weeks have passed and I have yet to
11        hear anything back from my supervisors or director or
12        Human Resources."
13   Q    Okay.  So you're -- it's your testimony that John was not
14        part of the meeting where she -- she made -- stated that she
15        gave you the -- I'm sorry.  Strike that.  John -- it's your
16        testimony that John Aphram was not part of the meeting where
17        she played the tape.  Was there a subsequent meeting with
18        John and Ms. Garcia and yourself?
19   A    Yes; yes.
20   Q    When did that occur?
21   A    Right after John came in and I told him that she played the
22        tape.  He came in afterwards.
23   Q    Okay; okay.  Who is Ms. -- Mrs. Kaye?
24   A    Where is that at?
25   Q    I'm just asking do you know who Mrs. Kaye is?

                        Page 82

1    A    Oh, Colleen Kaye.
2    Q    Mrs. Colleen Kaye?
3    A    Uh-huh (affirmative).
4    Q    Okay.  What steps did you take after the joint meeting with
5         you, Ms. Garcia, and John Aphram?
6    A    John Aphram went to go call Human Resources.
7    Q    Okay.  Did you ask for Ms. Garcia to prepare the September
8         10, 218 statement?
9    A    The what?
10   Q    I'm saying --
11        MR. PELTON:  The one in your hand.
12        THE WITNESS:  Oh, this one?
13   A    No.
14   Q    Did you ask her to prepare this statement?
15   A    No, I did not.
16   Q    Have you seen it before?
17   A    No, I have not.
18   Q    Did she provide you with a copy, to the best of your memory?
19   A    Not that I recall.
20   Q    Okay.  I want to go to page 2.  Did Ms. Garcia approach
21        you about an incident involving an ICU nurse named Anthony
22        Stout --
23   A    I don't recall that.
24   Q    -- let me finish the question -- and a conversation he had
25        with Ms. Luca?

                        Page 83

1    A    I don't recall that.
2    Q    It might have happened, but you just don't remember?
3    A    I don't recall it.
4    Q    Do you recall hearing a complaint that Ms. Luca was telling
5         people "Krissy and Stacy concocted a story to get me fired"?
6    A    I don't recall that.
7    Q    Okay.  When Ms. Luca came to you to discuss the recording
8         with Mr. Matthewson did she seem upset?
9    A    I didn't talk to Rachel after I heard the recording with
10        Phil Matthewson.
11   Q    You didn't -- you didn't have any subsequent --
12   A    I haven't seen Rachel.  Remember?  I have not gotten in
13        touch -- contact with Rachel.
14   Q    Okay.  All right.  So you didn't have any follow-up
15        conversation with Ms. Luca after the incident that's alleged
16        to have occurred on or about August 27th, 218?
17   A    No; no.
18   Q    Okay.  Did you have any -- let me strike that.  When Ms.
19        Garcia came in to talk to you and played the tape --
20   A    Yes; uh-huh.
21   Q    -- did you have a chance to see what her demeanor was like?
22   A    Krissy's?
23   Q    Yes.
24   A    She was upset.
25   Q    Okay.  Was she angry?

                        Page 84

1    A    That's subjective.  I don't know what's angry for Krissy.  I
2         assumed she was upset; just upset.
3    Q    Okay.  How did -- how did you know she was upset?  Did she
4         have --
5    A    Because she said -- because she said it hadn't stopped and
6         she talked about how her reputation was at stake.
7    Q    Were you concerned about that?
8    A    Yes.
9    Q    Okay.
10        MS. WARD:  I'm just going to have you mark --
11        these are two separate pages, but I just -- will you mark
12        that?  I think we're up to Exhibit 15.
13        (Plaintiff's Exhibit 15 marked)
14        MS. WARD:  I've got a copy here for you, Mr.
15        Pelton.  Here you go.
16        (Counsel hands document to counsel)
17        MR. PELTON:  Do you want to staple this?
18        MS. WARD:  Well, they're different statements.
19        You can do whatever you think is --
20        MR. PELTON:  Well, if you're marking it as one
21        exhibit, then maybe you ought to staple it so it doesn't
22        get --
23        MS. WARD:  Okay.
24        MR. PELTON:  It's Bate labeled 367 and 368?
25        MS. WARD:  Uh-huh (affirmative).

                        Page 85

                                    22 (Pages 82 to 85)



GARCIA v. BEAUMONT HEALTH, ET AL                    DEPOSITION OF ANTOINETTE CARROLL

| | |
|---|---|
| 1 | MR. PELTON: Okay. |
| 2 | MS. WARD: Can you pass that over? |
| 3 | MR. PELTON: Sure. |
| 4 | MS. WARD: It's probably a good idea. Thank you. |
| 5 | **A** **I need a translator. I can't --** |
| 6 | Q Well, let me ask you this question: Do you recognize these |
| 7 | notes? |
| 8 | **A** **No, I do not.** |
| 9 | Q Is this your handwriting? |
| 10 | **A** **No, it's not.** |
| 11 | Q Okay. Same thing with the one that says "Jean Aphram" -- |
| 12 | "John Aphram"? |
| 13 | **A** **No.** |
| 14 | Q Not your handwriting? |
| 15 | **A** **No.** |
| 16 | Q And you don't recognize them? |
| 17 | **A** **No.** |
| 18 | Q Never seen it before? |
| 19 | **A** **Never seen it before.** |
| 20 | Q Okay. This should be the last -- |
| 21 | MS. WARD: Mark that. |
| 22 | (Plaintiff's Exhibit 16 marked) |
| 23 | MR. PELTON: Thank you. |
| 24 | Q Okay. This document purports to be some notes taken, and |
| 25 | the top of it is "Net Carroll, RSP, 9/25/18." Can you tell |

Page 86

| | |
|---|---|
| 1 | me, did you have a meeting on 9/25/18 with regard to the |
| 2 | complaint that Ms. Garcia made about retaliation by Ms. |
| 3 | Luca? |
| 4 | **A** **I can't for -- say for sure what this is, but I think this** |
| 5 | **is when I talked to HR.** |
| 6 | Q Can you tell me, do you recognize this handwriting? |
| 7 | **A** **No, I do not.** |
| 8 | Q Did you take these notes? |
| 9 | **A** **No, I did not.** |
| 10 | Q Did you tell HR that Ms. Garcia was a bisexual during that |
| 11 | meeting, if you recall? |
| 12 | **A** **I do not recall.** |
| 13 | Q Okay. Do you recall discussing with HR the conversation |
| 14 | that Rachel Luca had with Phil Matthewson? |
| 15 | **A** **I don't recall. I can't read this. I don't recall.** |
| 16 | Q Okay. I want to go down -- one, two, three, four, five -- |
| 17 | ninth dash-line down. |
| 18 | **A** **One, two, three, four, five, six, seven, eight, nine. Oh,** |
| 19 | **my goodness. I don't even know what that is.** |
| 20 | Q It starts "Confirmed Net told Jean." |
| 21 | **A** **Okay.** |
| 22 | Q Can you read that in the record? |
| 23 | **A** **"Confirmed Net told Jean about the inappropriate touching."** |
| 24 | Q Okay. Do you remember discussing that with HR on or about |
| 25 | 9/25/18 -- 218? Actually, it's 2018. |

Page 87

| | |
|---|---|
| 1 | **A** I -- I can't say for sure. But if HR called and asked me |
| 2 | what happened, I'm pretty sure that I had to tell them what |
| 3 | happened. |
| 4 | Q Okay. Can you turn the page? And there's some notes. Not |
| 5 | the first paragraph, but the second paragraph. Can you read |
| 6 | that at all? |
| 7 | **A** **No, I cannot. I just see "FMLA."** |
| 8 | Q Okay. How about the next sentence? It says, "Net said." |
| 9 | Can you read that? |
| 10 | THE WITNESS: You know what, can I take a potty |
| 11 | break? I have to go to the bathroom, please. |
| 12 | MS. WARD: Sure. We've got to change the tape |
| 13 | anyways. |
| 14 | VIDEO OPERATOR: We are going off the record at |
| 15 | 11:20. |
| 16 | (Off the record) |
| 17 | VIDEO OPERATOR: We are going back on the record |
| 18 | at 11:28. |
| 19 | (Plaintiff's Exhibit 17 marked) |
| 20 | MS. WARD: Exhibit, I believe, 17? |
| 21 | MR. PELTON: I think it's 18. |
| 22 | MS. WARD: It might be. |
| 23 | MR. PELTON: Do you have 18, Madam Court Reporter? |
| 24 | REPORTER: 17. |
| 25 | MR. PELTON: It's 17? |

Page 88

| | |
|---|---|
| 1 | REPORTER: Uh-huh (affirmative). |
| 2 | Q Have you had a chance to look over the Exhibit 17? |
| 3 | **A** **Yes.** |
| 4 | Q Can we go to the third page? It appears that the third page |
| 5 | and the second page are basically the same thing? |
| 6 | **A** **Yes.** |
| 7 | Q Looking at the third page, do you see that it was addressed |
| 8 | to you? |
| 9 | **A** **Yes.** |
| 10 | Q Okay. Do you recall getting this? |
| 11 | **A** **Yes.** |
| 12 | Q And can you read the first sentence after "Subject: |
| 13 | Scheduling"? |
| 14 | MR. PELTON: Are you on the bottom e-mail? |
| 15 | MS. WARD: Yeah. |
| 16 | MR. PELTON: Okay. |
| 17 | **A** **You said the bottom one?** |
| 18 | Q Uh-huh (affirmative). |
| 19 | **A** **"I am writing to request I please not be assigned** |
| 20 | **as charge therapist on nights that Ms. Rachel -- Rachel** |
| 21 | **Luca is scheduled. I would also like to request that I** |
| 22 | **please not be partnered in an assignment with Ms.** |
| 23 | **Rachel Luca. I would be very uncomfortable in either** |
| 24 | **situation. I believe this is the best interest of** |
| 25 | **everybody to hopefully avoid any further issues. Thank** |

Page 89

23 (Pages 86 to 89)



GARCIA v. BEAUMONT HEALTH, ET AL                    DEPOSITION OF ANTOINETTE CARROLL

| | |
|---|---|
| 1 | you for your understanding, Kristina Garcia." |
| 2 | Q   Okay.  And then above that it looks like an e-mail from you |
| 3 | to John Aphram? |
| 4 | A   No, from John to me. |
| 5 | Q   From John to you?  Okay.  And there's a question in there. |
| 6 | Can you -- |
| 7 | A   "Do they work the same weekend?" |
| 8 | Q   And then your response? |
| 9 | A   "Yes." |
| 10 | Q   Okay.  This was when -- and the first page is -- this is |
| 11 | when Ms. Garcia came back from her FMLA leave, as I |
| 12 | understand it; yes? |
| 13 | A   I -- |
| 14 | Q   If you look at the first page? |
| 15 | A   Yes.  That's what she -- it says. |
| 16 | Q   Okay.  And can you tell me, what steps did you take to honor |
| 17 | her request not to be assigned a charge therapist on nights |
| 18 | that Ms. Luca worked? |
| 19 | A   I am not the night shift supervisor, so I have nothing to do |
| 20 | with the schedule.  But I do know Krissy and Rachel both |
| 21 | were asked about changing weekends.  Kristy works every |
| 22 | weekend, so there is no way for her not to be on a weekend. |
| 23 | Q   Yes.  With Ms. Luca, you mean? |
| 24 | A   With Ms. Luca, yes. |
| 25 | Q   Okay.  So did you take any steps to sit down with Ms. Garcia |

Page 90

| | |
|---|---|
| 1 | and talk to her about ways to not do the charge therapist |
| 2 | part of her job? |
| 3 | A   I am not the midnight supervisor.  The midnight and |
| 4 | afternoon supervisor does the charge schedule. |
| 5 | Q   Okay. |
| 6 | A   I do not do the schedule. |
| 7 | Q   So you had no involvement in whether she -- I realize she |
| 8 | worked weekends. |
| 9 | A   Right. |
| 10 | Q   I was just referring to whether -- |
| 11 | A   No; no. |
| 12 | Q   -- or not she worked weekends as a charge therapist? |
| 13 | A   I -- the appropriate supervisors were e-mailed on this.  I |
| 14 | am not the supervisor that makes that schedule. |
| 15 | Q   Okay.  Do you know what a charge therapist is? |
| 16 | A   Yes. |
| 17 | Q   What is a charge therapist? |
| 18 | A   A charge therapist is like a lead therapist.  They are there |
| 19 | in charge and they can be there in charge when there's a |
| 20 | supervisor there or not. |
| 21 | Q   What do they do? |
| 22 | A   They make sure the shifts run smoothly, they delegate, and |
| 23 | they help out. |
| 24 | Q   Okay.  Do you have any knowledge of whether or not Ms. |
| 25 | Garcia worked with Ms. Luca anytime between her return to |

Page 91

| | |
|---|---|
| 1 | work on October 5th until Luca's last day, November -- |
| 2 | A   I -- |
| 3 | Q   -- just a second -- November 30th, 2018? |
| 4 | A   -- I don't know. |
| 5 | Q   You have no knowledge? |
| 6 | A   No knowledge. |
| 7 | Q   Okay.  Did you discuss whether or not Ms. Luca will be |
| 8 | scheduled as a charge therapist?  Did you discuss that |
| 9 | verbally with anyone? |
| 10 | A   Say that -- repeat that. |
| 11 | Q   Did you discuss Ms. Luca being scheduled as a charge |
| 12 | therapist verbally with anyone after she returned to work |
| 13 | October 5th, 2018? |
| 14 | A   You said "Ms. Luca." |
| 15 | Q   I'm sorry. |
| 16 | A   She wasn't a charge therapist. |
| 17 | Q   Strike -- strike that.  My mistake.  Did you discuss Ms. |
| 18 | Garcia being a charge therapist with anyone verbally after |
| 19 | she returned from FMLA leave October 5th, 2018? |
| 20 | A   No. |
| 21 | Q   Did anyone come to you with concerns about whether she |
| 22 | would -- Ms. Garcia would be scheduled as a charge therapist |
| 23 | after October 5th, 2018? |
| 24 | A   When you say no one came to me to talk about it, I had |
| 25 | nothing to do with it.  That's what I'm saying. |

Page 92

| | |
|---|---|
| 1 | Q   Okay.  I'm just asking. |
| 2 | A   Yeah. |
| 3 | Q   Did you have any involvement in the conversation with Ms. |
| 4 | Garcia concerning the follow-up to your investigation |
| 5 | regarding -- or to the investigation regarding the |
| 6 | retaliation or alleged retaliation by Ms. Luca? |
| 7 | A   Repeat that, please. |
| 8 | Q   Did you have any involvement in the follow-up conversation |
| 9 | with Ms. Garcia regarding the investigation into the alleged |
| 10 | retaliation by Ms. Luca? |
| 11 | A   At this point it wasn't in my hands, I don't think. |
| 12 |       MS. WARD:  Can you mark this Exhibit 18? |
| 13 |       (Plaintiff's Exhibit 18 marked) |
| 14 |       REPORTER:  Did you want to staple it? |
| 15 |       MS. WARD:  It's just one page.  Sorry.  If you |
| 16 | could give one to Counsel. |
| 17 |       THE WITNESS:  A copy. |
| 18 |       (Witness hands document to counsel) |
| 19 | Q   Have you had a chance to look at it? |
| 20 | A   Yes. |
| 21 | Q   Were you present at the 7:10 a.m. meeting between Jean |
| 22 | Aphram and Ms. Garcia? |
| 23 | A   I don't recall. |
| 24 | Q   You might have been? |
| 25 | A   I don't recall. |

Page 93

24 (Pages 90 to 93)



GARCIA v. BEAUMONT HEALTH, ET AL                    DEPOSITION OF ANTOINETTE CARROLL

| | |
|---|---|
| 1   Q   Do you remember discussing any follow-up with her at all, at<br>2     any time after the allegations of retaliation by Ms. -- on<br>3     the part of Ms. Luca?<br>4   **A   I don't recall.**<br>5   Q   Okay. Do you recall seeing this document before?<br>6   **A   No, I've never seen this before.**<br>7   Q   Okay. Thank you.<br>8        MS. WARD: This is 19. For the reporter, for you,<br>9   and for you.<br>10       (Plaintiff's Exhibit 19 marked)<br>11       MR. PELTON: Do you have another copy?<br>12      MS. WARD: I just have the one I gave you.<br>13      MR. PELTON: You haven't given me one.<br>14      MS. GARCIA: I have one.<br>15      MS. WARD: Oh, two. Okay. There you go. Sorry.<br>16   It wasn't intentional.<br>17      MR. PELTON: Okay. I'm sure.<br>18   Q   This purports to be a memo from Serratos Angelita to Kevin<br>19     Brancaleone dated October 7th, 2018. Can I ask you, did<br>20     you -- have you ever seen this document before?<br>21   **A   No, I have not.**<br>22   Q   Were you involved at all in Mr. Brancaleone obtaining a<br>23     statement from Ms. Serratos?<br>24   **A   No, I was not.**<br>25   Q   Do you have any knowledge -- personal knowledge of what's at<br><br>Page 94 | 1   **A   No.**<br>2   Q   -- where you were learned of that information?<br>3   **A   No, I don't recall.**<br>4       MS. WARD: Let me just take a minute.<br>5       MR. PELTON: Sure.<br>6       MS. WARD: I may be coming to the end of this. Do<br>7   you have a lot of follow-up?<br>8       MR. PELTON: I do not.<br>9       MS. WARD: Okay. Can we take a five-minute break?<br>10   Can you step out?<br>11      VIDEO OPERATOR: We are going off the record at<br>12   11:40.<br>13       (Off the record)<br>14      VIDEO OPERATOR: We are going back on the record<br>15   at 11:46.<br>16      MS. WARD: Okay. All set? I'm done with my<br>17   questions at this time.<br>18      MR. PELTON: Okay. We have no questions. Thank<br>19   you.<br>20       MS. WARD: Okay. We're done.<br>21      VIDEO OPERATOR: This concludes the video<br>22   deposition of Antoinette Carroll consisting of two disks.<br>23   We are going off the record at 11:47.<br>24       (Deposition concluded at 11:47 a.m.)<br>25        -0-0-0-<br><br>Page 96 |
| 1   issue in this memo?<br>2   **A   No.**<br>3   Q   Okay. Were you present when Ms. Luca was disciplined by<br>4     John Aphram, Allen Frankhouse, and James Burgess?<br>5   **A   No.**<br>6   Q   Were you consulted at all prior to their meeting with Ms.<br>7     Luca to give her performance improvement plan?<br>8   **A   No.**<br>9   Q   Did you submit any written materials prior to their meeting<br>10    to give Ms. Luca a performance improvement plan?<br>11   **A   No.**<br>12   Q   Have you seen a copy of Ms. Luca's performance improvement<br>13    plan?<br>14   **A   No.**<br>15   Q   You've never seen it?<br>16   **A   I don't recall seeing it, no.**<br>17   Q   Did anyone contact you to let you know that she had received<br>18    a performance improvement plan?<br>19   **A   When you say "contact," I probably heard that she received**<br>20    **something, but I don't know what.**<br>21   Q   Do you know how you heard?<br>22   **A   It could have been a supervisor telling me.**<br>23   Q   Do you know what supervisor?<br>24   **A   No, I do not recall who.**<br>25   Q   Do you remember anything about that interaction at all --<br><br>Page 95 | |



**Survey Instructions**

- **Survey window will be open between 2/6/2018 and 2/19/2018.**
- **After 2/19/2018, you won't be able to modify the survey data.**
- **If you experience any issues or see an error in the prepopulated data please contact your local HR office.**

| Employee ID | 241906 | Employee Name | Garcia,Kristina J |
|---|---|---|---|
| Job Code | 101040 | Current Job Title | Respiratory Therapist Reg |
| Status | Active | Department | Respiratory Care Therapy |
| Standard Hours | 36.00 | Supervisor | Burgess,James M |
| FTE | 0.900000 | Supervisor ID | 223842 |

Date in Current Position   05/31/2011

If the start date of your current position is not accurate, please enter the correct date in the text box below "Date in Current Position Other"

Date in Current Position Other

Highest Education   H-Some Graduate School
Level

Completion Date 05/17/2019

If you do not find your certification/license in the available list please select "OTHER" and type your information in the text box to the right.

▼ Add License/Certification                     Find | View All | 🖾   First  ‹  1-5 of 10  ›  Last

| | License/Certification ID | License Id Description | License Issue Date | Expiration Date | Licensure Type |
|---|---|---|---|---|---|
| 1 | ACLS | CERT: Adv Cardiac Life Support | 06/03/2016 | 06/31/2018 | LIC |
| 2 | BLS | CERT: Basic Life Support | 08/08/2016 | 08/31/2018 | LIC |
| 3 | NRP | CERT: Neonatal Resuscitation | 10/26/2016 | 10/31/2018 | LIC |
| 4 | OTHER | Adult Critical Care Specialist | 11/10/2016 | 11/30/2021 | OTH |
| 5 | OTHER | Asthma Educator Certified | 05/26/2015 | 05/26/2022 | OTH |

▼ Work History                          Find | View All | 🖾   Work History  ‹  1-4 of 4  ›  Last

| | Employer Name | Job Title | Employed From | Employed Till | Job Status |
|---|---|---|---|---|---|
| 1 | Crudem Foundation | Volunteer Registered Respiratory Therapist | 03/12/2017 | 03/19/2017 | |
| 2 | Pioneer Specialty Hospital | Registered Respiratory Therapist | 05/01/2016 | 07/20/2017 | Contingent |
| 3 | Plunkett Cooney P.C. | Expert Witness in Respiratory Care | 07/20/2018 | | Contingent |
| 4 | The Lakeland Center | Registered Respiratory Therapist | 11/01/2018 | | Contingent |

By selecting acknowledge and submitting this document, I verify the information provided is an accurate reflection of my experience, education as well as licensure/certification, to the best of my ability.

✓ Acknowledge

Last Submission Date  02/17/2018  9:01:50PM

Submit


PLAINTIFF'S
EXHIBIT
Carroll
PENGAD 800-631-6989



**Beaumont**
HEALTH

| Title:<br>**Harassment Policy** | *Applicable to:<br>**Beaumont Health** | Effective Date:<br>**08/06/2018** |
|---|---|---|
| | | Last Periodic Review Date:<br>**08/06/2018** |
| Policy Owner:<br>**SVP and Chief HR Officer** | Document Type:<br>**Policy** | Functional Area:<br>**Human Resources** |

---

**\*For This Document, Beaumont Health Includes:**

Beaumont Corporate Shared Services
Beaumont Hospital, Dearborn
Beaumont Hospital, Farmington Hills
Beaumont Hospital, Grosse Pointe
Beaumont Hospital, Royal Oak
Beaumont Hospital, Taylor
Beaumont Hospital, Trenton
Beaumont Hospital, Troy
Beaumont Hospital, Wayne
Beaumont Medical Group
Beaumont Pharmacy Solutions
Post Acute Care

---

I. **PURPOSE AND OBJECTIVE:**

To affirm Beaumont Health's commitment to creating and maintaining an environment free from harassment.

II. **POLICY STATEMENT:**

Beaumont Health is committed to becoming a workplace of choice and a national leader for patient and family-centered care. We will achieve this by living our core values of compassion, respect, integrity, teamwork and excellence, and maintaining a work environment that is free from harassment. To uphold this commitment, Beaumont Health will not tolerate harassment, in any form, to anyone or by anyone including any employee, physician, volunteer, contractor, student, vendor, visitor, or patient.

III. **SCOPE:**

This policy applies to all Beaumont Health locations and workforce. Workforce includes, but not limited to, employees, students, residents, fellows, volunteers, active medical staff (physicians and non-physician providers) contract individuals, subcontractors, agents, vendors (excluding those whose sole connection with Beaumont is selling or otherwise providing medical supplies or equipment).

IV. **DEFINITIONS:**

   A. <u>HARASSMENT</u>

     Harassment is unwelcome verbal, physical or visual conduct that is based on a person's protected characteristic. A protected characteristic means a person's sex,

PLAINTIFF'S
EXHIBIT
2
Carmel  2-21-20

---

*Disclaimer:  User must ensure that any printed copies of this policy/procedure are current by checking the online version of the policy/procedure before use.*

Page 1 of 4



**Beaumont**
HEALTH

| Title:<br>**Harassment Policy** | *Applicable to:<br>**Beaumont Health** | Effective Date:<br>**08/06/2018** |
| | | Last Periodic Review Date:<br>**08/06/2018** |
| Policy Owner:<br>**SVP and Chief HR Officer** | Document Type:<br>**Policy** | Functional Area:<br>**Human Resources** |

color, race, ancestry, religion, national origin, age, physical or mental disability, medical condition, height, weight, marital status, military or veteran status, citizenship, sexual orientation, gender or any other characteristic protected under applicable federal, state, or local law. Prohibited harassment is conduct that may affect any term, conditions or benefit of employment; interfere unreasonably with an individual's work performance; or create an intimidating, hostile, or offensive working environment.

B. SEXUAL HARASSMENT
Sexual harassment means any harassment based on someone's sex or gender. It includes harassment that is not sexual in nature (for example, offensive remarks about an individual's sex or gender) as well as unwelcome sexual advances, requests for sexual favors, and other physical, verbal or visual conduct of a sexual nature when:

- submission to such conduct is made a term or condition of employment;
- submission to or rejection of the advance, request or conduct is used as a basis for employment decisions;
- such advances, requests or conduct have the purpose or effect of substantially or unreasonably interfering with an employee's work performance by creating an intimidating, hostile or offensive work environment.

Sexual harassment may include conduct that is:
- verbal (epithets, derogatory statements, slurs, sexually-related or gender-related comments or jokes, unwelcome sexual advances or requesting sexual favors);
- physical (assault or inappropriate physical contact such as pinching, touching, brushing up against, or impeding movement);
- visual (displaying sexually suggestive pictures, posters, cartoons, drawings or other items, leering or making sexual gestures, social media postings or communications that are derogatory or sexually suggestive).

C. OTHER TYPES OF HARASSMENT
Beaumont Health's Harassment policy applies to inappropriate and unwelcoming conduct based on race, color, ancestry, religion, national origin, age, physical or mental disability, medical condition, height, weight, marital status, military or veteran status, citizenship, sexual orientation, or any other characteristic protected under applicable federal, state, or local law. Such harassment may include conduct that is:

- verbal (epithets, derogatory statements, slurs, derogatory comments or jokes);
- physical (assault or inappropriate physical contact);

*Disclaimer: User must ensure that any printed copies of this policy/procedure are current by checking the online version of the policy/procedure before use.*

Page 2 of 4



| Title: | *Applicable to: | Effective Date: |
|---|---|---|
| **Harassment Policy** | **Beaumont Health** | **08/06/2018** |
| | | Last Periodic Review Date: |
| | | **08/06/2018** |
| Policy Owner: | Document Type: | Functional Area: |
| **SVP and Chief HR Officer** | **Policy** | **Human Resources** |

- visual (displaying derogatory signs, posters, cartoons, drawings or derogatory social medial posts or communications or making derogatory gestures).

The examples set forth in this section IV are illustrative only, and not exhaustive. Harassment is prohibited both in the workplace and at employer-sponsored events.

**V.     STANDARDS**

Beaumont Health employees are strictly prohibited from engaging in any form of harassing conduct with any employee, physician, volunteer, student, vendor, contractor, visitor, or patient with whom they come in contact during the course of or as a result of their employment. Similarly, Beaumont Health will not tolerate harassment of Beaumont employees by non-employees such as patients, visitors, affiliated physicians, contractors or vendors.

Beaumont Health prohibits any form of discipline, reprisal, intimidation or retaliation for good faith reporting of incidents of harassment, pursuing any harassment claim or cooperating in related investigations. Further, it is a violation of this policy for a supervisor or manager to require cooperation with or submission to any form of harassment or to retaliate against any person for refusing to do so.

**VI.    REPORTING HARASSMENT:**

All employees are responsible for maintaining an environment free from harassment, and are expected to report incidents of harassment or retaliation to their supervisor or manager, executive leader, or by contacting their local Human Resources Department or the Beaumont Health Trust Line at 1-800-805-2283.

**VII.   PROCESS:**

All complaints of harassment and retaliation will be investigated promptly, thoroughly and fairly. Precautions will be taken to ensure the safety of those involved in the investigation. Investigators will maintain confidentiality throughout the investigation process to the extent it is possible to do so.

Once a complaint is received, an investigation will be conducted by the Compliance, Audit, Accreditation and Risk (CAR) Department and/or Human Resources. To ensure a thorough and fair investigation, the investigators may conduct interviews with the complainant(s), subject(s) of the complaint, and any witnesses to the incident; review related documents, including witness statements, company e-mails and other internal communications; and secure other company assets, such as computers and surveillance videos.

---

*Disclaimer:  User must ensure that any printed copies of this policy/procedure are current by checking the online version of the policy/procedure before use.*

# Beaumont
## HEALTH

| Title: **Harassment Policy** | Applicable to: **Beaumont Health** | Effective Date: **08/06/2018** |
| --- | --- | --- |
| | | Last Periodic Review Date: **08/06/2018** |
| Policy Owner: **SVP and Chief HR Officer** | Document Type: **Policy** | Functional Area: **Human Resources** |

Any instances found to be substantiated will be addressed directly with corrective action, up to and including termination.

The CAR Department and/or Human Resources will notify the complainant(s) once the investigation is complete that the investigation has been completed.

VIII. **REFERENCES (if applicable):**
Beaumont Health Non Retaliation Policy

IX. **REVIEW AND REISSUE DATE:**
To be determined

X. **DISCRETION TO MODIFY POLICY:**
SVP and Chief Human Resources Officer

XI. **ATTACHMENTS:**
None

## CORPORATE AUTHORITY:

Beaumont Health ("BH") as the corporate parent to William Beaumont Hospital, Botsford General Hospital, and Oakwood Healthcare Inc., ("Subsidiary Hospitals") establishes the standards for all policies related to the clinical, administrative and financial operations of the Subsidiary Hospitals. The Subsidiary Hospitals, which hold all health facility and agency licenses according to Michigan law, are the covered entities and the providers of health care services under the corporate direction of BH. The Subsidiary Hospitals' workforces are collectively designated as BH workforce throughout BH policies.

*Disclaimer: User must ensure that any printed copies of this policy/procedure are current by checking the online version of the policy/procedure before use.*

Page 4 of 4

**Beaumont** | HEALTH SYSTEM

| Subject<br>**Sexual Harassment** | | | No.<br>**286** | Page<br>**1 of 3** |
|---|---|---|---|---|
| Prepared By<br>**Corporate Human Resources** | | Prior Issue Date<br>**08/01/12** | Issue Date<br>**09/01/16** | |

**GENERAL**

It is the intent of Beaumont Health System to create and maintain a safe and productive environment in which employees can effectively perform their work. As such, Beaumont Health System reaffirms its long-standing policy that sexual harassment of its employees is prohibited.

All employees, including supervisors and managers, will be subject to discipline, up to and including discharge for any act of sexual harassment, which, in the judgment of the Hospital, they have committed.

**DEFINITION**

Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when:

- Submission to the conduct is made either an explicit or implicit condition of employment;

- Submission to or rejection of the conduct is used as the basis for an employment decision affecting the harassed employee;

- The harassment substantially interferes with an employee's work performance or creates an intimidating, hostile, or offensive work environment.

Examples of sexual harassment includes, but are not limited to the following:

- Repeated or unwarranted sexual advances.

- Unconsented touching.

- Sexually derogatory statements about an employee.

- Direct or indirect requests for sexual favors.

- Unwelcome circulation of sexually explicit pictures, cartoons, or reading material.

- Sexually explicit remarks, which cause the recipient, discomfort, humiliation or otherwise interfere with the recipient's ability to perform their job responsibilities in a safe environment.

Personal or social conduct between employee's which is of a consensual nature, and which does not have a discriminatory effect upon an employee's employment, will not be considered as sexual harassment.

**HUMAN RESOURCES, CORPORATE**

Disclaimer: User must ensure that any printed copies of this policy/procedure are current by checking the policy and procedure web page before use.

Beaumont/Garcia 000464



Beaumont® | HEALTH SYSTEM

| Subject | | | No. | Page |
|---|---|---|---|---|
| **Sexual Harassment** | | | **286** | **2 of 3** |
| Prepared By | | Prior Issue Date | Issue Date | |
| **Corporate Human Resources** | | 08/01/12 | 09/01/16 | |

**PROHIBITION OF SEXUAL HARASSMENT**

It shall be a violation of Beaumont Hospital's policy prohibiting sexual harassment for any employee, male or female, managerial, supervisory or hourly, to in any way harass another employee by making unwelcome sexual advances, by either directly or indirectly requesting sexual favors, or by engaging in any other conduct of a sexual nature which constitutes or affects the terms or conditions of any employee's employment with the Hospital. It is also a violation for any employee to require or request, directly or indirectly, that any employee submit to such conduct as a basis for, or as a factor in, any employment decisions affecting such employee. This policy also forbids any employee from engaging in any conduct, which has the effect of either directly, or indirectly creating or contributing to an intimidating, hostile, or offensive working environment because of such conduct.

The Hospital will neither condone nor knowingly fail to take appropriate steps to prohibit the sexual harassment of any of its employees. <u>All</u> employees, including supervisors and managers, will be subject to discipline up to and including discharge, for any act of sexual harassment, which in the judgment of Hospital, they are found to have committed. (Refer to Program for Performance Management No. 282).

**INVESTIGATION PROCESS**

Any employee who believes that he or she is being subjected to sexual harassment in violation of this policy should report the alleged harassment to one of the following individuals:

▪ Employee's immediate supervisor

▪ Employee's department manager/director

▪ Director of Human Resources or his/her designee

In so doing, the employee should clearly state that he or she believes that he or she is the victim of sexual harassment and that the employee is reporting the same pursuant to this policy.

While such complaints or requests for investigation may initially be made either orally or in writing, the Hospital reserves the right to require any employee asserting a violation of this policy to file any complaint or request for investigation in writing. Such written complaint or request for investigation shall specify the nature of the conduct which is alleged to have violated this policy, the individual or individuals who are alleged to have engaged in said conduct, the dates, times, and places of said conduct, as well as any other information which the Hospital deems necessary for it's investigation.

**HUMAN RESOURCES, CORPORATE**

Disclaimer: User must ensure that any printed copies of this policy/procedure are current by checking the policy and procedure web page before use.

Beaumont/Garcia 000465

**Beaumont** | HEALTH SYSTEM

| Subject **Sexual Harassment** | | No. **286** | Page **3 of 3** |
|---|---|---|---|
| Prepared By **Corporate Human Resources** | Prior Issue Date **08/01/12** | Issue Date **09/01/16** | |

**INVESTIGATION PROCESS (Cont'd)**

Upon receiving a complaint of sexual harassment or a request for investigation of the same, the Hospital will investigate the matter. In doing so, it may require that all employees who possess knowledge of the alleged incident or of similar incidents to cooperate in its investigation by fully and accurately responding to its inquiries in this regard. The failure of any employee, including a complaining employee, to satisfactorily cooperate in such an investigation will be deemed sufficient grounds for discipline, up to and including discharge.

NOT WITHSTANDING THE FOREGOING, NO EMPLOYEE WILL BE SUBJECT TO ANY FORM OF RETALIATION OR DISCIPLINARY ACTION FOR MAKING OR PURSUING A COMPLAINT OF SEXUAL HARASSMENT OR A REQUEST FOR INVESTIGATION OF AN ALLEGED INCIDENT OF SEXUAL HARASSMENT, WHICH COMPLAINT OR REQUEST IS MADE IN GOOD FAITH.

**APPEAL**

Should any complaining employee, after the investigation of any complaint of sexual harassment, disagree with the action of the Hospital in the matter, said complaining employee may have such action reviewed under the Hospital's grievance procedure. (Refer to Employee Grievance Policy No. 284).

**CONFIDENTIALITY**

The Hospital will keep such complaints of sexual harassment confidential to the extent that it is possible and still conduct an investigation.

**INQUIRIES**

Any questions pertaining to this policy should be directed to Human Resources.

**DETAILED PROCEDURES**

None.

HUMAN RESOURCES, CORPORATE

Disclaimer: User must ensure that any printed copies of this policy/procedure are current by checking the policy and procedure web page before use.

Beaumont/Garcia 000466

To Whom It May Concern,

On the night of Sunday, July 28th I was sitting on break with two of my coworkers, Colleen Kay and Rachel Luca. I had forgotten my work coat that night and made the comment that I was so cold you could see me (meaning my nipples) through my bra. I was embarrassed about it (going into patient rooms like that) and mentioned I had a really good, insulted bra on so I was surprised. Colleen and Rachel both asked what kind of bra I had and stated they were in love with their new bra's and asked if I had "one of these"… they both pulled their bra's shoulder strap slightly out of their shirt to show me and were talking about the type/brand of bra that it was and how they both just got them and were in love with them. I said "No, I have a regular bra but a good one" and I pulled on my strap just as they did, to show it was regular. While I did that Rachel had got up and came next to me, I didn't even notice she had moved from her chair when suddenly her hand was down my shirt, inside my bra cup and she pinched my nipple (bare skin) and pulled up on my (left) breast, removing it from the bra cup. Stunned, I stated "Now that was too f****** far!". She immediately said, "oh I'm sorry I didn't mean to offend you". I responded asking "What are you doing?! Why would you do that?!" She said "I just wanted to see your bra", I said something along the lines of that wasn't my bra that was my nipple and again asked why she would do that. She stated "Well you have nice nipples" and giggled. It had all happened so quickly and I was so shocked I really didn't know what else to do at that point. I was so upset I knew I needed to stop and diffuse (myself and my emotions) because nothing good was going to come of it. I don't know if Colleen or Rachel had changed the subject at that point, it was a bit of a blur because I was so enraged I was focused on handling myself appropriately. I managed to let things go at that time because as I stated, any escalation of conversation wouldn't have served any constructive purpose at that time.

I have had situations with Rachel in the past where she had continuously made comments about me "wanting her" and her both asking me and telling me that she "knew" that "I found her attractive". It have never said I found her attractive and never responded to her questioning if I found her attractive because I brushed it off as her being silly. It had become so repetitive however, that a few months back (maybe 6-7 months ago) that I wanted to clear the air and had said to Rachel, "You know I'm not interested in you right?". I said this because I wanted to clear



the air in case she really believed that I was interested in her. She had responded "I'm not interested in you either" and stormed away appearing either upset or insulted. After that I acted normal toward her and she did the same. This incident however, was so upsetting and crossed the line that I felt I had to say something to our supervisor. I wanted this documented and I expressed to Net that I was not comfortable being alone with her so we would not be paired together in an ICU where we could possibly be alone in our supply room where we do a lot of our charting.

If there are any further questions, please feel free to contact me.

Kristina Garcia

8/6/18

- Monday, 8/6/18, Kryssie Garcia came into the office to discuss a personal issue that happened a week or two ago. Kryssie 's account of what happened is attached in a form letter (I asked her to type up). Kryssie states she doesn't want anyone to lose their job, but she wants this taken care of. I told Kryssie I will talk to all individuals involved and follow up with Jean Aphram, our director and HR.
- Wednesday, 8/8/18, I spoke with Colleen Kaye because it was mentioned that she was in the room when the inappropriate action took place.

Colleen states:

*They were in the backroom of 3East discussing bra's because she is expecting and her bra had been giving her issues. Her and Rachel Luca were looking at bra straps, then Rachel Luca asked Kryssie ("Let me see it"-her bra). Colleen doesn't recall anything coming up regarding a nipple and she states, "I didn't see Rachel touch/grab Kryssie's breast. She states the conversation wasn't sexual in any manner, just matter of fact (Two mothers giving advice on the best bra to wear while pregnant).*

- Wednesday, 8/8/18, I spoke with Rachel Luca regarding the complaint.

Rachel states:

*We were comparing bra's, nothing more. It was mother's talk, because we were discussing sports bra and breastfeeding. I accidently touched Kryssie. I did not grab her! Kryssie has been making comments about me, trying to be into women and I am uncomfortable with her comments. Kryssie brought up the nipple, I did not. Kryssie showed me her bra strap and I said let me feel the strap. I did not grab her breast or nipple. Kryssie was making comments about me grabbing her nipple in the staff room, saying things like: Rachel grab my nipple, because she is into girls. Dianna Grayson and Marcia Davis were walking by when this was said.*

- Wednesday, 8/8/18, I spoke with Dianna Grayson briefly regarding a conversation she may have overheard.

Dianna states:

*She did overhear a conversation, where someone stated: "Rachel grab my nipple because she is into girls." But she doesn't recall who said it or who was around at the time. She was very hesitant speaking on the issue.*

- Marcia Davis wasn't spoken to because she was off for vacation.
- Wednesday, 8/8/18, Kryssie came in to give me her written statement. Jean Aphram was in the office when she dropped it off and we, both assured her-we were taking this seriously and will be following up. As soon as, we hear back from HR, we would let her know the next step.
- Monday, 8/13/18, I spoke with Rachel Luca and Kryssie Garcia separately regarding the investigation into the allegations and told them of my findings:

Per my investigation, there is no one to corroborate what happened. Spoke to the person(s) names I was given to substantiate what happened and no one wants to be a part of this. Both parties account of what happened (do not match up-without any witnesses willing to corroborate what happened, it is a



PLAINTIFF'S EXHIBIT 5

Beaumont/Garcia 000394

case of "He Said-She Said". Thus, a warning is being given, that there is to be no inappropriate conversations, touching or behavior of any kind from this day forward between Rachel and Kryssie; nor, anyone else for that matter). If there is any inappropriateness in the future, it will be directed to HR and they will handle it in the way they deemed fit in compliance with their policies. Also, both parties are not to speak about this incident with anyone. This is a warning to cease and desist, effective immediately! If this does not occur, it will escalate to HR.

Both parties were reminded to be Professional while at work and to remember, we are here for our patients. Patient Care comes first. If there is any continued inappropriate behavior it needs to be and will be reported.

Net Carroll

Beaumont/Garcia 000395

9/14/18

I was asked to write a statement regarding alledged alteration between Rachel L. & Krysiu. To the best of my recollection the only thing said by Rachel was as follows: She brushed across my chest area when she passed by me and said something like Oh I just wanted to grab your boobies! Ha ha - I didn't think anything of it and just laughed it off. I really do not remember anything else that was said and do not want to pass on any info that I am not sure of."

Dianne Draper


PLAINTIFF'S
EXHIBIT
6
carroll 2-21-20

Beaumont/Garcia 000359

On Wednesday, 8/8/18, I spoke with Rachel Luca regarding the complaint.

Rachel states:

*We were comparing bra's, nothing more. It was mother's talk, because we were discussing sports bra and breastfeeding. I accidently touched Kryssie. I did not grab her! Kryssie has been making comments about me, trying to be into women and I am uncomfortable with her comments. Kryssie brought up the nipple, I did not. Kryssie showed me her bra strap and I said let me feel the strap. I did not grab her breast or nipple. Kryssie was making comments about me grabbing her nipple in the staff room, saying things like: Rachel grab my nipple, because she is into girls. Dianna Grayson and Marcia Davis were walking by when this was said.*

Rachel appeared upset that I was bringing this to her attention and repeated, she had nothing to add to the above statement. Rachel is not putting anything in writing at this time. She kept repeating, she couldn't believe this is happening.

On Monday, 8/13/18, I spoke with Rachel Luca regarding the investigation into the allegation that was made against her and told her of my findings:

At this time, there is no one to corroborate what happened. Spoke to the person(s) names I was given to substantiate what happened and no one wants to be a part of this. Both parties account of what happened (do not match up-without any witnesses willing to corroborate what happened, it is a case of "He Said-She Said". Thus, a warning is being given, that there is to be no inappropriate conversations, touching or behavior of any kind from this day forward between Rachel and Kryssie; nor, anyone else for that matter). If there is any inappropriateness in the future, it will be directed to HR and they will handle it in the way they deemed fit in compliance with their policies. Also, Rachel is not to speak about this incident with anyone. This is a warning to cease and desist, effective immediately! If this does not occur, it will escalate to HR.

Rachel was reminded to be Professional while at work and to remember, we are here for our patients. Patient Care comes first. If there is any continued inappropriate behavior it needs to be and will be reported.

Net Carroll



PLAINTIFF'S EXHIBIT 7 Carroll

**Aphtram, Jean**

| | |
|---|---|
| **From:** | Kaye, Colleen |
| **Sent:** | Saturday, September 22, 2018 10:55 PM |
| **To:** | Aphram, Jean |
| **Subject:** | Statement |

Hi Jean,

I apologize for the late response on this matter, it truly slipped my mind while at work the last few nights and I just sat down and had a few minutes.

Statement:

As I told Net when she asked me a few weeks ago about this matter that occurred between Rachel and Krissy, I did not see anyone touched inappropriately nor did anything that occurred during the conversation strike me as harmful.

The 3 of us (myself, Krissy and Rachel) were sitting in the back supply room for a few minutes around break time. I was charting for a few minutes. A conversation was started about bras because I am currently pregnant and we were just talking briefly about pregnancy things and comfortable bras were brought up. We all showed the strap part of our bras up near our shoulders to compare if they were similar in comfort, etc. Somehow nipple color was brought up as well, but it was a joking around part of the conversation and I didn't take any part of it serious. During this conversation and during the shift I did not witness anyone feeling uncomfortable about the conversation. To me it was just another normal night at work. I feel some people may joke around more than others, but in a harmless manner. I do know that conversations that occur during break, out of patient care areas, may not always be the most appropriate and I am aware of this. Thank you and I hope this helps.

Colleen Kaye

1



PLAINTIFF'S EXHIBIT
PENGAD 800-631-6989

## Aphram, Jean

**From:** Luca, Rachel
**Sent:** Monday, September 24, 2018 4:48 AM
**To:** Aphram, Jean
**Subject:** statement

here is the statement that was requested regarding a conversion that occured a few weeks ago. we were sitting in the back room of  3E Krissie, Colleen and I. we were discussing pregancy and comfortble materinty bras. i told colleen that sport bras were comfortable when i was preganant and nursing. krissie chimed in and said why dont you get something like this and showed her bra strap, i said thats similar to mine, your tattoo is showing, krissie made a comment saying you just wanted to see what color my nipples are, if they were dark or light. I said no your shirt is lowcut and showing your chest tattoo. she said mmmhmh  we all know that your a trisexual...willing to tri anything... i said no krissie i am not into women.  than we continued to talk the conversation carried on. i didnt at anypoint feel that anyone felt uncomfortable and shortly after that i got a phone call for a patient, so i left the room.

Rachel Luca



Beaumont/Garcia 000383

1

9-13-18

When I was working in 4 east with Rachel at the beginning of the shift she had mentioned, from what I can recall, that Kryssie and her were in the backroom in 3 east talking about their bras. Rachel said that all she did was feel the fabric on Kryssie's bra. After that she stated Kryssie spoke with management stating that Rachel touched her breasts. Rachel stated that Kryssie was not telling the truth about what happened that particular night. After that Rachel said she was not supposed to speak about the event and we went back to work.

I cant remeber if it was the same day or the next day in 4 east working with Rachel but she also mentioned a time when they (Rachel and Kryssie) were walking and their hands touched and Rachel made a joke about it but I can not recall exactly what she "jokingly' said to Kryssie.

[signature]

PLAINTIFF'S EXHIBIT 10 Carroll 2-21-20 PENGAD 800-631-6989

8/6/18 Conversation c̄ Kryssie Garcia
8/8/18 Follow-up c̄ Rachel Luca & Collen Kaye & Dianna Grayson
RE: ALLEGATION.
8/13/18 Spoke to Kryssie Garcia & Rachel Luca
RE: Investigation findings separately. At this time, they
ARE told to not talk about circumstance.

8/22/18 Kryssie Garcia said Rachel Luca talking about it to others
Rachel Luca scheduled to work 8/31 Rachel Luca called in
PMLA - that Night, then it was the weekend (no Supervisor on
the weekend).

I went on vacation 9/2 - 9/10
Returnal 9/10 to talk to Rachel Luca - she was sent home early.
Left before I got to work.
Now Kryssie Garcia on vacation from 9/9 → 10/5 (PMLA For
2 wks)

Rachel Luca calling in PMLA "T/o the week to keep from seeing
the Supervisor - only working weekend c̄ no supervisor.

Antinette Carroll, Rep



PLAINTIFF'S EXHIBIT 11 Carroll

8/27/18

- Monday, August 27, 2018. Kryssie Garcia came into the Supervisor office at the end of her shift, to let me know that per our conversation on the 6th of August-that she, Kryssie had let it go and was moving forward. Yet, last night (August 26th) it was brought to her attention, that Rachel Luca was now, going to staff and accusing Kryssie of lying on her, to get her in trouble and informing staff, she (Rachel Luca) was called into the office. As well as, making statements that Kryssie wanted her and was making sexual advances towards her. A conversation was taped between Kryssie and one of the staff person (Phil Matthewson) regarding the conversation shared between Rachel L.and Phil M., with Rachel making the accusations. Phil told Kryssie he did not want to be involved, but he felt Kryssie needed to know what was going on. If there were others willing to come forward, he would-but he didn't want to be the only one.
- Kryssie was afraid that Rachel was spreading these lies and accusations to other hospital personnel and as a result it could inadvertently affect how she, Kryssie was being treated by staff on a professional level.  She felt others would have trust issues with her and her Professionalism was based on trust, honesty and her performance. She did not want anyone to doubt her work performance based on false accusations and slander. She said within the last two weeks, staff has been treating her different (leaving the staff room, so they aren't alone with her, looking at her different, staff not speaking to her, staff not as friendly to her as in the past, before this happened, etc.)  Kryssie assured me, that she hadn't talked to anyone about it-after our talk in the office and the only way others would know about it, would be if Rachel was speaking about it. Kryssie was very upset and felt that if this continued, she would not be comfortable working here and she worked hard to strengthen herself professionally.
- I explained to Kryssie, I was sorry that this was happening and Rachel was told not to repeat any of the conversation I had with her on the issue. I explained to Kryssie that I would talk to Jean Aphram, our Director to see what our recourse would be, when he checked in with HR.  I told Kryssie, that Jean Aphram and I would probably have a sitdown to discuss the situation. (I feel at this point, bringing the Director in, may stress the importance and seriousness of the matter). Kryssie stated she understood. Kryssie said she didn't want to get Rachel in any trouble or to have her lose her job, but this behavior had to stop.
- Told Kryssie I will let her know what the next step is. Kryssie stated she may take it to HR herself. I told her we were talking and requesting guidance from HR on how to handle the situation.

Followup from HR: Call Rachel Luca in and interview her re: Kryssie's statements.

- Spoke to the Afternoon Supervisor, Jim Burgess re: speaking with Rachel on her next scheduled night to work, (Friday, August 31st)-Rachel called in FMLA and has herself scheduled during the weekend (when the Supervisors are off).
- Our director, Jean Aphram has reached out to Rachel via phone and has left messages to no avail.

Net Carroll



August 27, 2018

- Called into supervisor's office to hear Krissy Garcia's concern
- Krissy explained that Rachel Luca has been spreading misinformation and that she was slandering her reputation
- Krissy expressed her concerns and was debating going to HR
- Both Net and I explained that it was her choice to do so and even if she did not, I was going to follow up with HR rep to assist us in proper way to follow up regarding this incident
- We both expressed our concerns that this behavior is not tolerated and that we would keep her posted as much as we could.
    o Just for clarification, there were two issues brought to our attention by Krissy.
        ▪ First, is the inappropriate talk and bra touching claim by Krissie back on August 6th. Krissie at that time, did indicate to Net and I that she did not want Rachel to lose her job, but wanted her to stop with her comments. (see Net's documentation)
        ▪ Second, on August 27th, was called back into supervisor's office to listen to another complaint by Krissie. This complaint involved the claim that Rachel was making comments that Krissie was trying to get her in trouble, trying to get her fired, all these were lies and that Krissie was the one that made passes at her.
- Later that morning, spoke with HR rep, Margaret and explained situation. HR rep expressed need to interview Rachel and get her side of the story.
- Numerous attempts were made to discuss issue, with no call back. Called on 8/27, 8/29, 8/30, and 8/31. Left a message on all those calls to call back, no call back.
- Rachel also called in sick and subsequently only worked weekends when no supervision is working.
- I was able to make face to face contact with Rachel on Friday 9/7, at the end of her shift. I asked for her side of the story as advised by HR. Again, she denies any wrong doing. I did explain to her that these were serious allegations and we are looking for guidance on the next steps
- I have not seen or heard from Krissie since August 27th.

Jean Aphram

Beaumont/Garcia 000378

## KG Harassment Investigation Interview Notes

*Human Resources are investigating a reported incident between two Respiratory Care employees. Human Resources are trying to ascertain what kinds of information may be circulating throughout the workplace. We are trying to confirm what sort of information (if any) is being spoken about this matter in the workplace, and by whom.*

- Have you heard of, or do you have any personal knowledge of an alleged incident between Rachel Luca and Kristina Garcia?

- What sort of information have you heard regarding this matter?

- How did you learn about this matter?

- From whom specifically do you recall hearing about this matter?

- Have you personally heard either Ms. Luca or Ms. Garcia share details with anyone regarding this matter?

- Have you specifically heard anyone else in the workplace share any details regarding this matter? If so, whom?

- Have you witnessed any inappropriate behavior or conduct between these two employees? Bullying, intimidation, retaliation, physical contact?

- Is there anything else you would like to share with me regarding this situation?



PLAINTIFF'S EXHIBIT
PENGAD 800-631-6989
L3
Carroll

*Angelita Santos*

## KG Harassment Investigation Interview Notes

*Human Resources are investigating a reported incident between two Respiratory Care employees. Human Resources are trying to ascertain what kinds of information may be circulating throughout the workplace. We are trying to confirm what sort of information (if any) is being spoken about this matter in the workplace, and by whom.*

- Have you heard of, or do you have any personal knowledge of an alleged incident between Rachel Luca and Kristina Garcia? *Know about the situation. She was get her name from Garcia.*

- What sort of information have you heard regarding this matter? *That an accusation was made about dating, lying, bisexual, name calling. Garcia upset with whom was said.*

- How did you learn about this matter? *Not largely. Hams rumor mill. It just passes along through employees.*

- From whom specifically do you recall hearing about this matter? *Two ways. Kristina Garcia appears down low on it. Hear through rumor mill (through Rachel)*

- Have you personally heard either Ms. Luca or Ms. Garcia share details with anyone regarding this matter? *Garcia shared the gist of it with me. Angelita told her to go to H.R. and reamd back.*

- Have you specifically heard anyone else in the workplace share any details regarding this matter? If so, whom? *Not really.*

- Have you witnessed any inappropriate behavior or conduct between these two employees? Bullying, intimidation, retaliation, physical contact? *Prior to this NO.*

- Is there anything else you would like to share with me regarding this situation?

Beaumont/Garcia 000362

*MARCIA DAVIS*

## KG Harassment Investigation Interview Notes

Human Resources are investigating a reported incident between two Respiratory Care employees. Human Resources are trying to ascertain what kinds of information may be circulating throughout the workplace. We are trying to confirm what sort of information (if any) is being spoken about this matter in the workplace, and by whom.

- Have you heard of, or do you have any personal knowledge of an alleged incident between Rachel Luca and Kristina Garcia? *Yes. No personal knowledge.*

- What sort of information have you heard regarding this matter? *Only have from Luca (August), Luca contact Detroit forensic head of sexual harassment. Have in 4 days.*

- How did you learn about this matter? *Have from Rachel's comment in dept. Rachel to her. (one time)*

- From whom specifically do you recall hearing about this matter? *Rachel. maybe a couple of days later (?).*

- Have you personally heard either Ms. Luca or Ms. Garcia share details with anyone regarding this matter? *NO. haven't heard anything.*

- Have you specifically heard anyone else in the workplace share any details regarding this matter? If so, whom? *NO other staff talking no for as she knows.*

- Have you witnessed any inappropriate behavior or conduct between these two employees? Bullying, intimidation, retaliation, physical contact? *NO.*

- Is there anything else you would like to share with me regarding this situation? *Rachel does not have any sense of keeping to self. Talks a lot. Does this not know... (her talking)*

Dianna Grayson

*[handwritten note, top right:]* — Dianna indicated when she heard in her statement, it was what Rachel "may" have said in the breakroom. Not sure of timing and if it has been explained to everybody. By some, not to openly discuss.

## KG Harassment Investigation Interview Notes

Human Resources are investigating a reported incident between two Respiratory Care employees. Human Resources are trying to ascertain what kinds of information may be circulating throughout the workplace. We are trying to confirm what sort of information (if any) is being spoken about this matter in the workplace, and by whom.

- Have you heard of, or do you have any personal knowledge of an alleged incident between Rachel Luca and Kristina Garcia? *Yes, has heard.*

- What sort of information have you heard regarding this matter? *Something inappropriate. Overheard what was inappropriate.*

- How did you learn about this matter? *Through Boss asking her to write a statement about it.*

- From whom specifically do you recall hearing about this matter? *Overheard. Boss then recently. Really cannot remember all.*

- Have you personally heard either Ms. Luca or Ms. Garcia share details with anyone regarding this matter? *No, not that she's aware of.*

- Have you specifically heard anyone else in the workplace share any details regarding this matter? If so, whom? *No, not really. Doesn't believe anyone is continuing to talk about it.*

- Have you witnessed any inappropriate behavior or conduct between these two employees? Bullying, intimidation, retaliation, physical contact? *Nothing.*

- Is there anything else you would like to share with me regarding this situation?

  - *Rachel worked last night.*
  - *She does not work with her.*
  - *Heard info from her statement — Boss*

Anthony Stout

## KG Harassment Investigation Interview Notes

*Human Resources are investigating a reported incident between two Respiratory Care employees. Human Resources are trying to ascertain what kinds of information may be circulating throughout the workplace. We are trying to confirm what sort of information (if any) is being spoken about this matter in the workplace, and by whom.*

- **Have you heard of, or do you have any personal knowledge of an alleged incident between Rachel Luca and Kristina Garcia?** Knows both. Has heard from outside about claim through Rachel Luca.

- **What sort of information have you heard regarding this matter?** Heard directly from Rachel herself. Brought matter up. "Can you believe this?" Talked about accusation.

- **How did you learn about this matter?** Rachel approached him one morning on 4 East.

- **From whom specifically do you recall hearing about this matter?** Rachel / around Labor Day. One time in the morning. Labor wkd.

- **Have you personally heard either Ms. Luca or Ms. Garcia share details with anyone regarding this matter?** No. Very private person (Kristina). Only heard Rachel Luca mention to him one time.

- **Have you specifically heard anyone else in the workplace share any details regarding this matter? If so, whom?** No. They don't like each other very much.

- **Have you witnessed any inappropriate behavior or conduct between these two employees? Bullying, intimidation, retaliation, physical contact?**
  - No Kristina very professional
  - Rachel - over shares info regarding personal life.

- **Is there anything else you would like to share with me regarding this situation?**

  No other info...

September 10th, 2018

To whom it may concern,

I am writing to follow up with my sexual harassment complaint.

To reiterate the situation, on the morning of August 6th, 2018, I informed my immediate supervisor (Mrs. Antoinette Carroll) regarding the events that occurred on July 29th, 2018, resulting in Miss Luca putting her hand down my shirt, pinching my nipple and lifting my breast up out of my bra cup. As requested, I turned in a written statement on August 8th, 2018, to Mrs. Carroll, illustrating the event that had occurred and outlining previous situations with Miss Luca that made me uncomfortable. Mrs. Carroll updated me on the situation stating that she had spoken with Miss Luca and Mrs. Kaye (Mrs. Kaye is Miss Luca's close friend and a witness to the incident) and that she informed Miss. Luca that she was not to talk about the incident with anyone or else this would be turned over to Human Resources for further review. I was accepting of this as I simply wanted the harassment to stop and for everyone to move forward. Since then I have been treated differently by a number of staff (in particular, staff that are close friends with Miss Luca). Some staff members have withheld having friendly conversations with me, other staff members have left the immediate area when it is just them and I alone in the area/department, and another staff member chose to leave the ICU completely to do her charting during downtime rather than sit alone with me in the designated respiratory room as usually occurs. It became apparent to me that Miss. Luca had, in fact, been talking about the situation by the way the atmosphere had changed, especially since several co-workers I had not previously ever had any problems with had begun treating me poorly, although I did not have any hard proof of this. I let these initial things go, hoping that everything would run its course.

Moving forward, I have been approached by my co-workers informing me that Miss Luca continues to discuss the incident and asserts that I am lying about the situation. One such co-worker that she discussed the incident with was Phillip Mathewson. In the early morning hours of August 27th, 2018, I approached Mr. Matthewson to ask exactly what Miss Luca said. Mr. Matthewson confirmed that Miss Luca did, in fact, tell him the story and proclaimed that it was a lie. Mr. Matthewson expressed not wanting to get further involved in the situation. He told me he did not want to speak with management about it, albeit if other people were saying the same thing, he didn't mind being one of a number of people speaking with management, but that he did not want to be the only one speaking for fear of retaliation by Miss Luca. I had anticipated this response so in an effort to protect myself and my reputation I had recorded the conversation I had with Mr. Matthewson. Following the conversation with Mr. Matthewson, I updated Mrs. Carroll and requested that Human Resources be notified immediately as the situation was escalating. I expressed that Miss Luca was slandering my name in an attempt to ruin my reputation for speaking out against her in regards to being sexually harassed. I played Mrs. Carroll a portion of the audio where Mr. Matthewson confirmed that Miss Luca gave her unsolicited views and opinions to him regarding my sexual harassment claim and labeled me a liar. I was assured by both Jean Aphram, Director of Respiratory Care, and Mrs. Carroll that they would contact Human Resources that morning (August 27th, 2018) and updated me. Two weeks have passed and I have yet to hear anything back from my supervisors, our Director, or Human Resources.

PLAINTIFF'S
EXHIBIT
14
Carroll

Meanwhile, I continue to have my name slandered by Miss Luca. The most recent incident I am aware of was September 2nd, 2018. I was working in the 4 East ICU with David Antior, RRT. Miss Luca came into the unit a minimum of two times. She did not appear to have come to the unit for any constructive reason such as offering help, as neither Mr. Antior nor I were contacted by her. Instead, Miss Luca approached 4 East ICU nurse Anthony "Tony" Stout, RN, and begun discussing the incident. Mr. Stout states that Miss Luca approached him in his patient's room and specifically told him "Kryssie and Stacy concocted a story to get me fired" and proceeded to elaborate on how I made up the claim. Later that morning, I personally witnessed Miss Luca come to the unit and approach Mr. Stout while he was at the nursing desk and overheard her referencing the story again.

I am very upset that not only was I physically assaulted by Miss Luca, but that she proceeds to attack my character all without any repercussions. I know of nothing that has been done regarding my complaints. My co-workers have become unwillingly involved in this situation such as with Mrs. Stacy Cary, RRT, being named an accomplice to my alleged "lies" meanwhile others are unsolicitedly fed Miss Luca's version of the story accompanied by slander. Not only has Miss Luca involved those in our department but now other departments have become involved as well. She continues this despite management explicitly instructing her not to discuss the situation. This will undoubtedly affect my interprofessional relationships throughout the hospital as Miss Luca is branding me as a liar with the accusation of filing false claims of sexual harassment.

I was assured that this situation would be handled yet it persists without consequence. I have followed the chain of command in reporting this incident and handling it in a professional manner, nevertheless it continues to worsen. I would like to inquire as to what will be done to protect me from Miss Luca's retaliatory actions, relative to my coming forward and reporting sexual harassment. I am requesting a written update on my complaint in addition to the next steps Human Resources will take to ensure a safe work environment that is free from all forms of harassment.


Thank you in advance,


Kristina Garcia, BAS, RRT-ACCS, AE-C, FCCS

Jean Aphram -        9·10·18

- INCIDENT A MONTH AGO IN THE
  employee Break Room.
- NOT INVESTIGATING, but nobody
  confirmed AT THAT TIME.
- Jean SPOKE WITH Margaret
  wk. OF Aug 27TH
-

9.14.18

- He was NOT (personally) aware OF THE
  level OF Detail (phys Touching, etc)

. ONE girl
  claiming someone
  made a pass
  at Her.
  -

PLAINTIFF'S
EXHIBIT
15
Carroll

9.10.18  - Receive e-mail from Kristina.
        - Sent e-mail to Jean Ephrum.
        - Left mem for Kristina to call me.
        - Left mem for Jean to call me.

9.11.18  - Met with Jean Ephrum to discuss.
-12,13,  - e-mails exchanged

9.14.18  - File copies and prepared to send.
        - Received letter from attorney.
        - Advise Mike, Jose, Jean, _____.

To what extent
was the inform
in this letter
Board incorrigans?

Jean off/Here
on Tuesday
off w and a this.
Jean was or this.
                        H.M.

Capt J.                          H.R.
Garcia                          - Tony Stout
Luca                            - Diane Gaydon
Kaye                            - Marin Davis
Grayson                         - Angelina Sarratos
Davis
Matthewson

- Not more Recerds

Beaumont/Garcia 000368

NET CARROLL - DEP          9.25.18

- Kristin - was ready to move on.
  end of August.
- Garcia came to her. B.C. said
  it's a couple of weeks ago.
  mentioned inappropriate
- Kristin shared with Net, she was
  Bi-sexual. Not sure why shared
- Said "sexual Harassment" was never
  mentioned
- Said didn't want Lisa fired - several
  times. "Has to stop."
✳ - Net shares details with Jean Ryan.
✳ - In Aug 27th, Krissie gave a
  recording to Net. Net knows Rachel
  say to phil, "I'm not supposed to
  be talking about this." Have phil
  agreeing, etc.
- In early August (6th) Net asked
  Garcia to put together written statement
  was off 1-2 days, but brought on 8th
- Confirms Net told Jean about the
  inappropriate Touching

✳ - Rachel Told... "you never said anything
  Before."
- K3 told Net; were previously laid off due
  to house

PLAINTIFF'S
EXHIBIT
16
Carroll
02-17-2
PENGAD 800-631-6989

Net e-mails her ed or arbam
Sept. 17th asking For Velonsma
For Resp. Lori week. She said
"count me in."

- Rachel called in Mon → Tuesday
  FMLA.

- Net said Warn has an opportunity
  to get back with Garcia. Since
  Luca not here.   Net also on
  vacation

Beaumont/Garcia 000370

Beaumont/Garcia 000385

## Aphram, Jean

**From:** Garcia, Kristina
**Sent:** Thursday, October 04, 2018 9:33 AM
**To:** Hamick, Steven; Carroll, Net; Burgess, James; Frankhouse, Allen J
**Cc:** Aphram, Jean
**Subject:** FMLA

Just wanted to send an update on my FMLA.

I was cleared by my physician to return to work.
I am scheduled to work tomorrow night.
I will provide a copy of my physician note to Jim B. when I come in.

Thank you,

Kristina



# Scheduling

Garcia, Kristina

Fri 10/5/2018 10:56 PM

To:Carroll, Net <Antoinette.Carroll@beaumont.org>; Frankhouse, Allen J <Allen.Frankhouse@beaumont.org>; Burgess, James <James.Burgess@beaumont.org>;

Cc:Aphram, Jean <Jean.Aphram@beaumont.org>;

Bcc:KGarcia4@kent.edu <KGarcia4@kent.edu>;

I am writing to request that I please not be assigned as Charge Therapist on nights that Ms. Rachel Luca is scheduled.
I would also like to request that I please not be partnered in an assignment with Ms. Rachel Luca.
I would be very uncomfortable in either situation and I believe this is in the best interest of everybody to hopefully avoid any further issues.

Thank you for your understanding,

Kristina Garcia

Beaumont/Garcia 000386

**Aphram, Jean**

| | |
|---|---|
| **From:** | Carroll, Net |
| **Sent:** | Saturday, October 06, 2018 9:11 AM |
| **To:** | Aphram, Jean |
| **Subject:** | Re: Scheduling |

Yes

Get Outlook for iOS

On Sat, Oct 6, 2018 at 8:27 AM -0400, "Aphram, Jean" <Jean.Aphram@beaumont.org> wrote:

Do they work the same weekend?

Sent from my LG Mobile

------ Original message------
From: Garcia, Kristina
Date: Fri, Oct 5, 2018 22:56
To: Carroll, Net;Frankhouse, Allen J;Burgess, James;
Cc: Aphram, Jean;
Subject:Scheduling

I am writing to request that I please not be assigned as Charge Therapist on nights that Ms. Rachel Luca is scheduled. I would also like to request that I please not be partnered in an assignment with Ms. Rachel Luca. I would be very uncomfortable in either situation and I believe this is in the best interest of everybody to hopefully avoid any further issues.

Thank you for your understanding,

Kristina Garcia

1

**Brancaleone, Kevin**

| | |
|---|---|
| **From:** | Aphram, Jean |
| **Sent:** | Wednesday, October 24, 2018 4:02 PM |
| **To:** | Brancaleone, Kevin |
| **Subject:** | <<confidential>> K. Garcia |

Hi Kevin,

After speaking with my HR rep, on the morning of October 23, we agreed that we needed to follow-up with Ms. Garcia, and inform her that we did follow up and responded to her complaint. At approximately 10AM, I made a phone call to Ms. Garcia and left a message if she had time to meet with me the morning of October 24, after her shift ended at 0715.

At approx.. 0710 AM, Ms. Garcia came into my office to discuss situation.
- I thanked her for coming down to talk. I explained that we did take her complaint seriously, and after reviewing/investigating, with HR's guidance, we took appropriate action. I added that Kevin and I would also like to have a sit-down and discuss further when convenient for her and address any further questions she may have.
- Ms. Garcia asked if could know what action was taken and I replied "I cannot discuss that with you for confidentiality", but that we did address concern. She added that she would only meet with Kevin and myself with her attorney present.
- I said that was your prerogative, that I would relay that information to Kevin and we will get back to you.
- She said bye, got up and left office without any further comments.

That is my account of the interaction to the best of my recollection.

*Jean Aphram, MBA, RCP*
*Director of Respiratory Care*
*Pulmonary Rehab and Pulmonary Physiology*
*Beaumont Health*
*3601 W. 13 Mile Rd.*
*Royal Oak, MI 48073*
*Office*

# Beaumont

1



PLAINTIFF'S
EXHIBIT
18
Carroll 2-22-20

Beaumont/Garcia 000357

**Brancaleone, Kevin**

| | |
|---|---|
| From: | Serratos, Angelita |
| Sent: | Sunday, October 07, 2018 4:10 PM |
| To: | Brancaleone, Kevin |
| Subject: | In regards to the incident involving Kristina Garcia and Rachel Luca |

Good afternoon Kevin,

My name is Angelita and I am a registered respiratory therapist here at Beaumont Royal Oak. I am emailing you today because I was informed that you were handling the incident involving Rachel Luca and Kristina Garcia and I want to state what was said to me on Friday September 14th 2018 and Monday September 17th 2018.

On Friday September 14th on midnight shift. I was working on North tower. I was coming down the elevator from North tower and was walking the hall on 4 Center. $ center MPCU is where Rachel was working. As I was walking by, I saw Rachel Luca on her WOW outside a patient's room. She looked upset and flustered. I approached her and offered her some help with her work assignment and asked her if she was okay. In turn she replied that she was upset because she was claiming that people in our department was trying to get her fired. And that Kristina is claiming that she (Rachel) sexually assaulted her. Rachel went on stating that Kristina is lying and telling people in our department that she (Rachel) is bi-sexual. Rachel continued to vent to me how upset she is and that she is not bi-sexual, and is going to continue to stay reserved and keep a low profile while she is at work. I told her that maybe she should speak to someone in HR if she was upset and stressed out about the situation and told her that I was sorry that this was happening to her.

On Monday September 17th 2018, Rachel Luca and I attended an ACLS class here at Beaumont Royal Oak. During our lunch brake from the class, Rachel told me that she was going to go to the respiratory department to speak to someone. When she returned, Rachel looked upset. During the class Rachel sent me a text message stating that she was called to the office. After the class I went to my car and sent Rachel a text stating that things will work itself out and that I was sorry that this was happening to her. Immediately after I sent my text she called me. She was crying and she was very upset. She was upset that she was called into the office. She was venting to me that people in our department are trying to get her fired and telling that Kristina is lying about the situation between them. Continue to say that Kristina is telling everyone that she (Rachel) is bi-sexual and that she wasn't. She then tried to explain to me in her own words what happened, but I told her that I didn't want to know about the situation and that she should have not told me. That she needed to keep the situation private and speak to management. I asked her who else have you told besides myself about the situation between you and Kristina. Rachel claimed that she told one other person and the reason she told this other person was because they are good friends. Rachel continued to vent to me on how she was afraid that she was going to lose her job and doesn't have anyone to trust. I stated to Rachel that I no longer wanted to know anymore details about the incident. I also stated to Rachel that she should not talk about the incident to anyone else and that she should contact HR and speak them in regards to how she felt. I told her that if she continued to feel stressed out at work, that she should meet with someone in HR and give her statement.

This is all that I have, thank you for your time



1