UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION

KRISTINA GARCIA,

        Plaintiff,

v                                    Case No. 19-CV-11673

                                     HON. LINDA V. PARKER

                                     MAGISTRATE DAVID R. GRAND

BEAUMONT HEALTH and
RACHEL LUCA,

        Defendants.
                                /


VIDEO DEPOSITION OF JEAN APHRAM

    Taken by the Plaintiff on the 13th day of March, 2020, at

    280 North Old Woodward Avenue, Birmingham, Michigan, at

    9:30 a.m.


APPEARANCES:

For the Plaintiff:        MS. LISA C. WARD (P38933)
                          Law Offices of Lisa C. Ward PLLC
                          4131 Okemos Road, Suite 12
                          Okemos, Michigan 48864
                          (517) 347-8100


For the Defendants:       MR. ERIC J. PELTON (P40635)
                          Kienbaum Hardy Viviano Pelton & Forrest
                          PLC
                          280 North Old Woodward Avenue, Suite 400
                          Birmingham, Michigan 48009
                          (248) 645-0000


Page 1



1   Also Present:        Chip Staley, Video Operator
                         Kristina Garcia
2
3   RECORDED BY:         Amanda Flesher, CER 9491
                         Certified Electronic Recorder
4                        Network Reporting Corporation
                         Firm Registration Number 8151
5                        1-800-632-2720
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 2**

1   Birmingham, Michigan
2   Friday, March 13, 2020 - 9:26 a.m.
3        VIDEO OPERATOR:  We are going on the record at
4   9:26 a.m. on Friday, March 13th, 2020.  This is volume one
5   of disk one of the video deposition of Jean Aphram taken by
6   the Plaintiff in the matter of Kristina Garcia versus
7   Beaumont Health and Rachel Luca, filed in the United States
8   District Court for the Eastern District of Michigan Southern
9   Division, case number 19-CV-11673.  This deposition is being
10  held at 280 North Old Woodward Avenue, Birmingham, Michigan.
11  My name is Chip Staley and I am the videographer.  Counsel
12  will now state their appearance and affiliation for the
13  record.
14       MS. WARD:  Lisa Ward and I'm here on behalf of the
15  Plaintiff, --
16       MR. PELTON:  Eric --
17       MS. WARD:  Sorry.  -- Ms. Garcia.
18       MR. PELTON:  Eric Pelton for Defendant.
19       VIDEO OPERATOR:  The court reporter will now swear
20  in the witness.
21       REPORTER:  Raise your right hand for me, please.
22  Do you solemnly swear or affirm that the testimony you're
23  about to give will be the whole truth?
24       MR. APHRAM:  I will.
25       REPORTER:  Thank you.

**Page 4**

1
2                    TABLE OF CONTENTS
3                                              PAGE
4   Direct Examination by Ms. Ward . . . . . . . . . . . . 5
5
6
7                    EXHIBIT INDEX
8                                              PAGE
9   Plaintiff's Exhibit 1 marked . . . . . . . . . . . . 26
       (Sexual harassment policy 2016)
10  Plaintiff's Exhibit 2 marked . . . . . . . . . . . . 27
       (Sexual harassment policy 2018)
11  Plaintiff's Exhibit 3 marked . . . . . . . . . . . . 33
       (Statement)
12  Plaintiff's Exhibit 4 marked . . . . . . . . . . . . 42
       (Employee statements)
13  Plaintiff's Exhibit 5 marked . . . . . . . . . . . . 46
       (Statement)
14  Plaintiff's Exhibit 6 marked . . . . . . . . . . . . 48
       (E-mail)
15  Plaintiff's Exhibit 7 marked . . . . . . . . . . . . 61
       (Statement)
16  Plaintiff's Exhibit 8 marked . . . . . . . . . . . . 64
       (Statement)
17  Plaintiff's Exhibit 9 marked . . . . . . . . . . . . 66
       (E-mail)
18  Plaintiff's Exhibit 10 marked . . . . . . . . . . . . 68
       (Statement)
19  Plaintiff's Exhibit 11 marked . . . . . . . . . . . . 70
       (Statement)
20  Plaintiff's Exhibit 12 marked . . . . . . . . . . . . 71
       (Investigation notes)
21  Plaintiff's Exhibit 13 marked . . . . . . . . . . . . 73
       (E-mails and performance improvement plans)
22  Plaintiff's Exhibit 14 marked . . . . . . . . . . . . 76
       (E-mails)
23
24
25

**Page 3**

1            JEAN APHRAM
2       having been called by the Plaintiff and sworn:
3            DIRECT EXAMINATION
4   BY MS. WARD:
5   Q   Can you state -- state your name and spell it, if necessary,
6       for the record?
7   **A   Sure.  It's Jean, J-e-a-n, Aphram, A-p-h-r-a-m.**
8   Q   Aphram?
9   **A   Aphram.**
10  Q   I will try very hard to get that right throughout the
11      deposition.
12  **A   Okay.**
13  Q   Mr. Aphram, I'm going to ask you a series of questions.
14      They're going to be recorded.  And I only have a couple of
15      small rules for this process.  Number one, if I ask you
16      something and you haven't heard it, or you don't understand
17      it, you will need to indicate that to me so that I can try
18      again.  If not, if you just answer, I will assume you
19      understood the question and you're giving it your best
20      answer.  Do you understand the instructions?
21  **A   Yes.**
22  Q   Do you have any questions at this time?
23  **A   No, ma'am.**
24  Q   Have you ever testified in a deposition before in your life?
25  **A   No, ma'am.**

**Page 5**




NetworkReporting
STATEWIDE COURT REPORTERS
800-632-2720

1  Q  Have you ever testified in court, civil or criminal?
2  A  No.
3  Q  Have you ever been part of a court proceeding?
4  A  No.
5  Q  So you've never come as a witness or --
6  A  Once.
7  Q  Okay.
8  A  Yup.
9  Q  Can you tell me when and --
10 A  I don't recall, but it was -- I don't recall.  But I did do
11    one awhile ago, yeah.
12 Q  You were a witness?
13 A  No, not a witness.
14 Q  What were you?
15 A  There was -- there was something I was -- there was a
16    complaint against a -- an employee that I had to be there
17    for.  I don't know if that's a witness.
18       MR. PELTON:  Probably not, but --
19       THE WITNESS:  Okay.
20 Q  So were you there in court or did you actually speak?
21 A  No, I was there in court.  Sorry.
22 Q  Just as a support person?
23 A  Correct.
24 Q  You never gave any testimony?
25 A  No.

Page 6

1  Q  Okay; okay.  Other than that experience -- sorry -- other
2     than that experience, have you ever gone to any kind of
3     administrative hearing like unemployment, workers' comp,
4     something like that and provided testimony?
5  A  No.
6  Q  Okay.  Did you review any documents in preparation for your
7     deposition today?
8  A  Yes.
9  Q  Can you tell me what those were?
10 A  Just the correspondence between myself and HR.
11 Q  Can you be more descriptive?  From what dates to what dates?
12 A  I don't recall the dates specifically, but, I mean, it was
13    during the incident, the complaint.
14 Q  Correspondence between you and HR?
15 A  Yes.
16 Q  Okay.  Can you give us your address?
17 A  Yeah, 302 Menard Lane, LaSalle, Ontario.
18 Q  Okay.  Have you ever been known by any other prior names or
19    nicknames?
20 A  No.
21 Q  Never changed your last name?
22 A  No.
23 Q  Okay.  What's your marital status?
24 A  Married.
25 Q  How many kids do you have?

Page 7

1  A  Four.
2  Q  Can you give me your spouse's name?
3  A  Jennifer.
4  Q  Can you give me the name and ages of your children?
5  A  Yes.
6  Q  Go ahead.
7  A  Okay.  20, 19, 15 and 10.
8  Q  And their names?
9  A  Matthew, Andrew, Alexander and Benjamin.
10 Q  All boys?
11 A  Yes.
12 Q  Okay.  Did you go to high school?
13 A  Yes.
14 Q  Graduate?
15 A  Yes.
16 Q  Okay.  After high school did you get any other training?
17    Any other higher educational -- I'm sorry.  Skip -- strike
18    that.  Did you go and get any other higher educational kind
19    of degrees?
20 A  Yes.
21 Q  Okay.  What were they?
22 A  I got my associate's.
23 Q  Associate's?
24 A  Yeah.
25 Q  And where did you get an associate's?

Page 8

1  A  OCC, Oakland Community College.
2  Q  And when was that?
3  A  I graduated in '95.
4  Q  Okay.  And what was that associate degree in?
5  A  Respiratory therapy.
6  Q  Did you go to any other higher education at any time?
7  A  I did; I did.
8  Q  What was the next place that you went?
9  A  Siena Heights University.
10 Q  Siena Heights?
11 A  Yeah.
12 Q  And when did you attend Siena Heights University?
13 A  '95 through '96.
14 Q  And what were you trying to study there?
15 A  I got my undergrad.
16 Q  In?
17 A  Respiratory therapy.
18 Q  Okay.  Any other higher education?
19 A  Yes.
20 Q  Okay.  What was the next place you went?
21 A  Wayne State University.
22 Q  And when did you attend Wayne State?
23 A  2012 through 2015.
24 Q  And did you obtain a degree?
25 A  I did.

Page 9



GARCIA v. BEAUMONT HEALTH, ET AL.                    DEPOSITION OF JEAN APHRAM

| | | |
|---|---|---|
| 1 | Q | What was the degree? |
| 2 | A | **MBA.** |
| 3 | Q | Was there any kind of special concentration? |
| 4 | A | **Management.** |
| 5 | Q | And you graduated? |
| 6 | A | **Yes.** |
| 7 | Q | Okay.  Did you receive any other degrees -- have you? |
| 8 | A | **No.** |
| 9 | Q | Have you gone any other higher education places? |
| 10 | A | **No.** |
| 11 | Q | Okay.  Have you gone to any kind of specialized training? |
| 12 | A | **Can you be more specific?** |
| 13 | Q | Well, in addition to that, some people go out and get |
| 14 | | specialized training in CPR that's separate and apart |
| 15 | | from -- you know, first responder training, that kind of |
| 16 | | thing, or you decided you wanted to get a certificate to |
| 17 | | drive a commercial truck.  It's not a degree, but it's |
| 18 | | specialized. |
| 19 | A | **Sure.  So yeah, we're BLS certified, so basic --** |
| 20 | Q | BLS? |
| 21 | A | **Yeah, basic life support.** |
| 22 | Q | Okay.  And was that a -- some kind of educational thing you |
| 23 | | did? |
| 24 | A | **It was a course that's offered at the hospital.** |
| 25 | Q | And you took that? |

| | | |
|---|---|---|
| 1 | A | **Yes.** |
| 2 | Q | When? |
| 3 | A | **It would have been last year in May that we did a check-off.** |
| 4 | Q | Okay.  2019? |
| 5 | A | **Yeah.** |
| 6 | Q | Okay.  And did you pass? |
| 7 | A | **Yes.** |
| 8 | Q | And did that involve a certificate? |
| 9 | A | **Yeah, well, you got a BLS card; yes.** |
| 10 | Q | Okay.  All right.  Any other specialized training? |
| 11 | A | **Not that I recall.** |
| 12 | Q | When you got your management degree from Wayne State, did |
| 13 | | you have any specialized course work in sexual harassment? |
| 14 | A | **I don't recall.** |
| 15 | Q | Okay.  How about in conducting an investigation -- |
| 16 | A | **No.** |
| 17 | Q | Let me finish. |
| 18 | A | **Oh, I'm sorry.** |
| 19 | Q | You've got to let me finish the question. |
| 20 | A | **I apologize.** |
| 21 | Q | -- conducting an investigation into sexual harassment? |
| 22 | A | **No.** |
| 23 | Q | You've not received any specialized training in how to do |
| 24 | | that? |
| 25 | | MR. PELTON:  You asked him about Wayne State, I |

| | | |
|---|---|---|
| 1 | | think. |
| 2 | Q | I'm asking now about whether you've ever received any |
| 3 | | specialized training in conducting a sexual harassment |
| 4 | | investigation. |
| 5 | A | **As far -- well, so the -- there is a module that we take at** |
| 6 | | **work for harassment.** |
| 7 | Q | A module? |
| 8 | A | **Correct.** |
| 9 | Q | What does that mean? |
| 10 | A | **So it's a -- it's a online training and course that you** |
| 11 | | **take.  "Online" meaning that it's through the hospital and** |
| 12 | | **then we take a post-exam, post-test.** |
| 13 | Q | Did you pass it? |
| 14 | A | **Yes.** |
| 15 | Q | How long was the module? |
| 16 | A | **I don't recall.** |
| 17 | Q | All day? |
| 18 | A | **It's however long it takes you to complete it, so I don't** |
| 19 | | **recall.** |
| 20 | Q | Was it a -- |
| 21 | A | **There's several modules to take.** |
| 22 | Q | How many did you take? |
| 23 | A | **I don't recall.** |
| 24 | Q | Did -- would you approximate that it was a week's worth of |
| 25 | | moduling? |

| | | |
|---|---|---|
| 1 | A | **No; no.  It's usually within -- within a day.** |
| 2 | Q | Okay.  And you completed all of the offered modules? |
| 3 | A | **Correct.** |
| 4 | Q | Okay.  Was there testing afterwards? |
| 5 | A | **Yes.** |
| 6 | Q | And did you pass the tests? |
| 7 | A | **Yes.** |
| 8 | Q | And you don't remember how many modules there were? |
| 9 | A | **No.** |
| 10 | Q | Were all of the modules about investigating a sexual |
| 11 | | harassment complaint? |
| 12 | A | **Re- -- say -- repeat that question.** |
| 13 | Q | You said that you took some modules at work. |
| 14 | A | **Yes.** |
| 15 | Q | Didn't last more than a day. |
| 16 | A | **Right.** |
| 17 | Q | And what I'm trying to find out is if all of the modules you |
| 18 | | took at work were related to investigating a sexual |
| 19 | | harassment complaint? |
| 20 | A | **No.** |
| 21 | Q | They weren't?  So what portion of the modules involved |
| 22 | | investigating a sexual harassment -- |
| 23 | A | **Like I said, there was multiple modules for various types of** |
| 24 | | **subjects.  One of them was harassment.** |
| 25 | Q | Okay.  And would you say that was 50 percent of what you |



GARCIA v. BEAUMONT HEALTH, ET AL.                    DEPOSITION OF JEAN APHRAM

| | | |
|---|---|---|
| 1 | | did? |
| 2 | A | I don't recall. |
| 3 | Q | Would you say it was the majority of what you did? |
| 4 | A | I don't recall. |
| 5 | Q | Okay; okay. I want to talk a little bit about your |
| 6 | | employment. First of all, can you tell me the first job you |
| 7 | | had in the respiratory therapy world? |
| 8 | A | Sure. Worked at -- at the time it was St. John's Oakland on |
| 9 | | Dequindre. |
| 10 | Q | Okay. And when did you start? |
| 11 | A | In '95. |
| 12 | Q | Okay. And how long were you there? |
| 13 | A | Approximately three years. |
| 14 | Q | And did you leave voluntarily or involuntarily? |
| 15 | A | Voluntarily. |
| 16 | Q | And why? |
| 17 | A | Personal reasons. I mean, I -- |
| 18 | Q | What were they? |
| 19 | A | Got married and wanted something more -- different than |
| 20 | | working there, so -- |
| 21 | Q | Was there something about the environment that you didn't |
| 22 | | like? |
| 23 | A | No. It was a small community hospital and I wanted to be |
| 24 | | challenged. |
| 25 | Q | Okay; okay. And after that, what was the next place you |

Page 14

| | | |
|---|---|---|
| 1 | | went? |
| 2 | A | Beaumont Hospital. |
| 3 | Q | Okay. And when did you start at Beaumont Hospital? |
| 4 | A | Early 1998. |
| 5 | Q | And what was your first job there? |
| 6 | A | Staff respiratory therapist. |
| 7 | Q | And how long were you in that position? |
| 8 | A | Approximately three years. |
| 9 | Q | Okay. And who was your supervisor at that time? |
| 10 | A | I believe her name was Joy McAlpine. |
| 11 | Q | Joy? |
| 12 | A | Yeah. |
| 13 | Q | And can you spell the last name? |
| 14 | A | McAlpine? |
| 15 | Q | Yeah. Give it your best shot. |
| 16 | A | M-c-A-l-p-i-n-e. |
| 17 | Q | Okay. And what was the next change after the three years of |
| 18 | | respiratory therapist? |
| 19 | A | Sure. Became a -- the respiratory supervisor on a night |
| 20 | | shift. |
| 21 | Q | And that occurred when? |
| 22 | A | About 2001. |
| 23 | Q | And that was a promotion? |
| 24 | A | Yes. |
| 25 | Q | Okay. |

Page 15

| | | |
|---|---|---|
| 1 | A | There was an opening. Yeah, it was a promotion. |
| 2 | Q | Okay. And when you became a respiratory supervisor, how |
| 3 | | long did you hold that job? |
| 4 | A | 'Til the -- well, 'til I got this job in December of 2016, |
| 5 | | this position. |
| 6 | Q | And the position you're talking about now is? |
| 7 | A | Director of respiratory care. |
| 8 | Q | And you told me that was when? |
| 9 | A | December of 2016. |
| 10 | Q | Okay. When you were a respiratory supervisor, did someone |
| 11 | | supervise you? |
| 12 | A | Yeah. I had a preceptor. |
| 13 | Q | A what? |
| 14 | A | Preceptor, a mentor. |
| 15 | Q | Preceptor? |
| 16 | A | Yeah. |
| 17 | Q | Can you tell me what that is? |
| 18 | A | Well, it's someone that helps guide you. |
| 19 | Q | So like someone that trains you in the job? |
| 20 | A | Correct. |
| 21 | Q | Was that also the person that you reported to? |
| 22 | A | No. |
| 23 | Q | Okay. When I was saying "supervisor," -- my mistake -- I |
| 24 | | meant -- |
| 25 | A | Okay. |

Page 16

| | | |
|---|---|---|
| 1 | Q | -- who was your boss? |
| 2 | A | Which -- in which role? |
| 3 | Q | In the job when you were a respiratory supervisor did you |
| 4 | | answer to someone? |
| 5 | A | I did. |
| 6 | Q | What was that person's name? |
| 7 | A | Mike. |
| 8 | Q | Last name? |
| 9 | A | Wagner. |
| 10 | Q | Okay. And how long were you under Mike Wagner's |
| 11 | | supervision? |
| 12 | A | I don't recall when he started, but I know -- I mean, when |
| 13 | | he retired that's when I took over for him. |
| 14 | Q | So approximately 15 years? If you started in 2001 and -- |
| 15 | A | I don't know. I don't know when he started. |
| 16 | Q | Okay. During that time were you given reviews, performance |
| 17 | | reviews? |
| 18 | A | Yes. |
| 19 | Q | Did you ever have a performance review that was less than |
| 20 | | satisfactory? |
| 21 | A | No. |
| 22 | Q | Did you ever have any areas of concern? |
| 23 | A | No. |
| 24 | Q | Okay. When you moved up to director of respiratory care, |
| 25 | | was that a promotion? |

Page 17

5 (Pages 14 to 17)


NetworkReporting
STATEWIDE COURT REPORTERS
800-632-2720

**Page 18**

1  **A  Yes.**
2  Q  Okay.  Did you have any specialized training when you moved
3     into the director of respiratory care position?
4  **A  Well, I mean -- again, using the knowledge that I had gained**
5     **from obtaining my graduate degree and prior to Mike's**
6     **retirement, you know, he mentored me before he retired.**
7  Q  Okay.  Are you in -- currently in the same position that you
8     took over in 216?
9  **A  As director?**
10  Q  Yup.
11  **A  Yes.**
12  Q  Okay.  And who do you answer to?
13  **A  My administrator is Jose Rivera.**
14  Q  J-o-s-e?
15  **A  Yup.**
16  Q  Rivera?
17  **A  Yup.**
18  Q  Can you spell it?
19  **A  R-i-v-e-r-a.**
20  Q  Okay.  And how long has Jose Rivera been your administrator?
21  **A  I had a -- it was somebody before him, so I don't know when**
22     **his exact -- like when he took that role -- took over in**
23     **that position.**
24  Q  Who was before him?
25  **A  It was -- what's his name?  Sorry.  I'm just trying to**

**Page 19**

1  **remember, he -- because he's still there, but he's in a**
2     **different role.**
3  Q  That's okay.
4  **A  I don't remember.  I can't recall right now.**
5  Q  Okay.  And about how long, give or take a few months, have
6     you been supervised by Mr. Rivera?
7  **A  Can you ask that again?**
8  Q  About how long has Mr. Rivera been your administrator?  A
9     couple years?
10  **A  Again, I don't know when he started in that role, so I**
11     **wouldn't -- it wouldn't be fair of me -- for me to answer**
12     **that because I don't know when he started in that role as my**
13     **administrator.**
14  Q  Well, you said you started in the role in 216?
15  **A  Right.  I don't know when --**
16  Q  December?
17  **A  Yup.**
18  Q  So -- and you had another guy for awhile?
19  **A  Uh-huh (affirmative).**
20  Q  So that would take us into 217?
21  **A  Uh-huh (affirmative).**
22  Q  We're now into early 220.
23  **A  Uh-huh (affirmative).**
24  Q  How long were you under the prior guy?  Was it a matter of
25     months or a couple years?

**Page 20**

1  **A  It was months.**
2  Q  Months?  So -- okay.  That helps a little.  How much -- let
3     me ask you this:  How familiar were you at the time, in
4     2018, of the sexual harassment policy that was in place with
5     Beaumont Health?
6  **A  Can you repeat that question again?**
7  Q  How familiar were you in 218, when you were investigating
8     the incidents in this complaint, with the sexual harassment
9     policy in place at Beaumont Health?
10  **A  Sure.  Generally familiar.**
11  Q  Do you know when the new policy went into effect?
12  **A  No.**
13  Q  Would you have received a copy of the new policy?
14  **A  No.**
15  Q  So how did you make yourself "generally familiar"?
16  **A  Well, there's certain ways that people should conduct**
17     **themselves.  I mean, it's pretty self-explanatory.  And**
18     **there are certain ways that they should not.**
19  Q  Okay.  But I'm talking about the written policy.  Have you
20     ever read it?
21  **A  No.**
22  Q  So you've never read the policy at Beaumont Health for
23     sexual harassment?
24  **A  When?**
25  Q  I'm just saying.  I asked you if you had ever read it and

**Page 21**

1  you said "no."  And I'm trying to figure out if that means
2  you've never read it ever?
3  **A  I wouldn't say "never read it."**
4  Q  Well, how would you come to read it if you didn't have a
5     copy of it and you didn't know when it was put out?
6  **A  Can you repeat that question?**
7  Q  I'm trying to figure out how -- you said, "I wouldn't say I
8     never read it."  My question to you is, how did you come to
9     read it if you didn't have a copy of it --
10  **A  Sure.**
11  Q  -- and you didn't know when the new policy was put into
12     effect?  What circumstances -- under what circumstances
13     would have caused you to go read that?  And we're talking
14     about a time period in 2018.
15  **A  Sure.  I don't recall.**
16  Q  Do you recall specifically reading the new policy that came
17     out in 2018?
18  **A  No, I don't recall.**
19  Q  You don't have any memory of that?
20  **A  No.**
21  Q  Were you familiar with the old policy that was -- covered a
22     period from 212 to 216?
23  **A  I don't recall.**
24  Q  Do you have -- and were you -- did you receive any training
25     when these policies came out, specific to these policies?



1  A   I don't recall.
2  Q   Okay.  In your role as a director of respiratory care, how
3      many sexual harassment investigations have you done?
4  A   None, zero.
5  Q   How many employment discrimination investigations have you
6      done?
7  A   None.
8  Q   Okay.  What was your -- well, let me ask you this:  As part
9      of your job, did you have any supervisory authority over Ms.
10     Luca?
11 A   As -- in which role?
12 Q   In any role.
13 A   Well, I don't remember when she started.  As a director, I
14     mean, I oversee the department.
15 Q   So did you have any supervisory role over Ms. Luca?
16 A   No, not directly supervising; no.
17 Q   If she was having performance problems, would they have been
18     brought to your attention?
19 A   It depends.
20 Q   On what?
21 A   If they're -- if it's, like, something routine or
22     something -- I don't know.  What's the terminology?  Some --
23     maybe something relatively simple, then it would be handled
24     by the supervisors.
25 Q   What kind of issues would have been brought to your

Page  22

1      attention?
2  A   If there was something -- you know, gross neglect or
3      something like that.  I mean, something very serious, they
4      would be brought to my attention.
5  Q   How about chronic and excessive absenteeism?
6  A   It depends.
7  Q   On?
8  A   Well, if it's -- if it's reliability issues then it would be
9      brought to my attention.  If it's something that has to do
10     with FMLA then it would not be because it's -- wouldn't be.
11 Q   Okay; okay.  So prior to 2018, did you have any knowledge of
12     any discipline involving Rachel Luca?
13 A   Prior to 2018?
14 Q   Yup.
15 A   No.
16 Q   Did you receive any prior complaints about Ms. Luca?
17 A   I don't recall.
18 Q   Did you have any part to play in a performance improvement
19     plan that Ms. Luca received October of 216?
20 A   No.  I'd have to see the document.  I don't --
21 Q   Okay.
22     MR. PELTON:  Keep your voice up, please.
23 A   Oh, I'd have to see the document.  I mean, I don't know
24     what -- if I've signed it, then I was involved.  If it's
25     signed by me, then I was not involved.

Page  23

1  Q   Well, how about -- I'm just trying to get your memory now
2      and then we'll talk about the document.
3  A   Sure.
4  Q   How about December of 216?  She had another performance
5      improvement plan.
6  A   Yeah.
7  Q   Do you remember seeing or being involved in that process?
8  A   I don't recall.
9  Q   Okay.  I'm going to hand you something -- I'm not ready to
10     make it an exhibit yet -- just to see if it refreshes your
11     memory, to see if you even have your name on it anywhere.
12 A   Sure.
13 Q   Because I can't read the writing.
14     MR. PELTON:  Well, let's identify what's being
15     handed to the witness.
16     MS. WARD:  Two performance improvement plans
17     involving Ms. Luca that I got from Defendants.
18     (Counsel hands documents to witness)
19     MR. PELTON:  So one's dated as --
20     MS. WARD:  Yup.
21     MR. PELTON:  -- being prepared October 3rd, 2016.
22     It's control labeled 410 and 411.  There's a second one,
23     looks like, from 2016 dated -- excuse me -- control labeled
24     408 to 409.  Just take a moment to look at this.
25     THE WITNESS:  Yup.

Page  24

1  Q   Yeah.  I just want to ask if your name's on any of that, if
2      you were involved?  That's all, just generally.
3  A   Yes, my name is on the second one, the one that's dated
4      12/17/16.
5  Q   And that did involve you?
6  A   Yes, my signature's on there; yup.
7  Q   Do you want to take a moment to refresh your recollection
8      about that information?
9      (Witness reviews document)
10 A   Okay.  So -- yeah.
11 Q   Okay.  So your name is on there in what capacity?
12 A   As the department manager.
13 Q   So if it was brought to you as a department manager, does
14     that mean that it must have been, as you describe, a major
15     enough performance issue?
16 A   Correct.  Because this --
17     MR. PELTON:  Object to the characterization of his
18     testimony.
19     MS. WARD:  Well, I'm quoting him.
20 Q   But go ahead.
21     MR. PELTON:  Object to the -- your effort to
22     quoting something that's in the transcript; mischaracterizes
23     what he said.  Go ahead.
24 Q   So I'm asking you --
25 A   Can you repeat the question again?  Sorry.

Page  25

7 (Pages  22 to 25)



1  Q   I'm asking you if it was brought to your attention, does
2      that make it one of those more major performance issues?
3          MR. PELTON:  Object to form.
4  Q   Go ahead.
5  **A   Yes.**
6  Q   Okay.  So to bring you in meant that there was something
7      more than, what I understood to be, minor issues?
8  **A   Correct.**
9  Q   Okay.  Can I have it back?
10         (Witness hands document to counsel)
11 Q   Were any other complaints about Ms. Luca brought to your
12     attention prior to 218 about her performance, her
13     interactions in the office?
14 **A   I don't recall.**
15 Q   It might have happened, but you didn't remember?
16 **A   I don't recall.**
17 Q   Do you recall if anyone came to you concerned about Ms. Luca
18     selling her prescription drugs at work?
19 **A   No, I don't recall.**
20 Q   Okay.
21         MS. WARD:  I'm going to have this marked as
22     Exhibit 1.  Sorry.
23         (Plaintiff's Exhibit 1 marked)
24         (Counsel hands exhibit to counsel)
25         MR. PELTON:  Thank you.

Page 26

1          MS. WARD:  You're welcome.  And I'm going to have
2      the next one marked as Exhibit 2.  I just want to talk about
3      them both.
4          (Plaintiff's Exhibit 2 marked)
5  Q   Have you had a chance to look those over, Mr. Aphram?
6  **A   I'm doing it now.**
7  Q   Okay.  Well, when you're ready let me know.
8  **A   Oh, okay.**
9      **(Witness reviews exhibits)**
10 Q   Do you recognize those two documents?
11 **A   Yes, ma'am.**
12 Q   Let me ask you this:  Have you seen them before?
13 **A   Yes.**
14 Q   When?
15 **A   I don't recall.**
16 Q   So you don't know when you've seen them?
17 **A   No.**
18 Q   Do you have a specific recollection of reviewing either of
19     these documents prior to your involvement in the 28- -- 2018
20     incident with Ms. Garcia and Ms. Luca?
21 **A   I review a lot of policies that come through sometimes, so I**
22     **don't remember or recall which exact date or which time**
23     **line.**
24 Q   Would it have been your habit in your job to consult these
25     policies before being involved in any kind of investigation

Page 27

1      involving sexual harassment at Beaumont Hospital?
2          MR. PELTON:  Object to the form.  He's already
3      testified that he hasn't been in an investigation like that
4      before.
5  Q   Would it --
6          MR. PELTON:  So there can't be a habit.
7          MS. WARD:  I'm just asking him if that would be --
8  Q   -- something you would normally do?
9  **A   Not normally.**
10 Q   Okay.  So you don't know which policy would have been
11     consulted or be in effect at the time?
12 **A   (Shaking head negatively)**
13 Q   Okay.
14         MR. PELTON:  You've got to answer verbally.
15 **A   Oh, "no."**
16 Q   Okay.  I just want to draw your attention to Exhibit 1, page
17     3, first full paragraph.  I would like you to read the first
18     sentence into the record.
19 **A   Under where it says "investigation process"?**
20 Q   Yes.
21 **A   That one?**
22 Q   Right across, it starts with "upon."
23 **A   "Upon receiving a complaint of sexual harassment or**
24     **request for investigation of the same, the hospital will**
25     **investigate the matter."**

Page 28

1  Q   And then you drop down.  And the last sentence of that
2      paragraph?
3  **A   "The failure of any employee, including a complaining**
4      **employee, to satisfactorily cooperate in such an**
5      **investigation will be deemed sufficient grounds for**
6      **discipline up to and including discharge."**
7  Q   Okay.  And I was going to ask you to look at the front page
8      where there's examples of sexual harassment.  It's down --
9      one, two -- third -- third paragraph.
10 **A   Uh-huh (affirmative).**
11 Q   I'm sorry.  Fourth paragraph.  You looking at that now?
12 **A   Yes.**
13 Q   Would you agree that "unconsented touching" is included in
14     the definition or the example of sexual harassment?
15 **A   That's what's stated here (indicating).**
16 Q   How about "unwelcome circulation of sexually explicit
17     photos"?
18 **A   Yeah, that's what it says here.**
19 Q   And how about "sexually explicit remarks which cause the
20     recipient discomfort or humiliation"?
21 **A   Yup, it's described here.**
22 Q   So you agree all three of those things are included in the
23     policy?
24 **A   Yeah, they're under "examples"; yes.**
25 Q   Can you look at Exhibit 2, third page, under "process" and

Page 29

8 (Pages 26 to 29)



1   can you read the first sentence of the last paragraph into
2   the record?
3   A  It starts with "once"?
4   Q  Yup.
5   A  "Once a complaint is received an investigation will be
6      conducted by the compliance audit accreditation and risk
7      department and/or human resources."
8   Q  Are you part of the compliance audit accreditation and risk
9      department?
10  A  I'd have to -- I'd have to check.  But, yeah, I would be
11     part of -- I mean, I don't know.
12  Q  You don't know if you are or not?
13  A  Not for certainty, no.
14  Q  Okay.  So you might be on the committee, but you said you've
15     never done investigations for sexual harassment before?
16  A  I've never done -- yeah, not done; uh-huh (affirmative).
17  Q  Okay.  You're not part of HR -- are you? -- as that's known
18     at Beaumont Health?
19  A  Correct.
20  Q  Did you take any steps to ensure that the investigation of
21     Ms. Garcia's complaint was referred to the CAR or HR
22     departments?
23  A  Yes.
24         MR. PELTON:  Object to the form.
25  Q  You said "yes"?

                        Page 30

1          MR. PELTON:  Go ahead.
2          THE WITNESS:  Sorry.
3          MR. PELTON:  Uh-huh (affirmative).
4   A  Can you repeat the question, please?
5   Q  I just asked, did you take any steps to ensure that the
6      complaint by Ms. Garcia regarding the sexual harassment
7      incident was referred to either the compliance audit and
8      accreditation and risk department or human resources
9      department?
10  A  Yes.
11  Q  What steps did you take?
12  A  Called HR.
13  Q  When?
14  A  On the day that that was -- I was made aware of the initial
15     complaint.
16  Q  And when was that; do you remember?
17  A  The exact date?  Is that what you're asking?
18  Q  Best approximation.
19  A  Sure.  When Krissy first came to talk to Net and then that
20     was brought to me that same day.
21  Q  Okay.  Did this involve the retaliation incident or the
22     original inappropriate touching incident?
23  A  The original.
24  Q  Okay.  And what steps did you take to make sure that
25     investigation was conducted by CAR or HR?

                        Page 31

1   A  Notified HR of the complaint and we were guided -- you know,
2      directed to do an investigation.
3   Q  You were?
4   A  The department was.  So Net was involved, so yes.
5   Q  All right.  And what steps did you take to make sure Net
6      understood how to conduct that investigation?
7   A  She sat in on a phone call with --
8   Q  With?
9   A  -- with HR.
10  Q  And what was she told?
11  A  That we needed to investigate the complaint and get
12     everybody's side of the story.
13  Q  Was there specific instructions about how to do that?
14  A  To -- to talk to the individuals that were present.  So Ms.
15     Luca was one of those individuals.
16  Q  Okay.  Was she directed to any written resources to help her
17     with this task?
18  A  Written resources?  I don't recall.
19  Q  Was she given any training to help her with this task?
20  A  You're talking about who?
21  Q  The woman that you -- that was delegated to do the
22     investigation, Net Carroll?
23  A  She would have received the same training or module training
24     as I did.
25  Q  And you don't recall whether the modules included how to do

                        Page 32

1   an infect -- effective sexual harassment investigation?
2   A  I don't recall.
3   Q  Okay.  Was there any other instructions or training given to
4      Ms. Carroll before she conducted the investigation?
5   A  I don't recall.
6   Q  Okay.  And you realize Ms. Carroll's not part of HR;
7      correct?
8   A  Correct, but we called HR.
9   Q  No, I understood that.
10  A  Okay.
11  Q  But she's not part of that department.
12  A  Okay.
13  Q  And neither is she part of the CAR department, is she?
14  A  I'd have to check.  I don't know.
15  Q  Well, you don't know if you're part of the department?
16  A  Correct.
17  Q  Okay.
18         (Plaintiff's Exhibit 3 marked)
19  Q  I'm handing you what is now Exhibit 3.
20         (Counsel hands exhibit to witness)
21         MS. WARD:  "Yes"?  I'm asking you, court reporter.
22     Is --
23         REPORTER:  Yes.
24         MS. WARD:  Are up to 3?  Okay.
25         REPORTER:  Yes.  Whose copy is this?

                        Page 33

                              9 (Pages 30 to 33)



GARCIA v. BEAUMONT HEALTH, ET AL.                    DEPOSITION OF JEAN APHRAM

1   MS. WARD:  That's the witness's copy, but --
2   MS. GARCIA:  Ours?  It'll be ours.
3   MS. WARD:  Yeah.  Because you have one.  Do you
4   have one?
5   MR. PELTON:  I do.  So you got an extra.
6   MS. WARD:  Okay.
7  Q  Have you had a chance to look it over?
8  A  Yes.
9  Q  Do you know when this document was prepared?
10 A  When it was prepared?  No.  That's not me who prepared it.
11 Q  No, I understand.  I'm just asking if you might know.
12 A  Well, I don't know when it was prepared.
13 Q  Okay.  Have you seen it before?
14 A  Yes.
15 Q  When did you see it?
16 A  It would have been -- it was at the -- I don't recall the
17    exact date, but it was at the end of -- at the end of
18    August.
19 Q  Do you know why it was prepared?
20 A  Yeah, this was Krissy's or Ms. Garcia's statement of the
21    incident -- of the first incident.
22 Q  And I asked if you know why it was repair -- prepared.  Did
23    somebody ask her to put something in writing?
24 A  Yes.
25 Q  Okay.  Were you present when that request was made?

Page 34

1  A  I don't recall.
2  Q  Okay.  Did you ask her to put something in writing at that
3    time?
4  A  I don't recall, no.  I don't recall if -- who asked to put
5    it in writing.
6  Q  Okay.
7  A  But I -- it would have had to have been -- somebody who had
8    asked her to put it in writing because she did.
9  Q  I want to draw your attention to -- one, two, three, four,
10   five, six, seven, eight, nine -- the ninth line down.
11   There's a sentence that starts with "while."
12 A  Okay.
13 Q  Can you read that sentence into the record?  It's about
14   three lines long.
15 A  Where it starts with "while"?
16 Q  Uh-huh (affirmative).
17 A      "While I did that, Rachel had got up and came next
18    to me.  I didn't even notice she had moved from her
19    chair when she -- suddenly her hand was down my shirt
20    inside my bra cup and she pinched my nipple, bare skin,
21    and pulled out my left breast, removing it from the bra
22    cup."
23 Q  Okay.  And then about four line -- or three lines after
24   that, there's a sentence that starts with "I said something
25   along the lines of."  Can you read that in the record, next

Page 35

1   two sentences?
2  A  "I said something along the lines 'that wasn't my bra, that
3    was my nipple,' and again asked why she would do that.  She
4    stated, 'Well, you have nice nipples' and giggled."
5  Q  Okay.  Assuming for the purpose of my next question that
6    these facts are correct, would you agree that this conduct
7    violated the sexual harassment policy at Beaumont Health?
8      MR. PELTON:  Object to speculative and assumes
9    facts not in evidence.
10 Q  Go ahead.
11     MR. PELTON:  You can answer.
12 A  Can you repeat the question again, please?
13     MS. WARD:  Can you read it back?
14     REPORTER:  I can play it back for you.
15     MS. WARD:  Uh-huh (affirmative).
16     (Playback of previous testimony)
17     MR. PELTON:  Same objection.
18     MS. WARD:  Uh-huh (affirmative).
19 A  Then, yes.
20 Q  Okay.  I want to go to the second page and I want you to
21   read the second to the last sentence into the record.
22 A  Can you please tell me where do you want me to start?  Which
23    sentence?  I just want to make sure I got the right --
24 Q  I'm sorry.  The last sentence before you get to "if there
25    are any further questions."

Page 36

1  A  Where it starts "I wanted"?
2  Q  Uh-huh (affirmative).
3  A      "I wanted this documented and I expressed to Net
4    that I was not comfortable being alone with her, so we
5    would not be paired together in an ICU where we --
6    where we could possibly be alone in our supply room
7    where a lot of the -- where a lot of our charting --
8    where we do a lot of our charting."
9  Q  Okay.  And you said, if I understand right, you got this at
10   the end of August and read it?
11 A  It was not at the end of August.
12 Q  Okay.  When did you see it first then?
13 A  It would have been at the beginning of August, early August.
14 Q  You saw this in early August?
15 A  Yeah.  Sorry.  That's --
16 Q  Okay.  If I told you that my client remembers drafting it
17   around August 18th or 19th, does that sound about right?
18 A  I don't know.
19 Q  Would you have seen it after she drafted it?
20 A  It would have been after she drafted it, yes.
21 Q  Okay; okay.  My question is, based -- what did you do at
22   that time when you saw it to be sure that she was not
23   scheduled to work with Ms. Luca in an ICU?
24 A  I do not handle the scheduling or the assignment sheet
25    makeup.

Page 37

10  (Pages 34 to 37)



GARCIA v. BEAUMONT HEALTH, ET AL.                    DEPOSITION OF JEAN APHRAM

1  Q  Understood.
2  A  Okay.
3  Q  Did you take any steps at all?
4  A  Well, I would have had a discussion with the supervisor to
5     say, "Please make every effort to not schedule the two at
6     the same time or in the same area."
7  Q  Okay.  You -- do you recall specifically saying that to her
8     supervisor?
9  A  Generally, in the general terms.
10 Q  What do you mean "generally"?
11 A  I'm paraphrasing.  I --
12 Q  Okay.  But do you remember a specific conversation
13    requesting her not to be scheduled with Ms. Luca?
14 A  Yes.
15 Q  And who would have been the supervisor you were talking to?
16 A  It would have been Jim and Allen.
17 Q  Jim.  Last name?
18 A  Or Al- -- Jim Burgess.
19 Q  Or?
20 A  Or Allen.
21 Q  Last name?
22 A  Frankhouse.
23 Q  Okay.  And you remember specifically telling them that?
24 A  Not those specific words, but some -- in -- along the
25    same -- that context.

                    Page 38

1  Q  Okay.
2  A  To make --
3  Q  So you remember specifically instructing them not to
4     schedule her with Ms. Luca?
5  A  No, that's not what I said.
6  Q  Okay.  Go ahead.  Tell me.  Clarify it for me so I get it.
7  A  I said to "please make the effort because -- to not have her
8     work in the same area."
9  Q  Make the effort to not work in the --
10 A  Yes.
11 Q  What does that mean to you, "not work in the same area"?
12    You have to help me.
13 A  Just like she instructed to not work in --
14         MR. PELTON:  Maybe you need to listen.  I think it
15    was pretty clear.
16         MS. WARD:  Well, I'm going to ask it again if
17    that's okay.
18         MR. PELTON:  Okay.
19 Q  I'm trying to understand what you mean by "not work in the
20    same area."  How would -- how did you anticipate your
21    instruction would meet this goal?
22 A  Well, if there's two people assigned to one specific area or
23    floor or unit, to not put them together in that same floor
24    or unit.
25 Q  Uh-huh (affirmative).  And you recall instructing those two

                    Page 39

1     individuals of something like that?
2  A  Of something like that.
3  Q  Towards the end of August?
4  A  I don't recall the date, but it would have been after we
5     received this then.
6  Q  Okay.  And if I told you she was continually still scheduled
7     to be working with Ms. Luca, would that surprise you?
8         MR. PELTON:  Object.  Misrepresents her record.
9     Go ahead.
10        MR. PELTON:  Completely misrepresents it.
11 Q  Would that surprise you?
12        MR. PELTON:  It lacks foundation.
13        MS. WARD:  Understand.  The judge will rule.
14        MR. PELTON:  Okay.
15 Q  Would that surprise you?
16 A  You'd have to repeat that question.
17 Q  If I told you that she was scheduled to work in the same
18    area as Ms. Luca many times after this, would that surprise
19    you?
20 A  I don't recall.
21 Q  You don't know if it would have surprised you or not?
22 A  I don't recall.
23 Q  Okay.  Did you take any other steps to ensure that her
24    request was considered, other than talking to these two
25    individuals?

                    Page 40

1  A  You're going to -- I need to know which time line.  Which
2     time line are we talking about?
3  Q  I'm just asking.  You said -- you mentioned that you gave
4     this -- you had a discussion with these two individuals?
5  A  Uh-huh (affirmative).
6  Q  I'm saying that you do anything else before or after, at any
7     time, to try to honor her request?
8  A  We did try to honor her request.  I don't recall which time
9     line because there's two incidences here.
10 Q  Okay.  But I'm trying to ask you, what did you do besides
11    this conversation with these two individuals?
12 A  Gave them instructions to not -- make sure that
13    they're -- or to try to not schedule them in the same --
14    in the same area.
15 Q  Okay.  Did you have a conversation with them more than once?
16 A  I don't recall.
17 Q  Did you do any follow-up with them to see how it was going?
18 A  I don't recall.
19 Q  Might you have?
20 A  I don't recall.
21 Q  Okay.  Did you contact Ms. Garcia to see if her request was
22    being honored?
23 A  Did I?
24 Q  Yes.
25 A  I don't recall.

                    Page 41

11 (Pages 38 to 41)



GARCIA v. BEAUMONT HEALTH, ET AL.                    DEPOSITION OF JEAN APHRAM

1      (Plaintiff's Exhibit 4 marked)
2  Q  Exhibit 4, can you take a look at that?
3      (Witness reviews exhibit)
4  A  Okay.
5  Q  Have you ever seen that document before?
6  A  Yes.
7  Q  When did you first see it?
8  A  I don't recall.
9  Q  Would you have seen it at around the time 8/6/18 as set
10   forth in the document?
11 A  I don't recall.
12 Q  Do you remember the occasion that you came to review this
13   document?
14 A  Well, it would have been after the -- the initial complaint
15   from -- from Krissy.  And then the investigation would have
16   been done and these are statements from the people that
17   were --
18     MR. PELTON:  Keep your voice up, please, --
19     THE WITNESS:  Sorry.
20     MR. PELTON:  -- Mr. Aphram.
21     THE WITNESS:  Yup.
22 A  And the -- they would have been the statements from the
23   individuals that were asked if they had any knowledge of the
24   initial incident.
25 Q  Did you --

Page 42

1  A  So it would have been after that.
2  Q  Did you have any input in the preparation of this document?
3  A  No.
4  Q  Certainly you didn't work on it; correct?
5  A  Correct.
6  Q  It was given to you by Ms. Carroll?
7  A  Correct.
8  Q  I want to draw your attention to a couple of items.  First
9    of all, did you think that Ms. Carroll had reached the
10   correct conclusion after interviewing these witnesses?
11     MR. PELTON:  Which conclusion?
12 Q  At the bottom, "per my investigation."  It's underlined.
13 A  Can you repeat that question?  I'm sorry.
14 Q  If you look at the bottom of the first page --
15 A  Uh-huh (affirmative).
16 Q  -- there's something underlined there.
17 A  Yup.
18 Q  Do you want to take a minute to read it?
19 A  Yes, please.
20 Q  Okay.
21     (Witness reviews exhibit)
22 A  Okay.
23 Q  When you reviewed this, did you think Ms. Carroll had
24   reached the correct conclusion?
25 A  I believe so.

Page 43

1  Q  You did?
2  A  Uh-huh; yes.
3  Q  Okay.  Did you find any -- let me -- let me draw your
4    attention to two sentences here.  Under the "Colleen states"
5    section, --
6  A  Okay.
7  Q  -- third sentence, can you read that in the record?
8  A  It starts with?
9  Q  "Colleen doesn't."
10 A  Oh, "Colleen doesn't recall anything coming up" -- that one?
11 Q  Uh-huh (affirmative).
12 A  Okay.  "Colleen doesn't recall anything coming up regarding
13   a nipple and she states, 'I didn't see Rachel touch, grab
14   Krissy's breast.'"
15 Q  Okay.  And then I want you to read the first sentence under
16   "Rachel states."
17 A  Where it starts "we were"?
18 Q  Uh-huh (affirmative).
19 A  "We were comparing bras, nothing more.  It was mothers' talk
20   because we were discussing sports bra and breast feeding."
21 Q  Keep going.
22 A  "I accidently touched Krissy.  I did not grab her."
23 Q  Okay.  Did you see any problem in the fact that Colleen
24   alleges that she didn't see Rachel touch Krissy's breast,
25   but Rachel admitted that she did accidently touch Krissy?

Page 44

1    I'm just asking --
2      MR. PELTON:  Object to -- hold on.  Object.  That
3    completely misrepresents what Rachel says on this document.
4      MS. WARD:  That's okay.
5  Q  Go ahead and answer the question.
6      MR. PELTON:  Go ahead.
7  A  Can you please repeat it?
8      MS. WARD:  Can you repeat the question, please?
9      (Playback of previous testimony)
10 Q  Can you answer the question?
11 A  No.
12 Q  You didn't?
13 A  (No verbal response)
14 Q  Would you agree that this -- with the -- Carroll's
15   conclusion that this is just a "he said/she said"?
16 A  I do.
17 Q  Would you agree that most incidents of sexual harassment end
18   up being "he said/she said"s generally?
19     MR. PELTON:  Object, lack of foundation.
20 A  I can't answer that.  I don't know.
21 Q  Okay.  Did you have any prior knowledge of Ms. Luca's
22   reputation for truthfulness at Beaumont Health?
23 A  Can you repeat that again?
24 Q  Did you have any prior knowledge of Ms. Luca's reputation
25   for truthfulness at Beaumont Health?

Page 45

12 (Pages 42 to 45)



1   A   No.
2   Q   Did you have any prior knowledge of Ms. Garcia's reputation
3       for truthfulness?
4   A   No.
5           (Plaintiff's Exhibit 5 marked)
6   Q   Sorry.  That's for your counsel.
7           (Counsel hands exhibit to counsel)
8   A   Yeah.  No worries.  Thank you.
9           (Witness reviews exhibit)
10  Q   Have you had a chance to look it over?
11  A   Yes.
12  Q   I want to go to -- one, two, three -- the fourth
13      paragraph, assuming that "Rachel states," is a paragraph.
14      Can you get there?  It starts with "Rachel appeared upset."
15  A   Wait, fourth paragraph?
16  Q   Well --
17  A   Oh, if you're counting.  Okay.
18  Q   Like bullet point paragraphs.
19  A   Got it.  Okay.  So "Rachel appeared upset" -- that one?
20  Q   Uh-huh (affirmative).
21  A   "Rachel" --
22  Q   Second sentence.  Can you read that in the record?
23  A   Oh, sorry.  Where it says "Rachel is"?
24  Q   Right.
25  A   "Rachel is not putting anything in writing at this time.

Page 46

1   She kept repeating she couldn't believe this is happening."
2   Q   Okay.  Would you have seen Ms. Luca's failure to put
3       something in writing as not cooperating with the
4       investigation?
5   A   I can't answer that for her.
6   Q   I'm talking about your judgement as the management person.
7   A   No, I --
8   Q   I'm -- I'm talking about as set forth in Exhibit 1 about
9       cooperation.
10  A   Again, I can't answer for her.  I mean, would I see it?
11      Maybe.
12  Q   Maybe?
13  A   Maybe.
14  Q   Because satisfactory cooperation was required by Beaumont
15      Health; correct?
16  A   Uh-huh (affirmative).
17  Q   And so if she didn't put anything in writing, that could be
18      seen as not satisfactorily cooperating?
19  A   Maybe.  She made a statement, so --
20  Q   Okay.  No, I'm talking about "Rachel is not putting anything
21      in writing at this time."
22  A   Yeah.  I understand.
23  Q   I -- it sounds like she had the option.  And I understand
24      under the policy she's supposed to cooperate?
25  A   Maybe.

Page 47

1   Q   What do you mean "maybe"?
2   A   Well, she cooperated.  She's made a statement.
3           MS. WARD:  I have a packet here for the next
4       exhibit.
5           (Plaintiff's Exhibit 6 marked)
6   Q   That's for him.
7   A   Okay.
8           (Counsel hands exhibit to counsel)
9   Q   That's for you.
10          (Counsel hands exhibit to witness)
11  A   Thank you.
12          (Witness reviews exhibit)
13  Q   Did you have a chance to look that over?
14  A   Yes, ma'am.
15  Q   Okay.  The top appears to be some sort of cover memo
16      attaching Krissy's written statement after the initial
17      complaint.  Yes?
18  A   Sure.
19  Q   Is that the statement that's attached, September 10th?
20  A   Yeah.
21          MR. PELTON:  Are you talking about --
22  A   Yup.
23          MS. WARD:  I'm talking about the last two pages of
24      the exhibit.  I just want to make sure we got the right --
25          MR. PELTON:  307 and 308, yeah.  Okay.

Page 48

1   A   Got it.  Yes.
2   Q   That's the statement that was attached?
3   A   Yes.
4   Q   Okay.  And then I see there's a -- what purports to be a
5       statement that was put together by Net Carroll on 8/27?
6   A   Uh-huh (affirmative).
7   Q   And a statement that was put together by you on 8/27?
8   A   Well, I think -- yes.
9   Q   Would those be the right statements to be included in the
10      packet?
11  A   Yes.
12  Q   So you read all of those before you sent them on?
13  A   Yes.
14  Q   Okay.
15  A   Well, it's -- the last -- Krissy's narrative, I didn't get
16      that 'til after.
17  Q   What do you mean "after"?  I'm just looking at the --
18  A   Yeah.  Sorry.
19  Q   -- second sentence of the memo.
20  A   Got it.
21  Q   And that's why I'm trying to understand.  Can you read the
22      second sentence of the memo into the record?
23  A   "Also"?  That one?
24  Q   Yeah.
25  A   Okay.  "Also attached is Krissy's written statement after

Page 49

13 (Pages 46 to 49)



1    initial complaint.  Please let me know" --
2  Q  Yeah.
3  A  Oh, yeah.
4  Q  So "after initial complaint," I assume the initial complaint
5      was the document we -- we talked about in -- I'll get it for
6      me -- Exhibit 3?
7  A  Yeah; yes.
8  Q  And so this would have been the statement after the initial
9      complaint?
10 A  Cor- -- correct.
11 Q  So this would have been the September -- the statement
12     that's dated September 10?
13 A  September 10th, yup.
14 Q  You with me?
15 A  Yes.
16 Q  Okay.  I want you to turn to the last page of those two
17     pages I gave you.
18 A  Okay.
19 Q  And you see there's some handwriting on the bottom?
20 A  Okay.
21 Q  Is that your writing?
22 A  That is not my writing.
23 Q  Do you know whose writing that is?
24 A  I do not know whose writing that is.
25 Q  Okay.  Let me ask you this:  Why didn't you send the first

                        Page 50

1      statement along with your packet to Ms. -- Mr. -- I'm going
2      to say this right -- Brancaleone?  Is that how you say his
3      name?
4  A  Uh-huh (affirmative).
5  Q  Which would have been Exhibit 3.
6  A  The question was again?
7  Q  Why didn't you send along Exhibit 3 as part of your packet
8      that went to Mr. Brancaleone?
9  A  If I recall, we had received this (indicating) from Krissy
10     earlier -- earlier.
11 Q  Who had?
12 A  Net had received it.  My apologies.
13 Q  Uh-huh (affirmative).
14 A  Net had received this.  This was Krissy's statement of the
15     initial or the first incident.  And so I don't know -- I
16     don't recall why I would not have included it -- why I would
17     not have included it in this.
18 Q  But you agree you didn't, as per the sentence we read?
19 A  Yeah, because this -- yeah.
20 Q  Okay.  I want to look at the last two bullet points of Net's
21     statement.
22 A  Uh-huh (affirmative).
23 Q  Can you read those in the record?
24 A  Both of them?
25 Q  Yeah.

                        Page 51

1  A  Where it says "spoke to"?
2  Q  Yup.
3  A  Okay.
4         "Spoke to the afternoon supervisor, Jim Burgess,
5      regarding speaking with Rachel on her next scheduled
6      night to work, Friday, August 31st.  Rachel called in
7      FMLA and has -- and has herself scheduled during the
8      weekend when a super -- when the supervisors are off."
9  Q  Period.
10 A  Yes.
11 Q  Okay.  Did it concern you at all that Ms. Luca would
12     continue to be working at Beaumont without having gotten
13     back to Mr. Burgess?
14 A  Would it concern me at all?  Maybe.  I mean, I --
15 Q  Okay.  And then the next bullet point?
16 A  "Our director, Jean Aphram, has reached out to Rachel via
17     phone and has left messages to no avail."
18 Q  Okay.  So you tried to call her a number of times?
19 A  I believe so, yeah.
20 Q  Okay.  And, again, I want to go back to the policy and
21     cooperation.  Well, did it concern you about her failure to
22     get -- return your -- your phone calls and messages with
23     regard to her cooperation in the investigation?
24 A  No, not really.
25 Q  Because?

                        Page 52

1  A  Because people have lives outside of work and I don't -- I
2      can't answer for her.
3  Q  Okay.  I understand you can't answer for her.  But it didn't
4      concern you that she wasn't cooperating as per required by
5      the policy?
6         MR. PELTON:  Object to the characterization of
7      this being not cooperative.
8  Q  Go ahead.
9  A  Yeah.  I still can't answer the -- I can't answer for her.
10 Q  Okay.  All right.  Let me go to your statement.
11 A  Uh-huh (affirmative).
12 Q  I want to go down to -- under 6 there's an indentation.
13 A  Okay.
14 Q  Just for clarification, can you read the first sentence
15     under that bullet point?
16 A  Sure.  "First is the -- first is the inappropriate talk and
17     bra touching claim by Krissy back on August 6th."
18 Q  Okay.  And didn't Krissy, at that time, claim that Ms. Luca
19     had grabbed her nipple?
20 A  (No verbal response)
21 Q  We can go back to the other statement you read.
22 A  Yeah.
23 Q  Okay.  So here you characterize it as "inappropriate talk
24     and bra touching."  Is there a reason you took that
25     characterization in that statement?

                        Page 53

                                            14 (Pages 50 to 53)




1   **A   I don't recall.**
2   Q   You agree that this was Ms. Luca's version as opposed to Ms.
3      Garcia's version of the event?
4   **A   I don't recall why I wouldn't have put it in there.**
5   Q   Pardon me?
6   **A   I don't recall why I -- I mean --**
7   Q   Well, I can go back to the statement.  Let's go back to it
8      if you want to.
9   **A   Sure.**
10  Q   Okay.  I believe that was Exhibit 3.
11  **A   Okay.**
12  Q   Can you go back to that?
13  **A   Yeah.  I'm looking at it right now.**
14  Q   Okay.  And I had you read into the record starting with --
15     just to make it quick, "she had moved her chair when
16     suddenly her hand was down my shirt inside my bra cup and
17     she pinched my nipple, bare skin, and pulled up on my left
18     breast."
19  **A   Okay.**
20  Q   Okay.  But here (indicating) you characterize it as
21     "inappropriate talk and bra touching."  So had you made a
22     judgement when you wrote this, that her version of the event
23     wasn't truthful?
24  **A   No, I had not.**
25  Q   Can you tell me why you didn't refer to it the way she did

Page 54

1   in the memo?
2   **A   I don't know why.**
3   Q   Okay.  And I want to go to your bullet point after that.
4   **A   Uh-huh (affirmative).**
5   Q   The next -- not the next indent, the next full bullet point,
6      "later that morning."
7   **A   Okay.**
8   Q   The one after that, can you read that in the record?
9   **A   Sure.  "Later that morning spoke with HR rep, Margaret, and**
10     **explained situation.  HR rep expressed need to interview**
11     **Rachel and get her side of the story."**
12  Q   Okay.  And the next bullet point?
13  **A   "Numerous attempts were made to discuss issue with no call**
14     **back.  Called on, you know, 8/27, 8/29, 8/30, 31.  Left a**
15     **message on all those call back -- left a message on those**
16     **calls to call back.  No call back."**
17  Q   Okay.  Next point?
18  **A   "Rachel's also -- Rachel also called in sick and**
19     **subsequently only worked weekends when no supervision is**
20     **working."**
21  Q   Did it trouble you at all of Rachel's failure to get back to
22     you after leaving messages on the 27th, the 29th, the 30th
23     and the 31st?
24  **A   Maybe.  I mean, how do I know she is -- listens to her**
25     **audits?  I mean, that's -- you're asking a question --**

Page 55

1   Q   I'm not asking you what she did.  I'm asking you if it
2      troubled you.  It's a feeling.
3         MR. PELTON:  He answered the question and you just
4      cut him off when he was trying to answer it.  He said
5      "maybe" and then was trying to explain and you cut him off.
6   Q   Go ahead.
7   **A   Yeah.  I don't know.  I mean, I left the messages.  Whether**
8      **she got them or not, I don't know.  Did it trouble me?**
9      **Maybe.**
10  Q   Did you ever discuss any documents that you received from --
11     or that you had reviewed from my office with Kevin
12     Brancaleone?
13  **A   Any documents?**
14  Q   Yes, from my office.
15  **A   I believe -- yes.**
16  Q   You did?
17  **A   Yeah.**
18  Q   Do you remember what those documents were?
19  **A   Well, the one that I remember is that Ms. Garcia has**
20     **retained you as her counsel.**
21  Q   Okay.  And do you remember what that conversation was about?
22  **A   I'd have to look at the -- the document.  I don't recall.  I**
23     **mean, obviously.**
24  Q   What was -- that I -- she had retained me?
25  **A   Yeah.**

Page 56

1   Q   Do you remember what you talked about, about that?
2   **A   With who?**
3   Q   With Mr. Brancaleone?
4   **A   I was bringing him up to speed as to what -- what happened**
5      **from the first complaint on --**
6   Q   Uh-huh (affirmative).
7   **A   -- in early August until this point.**
8   Q   Okay.  And in that course of that discussion, somehow my
9      retention letter -- you looked at it?
10  **A   I believe he showed it to me, yeah.**
11  Q   Okay.  Do you remember anything about that letter?
12     Anything --
13  **A   No, I would have to --**
14  Q      -- that was said?
15  **A   I would have to look at the document.**
16  Q   Well, I can get the document for you.  But my question is do
17     you remember if anything was said about my letter during
18     that incident?
19         MR. PELTON:  He just answered it.
20  **A   I don't recall.**
21  Q   Did you express any concerns to Mr. Brancaleone at that
22     incident -- at that time?
23  **A   Any concerns in regard -- in -- for what?**
24  Q   Regard to Ms. Garcia's issue?
25  **A   I was -- I mean, well, yeah, as anybody would be.  I mean,**

Page 57

15 (Pages 54 to 57)



GARCIA v. BEAUMONT HEALTH, ET AL.                    DEPOSITION OF JEAN APHRAM

1   you get a letter that she's retaining an attorney.  I was
2   concerned for her well-being.
3   Q  Her well-being?
4   A  Yeah.
5   Q  Because?
6   A  Because the way it was stated, if she didn't feel like we
7      were -- you know, we were doing things adequately.
8         MS. WARD:  I got to get another drink.
9   Q  Did you -- at that time did you think --
10        MS. WARD:  I almost did it.  Just a second.
11  Q  At that time did you think you were doing things adequately?
12  A  Yes.
13        MS. WARD:  Sorry.
14  Q  Do you remember any other things being discussed at that
15     meeting after you reviewed the retention letter?
16  A  Just to go back and, you know, give Kevin anything that we
17     had documented up until that point.
18  Q  Okay.  Did you make any attempt at that point to open up the
19     prior investigation about the nipple touching incident?
20  A  Well, that was -- that was the genesis of this whole
21     complaint.
22  Q  Okay.  But did you make -- did you do anything to open up
23     the prior investigation after this discussion with Mr.
24     Brancaleone?
25  A  To open it up?  I don't know what that -- what

                           Page 58

1   you're referring --
2   Q  Re-interview witnesses?
3   A  Then, yes.
4   Q  You did?
5   A  We went -- well, we wanted -- we needed statements.
6   Q  Okay.
7   A  So we went back and got written statements from those
8      individuals.
9   Q  Were the written statements about the nipple touching
10     incident or the retaliation incident?
11  A  Well, I didn't know anything about retaliation, so I -- it
12     would have been about the -- the complaint -- the nipple
13     touching incident and then subsequently, later on, the
14     second part of this was the -- what she's claiming is the
15     retaliatory, so --
16  Q  Okay.  But if I look at the second indented bullet point on
17     your memo of August 27th, two issues.  Can you read that
18     bullet point, "second on August 27th"?
19  A  What -- I'm sorry.  Which bullet point?
20  Q  Okay.  There's an indented portion.
21  A  Right.
22  Q  Can you read the second bullet point?
23  A  Oh, where it says "second on August 27th"?
24  Q  Uh-huh (affirmative).
25  A  Yeah.

                           Page 59

1      "Was called back into supervisor's office to
2      listen to another complaint by Krissy.  This complaint
3      involved a claim that Rachel was making comments that
4      Krissy was trying to get her in trouble, trying to get
5      her fired.  All these rely -- all these were lies and
6      that Krissy was -- was the one that made passes at
7      her."
8   Q  Okay.  So that was the second incident.  And I'm just asking
9      if, on or about August 27th, you made any attempt to reopen
10     the investigation on the first incident?
11  A  Yeah, I don't recall.  I know we did follow up with HR on
12     this complaint.
13  Q  Yes.
14  A  Yeah.
15  Q  But you don't recall doing anything about the first incident
16     after August 27th?
17        MR. PELTON:  Any time after August 27th?
18        MS. WARD:  Yeah.
19        MR. PELTON:  Well, he already testified to that.
20        MS. WARD:  Okay.
21  A  I'm sorry.  Can you repeat the question?
22  Q  You don't recall after August 27th, 2018 reopening or doing
23     anything to open -- reopen the first investigation?
24  A  No.
25  Q  Okay.  That's all I -- thank you.  Okay; okay.

                           Page 60

1         MS. WARD:  I'm going to -- do you have the time?
2         MR. PELTON:  Huh?
3         MS. WARD:  What time it is.
4         MR. PELTON:  Uh-huh (affirmative).  I've got to
5      time my comfort break.
6         MS. WARD:  Pardon me?
7         MR. PELTON:  I've got to time my comfort break.
8   Q  That's for your attorney.
9         (Counsel hands document to counsel)
10        MS. WARD:  Court reporter.
11        (Plaintiff's Exhibit 7 marked)
12  A  Thank you.
13        (Counsel hands exhibit to witness)
14  Q  Have you had a chance to look at that document?
15        (Witness reviews exhibit)
16  A  Okay.
17  Q  First of all, do you know who made that statement?
18  A  It looks like Phil; Phil.
19  Q  Phil?
20  A  Matthewson.
21  Q  Okay.
22  A  And don't ask me to spell that.
23  Q  I won't.  I want to get to the third -- can you read the
24     third sentence down?
25  A  What's it start with, please?

                           Page 61

                                        16 (Pages 58 to 61)



1   Q   "Rachel."
2   A   "Rachel stated that Krissy was not telling the truth about
3       what happened after" --
4   Q   Nope; nope.  I'm sorry.  Go up to the second sentence.  My
5       mistake.
6   A   After that?
7   Q   "Rachel said."  Before that.
8   A   Okay.
9           MR. PELTON:  Third line.
10  A   I got it.  "Rachel said that all she did was feel the fabric
11      on Krissy's bra."
12  Q   Okay.  Had you had any occasion to interact with Phil
13      before?
14  A   Well, he's one of my employees, so I don't understand the
15      question.
16  Q   Okay.  Did you have any day-to-day interactions with him as
17      one of your employees?
18  A   Oh, during the morning when I come in I try to make a point
19      to, you know, say "good morning" to my -- my staff, yeah.
20  Q   Have you ever been involved in any discipline involving
21      Phil?
22  A   No.
23  Q   Would you consider him a good employee?
24  A   Yes.
25  Q   Would you consider him truthful?

Page 62

1   A   Yes.
2   Q   Okay.  And all I'm asking about this now is, I see that he
3       says that "Rachel said she felt the fabric on Krissy's bra."
4       But in her prior statement to you, she said she "accidently
5       touched Krissy."
6   A   Okay.
7   Q   Were you concerned at all about the discrepancy between the
8       two statements?
9           MR. PELTON:  Object to the form.
10  Q   Go ahead.
11  A   This statement was after the second incident.  So we were
12      investigating the complaint that Ms. Luca was continuously
13      speaking on the matter that was supposed to be quieted.
14      So --
15  Q   Well, assuming that Phil was truthful in his statement where
16      he said -- where he said that "Rachel said that all she did
17      was feel the fabric on Krissy's bra," that's different than
18      what she said in the statement she provided to Net Carroll.
19  A   Okay.
20          MR. PELTON:  Object to the form.
21  Q   Did --
22          MS. WARD:  Understood.
23  Q   Did it concern you at all that her story appears to have
24      been changing?
25          MR. PELTON:  Object to the characterization.

Page 63

1   Q   Go ahead.
2   A   No.
3   Q   Okay.
4           MS. WARD:  I'm going to mark Exhibit 8.
5           (Plaintiff's Exhibit 8 marked)
6           (Counsel hands exhibit to witness)
7   A   Thank you.
8   Q   Let me know if you've had a chance to look at it.
9           MS. WARD:  Do you have a copy?
10          MR. PELTON:  I do not.
11          MS. WARD:  Here.  I've got copies.  Do you have --
12      let me see.  Where are they?  Sorry.
13  Q   Did I give you the one with highlighting?
14  A   (Indicating)
15  Q   Yeah.
16          MS. WARD:  I need you to mark that -- this
17      (indicating) one, the blank one.
18  Q   Can I get that back?
19          (Witness hands exhibit to counsel)
20  Q   Sorry about that.
21          MS. WARD:  I guess I need my break.  I'm getting
22      tired.  But we'll wait for a minute.  I've just got a couple
23      more in this series.
24          (Counsel hands exhibit to witness)
25  Q   Have you had a chance to look it over?

Page 64

1   A   Yes.
2   Q   Okay.  I want to draw your attention after the colon
3       statement.  There's two paragraphs.  You see that?
4   A   Yes.
5   Q   Starting at the end of the fourth line, it starts with
6       "somehow nipple."
7   A   Okay.
8   Q   Okay.  Can you read that into the record?
9   A   Okay.  "Somehow nipple color was brought up as well, but it
10      was a -- it was a joking around part of the conversation and
11      I didn't take any part of it serious."
12  Q   Okay.  And I want to draw your attention back to Exhibit 4.
13      We've had some questions on that earlier?
14  A   Yes.
15  Q   Can you go to the portion that says "Colleen states"?
16  A   Okay.
17  Q   Three lines down, the sentence begins with "Colleen
18      doesn't."
19  A   Okay.
20  Q   Can you read that in the record?
21  A   "Colleen doesn't recall anything coming up regarding a
22      nipple and states, 'I didn't see Rachel touch, grab Krissy's
23      breast.'"
24  Q   So my question to you is, in this case, September 24th
25      statement, she discusses nipple color being brought up.  Do

Page 65



GARCIA v. BEAUMONT HEALTH, ET AL.           DEPOSITION OF JEAN APHRAM

1    you agree?
2  **A**  **Yes.**
3  Q  But when she gave her statement to Net Carroll, she didn't
4    recall anything regarding a nipple. Did the inconsistency
5    in her two statements concern you at all at this point?
6      MR. PELTON: Object to the form.
7  **A**  **No, because, again, we were looking at a different**
8    **complaint.**
9  Q  Okay. Let's go to Exhibit 9.
10      MS. WARD: And I'll get you the blank one this
11    time. Sorry about that.
12      (Plaintiff's Exhibit 9 marked)
13      (Counsel hands exhibit to witness)
14  Q  Have you had a chance to read that?
15  **A**  **Yes, ma'am.**
16  Q  This is -- purports to be a statement from Ms. Luca to you?
17  **A**  **Yes.**
18  Q  Have you seen that document before?
19  **A**  **Yes.**
20  Q  And do you know why Ms. Luca sent you that statement?
21  **A**  **Again, we were looking at the complaint that Ms. Luca was --**
22    **did not stop talking about the incident -- the first**
23    **incident.**
24  Q  Okay. I need to have you read -- one, two, three, four --
25    the very last word of the fourth line because there's no

         Page 66

1    punctuation like -- that I can read. It starts with
2    "Krissy." Can you read that in the record?
3  **A**  **Which line?**
4  Q  Four lines down, at the very end after the comma, "your
5    tattoo is showing," there's a statement.
6  **A**  **Okay.**
7  Q  Can you read that in the record?
8  **A**  **Sure. "Krissy made a" -- that one?**
9  Q  Uh-huh (affirmative).
10  **A**  **"Krissy made a comment -- Krissy made a comment saying, 'You**
11    **just wanted to see what color my nips are, if they are dark**
12    **or light.'"**
13  Q  Keep going.
14  **A**  **"I said, 'No. Your shirt is low-cut and showing your chest**
15    **tattoo.'"**
16  Q  Keep going.
17  **A**  **"She said, 'Mhmm. We all know that you are tri-sexual.'"**
18  Q  Keep going.
19  **A**  **"'Willing to try anything.'"**
20  Q  Keep going.
21  **A**  **"I said, 'No, Krissy. I'm not into women.'"**
22  Q  Okay. And I want you to go back to Exhibit 5. And can you
23    read under "Rachel states" the first two sentences into the
24    record?
25  **A**  **"We were comparing bras, nothing more. It was mothers' talk**

         Page 67

1    **because we were discussing sports bra and breast feeding."**
2  Q  Keep going.
3  **A**  **"I accidently touched Krissy."**
4  Q  Keep going.
5  **A**  **"I did not grab her."**
6  Q  Keep going.
7  **A**  **"Krissy has been making comments about me, trying to --**
8    **trying to be into women and I am uncomfortable with her**
9    **comments."**
10  Q  Okay. Were you concerned at all about all these extra parts
11    of the story, about Krissy allegedly saying, "You just want
12    to see what color my nipples are, if they were dark or
13    light"? All of that is coming out now on September 24, but
14    wasn't part of her statement on August 8th. Did that
15    concern you at all?
16      MR. PELTON: Object to -- mischaracterizes and
17    lacks foundation as to Exhibit 5.
18  **A**  **At that time, no.**
19  Q  Okay; okay. Next one is -- I'm going to go to Exhibit 10.
20    All right?
21      (Plaintiff's Exhibit 10 marked)
22      MS. WARD: For you.
23      (Counsel hands exhibit to counsel)
24      MS. WARD: And for you.
25      (Counsel hands exhibit to witness)

         Page 68

1  Q  Do you recognize Exhibit 10, Mr. Aphram?
2  **A**  **Yes.**
3  Q  What is it?
4  **A**  **Well, it's a e-mail from Ms. Garcia requesting not to be**
5    **assigned as charge on nights when Ms. Rachel Luca is**
6    **scheduled.**
7  Q  What else does she request?
8  **A**  **She also requests that -- not to be partnered in an**
9    **assignment with Ms. Luca.**
10  Q  Next sentence, can you read it?
11  **A**  **Sure. "I would be very uncomfortable in either situation**
12    **and I believe this is the best interest of everybody to**
13    **hopefully avoid any further issues."**
14  Q  And my question to you is, after you received this e-mail,
15    what steps did you take to make sure that Ms. Garcia's
16    requests were carried out?
17  **A**  **Sure. So, again, had another discussion with the**
18    **supervisors, in particular Mr. Frankhouse and Mr. Burgess --**
19  Q  Uh-huh (affirmative).
20  **A**  **-- as they are her immediate supervisors to, you know, honor**
21    **Ms. Garcia's requests to not be placed charge when Ms.**
22    **Luca's on and to make sure, again, not to have her assigned**
23    **in the same tower, floor, or ICU or unit.**
24  Q  Okay. Did you follow up with them to make sure that your
25    instructions were carried out?

         Page 69

         18 (Pages 66 to 69)



1  A  Did I follow up with them?  Maybe.  I don't recall.
2  Q  Did you follow up with Krissy Garcia to make sure that your
3     instructions were being carried out?
4  A  I don't recall.
5  Q  Okay.
6        (Plaintiff's Exhibit 11 marked)
7  Q  Let me give you what purports to be Exhibit 11.
8        (Counsel hands exhibit to witness)
9  A  Okay.
10 Q  Were you involved in all -- at all in getting a statement
11    from Angelita Serratos?
12 A  No.
13 Q  Have you seen this document before?
14 A  I have.
15 Q  When did you see it?
16 A  I don't recall.
17 Q  Did you -- do you remember reviewing it at the time?
18 A  It wasn't sent to me.
19 Q  I'm just asking.  You said you saw it?
20 A  Right.
21 Q  Do you remember reading it when you say you saw it?
22 A  Well, when it was forwarded to me, yes.
23 Q  When was it forwarded to you?
24 A  When I went down to talk to Mr. Brancaleone.
25 Q  And do you remember what the conversation was at that time

Page 70

1  Q  Okay.
2        (Witness reviews exhibit)
3  A  Okay.  What's --
4  Q  I'm just asking if you were involved in this investigation
5     called "KG Harassment Investigation"?
6  A  Well, this -- this is something HR has that they do, so I am
7     not involved in this piece of it.
8  Q  You didn't collect the statements?  You didn't talk to the
9     witnesses?
10 A  I collect --
11 Q  For purposes of this?
12 A  I didn't know this was going on.  That's -- I'm saying.
13 Q  Okay.  That's all I needed.
14 A  Yeah.
15 Q  That's all.  That's it.
16        MS. WARD:  Okay.  All right.  We're going to take
17    a break.  Yes?
18        MR. PELTON:  Okay.
19        VIDEO OPERATOR:  We are going off the record at
20    10:59.
21        (Off the record)
22        VIDEO OPERATOR:  We are going back on the record
23    at 11:16.
24 Q  Mr. Aphram, I want to draw your attention now to the PIP
25    that was given to Ms. Luca on or around October of 2018.  Do

Page 72

1     about this document?
2  A  Say that -- can you repeat the --
3  Q  Remember anything about the conversation during this meeting
4     wherein you were allowed to review the document?
5  A  Right.  I don't recall the exact conversation that took
6     place, but, you know, again, it was all in regards to the
7     complaint by Ms. Garcia.
8  Q  Did you take any steps to interview Ms. Serratos yourself?
9  A  I did not.
10 Q  Did you have any part -- I'm going to give you this
11    document.  This is going to be -- I believe we're up to 12.
12        (Plaintiff's Exhibit 12 marked)
13        MR. PELTON:  Can we take a break at this point?
14        MS. WARD:  Well, can we -- I just had a quick
15    question for him on this, then we can.
16        MR. PELTON:  Sure.
17        (Counsel hands exhibit to witness)
18 Q  First of all, were you involved in collecting this
19    information from these various witnesses that's here in
20    Exhibit 12?
21 A  I'd have to -- I haven't seen this document.
22 Q  You have never seen it?
23 A  No.
24 Q  So you didn't prepare and interview these individuals?
25 A  I'd have to -- I have to read this.  I'm not --

Page 71

1     you recall that?
2  A  I do recall a PIP.
3  Q  Yeah?  And were you at the meeting with Ms. Luca where the
4     PIP was issued to her?
5  A  I was not at that meeting.
6  Q  Did you have any input prior to the meeting on how that
7     meeting should be conducted?
8  A  Yes, I would have had some input.
9  Q  Do you remember what input you had?
10 A  Basically to -- the general content -- context would be to
11    administer and make sure she understands she, Ms. Luca, this
12    was a serious event and that she, you know, didn't adhere to
13    the initial directive to cease and desist talking about the
14    incident.
15        MS. WARD:  I'm going to have you mark this.  I
16    think we're up to number 13.
17        (Plaintiff's Exhibit 13 marked)
18        (Counsel hands exhibit to witness)
19 Q  Once you've had a chance to look it over --
20        (Witness reviews exhibit)
21 A  Okay.
22 Q  You've had a chance to look it over?
23 A  Yes, ma'am.
24 Q  Okay.  The top of Exhibit 13, that top memo is from you;
25    correct?

Page 73





Network Reporting
STATEWIDE COURT REPORTERS
800-632-2720

1   **A   Page 1?**
2   Q   Correct.
3   **A   Yes.**
4   Q   And that's to Mr. Brancaleone?
5   **A   Correct.**
6   Q   Okay.  And you have a statement in there.  It starts with
7       "Hi, Kevin?"
8   **A   Yes.**
9   Q   Can you read to me the second sentence?  It starts with
10      "she."
11  **A   "She was very emotional, could not remember the situation."**
12  Q   Keep going.
13  **A   "Jim said that she was deflecting and accusing Krissy as**
14      **being a more aggressive and vulgar person in this**
15      **situation."**
16  Q   Okay.  Where did you get the information that you put in
17      there for those two sentences?
18  **A   It would have been in discussion with the supervisors.**
19  Q   Which one?
20  **A   I don't -- it -- well, it would have been either Mr. Burgess**
21      **or Mr. Frankhouse.**
22  Q   So it says "Jim said."  You would have been speaking to Jim?
23  **A   Yes.**
24  Q   Okay.  Do you know what Mr. Burgess meant when he said
25      "deflecting"?

1   **A   Well, probably just what -- you know, what was stated as --**
2       **you know, she was saying -- no.  I mean, to -- to exactly**
3       **know what he was saying.  But, I mean, I understood it to be**
4       **that Ms. Luca was pointing the finger at Ms. Garcia.**
5   Q   Okay.  You also state in that memo that "she could not
6       remember the situation."
7   **A   Right.**
8   Q   Did you find that credible, that she couldn't remember the
9       situation?
10  **A   Well, I mean, I wasn't there when they -- when they did**
11      **this.**
12  Q   Uh-huh (affirmative).
13  **A   So I wouldn't know how to answer that one.  I mean, she may**
14      **have been emotional.  It sounded like she was.  But I wasn't**
15      **there, so --**
16  Q   I'm talking about the "could not remember situation"
17      statement you put in.
18  **A   This was, again, most likely coming from the feedback I**
19      **received from the supervisors.**
20  Q   Okay.  Did you question Mr. Burgess or Mr. Frankhouse more
21      about their observations?
22  **A   I don't -- well, it's not in here.  Probably not.**
23  Q   Okay; okay.  After that next sentence, I want you to read
24      the sentence after that.  So there's -- it starts with "she
25      did."

1   **A   "She did refuse to sign the PIP."**
2   Q   Why did you put that in there?
3   **A   So when he received that, it would -- it was -- he would**
4       **know that she didn't because she didn't agree with it**
5       **probably.**
6   Q   And you're assuming that from what Mr. Burgess told you?
7   **A   Well, it would have been what he told me and then I would**
8       **have seen the copy of the PIP.**
9   Q   Okay.  Were you worried at all that after October 19th, 2018
10      Ms. Luca might retaliate against Ms. Garcia?
11  **A   I don't know.  I mean, I was -- you would think that**
12      **somebody gets a write-up that they would not do what**
13      **they're -- you know, what the write-up was for -- was about.**
14  Q   Okay.  Did you know that she was continuing to try to get
15      the name of the person who, quote, unquote, "turned her in"?
16          MR. PELTON:  Object to the form.
17  Q   You didn't hear anything about that?
18  **A   No, ma'am.**
19  Q   Did you think that the PIP that Luca received was adequate
20      discipline in this matter?
21  **A   I believe so, yes.**
22  Q   Okay.  I'm going to hand you --
23          (Plaintiff's Exhibit 14 marked)
24          (Counsel hands exhibit to witness)
25  **A   Thank you.**

1           (Witness reviews exhibit)
2   Q   I've handed you Exhibit 14, which purports to be a memo from
3       Ms. Garcia to you and some others on February 28th, 2019.
4   **A   Okay.**
5   Q   Have you had a chance to review it?
6   **A   Yes, ma'am.**
7   Q   Do you recognize it?
8   **A   Yes.**
9   Q   I believe if you turn the page it has a confirmation that it
10      was read on February 28th, 219.
11  **A   Okay.**
12  Q   Do you dispute that?
13  **A   Do I dispute it?**
14  Q   Uh-huh (affirmative).
15  **A   Well, this is an automatic response if somebody does it, so**
16      **I don't dispute it.**
17  Q   Okay.  After you got this memo, did you take any steps to
18      contact Ms. Garcia to find out about her health concerns and
19      her inability to continue with a -- the job of charge
20      therapist?
21  **A   I did not.  I mean, she says in her letter why she's**
22      **stepping down.  So I don't routinely question if somebody**
23      **has -- you know, if they want to step down or change**
24      **something.  That's not our routine -- or my --**
25  Q   She says, and I quote, "due to health concerns."  And I just



1    wondered if you did anything to reach out to her after this
2    to discuss your memo with her?
3  **A  I may have.  I don't -- I don't recall.**
4    Q   Do you recall discussing her memo with anyone else?
5  **A  Well, there's a list of the supervisors that are listed**
6  **there, so I may have discussed it with them, but --**
7    Q   Do you have a recollection of discussing it with any of
8    these people?
9  **A  Maybe.**
10   Q   You do?  What recollection --
11 **A  I said "maybe."**
12   Q   Well, if you --
13 **A  I don't recall then.**
14   Q   You don't recall?
15 **A  I don't recall.**
16   Q   I was just going to ask you, what, if anything, do you
17   remember talking about after you got this memo?
18 **A  Well, it -- I would honor her request to not be**
19 **placed and -- or to be taken out of the charge role.**
20   Q   And do you have a recollection of a conversation with her
21   supervisors about this?
22 **A  I recall having a conversation about it, but I don't -- the**
23 **exact content of the conversation would have been, "She**
24 **wants to step down."  "Okay."  I mean, that would have been**
25 **the extent of it.**

Page 78

1    Q    Do you recall reaching out to any of her supervisors after
2    February 28th, 219 to see how she was doing?
3  **A   Maybe.  I don't recall.**
4         MS. WARD:  I don't have any other questions at
5    this time.
6         MR. PELTON:  No questions.
7         VIDEO OPERATOR:  We're done, Counsel?
8         MS. WARD:  Yes.
9         VIDEO OPERATOR:  This concludes the video
10   deposition of Jean Aphram consisting of one -- two disks.
11   We are going off the record at 11:27.
12
13                  -0-0-0-
14
15
16
17
18
19
20
21
22
23
24
25

Page 79



## Beaumont | HEALTH SYSTEM

| Subject **Sexual Harassment** | | No. **286** | Page **1 of 3** |
| --- | --- | --- | --- |
| Prepared By **Corporate Human Resources** | Prior Issue Date 08/01/12 | Issue Date 09/01/16 | |

**GENERAL**

It is the intent of Beaumont Health System to create and maintain a safe and productive environment in which employees can effectively perform their work. As such, Beaumont Health System reaffirms its long-standing policy that sexual harassment of its employees is prohibited.

All employees, including supervisors and managers, will be subject to discipline, up to and including discharge for any act of sexual harassment, which, in the judgment of the Hospital, they have committed.

**DEFINITION**

Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when:

- Submission to the conduct is made either an explicit or implicit condition of employment;
- Submission to or rejection of the conduct is used as the basis for an employment decision affecting the harassed employee;
- The harassment substantially interferes with an employee's work performance or creates an intimidating, hostile, or offensive work environment.

Examples of sexual harassment includes, but are not limited to the following:

- Repeated or unwarranted sexual advances.
- Unconsented touching.
- Sexually derogatory statements about an employee.
- Direct or indirect requests for sexual favors.
- Unwelcome circulation of sexually explicit pictures, cartoons, or reading material.
- Sexually explicit remarks, which cause the recipient, discomfort, humiliation or otherwise interfere with the recipient's ability to perform their job responsibilities in a safe environment.

Personal or social conduct between employee's which is of a consensual nature, and which does not have a discriminatory effect upon an employee's employment, will not be considered as sexual harassment.

Disclaimer: User must ensure that any printed copies of this policy/procedure are current by checking the policy and procedure web page before use.



Beaumont/Garcia 000464

# Beaumont | HEALTH SYSTEM

| Subject | | | | No. | Page |
|---|---|---|---|---|---|
| Sexual Harassment | | | | 286 | 2 of 3 |
| Prepared By | | Prior Issue Date | Issue Date | | |
| Corporate Human Resources | | 08/01/12 | 09/01/16 | | |

**PROHIBITION OF SEXUAL HARASSMENT**

It shall be a violation of Beaumont Hospital's policy prohibiting sexual harassment for any employee, male or female, managerial, supervisory or hourly, to in any way harass another employee by making unwelcome sexual advances, by either directly or indirectly requesting sexual favors, or by engaging in any other conduct of a sexual nature which constitutes or affects the terms or conditions of any employee's employment with the Hospital. It is also a violation for any employee to require or request, directly or indirectly, that any employee submit to such conduct as a basis for, or as a factor in, any employment decisions affecting such employee. This policy also forbids any employee from engaging in any conduct, which has the effect of either directly, or indirectly, creating or contributing to an intimidating, hostile, or offensive working environment because of such conduct.

The Hospital will neither condone nor knowingly fail to take appropriate steps to prohibit the sexual harassment of any of its employees. <u>All</u> employees, including supervisors and managers, will be subject to discipline up to and including discharge, for any act of sexual harassment, which in the judgment of Hospital, they are found to have committed. (Refer to Program for Performance Management No. 282).

**INVESTIGATION PROCESS**

Any employee who believes that he or she is being subjected to sexual harassment in violation of this policy should report the alleged harassment to one of the following individuals:

- Employee's immediate supervisor
- Employee's department manager/director
- Director of Human Resources or his/her designee

In so doing, the employee should clearly state that he or she believes that he or she is the victim of sexual harassment and that the employee is reporting the same pursuant to this policy.

While such complaints or requests for investigation may initially be made either orally or in writing, the Hospital reserves the right to require any employee asserting a violation of this policy to file any complaint or request for investigation in writing. Such written complaint or request for investigation shall specify the nature of the conduct which is alleged to have violated this policy, the individual or individuals who are alleged to have engaged in said conduct, the dates, times, and places of said conduct, as well as any other information which the Hospital deems necessary for it's investigation.

Disclaimer: User must ensure that any printed copies of this policy/procedure are current by checking the policy and procedure web page before use.

Beaumont/Garcia 000465

Beaumont° | HEALTH SYSTEM

| Subject | | | |
|---|---|---|---|
| Sexual Harassment | | No. 286 | Page 3 of 3 |
| Prepared By Corporate Human Resources | Prior Issue Date 08/01/12 | Issue Date 09/01/16 | |

**INVESTIGATION PROCESS (Cont'd)**

Upon receiving a complaint of sexual harassment or a request for investigation of the same, the Hospital will investigate the matter. In doing so, it may require that all employees who possess knowledge of the alleged incident or of similar incidents to cooperate in its investigation by fully and accurately responding to its inquiries in this regard. The failure of any employee, including a complaining employee, to satisfactorily cooperate in such an investigation will be deemed sufficient grounds for discipline, up to and including discharge.

NOT WITHSTANDING THE FOREGOING, NO EMPLOYEE WILL BE SUBJECT TO ANY FORM OF RETALIATION OR DISCIPLINARY ACTION FOR MAKING OR PURSUING A COMPLAINT OF SEXUAL HARASSMENT OR A REQUEST FOR INVESTIGATION OF AN ALLEGED INCIDENT OF SEXUAL HARASSMENT, WHICH COMPLAINT OR REQUEST IS MADE IN GOOD FAITH.

**APPEAL**

Should any complaining employee, after the investigation of any complaint of sexual harassment, disagree with the action of the Hospital in the matter, said complaining employee may have such action reviewed under the Hospital's grievance procedure. (Refer to Employee Grievance Policy No. 284).

**CONFIDENTIALITY**

The Hospital will keep such complaints of sexual harassment confidential to the extent that it is possible and still conduct an investigation.

**INQUIRIES**

Any questions pertaining to this policy should be directed to Human Resources.

**DETAILED PROCEDURES**

None.

HUMAN RESOURCES, CORPORATE

Disclaimer: User must ensure that any printed copies of this policy/procedure are current by checking the policy and procedure web page before use.

Beaumont/Garcia 000466

# Beaumont
#### HEALTH

| Title:<br>**Harassment Policy** | *Applicable to:<br>**Beaumont Health** | Effective Date:<br>**08/06/2018** |
| | | Last Periodic Review Date:<br>**08/06/2018** |
| Policy Owner:<br>**SVP and Chief HR Officer** | Document Type:<br>**Policy** | Functional Area:<br>**Human Resources** |

**\*For This Document, Beaumont Health Includes**:
Beaumont Corporate Shared Services
Beaumont Hospital, Dearborn
Beaumont Hospital, Farmington Hills
Beaumont Hospital, Grosse Pointe
Beaumont Hospital, Royal Oak
Beaumont Hospital, Taylor
Beaumont Hospital, Trenton
Beaumont Hospital, Troy
Beaumont Hospital, Wayne
Beaumont Medical Group
Beaumont Pharmacy Solutions
Post Acute Care

## I.   PURPOSE AND OBJECTIVE:
To affirm Beaumont Health's commitment to creating and maintaining an environment free from harassment.

## II.   POLICY STATEMENT:
Beaumont Health is committed to becoming a workplace of choice and a national leader for patient and family-centered care. We will achieve this by living our core values of compassion, respect, integrity, teamwork and excellence, and maintaining a work environment that is free from harassment. To uphold this commitment, Beaumont Health will not tolerate harassment, in any form, to anyone or by anyone including any employee, physician, volunteer, contractor, student, vendor, visitor, or patient.

## III.   SCOPE:
This policy applies to all Beaumont Health locations and workforce. Workforce includes, but not limited to, employees, students, residents, fellows, volunteers, active medical staff (physicians and non-physician providers) contract individuals, subcontractors, agents, vendors (excluding those whose sole connection with Beaumont is selling or otherwise providing medical supplies or equipment).

## IV.   DEFINITIONS:

### A.   HARASSMENT
Harassment is unwelcome verbal, physical or visual conduct that is based on a person's protected characteristic.  A protected characteristic means a person's sex,

PLAINTIFF'S EXHIBIT 2  Ashrum  3-13-20  PENGAD 800-631-6989

# Beaumont
## HEALTH

| Title:<br>**Harassment Policy** | | *Applicable to:<br>**Beaumont Health** | Effective Date:<br>**08/06/2018** |
|---|---|---|---|
| | | | Last Periodic Review Date:<br>**08/06/2018** |
| Policy Owner:<br>**SVP and Chief HR Officer** | | Document Type:<br>**Policy** | Functional Area:<br>**Human Resources** |

color, race, ancestry, religion, national origin, age, physical or mental disability, medical condition, height, weight, marital status, military or veteran status, citizenship, sexual orientation, gender or any other characteristic protected under applicable federal, state, or local law.  Prohibited harassment is conduct that may affect any term, conditions or benefit of employment; interfere unreasonably with an individual's work performance; or create an intimidating, hostile, or offensive working environment.

B. <u>SEXUAL HARASSMENT</u>

Sexual harassment means any harassment based on someone's sex or gender.  It includes harassment that is not sexual in nature (for example, offensive remarks about an individual's sex or gender) as well as unwelcome sexual advances, requests for sexual favors, and other physical, verbal or visual conduct of a sexual nature when:

- submission to such conduct is made a term or condition of employment;
- submission to or rejection of the advance, request or conduct is used as a basis for employment decisions;
- such advances, requests or conduct have the purpose or effect of substantially or unreasonably interfering with an employee's work performance by creating an intimidating, hostile or offensive work environment.

Sexual harassment may include conduct that is:
- verbal (epithets, derogatory statements, slurs, sexually-related or gender-related comments or jokes, unwelcome sexual advances or requesting sexual favors);
- physical (assault or inappropriate physical contact such as pinching, touching, brushing up against, or impeding movement);
- visual (displaying sexually suggestive pictures, posters, cartoons, drawings or other items, leering or making sexual gestures, social media postings or communications that are derogatory or sexually suggestive).

C. <u>OTHER TYPES OF HARASSMENT</u>

Beaumont Health's Harassment policy applies to inappropriate and unwelcoming conduct based on race, color, ancestry, religion, national origin, age, physical or mental disability, medical condition, height, weight, marital status, military or veteran status, citizenship, sexual orientation, or any other characteristic protected under applicable federal, state, or local law.  Such harassment may include conduct that is:

- verbal (epithets, derogatory statements, slurs, derogatory comments or jokes);
- physical (assault or inappropriate physical contact);

# Beaumont
### HEALTH

| Title:<br>**Harassment Policy** | | *Applicable to:<br>**Beaumont Health** | Effective Date:<br>**08/06/2018** |
|---|---|---|---|
| | | | Last Periodic Review Date:<br>**08/06/2018** |
| Policy Owner:<br>**SVP and Chief HR Officer** | | Document Type:<br>**Policy** | Functional Area:<br>**Human Resources** |

- visual (displaying derogatory signs, posters, cartoons, drawings or derogatory social medial posts or communications or making derogatory gestures).

The examples set forth in this section IV are illustrative only, and not exhaustive. Harassment is prohibited both in the workplace and at employer-sponsored events.

## V. STANDARDS

Beaumont Health employees are strictly prohibited from engaging in any form of harassing conduct with any employee, physician, volunteer, student, vendor, contractor, visitor, or patient with whom they come in contact during the course of or as a result of their employment. Similarly, Beaumont Health will not tolerate harassment of Beaumont employees by non-employees such as patients, visitors, affiliated physicians, contractors or vendors.

Beaumont Health prohibits any form of discipline, reprisal, intimidation or retaliation for good faith reporting of incidents of harassment, pursuing any harassment claim or cooperating in related investigations. Further, it is a violation of this policy for a supervisor or manager to require cooperation with or submission to any form of harassment or to retaliate against any person for refusing to do so.

## VI. REPORTING HARASSMENT:

All employees are responsible for maintaining an environment free from harassment, and are expected to report incidents of harassment or retaliation to their supervisor or manager, executive leader, or by contacting their local Human Resources Department or the Beaumont Health Trust Line at 1-800-805-2283.

## VII. PROCESS:

All complaints of harassment and retaliation will be investigated promptly, thoroughly and fairly. Precautions will be taken to ensure the safety of those involved in the investigation. Investigators will maintain confidentiality throughout the investigation process to the extent it is possible to do so.

Once a complaint is received, an investigation will be conducted by the Compliance, Audit, Accreditation and Risk (CAR) Department and/or Human Resources. To ensure a thorough and fair investigation, the investigators may conduct interviews with the complainant(s), subject(s) of the complaint, and any witnesses to the incident; review related documents, including witness statements, company e-mails and other internal communications; and secure other company assets, such as computers and surveillance videos.

*Disclaimer: User must ensure that any printed copies of this policy/procedure are current by checking the online version of the policy/procedure before use.*



| Title:<br>**Harassment Policy** | *Applicable to:<br>**Beaumont Health** | Effective Date:<br>**08/06/2018** |
| --- | --- | --- |
| | | Last Periodic Review Date:<br>**08/06/2018** |
| Policy Owner:<br>**SVP and Chief HR Officer** | Document Type:<br>**Policy** | Functional Area:<br>**Human Resources** |

Any instances found to be substantiated will be addressed directly with corrective action, up to and including termination.

The CAR Department and/or Human Resources will notify the complainant(s) once the investigation is complete that the investigation has been completed.

VIII. **REFERENCES (if applicable):**
Beaumont Health Non Retaliation Policy

IX. **REVIEW AND REISSUE DATE:**
To be determined

X. **DISCRETION TO MODIFY POLICY:**
SVP and Chief Human Resources Officer

XI. **ATTACHMENTS:**
None

**CORPORATE AUTHORITY:**
Beaumont Health ("BH") as the corporate parent to William Beaumont Hospital, Botsford General Hospital, and Oakwood Healthcare Inc., ("Subsidiary Hospitals") establishes the standards for all policies related to the clinical, administrative and financial operations of the Subsidiary Hospitals. The Subsidiary Hospitals, which hold all health facility and agency licenses according to Michigan law, are the covered entities and the providers of health care services under the corporate direction of BH. The Subsidiary Hospitals' workforces are collectively designated as BH workforce throughout BH policies.

To Whom It May Concern,

On the night of Sunday, July 28th I was sitting on break with two of my coworkers, Colleen Kay and Rachel Luca. I had forgotten my work coat that night and made the comment that I was so cold you could see me (meaning my nipples) through my bra. I was embarrassed about it (going into patient rooms like that) and mentioned I had a really good, insulted bra on so I was surprised. Colleen and Rachel both asked what kind of bra I had and stated they were in love with their new bra's and asked if I had "one of these"... they both pulled their bra's shoulder strap slightly out of their shirt to show me and were talking about the type/brand of bra that it was and how they both just got them and were in love with them. I said "No, I have a regular bra but a good one" and I pulled on my strap just as they did, to show it was regular. While I did that Rachel had got up and came next to me, I didn't even notice she had moved from her chair when suddenly her hand was down my shirt, inside my bra cup and she pinched my nipple (bare skin) and pulled up on my (left) breast, removing it from the bra cup. Stunned, I stated "Now that was too f****** far!". She immediately said, "oh I'm sorry I didn't mean to offend you". I responded asking "What are you doing?! Why would you do that?!" She said "I just wanted to see your bra", I said something along the lines of that wasn't my bra that was my nipple and again asked why she would do that. She stated "Well you have nice nipples" and giggled. It had all happened so quickly and I was so shocked I really didn't know what else to do at that point. I was so upset I knew I needed to stop and diffuse (myself and my emotions) because nothing good was going to come of it. I don't know if Colleen or Rachel had changed the subject at that point, it was a bit of a blur because I was so enraged I was focused on handling myself appropriately. I managed to let things go at that time because as I stated, any escalation of conversation wouldn't have served any constructive purpose at that time.

I have had situations with Rachel in the past where she had continuously made comments about me "wanting her" and her both asking me and telling me that she "knew" that "I found her attractive". It have never said I found her attractive and never responded to her questioning if I found her attractive because I brushed it off as her being silly. It had become so repetitive however, that a few months back (maybe 6-7 months ago) that I wanted to clear the air and had said to Rachel, "You know I'm not interested in you right?". I said this because I wanted to clear

PLAINTIFF'S EXHIBIT
3
A Phram

the air in case she really believed that I was interested in her. She had responded "I'm not interested in you either" and stormed away appearing either upset or insulted. After that I acted normal toward her and she did the same. This incident however, was so upsetting and crossed the line that I felt I had to say something to our supervisor. I wanted this documented and I expressed to Net that I was not comfortable being alone with her so we would not be paired together in an ICU where we could possibly be alone in our supply room where we do a lot of our charting.

If there are any further questions, please feel free to contact me.

Kristina Garcia

8/6/18

- Monday, 8/6/18, Kryssie Garcia came into the office to discuss a personal issue that happened a week or two ago. Kryssie 's account of what happened is attached in a form letter (I asked her to type up). Kryssie states she doesn't want anyone to lose their job, but she wants this taken care of. I told Kryssie I will talk to all individuals involved and follow up with Jean Aphram, our director and HR.
- Wednesday, 8/8/18, I spoke with Colleen Kaye because it was mentioned that she was in the room when the inappropriate action took place.

Colleen states:

*They were in the backroom of 3East discussing bra's because she is expecting and her bra had been giving her issues. Her and Rachel Luca were looking at bra straps, then Rachel Luca asked Kryssie ("Let me see it"-her bra). Colleen doesn't recall anything coming up regarding a nipple and she states, "I didn't see Rachel touch/grab Kryssie's breast. She states the conversation wasn't sexual in any manner, just matter of fact (Two mothers giving advice on the best bra to wear while pregnant).*

- Wednesday, 8/8/18, I spoke with Rachel Luca regarding the complaint.

Rachel states:

*We were comparing bra's, nothing more. It was mother's talk, because we were discussing sports bra and breastfeeding. I accidently touched Kryssie. I did not grab her! Kryssie has been making comments about me, trying to be into women and I am uncomfortable with her comments. Kryssie brought up the nipple, I did not. Kryssie showed me her bra strap and I said let me feel the strap. I did not grab her breast or nipple. Kryssie was making comments about me grabbing her nipple in the staff room, saying things like: Rachel grab my nipple, because she is into girls. Dianna Grayson and Marcia Davis were walking by when this was said.*

- Wednesday, 8/8/18, I spoke with Dianna Grayson briefly regarding a conversation she may have overheard.

Dianna states:

*She did overhear a conversation, where someone stated: "Rachel grab my nipple because she is into girls." But she doesn't recall who said it or who was around at the time. She was very hesitant speaking on the issue.*

- Marcia Davis wasn't spoken to because she was off for vacation.
- Wednesday, 8/8/18, Kryssie came in to give me her written statement. Jean Aphram was in the office when she dropped it off and we, both assured her-we were taking this seriously and will be following up. As soon as, we hear back from HR, we would let her know the next step.
- Monday, 8/13/18, I spoke with Rachel Luca and Kryssie Garcia separately regarding the investigation into the allegations and told them of my findings:

Per my investigation, there is no one to corroborate what happened. Spoke to the person(s) names I was given to substantiate what happened and no one wants to be a part of this. Both parties account of what happened (do not match up-without any witnesses willing to corroborate what happened, it is a



PLAINTIFF'S EXHIBIT
4
Aphram

case of "He Said-She Said". Thus, a warning is being given, that there is to be no inappropriate conversations, touching or behavior of any kind from this day forward between Rachel and Kryssie; nor, anyone else for that matter). If there is any inappropriateness in the future, it will be directed to HR and they will handle it in the way they deemed fit in compliance with their policies. Also, both parties are not to speak about this incident with anyone. This is a warning to cease and desist, effective immediately! If this does not occur, it will escalate to HR.

Both parties were reminded to be Professional while at work and to remember, we are here for our patients. Patient Care comes first. If there is any continued inappropriate behavior it needs to be and will be reported.

Net Carroll

Beaumont/Garcia 000395

On Wednesday, 8/8/18, I spoke with Rachel Luca regarding the complaint.

Rachel states:

*We were comparing bra's, nothing more. It was mother's talk, because we were discussing sports bra and breastfeeding. I accidently touched Kryssie. I did not grab her! Kryssie has been making comments about me, trying to be into women and I am uncomfortable with her comments. Kryssie brought up the nipple, I did not. Kryssie showed me her bra strap and I said let me feel the strap. I did not grab her breast or nipple. Kryssie was making comments about me grabbing her nipple in the staff room, saying things like: Rachel grab my nipple, because she is into girls. Dianna Grayson and Marcia Davis were walking by when this was said.*

Rachel appeared upset that I was bringing this to her attention and repeated, she had nothing to add to the above statement. Rachel is not putting anything in writing at this time. She kept repeating, she couldn't believe this is happening.

On Monday, 8/13/18, I spoke with Rachel Luca regarding the investigation into the allegation that was made against her and told her of my findings:

At this time, there is no one to corroborate what happened. Spoke to the person(s) names I was given to substantiate what happened and no one wants to be a part of this. Both parties account of what happened (do not match up-without any witnesses willing to corroborate what happened, it is a case of "He Said-She Said". Thus, a warning is being given, that there is to be no inappropriate conversations, touching or behavior of any kind from this day forward between Rachel and Kryssie; nor, anyone else for that matter). If there is any inappropriateness in the future, it will be directed to HR and they will handle it in the way they deemed fit in compliance with their policies. Also, Rachel is not to speak about this incident with anyone. This is a warning to cease and desist, effective immediately! If this does not occur, it will escalate to HR.

Rachel was reminded to be Professional while at work and to remember, we are here for our patients. Patient Care comes first. If there is any continued inappropriate behavior it needs to be and will be reported.

Net Carroll



PLAINTIFF'S
EXHIBIT
5
Aphram   8-13-20

**Brancaleone, Kevin**

| | |
|---|---|
| **From:** | Aphram, Jean |
| **Sent:** | Monday, September 10, 2018 2:28 PM |
| **To:** | Brancaleone, Kevin |
| **Subject:** | Inappropriate Behavior (Krissy and Rachel) |
| **Attachments:** | Kryssies statement.pdf; Bra incident MN.docx; Bra incident 2.docx; Complaint.docx |

Hi Kevin,

I have attached Net's and mine's narrative to the complaint. Also attached is Krissie's written statement after initial complaint.  Please let me know what else we need to do or what is our next step in this process?

Jean

1



Beaumont/Garcia 000310

8/27/18

- Monday, August 27, 2018. Kryssie Garcia came into the Supervisor office at the end of her shift, to let me know that per our conversation on the 6th of August-that she, Kryssie had let it go and was moving forward. Yet, last night (August 26th) it was brought to her attention, that Rachel Luca was now, going to staff and accusing Kryssie of lying on her, to get her in trouble and informing staff, she (Rachel Luca) was called into the office. As well as, making statements that Kryssie wanted her and was making sexual advances towards her. A conversation was taped between Kryssie and one of the staff person (Phil Matthewson) regarding the conversation shared between Rachel L.and Phil M., with Rachel making the accusations. Phil told Kryssie he did not want to be involved, but he felt Kryssie needed to know what was going on. If there were others willing to come forward, he would-but he didn't want to be the only one.
- Kryssie was afraid that Rachel was spreading these lies and accusations to other hospital personnel and as a result it could inadvertently affect how she, Kryssie was being treated by staff on a professional level. She felt others would have trust issues with her and her Professionalism was based on trust, honesty and her performance. She did not want anyone to doubt her work performance based on false accusations and slander. She said within the last two weeks, staff has been treating her different (leaving the staff room, so they aren't alone with her, looking at her different, staff not speaking to her, staff not as friendly to her as in the past, before this happened, etc.) Kryssie assured me, that she hadn't talked to anyone about it-after our talk in the office and the only way others would know about it, would be if Rachel was speaking about it. Kryssie was very upset and felt that if this continued, she would not be comfortable working here and she worked hard to strengthen herself professionally.
- I explained to Kryssie, I was sorry that this was happening and Rachel was told not to repeat any of the conversation I had with her on the issue. I explained to Kryssie that I would talk to Jean Aphram, our Director to see what our recourse would be, when he checked in with HR. I told Kryssie, that Jean Aphram and I would probably have a sitdown to discuss the situation. (I feel at this point, bringing the Director in, may stress the importance and seriousness of the matter). Kryssie stated she understood. Kryssie said she didn't want to get Rachel in any trouble or to have her lose her job, but this behavior had to stop.
- Told Kryssie I will let her know what the next step is. Kryssie stated she may take it to HR herself. I told her we were talking and requesting guidance from HR on how to handle the situation.

Followup from HR: Call Rachel Luca in and interview her re: Kryssie's statements.

- Spoke to the Afternoon Supervisor, Jim Burgess re: speaking with Rachel on her next scheduled night to work, (Friday, August 31st)-Rachel called in FMLA and has herself scheduled during the weekend (when the Supervisors are off).
- Our director, Jean Aphram has reached out to Rachel via phone and has left messages to no avail.

Net Carroll

Beaumont/Garcia 000315

August 27, 2018

- Called into supervisor's office to hear Krissy Garcia's concern
- Krissy explained that Rachel Luca has been spreading misinformation and that she was slandering her reputation
- Krissy expressed her concerns and was debating going to HR
- Both Net and I explained that it was her choice to do so and even if she did not, I was going to follow up with HR rep to assist us in proper way to follow up regarding this incident
- We both expressed our concerns that this behavior is not tolerated and that we would keep her posted as much as we could.
    - Just for clarification, there were two issues brought to our attention by Krissy.
        - First, is the inappropriate talk and bra touching claim by Krissie back on August 6th. Krissie at that time, did indicate to Net and I that she did not want Rachel to lose her job, but wanted her to stop with her comments. (see Net's documentation)
        - Second, on August 27th, was called back into supervisor's office to listen to another complaint by Krissie. This complaint involved the claim that Rachel was making comments that Krissie was trying to get her in trouble, trying to get her fired, all these were lies and that Krissie was the one that made passes at her.
- Later that morning, spoke with HR rep, Margaret and explained situation. HR rep expressed need to interview Rachel and get her side of the story.
- Numerous attempts were made to discuss issue, with no call back. Called on 8/27, 8/29, 8/30, and 8/31. Left a message on all those calls to call back, no call back.
- Rachel also called in sick and subsequently only worked weekends when no supervision is working.
- I was able to make face to face contact with Rachel on Friday 9/7, at the end of her shift. I asked for her side of the story as advised by HR. Again, she denies any wrong doing. I did explain to her that these were serious allegations and we are looking for guidance on the next steps
- I have not seen or heard from Krissie since August 27th.

Jean Aphram

September 10th, 2018

To whom it may concern,

I am writing to follow up with my sexual harassment complaint.

To reiterate the situation, on the morning of August 6th, 2018, I informed my immediate supervisor (Mrs. Antoinette Carroll) regarding the events that occurred on July 29th, 2018, resulting in Miss Luca putting her hand down my shirt, pinching my nipple and lifting my breast up out of my bra cup. As requested, I turned in a written statement on August 8th, 2018, to Mrs. Carroll, illustrating the event that had occurred and outlining previous situations with Miss Luca that made me uncomfortable. Mrs. Carroll updated me on the situation stating that she had spoken with Miss Luca and Mrs. Kaye (Mrs. Kaye is Miss Luca's close friend and a witness to the incident) and that she informed Miss. Luca that she was not to talk about the incident with anyone or else this would be turned over to Human Resources for further review. I was accepting of this as I simply wanted the harassment to stop and for everyone to move forward. Since then I have been treated differently by a number of staff (in particular, staff that are close friends with Miss Luca). Some staff members have withheld having friendly conversations with me, other staff members have left the immediate area when it is just them and I alone in the area/department, and another staff member chose to leave the ICU completely to do her charting during downtime rather than sit alone with me in the designated respiratory room as usually occurs. It became apparent to me that Miss. Luca had, in fact, been talking about the situation by the way the atmosphere had changed, especially since several co-workers I had not previously ever had any problems with had begun treating me poorly, although I did not have any hard proof of this. I let these initial things go, hoping that everything would run its course.

Moving forward, I have been approached by my co-workers informing me that Miss Luca continues to discuss the incident and asserts that I am lying about the situation. One such co-worker that she discussed the incident with was Phillip Mathewson. In the early morning hours of August 27th, 2018, I approached Mr. Matthewson to ask exactly what Miss Luca said. Mr. Matthewson confirmed that Miss Luca did, in fact, tell him the story and proclaimed that it was a lie. Mr. Matthewson expressed not wanting to get further involved in the situation. He told me he did not want to speak with management about it, albeit if other people were saying the same thing, he didn't mind being one of a number of people speaking with management, but that he did not want to be the only one speaking for fear of retaliation by Miss Luca. I had anticipated this response so in an effort to protect myself and my reputation I had recorded the conversation I had with Mr. Matthewson. Following the conversation with Mr. Matthewson, I updated Mrs. Carroll and requested that Human Resources be notified immediately as the situation was escalating. I expressed that Miss Luca was slandering my name in an attempt to ruin my reputation for speaking out against her in regards to being sexually harassed. I played Mrs. Carroll a portion of the audio where Mr. Matthewson confirmed that Miss Luca gave her unsolicited views and opinions to him regarding my sexual harassment claim and labeled me a lair. I was assured by both Jean Aphram, Director of Respiratory Care, and Mrs. Carroll that they would contact Human Resources that morning (August 27th, 2018) and updated me. Two weeks have passed and I have yet to hear anything back from my supervisors, our Director, or Human Resources.

Beaumont/Garcia 000307

2

Meanwhile, I continue to have my name slandered by Miss Luca. The most recent incident I am aware of was September 2nd, 2018. I was working in the 4 East ICU with David Antior, RRT. Miss Luca came into the unit a minimum of two times. She did not appear to have come to the unit for any constructive reason such as offering help, as neither Mr. Antior nor I were contacted by her. Instead, Miss Luca approached 4 East ICU nurse Anthony "Tony" Stout, RN, and begun discussing the incident. Mr. Stout states that Miss Luca approached him in his patient's room and specifically told him "Kryssie and Stacy concocted a story to get me fired" and proceeded to elaborate on how I made up the claim. Later that morning, I personally witnessed Miss Luca come to the unit and approach Mr. Stout while he was at the nursing desk and overheard her referencing the story again.

I am very upset that not only was I physically assaulted by Miss Luca, but that she proceeds to attack my character all without any repercussions. I know of nothing that has been done regarding my complaints. My co-workers have become unwillingly involved in this situation such as with Mrs. Stacy Cary, RRT, being named an accomplice to my alleged "lies" meanwhile others are unsolicitedly fed Miss Luca's version of the story accompanied by slander. Not only has Miss Luca involved those in our department but now other departments have become involved as well. She continues this despite management explicitly instructing her not to discuss the situation. This will undoubtedly affect my interprofessional relationships throughout the hospital as Miss Luca is branding me as a liar with the accusation of filing false claims of sexual harassment.

I was assured that this situation would be handled yet it persists without consequence. I have followed the chain of command in reporting this incident and handling it in a professional manner, nevertheless it continues to worsen. I would like to inquire as to what will be done to protect me from Miss Luca's retaliatory actions, relative to my coming forward and reporting sexual harassment. I am requesting a written update on my complaint in addition to the next steps Human Resources will take to ensure a safe work environment that is free from all forms of harassment.

Thank you in advance,

Kristina Garcia, BAS, RRT-ACCS, AE-C, FCCS

*what co-workers have approached Garcia?*

*what other depts have become involved in this matter?*

9-13-18

When I was working in 4 east with Rachel at the beginning of the shift she had mentioned, from what I can recall, that Kryssie and her were in the backroom in 3 east talking about their bras. Rachel said that all she did was feel the fabric on Kryssie's bra. After that she stated Kryssie spoke with management stating that Rachel touched her breasts. Rachel stated that Kryssie was not telling the truth about what happened that particular night. After that Rachel said she was not supposed to speak about the event and we went back to work.

I cant remeber if it was the same day or the next day in 4 east working with Rachel but she also mentioned a time when they (Rachel and Kryssie) were walking and their hands touched and Rachel made a joke about it but I can not recall exactly what she "jokingly' said to Kryssie.





1

**Brancaleone, Kevin**

From:          Aphram, Jean
Sent:          Monday, September 24, 2018 7:07 AM
To:            Brancaleone, Kevin
Subject:       FW: Statement

Hi Kevin,
Here is Colleen Kaye's statement.
Jean

From: Kaye, Colleen
Sent: Saturday, September 22, 2018 10:55 PM
To: Aphram, Jean <Jean.Aphram@beaumont.org>
Subject: Statement

Hi Jean,

I apologize for the late response on this matter, it truly slipped my mind while at work the last few nights and I
just sat down and had a few minutes.

Statement:

As I told Net when she asked me a few weeks ago about this matter that occurred between Rachel and Krissy, I
did not see anyone touched inappropriately nor did anything that occurred during the conversation strike me as
harmful.

The 3 of us (myself, Krissy and Rachel) were sitting in the back supply room for a few minutes around break
time. I was charting for a few minutes. A conversation was started about bras because I am currently pregnant
and we were just talking briefly about pregnancy things and comfortable bras were brought up. We all showed
the strap part of our bras up near our shoulders to compare if they were similar in comfort, etc. Somehow nipple
color was brought up as well, but it was a joking around part of the conversation and I didn't take any part of it
serious. During this conversation and during the shift I did not witness anyone feeling uncomfortable about the
conversation. To me it was just another normal night at work. I feel some people may joke around more than
others, but in a harmless manner.  I do know that conversations that occur during break, out of patient care
areas, may not always be the most appropriate and I am aware of this. Thank you and I hope this helps.

Colleen Kaye



1

Brancaleone, Kevin

| | |
|---|---|
| **From:** | Aphram, Jean |
| **Sent:** | Monday, September 24, 2018 7:39 AM |
| **To:** | Brancaleone, Kevin |
| **Subject:** | FW: statement |

Good Morning Kevin,

Below is Rachel Luca's statement regarding original incident.

Jean

**From:** Luca, Rachel
**Sent:** Monday, September 24, 2018 4:48 AM
**To:** Aphram, Jean <Jean.Aphram@beaumont.org>
**Subject:** statement

here is the statement that was requested regarding a conversion that occured a few weeks ago. we were sitting in the back room of 3E Krissie, Colleen and I. we were discussing pregancy and comfortble materinty bras. i told colleen that sport bras were comfortable when i was preganant and nursing. krissie chimed in and said why dont you get something like this and showed her bra strap, i said thats similar to mine, your tattoo is showing, krissie made a comment saying you just wanted to see what color my nipples are, if they were dark or light. i said no your shirt is lowcut and showing your chest tattoo. she said mmmhmh we all know that your a trisexual..willing to tri anything.. i said no krissie i am not into women. than we continued to talk the conversation carried on. i didnt at anypoint feel that anyone felt uncomfortable and shortly after that i got a phone call for a patient, so i left the room.

Rachel Luca



1

# Scheduling

## Garcia, Kristina

Fri 10/5/2018 10:56 PM

To:Carroll, Net <Antoinette.Carroll@beaumont.org>; Frankhouse, Allen J <Allen.Frankhouse@beaumont.org>; Burgess, James <James.Burgess@beaumont.org>;

Cc:Aphram, Jean <Jean.Aphram@beaumont.org>;

Bcc:KGarcia4@kent.edu <KGarcia4@kent.edu>;

I am writing to request that I please not be assigned as Charge Therapist on nights that Ms. Rachel Luca is scheduled.
I would also like to request that I please not be partnered in an assignment with Ms. Rachel Luca.
I would be very uncomfortable in either situation and I believe this is in the best interest of everybody to hopefully avoid any further issues.

Thank you for your understanding,

Kristina Garcia



**Brancaleone, Kevin**

| | |
|---|---|
| **From:** | Serratos, Angelita |
| **Sent:** | Sunday, October 07, 2018 4:10 PM |
| **To:** | Brancaleone, Kevin |
| **Subject:** | In regards to the incident involving Kristina Garcia and Rachel Luca |

Good afternoon Kevin,

My name is Angelita and I am a registered respiratory therapist here at Beaumont Royal Oak. I am emailing you today because I was informed that you were handling the incident involving Rachel Luca and Kristina Garcia and I want to state what was said to me on Friday September 14th 2018 and Monday September 17th 2018.

On Friday September 14th on midnight shift. I was working on North tower. I was coming down the elevator from North tower and was walking the hall on 4 Center. $ center MPCU is where Rachel was working. As I was walking by, I saw Rachel Luca on her WOW outside a patient's room. She looked upset and flustered. I approached her and offered her some help with her work assignment and asked her if she was okay. In turn she replied that she was upset because she was claiming that people in our department was trying to get her fired. And that Kristina is claiming that she (Rachel) sexually assaulted her. Rachel went on stating that Kristina is lying and telling people in our department that she (Rachel) is bi-sexual. Rachel continued to vent to me how upset she is and that she is not bi-sexual, and is going to continue to stay reserved and keep a low profile while she is at work. I told her that maybe she should speak to someone in HR if she was upset and stressed out about the situation and told her that I was sorry that this was happening to her.

On Monday September 17th 2018, Rachel Luca and I attended an ACLS class here at Beaumont Royal Oak. During our lunch brake from the class, Rachel told me that she was going to go to the respiratory department to speak to someone. When she returned, Rachel looked upset. During the class Rachel sent me a text message stating that she was called to the office. After the class I went to my car and sent Rachel a text stating that things will work itself out and that I was sorry that this was happening to her. Immediately after I sent my text she called me. She was crying and she was very upset. She was upset that she was called into the office. She was venting to me that people in our department are trying to get her fired and telling that Kristina is lying about the situation between them. Continue to say that Kristina is telling everyone that she (Rachel) is bi-sexual and that she wasn't. She then tried to explain to me in her own words what happened, but I told her that I didn't want to know about the situation and that she should have not told me. That she needed to keep the situation private and speak to management. I asked her who else have you told besides myself about the situation between you and Kristina. Rachel claimed that she told one other person and the reason she told this other person was because they are good friends. Rachel continued to vent to me on how she was afraid that she was going to lose her job and doesn't have anyone to trust. I stated to Rachel that I no longer wanted to know anymore details about the incident. I also stated to Rachel that she should not talk about the incident to anyone else and that she should contact HR and speak them in regards to how she felt. I told her that if she continued to feel stressed out at work, that she should meet with someone in HR and give her statement.

This is all that I have, thank you for your time



PLAINTIFF'S
EXHIBIT
11
Aprhram

Beaumont/Garcia 000349

## KG Harassment Investigation Interview Notes

*Human Resources are investigating a reported incident between two Respiratory Care employees. Human Resources are trying to ascertain what kinds of information may be circulating throughout the workplace. We are trying to confirm what sort of information (if any) is being spoken about this matter in the workplace, and by whom.*

- Have you heard of, or do you have any personal knowledge of an alleged incident between Rachel Luca and Kristina Garcia?

- What sort of information have you heard regarding this matter?

- How did you learn about this matter?

- From whom specifically do you recall hearing about this matter?

- Have you personally heard either Ms. Luca or Ms. Garcia share details with anyone regarding this matter?

- Have you specifically heard anyone else in the workplace share any details regarding this matter? If so, whom?

- Have you witnessed any inappropriate behavior or conduct between these two employees? Bullying, intimidation, retaliation, physical contact?

- Is there anything else you would like to share with me regarding this situation?


PLAINTIFF'S
EXHIBIT
12
Aphram

Beaumont/Garcia 000371

*Angelita Santos*

## KG Harassment Investigation Interview Notes

*Human Resources are investigating a reported incident between two Respiratory Care employees. Human Resources are trying to ascertain what kinds of information may be circulating throughout the workplace. We are trying to confirm what sort of information (if any) is being spoken about this matter in the workplace, and by whom.*

- Have you heard of, or do you have any personal knowledge of an alleged incident between Rachel Luca and Kristina Garcia? *Know about the situation. She also got the name from Garcia.*

- What sort of information have you heard regarding this matter? *That an accusation was made about dating, lying, bisexual, name calling. Garcia was with when was said.*

- How did you learn about this matter? *Not largely. Hence rumor mill. it has passed along through employees.*

- From whom specifically do you recall hearing about this matter? *Two ways. Kristina Garcia appears open door on / did not. Here through rumor mill (through Rachel).*

- Have you personally heard either Ms. Luca or Ms. Garcia share details with anyone regarding this matter? *Garcia shared the gist of it with her. Angelita also her go to H.R. as soon as door open.*

- Have you specifically heard anyone else in the workplace share any details regarding this matter? If so, whom? *Not really.*

- Have you witnessed any inappropriate behavior or conduct between these two employees? Bullying, intimidation, retaliation, physical contact? *Prior to this NO.*

- Is there anything else you would like to share with me regarding this situation?

Beaumont/Garcia 000362

*MARCIA DAVIS*

## KG Harassment Investigation Interview Notes

*Human Resources are investigating a reported incident between two Respiratory Care employees. Human Resources are trying to ascertain what kinds of information may be circulating throughout the workplace. We are trying to confirm what sort of information (if any) is being spoken about this matter in the workplace, and by whom.*

- Have you heard of, or do you have any personal knowledge of an alleged incident between Rachel Luca and Kristina Garcia? *Yes. No personal Knowledge.*

- What sort of information have you heard regarding this matter? *Only Heard From Luca (August). Luca talking Battimate possibe Reaching her of sexual Harassment. Heard in 4 days.*

- How did you learn about this matter? *Heard From Rachel's comments in Dept. Related to her. (one time)*

- From whom specifically do you recall hearing about this matter? *Rachel. maybe a couple of Days later (?).*

- Have you personally heard either Ms. Luca or Ms. Garcia share details with anyone regarding this matter? *No. Havent heard anything*

- Have you specifically heard anyone else in the workplace share any details regarding this matter? If so, whom? *No other staff talking No one in the know.*

- Have you witnessed any inappropriate behavior or conduct between these two employees? Bullying, intimidation, retaliation, physical contact? *No.*

- Is there anything else you would like to share with me regarding this situation?
*Rachel does not have any Sense of Keeping to self. Talks alot. Does not know... (Her saying)*

Beaumont/Garcia 000363

Dianna Grayson

— Dianna indicated when she heard in her statement, it was what Rachel "may" have said in the breakroom. Not sure of timing and if it had been explained to anyone by then, not to openly discuss.

## KG Harassment Investigation Interview Notes

Human Resources are investigating a reported incident between two Respiratory Care employees. Human Resources are trying to ascertain what kinds of information may be circulating throughout the workplace. We are trying to confirm what sort of information (if any) is being spoken about this matter in the workplace, and by whom.

- Have you heard of, or do you have any personal knowledge of an alleged incident between Rachel Luca and Kristina Garcia? Yes, has heard.

- What sort of information have you heard regarding this matter? Something inappropriate. Doesn't know what was inappropriate.

- How did you learn about this matter? Through Boss asking her to write a statement about it.

- From whom specifically do you recall hearing about this matter? Overheard. Boss then recently. Really cannot remember all.

- Have you personally heard either Ms. Luca or Ms. Garcia share details with anyone regarding this matter? No, not that she's aware of.

- Have you specifically heard anyone else in the workplace share any details regarding this matter? If so, whom? No, not really. Doesn't believe anyone is continuing to talk about it.

- Have you witnessed any inappropriate behavior or conduct between these two employees? Bullying, intimidation, retaliation, physical contact? Nothing.

- Is there anything else you would like to share with me regarding this situation?
  - Rachel worked last night.
  - She doesn't work with her.
  - Heard info from her statement + Boss

Beaumont/Garcia 000364

*[handwritten name at top]*

## KG Harassment Investigation Interview Notes

Human Resources are investigating a reported incident between two Respiratory Care employees. Human Resources are trying to ascertain what kinds of information may be circulating throughout the workplace. We are trying to confirm what sort of information (if any) is being spoken about this matter in the workplace, and by whom.

- Have you heard of, or do you have any personal knowledge of an alleged incident between Rachel Luca and Kristina Garcia? *[handwritten response]*

- What sort of information have you heard regarding this matter? *[handwritten response]*

- How did you learn about this matter? *[handwritten response]*

- From whom specifically do you recall hearing about this matter? *[handwritten response]*

- Have you personally heard either Ms. Luca or Ms. Garcia share details with anyone regarding this matter? *[handwritten response]*

- Have you specifically heard anyone else in the workplace share any details regarding this matter? If so, whom? *[handwritten response]*

- Have you witnessed any inappropriate behavior or conduct between these two employees? Bullying, intimidation, retaliation, physical contact? *[handwritten response]*

- Is there anything else you would like to share with me regarding this situation? *[handwritten response]*

Brancaleone, Kevin

From:           Aphram, Jean
Sent:           Friday, October 19, 2018 3:53 PM
To:             Brancaleone, Kevin
Subject:        FW: Message from "DEV16096"
Attachments:    20181019154642224.pdf

Hi Kevin,

Jim Burgess, Allen Frankhouse and Theresa Pooley Assistant Nurse Manager 4 East, just to sit in and witness, as Jim and Allan administered PIP to Rachel. She was very emotional, could not remember situation. Jim said that she was deflecting and accusing Krissie as being the more aggressive and vulgar person in this situation. Jim kept things on point and that she did not follow warning from the original discussion to keep situation confidential. She did refuse to sign PIP. I am sending original via interdepartmental mail. I made a copy for her as well. We can talk more on Monday. Have a good weekend.

Jean

1



Beaumont/Garcia 000352

**Brancaleone, Kevin**

| | |
|---|---|
| **From:** | Aphram, Jean |
| **Sent:** | Friday, October 19, 2018 3:54 PM |
| **To:** | Brancaleone, Kevin |
| **Subject:** | FW: Luca |

FYI

**From:** Frankhouse, Allen J
**Sent:** Friday, October 19, 2018 12:46 AM
**To:** Aphram, Jean <Jean.Aphram@beaumont.org>
**Subject:** Luca

Hey Jean,

Jim B, Theresa (4 East charge RN), and I met in the 4E conference room to talk with Rachel.

Rachel read over the PIP, started talking about a completely different situation, and acted like she didn't know what situation we were talking about. Jim did an excellent job at describing the PIP. He emphasized that her PIP was written for her harassment and retaliation for the incident that occurred and that there was a level of professionalism that was not met on her end.

She later came to me to discuss the PIP and said she didn't understand it. I explained it to her and told her that she needs to improve on her professionalism. She told me that several people approached her about the incident and started digging for information. To which I told her, she needs to tell them that she can't talk about it and let us know who is digging around so we can put a stop to it.

She said she wants the information of who told management what. I told her that we (supervisors) cannot disclose any of that information. I told her she can talk to you or Kevin, but I am pretty sure she'll get the same answer. She wants a copy of the PIP. I told her to talk with you.

She was very emotional and started saying how she forgot about the incident and that she has a serious family problem that she is preoccupied with. She also stated how Krissy was very aggressive with remarks before and during the investigation.

Sorry if this is too much info. I just wanted to get it down.

Allen Frankhouse: RCP-ACCS,CPFT
Clinical Supervisor
Department of Respiratory Care


Beaumont Health System
3601 West 13 Mile Road
Royal Oak, MI 48037
Office: ▮▮▮▮▮▮▮▮
Pager: ▮▮▮▮▮▮▮▮

1

Beaumont/Garcia 000356

Brancaleone, Kevin

**From:** Burgess, James
**Sent:** Friday, October 19, 2018 4:00 PM
**To:** Aphram, Jean
**Cc:** Brancaleone, Kevin
**Subject:** Rachel Luca

Hi Jean. Allen and I met with Rachel Lucu last night to give her a level 1 pip. Theresa Pooley, the asst. nurse manager for 4 east, was also present. I asked her to sit in on the meeting so that there would be another female present. I told Rachel that Theresa was there as another administrator. We met in the 4-east conference room. I asked Rachel to read the pip. She did and said that she did not understand what this was about. I outlined the events and the investigation and the pip that resulted. I told her the pip was about retaliation against Kryssie . She (Rachel) had been given explicit instructions not to talk to other staff members about the incident, which she ignored. Rachel became upset and started to cry stating that she was the one being bullied and that this is not fair. I suggested that she write down any complaints that she might have and they would be investigated. I told her that all communications with staff needed to be professional. I reiterated the provisions spelled out in the pip. Specifically that she is not to talk with staff about the incident involving Kryssie, and that failure to comply would result in escalation of the corrective action process to a level 2 pip and possibly include the loss of her position at Beaumont health.

James Burgess, RCP
Clinical Supervisor, Respiratory Care

Beaumont Health
3601 West 13 Mile Road
Royal Oak, MI 48037
Office: ███
Pager: ███

1

**Beaumont** | HEALTH SYSTEM

## Performance Improvement Plan

| Date Prepared: 10/9/18 | Incident Date: / / | | | |
|---|---|---|---|---|
| Employee Name: Rachel Luca | | Employee ID # 241633 | Department Name: Respiratory Care - RO | Position Title: Respiratory Therapist | Hire Date: 6/2/15 |

### 1) Describe what happened:

**What happened?**
In August 2018, allegations of harassment and retaliation were brought to the attention of Respiratory Care management, regarding an alleged incident between Ms. Luca and another Respiratory Care employee. Respiratory Care leadership conducted an investigation into the matter. During the course of the department's investigation and in the time period which followed, Ms. Luca demonstrated poor judgment by discussing the details of the alleged matter with other hospital employees. Ms. Luca was given explicit instructions by Respiratory Care management to avoid doing so, yet several employee witnesses support the fact Ms. Luca has had discussions with other employees regarding the matter. Ms. Luca made a reckless behavioral choice to disregard management's direction in this situation.

**What should have happened?**
Ms. Luca had a duty to avoid causing substantial and unjustifiable risk or harm to others, as driven by her actions. Ms. Luca should have maintained an appropriate level of conduct and discretion, relative to communications in this matter. Ms. Luca should not have continued discussions, or shared details, relative to the circumstances or the investigation. If Ms. Luca had continued concerns in this matter, she should have approached Respiratory Care management with those concerns..

### 2) Please classify the behavior of the employee in the event: (not applicable to attendance/tardiness)

☐ Repetitive Human Error
*Needs to be filed in HR. file*

☐ Repetitive At-Risk Behavior
*Needs to be filed in HR. file*

☒ Reckless Behavior
*Needs to be filed in HR. file*

### 3) Nature of incident: Please check the appropriate box or specify if incident is not listed.
*(This list is not inclusive of all possible incidents but rather those most commonly addressed with employees).*

☐ Failure to Follow Policy & Procedures

☐ Excessive Tardies

☐ Excessive Absences

☐ Quality of Work *(Poor Job Performance)*

☐ Neglect of Duty

☐ Failure to Follow Dept. Call-In Policy

☒ Failure to Follow Supervisor's Instructions

☐ Quantity of Work

☐ Violation of Confidentiality Policy

☐ Unexcused Absence

☐ Unprofessional Communication or Behavior

☐ Disorderly or Improper Conduct

☐ Failure to Complete or Maintain Mandatory Requirements

☐ Working but Impaired

☐ Falsification of Work Records

☒ Other Poor Job Performance - Inappropriate Behavior

### 4) Identify the duty(ies) which was breached/violated in accordance with Just Culture:

☒ Duty to Avoid Causing Unjustifiable Risk or Harm
☐ Duty to Follow a Procedural Rule (Unexcused Absence)
☐ Duty to Produce an Outcome.(Attendance/Tardiness)

### 5) Supervisor expectations:

DEC 2013

1

Beaumont/Garcia 000353

There is an expectation that in her interactions with others, Ms. Luca has a duty to produce appropriate outcomes, adhere to the Beaumont Standards of Service and follow the Hospital's Code of Conduct guidelines.

Ms. Luca is expected to perform her duties in a professional manner. Interactions with all individuals should occur with professionalism, mutual respect, discretion and proper conduct.

When given specific direction by her leadership team to avoid discussing the matter with other staff members, there was an expectation that Ms. Luca would follow that direction.

DEC 2013

2

Beaumont/Garcia 000354

**Beaumont** | HEALTH SYSTEM

## Performance Improvement Plan

6) **Check action given:**

☒ Level I – Performance Improvement Plan

☐ Level II – Performance Improvement Plan without Suspension

☐ Level II – Performance Improvement Plan with __ Day(s) Suspension – Dates: / / to / /

☐ Level III – Termination of Employment – Effective Date: / /

7) **Employee background information:**

Beaumont's Harassment Policy outlines that "Prohibited harassment is conduct that may affect any term, conditions or benefit of employment; interfere unreasonably with an individual's work performance; or create an intimidating, hostile, or offensive working environment."

Beaumont's Code of Conduct states that "As part of our commitment to having a respectful and inclusive workplace of choice, we do not allow harassment or bullying. we consider harassment to include language or conduct, which may be derogatory, intimidating or offensive to others."

Conduct on the part of a Beaumont employee that is inappropriate or that impedes harmonious interactions and relationships shall not be tolerated.

8) **Consequences if the behavior/breach occurs again:**

Given Ms. Luca's reckless behavioral choice to disregard management's direction in this situation, she is being issued a Performance Improvement Plan Level I for Poor Job Performance - Inappropriate Behavior.

Ms. Luca is expected to show immediate improvement and discretion in her interactions with others. As a part of this Performance Improvement Plan, Ms. Luca will enter a 30-Day evaluation period, reviewing her behavior and performance. Once she has successfully completed the evaluation period, she will be expected to maintain this improved behavior and performance throughout the remainder of her employment with the Hospital.

Failure to meet these expectations will result in further progression through the Hospital's Performance Management Program Policy (#282), up to and including Termination of Employment with Beaumont Health.

NOTE:
* Receipt of two suspensions in an 18-month period of time will result in termination of employment.
* Employees in an active suspension will not be eligible for a salary increase for 18 months from the date of the incident.
* Licensed health care professionals will be reported to the State of Michigan Licensing Bureau in accordance with Michigan State law when suspension level and termination occurs.

I acknowledge that this discussion session has occurred, that my breach(s) has been reviewed with me, and I have received a copy of this form. I understand that my signature does not necessarily indicate that I agree with this action, only that I have received a copy of this form. I further understand that future breaches may result in additional disciplinary action up to and including discharge.

_Patient refused to sign_  Employee Signature    10-18-19 Date

Original sent to HR ☐
Copy to Employee ☐
Copy to Employee File ☐

This original Performance Improvement Plan will be maintained in the employee's personnel file in the Human Resources Department. All Level I, II and III Plans must have prior approval from the appropriate Administrator and the Human Resources Department.

Dept. Supervisor Signature    10-18-19 Date

Administrator Signature    10/10/18 Date

Dept. Manager Signature    10-10-18 Date

Human Resources Signature    10.10.18 Date

DEC 2013

3

Beaumont/Garcia 000355

# Charge Therapist

Garcia, Kristina

Thu 2/28/2019 12:35 AM

To:Aphram, Jean <Jean.Aphram@beaumont.org>;

Cc:Carroll, Net <Antoinette.Carroll@beaumont.org>; Hamick, Steven <Steven.Hamick@beaumont.org>; Frankhouse, Allen J <Allen.Frankhouse@beaumont.org>; Burgess, James <James.Burgess@beaumont.org>;

Bcc:ckgarcia4@kent.edu <kgarcia4@kent.edu>; Kryssie_B@hotmail.com <Kryssie_B@hotmail.com>;

Importance: High

Effective Immediately.

It is with great sorrow that I am stepping down from the role as one of our departments Charge Therapists. Over the last two years I have thoroughly enjoyed assisting our team through leadership, education and assistance as a Charge Therapist. Acting as Charge I have been able to combine and utilize my education and enthusiasm for professional leadership, the science of respiratory care as well as direct patient care.
As health care providers we recognize the importance of being an active participant in our own health care plans. Due to health concerns I am no longer able to fulfill the current expectations and demands of Charge Therapist. I look forward to continuing to serve as a valuable resource for our team whilst focusing my energy on professional growth and providing excellent patient care.

Kristina Garcia



PLAINTIFF'S
EXHIBIT
14
Aphram   3-13-20

10/13/19, 6:33 AM

# Read: Charge Therapist

### Aphram, Jean

Thu 2/28/2019 7:35 AM

To:Garcia, Kristina <Kristina.Garcia@beaumont.org>;

Importance: High

Your message

To: Aphram, Jean
Subject: Charge Therapist
Sent: Thursday, February 28, 2019 12:35:28 AM (UTC-05:00) Eastern Time (US & Canada)

was read on Thursday, February 28, 2019 7:34:53 AM (UTC-05:00) Eastern Time (US & Canada).