UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KRISTINA GARCIA,

        Plaintiff,

                                      CASE NO.:  2:19-cv–11673

v.

                                      District Judge Linda v. Parker

BEAUMONT HEALTH and RACHEL LUCA,         Magistrate Judge David Grand

        Defendants.

---

Lisa C. Ward (P38933)
Attorney for Plaintiff
Law Offices of Lisa C. Ward, PLLC
4131 Okemos Rd., Ste. 12
Okemos, MI 48864
(517) 347-8100
lisacwardlaw@gmail.com

Eric J. Pelton   (P40635)
Shannon V. Loverich (P53877)
Attorneys for Def. Beaumont Health
Kienbaum Hardy Viviano
        Pelton & Forrest, PLC
280 N. Old Woodward Ave., Suite 400
Birmingham, MI  48009
(248) 645-0000
epelton@khvpf.com
sloverich@khvpf.com

---

<u>ORAL ARGUMENT REQUESTED</u>

<u>PLAINTIFF'S RESPONSE OPPOSING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT</u>

ISSUES PRESENTED

I. Has Plaintiff establish a prima facie case of disparate treatment sex and sexual orientation discrimination based on Defendant's failure to adequately respond to Plaintiff's complaints of sexual harassment and retaliation? Has Defendant failed to set forth a non-discriminatory reason for its refusal to honor Plaintiff's request not to be scheduled as a charge therapist on the midnight shift with her harasser?

II. Has Plaintiff established a prima facie case of sexual harassment under the ELCRA, including the respondeat superior element, by showing that Defendant failed to take prompt or appropriate remedial action? Are there genuine issues of material fact regarding whether Defendant's actions were prompt and appropriate?

III. Has Plaintiff established a prima facie case of retaliation under Title VII and/or the ELCRA, which do not require an adverse job action, but merely a materially adverse action? Are there genuine issues of fact concerning whether Ms. Luca's continual harassment of Plaintiff was serve and pervasive and whether Defendant's response was prompt or appropriate under the circumstances of this case?

CONTROLLING AUTHORITY

*Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998)

*Burlington Northern & Santa Fe Railroad Co. v. White*, 548 U.S. 53 (2006)

*Chambers v. Trettco, Inc.*, 463 Mich. 297; 614 N.W.2d 910 (2000)

*Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321 (6th Cir. 2008)

*Jackson v. Quanex Corp.*, 191 F.3d 647 (6th Cir. 1999)

*Keeton v. Flying J, Inc.*, 429 F.3d 259 (6th Cir. 2005)

*Laster v. City of Kalamazoo*, 746 F.3d 714 (6th Cir. 2014)

*Meyer v. City of Center Line*, 242 Mich.App. 560; 619 N.W.2d 182 (Mich. Ct. App. 2000)

*Smith v. Rock-Tenn Services, Inc.*, 813 F.3d 298 (6th Cir. 2016)

*Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463 (6th Cir. 2012)

*Watford v. Jefferson County Public Schools*, 870 F.3d 448 (6th Cir. 2017)

*White v. Department of Transportation*, No.349407, 2020 WL 5849754 (Mich. Ct. App. October 1, 2020)

*Williams v. General Motors Corp.*, 187 F.3d 553 (6th Cir. 1999)

TABLE OF CONTENTS

ISSUES PRESENTED ................................................................................................ i

CONTROLLING AUTHORITY ................................................................................. ii

TABLE OF CONTENTS ......................................................................................... iii

INDEX OF AUTHORITIES ..................................................................................... iv

INTRODUCTION ................................................................................................... 1

PROCEDURAL HISTORY ..................................................................................... 1

DEPOSITION TESTIMONY .................................................................................... 3

STANDARD OF REVIEW ..................................................................................... 10

ARGUMENT ....................................................................................................... 11

      PLAINTIFF HAS ESTABLISHED THE ESSENTIAL ELEMENTS OF A TITLE VII CLAIM BASED ON DISPARATE TREATMENT ......................................................... 11

      DEFENDANT FAILED TO TAKE PROMPT AND APPROPRIATE ACTION TO STOP THE HARASSMENT ................................................................................. 15

      PLAINTIFF HAS ESTABLISHED A CLAIM OF RETALIATION UNDER TITLE VII AND THE ELCRA ....................................................................................... 19

RELIEF .............................................................................................................. 22

INDEX OF EXHIBITS .......................................................................................... 23

INDEX OF AUTHORITIES

Cases

*Anderson v. Libberty Lobby, Inc.*, 477 U.S. 242 (1986) ............................................... 11

*Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998) ............................................. 12

*Burlington Northern & Santa Fe Railroad Co. v. White*, 548 U.S. 53 (2006) ................ 19, 20, 21

*Chambers v. Trettco, Inc.*, 463 Mich. 297; 614 N.W.2d 910 (2000) .................................... 15, 16

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ........................................................... 11

*Deleon v. Kalamazoo County Road Commission*, 739 F.3d 914 (6th Cir. 2014) ................ 12, 13

*Gallagher v. C.H. Robinson Worldwide, Inc.*, 567 F.3d 263 (6th Cir. 2009) .............................. 18

*Hardwick v. City of Detroit*, 876 F.3d 238 (6th Cir. 2017) ........................................... 11

*Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321 (6th Cir. 2008) ......................................... 17, 20

*Jackson v. Quanex Corp.*, 191 F.3d 647 (6th Cir. 1999) ................................................. 16

*Kalich v. AT&T Mobility, LLC*, 679 F.3d 464 (6th Cir. 2012) ........................................... 11

*Keeton v. Flying J, Inc.*, 429 F.3d 259 (6th Cir. 2005) ................................................. 12

*Laster v. City of Kalamazoo*, 746 F.3d 714 (6th Cir. 2014) ............................................. 20, 22

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ..................... 11

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) ................................................. 12

*Meyer v. City of Center Line*, 242 Mich.App. 560; 619 N.W.2d 182 (Mich. Ct. App. 2000) ........ 20

*Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75 (1998) ............................................... 11

*Powell-Pickett v. A.K. Steel Corp.*, 549 Fed.Appx. 347, 352 (6th Cir. 2013) ........................... 14

*Radke v. Everett*, 442 Mich. 368 (1993) ................................................................. 16

*Redlin v. Gross Pointe Pub. Sch. Sys.*, 921 F.3d 599, (6th Cir. 2019) ................................... 13

*Reich v. City of Elizabethtown*, 945 F.3d 968 (6th Cir. 2019) ........................................... 14

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000) ....................................... 11

*Robinson v. Ford Motor Co.*, 277 Mich. App. 146; 744 N.W.2d 363 (Mich. Ct. App. 2007) ........ 11

*Smith v. Rock-Tenn Services, Inc.*, 813 F.3d 298 (6th Cir. 2016) .................................. 17, 18, 19

*Spees v. James Marine, Inc.*, 617 F.3d 380 (6th Cir. 2010) ................................... 12, 15

*Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981) .................................... 12

*Waldo v. Consumers Energy Co.*, 726 F.3d 802, 817 (6th Cir. 2013) ......................... 16

*Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463 (6th Cir. 2012) ....................... 11, 13

*Watford v. Jefferson Cty. Pub. Sch.*, 870 F.3d 448 (6th Cir. 2017) ............................ 13

*White v. Dep't of Transp.,* No.349407, 2020 WL 5849754 (Mich. Ct. App. October 1, 2020) .... 20

*Williams v. General Motors Corp.*, 187 F.3d 553 (6th Cir. 1999) ............................... 17

## Statutes

42 U.S.C. 2000e *et seq.* ............................................................................................. 1

42 U.S.C. 2000e-3(a) ............................................................................... 19

Mich. Comp. Laws § 37.2101 (ELCRA) ................................... 2, 11, 15, 16, 19, 20, 22

Mich. Comp. Laws § 37.2701(a) .............................................................. 19

## Rules

Fed. R. Civ. P. 56(a) .................................................................................. 10

Fed. R. Civ. P. 56(e) .................................................................................. 11

Local Rule 7.1 ................................................................................................. 1

INTRODUCTION

Plaintiff, Kristina Garcia, through her Attorney, Lisa C. Ward, Law Offices of Lisa C. Ward, PLLC, hereby opposes the Motion For Summary Judgment filed on behalf of Defendant, Beaumont Hospital, on October 13, 2020.  Plaintiff's Response Opposing Defendant's Motion For Summary Judgment is being filed pursuant to Fed. R. Civ. P. 56 and Local Rule 7.1.

PROCEDURAL HISTORY

On June 6, 2019, Plaintiff filed a Complaint And Jury Demand against Defendant Beaumont Health ("Defendant") and Defendant, Rachel Luca. (ECF No. 1, PageID.1-7.)  In her complaint, Plaintiff alleged that Defendant violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e et seq., by engaging in sex discrimination, sexual orientation discrimination, and retaliation. (ECF No. 1, PageID.4-6.)  Plaintiff's complaint is based on Defendant's failure to adequately protect Plaintiff from continuing harassment and retaliation after Plaintiff reported a sexual assault by a coworker, Ms. Luca. While on a break during the midnight shift, Ms. Luca put her hand down Plaintiff's shirt, pinched Plaintiff's nipple and pulled Plaintiff's breast out of her bra cup. (ECF No. 1, PageID.2-6.)  It is Plaintiff's position that Defendant would have treated her reports of sexual harassment and retaliation differently if she were not a bisexual woman being harassed by another woman. (ECF No.1, PageID.5.)

Defendant Beaumont Health's Answer To Complaint And Affirmative Defenses was filed on August 19, 2019.  (ECF No. 6, PageID.16.)  In its answer, Defendant asserted numerous affirmative defenses, including that "Beaumont Health has in place a clear and well-disseminated policy against discrimination in the workplace and a reasonable and available procedure for handling complaints thereof, which provides for prompt and effective responsive action."(ECF No. 6, PageID.24.)  Defendant also asserted as an affirmative defense that

1

"Beaumont Health exercised reasonable care to prevent and promptly correct any alleged sexually harassing behavior." (ECF No. 6, PageID.24.)

Plaintiff filed a Motion to Amend Complaint and Brief in Support on October 9, 2019 to add two counts under the Michigan Elliot-Larsen Civil Rights Act ("ELCRA"), MCL 37.2101 et seq., for unlawful sexual harassment and retaliation. (ECF No. 19, PageID.70-87.)  On March 6, 2020, this Court issued an Opinion and Order Granting in Part and Denying in Part Plaintiff's Motion to Amend Complaint. (ECF No. 26, PageID.135-145.)  Pursuant to that Order, Plaintiff filed a First Amended Complaint and Jury Demand on March 11, 2020, which included a sexual harassment claim under ELCRA against Defendant and a retaliation claim under ELCRA against Defendant and Ms. Luca. (ECF No. 28, PageID.150-158.)

Defendant's Answer To First Amended Complaint And Affirmative Defenses was filed on March 25, 2020. (ECF No. 30, PageID.163-174.)  In its Answer, Defendant raised the same affirmative defenses, including that "Beaumont Health has in place a clear and well-disseminated policy against discrimination in the workplace and a reasonable and available procedure for handling complaints thereof, which provides for prompt and effective responsive action."  (ECF No. 30, PageID.173.)  Defendant also asserted as an affirmative defense that "Plaintiff's claim for hostile work environment sexual harassment is barred because Beaumont Health exercised reasonable care to prevent and correct promptly any alleged harassment or retaliation." (ECF No. 30, PageID.174.)

The parties have engaged in extensive written discovery, including interrogatories and multiple requests to produce documents.  On February 4, 2020, Defendant took the deposition of Plaintiff. (ECF No. 72-2, PageID.899-975.)  Plaintiff took the deposition of Mr. Jean Aphram, Director of Respiratory Care on March 13, 2020.  (ECF No. 72-6, PageID.1204-1224.)  On February 21, 2020, Plaintiff took the deposition of another supervisor in the Respiratory Care department, Ms. Antoinette Carroll.  (ECF No. 72-5, PageID.1143-1167.)  Recently, on

September 22, 2020, Defendant took a second deposition of Plaintiff.  (ECF No. 72-2, PageID. 1056-1071.)  Plaintiff's Response Opposing Defendant Beaumont Health's Motion for Summary Judgment is timely filed pursuant to this Court's Second Amended Scheduling Order.  (ECF No. 69, PageID.849.)

DEPOSITION TESTIMONY

Ms. Garcia is a respiratory therapist working the midnight shift, from 6:45 p.m. to 7:15 a.m., Friday through Sunday at Beaumont Health.  Defendant took the deposition of Kristina Garcia on February 4, 2020.  (ECF No. 72-2, PageID.899-975.)  When Ms. Garcia was asked whether she experienced other instances of discrimination while employed with Defendant, she explained that another supervisor, Mr. Frankhouse, wanted to take away her duties as a BLS instructor after she returned from her FMLA leave.  Ms. Garcia went on FMLA leave after the sexual harassment and retaliation by Ms. Luca in September of 2018.  (ECF No. 72-2, PageID. 915-916.)  Ms. Garcia also testified about her duties as a charge therapist on the midnight shift. Because there are no other supervisors on the midnight shift, the charge therapist acts as a supervisor and has the responsibility of responding to any staff needs or problems.  When Ms. Garcia worked at a charge therapist, she received additional compensation.  (ECF No. 72-2, PageID.919-922.)

During her deposition, Ms. Garcia testified that several months prior to the sexual assault, Ms. Luca began making comments about Ms. Garcia and Ms. Luca as a couple, that Ms. Garcia "wanted her" and that Ms. Garcia found her attractive.  On at least one occasion, Ms. Luca attempted to hold hands with Ms. Garcia. Ms. Luca also asked Ms. Garcia about her sexuality, how many women she had dated and whether Ms. Luca was bisexual.  In response to Ms Luca's comments, Ms. Garcia told Ms. Luca that she was not interested in her, which made

3

Ms. Luca upset or insulted.  (ECF No. 72-2, PageID.924-925, 929, 933.)  On July 29, 2018, Ms.

Luca and Ms Garcia were working the midnight shift.  While at work, Ms. Luca was googling

nasty terms for infected vaginas and showing the photos to Ms. Garcia, stating:  "So this is what

you like?" and "Is this what you're into?"  Ms. Luca also bragged about how even after having

kids, her vagina was still beautiful.  At this point, Ms.  Luca grabbed the waistband of her pants

like she was going to show everyone her vagina. Another employee, Toni Rose Cudilla was

present for this conversation.  (ECF No. 72-2, PageID.930-932, 948-949.)

During the same midnight shift on July 29, 2018, Ms. Garcia, Ms. Luca and another

respiratory therapist, Colleen Kaye, were on a break from work.  Ms. Luca was talking about her

ex-husband and a recent date she was on, where the man had made a move on her.  (ECF No.

72-2, PageID.941.)  At some point, Ms. Luca started talking about a sexual comment she heard

from Phil Matthewson about "peak flow".  (ECF No. 72-2, PageID.941-942.)  Ms. Luca and Ms.

Kaye began talking about their bras and all of them showed each other their bra straps.  Ms.

Garcia noted that she was so cold, they could see her "nips" through her bra, so she had but on

PPE gown over her shirt.  (ECF No. 72-2, PageID.941-942, 944-945.)   Suddenly, Ms. Luca

came over to Ms. Garcia, put her hand in her shirt, pinched her nipple and pulled her breast out

of her bra cup.  When Ms. Garcia objected, Ms. Luca responded by saying, "Well you have nice

nipples, he, he, he."  (ECF No. 72-2, PageID.945-946.)  Ms. Garcia was shocked and angry.

(ECF No. 72-2, PageID.930-932.)  After her shift, Ms. Garcia spoke to Tonirose Cudilla and her

friend, Stacy Cary, and informed them of the sexual harassment by Ms. Luca.  (ECF No. 72-2,

PageID.931-932, 947-948.)

Ms. Garcia was off for several days, but when she returned to work, she reported Ms.

Luca's sexual harassment to her supervisor, Ms. Carroll.  During the August 6, 2018 meeting

with Ms. Carroll, which Ms. Garcia recorded, Ms. Garcia told her that she was not comfortable

being alone with Ms. Luca on the midnight shift. (ECF No. 72-2, PageID.1000-1013.)  Two days

later, Ms., Garcia submitted a written complaint about Ms. Luca's sexual harassment.
Subsequently, Ms. Carroll notified Ms. Garcia that the three witnesses did not have the same
stories and so Defendant would not take any action against Ms. Luca.  (ECF No. 72-2, PageID.
951-953.)  In spite of Defendant's assertions that Ms. Garcia was satisfied with the investigation,
she actually testified that she did not know if it had been handled the way she wanted it
handled.  Although she did not want Ms. Luca to lose her job, she did want there to be
consequences, and that Ms. Luca be "penalized in some way."  (ECF No. 72-2, PageID.
953-954, 969-970.)

On or about August 27, 2018, Ms. Garcia became aware that Ms. Luca was telling co-
workers lies about her.  During a conversation with Phil Matthewson, he stated that Ms. Luca
called Ms. Garcia a liar.  During this same time, Ms. Garcia noticed that other employees were
uncomfortable around her and did not want to be in a room alone with her.  As a result of her
conversation with Mr. Matthewson, Ms. Garcia reported Ms. Luca's retaliation to Ms. Carroll
immediately, and played her part of the recording of the conversation with Mr. Matthewson.
(ECF No. 72-2, PageID.955-960.) Several days later, Ms. Garcia learned that Ms. Luca told
another employee, Tony Stout, that Ms. Garcia had concocted a story to get her fired.  Even
after the report of retaliation on August 27, 2018, Ms. Luca continued to come into areas of the
hospital where Ms. Garcia was working on the midnight shift and tell nurses that Ms. Garcia had
made up the story to get her fired. (ECF No. 72-2, PageID.959-962.)  On October 27, 2018,
while working the midnight shift, Ms. Luca approached Ms. Garcia at work and tried to talk to
her, but Ms. Garcia walked away.

From the time of the initial sexual harassment on July 29, 2018, up to the end of
November of 2018, Ms Garcia continued to be scheduled as a charge therapist on the midnight
shift when Ms. Luca was also scheduled to work as a respiratory therapist. (ECF No. 72-2,
PageID.963-965.)  Ms. Garcia also testified that her complaint of sexual harassment would have

5

been handled differently if she had not been a bisexual woman who was sexually harassed by another woman.  When asked for proof of her claim, Ms. Garcia repeated the statement made by Ms. Carroll during the August 6, 2018 meeting:  "that if it had been a man, he would have been  — I believe she said walked out or he would have been fired."  (ECF No. 72-2, PageID. 971-973.)

Subsequently, on September 22, 2020, Defendant took a second deposition of Ms. Garcia.  (ECF No. 72-2, PageID.1056-1071.)  During her second deposition, Ms. Garcia testified that she has not been involved in her usual activities, because she has been feeling stressed and depressed.  (ECF No. 72-2, PageID.1058.)  When Ms. Garcia was questioned regarding her resignation as a charge therapist on February 28, 2019, she testified that she was afraid that Ms. Luca, who was going to be released from jail, might get her job back at Beaumont Health.  Given that her request not to be scheduled with Ms. Luca as a charge therapist on the midnight shift had been ignored by Defendant, she felt she had to resign.  Ms. Garcia was never told that Ms. Luca's employment had been terminated at the end of November 2018, prior to her resignation as a charge therapist. (ECF No. 72-2, PageID.1060-1061.)

During the early part of 2018, Ms. Garcia was suffering from anxiety and stress.  (ECF No. 72-2, PageID.1061-1062.)  Ms. Garcia also testified about her ongoing mental health treatment as a result of the sexual harassment and retaliation, and that she is being treated by a counselor and her primary care physician for trauma, depression and anxiety. (ECF No. 72-2, PageID.1063-1064, 1068-1069.)  Ms. Garcia also testified that she continues to feel unprotected and unsafe at her job and she worries that if anything major came up she would not be listened to, or protected.  (ECF No. 72-2, PageID.1065-1067.)  As an example of her feeling unsafe, after Ms. Luca was no longer on the schedule, her supervisor, Mr. Burgess approached her about what she should do and say if Ms. Luca came into the building on the midnight shift.  Ms.

Garcia felt that it was inappropriate for her to be put in the position of having to deal with Ms. Luca.  (ECF No. 72-2, PageID.1066.)

On February 21, 2020, Plaintiff took the deposition of Antoinette Carroll, Director of Respiratory Care, who conducted the investigation into Ms. Garcia's sexual harassment complaint. (ECF No. 72-5, PageID.1143-1167.)  During her deposition, Ms. Carroll testified that the only training she received for doing any type of investigation took place in 2000 and she could not recall if it involved any training related to investigating a sexual harassment or retaliation complaint.  (ECF No. 72-5, PageID.1148.)  Ms. Carroll also acknowledged that in the past five years, she had not done any other investigations involving employee complaints of discrimination, retaliation or sexual harassment.  (ECF No. 72-5, PageID.1149.)  Although Ms. Carroll said that she had not done any prior investigation involving sexual harassment by Ms. Luca, she did admit that she had previously investigated Ms. Luca many times after employees complained about her being "too personal" and talking about "all her personal affairs."  (ECF No. 72-5, PageID.1149.)  Ms. Carroll found Ms. Luca's continuous denial of the allegations suspicious and did not always believe her, but at no time did she discipline Ms. Luca as a result of the employee complaints, beyond telling her to stop.  (ECF No. 72-5, PageID.1150.)

With regard to the actual investigation of Ms. Garcia's sexual harassment complaint, Ms. Carroll testified that although Beaumont Hospital issued a revised Harassment Policy, which was effective August 6, 2018, she did not know if she received a copy of it and was unsure whether she reviewed the revised policy or the older September 1, 2016 Sexual Harassment Policy during her investigation.  (ECF No. 72-5, PageID.1152-1154.)  Ms. Carroll also acknowledged that the 2018 Harassment Policy required that the investigation of a harassment complaint be done by either the Compliance, Audit, Accreditation and Risk Department and/or the Human Resources Department, and that she was not employed in either department.  In spite of the 2018 Harassment Policy direction that the investigator review related documents,

7

including company emails and internal communications, as well as, computers and surveillance videos, Ms. Carroll did not review any of these materials.  (ECF No. 72-5, PageID.1154-1155.)

After Ms. Garcia told her that Ms. Luca had put her hand down her shirt, inside her bra cup, and pinched her nipple, Ms. Carroll had Ms. Garcia put her sexual harassment complaint in writing, which she did a couple of days after their meeting.  During that same conversation, Ms. Garcia asked not to be scheduled together with Ms. Luca in an ICU where they would be alone in the supply room.  Ms. Carroll remembered that Ms. Garcia was very upset and angry during their conversation and she admitted that Ms. Garcia had never lied to her or been dishonest with her in the past.  (ECF No. 72-5, PageID.1155-1156.)

Subsequently, Ms. Carroll interviewed Ms. Luca and her friend, Colleen Kaye, who was also present during the sexual harassment.  Ms. Carroll testified that Ms. Kaye told her that she did not see Rachel touch or grab Krissy's breast.  However, Ms. Luca stated that she accidentally touched Krissy, but that she did not grab her.  When Ms. Carroll told Ms. Luca to put something in writing, she refused.  In addition, when other potential witnesses said they did not want to get involved, Ms. Carroll was concerned, but did nothing.  (ECF No. 72-5, PageID. 1156-1158.)  Ms. Carroll also admitted that she concluded her investigation before she had interviewed all the potential witnesses.  (ECF No. 72-5, PageID.1158-1159.)  In spite of the fact that Ms. Carroll believed that Ms. Garcia had told her the truth about the sexual harassment by Ms. Luca, Ms. Carroll determined that it was a "he said-she said," and did not discipline Ms. Luca. Subsequently, when Ms. Luca used FMLA leave during the week and only worked weekends, so that she would not have to see any supervisors, Ms. Carroll was concerned, but did nothing.  (ECF No. 72-5, PageID.1159-1162.)

Ms. Carroll had a more limited role in the investigation concerning Ms. Luca's retaliation against Ms. Garcia.  On August 27, 2018, Ms. Garcia reported to Ms. Carroll that Ms. Luca was calling her a liar and slandering her name in an attempt to ruin her reputation for reporting Ms.

8

Luca's sexual harassment.  Ms Garcia was informed about this by Phil Matthewson, and she

played Ms. Carroll part of a tape of her conversation with Mr Matthewson. Ms. Garcia also

informed Ms. Carroll that two weeks had passed and she had not heard anything back from her

supervisors, director or Human Resources.  Ms. Garcia also told Ms. Carroll that other

employees were leaving the room so that they were not alone with her.  (ECF No. 72-5, PageID.

1163-1164.)  After Ms. Garcia came back from FMLA leave, on October 5, 2018, she again

requested that she not be scheduled to work as a charge therapist during the midnight shift

when Ms. Luca was working and that she not be partnered in an assignment with Ms. Luca.

(ECF No. 72-5, PageID.1165-1166.)

Plaintiff took the deposition of Director of the Respiratory Department, Jean Aphram, on

March 13, 2020.  Mr. Aphram was the supervisor who investigated Ms. Garcia's claim of

retaliation by Ms. Luca. (ECF No. 72-6, PageID.1204-1224.)  During his deposition, Mr. Aphram

admitted that before he investigated Ms. Garcia's complaint of retaliation, he had never read the

August 6, 2018 Harassment Policy and he had never done any type of employment

discrimination investigation.  (ECF No. 72-6, PageID.1209-1211.)  With regard to prior problems

with Ms. Luca, Mr. Aphram testified that he was involved in the second of two performance

improvement plans that had been issued to Ms. Luca in 2016. He also testified that for him to be

involved in employee discipline, it had to involve gross neglect or something very serious.  (ECF

No. 72-6, PageID.1210-1211.)  In spite of Beaumont Health's August 6, 2018 Harassment Policy

requiring that the investigation be conducted by the either the Compliance, Audit, Accreditation

and Risk Department and/or the Human Resources Department, Mr. Aphram admitted that the

initial investigation was done by Ms. Carroll, rather than following the policy.

After reviewing Ms. Garcia's written complaint, Mr. Aphram admitted that an employee

putting her hand down another employee's shirt, pulling her breast out of her bra cup and

pinching her nipple would violate the August 6, 2018 Harassment Policy.  (ECF No. 72-6,

9

PageID.1212-1213.)  Although Mr. Aphram was aware of Ms. Garcia's request not to be scheduled together in an ICU on the night shift, where they might be alone in the supply room, Mr. Aphram merely suggested to her supervisor that they not be in the same area.  (ECF No. 72-6, PageID.1213-1214.)  Mr. Aphram did not recall whether he ever follow-up with either Ms. Garcia or her direct supervisor to see if she was still being scheduled as a charge nurse on the midnight shift with Ms. Luca.  (ECF No. 72-6, PageID.1214, 1221-1222.)

It was not until after the retaliation by Ms. Luca that Mr. Aphram finally got written statements from Colleen Kaye and Ms. Luca, which were inconsistent with the prior verbal statements that they had given to Ms. Carroll.  (ECF No. 72-6, PageID.1219.)  Ms. Luca's story had changed from saying that she accidentally touched Ms. Garcia to saying "that she felt the fabric on Krissy's bra;" Ms. Kaye's story had also changed from not remembering anything being discussed about nipples to "some how nipple color was brought up."  (ECF No. 72-6, PageID. 1219-1221.)  Mr. Aphram did not re-visit Ms. Carroll's conclusion that no sexual harassment had occurred because it was a "he said-she said issue."  Ms. Garcia first reported that Ms. Luca was retaliating against her on August 27, 2018.  However, it was not until October 19, 2018, almost two months later, that Ms. Luca was given a performance improvement plan. (ECF No. 72-6, PageID.1222-1223.)  From July 29, 2018 until November 30, 2018, Ms. Garcia was continually scheduled to work as a change therapist on the midnight shift, where she would have been required to interact with Ms. Luca.

STANDARD OF REVIEW

Summary judgment is proper only where the movant shows that there is no genuine issue as to any material fact and is therefore entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(a). The central inquiry is "whether the evidence presents a sufficient disagreement

to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Libberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Pursuant to FED. R. CIV. P. 56(e), the movant has the initial burden of showing "the absence of a genuine issue of material fact." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once this burden is met, the non-movant must come forward with "specific facts showing that there is a genuine issue for trial." *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "[C]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); and *Hardwick v. City of Detroit*, 876 F.3d 238, 243 (6th Cir. 2017).

ARGUMENT

I.  Plaintiff Has Established The Essential Elements Of A Title VII Claim Based On Disparate Treatment

In this case, Plaintiff alleges that Defendant discriminated and retaliated against her on the basis of sex and sexual orientation in violation of Title VII, when it failed to adequately respond to Plaintiff's complaint of sexual harassment and failed to protect her from unlawful retaliation.  Title VII prohibits employment discrimination and retaliation based on sex and sexual orientation.[1]  In order to establish a prima facie case of disparate treatment sex and

---

[1]  Same sex sexual harassment has been recognized as a violation of Title VII, *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75 (1998), and a violation of ELCRA, *Robinson v. Ford Motor Co.*, 277 Mich. App. 146 (Mich. Ct. App. 2007).  Both the Sixth Circuit and Michigan courts have recognized that, under ELCRA, Plaintiff must show that the harassment was gender-based, or "because of . . . sex." *Kalich v. AT&T Mobility, LLC*, 679 F.3d 464, 470-71 (6th Cir. 2012) (*quoting Vickers v. Fairfield Med. Ctr.*, 453 F.3d 757 (6th Cir. 2006)).  Federal and Michigan courts "often interpret ELCRA provisions using Title VII case law." *Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463 (6th Cir. 2012); *Robinson*, 277 Mich. App. 146 (Mich. Ct. App. 2007).

sexual orientation discrimination under Title VII, Plaintiff must show that (1) she is a member of a protected group, (2) she suffered an adverse employment action, and (3) she was treated differently than a similarly situated non-protected employee.  If Defendant can articulate a legitimate nondiscriminatory reason for its actions, Plaintiff must show that Defendant's explanation is a mere pretext to cover Defendant's discrimination.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) and *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981).  A Plaintiff can establish a claim of discrimination through the use of direct or circumstantial evidence.  Direct evidence claims are removed from the burden-shifting framework of *McDonnell Douglas*.  In *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742; 118 S.Ct. 2257; 141 L.E.2d 633 (1998), the United States Supreme Court set forth the definition of a adverse employment action for purposes the anti-discrimination provision of Title VII. "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* at 761.

The United States Court of Appeals for the Sixth Circuit has also addressed the standard to apply when determining when an employee has suffered an adverse employment action. In *Keeton v. Flying J, Inc.,* 429 F.3d 259, 264-65 (6th Cir. 2005) the Sixth Circuit noted that their prior cases have not precluded the possibility that a transfer not rising to the level of a constructive discharge might constitute an adverse employment action.  "And even if a reassignment is not paired with a salary or work hour change, it can nonetheless be considered an adverse employment action where there is evidence that the employee received a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Spees v. James Marine, Inc.*, 617 F. 3d 380, 391 (6th Cir. 2010).  In *Deleon v. Kalamazoo County Road Commission*, 739 F.3d 914

(6th. Cir. 2014), the Sixth Circuit held that a lateral transfer, even to a position that the plaintiff had applied for, constituted an adverse employment action.  *Id.* at 919.

In addition, the fact that the plaintiff was able to continue doing her job, does not mean that she did not suffer an adverse employment action.  "A plaintiff need not prove a tangible decline in her work productivity; only that the harassment made it more difficult to do her job." *Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 470 (6th Cir. 2012) (*quoting Gallagher v. C.H. Robinson Worldwide, Inc.*, 567 F.3d 263, 274 (6th Cir. 2009)).  *See Watford v. Jefferson County Public Schools*, 870 F.3d 448 (6th Cir. 2017), wherein the Sixth Circuit held that holding grievance proceedings in abeyance constituted a materially adverse action under Title VII. The Sixth Circuit has also found a materially adverse employment action in a situation where the plaintiff was ultimately paid her same salary, but the employer's action had resulted in a loss of pay at first, but more importantly, a loss of prestige.  *See Redlin v. Gross Pointe Public School System*, 921 F.3d 599, 608 (6th Cir. 2019).

In this case, Plaintiff's claim of disparate treatment sex and sexual orientation discrimination is that her complaint of sexual harassment would have been treated differently by Defendant if she was not a bi-sexual woman who was sexually harassed by another woman. When Plaintiff complained about the sexual harassment by Ms. Luca, Ms. Carroll did not follow Defendant's own harassment policy when she conducted the initial investigation.  When Plaintiff had her initial meeting with Ms. Carroll on August 6, 2018, Ms. Carroll stated that if the sexual harassment would have been between a man and a woman, the man would lose his job.  "Well he would have been out of a job,  He would have been gone."   (Affidavit of Kristina Garcia at ¶ 1a, Exhibit 1.) When Plaintiff stated that she had been sexually harassed because she is bi-sexual, Ms. Carroll acknowledged that that was true, asking:  "Is, is she jealous?"  (Exhibit 1 at ¶¶ 3a, b). Ms. Carroll also admitted that Defendant had prior issues with Ms. Luca and that she

had been "talked to about a number of things," but  in the past Ms. Luca had done things and gotten away with them.  (Exhibit 1 at ¶¶ 1b,c and 2b).

In her declaration, Ms. Carroll attempts to change her testimony that Ms. Garcia had never lied to her in the past by stating that she only "kind of" believed her. She also tried to bolster the credibility of Ms. Kaye and Ms. Luca. As previously stated above, Ms. Luca admitted to touching Ms. Garcia in spite of Ms. Kaye's statement that she did not see Rachel touch Krissy. Whether Ms. Carroll's refusal to consider the statements by Ms. Luca and her friend, Ms. Kaye, as truthful was reasonable is a disputed issue of fact that cannot be decided on summary judgement.  The Sixth Circuit Court of Appeals has established that post-deposition affidavits that contradict earlier deposition testimony should not be considered in deciding a motion for summary judgement.  *See Reich v. City of Elizabethtown*, 945 F.3d 968 (6th Cir. 2019). "A party may neither duck her deposition, nor hold her cards in anticipation of later advantage." *Powell-Pickett v. A.K. Steel Corp.*, 549 Fed.Appx. 347, 352 (6th Cir. 2013).

In spite of Defendant's claims that Plaintiff suffered no materially adverse employment action, there are genuine issues of material fact as to whether Plaintiff's involuntary loss of the charge therapist position and loss of pay constitutes a materially adverse employment action. Prior to the sexual harassment by Ms. Luca, Plaintiff worked on the mid-night shift as a charge therapist, which involved supervisory duties and extra pay.  During her August 6, 2020 meeting with Ms. Carroll, Plaintiff requested that she not be assigned as a charge therapist on the midnight shift with Ms. Luca.  When Plaintiff returned from her FMLA leave at the beginning of October 2018, she sent a written request to Defendant asking that she not be assigned as a charge therapist on the nights that Ms. Luca was scheduled to work.  The very next weekend, Plaintiff was scheduled to work as a charge therapist on the midnight shift with Ms. Luca, which required her to find a substitute for charge therapist; and this continued for months until Ms. Luca was terminated. (ECF No. 72-2, PageID.1199-1201.)

14

Moreover, Defendant's statement that Plaintiff "never again interacted with Luca in the workplace," is not true.  Not only did Ms. Luca approach Plaintiff when she was working the midnight shift, but Ms. Luca continued to come into the areas of the hospital where Plaintiff was working to tell nurses that Plaintiff lied and made up a story to get her fired.  In addition, at one point, Plaintiff was instructed by Ms. Burgess about what she should tell Ms. Luca if she came into the building after she was no longer working.  At the time Plaintiff resigned from her position of charge therapist, Defendant had not informed her that Ms. Luca had been terminated from employment.

Plaintiff disputes that her resignation as a charge therapist was voluntary.  Given that Defendant continually ignored her request not to be scheduled as a charge therapist with Ms. Luca on the midnight shift, Plaintiff was forced to resign her position as charge therapist, which resulted in a loss of pay, as well as, supervisory duties.  Plaintiff submits that her loss of the charge therapist position under the facts of this case, constitutes a materially adverse employment action under Title VII.  Although Defendant attempts to argue that it had a legitimate business reason for the discipline of Ms. Luca, it does not offer an explanation for why it could not honor Plaintiff's request not to be scheduled as a charge therapist on the midnight shift with Ms. Luca.  The failure of Defendant to address this issue is fatal to its claim of having a legitimate business reason for its actions.  *Spees*, 617 F.3d at 391.


II. Defendant Failed To Take Prompt And Appropriate Remedial Action To Stop The Harassment

The Michigan Supreme Court set forth the elements for a claim of hostile environment sexual harassment under the Michigan Elliot-Larsen Civil Rights Act ("ELCRA"), MCL 37.2101 *et seq.*, in *Chambers v. Trettco*, 463 Mich. 297, 311 (2000): (1) the employee belonged to a protected group; (2) the employee was subjected to communication or conduct on the basis of sex; the employee was subjected to unwelcome sexual conduct or communication; (4) the

15

unwelcome sexual conduct or communication was intended to or in fact did substantially interfere with the employee's employment or created an intimidating, hostile, or offensive work environment; and (5) respondeat superior.  A claim for hostile environment sexual harassment includes sexual harassment by a co-worker or a supervisor.  An employer can avoid liability in a hostile environment case if the employer takes prompt and appropriate remedial action upon notice of the hostile work environment.  *Id.* at 312-313. See also: *Radke v. Everett, 442 Mich. 368 (1993).*

In *Jackson v. Quanex Corporation*, 191 F.3d 647 (6th Cir. 1999), the Sixth Circuit reversed a grant of judgment as a matter of law to defendant in a case alleging co-worker harassment, creating a racially hostile work environment.  After noting that the same standards apply under ELCRA, §1981 and Title VII, the Court also ruled that the same principles govern sexual harassment and racial harassment cases.  "In *Radke*, the Michigan Supreme Court held that courts must evaluate the totality of the circumstances to determine whether unwelcome conduct created a hostile work environment actionable under the Elloitt-Larsen Act."  *Id.* at 658. When looking at the totality of the circumstances, the court can consider events that occurred outside the time period,for purposes of determining whether there is a hostile work environment. *Waldo v. Consumers Energy Co.*, 726 F.3d 802, 817 (6th Cir. 2013).  With regard to employer liability, the employer is held directly liable for co-worker harassment if its response manifests indifference or unreasonableness in light of the facts the employer knew or should have known. *Jackson*, *supra*, at 659.  After reviewing the inadequate response of the defendant, the Court held that the employer would not be shielded from liability for the racially hostile work environment.

The Sixth Circuit found that co-worker sexual harassment, which included offensive comments and one act of touching, created a sexually hostile work environment in *Williams v. General Motors Corporation*, 187 F.3d 553 (6th Cir. 1999).  In *Williams*, the Sixth Circuit

reversed a grant of summary judgment for the defendant on the basis that the allegations  of

harassment included an element of physical invasion.  *Id.* at 559.  In *Smith v. Rock-Tenn*

*Services, Inc.*, 813 F.3d 298 (6th Cir. 2016), the Sixth Circuit dismissed the employer's assertion

that the co-worker's conduct, which included physical touching, was "horseplay" and not sexual

harassment.  The court noted that the issue of whether the harassment was severe and

pervasive was a question of fact for the jury.

The Sixth Circuit reviewed what constitutes appropriate remedial action on the part of

the employer in *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321 (6th Cir. 2008).  As part of its

defense to allegations of co-worker sexual harassment, the employer asserted that it had a well-

publicized anti-harassment policy and that its response was sufficient because it separated the

alleged harasser and the victim.  The Court determined that there was an issue of fact for the

jury as to whether the employer's response was  adequate and whether its response was

reasonably calculated to end the harassment.  *Id.* at 340.  When the employer asserted that it

could not have taken additional steps to discipline the harasser because he denied that he had

engaged in the harassment, the Court noted that the harasser had a history of lying about these

matters, and thus, there was a genuine issue of material fact as to the appropriateness of the

employer's response.  *Id.* at 343-44.   In *Smith v. Rock-Tenn*, *supra*, the Sixth Circuit upheld the

denial of the employer's motion for judgment as a matter of law in a case involving co-worker

sexual harassment based on the employer's failure to take prompt and appropriate measures

after a report of sexual harassment.  "In this case, a reasonable jury could have concluded that

Defendant's total inaction for ten days, where Defendant knew that Leonard had touched

Plaintiff, and had told Leonard that further complaints would result in termination was

unreasonable.  *Smith*, 813 F.3d 312.  As support for its decision, the Court noted that the

employer did not separate the two employees, suspend the harasser pending an investigation

or initiate its investigation in a timely manner.  *Id.  See Gallagher v. C.H. Robinson Worldwide*, 567 F.3d 263 (6th Cir. 2009).

Defendant relies on false statements to support its argument that it took prompt and appropriate remedial action after Plaintiff's report of sexual harassment.  Defendant's claim that it had not received any prior complaints of Ms. Luca engaging in sexually inappropriate conduct or comments is misleading because Ms. Luca's reputation for sexual "horseplay" was well known.  During the August 6, 2018 meeting between Plaintiff and Ms. Carroll, Ms. Carroll admitted that Ms. Luca had been talked to previously, but she continued to do these things and get away with it.  (Exhibit 1 at ¶¶ 1b, c), (ECF No. 72-2, PageID.1000-1013.).  As set forth in the attached Affidavit of Kristina Garcia, Ms. Luca often engaged in sexually inappropriate conduct, including touching, and made sexually inappropriate comments at work about her sexual activities and those of other co-workers.  (Affidavit of Kristina Garcia, Exhibit 2).  Although co-workers may not have made a formal complaint to Human Resources, Ms. Luca's comments and conduct were well known and the issue is not just what was reported to management, but also what Defendant should have known.

In this case, Plaintiff reported sexual harassment by Ms. Luca on August 6, 2018, and submitted a detailed written statement two days later.  Although Plaintiff did not want Ms. Luca to get fired, she did want Ms. Luca to face discipline and for the harassment to stop.  At no time during the investigation by Ms. Carroll did Defendant take any steps to protect Plaintiff from further harassment and retaliation by Ms. Luca by separating the two employees or by suspending Ms. Luca during the investigation.  In spite of Ms. Luca's reputation for inappropriate sexual comments and conduct at work and the fact that Ms. Luca and Ms. Kaye changed their story of what happened, Ms. Carroll did not take any of this into account before deciding it was a he said-she said issue.  Thus, there are genuine issues of material fact as to whether Ms.

Carroll's failure to discipline Ms. Luca was reasonable based on Ms. Luca's prior history of lying and the fact that her story did not match-up with Ms. Kaye's as to what happened.

Even after Ms. Luca retaliated against Plaintiff on or about August 27, 2018 by telling Mr. Matthewson that Plaintiff had lied about her to get her fired, Defendant did nothing to discipline Ms. Luca until she received a performance improvement plan on October 18, 2018, almost two months later. During this time, Plaintiff was subjected to Ms. Luca coming into the areas where she was working and telling other co-workers that Plaintiff was lying to get her fired. In addition, contrary to Defendant's statement that they were not "paired" together, Plaintiff had to find other employees to be charge therapist on the midnight shift because Defendant would not honor her request to alter her schedule. Defendant's action did not stop Ms. Luca's harassment and retaliation of Plaintiff and thus, its response to Plaintiff's complaint of sexual harassment was neither prompt nor appropriate. As set forth above, there are genuine issues of material fact as to whether Ms. Luca's conduct was severe and pervasive, and whether Defendant's response was prompt and appropriate. *Smith v. Rock-Tenn Services, Inc.*, 813 F.3d 298 (6th Cir. 2016).

### III. Plaintiff Has Established A Claim Of Retaliation Under Title VII and the ELCRA

Under both Title VII and ELCRA, an employer is liable if it retaliates against an employee for having engaged in protected conduct and there is no restriction that the retaliatory action must affect the terms and conditions of employment. 42 U.S.C. 2000e-3(a); MCL37.2701(a). With regard anti-retaliation under Title VII, in *Burlington Northern & Santa Fe Railroad Co. v. White*, 548 U.S. 53; 126 S.Ct. 2405, 165 L.E.2d 345 (2006) the Supreme Court held that the anti-retaliation provision is much broader than the anti-discrimination provision. "We also conclude that the provision covers those (and only those) employer actions that would have been materially adverse to a reasonable employee or job applicant. In the present context that

means that the employer's actions must be harmful to the point that they could dissuade a reasonable worker from making or supporting a charge of discrimination." *Id.* at 57.

In *White v. Department of Transportation*, No.349407, 2020 WL 5849754 (Mich. Ct. App. October 1, 2020), the Michigan Court of Appeals utilized the *Burlington Northern decision* as the controlling case for Title VII and ELCRA retaliation claims. *Id.* at *8. (Exhibit 3.) Under *Burlington Northern*, a materially adverse action is an employer action that is likely to deter victims of discrimination from complaining to the EEOC, the courts, and their employers. *Burlington Northern, supra,* at 68. The Supreme Court noted that a schedule change in an employee's work schedule could be an act of retaliation, depending on the circumstances. *Id.* at 69, 71.

An employer can be held liable for a co-worker's actions if the retaliatory conduct is sufficiently severe, so as to dissuade a reasonable worker from making or supporting a charge of discrimination; supervisors or management had actual or constructive knowledge of the co-worker's retaliatory conduct; and supervisors or management have responded to the plaintiff's complaints so inadequately that the response manifests indifference or unreasonableness under the circumstances. *Laster v. City of Kalamazoo*, 746 F.3d 714, 732 (6th Cir. 2014) and *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321 (6th Cir. 2008). "To hold otherwise would allow an employer to recruit or permit employees to carry out retaliatory acts with impunity" *Id.* at 346. *See Meyer v. City of Center Line*, 242 Mich.App. 560 (Mich. Ct. App. 2000). "Where the harassment is sufficiently severe, a supervisor's failure to take action to stop retaliatory harassment can constitute a materially adverse change in the conditions of employment." *Id.* at 571.

Defendant asserts that Plaintiff cannot establish the essential elements of a retaliation claim under either the ELCRA or Title VII because she has not suffered an adverse employment action. However, the anti-retaliation provision does not require an adverse employment action,

only a materially adverse action.  Defendant appears to be arguing that because Ms. Luca engaged in the retaliatory conduct, Defendant is not liable.  Plaintiff first learned that Ms. Luca was calling her a liar on August 27, 2018 after her conversation with Ms. Matthewson.  At that time, Plaintiff immediately notified Ms. Carroll about the retaliation, which Ms. Luca denied.  On or about September 2, 2018, Ms. Luca came into where Plaintiff was working to tell Tony Stout that Plaintiff had concocted a story to get her fired. Subsequently, on September 14, 2018, Ms. Luca was in the area where Angelita Serratos was working and again claimed that Plaintiff was lying. Ms. Luca repeated the allegation to Ms. Serratos on September 17, 2018.  In addition, Plaintiff testified that while she was working the midnight shift, Ms. Luca continued to harass her by coming into where she was working and telling the nurses that Plaintiff was a liar.  Thus, there is a genuine issue of material fact as to whether being called a liar in front of her co-workers for weeks without consequence could dissuade a reasonable worker from making or supporting a charge of discrimination. *Burlington Northern*, 548 U.S. 53.

As explained above, Defendant's response to Plaintiff's claim of retaliation was inadequate and unreasonable under the circumstances of this case.  Not only did Defendant continue to schedule Plaintiff to work the midnight shift as a charge therapist with Ms. Luca, but it allowed Ms. Luca to harass Plaintiff for weeks before it gave Ms. Luca any discipline.  On August 27, 2020, Plaintiff reported that Ms. Luca had retaliated against her to Ms. Carroll.  Ms. Luca was given a performance improvement plan on or about October 18, 2018, almost two months later.  Mr. Aphram states that he met with Ms. Luca on September 7, to discuss Plaintiff's retaliation complaint and Ms. Luca denied retaliating against Plaintiff.

Given the fact that Ms. Luca's statement turned out to be a lie, Defendant did not re-visit Plaintiff's initial complaint of sexual harassment.  After Mr. Aphram's meeting with Ms. Luca, Ms. Luca continued to slander Plaintiff with her co-workers, including the nurses.  Plaintiff submits that there is a genuine issue of fact as to whether, viewing the facts in the light most favorable to

her, Defendant's response to her retaliation complaint was so inadequate that it manifests indifference or unreasonableness under the circumstances.  Given the goals of Title VII and the ELCRA, Defendant should be held liable for its own indifference or unreasonable behavior.

*Laster v. City of Kalamazoo*, 746 F.3d 714 (6th Cir. 2014)

RELIEF

WHEREFORE, for the above-stated reasons, Plaintiff, Kristina Garcia, requests that this Honorable Court deny the Motion For Summary Judgment filed on behalf of Defendant, Beaumont Hospital, and set this case for a jury trial.

Dated: November 3, 2020                                    Respectfully submitted,


                                                          /s/ Lisa C. Ward_____
                                                          Lisa C. Ward (P38933)
                                                          Attorney for Plaintiff
                                                          Law Offices of Lisa C. Ward
                                                          4131 Okemos Rd., Ste. 12
                                                          Okemos, MI 48864
                                                          (517) 347-8100
                                                          lisacwardlaw@gmail.com

22

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KRISTINA GARCIA,

       Plaintiff,

                                 CASE NO.:  2:19-cv–11673

v.

                                 District Judge Linda v. Parker

BEAUMONT HEALTH and RACHEL LUCA,      Magistrate Judge David Grand

       Defendants.

---

Lisa C. Ward (P38933)
Attorney for Plaintiff
Law Office of Lisa C. Ward, PLLC
4131 Okemos Rd., Ste. 12
Okemos, MI 48864
(517) 347-8100
lisacwardlaw@gmail.com

Eric J. Pelton   (P40635)
Shannon V. Loverich (P53877)
Attorneys for Def. Beaumont Health
Kienbaum Hardy Viviano
     Pelton & Forrest, PLC
280 N. Old Woodward Ave., Suite 400
Birmingham, MI  48009
(248) 645-0000
epelton@khvpf.com
sloverich@khvpf.com

---

INDEX OF EXHIBITS

October 29, 2020 Affidavit of Kristina Garcia ............................................................. EXHIBIT 1

October 29, 2020 Affidavit of Kristina Garcia ............................................................. EXHIBIT 2

*White v. Dep't of Transp.,* No.349407, 2020 WL 5849754 (Mich. Ct. App. October 1, 2020) ........

.................................................................................................................................. EXHIBIT 3

23

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KRISTINA GARCIA,

                Plaintiff,

v.                                 CASE NO.:  2:19-cv–11673

                                 District Judge Linda v. Parker

BEAUMONT HEALTH and RACHEL LUCA,      Magistrate Judge David Grand


                Defendants.

_____

| | |
|---|---|
| Lisa C. Ward (P38933) | Eric J. Pelton  (P40635) |
| Attorney for Plaintiff | Shannon V. Loverich (P53877) |
| Law Office of Lisa C. Ward, PLLC | Attorneys for Def. Beaumont Health |
| 4131 Okemos Rd., Ste. 12 | Kienbaum Hardy Viviano |
| Okemos, MI 48864 |     Pelton & Forrest, PLC |
| (517) 347-8100 | 280 N. Old Woodward Ave., Suite 400 |
| lisacwardlaw@gmail.com | Birmingham, MI  48009 |
| | (248) 645-0000 |
| | epelton@khvpf.com |
| | sloverich@khvpf.com |

_____


### **PROOF OF SERVICE**

I, Veronica Stachurski, hereby certify that on November 3, 2020, I served a copy of Plaintiff's

Response Opposing Defendant's Motion for Summary Judgement on Defendant's attorney of

record in the above referenced case via the ECF system, which will send notification to all

parties.


Dated: November 3, 2020                 /s/ Veronica Stachurski

                                           Veronica Stachurski

                                           *Legal Assistant*