UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KRISTINA GARCIA,

        Plaintiff,

                              CASE NO.: 2:19-cv–11673

v.

                              District Judge Linda v. Parker

BEAUMONT HEALTH and RACHEL LUCA,      Magistrate Judge David Grand

        Defendants.

---

Lisa C. Ward (P38933)
Attorney for Plaintiff
Law Office of Lisa C. Ward, PLLC
4131 Okemos Rd., Ste. 12
Okemos, MI 48864
(517) 347-8100
lisacwardlaw@gmail.com

Eric J. Pelton  (P40635)
Shannon V. Loverich (P53877)
Attorneys for Def. Beaumont Health
Kienbaum Hardy Viviano
      Pelton & Forrest, PLC
280 N. Old Woodward Ave., Suite 400
Birmingham, MI  48009
(248) 645-0000
epelton@khvpf.com
sloverich@khvpf.com

---

## INDEX OF EXHIBITS

October 29, 2020 Affidavit of Kristina Garcia ............................................................... EXHIBIT 1

October 29, 2020 Affidavit of Kristina Garcia ............................................................ EXHIBIT 2

*White v. Dep't of Transp.,* No.349407, 2020 WL 5849754 (Mich. Ct. App. October 1, 2020) ........

............................................................................................................................................ EXHIBIT 3

# EXHIBIT 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**KRISTINA GARCIA,**

    Plaintiff,

                               CASE NO.: 2:19-cv-11673

v.

                               District Judge Linda V. Parker

**Beaumont Health and RACHEL LUCA,**        Magistrate Judge David Grand

    Defendant.

---

**Lisa C. Ward (P38933)**
Attorney for Plaintiff
Law Office of Lisa C. Ward, PLLC
4131 Okemos Rd., Ste. 12
Okemos, MI 48864
(517) 347-8100
lisacwardlaw@gmail.com

**Eric J. Pelton (P40635)**
**Shannon V. Loverich (P53877)**
Attorneys for Def. Beaumont Health
Kienbaum Hardy Viviano
    Pelton & Forest, PLC
280 N. Old Woodward Ave., Suite 400
Birmingham, MI 48009
    (248) 645-0000
epelton@khvpf.com
sloverich@khvpf.com

---

## <u>AFFIDAVIT OF KRISTINA GARCIA</u>

    I, Kristina Garcia, am submitting this affidavit in support of my Response Opposing Defendant's Motion for Summary Judgement.

On August 6, 2018, I was in the office of Ms. Antoinette Carroll, my supervisor, to report my complaint of sexual harassment on the part of Ms. Rachel Luca. In the course of that conversation, Ms. Carroll made the following statements:

1. After reporting the sexual assault incident with Ms. Luca and stating that if it was a man, I would have hit him without thinking, Ms. Carroll made the following statements:

   a. "Well, he would have been out of the job. He would have been gone. Because that's sexual harassment. And guess what? It's sexual harassment on her part, too."

   b. "What they, what they, what they will do is, they'll send it up to Jean and say it's a sexual harassment because that's exactly what it is sexual harassment. Yes, we've had issues with Rachel Luca and I think this is the one that's just gone just because she's been talked to about number of things. But this is the first time she's ever. Well, I know she's done some."

   c. "They add up to and then with her. She thinks she, the problem is she does these things and then she gets away with it. And she thinks it's okay… And that's the thing. And she doesn't. And you can tell her and she till doesn't realize the severity of what's going on."

2. During that conversation, I did state that I did not want to get her fired, but that I was really upset, and that I did not want to be alone with Ms. Luca while I was at work. In response to that, Ms. Carroll stated:

   a. "Kryssie because now that I know, I have to respond. And me as a female, I'm upset for you that you should had to go through that and you shouldn't have. And I felt like she violated you. I don't care. You know what I'm saying? (Kristina: I feel like she disrespected me). That too! But it's a violation too. Anytime you touch someone else's body with no permission or consent, it's a violation, period. Any way you want to look at it. And that's sexual harassment, period. Anyway you look at it. Whether she think[s] it was fun in that, shame on you. Why do you think it's fun to do that? Why do you think it's okay to do that?"

   b. "That's what it is. I mean, I can't talk to you about different things I've talked to her about, but she knows that she's supposed to act the way a certain way when she's here. And she's still not doing it. And she does little things like she tries to. It's so funny. Because, you know, you can see people thinking they're working

you, and you know what they're after?  And you're like, looking at them, like, "Do you seriously think I'm falling for this kind of thing," you know, and that's how she is.  She would come in and give me a sad story.  And I'm thinking seriously, how old are you?  You know, I'm a mother too.  And it's like, I ain't falling for that.  Or she forgets you're on Facebook, silly.  I can see some of the stuff you're doing.  And you tell me stuff and I'm supposed to believe it.  You know, and it's like, okay."

c.  Well, that's the thing, 'cause then we have to make sure that you both aren't in the same area together.  So yeah.  Oh, Kryssie."

3.  I also discussed with Ms. Carroll the fact that I felt that I had been sexually harassed because I'm bisexual.  In response to that, Ms. Carroll stated:

a.  "Which, you shouldn't be.  I mean, that's the thing.  You're right.  And you shouldn't be, but I don't know what she's thinking.  You know, I'm saying? … But, it could be because that's how it but I don't understand that has nothing to do with anything.  Has nothing to do with.  Is, is she jealous?"

b.  "It's because you're a good person, and you don't want to lose her job.  But, you got to think of the fact that it's going to be something else.  And it's always attention with her.  And she has that reputation of just doing something unorthodox, period.  And it's not okay, and she needs to know it has to stop."

Based on my conversation with Ms. Carroll, I was surprised when absolutely no discipline was taken against Ms. Luca for her sexual harassment of me on the job.  In addition, in spite of the promises made by Ms. Carroll that I would not be alone with Ms. Luca on the night shift, I was continually scheduled to as a charge therapist on the night shift with Ms. Luca for the next three months.  Based on my fear that I would be sexually assaulted again, or retaliated against, by Ms. Luca, I had to resign my position as a charge therapist.

This information is true to the best of my knowledge, information, and belief.

**FURTHER AFFIANT SAYETH NOT.**

Dated : _10-29-2020_

Kristina Garcia

Subscribed and sworn before me
On _10-29-2020_
_Eli Boike_
Notary Public, _Macomb_ County
Acting in _Macomb_ County
My Commission expires _12/26/2024_

ELI BOIKE
Notary Public State of Michigan
County of Macomb
My Commission Expires: December 26, 2024
Acting in the County of _Macomb_

# EXHIBIT 2

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**KRISTINA GARCIA,**

         Plaintiff,

                                    CASE NO.: 2:19-cv-11673

v.

                                    District Judge Linda V. Parker

**Beaumont Health and RACHEL LUCA,**          Magistrate Judge David Grand

         Defendants.

_____

| | |
|---|---|
| **Lisa C. Ward (P38933)** | **Eric J. Pelton (P40635)** |
| Attorney for Plaintiff | **Shannon V. Loverich (P53877)** |
| Law Office of Lisa C. Ward, PLLC | Attorneys for Def. Beaumont Health |
| 4131 Okemos Rd., Ste. 12 | Kienbaum Hardy Viviano Pelton & |
| Okemos, MI 48864 | Forest, P.L.C. |
| (517) 347-8100 | 280 N. Old Woodward Ave., Suite 400 |
| lisacwardlaw@gmail.com | Birmingham, MI 48009 |
| | (248) 645-0000 |
| | epelton@khvpf.com |
| | sloverich@khvpf.com |

_____

### <u>AFFIDAVIT OF KRISTINA GARCIA</u>

       I, Kristina Garcia, am submitting this affidavit in support of my Response Opposing Defendant's Motion for Summary Judgment.

Prior to the incident that resulted in my complaint of sexual harassment, I am aware of the following sexual misconduct that Ms. Rachel Luca has engaged in while at work at Beaumont Health:

1. On multiple occasions while at work, Ms. Luca lifted her shirt up, and rubbed essential oils on herself, exposing herself from her bra to her panty line. This happened in front of many therapists in the Respiratory Department.

2. Ms. Luca also walked out of the locker room in just her shirt and panties and she would do pushups in the Respiratory Department after taking her scrub shirt off; therefore exposing the upper half of her body.

3. Ms. Luca often played what she called, "grab ass" with several coworkers; wherein she would smack the coworker's butt as hard as possible and when least expected. This made loud smacking noises, which was seen by other employees in the Respiratory Department.

4. I am also aware that Ms. Luca engaged in sexual banter, told sexual jokes and sexual stories while at work.

   a. For example, Ms. Luca approached another therapist, Carissa Seog, at the nurse's station and asked the Ms. Seog whether she allowed her husband to cum (ejaculate) inside of her. When Ms. Seog informed me of this incident she told me that she was offended and appalled.

   b. Ms. Luca also talked about sexual activities involving her husband, while she was at work in the Respiratory Department. For example, she told a story about how her husband had removed her IUD without her knowing it.

   c. Ms. Luca also spoke about her sexual encounters involving individuals she met on dating apps while working in the Respiratory Department. These stories included information about having sex in a car and at a doctor's office.

   d. In addition to the above, Ms. Luca also sent nude pictures of herself to a coworker, Nurse Christopher Kassab. This is in addition to showing me nude pictures while at work, as set forth in my complaint.

   e. Ms. Luca also brought in peppermint essential oil and put the oil in a respiratory therapist's eye, which resulted in blurry vision and his eyes burning.

   f. Ms. Luca also secretly put a powder laxative in co-worker Phil Matthewson's apple juice, and bragged to everyone in the Respiratory Department about what she had done.

g. Ms. Luca also bragged to me that she was providing Xanax to her supervisor, Antoinette Carroll, and wanted to play me a recording of the transaction; but I declined

The conduct set forth above was well known to supervisors, including Antoinette Carroll. These supervisors knew of Ms. Luca's antics, and named her, "Crazy Rachel." In spite of Ms. Luca's sexual misconduct and sexually offensive actions, to the best of my knowledge, none of the supervisors took any steps to discipline her for these activities.

This information is true to the best of my knowledge, information, and belief.

**FURTHER AFFIANT SAYETH NOT**.

Dated: _10-29-2020_

_Kristina Garcia_
Kristina Garcia

Subscribed and sworn before me
On ___10-29-2020___
___Eli Boike___
Notary Public, Macomb County
Acting in Macomb County
My Commission expires 12/26/2024

_Eli B___
ELI BOIKE
Notary Public State of Michigan
County of Macomb
My Commission Expires: December 26, 2024
Acting in the County of _Macomb_

# EXHIBIT 3

2020 WL 5849754
Only the Westlaw citation is currently available.
Court of Appeals of Michigan.

Ellen WHITE, Plaintiff-Appellant,
v.
DEPARTMENT OF TRANSPORTATION,
Defendant-Appellee.

No. 349407
|
October 1, 2020, 9:00 a.m.

Wayne Circuit Court, LC No. 17-017679-CZ

Before: Riordan, P.J., and Shapiro and Ronayne Krause, JJ.

**Opinion**

Shapiro, J.

*1 Plaintiff Ellen White brought a claim of employment discrimination against defendant Department of Transportation alleging that she had been denied a promotion as a result of racial discrimination in violation of the Elliott-Larsen Civil Rights Act (ELCRA), MCL 37.2202(1)(a). After she filed suit, defendant took certain actions that plaintiff concluded were in retaliation for having sued the department. Accordingly, she amended her complaint to add a count alleging retaliation in violation of ELCRA, MCL 37.2701(a).

Sometime later, defendant filed a motion seeking summary disposition as to each claim. The trial court granted the motion in full and so dismissed the case. Plaintiff then appealed to this Court. For the reasons stated in this opinion, we affirm the dismissal of plaintiff's failure-to-promote claim, but reverse the dismissal of her retaliation claim.

I. FACTS & PROCEDURAL HISTORY

Plaintiff is African American. In 2008, she began working as a property analyst (PA) for defendant's real estate services section. Plaintiff's job involved right-of-way acquisition and relocation, meaning she would help acquire property needed

for defendant's projects and then find new housing for the former property owners. Beginning in 2015, she was assigned to the Gordie Howe International Bridge (GHIB) project in Detroit. She lived in Lansing and was formally assigned to defendant's Lansing office, but would work in Detroit four days each week during which she would be housed in a local hotel.

Plaintiff was hired at classification level 10 (PA 10). A year later she was reclassified to a PA 11. She stayed at that level until 2013, when she became a PA 12. In April 2016, defendant posted an opening for a property specialist, classification level 13 (PS 13). This position is responsible for managing defendant's statewide relocation program. There were two applicants for the position: plaintiff and Lori Crysler, who is Caucasian. Crysler was originally hired by defendant in January 2015 as a PA 10 and in February 2016, she was reclassified to a PA 12. Crysler had thirty years' experience in the real estate industry before joining defendant. At the time of application, plaintiff had received a "high performing" annual rating for the past four years. Her ratings in the four years prior to that were "meets expectations." Crysler had received high-performing ratings in her two evaluations. Both candidates interviewed for the PS 13 position in May 2016. The three-person interview panel unanimously selected Crysler for the position. [1]

Plaintiff filed suit in Wayne Circuit Court on December 18, 2017, alleging racial discrimination in violation of ELCRA. [2] At the time of suit, plaintiff was working fulltime in Detroit on the GHIB project and she only went to defendant's Lansing office for biweekly meetings. On January 8, 2018, plaintiff's supervisor rated her 2017 job performance as "needs improvement." This was the first time that plaintiff received a negative annual performance rating. And as a result of the needs-improvement rating, plaintiff was placed under a "performance improvement plan" (PIP) for a period of up to six months, with a formal review to be conducted within three months.

*2 On January 29, 2018, defendant filed a motion for a change of venue to Ingham County, which was later denied. The motion was based in part on defendant's assertion that plaintiff's "assigned duty station is Lansing" and that venue cannot be based on an "employee's temporary work station." On February 13, 2018, plaintiff submitted an affidavit in

For Educational Use Only

opposition to the motion in which she stated that her "workstation in Detroit is not 'temporary' " and that she had been working there since about January 2015. Two days later, on February 15, 2018, plaintiff's supervisor sent an e-mail to plaintiff directing her to report to Lansing daily beginning on February 20th and informing her that she would go to Detroit on an appointment basis only. The following week, on February 21, 2018, the supervisor issued plaintiff a notice of "formal counseling" that outlined plaintiff's alleged failure to comply with the PIP and provided new dates for her to show progress. The notice stated that plaintiff's "performance is unacceptable." Plaintiff went on medical leave in March 2018 because of stressful work conditions. She did not return to work before retiring in November 2018.

In August 2018, plaintiff filed an amended complaint adding a retaliation claim on the basis of the negative performance rating and the change in her work location. After discovery was completed, the parties filed competing motions for summary disposition under MCR 2.116(C)(10). The trial court ruled that plaintiff failed to establish a question of fact whether defendant's nondiscriminatory reason for the promotion decision, i.e., that Crysler was the best candidate for the position, was a pretext for racial discrimination. The court granted summary disposition of plaintiff's retaliation claim on the grounds that she failed to identify an adverse employment action.

## II. ANALYSIS

### A. STANDARD OF REVIEW

Summary disposition was granted in favor of defendant pursuant to MCR 2.116(C)(10) on the basis that plaintiff failed to establish a genuine issue of material fact. A trial court's decision on a motion for summary disposition is reviewed de novo. *Spiek v. Dep't of Transp.*, 456 Mich. 331, 337, 572 N.W.2d 201 (1998). When reviewing a motion brought under MCR 2.116(C)(10), we must view that evidence in the light most favorable to the nonmoving party to determine if a genuine issue of material fact exists. See *Maiden v. Rozwood,* 461 Mich. 109, 118-120, 597 N.W.2d 817 (1999). "A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing

party, leaves open an issue upon which reasonable minds might differ." *West v. Gen. Motors Corp.*, 469 Mich. 177, 183, 665 N.W.2d 468 (2003).

### B. PLAINTIFF'S FAILURE-TO-PROMOTE DISCRIMINATION CLAIM

Plaintiff first argues on appeal that the trial court erred by dismissing her discrimination claim because she established a question of fact whether defendant's stated reason for the promotion decision was a pretext for discrimination. We disagree and so affirm summary disposition as to that count.

### 1. CONTROLLING LAW

ELCRA prohibits employers from discriminating on the basis of race:

(1) An employer shall not do any of the following:

(a) Fail or refuse to hire or recruit, discharge, or otherwise discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of religion, race, color, national origin, age, sex, height, weight, or marital status.

[ MCL 37.2202(1)(a).]

"The courts have recognized two broad categories of claims under this section: 'disparate treatment' and 'disparate impact' claims." *Wilcoxon v. Minnesota Mining & Mfg. Co.*, 235 Mich. App. 347, 358, 597 N.W.2d 250 (1999). This case concerns disparate treatment because plaintiff alleges that defendant intentionally discriminated against her on the basis of race. See *Duranceau v. Alpena Power Co.*, 250 Mich. App. 179, 182, 646 N.W.2d 872 (2002).

Because there is "no direct evidence of impermissible bias," plaintiff's claim of intentional discrimination must proceed under the *McDonnell Douglas*[3] burden-shifting framework. *Hazle v. Ford Motor Co.*, 464 Mich. 456, 462, 628 N.W.2d 515 (2001). First, the plaintiff must set forth a prima facie case. In *Hazle*, the Supreme Court determined that the "plaintiff was required to present evidence

For Educational Use Only

White v. Department of Transportation, --- N.W.2d ---- (2020)

that (1) she belongs to a protected class, (2) she suffered an adverse employment action, (3) she was qualified for the position, and (4) the job was given to another person under circumstances giving rise to an inference of unlawful discrimination." [4]   *Id.* at 463, 628 N.W.2d 515. "[O]nce a plaintiff establishes a prima facie case of discrimination, the defendant has the opportunity to articulate a legitimate, nondiscriminatory reason for its employment decision in an effort to rebut the presumption created by the plaintiff's prima facie case." [5]   *Id.* at 464, 628 N.W.2d 515.

**\*3** If the defendant gives a legitimate, nondiscriminatory reason for the employment decision, the presumption of discrimination is rebutted, "and the burden shifts back to the plaintiff to show that the defendant's reasons were not the true reasons, but a mere pretext for discrimination." *Sniecinski v. Blue Cross and Blue Shield of Mich.*, 469 Mich. 124, 134, 666 N.W.2d 186 (2003). "At that point, in order to survive a motion for summary disposition, the plaintiff must demonstrate that the evidence in the case, when construed in the plaintiff's favor, is 'sufficient to permit a reasonable trier of fact to conclude that discrimination was a motivating factor for the adverse action taken by the employer toward the plaintiff.' " *Hazle*, 464 Mich. at 465, 628 N.W.2d 515, quoting *Lytle v. Malady (On Rehearing)*, 458 Mich. 153, 176, 579 N.W.2d 906 (1998).

### 2. APPLICATION

Defendant's nondiscriminatory reason for the employment decision is that Crysler was the best candidate for the position. Plaintiff offers four grounds for concluding that this explanation is a pretext for discrimination.

Plaintiff first argues that Crysler was not qualified for the sought position. The Civil Service Commission determined that Crysler was qualified to apply for the position on the basis of equivalent experience. But in discovery plaintiff established that Crysler made a misstatement in her application that could have affected the Civil Service Commission's eligibility determination. [6] Yet plaintiff has not presented evidence that defendant knew of the misstatement in Crysler's application at the time of the promotion decision.

A similar issue arose in *Hazle*, where the plaintiff claimed that the selected applicant "committed 'resume fraud' in representing her educational and employment background." *Hazle*, 464 Mich. at 460, 628 N.W.2d 515. The Supreme Court held that even if the plaintiff was correct this failed to establish that the employer's nondiscriminatory reason was pretextual because "there is no record evidence that any of this was known to defendants when they made their employment decision." [7]   *Id.* at 474, 628 N.W.2d 515. Although defendant might have discovered the misstatement in Crysler's application, there is no evidence that it did and so it properly relied on the Civil Service Commission's finding that she was qualified. The discovery of a misrepresentation unknown to the employer until after the promotion decision does not show that race was a motivating factor in the decision.

Plaintiff also argues that she was more qualified and had more experience as a PA than Crysler. Although plaintiff had more internal experience, Crysler had a substantial amount of real estate experience before joining defendant. The interview panel clearly valued that experience, and it is apparent from the panel's recommendation memo that Crysler gave an impressive interview. In any event, plaintiff's subjective claim that she was more qualified does not create a question of fact on whether the employer's proffered reason for the decision is pretextual. *Hazle*, 464 Mich. at 476, 628 N.W.2d 515. Further, "the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Id.* (quotation marks, citation, and alteration omitted). Plaintiff is essentially challenging defendant's business judgment, which is insufficient to raise a question of fact of whether the nondiscriminatory explanation for the hire was a pretext for racial discrimination. See *Town v. Mich. Bell Telephone Co.*, 455 Mich. 688, 704, 568 N.W.2d 64 (1997); *Meagher v. Wayne State Univ.*, 222 Mich. App. 700, 712, 565 N.W.2d 401 (1997).

**\*4** Plaintiff next argues that defendant's employees gave conflicting testimony whether the interview panel was the actual decisionmaker in this case. As defendant argues, however, plaintiff is not pursuing a "cat's paw" theory of

liability under a which a supervisor's discriminatory animus is imputed to the ultimate decisionmaker. See e.g., *Chattman v. Toho Tenax America, Inc.*, 686 F.3d 339, 350 (C.A. 6, 2012). Indeed, plaintiff has not provided evidence of discriminatory animus as to any of defendant's employees regarding the decision to promote Crysler rather than plaintiff. We therefore do not see how a discrepancy regarding who made the ultimate decision in this case shows discriminatory intent. Moreover, we conclude that the alleged inconsistencies in this case merely show the nuance of defendant's administrative bureaucracy and that they do not create a triable issue of fact on whether the promotion decision was motivated by racial bias.[8]

Finally, plaintiff relies on statistics of defendant's work force to show pretext. There are few published decisions in Michigan addressing the use of statistics to show intentional discrimination. We have recognized that "[t]he use of statistics may be relevant in establishing a prima facie case of discrimination or in showing that the proffered reasons for a defendant's conduct are pretextual." *Dixon v. W.W. Grainger, Inc.*, 168 Mich. App. 107, 118, 423 N.W.2d 580 (1987). In *Featherly v. Teledyne Indus., Inc.*, 194 Mich. App. 352, 360-361, 486 N.W.2d 361 (1992), we characterized the statistics indicating that older employees were most affected by layoffs as "weak circumstantial evidence of age discrimination," but determined that it supported the plaintiffs' prima facie case "especially when conjoined with the other facts evidencing age discrimination." By contrast, in this case there is no separate evidence that race was a factor in the promotion decision, and statistics would be plaintiff's only circumstantial evidence of discrimination.

The use of statistics to prove intentional or disparate discrimination is more settled in federal caselaw. We are not bound by federal precedent interpreting analogous questions under Title VII of the 1964 Civil Rights Act, but that caselaw is generally considered persuasive. *DeFlaviis v. Lord & Taylor, Inc.*, 223 Mich. App. 432, 437, 566 N.W.2d 661 (1997); *McCalla v. Ellis*, 180 Mich. App. 372, 377-378, 446 N.W.2d 904 (1989). In the Sixth Circuit, "[a]ppropriate statistical data showing an employer's pattern of conduct toward a protected class as a group can, if unrebutted, create an inference that a defendant discriminated against individual members of the class." *Peeples v. Detroit*,

891 F.3d 622, 635 (C.A. 6, 2018) (quotation marks and citations omitted). But "the statistics must show a significant disparity and eliminate the most common nondiscriminatory explanations for the disparity." *Id.* (quotation marks and citation omitted).

**\*5** Plaintiff points out that African Americans make up 13.9% of Michigan's population but about only 6% of defendant's workforce.[9] She also relies on statistics regarding the percentage—over a one- or two-year period —of defendant's reclassifications (3%), promotions (4%) and hires (4%) that have gone to African Americans. However, without additional information regarding the racial composition of the job applicants, these statistics are not sufficient to establish a pattern of discrimination. As to reclassifications, plaintiff fails to show that there is a significant deviation relative to the percentage of African Americans in defendant's workforce, and the fact that no African American had been hired as a PS 13 in at least the last 15 years is insufficient to establish a pattern of discrimination given that we have not been provided with information regarding the number of postings or the applicant pool for those postings.[10] See *Hague v. Thompson Distribution Co.*, 436 F.3d 816, 829 (C.A. 7, 2006) ("[I]f the plaintiffs rely on the racial composition of a workforce as evidence of discrimination it must subject all of the employer's decisions to statistical analysis to find out whether [race] makes a difference.") (quotation marks and citation omitted; alteration by *Hague*).

In sum, plaintiff fails to establish a material question of fact whether defendant's legitimate, nondiscriminatory reason for the promotion decision was a pretext. Defendant properly relied on the Civil Service Commission's determination that Crysler was qualified for the sought position. Plaintiff's subjective opinion that she was more qualified for the position does not by itself create a triable question of fact. The promotion decision was unanimously made by the interview panel and any alleged discrepancy regarding the hiring process is immaterial. Plaintiff's statistical evidence is not sufficiently probative without additional context and analysis.

## C. PLAINTIFF'S RETALIATION CLAIM

Plaintiff next argues that the trial court erred by granting defendant summary disposition of her retaliation claim. We agree.

## 1. BACKGROUND

Under ELCRA, an employer is liable if it retaliates against an employee for having engaged in protected activity, e.g., opposing a violation of the Act's antidiscrimination provision. See *DeFlaviis*, 223 Mich. App. at 436, 566 N.W.2d 661. ELCRA's antiretaliation provision provides:

Two or more persons shall not conspire to, or a person shall not:

> (a) Retaliate or discriminate against a person because the person has opposed a violation of this act, or because the person has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing under this act.
>
> [ MCL 37.2701(a).]

Here, plaintiff claims that defendant retaliated against her for filing her failure-to-promote lawsuit. In its motion for summary disposition, defendant argued that plaintiff has not submitted evidence sufficient to allow a reasonable jury to conclude that defendant's actions were materially adverse. In reviewing the issue under MCR 2.116(C)(10), we are obligated to consider the evidence and inferences therefrom in the light most favorable to plaintiff. See *Liparoto Const., Inc. v. Gen. Shale Brick, Inc.*, 284 Mich. App. 25, 29, 772 N.W.2d 801 (2009).

The record is clear as to certain salient facts. First, plaintiff had been working for defendant since 2008; had twice been assigned a higher classification; and in her annual performance reviews received either a "meets expectations" or "high performance" rating from her supervisor.[11] She filed suit on December 18, 2017. Three weeks later, on January 8, 2018, she had her annual performance review for 2017 and

for the first time received an unsatisfactory rating: "Needs Improvement."

*6 Second, during this time, plaintiff's failure-to-promote case was progressing and defendant brought a motion to change venue from Wayne County to Ingham County. On February 13, 2018, plaintiff filed her response which included her affidavit that she worked primarily in Detroit. Two days after she submitted that affidavit, on February 15, 2018, defendant informed plaintiff that she was to report to work in Lansing rather than Detroit.

## 2. CONTROLLING LAW

As already noted, while we are not bound by Title VII caselaw, Michigan courts regularly look to it for guidance in interpreting ELCRA. This stems from the fact that ELCRA is "clearly modeled after Title VII ...." *Rasheed v. Chrysler Corp.*, 445 Mich. 109, 123 n. 20, 517 N.W.2d 19 (1994). And in this case, we see no reason to depart from the United States Supreme Court's interpretation of the comparable Title VII provisions. ELCRA's antidiscrimination and antiretaliation provisions mirror Title VII's. Like Title VII, ELCRA prohibits employers from discriminating against an individual on the basis of race "with respect to employment, compensation, or a term, condition, or a privilege of employment," MCL 37.2202(1)(a), and also from limiting, segregating, or classifying "an employee or applicant for employment in a way that deprives or tends to deprive the employee or applicant of an employment opportunity, or otherwise adversely affects the status of an employee or applicant" because of race, MCL 37.2202(1)(b). See 42 USC 2000e-2(a).[12] The antiretaliation provisions of both ELCRA and Title VII differ from their respective antidiscrimination provisions in that they bar retaliation or discrimination with no limitation on the type of acts that would be considered unlawful. See MCL 37.2701(a); 42 USC 2000e-3(a).[13]

The controlling case regarding Title VII's antiretaliation provision is *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006).

Prior to *Burlington,* courts had been applying the same standards to discrimination and retaliation cases. Specifically, some federal circuit courts concluded that to establish a claim for retaliation, the alleged retaliatory action needed to involve an "ultimate employment decision" such as hiring, firing, rate of pay or promotion, consistent with the standard for a discrimination case. In *Burlington,* however, the Supreme Court concluded that

> **\*7** Title VII's substantive provision and its antiretaliation provision are not coterminous. The scope of the antiretaliation provision extends beyond workplace-related or employment-related retaliatory acts. We therefore reject the standards applied in the Courts of Appeals that have treated the antiretaliation provision as forbidding the same conduct prohibited by the antidiscrimination provision and that have limited actions retaliation to so-called "ultimate employment decisions." [ *Id.* at 67, 126 S.Ct. 2405.]

Significantly, *Burlington* went on to define "materially adverse" as an action that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination," *id.* at 68, 126 S. Ct. 2405 (quotation marks and citation omitted), and stated that "the antiretaliation provision, unlike the substantive provision, *is not limited to discriminatory actions that affect the terms and conditions of employment,*" [14] *id.* at 64, 126 S. Ct. 2405 (emphasis added).

At the same time, the Court said that Title VII "does not set forth a general civility code for the American workplace"; that "petty slights, minor annoyances and simple lack of good manners" are not are not actionable even if retaliatory; and that the actions must deter reasonable employees, noting that

the test is objective. *Id.* at 68, 126 S. Ct. 2405 (quotation marks and citation omitted). An objective test does not mean that the ultimate question is for the court; rather, the court must determine if plaintiff has submitted sufficient proofs to establish a question of fact whether or not the action meets the *Burlington* standard. Thus, the decision must be based in the facts of the case, not bright-line or categorial rules as to what actions would or would not deter an employee from objecting to discrimination. As stated in *Burlington,*

> We phrase the standard in general terms because the significance of any given act of retaliation will often depend upon the particular circumstances. Context matters. "The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." A schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school-age children. A supervisor's refusal to invite an employee to lunch is normally trivial, a nonactionable petty slight. But to retaliate by excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination. Hence, *a legal standard that speaks in general terms rather than specific prohibited acts is preferable, for an "act that would be immaterial in some situations is material in others."* [ *Id.* at 69, 126 S. Ct. 2405 (citations omitted; emphasis added).]

**\*8** The examples given by the Supreme Court in this passage are telling. It would be easy to hold that not being invited to a training lunch, or having to accommodate a minor schedule change, does not constitute a material adverse action regardless of their effect. However, *Burlington* rejects the idea that certain actions are always or never materially adverse—each case is to be considered on its facts and not by application of a general rule that certain actions are, by nature, not materially adverse.

Notably, defendant does not refer to *Burlington* in its brief. Instead it suggests that we rely on a pre-*Burlington*

case, *Pena v. Ingham Co. Road Comm.*, 255 Mich. App. 299, 312, 660 N.W.2d 351 (2003), which in turn relied on pre- *Burlington* caselaw from the Sixth Circuit for the proposition that an adverse employment action typically "takes the form of an ultimate employment decision, such as 'a termination in employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.' " Quoting *White v. Burlington N. & S.F. R. Co.*, 310 F.3d 443, 450 (C.A. 6, 2002), vacated for en banc rehearing 321 F.3d 1203 (C.A. 6, 2003). However, as discussed, federal precedent applying that standard to retaliation claims was expressly overruled by *Burlington*, 548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d 345. [15] It would be a strange result, to say the least, if we continued to follow Title VII precedent overruled by a United States Supreme Court decision based on the same statutory language found in ELCRA.

We have not addressed in a published ELCRA case whether to follow *Burlington*. [16] We do so here and adopt the reasonable-employee standard for determining whether an employer has committed a retaliatory adverse employment action under ELCRA. Given that the antiretaliation provision does not contain the limiting language used in substantive discrimination provision, there is no basis in MCL 37.2701(a) to limit retaliatory acts under ELCRA to those affecting the terms and conditions of employment such as pay, hiring and firing. The adoption of *Burlington* is also consistent with our long history of applying persuasive Title VII precedent to analogous ELCRA issues absent statutory differences.

### 3. APPLICATION

Plaintiff alleges that defendant retaliated against her in two ways after she filed her lawsuit on December 18, 2017. First, that on January 8, 2018, she was given a negative performance evaluation that required her to work under a PIP, which was expanded in February with additional requirements set forth in a "notice of formal counseling." Second, that the work-

location change from Detroit to Lansing affected her ability to perform her job, which involved regularly meeting in Detroit with homeowners and others parties affected by the eminent domain process necessary to the building of the GHIB.

**\*9** For the reasons already discussed, we reject defendant's argument that imposition of a needs-improvement rating and PIP could *never* deter a reasonable employee from opposing acts of discrimination. Consistent with *Burlington*, we must consider these actions in the context in which they occurred, not in the abstract. Plaintiff had received only positive or satisfactory evaluations during the nine years she worked for defendant until the evaluation conducted one month after she filed her lawsuit. And, a month later, in the midst of a litigation venue dispute, plaintiff was effectively transferred from Detroit to Lansing, which precluded her from performing her duties on-site without regularly commuting to Detroit.

Per *Burlington*, "it is for a jury to decide whether anything more than the most petty and trivial actions against an employee should be considered 'materially adverse' to [the employee] and thus constitute adverse employment actions." *Crawford v. Carroll*, 529 F.3d 961, 973 n. 13 (C.A. 11, 2008). See also *McArdle v. Dell Products, L.P.*, 293 Fed. Appx. 331, 337 (C.A. 5, 2008) ("Whether a reasonable employee would view the challenged action as materially adverse involves questions of fact generally left for a jury to decide."). We conclude that the imposition of a PIP and plaintiff's effective transfer were not "trivial" acts nor a "minor annoyance," *Burlington*, 548 U.S. at 68, 126 S.Ct. 2405, and so the question of whether plaintiff was subject to an adverse employment action should be determined by a jury.

First, the negative evaluation and PIP, in and of themselves, plainly carried a substantial deterrent effect. The PIP includes increased monitoring and an additional mandatory performance review. Civ. Serv. R. 2-3.2(a)(2) (2020). It set dates and requirements for improvement in areas for which plaintiff was rated as needing improvement and required her to meet weekly with her supervisor to review her compliance. The plan also required plaintiff to take multiple courses, including both civil service and substantive real estate classes, to cross-train in other areas within the real estate services section.

Further, imposition of a PIP under the Civil Service Commission Rules may have consequences beyond its requirements. Failure to comply with the plan risks an unsatisfactory "interim rating," which constitutes discipline under the Civil Service Commission Rules "and may be the basis for additional discipline, up to and including dismissal." Civ. Serv. R. 2-3.3(d). A PIP can also lead to formal counseling, as was the case here, where plaintiff was informed —a day after submitting an affidavit opposing defendant's request for a venue change—that her work performance was unacceptable, the obvious implication being that her job and livelihood were at risk.

While defendant argues that negative performance evaluations, PIPs and formal counsel do not constitute discipline or preclude an employee from applying for a different internal position, performance evaluations "may be considered in making employment decisions, including promotion, retention, assignment and training." Civil Serv. R. 2-3.1(d). Thus, while a needs-improvement rating does not formally preclude an employee from pursuing a different position or promotion, it is highly likely, if not certain, that such a rating will reflect poorly on the employee and hinder future advancement. [17] Further, the Civil Service Commission Rules provide that a needs-improvement rating renders the employee "ineligible for reclassification," Civil Serv. R. 2-3.2(b)(2)(B), and is neither appealable nor grievable, Civil Serv. R. 2-3.2(b)(2)(A).

*10 In addition to the negative performance evaluation and PIP, plaintiff's retaliation claim is based on her sudden workplace transfer from Detroit to Lansing in the midst of a venue dispute. Again, plaintiff filed this case in Wayne County, and defendant filed a motion to change venue. Plaintiff responded in opposition and attached her affidavit in which she described her duties in Detroit as grounds for venue in Wayne County. Two days after plaintiff submitted her affidavit, her supervisor informed her that her primary workplace would thereafter be in Lansing, where she was to report to daily and that she would have to drive to and from Detroit for any appointments she had near the worksite. The timing of this change is clearly more than fortuitous; indeed, it is compelling. A reasonable jury could readily conclude that plaintiff's work location was changed precisely to affect the underlying litigation, i.e., because she filed suit, defendant

transferred her in hopes of making her suit more difficult. See *Funk v. Lansing*, ―― Fed. Appx. ――, ――, 2020 WL 4384226 (C.A. 6, 2020) (Case No. 19-1691), slip op. at 16 (stating that "temporal proximity is relevant to causation," and the fact that the employer's action came just two days after the plaintiff made his complaint "is of particular concern.").

Generally, being reassigned closer to one's home would not be a considered an adverse employment action. However, as discussed, the particular circumstances of the job must be considered in evaluating whether an action is materially adverse. See *Burlington*, 548 U.S. at 68, 126 S.Ct. 2405. Plaintiff explained at her deposition that being at the project location was essential to relocation work because "[y]ou have to be accessible to those property owners. They may want to come into the office. They may want you to come out to the field ... but whatever their issue is that's what you're there for." She further explained, "You don't know what's going to come up on any given day on any of your parcels.... So you have to be there every day to be accessible to your property owners." Plaintiff's view that the change in her work location represented a fundamental change in her employment has an objective basis. It was explained to her when she was offered a job as a PA that the position would require her presence at the project location during the week, and indeed that is what she did until the reassignment. Because being at the project site was an essential part of relocation work, we conclude that the change in plaintiff's work location represented more than a mere alteration of job responsibilities.

Applying *Burlington*, we conclude that the needs-improvement evaluation, the corresponding PIP and the workplace transfer could dissuade a reasonable employee from making or supporting a claim of discrimination under ELCRA. Accordingly, whether plaintiff suffered an adverse employment action in this case is a question for the jury, and the trial court erred by granting summary disposition.

The partial dissent does not dispute that we should follow *Burlington*, but attempts to avoid the effect of that United States Supreme Court case with citations to several federal circuit court cases addressing whether negative performance evaluations or PIPs constitute adverse employment actions. The cited cases do not lead us to change our view. First, many of the cases rely in whole or in part on

pre-*Burlington* precedent. For instance, in *Cole v. Illinois*, 562 F.3d 812, 816-817 (C.A. 7, 2009)—which is an oft-cited case on this issue [18]—the Seventh Circuit observed *Burlington*'s holding, but then concluded that the PIP in that case was not an adverse action based entirely on cases decided before *Burlington* that were not applying the reasonable-employee standard but instead analyzed retaliation claims under the same standards as substantive discrimination claims. [19] The dissent asserts that the reliance on pre-*Burlington* decisions should be viewed as a determination that *Burlington* did not affect the applicable standards for retaliation cases. However, *Burlington* clearly *did* the change the standard for retaliation cases, and we do not find perfunctory application of pre-*Burlington* caselaw—without any discussion of the fact that the relied-upon cases were decided before *Burlington*—to be a persuasive application of the reasonable-employee standard. And, as noted, such decisions are especially unpersuasive given that the United States Supreme Court made clear that courts should not define whole categories of actions that may not be considered material regardless of context.

**\*11** The Sixth Circuit has recognized that the *Burlington* standard must be applied on a case-by-case basis. In *Halfacre v. Home Depot, U.S.A., Inc.*, 221 Fed. Appx. 424 (C.A. 6, 2007), two months after the plaintiff claimed race discrimination in a failure-to-promote case, he received an evaluation with an overall performance grade that was lower than all of his previous evaluations. His prior evaluations were "generally stellar." *Id.* at 425-426. As part of his case, the plaintiff alleged retaliation, and the defendant's summary disposition motion was granted prior to the Supreme Court's decision in *Burlington*. *Id.* at 426-427. In its decision, the district court held "as a categorical matter, that '[a] performance evaluation that is lower than an employee feels is warranted is not an adverse employment action sufficient to state a claim of discrimination.' " *Id.* at 432. By the time the Sixth Circuit considered the appeal from the district court decision, the Supreme Court had issued its decision in *Burlington*.

In light of that decision, the Sixth Circuit reversed, reasoning that the district court's categorical approach "is now suspect.... [A lower performance] evaluation could—in certain circumstances—'dissuade[ ] a reasonable worker from making or supporting a charge of discrimination.' " *Id.*, citing *Burlington*, 126 S. Ct. at 2415.

The Sixth Circuit has also recognized that *Burlington* sets forth a "more liberal definition [that] permits actions not materially adverse for purposes of an anti-discrimination claim to qualify as such in the retaliation context." *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 596 (C.A. 6, 2007). In that case, the court held that "[t]he retaliatory actions alleged by [the plaintiff], including her brief placement on paid administrative leave and the 90–day performance plan," met the "*relatively low bar*" for a materially adverse action for purposes of a retaliation claim. *Id.* (emphasis added). See also *Estate of Oliva v. New Jersey*, 579 F. Supp. 2d 643, 671 (D. N.J., 2008) (holding that "[a]n unwarranted negative [performance] evaluation by one's supervisor could have a deterrent effect" and cause "a reasonable worker [to] be dissuaded from making a charge of discrimination.").

The dissent asserts that negative performance evaluations and PIPs must have "tangible job consequences" to be actionable. The dissent does not elaborate on what constitutes a tangible consequence, but indicates with a supporting citation that there must be a financial harm. However, that position cannot be squared with *Burlington*, which held in part that a reassignment of job duties, a change in schedule or even exclusion from a business lunch—without any mention of a pay deduction—could be an adverse employment action. *Burlington*, 548 U.S. at 69-71, 126 S.Ct. 2405. Nor is there support for that position in MCL 37.2701(a), which simply prohibits an employer from retaliating or discriminating against a person who engaged in a protected activity. Moreover, ELCRA is remedial and so should be construed broadly in order to accomplish its purpose, *Bachman v. Swan Harbour Ass'n*, 252 Mich. App. 400, 427, 653 N.W.2d 415 (2002), which, as it relates to retaliation, is to allow employees to report discrimination without a reasonably-based fear of retribution.

In sum, to the extent that cases cited by the dissent hold that a negative performance evaluation or PIP can never constitute an adverse action for purposes of retaliation claim, we decline to follow these cases because they do not contain a persuasive discussion of the reasonable-employee standard. Moreover, that standard must be applied on a case-by-case basis, and here, plaintiff did not merely receive a negative performance evaluation, [20] she also was placed under a PIP, received a notice of formal counseling, and was effectively reassigned to a work location that was less conducive to performance of her duties. Cf. *Henry v. Abbott Labs.*, 651 Fed. Appx. 494, 505 (C.A. 6, 2016) (holding that a reasonable jury could find that the alleged adverse actions could dissuade a reasonable employee from making or supporting a charge of discrimination when the plaintiff received, in addition to a low performance review, "increased scrutiny, a letter of expectations threatening further action if her performance did not improve, and [was] kept on the training line.").

**\*12** Viewing the evidence in a light most favorable to the opposing party, we conclude that plaintiff has presented evidence sufficient to create a genuine issue of fact whether defendant's actions were materially adverse, i.e., that such actions "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington*, 548 U.S. at 68, 126 S.Ct. 2405 (quotation marks and citation omitted). A jury could reasonably find that the alleged retaliatory actions taken against plaintiff, i.e., the negative performance evaluation, PIP, and work relocation, were materially adverse. Therefore, we conclude that the trial court erred by granting defendant's motion for summary disposition as to this claim.

### III. CONCLUSION

We affirm dismissal of plaintiff's discrimination claim, but reverse dismissal of her retaliation claim. We remand for further proceedings consistent with this opinion. We do not retain jurisdiction. Neither party having prevailed in full, costs may not be taxed. MCR 7.219(A).

Riordan, P.J. (concurring in part and dissenting in part)

I agree with trial court's conclusion that plaintiff failed to establish a discrimination claim. However, I disagree with the majority that plaintiff's performance evaluation, performance improvement plan ("PIP"), formal counseling, and reduced travel requirements were adverse employment actions and, as a result, they support plaintiff's retaliation claim. In reaching this conclusion, it is not necessary to consider whether the majority's adoption of the standard set forth in *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 71, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006), is proper because plaintiff provides no objective basis for demonstrating that the alleged retaliatory actions were materially adverse under either our existing precedent or under the majority's newly adopted rule. See *Wilcoxon v. Minnesota Min. & Mfg. Co.*, 235 Mich. App. 347, 363, 597 N.W.2d 250 (1999) (there must be some objective basis for demonstrating that the change is adverse because a plaintiff's subjective impressions as to the desirability of one position over another are not controlling);

*Pena v. Ingham Co. Rd. Com'n*, 255 Mich. App. 299, 311, 660 N.W.2d 351 (2003) (applying *Wilcoxon* to a retaliation claim and citing various federal circuit court cases for the proposition that "[a]lthough there is no exhaustive list of adverse employment actions, typically it takes the form of an ultimate employment decision, such as 'a termination in employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation' ");

*Burlington*, 548 U.S. at 71, 126 S.Ct. 2405 (considering whether a reasonable employee would find the challenged action materially adverse, meaning that it would dissuade a reasonable worker from making or supporting a claim of discrimination).

Plaintiff fails to submit any evidence to support her general allegation that she was prevented from obtaining potential promotions. She does not allege, nor offer any version of facts to support, that she was denied raises or promotions because of her race and age. Rather, until plaintiff voluntarily went on medical leave, she maintained the same position and salary, she was not disciplined under the Civil Service Rules, and she remained eligible for promotion. While the majority offers its own conjecture, plaintiff has not submitted any evidence to support a conclusion that a reasonable employee

in the same circumstances would be dissuaded from making a discrimination claim.

The majority reasons that plaintiff suffered an adverse employment action because a needs-improvement rating and a PIP plan carry potential consequences. However, I would hold, consistent with federal caselaw, that plaintiff failed to meet her burden of demonstrating that she suffered an adverse employment action because negative performance evaluations and PIP plans alone are not sufficient evidence.

**\*13** Federal courts applying *Burlington* require allegations and evidence that PIPs and negative performance evaluations have materially adverse consequences in order to qualify as an adverse employment action. See, e.g., *Halfacre v. Home Depot, U.S.A., Inc.*, 221 Fed. Appx. 424, 433 (C.A. 6, 2007) (lower performance-evaluation scores that significantly that do not actually impact an employee's wages or professional advancement are not materially adverse); *Cole v. Illinois*, 562 F.3d 812, 816 (C.A. 7, 2009) (the adoption of the improvement plan did not constitute an adverse action that would cause a reasonable employee to forego exercising her rights under the Family Medical Leave Act, or result in a reduction in responsibility, pay, hours, or any other benefit, and it did not impose a material change in employment duties); *Thibodeaux-Woody v. Houston Cmty. Coll.*, 593 Fed. Appx. 280, 286 (C.A. 5, 2014) (stating that a less than optimal performance review, without more, is not something that would have discouraged an employee from asserting a charge of discrimination); *Payan v. United Parcel Serv.*, 905 F.3d 1162, 1174 (C.A. 10, 2018) (placement on an employee improvement plan alone does not qualify as a materially adverse action as defined by *Burlington Northern*); *Sykes v. Pennsylvania State Police*, 311 Fed. Appx. 526, 529 n. 2 (C.A. 3, 2008) (noting that negative performance evaluations are not by themselves actionable under Title VII absent a showing that they resulted in a more tangible form of adverse action, such as ineligibility for promotional opportunities); *Crawford v. Carroll*, 529 F.3d 961, 974 (C.A. 11, 2008) (finding that an unfavorable performance evaluation constituted an adverse employment action where it actually rendered the plaintiff ineligible for a merit pay increase); *Weber v. Battista*, 494 F.3d

179, 185, 377 U.S. App. D.C. 347 (2007) (holding that two performance evaluations "qualif[ied] as adverse actions" under *Burlington* "insofar as they resulted in ... losing a financial award or an award of leave"); *AuBuchon v. Geithner*, 743 F.3d 638, 644 (C.A. 8, 2014) (explaining that since *Burlington*, to avoid the "triviality pitfall" a materially adverse employment action must produce some injury or harm, and commencing performance evaluations, falsely reporting poor performance, sending critical letters threatening discipline, among other acts, as a matter of law do not establish a prima facie case of retaliation absent materially adverse consequences to the employee); *Fields v. Bd. of Ed. of City of Chicago*, 928 F.3d 622, 626 (C.A. 7, 2019) (stating that "performance improvement plans, even though they had the potential to lead to termination or other discipline, are not enough" to establish an adverse employment action).

See also *Meagher v. Wayne State Univ.*, 222 Mich. App. 700, 710, 565 N.W.2d 401 (1997) (while federal decisions in civil rights cases are often used for guidance they are not binding on this Court). This is not to say that a PIP or negative performance evaluations may *never* be the basis for a retaliation claim, but that there must be some evidence of tangible job consequences. *Baloch v. Kempthorne*, 550 F.3d 1191, 1199, 384 U.S. App. D.C. 85, 93 (2008) ("performance reviews typically constitute adverse actions only when attached to financial harms").

The majority takes great pains to distinguish the case before us from the overwhelming weight of federal cases and points out that many of the cases cited *supra* merely apply the law to the facts and rely on cases pre-dating *Burlington*. Rather than assume that the federal courts were unaware of the dates of the authorities they cite, or that they were all simply mistaken by citing cases decided before *Burlington*, it is more reasonable to conclude that the federal courts intentionally carried over the pre-*Burlington* legal standard for relying on PIPs and performance evaluations as the basis for retaliation claims into post-*Burlington* jurisprudence. Additionally, many of the cited cases clearly and concisely state the law under *Burlington* and additional exegesis was not required. The majority does not explain what further wisdom the federal

White v. Department of Transportation, --- N.W.2d ---- (2020)

courts must express when applying well-established law to the uncomplicated facts of those cases.

Additionally, the majority attempts to factually distinguish this case from the cited cases by characterizing the PIP at issue as more onerous than those in the cited cases. Plaintiff was required to take classes, cross-train in other areas, and meet weekly with her supervisor. These requirements are similar to those in federal cases where work-related objectives were identified, timelines established, and follow-up meetings were scheduled. See *Jarvis v. Siemens Med. Sols. USA, Inc.*, 460 Fed. Appx. 851, 853 (C.A. 11, 2012) (PIP identified objectives the plaintiff needed to achieve within 30 days and scheduled review meetings); *Langenbach v. Wal-Mart Stores, Inc.*, 761 F.3d 792, 798 (C.A. 7, 2014) (PIP identified actions the plaintiff could take to improve her performance, measurement standards by which her performance would be evaluated, and a time frame in which she was expected to improve). Moreover, the majority offers no discernable test or guidance for measuring when a PIP is burdensome enough to dissuade a reasonable employee from making a discrimination claim. In this case, plaintiff was required to attend weekly meetings, but would monthly meetings have been requisitely oppressive? I agree with the majority's assertion that generally the possibility of discipline can be stressful. See *Poullard v. McDonald*, 829 F.3d 844, 856 (C.A. 7, 2016) ("the possibility of discipline can be stressful"). However, the mere possibility or threat of discipline is insufficient to support a claim for retaliation, and excessive scrutiny, or "closer supervision," is not an actionable adverse employment action. *Id.* at 856-857; *Thomson v. Odyssey House*, 652 Fed. Appx. 44, 46 (C.A. 2, 2016). Accordingly, rather than applying the majority's newly adopted *Burlington* test in a novel manner, I would apply it in a manner consistent with the overwhelming body of federal

cases which require evidence of tangible job consequences. In this case, plaintiff has not pleaded or submitted evidence of such consequences.

**\*14** The majority concludes that plaintiff suffered negative consequences from the needs-improvement rating and PIP plan because she was issued a Notice of Formal Counseling. However, neither plaintiff nor the majority explain how the notice was materially adverse to plaintiff. There are no allegations or evidence in the record that the notice had any impact on plaintiff's salary or benefits,[1] or that the notice would induce a reasonable employee to forgo making or supporting a discrimination claim.[2]

The majority further concludes that plaintiff established a genuine issue of material fact regarding whether the change in work location constitutes an adverse employment action. However, plaintiff's reduced travel schedule is not objectively adverse, *Wilcoxon*, 235 Mich. App. at 364, 597 N.W.2d 250; *Burlington*, 548 at 68, 548 U.S. 53, 126 S. Ct. 2405, particularly when she was instructed to continue to commute from her home office in Lansing to the Detroit worksite when the need arose. Plaintiff's concession that she did not again travel to Detroit after she began reporting to the Lansing office may be evidence that such a need did not arise thereafter, but it is not evidence of retaliatory motive. Nor is there any evidence to support the conclusion that the reduced travel time would dissuade a reasonable employee from making a discrimination claim.[3]

I agree with the majority's disposition on all other issues. Accordingly, I would affirm the trial court in all respects.

**All Citations**

--- N.W.2d ----, 2020 WL 5849754

## Footnotes

| 1 | There was a fourth member of the panel who served as a "hiring manager," but she did not have a vote in the selection. |
| 2 | Plaintiff also alleged age discrimination, but she did not address that claim at the summary-disposition stage. Nor does she appeal the dismissal of that claim. Accordingly, we will not address it. |

3      *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).

4      *Hazle* explained that "the elements of the *McDonnell Douglas* prima facie case should be tailored to fit the factual situation at hand." *Hazle*, 464 Mich. at 463 n. 6, 628 N.W.2d 515. In *Hazle*, the plaintiff lost a sought-after promotion to an outside candidate. *Id.* at 459, 628 N.W.2d 515. The plaintiff alleged discrimination on the basis of race and maintained that she was the more qualified candidate. *Id.* Like *Hazle*, plaintiff is also challenging a promotion decision on the basis of race and she argues that she had more internal experience and was better qualified than the selected applicant. Given the factual similarity, we conclude that *Hazle*'s formulation of the prima facie case is controlling here.

5      Defendant argues that plaintiff did not present evidence raising an inference of discrimination. However, in its motion for summary disposition defendant conflated the fourth element of the prima facie case with plaintiff's duty to show that the stated reason for the employment decision was a pretext. Perhaps as a result, the trial court also conflated the issues. In any event, because we conclude that plaintiff fails to create a question of fact on pretext, we will assume for purposes of this appeal that she established a prima face case.

6      The PS 13 job posting issued in April 2016 required four years' equivalent experience to a PA, including two years equivalent to a PA 11 or one year equivalent to a PA 12. In her application, Crysler indicated that she had been employed as a PA 12 since January 2015, i.e., she had one-year of actual experience as a PA 12. In fact, Crysler was hired in January 2015 as a PA 10 and was not reclassified to a PA 12 until February 2016, thus she did not have one year of actual experience as a PA 12. While plaintiff assumes that Crysler was not qualified given the misstatement, the record does not indicate what the Civil Service Commission would have decided had Crysler accurately stated her employment history with defendant.

7      The Court noted that under the after-acquired evidence doctrine an employer may not rely on the employee's subsequent wrongdoing to justify the prior employment decision, and reasoned that "a logical corollary of this principle [is] that an employee cannot establish discriminatory intent by offering evidence of facts that were unavailable to the employer when it made its employment decision." *Hazle*, 464 Mich. at 475 n. 15.

8      Plaintiff relies on testimony that defendant's hiring decisions are made by the sought position's direct supervisor, who is a member of the interview panel. Yet a member of the interview panel in this case explained that the direct supervisor's decision is "fairly easy" when the interview panel is unanimous, as was the case here. In other words, if there is disagreement within the interview panel, the direct supervisor has to make a unilateral decision, but that was not necessary in this case. Plaintiff also relies on testimony that the head of defendant's real estate section reviewed the interview panel's recommendation before giving it to HR. But this does not change the fact that it was the interview panel who selected Crysler. Finally, plaintiff notes that two employees were listed as hiring managers on the panel's recommendation memo. As explained by multiple witnesses, however, hiring managers handled the administrative and compliance aspects of the interview process and did not have a vote in the selection.

9      All statistics contained in this opinion are approximate and come from undisputed data provided by plaintiff.

10     Plaintiff does not claim that the information does not exist or that defendant has withheld such information in discovery.

11     Plaintiff received a "meets expectations" rating for 2008, 2009, 2010 and 2011. She received a "high performance" rating for 2012, 2013, 2014 and 2015. The 2016 review gave plaintiff a high-performance rating but there is a dispute whether that review was fully completed.

12     42 USC 2000e-2(a) provides:
       It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

13    42 USC 2000e-3(a) provides in pertinent part:

It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

14    In concluding that claims of retaliation are not restricted to actions affecting the terms and conditions of employment, Burlington relied on the provisions' textual differences and on the presumption that Congress intended for different words to have different meanings, i.e., Congress would have specified that retaliation was limited to employment decisions if it intended that result. Burlington, 548 U.S. at 62-63, 126 S.Ct. 2405. The same presumption regarding textual differences in statutes exists in Michigan. "If the Legislature had intended the same meaning in both statutory provisions, it would have used the same word." United States Fidelity & Guar. Co. v. Mich. Catastrophic Claims Ass'n, 484 Mich. 1, 14, 795 N.W.2d 101 (2009).

Burlington also reasoned that the objective of the antiretaliation provision, i.e., to prevent "an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of the Act's basic guarantees," could not be accomplished by prohibiting only actions "directly related" to employment. Burlington, 548 U.S. at 63-64, 126 S.Ct. 2405.

15    The Sixth Circuit decision relied on by Pena was the case that led to the Supreme Court's decision in Burlington. After Pena was decided, the Sixth Circuit vacated Burlington, 310 F.3d 443, and decided the case en banc, holding that the plaintiff was subjected to retaliatory adverse employment actions, White v. Burlington Northern & Santa Fe R. Co., 364 F.3d 789 (C.A. 6, 2004). The Supreme Court affirmed, applying the reasonable-employee standard discussed above.

16    We have applied Burlington in an unpublished decision. See Rott v. Madison Dist. Pub. Sch., unpublished per curiam opinion of the Court of Appeals, issued December 21, 2010 (Docket No. 294291), p. 3, 2010 WL 5175457. In other cases, we have noted Burlington but held or indicated that the plaintiff's claim failed under that standard without expressly deciding whether to adopt it. See Aguilar v. Saginaw, unpublished per curiam opinion of the Court of Appeals, issued August 30, 2018 (Docket No. 339016), pp. 15-17, 2018 WL 4164685; Haase v. IAV Automotive Engineering, Inc., unpublished per curiam opinion of the Court of Appeals, issued December 1, 2011 (Docket No. 298348), p. 5, 2011 WL 6004073.

17    Defendant relies on caselaw that "the effect of a poor evaluation is ordinarily too speculative to be actionable." Douglas v. Donovan, 385 U.S. App. D.C. 120, 559 F.3d 549, 553 (2009). However, the cited case concerned discrimination, not retaliation. As discussed, Burlington clarified that what constitutes an adverse action for purposes of retaliation is broader than what constitutes an adverse employment action under the substantive discrimination provision. Further, we reject the suggestion that the potential consequences of an alleged adverse action should not be considered in applying the reasonable-employee standard. Reasonable people consider possibilities and contingencies when making decisions. Given that

the needs-improvement rating and PIP could lead to discipline (including dismissal) and the hinderance of professional advancement, a reasonable employee would consider those possibilities in deciding whether to make or support a charge of discrimination and could reasonably conclude that it would be better not to do so.

18    Three of the cases cited by the dissent rely directly to *Cole. See Fields v. Bd. of Ed. of City of Chicago*, 928 F.3d 622, 626 (C.A. 7, 2019); *Payan v. United Parcel Serv.*, 905 F.3d 1162, 1174 (C.A. 10, 2018); *Langenbach v. Wal-Mart Stores, Inc.*, 761 F.3d 792, 799 (C.A. 7, 2014).

19    The same is true as to *Baloch v. Kempthorne*, 550 F.3d 1191, 1193 (D.C. Cir., 2008), which concluded that an unsatisfactory performance review should not be considered a materially adverse action and in support cited two cases, each of which was decided prior to *Burlington*. One of those cases, *Oest v. Ill. Dep't of Corrections*, 240 F.3d 605 (C.A. 7, 2001) was a discrimination case, not a retaliation case, and has since been overturned. See *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (C.A. 7, 2016). Similarly, *Langenbach*, 761 F.3d 792, relied on *Cole* and a pre-*Burlington* case, *Haywood v. Lucent Techs., Inc.*, 323 F.3d 524, 532 (C.A. 7, 2003), and involved a plaintiff who alleged she was given an unsatisfactory review and was placed on a PIP after she took leave under the Family and Medical Leave Act (FMLA). However, as the *Langenbach* court noted, the plaintiff had "already received low performance evaluations and had been placed on a PIP" *before* she took her FMLA leave. *Langenbach*, 761 F.3d at 801. Similarly, defendant's reliance on *Jarvis v. Siemens Medical Solutions USA, Inc.*, 460 Fed.Appx. 851 (C.A. 11, 2012), is of little value in that case the plaintiff did not have a history of positive reviews, as the instant plaintiff did, and failed to show up for work on several occasions and falsified his time card. See *id.* at 855.

20    Several of the cases relied on by the dissent do not involve negative performance evaluations or PIPs, but rather employees who received lower, but still satisfactory, job evaluations. *Thibodeaux-Woody v. Houston Community College*, 593 Fed. Appx. 280, 285-286 (C.A. 5, 2014); *AuBuchon v. Geithner*, 743 F.3d 638, 644 (C.A. 8, 2014); *Weber v. Battista*, 494 F.3d 179, 184-185, 377 U.S. App. D.C. 347 (2007). Similarly, PIPs were not at issue in the two cases relied on by the dissent involving employee counseling. See *Cheatham v. DeKalb Co. Georgia*, 682 Fed. Appx. 881, 889-890 (C.A. 11, 2017); *Woods v. Washington*, 475 Fed. Appx. 111, 112-113 (C.A. 9, 2012). Nor did the plaintiffs in in any of the cases cited by the dissent also claim retaliation based on a change in work location.

1    *Wilcoxon*, 235 Mich. App. at 363, 597 N.W.2d 250 (a materially adverse action is one such as termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation). See also *Welsh v. Fort Bend Indep. Sch. Dist.*, 941 F.3d 818, 827 (C.A. 5, 2019) (stating that under the *Burlington* standard, "when determining whether an allegedly retaliatory action is materially adverse, courts look to indicia such as whether the action affected job title, grade, hours, salary, or benefits or caused a diminution in prestige or change in standing among coworkers" (internal quotation marks and ellipses omitted)).

2    *Burlington*, 548 U.S. at 68, 126 S.Ct. 2405. See also, *Cheatham v. DeKalb Co., Georgia*, 682 Fed. Appx. 881, 890 (C.A. 11, 2017) (finding that the plaintiff did not identify any "serious and material change in the terms, conditions, or privileges of employment" deriving from counseling, and thus it did not constitute an adverse employment action); *Woods v. Washington*, 475 Fed. Appx. 111, 112-13 (C.A. 9, 2012) (holding that there was no triable fact as to whether the plaintiff suffered an adverse employment action resulting

from either "Formal Counseling" or "Final Counseling" because neither action affected his compensation, workplace conditions, responsibilities, or job status).

3    See    *Johnson v. TCB Const. Co., Inc.*, 334 Fed. Appx. 666, 671 (C.A. 5, 2009) (holding that an added 30-35 minute commute was not an adverse employment action when there was no evidence that the added commute was unreasonable); *Webb v. Round Rock Indep. Sch. Dist.*, 595 Fed. Appx. 301, 303 (C.A. 5, 2014) (holding that the plaintiff failed to demonstrate that an added 16-mile commute was an adverse employment action because she failed to submit any evidence that it would dissuade a reasonable employee from making a discrimination claim).

**End of Document**                              © 2020 Thomson Reuters. No claim to original U.S. Government Works.