UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KRISTINA GARCIA,

      Plaintiff,

v.                                         Civil Case No. 19-11673
                                         Honorable Linda V. Parker

BEAUMONT HEALTH and
RACHEL LUCA,

      Defendants.

_____/

## OPINION AND ORDER GRANTING DEFENDANT BEAUMONT HEALTH'S MOTION FOR SUMMARY JUDGMENT

This lawsuit arises from Plaintiff Kristina Garcia's employment as a respiratory therapist with Defendant Beaumont Health ("Beaumont"). Defendant Rachel Luca was Garcia's co-worker. Garcia alleges that Luca harassed and sexually assaulted her, that Beaumont improperly investigated and responded to Garcia's complaints concerning Luca's actions, and that Luca told Garcia's co-workers that Garcia was lying about the incident. Garcia further alleges that this conduct interfered with her ability to perform her job, caused her to take leave from work for approximately two weeks, and has led to emotional distress and other damages. In an Amended Complaint filed March 11, 2020, Garcia asserts the following claims: (I) sex discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") against Beaumont: (II) sexual orientation

discrimination under Title VII against Beaumont; (III) retaliation in violation of Title VII against Beaumont; (IV) sexual harassment under Michigan's Elliot-Larsen Civil Rights Act ("ELCRA") against Beaumont; and (V) an ELCRA retaliation claim against Beaumont and Luca.  (Am. Compl., ECF No. 28.)

The matter is presently before the Court on Beaumont's Motion for Summary Judgment filed pursuant to Rule 56 of the Federal Rules of Civil Procedure.  (ECF No. 72.)  The motion has been fully briefed.  (ECF Nos. 73, 74.) Garcia also has filed notices of supplemental authority on the issue of whether Beaumont's investigation of her complaint was sufficient (ECF No. 77), whether she suffered a materially adverse employment action (ECF No. 81), and to discuss why one of the cases cited in previous supplemental authority supports her claim (ECF No. 83).  Beaumont has responded to Garcia's supplemental authority.  (ECF Nos. 78, 85.)  Finding the facts and legal arguments sufficiently presented in the parties' briefs, the Court is dispensing with oral argument with respect to Beaumont's summary judgment motion.  *See* E.D. Mich. LR 7.1(f).

## I.    Summary Judgment Standard

Summary judgment pursuant to Rule 56 is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a

2

jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  After adequate time for discovery and upon motion, Rule 56 mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The movant has the initial burden of showing "the absence of a genuine issue of material fact."  *Id*. at 323.  Once the movant meets this burden, the "nonmoving party must come forward with specific facts showing that there is a genuine issue for trial."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks and citation omitted).  To demonstrate a genuine issue, the nonmoving party must present sufficient evidence upon which a jury could reasonably find for that party; a "scintilla of evidence" is insufficient.  *See Liberty Lobby*, 477 U.S. at 252.  The court must accept as true the non-movant's evidence and draw "all justifiable inferences" in the non-movant's favor. *See Liberty Lobby*, 477 U.S. at 255.

"A party asserting that a fact cannot be or is genuinely disputed" must designate specifically the materials in the record supporting the assertion, "including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials."

3

Fed. R. Civ. P. 56(c)(1).  Notably, the trial court is not required to construct a party's argument from the record or search out facts from the record supporting those arguments.  *See, e.g., Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) ("the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact") (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)); *see also InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989), *cert. denied* 494 U.S. 1091 (1990) ("A district court is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim.").  The parties are required to designate with specificity the portions of the record so the court can "readily identify the facts upon which the . . . party relies[.]"  *InterRoyal Corp.*, 889 F.2d at 111.

## II.    Factual Background

Garcia, a bi-sexual female, has been employed as a respiratory therapist at Beaumont's Royal Oak Hospital since April 2011.  (Garcia Dep. at 31, 54-56, ECF No. 72-2 at Pg ID 907, 913.)  She remains employed in that position today.  The hospital is a 1,000-bed facility, consisting of four towers and approximately 35 floors.  (Carroll Decl. ¶ 4, ECF No. 72-3 at Pg ID 1087.)  Beaumont employs

approximately 7,900 individuals at its Royal Oak hospital.  (Dixon Decl. ¶ 3, ECF No. 72-4 at Pg ID 1094.)

Respiratory therapists are assigned generally to work in pairs throughout the hospital's four towers.  (Carroll Decl. ¶ 3, ECF No. 72-3 at Pg ID 1087.)  They report to one of four supervisors who, in turn, report to Respiratory Care Director Jean Aphram.  (Garcia Dep. at 59-60, ECF No. 72-2 at Pg ID 914.)  For much of Garcia's employment, the four supervisors have been Antoinette Carroll, James Burgess, Steven Hamick, and Allen Frankhouse.  (*Id*. at 60, Pg ID 914.)

When a supervisor is not on site—generally weekends, holidays, or midnight shifts—a "charge therapist" serves as the lead, responding to staff needs and making and changing the respiratory therapists' work assignments to meet patient demand.  (*Id*. at 79-80, Pg ID 919.)  Garcia worked as a charge therapist from approximately January 2017 until she resigned from that role on February 28, 2019.  (Carroll Decl. ¶ 5, ECF No. 72-3 at Pg ID 1087; *Id*. Ex. 1, ECF No. 72-3 at Pg ID 1092.)  When she worked as a charge therapist, Garcia earned an additional $1.25 or $1.50 per hour in salary.  (Garcia Dep. at 81, ECF No. 81 at Pg ID 920.)

Luca was Garcia's co-worker.  Luca began working at Beaumont as a respiratory therapist on June 2, 2015.  (Dixon Decl. ¶ 7, ECF No. 72-4 at Pg ID 1095.)

Garcia testified that she and Luca had an amicable working relationship. (Garcia Dep. at 90, ECF No. 72-2 at Pg ID 922.)  Garcia typically worked the midnight shift, from 6:45 p.m. to 7:15 a.m., on Fridays, Saturdays, and Sundays. (*Id*. at 58, 74, Pg ID 914, 918.)  Luca worked midnight shifts too.  (*See* Carroll Dep. at 23, ECF No. 72-5 at Pg ID 1149.)  When Garcia first started working at Beaumont, Carroll supervised the midnight shift.  (Garcia Dep. at 61, ECF No. 72-2 at Pg ID 915.)  Carroll subsequently moved to the day shift and Frankhouse took over as supervisor on the midnight shift.  (*Id*.)

Garcia testified that her coworkers on the midnight shift referred to Luca as "Crazy Rachel."  (*Id*. at 135, Pg ID 933.)  When defense counsel asked questions about Luca's personality during Garcia's deposition, Garcia described Luca as "interesting" and someone who "would always put a playful spin on everything." (*Id*. at 135, Pg ID 933.)  Carroll provided during her deposition that Luca talked too much to her coworkers about personal matters.  (Carroll Dep. at 23-24, ECF No. 72-5 at Pg ID 1149.)  Garcia provides an affidavit in response to Beaumont's summary judgment motion in which she asserts that Luca engaged in "sexual misconduct" at work.  (Garcia Aff., ECF No. 73-1 at Pg ID 1304-06.)  According to Garcia, this conduct "was well known to supervisors, including Antoinette Carroll."  (*Id*. at Pg ID 1306.)

On August 6, 2018, Garcia went to Carroll to complain about an incident involving Garcia and Luca during the midnight shift beginning July 29.[1]  (Garcia Dep. at 121-22, 201, 206, ECF No. 72-2 at Pg ID 930, 950; Garcia Timeline, ECF No. 72-2 at Pg ID 997.)  Garcia reported the incident to Carroll rather than Frankhouse, who was the midnight shift supervisor, because she felt more comfortable discussing the matter with a woman and felt that Carroll was "the strength of the leadership team."  (Garcia Dep. at 206, ECF No. 72-2 at Pg ID 951.)  Garcia recorded her conversation with Carroll, which was transcribed by Garcia's attorney.  (*See* Tr., ECF No. 72-2 at Pg ID 1000-1012.)

According to Garcia, she, Luca, and a third respiratory therapist, Colleen Kaye, were on a break in a small storage room on the third floor of the hospital's East Tower.  (Garcia Dep. at 120, 152-85, ECF No. 72-2 at Pg ID 929, 937; ECF No. 72-2 at Pg ID 991-92.)  Garcia stated that she was freezing and that you could see her nipples through her bra even though she was wearing a really good, insulated bra.  (Garcia Stmt., ECF No. 72-2 at Pg ID 991.)  Luca and Kaye then commented on how much they loved their bras and asked if Garcia "had one of

---

[1] When asked why she waited a week to report the incident, Garcia explained that it was because she "had time to process what happened," she had been off during the week, and she was focused on her dog who was having surgery for cancer. (Garcia Dep. at 201, ECF No. 72-2 at Pg ID 950.)

these" while pulling the shoulder straps on their bras "slightly out of their shirt[s] to show [Garcia]." (*Id*.)

According to Garcia, as she pulled out the strap of her bra to show Luca and Kaye, Luca got up, walked next to Garcia, and then suddenly put her hand down Garcia's shirt. (*Id*.) Garcia claims Luca put her hand inside the bra cup, pinched Garcia's nipple, and pulled Garcia's breast up and out of the bra cup. (*Id*.) Garcia was stunned and "pissed off". (*Id*.; Garcia Dep. at 186-90, ECF No. 72-2 at Pg ID 190) She then said, "Now that was too f***ing far!" (Garcia Stmt., ECF No. 2-2 at Pg ID 991.) Luca allegedly apologized and said, "oh I'm sorry I didn't mean to offend you. … I just want to see your bra." Garcia responded that it was not her bra but her nipple, to which Luca allegedly answered, "Well you have nice nipples" and giggled. (*Id*.) The conversation then changed to other topics until Garcia, Luca, and Kaye returned to their work assignments. (*Id*.; Garcia Dep. at 188-89, ECF No. 72-2 at PG ID 946-47.)

Later in the shift, Garcia, Luca, and other coworkers were in the same breakroom when Luca began discussing her vagina. (Garcia Dep. at 194-201, ECF No. 72-2 at Pg ID 948-50.) According to Garcia, Luca began Googling vaginal infections and pointed her phone toward Garcia, asking "so this is what you like? This is what you're into?" (*Id*. at 195, Pg ID 948.) At one point, when Luca insinuated that she was going to show her co-workers her vagina, another co-

8

worker said 'Rachel, you're crazy. What are you doing? Like knock it off." (*Id*. at 199, Pg ID 949.)

Garcia also told Carroll about another incident which occurred approximately six to eight months earlier where Luca "kept making comments about like, she thinks I want her and stuff like that." (Tr. at 1, ECF No. 72-2 at Pg ID 1000.) Concerned that she was misleading Luca, Garcia told Luca that she was not interested in her. (*Id.*) Garcia stated that Luca "got huffy and puffy," left the room, but returned a few seconds later and said, "I'm not interested in you either." (*Id.*) Garcia "blew [the incident] off" and described it as "[n]o big deal." (*Id.* at 2, Pg ID 1001.)

Garcia also told Carroll that "a little bit after that," while Garcia and Luca were walking in the hallway, their hands bumped and Luca grabbed Garcia's hand and laughed. (*Id.*at Pg ID 1001.) Garcia asked Luca what she was doing and Luca "jokingly" responded, "what, you don't want to hold my hand? You don't find me attractive?" (*Id.*) Garcia told Carroll that she and Luca had not had any issues since then. (*Id.*)

Carroll expressed concern and shock as Garcia described the July 29 incident to her. (*See* ECF No. 72-2 at Pg ID 1000-13.) Garcia repeatedly expressed to Carroll that she did not want to get Luca in trouble or fired but wanted the incidents documented in some way. (*Id*. at 5-8, 11-12, Pg ID 1004-07, 1010-

11.)  Garcia told Carroll that if it had been a man who touched her, she would have hit him without thinking.  (*Id*. at 5, Pg ID 1004.)  Carroll responded: "Well, he would have been out of the job.  He would have been gone.  Because that's sexual harassment.  And guess what?  It's sexual harassment on her part too."  (*Id*.)

Garcia told Carroll that she did not want to be stuck in a unit or alone with Luca.  (*Id.* at 8, 12, Pg ID 1007, 1011.)  Carroll responded: "Well, that's the thing, 'cause then we have to make sure that you both aren't in the same area together.  So yeah."  (*Id.* at 12, Pg ID 1011.)  Carroll informed Garcia that she had to respond to the report because touching someone without their permission or consent is a violation, it is sexual harassment.  (*Id.* at 8, Pg ID 1007.)  Carroll told Garcia that she (Garcia) needed to put something in writing.  (*Id*. 9, at Pg ID 1008.)

On August 8, two days after reporting the incident to Carroll, Garcia submitted a written statement describing Luca's alleged pinching of her nipple.  (Garcia Stmt., ECF No. 72-2 at Pg ID 991-92.)  In the statement, Garcia also described the exchange six or seven months earlier where Luca seemed to be expressing an interest in Garcia and Garcia "clear[ed] the air" to communicate that she was not interested in Luca.  (*Id*.)  Garcia wrote that she and Luca thereafter had acted "normal toward" one another but the recent incident "was so upsetting and crossed the line" that she needed to report it to their supervisor.  (*Id.* at Pg ID 992.)  Garcia reported that she did not feel comfortable being alone with Luca and asked

10

that they not be paired together in a unit where they might find themselves alone in the supply room where they do a lot of charting.  (*Id*.)  Garcia, however, did not ask to be scheduled on a different shift than Luca when making her verbal report to Carroll or in her written statement.  (*See* ECF No. 72-2 at Pg ID 991-92, 1000-12.)

After Garcia verbally complained to Carroll, Carroll had consulted Beaumont's sexual harassment policy and contacted Aphram.[2]  (Carroll Dep. at 38-39, 66, ECF No. 72-5 at Pg ID 1153, 1159; Carroll Decl. ¶ 9, ECF No. 72-3 at Pg ID 1088.)  A call was made to Beaumont's human resources department and the decided course of action was for Carroll to investigate the incident after she received Garcia's written complaint.  (Carroll Decl. ¶ 9, ECF No. 72-3 at Pg ID 1088.)

---

[2] Beaumont had a sexual harassment policy, issued September 1, 2016, which was replaced by a new policy on August 6, 2018—the day Garcia reported Luca's alleged assault to Carroll.  (*See* Carroll Dep. at 38-39, ECF No. 72-5 at Pg ID 1153; 2016 & 2018 Policies, ECF No. 72-5 at Pg ID 1169-75.)  Carroll was not sure which of the two policies she reviewed after receiving Garcia's verbal complaint, although she thought it was the earlier one.  (Carroll Dep. at 39, ECF No. 72-5 at Pg ID 1153.)  Both policies prohibit unwelcome touching and provide information about reporting and responding to employee complaints.  (*See* 2016 & 2018 Policies, ECF No. 72-5 at Pg ID 1169-75.)  The 2016 policy states that the "Hospital will investigate" a complaint of sexual harassment.  (2016 Policy at 3, ECF No. 72-5 at Pg ID 1175).  In comparison, the 2018 policy provides that the Compliance, Audit, Accreditation, and Risk (CAR) Department and/or Human Resources will investigate a complaint.  (2018 Policy at 3, ECF No. 72-5 at Pg ID 1171.)

11

After receiving Garcia's written statement, Carroll interviewed Luca and Kaye independently. (Carroll Decl. ¶ 10, ECF No. 72-3 at Pg ID 1088.) Carroll arranged the interviews so that Luca and Kaye would not be alerted to the fact that Carroll was investigating an employee complaint. (*Id.* ¶ 11, Pg ID 1088.) Luca and Kaye both denied that Luca reached into Garcia's bra and touched her nipple. (Carroll Dep. at 52-53, ECF No. 72-5 at Pg ID 1156.) According to Carroll's notes from the interviews, Kaye reported that she and Luca were discussing bras and looking at their bra straps because Kaye's bra had been giving her issues. (Investigation Notes at 1, ECF No. 72-5 at Pg ID 1178.) Kaye further reported that Luca then asked Garcia to see her bra. (*Id.*) Kaye stated that she did not recall anything being said about a nipple, nor did she see Luca touch or grab Garcia's breast.[3] (*Id.*)

Luca similarly reported to Carroll that they were comparing bras; they were discussing sports bras and breastfeeding. (*Id.*) Luca admitted to "accidentally" touching Garcia but stated that it was when Garcia showed Luca her bra strap and

---

[3] In a subsequent statement Kaye gave to Beaumont related to a retaliation complaint by Garcia, Kaye said something somewhat different in that she reported that "nipple color was brought up" when she, Luca, and Garcia were in the supply room on July 29. (*See* Kaye email, ECF No. 72-6 at Pg ID 1243.) Although Garcia makes much of this discrepancy in Kaye's statement, the matter is not material to the resolution of Beaumont's motion.

Luca asked to feel the strap.[4]  (*Id*.)  According to Luca, Garcia was making comments in the staff room after about Luca grabbing her nipple and that Luca is into girls.  (*Id*.)

Carroll interviewed another employee who Luca said was walking by when Garcia made the comments.  (*Id*.)  That employee told Carroll that she heard the comment but could not recall who said it.  (*Id*.)  During her deposition, Garcia acknowledged making the comment in front of Luca and other coworkers on the same day as the incident, explaining that she was trying to get Luca to admit to the alleged touching.  (Garcia Dep. at 123-26, ECF No. 72-2 at Pg ID 931.)

Carroll ultimately concluded that Garcia's allegations were unsubstantiated as Garcia's and Luca's accounts of what happened were different and no one Carroll spoke with—including Kaye who was present—corroborated what Garcia reported.  (Investigation Notes at 1, ECF No. 72-5 at Pg ID 1178.)  Carroll states that while she "kind of" believed Garcia when she reported the incident, she also believed Luca and Kaye when she interviewed them as they "appeared honest and truthful when they were answering [Carroll's] questions."  (Carroll Decl. ¶ 12,

---

[4] During Beaumont's investigation of a subsequent complaint by Garcia, discussed *infra*, a co-worker reported that Luca said she felt the fabric on Garcia's bra during the July 29 incident.  (*See* Stmt., ECF No. 72-6 at Pg ID 1242.)  Garcia argues that this purported statement by Luca is contradictory to her earlier statement that she "accidentally" touched Garcia.  This discrepancy also is not material to the resolution of Beaumont's motion.

ECF No. 72-3 at Pg ID 1089.)  Carroll provides that she had no reason to doubt

Kaye's honesty or integrity, and that, under the circumstances, Kaye would have

witnessed if anything Garcia described had happened.  (*Id*.)

On August 13, 2018, Carroll met separately with Garcia and Luca to discuss

the outcome of her investigation.  (*Id.*¶ 13, Pg ID 1089.)  Despite finding Garcia's

complaint unsubstantiated, Carroll warned Garcia and Luca that there should be no

inappropriate conversations, touching, or behavior of any kind between them, or

anyone else.  (*Id.*; Carroll Investigation Notes at 2, ECF No. 72-5 at Pg ID 1179.)

Carroll further warned that any inappropriateness in the future would be directed to

human resources and that neither Garcia nor Luca were to speak about the incident

with anyone.  (*Id*.)

Garcia subsequently learned, however, that Luca talked about the alleged

assault with co-worker Phil Matthewson, disputing Garcia's allegations.  (Garcia

Dep. at 222, ECF No. 72-2 at Pg ID 955.)  On August 27, 2018, Garcia asked to

meet with Matthewson and then recorded their conversation.  (*Id*. at 223, 237, Pg

ID 955. 959; *see also* Tr. at 1-15, ECF No. 72-2 at Pg ID 1021-34.)  During the

conversation, Garcia told Matthewson her version of the incident.  (Garcia Dep. at

237, ECF No. 72-2 at Pg ID 959; Tr. at 10-11, ECF No. 72-2 at Pg ID 1030-31.)

Matthewson indicated that he did not believe Luca (Tr. at 2, 6-7, ECF No. 72-2 at

Pg ID 1022, 1026. 1027); however, Garcia was still upset that Luca was attacking

her credibility (*id.* at 2, 7, 11, Pg ID 1022, 1027, 1031; Garcia Dep. at 234-35, ECF No. 72-2 at Pg ID 958.)

Garcia then went to see Carroll and played a portion of the recording to show that Luca was "calling [her] a liar and slandering [her] name and [her] character and telling people about [the incident] unprovoked." (Garcia Dep. at 238-39, ECF No. 72-2 at Pg ID 959.)  Carroll called Aphram into the meeting to hear Garcia's concerns.  (Aphram Notes, ECF No. 72-6 at Pg ID 1239.)  Aphram, contacted HR and was told to interview Luca regarding Garcia's accusations.  (*See id.* at Pg ID 1239; Carroll Notes, ECF No. 72-6 at Pg ID 1238.)  Aphram called Luca on August 27, 28, 30, and 31, but Luca did not answer or return Aphram's messages.  (Aphram Notes, ECF No. 72-6 at Pg ID 1239.)  Luca was not at work between August 27 and September 7, 2018.  (Carroll Decl. ¶ 17, ECF No. 72-3 at Pg ID 1090.)  When Luca returned to work on September 7, Aphram interviewed her.  (Aphram Notes, ECF No. 72-6 at Pg ID 1239.)  Luca denied any wrongdoing. (*Id.*)  Aphram expressed that the allegations were serious and that he was looking for guidance on the next steps.  (*Id.*)

On September 10, because she had not heard anything from human resources, Garcia sent a letter via email to Beaumont's Human Resources Representative Kevin Brancaleone and its Vice President for Rehabilitative Services Jose Rivera, reiterating her claims of sexual assault and "retaliation"—

i.e., Luca's talking about the July 29 incident to co-workers and calling Garcia a liar.  (Garcia Dep. at 265-66, ECF No. 72-2 at Pg ID 966; Timeline, ECF No. 72-2 at Pg ID 997; 9/10/18 Ltr., ECF No. 72-2 at Pg ID 1047-1049.)  Later on September 10, Brancaleone and Rivera sent emails to Garcia in response to her letter.  (Garcia Dep. at 272, ECF No. 72-2 at Pg ID 967; Brancaleone emails, ECF No. 72-4 at Pg ID 1114; Rivera email, ECF No. 72-4 at Pg ID 1116.)  Brancaleone asked to meet with Garcia to discuss her complaint but Garcia responded that she would be on vacation until September 28 and would contact him when she returned.  (Brancaleone emails, ECF No. 72-2 at Pg ID 1114.)  Garcia then took FMLA leave from September 27 to October 3.  (Garcia Dep. at 274, ECF No. 72-2 at Pg ID 968.)  Garcia thereafter refused to discuss her complaint with Beaumont unless her lawyer was present, which was not permitted by Beaumont policy. (Dixon Decl. ¶ 16, ECF No. 72-4 at Pg ID 1097.)

Beaumont nevertheless continued to investigate Garcia's complaint and determined that Luca had violated Carroll's directive by talking to three co-workers about Garcia's assault allegation.  (*Id*. ¶¶ 17, 21, Pg ID 1097-98; Performance Improvement Plan, ECF No. 72-4 at Pg ID 1140.)  On October 9, 2018, management and HR prepared written discipline for Luca.  (Aphram Dep. at 73-76, ECF No. 72-6 at Pg ID 1222-23; Performance Improvement Plan, ECF No.

72-6 at Pg ID 1255; Dixon Decl. ¶ 22, ECF No. 72-4 at Pg ID 1099; ECF No. 72-4 at Pg ID 1138.)  Luca's supervisor administered the discipline on October 18.  (*Id.*)

Garcia reported no other complaints about Luca after the "retaliation" claim. (Garcia Dep. at 257-60, ECF No. 72-2 at Pg ID 964.)  Garcia testified that she did not have any interaction with Luca subsequent to the alleged July 29 incident, and that Luca did not engage in any conduct or communications of a sexual nature again.  (*Id*. at 260, 290, ECF No. 72-2 at Pg ID 964, 972.)  While Garcia testified that Luca tried to talk to her during the midnight shift on October 27, Garcia indicated that she walked away.  (*Id.* at 256, Pg ID 963.)  Garcia further testified that she and Luca were not paired together for any work assignments after July 29. (*Id.* at 260, Pg ID 964.)  However, Garcia was assigned to be charge therapist on two occasions when Luca was working, October 13 and November 11.  (*Id.* at 262-64, Pg ID 965.)  Garcia believes this assignment could have caused them to interact because the charge therapist is the individual who respiratory therapists approach if issues arise during a shift without a supervisor.  (*Id.* at 260-62, Pg ID 964-65.)  Garcia allegedly asked three times to be removed from the position on October 13 and eventually found another charge therapist to take her place on that date.  (*Id.* at 262, Pg ID 965.)  While she did not request or find a replacement for the November 11 assignment, Garcia acknowledged during her deposition that she did not run into Luca during the shift.  (*Id.* at 263-64, Pg ID 965.)

17

Beaumont terminated Luca's employment on December 11, 2018, after she

failed to report to work for her scheduled shifts.  (Dixon Decl. ¶ 7, ECF No. 72-4 at

Pg ID 1095.)  Luca had last worked at Beaumont on November 30, 2018.  (*Id.*)

On February 28, 2019, Garcia sent an email to Aphram, resigning as a

charge therapist, effective immediately.  (2/28/19 Email, ECF No. 72-2 at Pg ID

1081.)  When asked during her deposition why she resigned, Garcia explained that

she was afraid Luca might get her job back at Beaumont and since her previous

request not to be scheduled as charge therapist during Luca's shift had been

ignored, Garcia felt that she had to resign the position.  (Garcia Dep. at 323-24,

ECF No. 72-2 at Pg ID 1060.)

## III.   Applicable Law & Analysis

### A.   Garcia's Claims

In Counts I and II of her Amended Complaint, Garcia alleges that her sex

and/or sexual orientation were "factor[s] that made a difference in [Beaumont]'s

failure to respond to the incidents of harassment [she] reported . . .."  (Am. Compl.

¶¶ 25, 31, ECF No. 28 at Pg ID 154.)  In response to Beaumont's summary

judgment motion, Garcia asserts that Beaumont treated her complaint differently

because she is a bi-sexual woman who was sexually harassed by another woman.

(Pl. Resp. Br. at 13, ECF No. 73 Pg ID 1285.)  She further argues that Beaumont

engaged in unlawful discrimination because it would have treated a male harasser

18

differently than it treated Luca.  (*Id*.)  Garcia relies on Carroll's statement, when

Garcia verbally reported the July 29 incident, that a man would have been

terminated if he did what Garcia claimed Luca did.  (*Id*.)

Although unclear from her pleading, Garcia articulates in her response brief

that her retaliation claims (Counts III and V) are based on Beaumont's alleged

inadequate response to Luca's purported "retaliatory" conduct—that being, telling

co-workers that Garcia is a liar or lied about the July 29 incident.  (*Id*. at 20-21, Pg

ID 1292-93.)  Garcia asserts that, instead of immediately disciplining Luca in

response to Garcia's complaint, Beaumont allowed Luca to harass Garcia for

weeks and continued to schedule Garcia to work the midnight shift as a charge

therapist with Luca.  (*Id*. at 21, Pg ID 1293.)

In Count IV of her Amended Complaint, Garcia claims that Luca's conduct

created a hostile work environment and that Beaumont failed to take prompt and

appropriate remedial action.

### B.    Title VII Disparate Treatment Claim

The parties agree on the elements Garcia must show to establish a prima

facie claim of disparate treatment: (1) she is a member of a protected group; (2) she

suffered an adverse employment action, and (3) she was treated different than a

similarly situated individual outside the protected group. [5]  *Alexander v. Caresource*, 576 F.3d 551, 559 (6th Cir. 2009) (citation omitted).  Beaumont contends that Garcia cannot satisfy the second or third elements.  Although even if Garcia establishes a prima facie case of discrimination, Beaumont maintains that it had a legitimate non-discriminatory reason for its actions.

"An adverse employment action is an action by the employer that constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  *Regan v. Faurecia Auto. Seating, Inc.*, 679 F.3d 475, 481 (6th Cir. 2012) (quoting *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 402 (6th Cir. 2008)).  Garcia relies only on her resignation as a charge therapist to satisfy this element, claiming "she was forced to resign" when Beaumont "continually ignored her request not to be scheduled as a charge therapist with Ms. Luca on the midnight shift[.]"  (Pl. Resp. at 15, ECF No. 73 at Pg ID 1287.)

An "involuntary resignation" or "constructive discharge" constitutes an adverse action where "the employer deliberately created intolerable working

---

[5] Garcia does not claim to have direct evidence to support any of her claims.  As such, her discrimination and retaliation claims are evaluated under the familiar burden-shifting framework set forth in *McDonnell-Douglas Corporation v. Green*, 411 U.S. 792 (1973).

conditions, as perceived by a reasonable person, and . . . the employer did so 'with the intention of forcing the employee to quit.'" *Logan v. Denny's, Inc.*, 259 F.3d 558, 568-69 (6th Cir. 2001) (quoting *Moore v. KUKA Welding Sys.*, 171 F.3d 1073, 1080 (6th Cir. 1999) (ellipsis removed). No reasonable juror could find that Beaumont deliberately created an intolerable working condition for Garcia by scheduling her twice as a charge therapist during Luca's shift. First, Garcia switched her schedule on one of those dates. Second, Garcia acknowledged that she had no interaction with Luca *period* after the alleged assault, whether while Garcia was working as a charge therapist or otherwise.[6] Third, Garcia resigned as a charge therapist more than two months after Beaumont terminated Luca's

---

[6] In her response brief, Garcia asserts that "[Beaumont['s statement that [she] 'never again interacted with Luca in the workplace,' is not true" because "[n]ot only did Ms. Luca approach [Garcia] when she was working the midnight shift, but Ms. Luca continued to come into the areas of the hospital where [Garcia] was working to tell nurses that [Garcia] lied and made up a story to get her fired." (Pl. Resp. Br. at 15, ECF No. 73 at Pg ID 1287.) Garcia, however, cites no evidence to support these factual assertions and they are contradicted by her deposition testimony. Admittedly Garcia has described occasions where she saw Luca in the hospital during their shifts. (*See* Garcia Dep. at 258-59, ECF No. 72-2 at Pg ID 964.) Nevertheless, Garcia testified that she did not have any interaction with Luca after the alleged assault. (*Id.* at 259-60, 264, Pg ID 964-65.) She described only one date, September 2, 2018, where Luca came into her work area and spoke with other nurses about Garcia's allegations (*id.* at 240-41, Pg ID 959-60), which is consistent with the incidents Garcia recorded in her timeline (*see* Timeline, ECF No. 72-2 at Pg ID 997-99.) Garcia only heard from coworkers about other incidents where Luca allegedly discussed the incident with them. (*See id.*)

employment.[7]  Finally, Garcia offers no evidence to show that Beaumont

deliberately scheduled Garcia in this manner to force her to quit the position.  But

even if Garcia satisfied the adverse-action element of her prima facie case, she fails

to show that Beaumont treated *her* differently than similarly situated individuals

outside the protected class.

_____

[7] Garcia asserts in her response brief that she "was never told that Ms. Luca's
employment had been terminated at the end of November 2018, prior to her
resignation as a charge therapist." (Resp. at 6, ECF No. 73 at Pg ID 1278 (citing
Garcia Dep. at 327-28, ECF No. 72-2 at Pg ID 1060-61.) When asked if she was
aware that Luca's employment had been terminated, Garcia responded, "I don't – I
mean I knew she was in jail, so she wasn't working." (Garcia Dep. at 327, ECF
No. 72-2 at Pg ID 1061.) Beaumont's counsel then asked Garcia: "You weren't
aware her employment had been terminated?" (*Id*.) Garcia responded: "I don't
believe so, no." (*Id*. at 328, Pg ID 1061.) However, when asked why she resigned
the charge therapist position, Garcia specifically stated that she was aware that
Luca was coming up for release from jail and was afraid she might get her job back
at Beaumont. (*Id*. at 323-24, Pg ID 1061.) Moreover, in the timeline Garcia kept,
she recorded that the "[l]ast day that [Luca] worked before jail drama" was
November 30, 20189. (Timeline, ECF No. 72-2 at Pg ID 998.) Although Garcia
wrote "2019" on the timeline, it is evident that this was a typo based on where on
the timeline this information is noted and because she subsequently recorded
learning about Luca's arrest on December 13, 2018 and subsequent release from
jail on March 12, 2019. (*See id.*) As well, Garcia testified that one of her
supervisors approached her on December 7, 2018, and advised her to call security
if Luca came to the building and attempted to work or get her stuff and refused to
leave. (Garcia Dep. at 345, Pg ID 72-2 at Pg ID 1066; *see also* Timeline, ECF No.
72-2 at Pg ID 998 (recording date when supervisor approached her).) Thus, Garcia
knew that Luca was no longer working at Beaumont well before Garcia decided to
resign the charge therapist position.

In fact, Garcia does not even claim that Beaumont treated *her* differently.[8]
Rather, her claim is based on how Beaumont treated *Luca* in comparison to how it
would have presumably treated a male who allegedly assaulted a woman (whether
bisexual or not).  Further, Garcia is not claiming that Luca—the member of the
protected class—was treated more harshly but that similarly situated employees
*outside the class* receive less favorable treatment.  Garcia does not cite a single
case suggesting that a plaintiff can prove disparate treatment by showing that the
employer treated someone other than the plaintiff differently than an individual
outside the protected class.

However, even if tenable, Garcia lacks evidence to show that Beaumont has
treated similarly situated male harassers differently than it treated Luca.  Carroll's
statements when Garcia verbally reported the July 29 incident are not proof that
Beaumont has treated similarly situated male employees more harshly.  The
statements certainly do not communicate how Beaumont has treated—or even
might treat—a male employee where the allegations of harassment are found to be
unsubstantiated.  Beaumont presents evidence, however, that such an employee

---

[8] Garcia maintains that her *claim* was treated differently than it would have been if
either she was not bisexual and/or her harasser had been male.  Even if this
assertion could show treatment toward Garcia, she offers no evidence that
Beaumont treated a similarly situated victim of harassment outside the protected
classes differently.

would not be terminated under those circumstances. (Dixon Decl. ¶¶ 13, 14, ECF No. 72-4 at Pg ID 1096-97.)

For these reasons, Beaumont is entitled to summary judgment on Garcia's discrimination claims (Counts I and II).

## C. Retaliation

The Sixth Circuit has held that "in appropriate circumstances, Title VII permits claims against an employer for coworker retaliation." *Laster v. City of Kalamazoo*, 746 F.3d 714, 732 (2014) (quoting *Hawkins v. Annheuser-Busch, Inc.*, 517 F.3d 321, 346 (6th Cir. 2008)). Federal precedent interpreting Title VII—which the Michigan courts find "highly persuasive" when interpreting the ELCRA—has led the Michigan courts to similarly construe the State statute as permitting such claim. *See Meyer v. City of Ctr. Line*, 619 N.W.2d 182, 188-89 (Mich. Ct. App. 2000). An employer can be liable for a coworker's retaliation under Title VII if:

> (1) the coworker's retaliatory conduct is sufficiently severe so as to dissuade a reasonable worker from making or supporting a charge of discrimination; (2) supervisors or members of management have actual or constructive knowledge of the coworker's retaliatory behavior; and (3) supervisors or members of management have condoned, tolerated, or encouraged the acts of retaliation, or have responded to the plaintiff's complaints so inadequately that the response manifests indifference or unreasonableness under the circumstances.

24

*Id.* (citing *Hawkins*, 517 F.3d at 347).[9]  While there is evidence that Garcia

reported Luca's alleged retaliatory conduct to Beaumont, for the reasons that

follow the Court concludes that she cannot demonstrate the first or third elements

to demonstrate Beaumont's liability for it.

The Supreme Court has found that Title VII's "antiretaliation provision

protects an individual not from all retaliation, but from retaliation that produces an

injury or harm." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67

(2006).  Therefore, as the Supreme Court explained in *White*, it "speak[s] of

*material adversity*" so as "to separate significant from trivial harms.  *Id.* (emphasis

in original).  The Court explained further that "Title VII . . . does not set forth 'a

general civility code for the American workplace.'"  *Id.* (quoting *Oncale v.

Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)).  Accordingly, a proper

application of the "standards for judging hostility . . . will filter out complaints

attacking the ordinary tribulations of the workplace, such as the sporadic use of

abusive language, gender-related jokes, and occasional teasing."  *Faragher v. City

of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotation marks and citation

omitted).  Similarly, "petty slights, minor annoyances, and simple lack of good

---

[9] Whether the Michigan courts would adopt the same elements to establish such a claim under the ELCRA is unclear.  Nevertheless, the Michigan courts have indicated that an employer's liability attaches for coworker harassment only if the employer knew about harassment that "is sufficiently severe."  *Meyer*, 619 N.W.2d at 570-71.

manners" normally will not be actionable. *White*, 548 U.S. at 68. "Only harassing conduct that is 'severe or pervasive' can produce a 'constructive alteration in the terms or conditions of employment." *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 270 (2001) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 752 (1998)).

Whether conduct is sufficiently severe or pervasive is determined "by looking at all the circumstances, including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Faragher*, 524 U.S. at 787-88 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). Conduct is evaluated using an objective standard: "We refer to reactions of a *reasonable* employee . . .." *White*, 548 U.S. at 54-55 (emphasis added).

When evaluated under this standard, Luca's alleged retaliatory conduct—telling three coworkers that Garcia was lying about the July 29 incident—is neither severe nor pervasive. *See, e.g., McQuail v. Tenn. Tech. Univ.*, 69 F. Supp. 3d 701, 714 (M.D. Tenn. 2014) (holding a coworker's refusal to acknowledge the plaintiff's accomplishments and humiliation of the plaintiff during a faculty meeting not actionable retaliatory conduct); *Owen v. Peak*, No. 3:02cv179, 2008 WL 4449011, at *6 (S.D. Ohio Sept. 26, 2008) (concluding that embarrassing and

humiliating the plaintiff, yelling at her in front of coworkers and patients, submitting false complaints about her to a supervisor, announcing her personal leave information, and other acts not sufficiently severe to support retaliation claim); *Baird v. Snowbarger*, 744 F. Supp. 2d 279, 292 (D.D.C. 2010), *aff'd in part, vacated in part on other grounds sub nom Baird v. Gotbaum*, 662 F.3d 1246 (D.C. Cir. 2011) (finding conduct insufficiently severe where the plaintiff was the subject of a number of insulting emails attacking her as "psychotic" and experiencing "litigation induced hallucinations"); *cf. Ray v. Henderson*, 217 F. 3d 1234 (9th Cir. 2000) (reversing summary judgment to employer where the plaintiff "was targeted for verbal abuse related to [his] complaints for a period lasting over one and half years. His supervisors regularly yelled at him during staff meetings; they called him a 'liar,' a 'troublemaker,' and a 'rabble rouser,' and told him to 'shut up.' Additionally, [the plaintiff] was subjected to a number of pranks, and was falsely accused of misconduct.") But even if Luca's conduct is deemed sufficiently severe or persuasive to satisfy the first element of Garcia's retaliation claim, Garcia fails to demonstrate that Beaumont "condoned, tolerated, or encouraged" Luca's harassment or made a "decision not to take action to stop [it]." *Hawkins*, 517 F.3d at 347.

No reasonable juror could conclude that Beaumont's response to Garcia's report of "retaliation" was "so inadequate[] that the response manifests

indifference or unreasonableness under the circumstances." *Laster*, 746 F.3d at

732.  Beaumont took reasonably prompt efforts to investigate Garcia's complaint

given that Garcia was on vacation and then FMLA leave for several weeks after

she brought the matter to her supervisors' attention.  Garcia reported Luca's

retaliatory conduct to Carroll on August 27.  On August 27, 28, 30, and 31,

Beaumont attempted to contact Luca to interview her about Garcia's complaint.

On the date Luca returned to work, September 7, Beaumont interviewed her.

When Garcia inquired about the status of her complaint three days later,

Brancaleone immediately responded asking to meet with her but Garcia was

unavailable until October 3 and then refused to meet without her attorney.  By

October 9, Beaumont concluded that Luca had violated Carroll's directive not to

discuss the July 29 incident and drafted discipline for her.  The disciplinary action

was conveyed to Luca on October 18, the next date she worked.  Garcia reported

no further complaints about Luca.

For these reasons, the Court concludes that Beaumont also is entitled to

summary judgment on Garcia's retaliation claims (Counts VII and V).

### D.    Hostile Work Environment

To prevail on her ELCRA hostile work environment claim against

Beaumont, Garcia must show:

> (1) [s]he belonged to a protected group; (2) [s]he was
> subjected to communication or conduct on the basis of sex;

28

(3) [s]he was subjected to unwelcome sexual conduct or
communication; (4) the unwelcome sexual conduct or
communication was intended to or in fact did substantially
interfere with [her] employment or created an intimidating,
hostile, or offensive work environment; and (5) respondeat
superior.

*Kalich v. AT&T Mobility, LLC*, 679 F.3d 464, 470 (6th Cir. 2012) (citing *Haynie v.*

*State*, 664 N.W.2d 129, 133 (Mich. 2003)).  The last element requires proof that

Beaumont "had either actual or constructive notice of the hostile work environment

and failed to take prompt and remedial action."  *Id*. at 474 (citing *Betts v. Costco*

*Wholesale Corp.*, 558 F.3d 461, 470-71 (6th Cir. 2009)) (additional citations

omitted).  Actual notice is established by showing that the harassment was reported

to "higher management"—meaning "someone in the employer's chain of

command who possesses the ability to exercise significant influence in the

decision-making process of hiring, firing, and disciplining the offensive

employee."  *Id*. (quoting *Sheridan v. Forest Hills Pub. Schs.*, 637 N.W.2d 536,

542-43 (Mich. Ct. App. 2001)).  Constructive notice can be shown where "the

harassment was so pervasive as to warrant an inference that the employer had

actual knowledge or to charge the employer with constructive knowledge."  *Id*.

(citing *Sheridan*, 637 N.W.2d at 542).

The Court pauses to address certain "evidence" Garcia puts forth to

demonstrate Beaumont's liability.  First, Garcia points to several statements by

Carroll:

> "[A]dmit[ting] that she had previously investigated Ms.
> Luca many times after employees complained about her
> being 'too personal' and talking about 'all her personal
> affairs.'" (Resp. Br. at 7, ECF No. 73 at Pg ID 1279 (citing
> Carroll Dep. at 24, ECF No. 72-5 at Pg ID 1149).)

> "[A]dmit[ing] that [Beaumont] had prior issues with Ms.
> Luca and that she had been 'talked to about a number of
> things.' but in the past Ms. Luca had done things and gotten
> away with them." (*Id.*at 13-14, Pg ID 1285-86 (citing
> Garcia Aff. ¶¶ 1b, c, 2b, ECF No. 73-1 at Pg ID 1300-01).)

There is no evidence, however, suggesting that Carroll was aware of Luca's

alleged sexual misconduct—or "sexual 'horseplay'" as Garcia describes (Pl. Resp.

Br. at 18, ECF No. 73 at Pg ID 1290—prior to Garcia reporting the July 29

incident.  Nor is there evidence that the "number of things" Carroll previously

addressed with Luca involved sexual misconduct.  In fact, Carroll testified during

her deposition that previous complaints about Luca involved her talking too much

about personal matters.  (Carroll Dep. at 23-33, ECF No. 72-5 at Pg ID 1149-51.)

Garcia also offers an affidavit in support of her opposition to Beaumont's

motion in which she describes other "sexually inappropriate conduct" by Luca and

claims that this conduct "was well known to supervisors, including Antoinette

Carroll."  (*See* Garcia Aff., ECF No. 73-1 at Pg ID 1304-06.)  Beaumont argues

that this affidavit should be stricken.  However, Beaumont does not claim that

Garcia's averments in the affidavit contradict her previous testimony.  *See Penny v.*

*United Parcel Service*, 128 F.3d 408, 415 (6th Cir. 1997) ("[A] party cannot create

a genuine issue of material fact by filing an affidavit, after a motion for summary

judgment has been made, that essentially contradicts his earlier deposition

testimony."); *see also Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir.

1986) (establishing this general principle).  As such, the Court does not understand

Beaumont's basis for asking the Court to strike or disregard the affidavit

completely.  Nonetheless, Garcia has proffered no evidence, aside from her own

unsupported conclusions in her affidavit, to show that Beaumont was aware of the

conduct Garcia ascribes to Luca therein.

> Rule 56 of the Federal Rules of Civil Procedure provides:

>> An affidavit or declaration used to support or oppose a
>> motion must be made on personal knowledge, set out facts
>> that would be admissible in evidence, and show that the
>> affiant or declarant is competent to testify on the matters
>> stated.

Fed. R. Civ. P. 56(c)(4); *see also Ondo v. City of Cleveland*, 795 F.3d 597, 605

(6th Cir. 2015) (stating that as part of the duty to show the existence of a genuine

issue of material fact, Rule 56(c)(4) restricts matters in affidavits to facts "alleged

on personal knowledge" and, therefore, "statements made on belief or 'on

information and belief,' cannot be utilized on a summary-judgment motion")

(quoting 10B Wright, Miller & Kane, Federal Practice and Procedure § 2738, at

345 (3d ed. 1998)).  Therefore, "[a]ffidavits based on mere 'information and

belief,' as opposed to facts the affiant *knows* to be true, are not proper."  *Giles v.*

*Univ. of Toledo*, 241 F.R.D. 466, 469 (N.D. Ohio 2007) (emphasis in original) (quoting *Auto. Radio Mfg. Co. v. Hazeltine Research, Inc.*, 339 U.S. 827, 831 (1950), *overruled on other grounds by Lear, Inc. v. Adkins*, 395 U.S. 653 (1969))).

"In order for inferences, thoughts, and opinions to be properly included in a Rule 56 affidavit, they must be premised on firsthand observations or personal experience and established by specific fact." (*Id.*) (citing *Buchanan v. City of Bolivar*, 99 F.3d 1352, 1355 n.2 (6th Cir. 1996); *Harrah's Entm't, Inc. v. Ace Am. Ins. Co.*, 100 F. App'x 387, 394 (6th Cir. 2004); *Drake v. Minn. Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998)). Similarly, speculation is insufficient to create a genuine issue of material fact at the summary judgment stage. *Hartsel v. Keys*, 87 F.3d 795, 801, 803 (6th Cir. 1996) (conclusory statements, subjective beliefs, or intuition not sufficient to support discrimination claim); *Betkerur v. Aultman Hosp. Ass'n*, 78 F.3d 1079, 1096 (6th Cir. 1996) ("rumors, conclusory allegations and subjective beliefs are wholly insufficient evidence to establish a claim of discrimination as a matter of law"). "[C]onclusory allegations, speculation, and unsubstantiated assertions are not evidence, and are not sufficient to defeat a well-supported motion for summary judgment." *Jones v. City of Franklin*, 677 F. App'x 279, 282 (6th Cir. 2017) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)). "[I]n order to defeat summary judgment, the party opposing the motion must present affirmative evidence to support its

position; a mere 'scintilla of evidence' is insufficient." *Id.* (quoting *Bell v. Ohio State Univ.*, 351 F.3d 240, 247 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 252).

Garcia's affidavit fails to show that she is competent to testify as to what Beaumont knew regarding Luca's described conduct. She states no facts to substantiate this assertion. Her belief or speculation as to what supervisors knew is not admissible to create a genuine issue of material fact. It therefore remains undisputed that, prior to Garcia's complaints regarding the July 29 alleged assault, neither her supervisors nor other members of Beaumont's upper management were aware of sexually inappropriate comments or conduct by Luca. (Dixon Decl. ¶ 9, ECF No. 72-4 at Pg ID 1096; Carroll Decl. ¶ 7, ECF No. 72-3 at Pg ID 1088.)

Turning back to Garcia's sexual harassment claim and Beaumont's motion, Beaumont argues that the claim fails because it took prompt and remedial action after Luca's conduct was reported. According to the Sixth Circuit, an employer "may be held liable for a coworker's harassment if its 'response manifests indifference or unreasonableness in light of the facts the employer knew or should have known.'" *Mullins v. Goodyear Tire & Rubber Co.*, 291 F. App'x 744, 748 (6th Cir. 2008) (quoting *Blankenship v. Parke Care Ctrs., Inc.*, 123 F.3d 868, 873 (6th Cir. 1997), *modified on other grounds in Faragher*, 524 U.S. at 780, 807 and *Ellerth*, 524 U.S. at 758-59); *see also Hawkins*, 517 F.3d at 339. The Sixth Circuit

is unwilling to find an employer's response indifferent or unreasonable absent evidence of continued harassment. *Mullins*, 291 F. App'x. at 749; *Hawkins*, 517 F.3d at 340 (quoting *Jackson v. Quanex Corp.*, 191 F.3d 647, 633-34 (6th Cir. 1999) ("A response is generally adequate . . . if it is 'reasonably calculated to end the harassment.'")).

Beaumont immediately investigated Garcia's complaint by interviewing the individuals who were present when the alleged assault occurred and counseled and warned Luca even though Beaumont concluded that Garcia's allegations were unsubstantiated.[10]  As Garcia requested, Beaumont never paired her and Luca together in a unit after the incident.  While Garcia was scheduled as charge therapist twice during Luca's shifts, Garcia was able to switch one of those shifts and she had no interaction with Luca during the other. *See Mullins*, 291 F. App'x at 750 (concluding that the employer's response to coworker's sexual harassment was adequate even though the coworker intentionally entered the area where the

---

[10] Garcia asserts that Beaumont's response to her complaints about Luca telling co-workers that Garcia was lying about the July 29 incident was neither prompt nor remedial as no discipline was administered until mid-October. (Pl. Resp. at 19, ECF No. 73 at Pg ID 1291.)  Beaumont demonstrates, however, that the delay was not due to its inaction but rather Garcia's planned vacation and then absence under the FMLA.  Further, any delay in responding to Luca's purported "retaliation" is not relevant to Garcia's hostile work environment claim because the "retaliation" did not constitute sexual harassment.  In other words, Beaumont's response to Garcia's complaints about this conduct cannot demonstrate a failure to take prompt and remedial action to address *sexual harassment*.

plaintiff worked "as there was no evidence that [the coworker] did so because of [the] plaintiff's sex . . . If [the coworker] entered the . . . area to annoy [the plaintiff], such action might have been rude and inappropriate, but it does not give rise to a Title VII claim unless [the coworker] did so because of [the] plaintiff's gender.")  Garcia does not allege any sexual harassment by Luca after Beaumont took these steps.[11]  Under these circumstances, Garcia cannot establish respondeat superior liability.  *See, e.g., Mullins*, 291 F. App'x at 749 (finding prompt and remedial action where the employer "reacted immediately, launched a two-week investigation, interviewed the parties involved, and instructed [the alleged harasser] not to bother [the plaintiff] and to avoid [the plaintiff's work area]" and the response was "effective in ending the sexual harassment"); *Doe v. City of Detroit*, 3 F.4th 294, 301-02 (6th Cir. 2021) (finding that the city took reasonable steps by initiating investigation and, while the identity of the perpetrator was not discovered, the city held a meeting and informed employees that it had a zero-tolerance harassment policy); *Bellamy v. Fritz*, 129 F. App'x 245, 248-49 (6th Cir. 2005) (finding that the defendant took prompt and remedial action upon learning of

---

[11] Garcia argues in her response brief that "[Beaumont]'s action did not stop Ms. Luca's harassment . . . and thus, its response to [Garcia]'s complaint of sexual harassment was neither prompt nor appropriate."  (Pl. Resp. at 19, ECF No. 73 at Pg ID 1291.)  However, Garcia does not identify any further instances of sexual harassment after the July 29 incident and, again, she testified that she and Luca had no interaction after that date.

the alleged harassment by immediately setting up a meeting with the alleged harasser, counseling him, sending him to sexual harassment training, and instructing him to have no non-business related contacts with the plaintiff and the alleged harasser complied); *Knabe v. Boury Corp.*, 114 F.3d 407, 412-13 (3d Cir. 1997) (concluding that "[e]ven if a company's investigation into complaints of sexual harassment is lacking, the employer cannot be liable for the hostile work environment created by an employee . . . unless the remedial action taken subsequent to the investigation is also lacking . . . whether the action was reasonably calculated to prevent further harassment").

Garcia may believe that the only appropriate remedial action was to suspend or terminate Luca.  However, "[t]he issue is not whether [the] plaintiff finds the response by [the] defendant satisfactory but whether [the] defendant's response was appropriate." *Mullins*, 291 F. App'x at 749 (quotation marks and citation omitted).  "[A] harassment victim may not dictate an employer's action against a co-worker." *Id*. (quoting *Blankenship v. Parke Care Ctrs.*, 123 F.3d 868, 874 (6th Cir. 1997)).

The cases Garcia cites in response are distinguishable.  *Hawkins* involved a "serial harasser" who had engaged in "threatening behavior" and management responded to complaints by "repeatedly removing *the victims* of harassment from [the work area] while failing to undertake more fundamental action, such as

36

training, warning, or monitoring [the harasser]."  517 F.3d at 342 (emphasis

added).  For the reasons discussed earlier, there is no evidence that Beaumont

knew Luca was a "serial harasser"—if she in fact was.  As the Sixth Circuit

acknowledged, courts have found the removal of a first-time harasser from the

victim's work environment sufficient to preclude liability.  *Id*. at 342 (citing cases).

*Smith v. Rock-Tenn Services, Inc.*, 813 F.3d 298 (6th Cir. 2016), also involved a

harasser who had engaged in misconduct before.  *Id*. at 304-05.  When the plaintiff

complained about the harasser's behavior, a supervisor who had given the harasser

a disciplinary warning approximately two and a half months earlier told the

plaintiff that nothing could be done for almost two weeks, sent the plaintiff back to

work in the same area about 10 to 15 yards from the harasser in the meantime, and

at one point sent the two employees to get a hearing test together.  *Id*.  The

defendant only initiated an investigation after the plaintiff wrote management and

requested leave due to the stress of working near the harasser.  *Id*. at 311.  During

the investigation, the defendant accepted the harasser's denial of the allegations,

ignored information about a prior incident where the harasser had been told that

future complaints would result in discharge, and there was no communication with

the person in charge of discipline for the defendant.  *Id*.

       For these reasons, the Court concludes that Beaumont is entitled to summary

judgment on Garcia's hostile work environment claim (Count IV).

**IV.   Conclusions**

In summary, the Court finds no genuine issues of material fact and that Beaumont is entitled to summary judgment as a matter of law with respect to the claims Garcia asserts in her Amended Complaint.

Accordingly,

**IT IS ORDERED** that Defendant Beaumont Health's Motion for Summary Judgment (ECF No. 72) is **GRANTED** and it is terminated as a party to this action.

**IT IS SO ORDERED.**

s/ Linda V. Parker
LINDA V. PARKER
U.S. DISTRICT JUDGE

Dated: October 25, 2021

38